# EXHIBIT B

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF _____

NEEDHAM BANK,

    Plaintiff,

v.

TYCOON HOLDINGS, LLC, CHOICE LABS, LLC, FRANK MANAGEMENSERVICES, LLC, GCC MI ACQUISITIONS, INC, GCC MI HOLDINGS, LLC, TYCOON I OPERATIONS, LLC, TYCOON I RE, LLC, LYRICAL LLC, AND TYCOON I PREMIER DRIVE, LLC, PURE GREEN, LLC, TSC HOLDINGS GROUP, LLC, TSC RE, LLC, 48 INDUSTRIAL, LLC AND TSC OPERATIONS, LLC and PERE, LLC,

    Defendants.

Case No.: 25-0309 CB

Hon.:

Hon. Richard N. LaFlamme
P32641

**TRUE COPY**
OF ORIGINAL ON FILE

FEB 07 2025

JACKSON COUNTY CIRCUIT COURT
CIERRA L. SOWLE, CO. CLERK

---

## CONSENTED-TO[1] ORDER APPOINTING RECEIVER

At a session of said Court, held in the City of Jackson County of Jackson _____, on FEB 07 2025 _____,

PRESENT: HON: Hon. Richard N. LaFlamme
                  P32641
               Circuit Court Judge

THIS MATTER is before the Court on the Consented-To Emergency Motion for Appointment of a Receiver and Injunctive Relief (the "*Petition*").

For those reasons articulated in the Petition and the accompanying Verified Complaint (the "*Complaint*"), which are relied upon in full here, this Court enters the present Order because: (i) pursuant to MCL §544.1017(2), all parties and their undersigned counsel, but for PERE, LLC, stipulate to the appointment of Opus Consulting Partners LLC ("*Opus*") through its agent, Jacques Santucci, as Receiver in this matter in accordance with the terms of this Order; and (ii) as it relates

---

[1] The only party / Borrower / Defendant not consenting to this Order is PERE, LLC.

1

specifically to PERE, LLC, (a) Plaintiff has demonstrated that cause exists to enter an *ex parte* order appointing Opus under MCL 554.1013 (2)(a) and / or, to the extent necessary[2], (b) otherwise satisfied its burden under MCR 3.310(B) and consistent therewith, the Court finds that:

(i)     First, the Bank has a likelihood of success on the merits based on the plain language of the exhibits attached to Bank's Complaint;

(ii)    Second, there is an imminent danger and risk that the Bank will suffer irreparable harm if Borrowers are not protected from the various creditors of and claimants against Guarantor Heller, where the Bank only extended funds on the strength of Heller's material representations and personal guaranty. Also, PERE being left outside of the receivership risks irreparable harm to the Bank and the Defendants other than PERE. PERE's role in the overall business of the MI Borrowers is central: PERE owns the property where the MI Borrowers' product is grown and processed into retail goods. (See Complaint) Thus, a threat to the stability of PERE is a threat to the viability of the entire group of Defendants, which would constitute irreparable harm. *Slis v State*, 332 Mich App 312, 361; 956 NW2d 569 (2020) ("the possibility of going out of business can constitute irreparable harm");

(iii)   Third, the balancing of harms tilts decisively in favor of a receivership. PERE is not harmed by it at all—indeed, the receivership would *protect* PERE from Heller's mismanagement. And PERE cannot, *ipso facto*, be harmed by the Bank exercising a form of relief (receivership) to which PERE *already agreed* in the MI Loan Documents. (See Complaint) Meanwhile, the Bank (and the other Defendants)

---

[2] If MCL 554.1013 has been satisfied, the Court need not reach MCR 3.310(B and the following discussion (i.e., "(i)" – "(iv)") is moot.

would be severely harmed if PERE is excluded because PERE is a key cog in the MI Borrowers' overall business; and

(iv)    Fourth, the public interest is served by a receivership over PERE. Collectively, the MI Borrowers remain a strong and viable business—but they must be managed collectively. Heller's conduct with respect to his other companies, as described in the Verified Complaint and other litigation, shows that he cannot be trusted to run PERE as it should be and instead is likely to manage it in his own personal interest and for his own nefarious ends. Moreover, PERE's agreement to submit to receivership should be enforced, and courts have found "that the public interest lies in preserving the enforceability of contracts." *See Neveux v Webcraft Techs., Inc.*, 921 F Supp 1568, 1573 (ED Mich 1996), and see Section M.

Defendants' business is in jeopardy of waste and further diminution of value absent immediate appointment of a receiver. This Court is otherwise fully informed in the premises. Upon review of the Complaint and Petition and Borrowers[3] having consented, stipulated, and agreed to the entry of the form of this Order as described below, and Plaintiff having otherwise demonstrated entitlement to *ex parte* relief, the Court FINDS as follows:

1.    "*Agency*" shall refer to the Michigan Cannabis Regulatory Agency.

2.    "*Borrowers*" shall collectively refer to the MA Borrowers and the MI Borrowers.

3.    "*Commission*" shall refer to the Massachusetts Cannabis Control Commission.

4.    "*MA Borrowers*" shall refer collectively to (a) TSC Holdings Group, LLC, a Massachusetts limited liability company, (b) TSC RE, LLC, a Massachusetts limited liability

---

[3] Capitalized Terms not otherwise defined shall have the meaning ascribed to them in the Complaint.

company, (c) 48 Industrial, LLC, a Massachusetts limited liability company and (d) TSC

Operations, LLC, a Massachusetts limited liability company.

5.  "*MI Borrowers*" shall refer collectively to (a) Tycoon Holdings, LLC, a Michigan

limited liability company, (b) Choice Labs, LLC, a Michigan limited liability company, (c) Frank

Management Services, LLC, a Michigan limited liability company, (d) GCC MI Acquisitions, Inc.,

a Michigan corporation, (e) GCC MI Holdings, LLC, a Michigan limited liability company, (f)

Tycoon I Operations, LLC, a Michigan limited liability company, (g) Tycoon I RE, LLC, a

Michigan limited liability company, (h) Lyrical LLC, a Michigan limited liability company, (i)

Premier Drive Tycoon I, LLC, a Delaware limited liability company, (j) Pere, LLC (f/k/a 2497 E.

Huron, LLC), a Michigan limited liability company, and (k) Pure Green, LLC, a Michigan limited

liability company.

6.  "*Lender*" shall refer to Needham Bank.

7.  "*MA Regulations*" shall refer to those regulations adopted and promulgated by the

Commission related to adult use of marijuana, as applicable, at 935 CMR 500.00 et. seq.

8.  "*MI Regulations*" shall refer to those regulations adopted and promulgated by the

Agency relating to adult use of marijuana as codified at MCL 333.27951 to 333.27967 and R.

420.1 et seq.

9.  "*Regulators*" shall collectively refer to the Agency and the Commission.

10.  "*Regulations*" shall collectively refer to the MA Regulations and the MI

Regulations.

NOW THEREFORE:

Having considered the pleadings and statements of counsel, if any, and upon agreement of

the parties to the form of this Order, the Court finds that the Plaintiff's Petition to be well taken.

4

Pursuant to MCL 600.2629, MCL 554.1016, MCR 2.622, and the terms and conditions of the Loan Documents between and among the parties herein, the Court finds the appointment of a receiver necessary and appropriate.

IT IS HEREBY ORDERED THAT:

The circumstances of this case require entry of an order without a hearing; and

The Court further finds that the grounds set forth in MCL §554.1016 are satisfied for the appointment of a receiver and there is otherwise good cause to do so.

THE COURT HEREBY FINDS that appointment of a receiver is in the best interests of all parties, and, therefor, grants (with consent of the identified parties and their waiving rights to appeal) the relief requested in Counts I and IV of the Complaint and orders as otherwise stated herein.

IT IS HEREBY ORDERED that, as demonstrated by the Curriculum Vitae attached hereto as Exhibit A, Opus, through its agent Jacques Santucci is deemed to be qualified and have the necessary experience to serve as a receiver pursuant to MCR 2.622(b)(B) (hereinafter, the "*Receiver*") and is entitled to all the protections and privileges afforded such Court appointees by applicable law, and the Receiver is hereby appointed as the receiver of Receivership Property, as defined below, specifically including, but not limited to, the Premises as defined herein, with all of the powers and obligations set forth herein. Receiver's duty to act as receiver is subject to Receiver's written acceptance and approval of the terms hereunder. This Order is effective up on entry (the "*Effective Date*") and all Receiver's duties hereunder shall be consistent with applicable Michigan law, including, but not limited to, the Regulations, MCL 600.554.1011 *et seq.*, and MCR 6.226.

IT IS HEREBY FURTHER ORDERED, as follows:

5

A.    **Receivership Property.**

1.    Effective upon the filing of an acceptance of appointment (the "*Acceptance*"), the Receiver is hereby appointed, with full powers as the Court Appointed Receiver for all of the assets and property, tangible or intangible, real, personal or mixed (including, but not limited to additional monies, funds or sales proceeds that may become subject to Plaintiff's security interest and liens as provided for in the Loan Documents after the entry of this Order pursuant to MCL 554.1020) of Borrowers. The Receiver shall take immediate possession of, hold, secure, take charge of, preserve and protect, to the exclusion of all others, the aforementioned assets and property of Borrowers, as more fully set forth below (collectively the "*Receivership Property*") to the extent necessary to hold, retain, manage, operate, preserve and protect the Receivership Property and to carry out the instructions and terms of this Order. Borrowers shall have neither possession nor control of, nor any right to, the Receivership Property including Income (as defined below) derived from the Receivership Property unless and until the Receivership imposed by this Order is terminated, and Receiver is discharged, with such Receivership Property to include but not be limited to:

(a)    The mortgaged properties pursuant to the MI Mortgages and the MA Mortgages (the "*Mortgages*") and such properties, collectively, the "*Mortgaged Properties*") consisting of certain land and improvements thereon (collectively, the "*Premises*") located at 4493, 4494, 4495, 4497 and 4499 Phelps Drive, Jackson, Michigan, 3331 Page Avenue, Jackson, Michigan, 4202 Ann Arbor Road, Jackson, Michigan, 180 Premier Drive, Orion, Michigan, 2497 E. Huron Road,

6

Au Gres, Michigan, 56 Industrial Drive (a/k/a 56A Industrial Drive), Uxbridge, Massachusetts and 44 Industrial Drive (a/k/a 56B Industrial Drive), Uxbridge, Massachusetts.

(b)    All documents, instruments, agreements, licenses, permits, information and materials (collectively, the *"Project Records"*) relating to the ownership, maintenance, repair, replacement, improvement, management, leasing, insuring, tax appeal (if applicable), marketing, financing, using, operation, preservation and protection of the Premises, including, without limitation, all Project Documents, and all Property (as defined in the Mortgage). The term *"Project Documents"* is defined on **Exhibit B** attached hereto and is incorporated herein by this reference.

(c)    All Collateral;

(d)    The licenses issued by Regulators and used in connection with the Borrowers' business (the *"Licenses"*) as described on **Exhibit C** attached hereto and incorporated by reference;

(e)    All accounts receivables, reimbursements, refunds of any kind including without limitation tax refunds, cash, cash on hand, contents of any safes located at the Premises, checks, cash equivalents, credit card receipts, demand deposit accounts, bank accounts, cash management or other financial accounts (including those from LeafLink Financial), payroll, vendor, petty cash, escrow and security deposit accounts, online or mobile payment applications or systems (such as Venmo, Cash App, PayPal and the like), dedicated ATM or cashless ATM systems, letters of credit, bank or other deposits, and all other cash collateral (all whether now existing or later arising); current and past-due earnings, revenues, issues and profits, accounts, and accounts receivable (all whether unpaid, accrued, due, or to become due) other amounts and consideration now due and unpaid, or hereafter to become fixed or due, from or relating to the Receivership

Property and all proceeds therefrom including, but not limited to proceeds from the sale of the Receivership Property pursuant to this Order (collectively, "*Income*"); and

(f)    All checking, savings, depository, payroll, vendor, petty cash, operating, lock box, credit card merchant, including any points accrued or associated with, or other accounts, or funds relating to the Property (the "*Business Accounts*");

(g)    All security, utility, prepayments and other deposits received by or on behalf of any Borrower, their owners, officers, members, managers, employees, agents and all those in active participation or concert with them, and any deposits made by Borrowers' owners, officers, members, managers, employees, agents and those in active participation or concert with them who receive notice of this Order to an lessor utility provider or other service provider in each case in connection with the ownership, operation, repair or use of the property of the Borrowers ("*Business Deposits*");

(h)    All insurance claims, rights to submit insurance claims, refunds, rebates or any unused premiums;

(i)    All intellectual property including but not limited to, all patents, domain names, industrial design, confidential information, inventions, moral rights, database rights, works of authorship, service marks, logos, trademarks, design rights, business or trade names, commercial assets, computer software ("*Business IP*");

(j)    All current and future licenses, leases or other agreements or arrangements affecting the use or occupancy of all or any portion of any property of Borrowers, except to the extent not permitted by law; and

(k)    All other tangible and intangible property owned by the Borrowers.

2.    The Receiver is an agent of this Court while acting under this Order.

8

3.      Effective upon the Acceptance, the Receiver is authorized and directed to take immediate possession and full control of the Receivership Property, subject to the provisions set forth in this Order.

4.      The Receiver is authorized to take an action the Receiver deems reasonable and appropriate to manage and operate the Receivership Property and, after the occurrence of a termination event (each, a *"Termination Event"*) as provided for in that certain Forbearance To Loan Agreements dated February 6, 2025 by and among the Borrowers and the Lender (the *"Forbearance Agreement"*) if deemed advisable by the Receiver in the exercise of its business judgment, to attempt to market and sell the Receivership Property, and otherwise to exercise the power and authority set forth in this Order. The Receiver shall have access to the Receivership Property at any time and from time to time to carry out its duties under the terms of this Order.

5.      Receiver shall be entitled to take possession of, control, and receive from all depositories, banks, credit unions, brokerages and other financial institutions (collectively, *"Financial Institutions"*) any money on deposit in all such Financial Institutions belonging to Borrowers or arising from the operation of the Receivership Property, whether such funds be in accounts titled in the name of Borrowers or not. Upon demand of Receiver, all Financial Institutions shall deliver such deposits to Receiver together with such records as Receiver may reasonably request with respect to such accounts. Unless required otherwise by Applicable Law, Receiver shall continue to deposit monies and funds collected and received in connection with the Receivership Property in a receivership operating account with the Lender.

6.      Receiver shall prepare and file with the Court and serve on Lender, Borrowers and the Special Notice List (as defined in Section F(6) below), an accounting of all Receivership Property no later than thirty (30) days after the date of entry of the Effective Date. As soon as

9

practical thereafter, Receiver shall prepare and deliver to Lender and Borrowers an accounting of all income and disbursements received or made by Borrowers from the date of the MA Loan Agreement through the Effective Date. Each of Borrowers' directors, officers, managers, accountants and CPAs shall be required to assist Receiver in such accounting to the fullest extent possible, including, but not limited to, turning over to Receiver all financial information in his, her, or its possession.

7.    Receiver is authorized to perform a review and accounting of all of Borrowers' assets, rights, holdings, and interests, and may, but shall not be required to, apply to the Court on a short order of notice with the Special Notice List to amend this Order as necessary to provide Receiver with the authority to act on behalf of the Receivership Property and/or to identify and include any assets, rights, holdings, or interests that should be a part of the Receivership Property. Receiver is empowered to use any and all lawful means to identify and secure the assets, rights, holdings, and interests of the Receivership Property.

8.    Borrowers and/or any of their respective officers, managers, members, directors, agents, representatives, attorneys, accountants, consultants and employees (collectively, the "*Borrower Parties*") are prohibited from removing, transferring, or disposing of any Receivership Property including but not limited to any Collateral and property subject to the liens granted in the Loan Documents, or diverting any Receivership Property, except with express authority from Receiver and are expressly directed to cooperate in the transition of the management of the Receivership Property to the Receiver and to turn over to the Receiver all documents and records pertaining to the Receivership Property as may be reasonably requested.

9.    Receiver may contact any party it reasonably believes to be an account debtor of any Borrower or any other party that Receiver reasonably believes owes money to any Borrower

10

(collectively, "*Account Debtors*") and arrange for direct payment of any obligations due from such Account Debtors to Receiver. Receiver is further empowered to commence a lawsuit against an Account Debtor or defend any lawsuit brought by an Account Debtor.

10.    Borrowers and their directors and officers shall fully cooperate with Receiver in adding Receiver as additional insureds and loss payees on all insurance policies relating to the operation and management of the Receivership Property, including, but not limited to, fire, extended coverage, automobile and van coverage, property damage, liability, fidelity, employment practices, directors and officers, and workers' compensation, and modifying the policies, if deemed appropriate, by Receiver, but subject to approval by Lender and Borrowers for any modifications to insurance.

11.    In accordance with MCL554.1018(2), Receiver, in lieu of posting a bond, shall provide alternative security by carrying fidelity insurance in an amount not less than Five Hundred Thousand Dollars ($500,000)in the aggregate and commercial general liability insurance in an amount not less than Two Million Dollars ($2,000,000) in the aggregate; Receiver is authorized to act before providing such insurance in lieu of a bond.

12.    With the exception of the instant case, Receiver is the holder of all privileges held by Borrowers that are recognized by the Massachusetts or Michigan Rules of Civil Procedure, Massachusetts or Michigan Rules of Evidence, and any and all rules of court and case law thereunder, including, without limitation, the attorney-client privilege and attorney work product protection.

13.    Immediately upon the entry of this Order, the Borrower Parties shall:

11

a)      Turn over and surrender to Receiver all Collateral and assets of and income from the Receivership Property currently held by any of the Borrower Parties, including surrender of possession and control of the Premises;

b)      Turn over and surrender to Receiver all Receivership Property, including, without limitation: (i) all monies accountable to the proceeds, revenues, issues, and profits of the Receivership Property, now in the possession, custody or control of any of the Borrower Parties including all bank accounts; (ii) all records, statements, copies of checks, bills, invoices, and other data from all bank accounts maintained by Borrower in connection with the Receivership Property, and all other records, books of account, ledgers, business records, expense accounts, and all documents and records (including records maintained in electronic form) pertaining to the operation, maintenance and control of the Receivership Property (collectively, the "*Books and Records*") and Project Documents whether in possession of any of the Borrower Parties or any third party professionals retained by any of the Borrower Parties, including, but not limited to, all accountants; (iii) all keys relating to the Receivership Property; (iv) all computer systems, servers, and/or software, including any cloud storage or cloud/remote based programs, intellectual property rights, and websites (with all associated system access information, passwords, alarm codes, keycards, software or similar items), accounts, passwords, and related software for any and all online or mobile payment applications or systems (such as Venmo, Cash App, PayPal and the like), all METRC-compatible seed to sale tracking software, all point of sale software, dedicated ATM or cashless ATM systems that may be used in connection with the Receivership Property, irrespective of who owns or controls the same and wherever located or in whatever mode maintained; (v) all documents and rights that constitute or pertain to

12

insurance policies, whether currently in effect or lapsed that relate to the Receivership Property; (vi) all contracts, leases and subleases, royalty agreements, licenses, assignments, or other agreements of any kind whatsoever, whether currently in effect or lapsed, which relate to any interest in the Premises and/or the Receivership Property; (vii) all income and monies derived from the Receivership Property wherever, whenever, and however deposited, stored, secured, and/or maintained; (viii) all mail relating to the Receivership Property; (ix) all keys, passwords, and combinations for all safes, lock boxes, and locks related to or located on any property or premises associated with or under the control of the Receivership Property; (x) all credit card terminals and merchant accounts, and (xi) all Mortgaged Property; and

      c)     Provide access and control to Receiver to all real property, personal property, intangible property, and any other physical facilities relating to the Receivership Property.

**B.**    **Receiver's Duties and Authorities**

    1.    Receiver shall be vested with, and shall be authorized to implement, the following authority, powers, and duties, all in accordance with the MI Regulations, MCL 554.1022, MCR 6.226 and all other laws, statutes, regulations and rules applicable to the Borrowers and their business activities and operations (the "*Applicable Law*"):

      a)     To collect and open all mail and other deliveries received at Borrowers' current mailing address(es), or at such address that Receiver directs in writing, and to receive and review all communications, including fax or electronic communications (emails) directed or addressed to Borrowers and its officers and directors and to redirect Borrowers' mail to Receiver;

b)    To take possession of, maintain, secure, manage, operate, repair; and preserve the Receivership Property including, but not limited to, excluding any of the Borrower Parties, or anyone claiming under any of them, from operating or managing the Receivership Property, or being present at any location within the Receivership Property without the express permission of Receiver;

c)    To assume control over the Receivership Property and to collect, receive and allocate all Income and to continue to operate the business of Borrowers in the ordinary course of business or as provided herein including, but not limited to the sale of cannabis and cannabis products in accordance with the Regulations;

d)    To prepare and maintain complete books, records, and financial reports of the Receivership Property, including, but not limited to, operating statements, income statements, balance statements, and all other statements prepared for the Receivership Property;

e)    To provide Lender and Borrowers, and their respective counsel and appraisers and other independent third party consultants engaged by them, at all reasonable times and in accordance with the Regulations, to inspect the Receivership Property and all books and records, and to cooperate with Lender, its counsel, appraisers, and other independent third- party consultants to evaluate the Receivership Property, subject to applicable state and federal law regarding the privacy and security of customer information, as well as any requirements imposed by the Regulators and the Regulations;

f)    In the exercising of its reasonable business judgment to negotiate agreements for the use, sale, or liquidation of Borrowers' assets, subject to the other provisions of this Order and the Regulations;

14

g)      To retain legal counsel to represent Receiver and the Receivership Property as Receiver determines. In connection herewith, in the exercise of its reasonable business judgment, Receiver is authorized to: (i) institute and prosecute in Borrowers' name litigation to recover property of, or amounts due to or claims of Borrowers including but not limited to any claims any Borrower may have against the Guarantor; (ii) institute and prosecute in Receiver's name litigation to recover fraudulent transfers of Borrowers, which claims shall be deemed assigned to Receiver by each creditor that files or is deemed to have filed a proof of claim with Receiver; (iii) continue to maintain any litigation to which Borrowers is a party, including any action in which Borrowers' rights are being asserted derivatively, but excluding the above-captioned action, which may be continued by Lender and Borrowers subject to the other provisions of this Order; (iv) intervene or join any action between any party and Borrowers to ensure preservation of the Receivership Property, including Income; (v) defend all suits or legal proceedings that may affect the Receivership Property or otherwise affect Receiver's possession, control and disposition of the Receivership Property; and (vi) conduct every aspect of litigation provided for under the applicable court rules, including discovery and issuing subpoenas. Except with respect to any legal, equitable, administrative proceeding or litigation involving a local, state or federal taxing authority ("*Tax Litigation*") and the above-captioned action, Receiver may settle any litigation to which Receiver or Borrowers are a party; provided, however, that Receiver shall obtain this Court's approval for any settlement of litigation in which there is asserted by or against Borrowers or Receiver claims in a total amount exceeding $100,000. Even to the extent that this Court's approval is not required, Receiver may in its discretion seek this Court's approval to pursue, dismiss, or compromise any legal action

15

other than Tax Litigation, upon notice to the Special Notice List or upon such broader notice as Receiver determines;

h)      To review Borrowers' existing insurance policies, including but not limited to worker's compensation, disability, general liability, and property insurance and to retain, modify, or purchase such insurance, and name Lender, with respect to its Collateral, and/or Receiver as named and/or additional insureds and/or loss payees, as Receiver deems appropriate for the Receivership Property's preservation and protection. To the extent consistent with Applicable Law, Receiver shall not be responsible for claims arising from the lack of procurement or inability to obtain insurance;

i)      To receive and endorse checks pertaining to the Receivership Property either in Receiver's name or in Borrowers' name; and

j)      Remove any current authorized signor(s) for any and all bank accounts relating to the estate created pursuant to this Order (the "*Receivership Estate*") and substitute the Receiver or a designee as an authorized signor for all open and future bank accounts relating to the Receivership Estate, including without limitation bank accounts in the name of any Borrower.

k)      Purchase materials, supplies and services and to pay therefor at ordinary and usual rates and prices out of funds that shall come into the Receivership Estate, and to compromise debts of the Receivership Estate, and as Receiver to do all things and to incur the risks and obligations ordinarily incurred by owners, managers and operators of similar businesses and that no such risk or obligation so incurred shall be the personal risk or obligation of the Receiver but shall be a risk or obligation of the Borrowers. No funds of the Receivership Estate may be expended without the authorization of the Receiver and the

Receiver may impose whatever safeguards it deems necessary to ensure every expenditure is properly authorized. The Receiver, in accordance with this Order shall have the authority to use funds of the Receivership Estate for the purposes of making payments required or permitted to be made hereunder, including, without limitation, expenses on account of bank service changes, commissions, marketing and sale costs, dues and publications, insurance, maintenance, accounting and other profession services, postage and delivery costs, interest, inventory, office expenses, rent or other payments under a lease, repairs and maintenance, supplies, taxes utilities, wages and premiums.

l)      To determine the valuation of, contest the amounts of, and pay all, personal property taxes, and any other taxes or assessments against the Receivership Property, if any.

m)      Negotiate, execute, perform, extend, re-negotiate, amend, or modify any contracts or obligations, to the extent any such contract or agreement is necessary for the Defendants to maintain the status and resources required of them under Massachusetts or Michigan law to remain eligible for the Licenses in accordance with Applicable Law.

n)      Hire, manage and terminate the employment of any employee, contractor, professional, or agent to the extent such action is necessary for any of the Defendants to maintain their respective Licenses.

o)      Interact for Borrowers with any governmental entity, agency department, Regulator, employee, agent or inspector in connection with obtaining any approvals, Licenses certificates, licenses, rights of occupancy or use, zoning approvals, variances, special use permits, permits or rights of approvals required by Massachusetts or Michigan

law for the Borrowers to remain eligible for their respective Licenses and any approvals to operate such establishments.

p)      Obtain and be authorized to obtain all required agent cards for all necessary employees or agents of any of the Borrowers and, to the extent required by Applicable Law, for the Receiver and its personnel.

q)      Interface with the Regulators, Department of Taxation, and any other relevant State and local governmental agencies or bodies on behalf of the Borrowers.

r)      On an ongoing basis when due, the Receiver shall pay civil penalties (if any) assessed against the Licenses by the Regulators, required renewal fees for the Licenses, and any taxes or fines assessed by either the State of Michigan or Commonwealth of Massachusetts with respect to the preservation of the Licenses (the foregoing expenses shall be collectively referenced herein as *"Cannabis Administrative Fees"*), incurred during the Receiver's appointment, which payments to any Regulator, Michigan and/or Massachusetts governmental authority shall be made timely and from any available funds of the Receivership Estate. The Cannabis Administrative Fees shall be deemed administrative expenses with payment priority over any other creditor. The Receiver shall also timely submit renewal applications for the Cannabis Licenses to the Regulators and pay any renewal fees.

s)      (i) Sell or otherwise dispose of any portion of the Receivership Estate in the normal course of business; (ii) collection of accounts receivable and other amounts owed in respect of the Receivership Estate; (iii) securing and protection of the Receivership Estate; (iv) damage caused to the Receivership Estate (v) recovery of possession for the Receivership Estate; and, (vi) initiation or prosecution of any claims or litigation for the benefit of the Receivership Estate.

t)    To fulfill or take any other action permitted pursuant to MCL 554.1022 that are not expressly included above.

2.    Receiver shall take such actions as it determines in its reasonable business judgment to cause to be preserved all Receivership Property of significant use or value or with respect to which preservation is required pursuant to Applicable Law. The authority granted to Receiver by this Order is self-executing, unless the action requires Approval pursuant to this Order. Receiver is authorized to act on behalf of Borrowers (or Receiver) in Receiver's business judgment as Receiver deems appropriate to the extent not inconsistent with this Order without further order of this Court. In connection therewith, Receiver, in its reasonable business judgment may incur, and may pay from Receivership Property, sums to protect, preserve and administer the Receivership Property, including payment for rent, utilities, repairs, insurance, wages, licensing fees, independent contractors, storage charges, materials, supplies and services and any other expenses of the Receiver that, in the exercise of its reasonable business judgment, may deem to be beneficial to the preservation of the Receivership Property or reasonably necessary or desirable by Receiver to permit Receiver to fulfill its obligations including but not limited to preparing and filing of all required state and federal tax returns and forms (collectively, *"Preservation Payments"*). Receiver also may use Lender's Collateral including but not limited to cash collateral (with Lender's assent, which Lender has given subject to the conditions contained herein) to operate Borrowers' business pursuant to an Approved Budget (as defined below), make Preservation Payments, make payments of all amounts due and owing to the Lender under the Loans and as required by the Loan Documents and the Forbearance Agreement (collectively, the *"Lender Obligations"*) and fulfill its duties and obligations under this Order, subject to the following procedures:

19

a)      Receiver is authorized to make Preservation Payments, without this Court's approval and without Lender's consent: (i) on an emergency basis as determined by Receiver in its business judgment; (ii) to address life-threatening or other health or safety issues that for any reason are not deemed to be Preservation Payments and (iii) to fulfill its obligations under Applicable Law and this Order as Receiver; *provided, however,* if the Receiver believes that there will be a shortfall under the Approved Budget to meet all Receivership Expenses as and when the same become due and payable, including making timely payments of the Lender Obligations and required Preservation Payments in addition to other items provided for in the Approved Budget, Receiver shall meet and confer with the Lender to attempt to reach an agreement between Lender and Receiver to amend the Approved Budget to defer so much of the Lender Obligations as is necessary to eliminate such projected shortfall and, if no such agreement can be reached within one (1) business day of such meeting, Receiver may make such Preservation Payments subject to the right of the Lender to declare a Termination Event under the Forbearance Agreement;

b)      For a period of thirty (30) days from the Effective Date, Receiver is authorized to spend Income in the ordinary course operation of the Receivership Property;

c)      On or before thirty days (30) days after the Effective Date, Receiver shall submit to Lender a proposed 13-week cash flow budget, for the period starting thirty-one (31) days following the Effective Date. Thereafter, Receiver shall submit to Lender a rolling 13-week cash flow budget (with trailing budget to actual reconciliation) every two (2) weeks or such longer period not to exceed thirty (30) days agreed to by the Receiver and the Lender. Lender may object to each proposed budget no later than fourteen (14) days after delivery, in writing served on Receiver and its counsel, specifying particular

budget line items which are objectionable. If Lender fails to object to any proposed budget, or approves such budget, such budget shall be deemed to be an *"Approved Budget"*, and Receiver may pay all such expenses included on the Approved Budget. To the extent Lender objects to any proposed budget, the Lender or the Receiver may submit any unresolved objection to the Court for determination on a motion filed in accordance with Michigan Court Rules and served on Lender, Borrowers, and Receiver, and any party on the Special Notice List; *provided, however*, that Receiver may operate Borrowers' business in accordance with the proposed Approved Budget unless and until the Court rules otherwise on such objection;

d)    Receiver may expend sums in excess of any individual Approved Budget line-item(s) so long as expenses in the aggregate are within 10% of the Approved Budget on a cumulative aggregate basis and not otherwise objected to by the Lender as provided for herein;

e)    Receiver shall ensure that any Approved Budget shall have a line item for the monthly payment of such Lender Obligations; and

f)    No funds of the Receivership Property may be expended without the authorization of Receiver and Receiver may impose whatever safeguards it deems necessary to ensure every expenditure is properly authorized.

3.    Receiver shall submit the Receiver's Reports (as defined below) to the Court for *in camera* inspection, and shall, within ten (10) days thereafter, submit a true copy thereof to counsel for Plaintiff and Defendant. Such reports **are not** to be filed with the Clerk of the Court and **shall not** be available for public inspection without a specific order of the Court.

4.    Receiver shall keep adequate records of obligations incurred and paid, cash receipts and disbursements, and disposition of Receivership Property.

5.    Receiver is authorized to use all tax identification numbers of Borrowers. Receiver shall cause to be filed all federal, state and local income tax returns of Borrowers for the period through termination of this receivership, including. Receiver is authorized to communicate with, negotiate with and serve as nonexclusive representative of Borrowers to all taxing authorities. Receiver shall use its best efforts to issue all tax related forms on behalf of Borrowers, including, without limitation, Internal Revenue Service Forms W-2 and 1099. All costs and expenses incurred by Receiver to fulfill its obligations under this paragraph shall be paid as Preservation Payments.

6.    Receiver is authorized: (a) to employ or terminate such attorneys consultants, officers, employees, independent contractors, accountants, brokers, auctioneers and other professionals, including persons or entities who formerly rendered services to Borrowers, as Receiver in its sole discretion determines to be necessary or appropriate to the performance of its duties without seeking court approval so long as the Receiver files and serves written notice to the Court and all parties to this action of each such retention (the "*Professionals Notice*") and no objection is received within fourteen (14) business days of the Receiver filing and serving the Professionals Notice; and (b) if authorized pursuant to an Approved Budget, or otherwise directed by the Court, to pay from Receivership' Property reasonable compensation and reimbursement of reasonable expenses to such professionals (including Borrowers' litigation counsel in the instant action) for their services.  Except for the final approval of fees and expenses of the Receiver and counsel for the Receiver paid on an interim basis, the payment of any professional or person as provided herein shall not be subject to Court approval; *provided, however*, Receiver shall include in its Receiver's Reports (as defined below) a schedule of payments contemplated hereunder

22

during each reporting period. Receiver shall select counsel to represent Receiver in general receivership matters, as directed by Receiver in his sole discretion.

7.     Receiver and the Receivership Property shall not be bound by the terms of any agreement, settlement, executory contract, or unexpired lease of Borrowers, unless Receiver shall affirm in writing that Receiver shall be so bound. Notwithstanding any other provision of this Order, upon determining that any asset (including any contract or lease) has no net value or is otherwise burdensome to the Receivership Property, Receiver may seek an order of this Court (a "*Rejection Order*") by motion filed in accordance with Michigan Court Rules, with service on the affected party and the Special Notice List. Notwithstanding the foregoing, the sole remedy of any counter-party to a contract or lease with Borrowers (whether the subject of a Rejection Order or otherwise), or any other party alleging to be adversely affected by a Rejection Order, shall be the right to file a claim with the priority of a general unsecured pre-Receivership claim unless such contract or lease provided for a lien on property of the Borrowers or a lien arose under operation of law, in the manner provided for in this Order, not later than thirty (30) days after the date of such Rejection Order, for any damages arising from or relating to such contract or lease or Rejection Order. Notwithstanding the above, the Receiver is deemed to have affirmed and assumed the Forbearance Agreement.

8.     Receiver may, in its sole and absolute discretion, continue in effect and/or cause the Borrowers to assume any contracts, agreements, leases, letters of credit, contracts and all other instruments presently existing which are not expired or in default relating to Receivership Property.

9.     Receiver may, after expending the necessary funds to operate the business of the Receivership Property and paying all reasonable and necessary costs and expenses associated with

such operation, maintain any remaining funds for distribution to creditors and such other parties or non-parties as may be legally entitled to receive such funds in accordance with Michigan law; and may distribute such funds from time to time upon further order of the Court.

C.    **Sale of the Receivership Property.**

    1.    To the extent the Receiver believes that, in the exercise of its reasonable business judgment, after analyzing all other practical and feasible courses of action, a sale of some or all of the Borrowers' assets are in the best interests of the various parties and constituents, Receiver is authorized to conduct a marketing program to evaluate and explore a sale of all or any portion of the Receivership Property, including a sale of substantially all assets of Borrowers as a going concern, provided, however, Receiver shall seek prior Court approval for any sale or auction sale of Receivership Property, by motion filed in accordance with Michigan Court Rule 2.119, with service on the Special Notice List. In connection with such authority, Receiver may engage its own personnel, and may employ such contractors, subcontractors, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors, or professionals, as Receiver may in its discretion deem appropriate or desirable in furtherance of this authority, and the costs of such persons or entities shall be Receivership Expenses (as defined below).

    2.    To the extent that the Receiver believes it is in the best interests of the Receivership Estate and various parties hereto that, after considering all practical and feasible options, Receiver and/or its designee is authorized, and the Court appoints Receiver and/or its designee as Borrowers' attorney-in-fact to sell all, substantially all or any portion of the Receivership Property on behalf of, and in the name of, Borrower, subject to the following conditions precedent:

        a)    The Receivership Property has not otherwise been sold at a secured party sale or otherwise;

b)        The sale and contracts for sale, shall be subject to submission to the Court pursuant to MCR 2.119 with service upon the Special Notice List for consideration, response, objection, counteroffer, and approval by further Order of the Court;

c)        The sale shall be for a commercially reasonable price as established by a commercially reasonable process. Any sale pursuant to the terms hereof or any Order of the Court shall be deemed to have sold for a commercially reasonable price;

d)        Any such sale involving any of the Licenses, and/or transfer of any ownership interest therein, shall also be approved by the applicable Regulator to the extent required by Applicable Law. No transfers of interest in the Licenses shall be effective without the requisite Regulators' approval.

e)        No sale shall be made to Receiver and/or its designee, or to any person or entity with a beneficial interest in Receiver and/or its designee, or to any person or entity in which Receiver and/or its designee has a beneficial interest;

f)        Receiver may propose other terms and conditions of sale it considers to be appropriate in the reasonable business judgment of Receiver, subject to approval by further Order of the Court;

g)        With respect to any such sales contemplated by this Order, Lender may credit bid any or all of the secured debt owed to it by Borrowers, and the parties hereto stipulate and agree that as of the February 3, 2025, (i) the amount that the MA Borrowers owe pursuant to the MA Loan Documents, which is secured by a valid, first priority lien on the Collateral, is $9,965,430.06, which amount shall continue to incur additional interest, late charges and other reimbursable expenses and fees including but not limited to the Lenders' attorneys' fees all in accordance with the MA Loan Documents and (ii)

25

amount that the MI Borrowers owe pursuant to the MI Loan Documents, which is secured by a valid, first priority lien on the Collateral, is $41,193,496.30, which amount shall continue to incur additional interest, late charges and other reimbursable expenses and fees including but not limited to the Lenders' attorneys' fees all in accordance with the MI Loan Documents; and

h)    Any proposed sale or transfer of the License shall be subject to compliance with the Regulations, including Agency approval of any proposed purchaser prior to the consummation of the transfer of the License, and other applicable Michigan law.

3.    To the extent permissible by law, the sale of Receivership Property shall be free and clear of liens, claims, encumbrances, leasehold interests, pledges, mortgages, security interests, charges, options, and other interests (collectively, "*Liens*"), which Liens, if any, shall transfer, affix and attach to the proceeds of the sale with the same force, validity, priority and effect as they may have at the time of the sale in the same order of priority as applicable to the Receivership Property.

4.    Subject to obtaining requisite approval of the Court and the applicable Regulators, Receiver has the authority to do and perform all and every act desirable, proper or necessary, with respect to the sale of the Receivership Property including, without limitation, the authority to execute and deliver bills of sale, assignments, and all other documents necessary or desirable to transfer the Receivership Property.

5.    Receiver shall petition the Court for approval of any contract for sale of all or a portion of the Receivership Property, by motion duly served on the Special Notice List, and any party opposing such petition for sale shall serve its objection or counteroffer with Receiver pursuant to MCR 2.119. If any objection or counteroffer is received, Receiver may seek further

order of the Court with respect to such objection or counteroffer, which may include scheduling an auction and establishing bidding procedures for the sale of the Receivership Property. Any resulting order of Court Approval of sale shall be a final order unless: (a) a timely motion for rehearing or timely appeal as of right is filed; and (b) the order is stayed within such period upon posting a bond in the amount of the purchase price and/or such other conditions deemed appropriate by the Court.

6.    Any proposed sale or transfer of all or substantially all of the Receivership Property shall be subject to compliance with the Regulations, including approval by the applicable Regulator of any proposed purchaser prior to the consummation of the transfer of the License, and other Applicable Law. Within ten (10) days after closing on the sale of any of the Receivership Property other than in the ordinary course of business, Receiver shall file an affidavit with the Clerk of Court and shall serve same on the Special Notice List stating the following with respect to the property which was sold:

      a)    The description of the property sold;

      b)    The date of sale;

      c)    The identity of the purchaser;

      d)    The sale complied with the conditions of this Order; and

      e)    The sale price.

7.    Receiver may seek an order of the Court to confirm any sale following the procedures, and meeting the conditions, set forth above after considering responses or objections of any party and conducting a hearing thereon, if it deems appropriate.

8.    Notwithstanding anything herein to the contrary, Receiver, other than in the ordinary course of business, is authorized to sell any Receivership Property (not including the

License) for an aggregate consideration of less than $75,000 as a private sale and without obtaining an Order of the Court (each, a *De Minimis Sale*"). This Order shall be considered a grant of authorization for such De Minimis Sale and no further Order of the Court is required. Receiver shall account for each De Minimis Sale, including the nature of the Receivership Property sold, date of sale and sale price, in its periodic reports to the Court as set forth in Section F(9) below. If a proposed buyer or Receiver believes that an Order of this Court is necessary or desirable for a De Minimis Sale, Receiver may seek authorization from the Court to conduct such sale as set forth in Section C(5)-(7) above. Notwithstanding the above and for clarification purposes only, nothing herein shall be construed to prevent Receiver from selling cannabis in the ordinary course of business in accordance with the Regulations.

9.      The *"Net Proceeds of the Sale of the Receivership Property"* shall be the gross sales price of the Receivership Property, less customary closing costs, pro-rations, sales commissions, and other adjustments reasonably approved by Receiver and less Receivership Expenses and/or a reserve for future Receivership Expenses.

10.     The Net Proceeds of the Sale of the Receivership Property shall then be disbursed pursuant to the waterfall set forth in Section E(1) below.

11.     Subject to any restrictions imposed upon Lender in the Forbearance Agreement, by motion filed in accordance with MCR 2.119 and served on the Special Notice List, Lender may seek leave of this Court to pursue its secured party rights and remedies regarding the Receivership Property pursuant to its rights (a) pursuant to and under the MJ Mortgages and the MA Mortgages to commence foreclosure of the real estate and (b) Article 9 of the Uniform Commercial Code, as adopted by the Commonwealth of Massachusetts or State of Michigan, as applicable, and the applicable Loan Documents, and Applicable Law, which rights are specifically reserved to Lender;

*provided, however,* that such exercise of remedies by the Lender shall not leave the Receiver without funds in an amount needed to fully pay all costs and expenses of the Receiver, including Receivership Expenses (as defined herein) incurred or to be incurred in carrying out its obligations under this Order until discharged. Other than as provided herein, the Receiver shall not take any action that impedes or interferes with the potential foreclosure, foreclosure sale or process, or other actions taken by Plaintiff against Defendants should Plaintiff elect to pursue such remedies.

**D.    Extent of Receiver's Authority**

1.    Title to the Receivership Property, including all title right and interest in and to the License shall remain in the name of Borrowers. Receiver is vested with full and exclusive authority to conduct the management of the operational and financial affairs of Borrowers, pursuant to and consistent with this Order and Applicable Law. This grant of authority is not, and shall not be deemed to be, an assignment or transfer of the Receivership Property, nor is it intended to be, and it shall not constitute a "change in control" pursuant to the Regulations. Without limiting the foregoing, and consistent with all other provision of this Order, Receiver is authorized to exercise all powers and authority generally available under applicable, which may be incidental to the powers described in this Order or reasonably necessary to accomplish the purpose of this Receivership. Receiver shall have such additional powers that are provided by law and the Regulations and that the Court may from time to time direct or confer.

2.    Receiver shall, during the pendency of this action, have the right to apply to this Court for further instructions or directions.

3.    With the exception of the instant action, all pending or potential actions and litigation or other adversarial actions brought against Borrowers shall be stayed from the date of entry of this Order, unless the Court, upon a motion brought by Receiver or other interested party

(providing notice and an opportunity for interested parties to be heard) orders the stay lifted, extended, or otherwise modified upon a showing of good cause (the "*Litigation Stay*"). Pursuant to the Litigation Stay:

    a)      no landlord or lessor may terminate any lease or commence or continue any eviction related actions connected with the Receivership Property without prior order of the Court;

    b)      no counterparty to an agreement or contract with Borrowers may terminate such agreement or contract or commence any action related thereto without the prior order of the Court;

    c)      no utility may terminate service to the Receivership Property as a result of non-payment of pre-receivership obligations without prior order of this Court;

    d)      no insurance company may cancel their existing current-paid policy as a result of the appointment of a Receiver without prior approval of the Court;

    e)      no individual or entity may sue Receiver or bring an action with respect to the Receivership Property without first obtaining the permission of this Court;

    f)      all civil proceedings of any nature involving the Receivership Property are stayed unless and until the stay is lifted pursuant to this paragraph;

    g)      no individual or entity may sue Receiver or any portion of the Receivership Property in this Court or any other court without first obtaining the permission of this Court; and

    h)      Neither the Regulators nor and any other state, county, city or other local jurisdiction or other governmental authority may cancel any license, permit, or other

governmental approval previously issued to Borrowers solely as a result of the appointment of Receiver.

4. Receiver is acting solely in its capacity as a court-appointed Receiver and the debts of Receiver are solely the debts of the Receivership Property. In no event shall Receiver or Jacques Santucci or Receiver's personnel have any personal liability or obligation for the proper debts of Receiver and/or the Receivership Property. The liability of Receiver and any person engaged by Receiver hereunder is and shall be limited to the Receivership Property, without personal recourse against Receiver or its personnel, and neither Receiver nor any person or entity engaged by Receiver hereunder shall be personally liable for any actions taken pursuant to this Order or carrying out Receiver's duties, excepting only claims which arise from the willful misconduct of such person as determined by a final order of this or another court of competent jurisdiction. Receiver shall be indemnified and held harmless by and from the Receivership Property, against any loss or liability of any nature whatsoever, and against the expense of defending against same, except as to any act or omission determined by a final, nonappealable Order of this Court to be willful misconduct.

5. Consistent with Section E(1) below, Receiver and the Receivership Property shall not be responsible for paying any expenses of Borrowers, or other payables owed to third parties, which payables were due and owing prior to the appointment of Receiver. However, Receiver may, in its sole discretion, pay costs and expenses incurred prior to Receiver's appointment if Receiver determines in its business judgment that payment of such items is necessary for the preservation, care, and maintenance of the Receivership Property, or otherwise is in the best interests of the Receivership Property.

31

6.      Receiver is authorized to obtain trade credit and other unsecured credit in the name of Borrowers without further order of the Court. Receiver may cause Borrowers to borrow money on a secured basis in the total amounts and upon such terms as may be authorized by the Court pursuant to a motion of Receiver filed pursuant to MCR 2.119 and served on the Special Notice Parties. Notwithstanding the above, prior to seeking any additional source of secured debt other than from Lender, the Receiver shall first make a request upon Lender to make a secured loan to the Receivership Estate and Lender shall have ten (10) business days in which to respond with either a rejection of such request or an acknowledgment of its willingness to extend secured debt to the Receivership Estate; provided, however, Lender has no obligation to provide any further secured debt to the Borrowers or the Receivership Estate. If Lender agrees to provide secured debt to the Receivership Estate on terms and conditions comparable to the Loan Agreements, the Receiver shall not seek any other alternatives but shall close such secured financing with Lender upon obtaining court approval. Nothing herein shall be construed to prevent or obligate Lender to make a protective advance pursuant to the Loan Documents

E.    **Distribution of Net Proceeds of the Sale of the Receivership Property and Income**

1.      Net Proceeds of the Sale of the Receivership Property and Income shall be applied and distributed as follows with interim distributions to occur as determined by Receiver:

a)      First, to Receiver's fees and expenses and/or any party retained by Receiver to carry out Receiver's duties and obligations hereunder including but not limited to any counsel, accountants or other professionals (*"Receivership Expenses"*);

b)      Next, to the operating expenses of the Receivership Property and/or any operating expenses incurred by any party retained by Receiver to carry out Receiver's duties and obligations hereunder, including but not limited to payment of the Lender

32

Obligations as well as federal trust fund payments owed by the Borrowers to the Internal Revenue Service and Preservation Payments in accordance with the terms of this Order. Receiver shall not make disbursements that are inconsistent with the Approved Budget except for:

      i.    Preservation Payments (including as necessary for Receiver to fulfill its obligations under Section B(2) above);

      ii.    life-threatening or other health or safety issues that for any reason are not deemed to be Preservation Payments; or

      iii.    variations on individual Approved Budget line-item(s) so long as expenses in the aggregate are within 10% of the Approved Budget on a cumulative aggregate basis.

c)    Next, to the repayment of any Court- approved loan or protective advances made by Lender or any other secured lender to Receiver, if any;

d)    Next, to any taxing authorities to the extent of any super-priority tax lien, unless otherwise provided by law;

e)    Next, after payment of monthly Lender Obligations as provided for in E(1)(b) above, to the secured claim of Lender and of any other similarly-situated creditor to the extent and in the same order of priority of its lien, pending proof of legal entitlement and, if disputed by any of Borrowers, Lender, or Receiver, further order of the Court, until paid in full;

f)    Next, to junior secured creditors in the order of priority of their liens pending proof of legal entitlement and, if disputed by any of Borrowers, Lender, Receiver or such creditor, further order of the Court, until paid in full;

33

g)      Next, to be retained by Receiver to be used for a distribution on a *pro rata*
basis to unsecured creditors of Borrowers holding allowed claims incurred or arising prior
to Receiver's appointment; and

h)      Next, to pay, *pro rata,* any other valid claims of the equity holders of the
Borrowers in accordance with the waterfalls established by the Borrowers' corporate
governing documents.

2.      For any distribution pursuant to subsections (a) through (h) of Section E(1) above,
Receiver shall give at least ten (10) business days advance notice to Borrowers and Lender. If any
Borrower or Lender disputes the proposed distribution, they shall serve Receiver, and plaintiff or
defendant with a written notice of the dispute, referencing the particular creditor claims or
distributions disputed, no later than the tenth (10th) business day following Receiver's notice.
Thereafter, Receiver may make the proposed distribution except for the items so disputed in
writing. If Receiver and the objecting party cannot resolve their dispute, Receiver may seek further
order of the Court, filing its motion for authority and the written dispute notice pursuant to MCR
2.119.

F.      **Receiver Compensation, Reports, Notices and Accounting**

1.      Receiver shall be paid compensation for the services of its professionals at their
respective hourly rate for services rendered, plus all necessary and reasonable expenses, with such
compensation payable no less frequently than monthly, from Receivership Property.    The
Receiver's fee schedule is attached hereto as **Exhibit D**.

2.      Receiver's professionals shall be paid compensation for services rendered to
Receiver and/or the Receivership Property pursuant to written engagement or fee agreements
between Receiver and such professionals, with such compensation payable no less frequently than

monthly, form Receivership Property. The Receiver's legal counsel's fee schedule is attached hereto as **Exhibit E**.

3.      The Receivership Expenses with respect to the fees of the Receiver or counsel to the Receiver shall be paid as when due and payable: (a) first from the Income from the Receivership Property, (b) next, by the Net Proceeds of the Sale of the Receivership Property and (c) next, by Lender, but only to the extent that the Income and Net Proceeds of the Sale of the Receivership Property is insufficient to pay Receiver's compensation, with any such payments to Lender to be funded as a protective advance made by Lender.

4.      To be paid Receivership Expenses, the Receiver must prepare a statement of account. This statement of account must be included in the monthly Receiver's Report provided for in Section F(9) below and served on the Lender. Objections to each of the statements of account, if any, must be made within ten (10) days of the date of filing and service of the Receiver's Report containing the statement of account (the "*Objection Period*"). All objections shall be made on a line-item basis with a statement of the reason for such objection. Failure of a party to object within this the Objection Period shall constitute a waiver of that party's objection(s) to the fees for that period. After the Objection Period, the Receiver may pay the statement from funds available to the Borrowers or from the Receivership Estate, except for the items objected to. If any objections are made during the Objection Period, the Receiver shall make a good faith effort to meet and confer with the objecting party to resolve the dispute and then either: (a) file a notice with the Court regarding the agreed resolution of the dispute, or (b) file a motion with the Court for approval and authorization to pay the disputed expense(s).

5.      All pleadings, objections, notices, requests or other communications to Receiver, pursuant to this Order shall be in writing, and shall be sent by Paper Delivery (delivery by hand,

35

by recognized overnight courier service, or by first class mail with postage prepaid, shall constitute

"*Paper Delivery*") and by Electronic Delivery (delivery by email shall constitute "*Electronic*

*Delivery*") as follows:

Receiver:

Opus Consulting Partners, LLC
Attn: Jacques Santucci
770 Congress Street
Portland, Maine 04102
jacques@opuscg.com

With a copy to:

With a copy to

Casner & Edwards, LLP
Attention:  Michael J. Fencer, Esq.
303 Congress Street
Boston, Massachusetts 02210
fencer@casneredwards.com

and

Howard & Howard PLLC
Attention:  Alexander M. Leonowicz, Esq.
450 W. 4th Street
Royal Oak, Michigan 48067
aleonowicz@howardandhoward.com

6.      Receiver, with the cooperation of Borrowers' directors, officers, managers, and

employees as needed and requested by the Receiver, shall assemble and maintain: (a) a notice list

containing names and to the extent provided email or fax addresses of the Lender, Borrowers, the

Regulators, each of the taxing authorities, the host municipality in which the Borrowers are

operating, and each of their counsel, if any, as well as any party requesting notice in this matter

(the "*Special Notice List*"); (b) a notice list containing names and mailing addresses of all known

creditors and constituents of Borrowers, or their representatives (the "*General Notice List*"), and

within twenty-eight (28) days of this Order, serve upon the Special Notice List and General Notice List, a notice of Receiver's appointment together with a copy of this Order; and (c) a notice list containing names, email or fax addresses of creditors and other interested parties who request to receive all reports and notices permitted or required by this Order (the "*Opt-in Notice List*" and collectively with the Special Notice List and the General Notice List, the "*Lists*"). Any creditor of the Borrowers who makes a request to Receiver to be included on the Opt-in Notice List shall be added to such list and shall thereafter receive communications to the Opt-in Notice List by either email or fax (as specified in the request). All reports and notices delivered to the Opt-in Notice List shall also be served upon the Special Notice List. Receiver shall provide notice of Receiver's appointment and a copy of this Order to the Regulators within ten (10) days of this Order or such shorter time period as may be required by Applicable Law.

7.      By motion filed in accordance with MCR 2.119 and served on the Lists, Receiver may seek an order of this Court setting a deadline for claims against Borrowers or the Receivership Property (the "*Bar Date*"), and procedures to resolve such claims. Following the Bar Date, the General Notice List may be modified to include only creditors (and representatives of creditors) that filed or are deemed to have timely filed a proof of claim with Receiver.

8.      Within thirty-five (35) days of the date of this Order, Receiver shall file with this Court and serve on the Special Notice List and the Opt-in Notice List: (a) a detailed inventory of the Receivership Property, including estimated values of such property and any encumbrances thereon; and (b) a list of creditors of Borrowers, so far as known to it.

9.      Within fifteen (15) days after the end of each month, Receiver shall file with this Court and serve on the Special Notice List and the Opt-in Notice List a report summarizing the activities of Receiver during the previous calendar month, including any significant transactions,

and Receiver's cash receipts and disbursements for such month. The reports required hereunder shall satisfy the requirements of MCR 2.622(D) and will include the financial reporting of the immediately preceding month including, an income and expense statement, balance sheet, and cash flow analysis (collectively, "*Receiver's Reports*").

10.    Receiver shall furnish to the parties' counsel any additional information regarding the Receivership Property as required by law and as may be reasonably requested by them, but Receiver is authorized to request instructions from this Court if:

(a)    any party requests information or documents that would be unduly burdensome or expensive to produce; or

(b)    Receiver believes in good faith that a party has requested information to annoy harass, or for any other improper purpose.

11.    In addition to the Court, Receiver shall furnish copies of the Receiver's Reports to the following:

Michelle L. Haughton
Needham Bank
1063 Great Plain Avenue
Needham, Massachusetts 02492

## G.    **Regulatory Requirements**

1.    The agents of the Regulators shall be authorized to enter the premises of Borrowers and the Receivership Property in accordance with, and pursuant to, the Regulations, including, without limitation, to provide on-site services and as may be needed to assist Receiver to operate the business of Borrowers and the Receivership Property.

2.    Receiver shall be authorized to interact with the Regulators on behalf of Borrowers.

3.    Receiver shall comply at all times with the Regulations and all other legal and regulatory requirements applicable to a Borrower which maintains a License, except as otherwise determined pursuant a court order.

4.    Receiver is authorized to do everything in its power to maintain the License and the Collateral, including, but not limited to, applying for renewal and paying any renewals, licensing fees or other fees due to any of the Regulators incurred after the date of this Order.

**H.    Approval**

Whenever this Order uses the term "subject to Approval" or "Approval" for any matter which is not expressly authorized by this Order or for which this Order does not expressly require a party to seek Court approval by motion, Receiver shall provide five (5) business days' notice of the Receiver's planned action or inaction in writing to Lender and Borrowers, and such Approval shall be deemed given upon Lender's written consent either directly by Lender or by its counsel. If Borrowers or Lender objects to the noticed action, it shall notify the Receiver of its objection within five (5) business days, and if not resolved to the satisfaction of Lender, Borrowers, and Receiver, any party may seek an order of this Court by motion filed in accordance with MCR 2.119 and served upon Receiver, Lender, and Borrowers, with such parties' responses due within the time prescribed by Michigan Court Rules. Upon such objection, Receiver shall not take the proposed action until the Court expressly has approved the same. At any time, Receiver also may seek a specific "Order of Approval" from this Court, authorizing the taking or refraining from taking a particular action by motion filed in accordance with MCR 2.119 and served on Lender and Borrowers.

I.    **Term and Final Accounting**

1.    This Receivership shall terminate upon the distribution of all Receivership Property and upon the distribution of all Income (as set forth in Paragraph E(1) above); provided, however, that if, after paying all necessary costs and expenses of the Receivership (including, without limitation, all Preservation Payments) and making distributions in full to Lender and other secured creditors pursuant to the waterfall provided herein, and where all general unsecured claims have not been paid in full and Receiver holds a sum too small to permit a cost-effective distribution to such general unsecured creditors, then Receiver may donate such remaining funds to charity.

2.    This Receivership shall continue until further order of the Court.

3.    Receiver can be removed in the Court's equitable discretion *sua sponte* or upon a motion for cause filed in accordance with MCR 2.119, MCL 554.1032, and MCR 2.226(I). If Receiver is removed, a successor receiver may be appointed by the Court; provided, however, such successor receiver must be approved by the Lender in order for such successor receiver to be approved to use the Lender's Collateral including but not limited to its cash collateral to pay itself or its counsel and other professionals.

4.    Neither the termination of the Receivership, nor Receiver's removal will discharge Receiver. Any order terminating the Receivership shall instruct Receiver regarding the delivery of Receivership Property in its custody and control. Receiver shall submit a final accounting (with copies to the recipients of Receiver's Reports as identified above) for approval by the Court within thirty (30) days after the termination of the Receivership or the Receiver's removal, 'unless the Court/orders otherwise. Only after the Court approves the Receiver's final accounting will Receiver be discharged.

**J.    General Provisions**

1.      Any instrument executed by Receiver transferring Receivership Property will be sufficient to transfer such property, any receipt or acquittance given by Receiver will be a sufficient discharge in favor of the person to whom it is given, and no person dealing with Receiver will under any circumstances be bound to ascertain or inquire as to any fact or event or purpose justifying the exercise of any power herein conferred upon Receiver, or the propriety or regularity of any exercise of or act purporting to be an exercise of any such power.

2.      Upon approval of Receiver's final accounting, no claims may be asserted against Receiver or any of its representatives (in such capacity) on any basis whatsoever, other than any failure to make the final distribution or otherwise comply with this Court's order approving the final account. Upon discharge of Receiver, no claims may be asserted against Receiver or any of its representatives (in such capacity) on any basis whatsoever. For avoidance of doubt and for purposes of this Order, willful misconduct shall not include contravention of any local or federal cannabis laws, as long as Receiver is acting in conformity with applicable state cannabis laws and regulations.

3.      This Court shall have exclusive jurisdiction over all matters relating to Receivership Property, the conduct of the Receivership, and all other matters related to Borrowers.

4.      As of the Effective Date, all persons and entities-including, but not limited to, creditors of Borrowers, the parties in the above-captioned action, their respective directors, officers, agents and representatives, and all persons or entities acting under or in concert with such creditors or parties are hereby: (a) placed on notice that all Receivership Property is in *custodia legis*, and, as such, under the protection of this Court, immune from attachment or other legal process, and subject entirely to control by Receiver as this Court's appointee; and (b) restrained

41

and enjoined from (i) diverting, concealing, encumbering, disposing of, or transferring the Receivership Property and any and all funds or property now or hereafter subject to this Order, except to transfer the Receivership Property to Receiver or as otherwise directed by Receiver; (ii) interfering with Receiver's possession, control  and disposition of any and all Receivership Property; (iii) interfering in any, manner with the discharge of Receiver's duties under this Order; and (iv) for the avoidance of doubt, interfering with Receiver's right to possess, control and dispose of any and all' executory contract or lease, including any nonresidential real property lease. All Financial Institutions, including online or mobile payment application providers, at which Borrowers maintain bank accounts are held to timely honor any checks, drafts, wires or ACH transfers drawn or issued by Borrowers on or before the Effective Date unless such financial institution is instructed by Receiver to stop payment on or otherwise dishonor such check, draft, wire, or ACH transfer.

5.    All persons and entities that provided services to Borrowers as of the Effective Date, including but not limited to, electrical, gas, telephone and other utility service, insurance policies, service contracts, maintenance contracts and the like, are hereby restrained and enjoined from terminating such service except: (a) with the written consent of Receiver; or (b) for non-payment of charges accrued or relating solely to the period from and after the Effective Date, following fifteen (15) days' written notice of non-payment demand of post-Effective Date services to Receiver.

6.    Receiver shall faithfully perform and discharge Receiver's duties and obey the Court's orders.

7.    Receiver and all employees and agents of Receiver are subject to the personal jurisdiction of the Court, and expressly consent thereto.

42

8.      Receiver's duty to act as Receiver is subject to Receiver's written acceptance and approval of the terms of this Order. Upon acceptance, Receiver shall be bound by each and every term contained in this Order and each and every obligation of Receiver imposed by this Order.

**K.      Amendment of Order**

This Order may be amended for cause after a motion filed pursuant to MCR 2.119 and served on the Special Notice List.

**L.      No Prejudice to Foreclosure/Final Order**

1.      Nothing in the Complaint, or these proceedings to appoint a receiver, shall be deemed a waiver by Lender of its rights after a Termination Event to seek leave of this Court to pursue its rights and remedies pursuant to Article 9 of the Uniform Commercial Code, as adopted by the State of Michigan, or the Commonwealth of Massachusetts, as applicable, or of its rights available under the Loan Documents, including but not limited to its rights under the Mortgages, or at law or equity.

2.      The Court expressly determines there is no just reason for delay.

**M.      Ex Parte Matters [PER FN2 THIS SECTION MAY BE RENDERED MOOT AND, IF SO, SHALL BE DELETED]**

As it relates to this Order and PERE, LLC specifically, the parties and/or their attorneys shall appear before this Court on February 14, 2025, at 10:00 (a.m.) p.m. to show cause, if any, why the Court should not issue a preliminary injunction consistent herewith. Any brief in opposition to the requested injunctive relief shall be filed no later than February 13, 2025.

IT IS FURTHER ORDERED that, if Defendants do not appear at the preliminary injunction hearing, a preliminary injunction will be entered according to the above terms.

Docusign Envelope ID: 20402DB1-B723-4E2R-B8C8-1EE5EB30C232

IT IS FURTHER ORDERED that no security need be posted before issuance of the restraining order, this Court finding such security is unnecessary.

Issued this 7th day of February, 2025, at 11 : 15 a.m./p.m.

Hon. _____
Hon. Richard N. LaFlamme
P32641

Circuit Court Judge

SO ORDERED, this 7 day of Feb, 2025.

## CONSENTED-TO

TYCOON HOLDINGS, LLC, CHOICE LABS, LLC, FRANK MANAGEMENSERVICES, LLC, GCC MI ACQUISITIONS, INC, GCC MI HOLDINGS, LLC, TYCOON I OPERATIONS, LLC, TYCOON I RE, LLC, LYRICAL LLC, AND TYCOON I PREMIER DRIVE, LLC, PURE GREEN, LLC, TSC HOLDINGS GROUP, LLC, TSC RE, LLC, 48 INDUSTRIAL, LLC AND TSC OPERATIONS, LLC

By their duly authorized agent,

Signed by:
Wesley Lutz
1E2868501E424FR

Wesley Lutz

44

## Exhibit A

### Curriculum Vitae of Opus

[to be attached]

# Jacques Santucci



## OPUS CONSULTING

PRESIDENT

Jacques Santucci is the President of Opus Consulting, a business performance management firm specializing in the cannabis industry as well as hospitality, financial services, real estate and technology industries. His team assists clients around the country navigate the complex and evolving challenges of starting, operating and improving a cannabis business. They have successfully guided clients through challenging workout situations in various sectors including cannabis, hospitality and social services.

Jacques has facilitated the launch and assisted in the management of several cannabis companies in states including in Maine, Rhode Island, Connecticut, Massachusetts, New York, Ohio, Michigan and Hawaii among others. In 2010, Jacques co-founded Wellness Connection of Maine, the state's largest group of marijuana dispensaries, and the first operation on the East Coast market, operating four state-licensed dispensaries and one growing and manufacturing facility. His role as co-founder and CFO focused particularly on the strategy and management, setting up operations, compliance and administration, banking relationship, taxes and audit and overseeing construction of facilities and systems as well as creating relationships with financing partners and vendors.

Jacques has deep experience in restructuring and turnaround work for over 20 years, having assisted as a turnaround manager or restructuring officer or successfully navigated numerous court-appointed receiverships as well as bankruptcy proceedings. In recent years, Jacques has served as court-appointed receiver for two large cannabis enterprises, managing the operations and leading the company through the complexities of the process. He is approved as receiver for cannabis operations in Massachusetts where he led the first receivership, Ermont. He was also appointed receiver for The Source in Nevada.

He is a sought-after speaker on the topics of the impact of IRS280E, the primary business management basics in the cannabis industry. He is an active member of the Turnaround Management Association, as Board Member of a local chapter.

Santucci began his career at Ernst & Young as an auditor and then at Universal Pictures in Paris, France. Jacques has also worked for international groups in Europe and in the USA in leadership capacities.

# MEET OUR TEAM



OPUS
CONSULTING



Connor is a Partner at Opus Consulting, where he has been a key player in the emerging legal cannabis industry since 2014. Specializing in business turnarounds and investor relations, Connor has played a pivotal role in acquiring licenses, launching, and advising numerous cannabis operations across the country. His strategic insights and deep industry knowledge have been instrumental in helping clients navigate complex challenges, driving sustainable growth, and enhancing profitability. He has founded and operated a retail cannabis store.

With extensive experience collaborating with prominent businesses in the cannabis sector, Connor has built a vast network of resources and connections, which he leverages to support clients through turnaround strategies and investor relations. His ability to guide companies through distressed situations and financial restructuring has been a critical asset, especially in his involvement in two cannabis receivership cases, where he provided expert guidance on financial recovery and operational optimization.

## Connor Yost
Partner

Connor's commitment to industry best practices and hands-on project management allows him to lead initiatives that improve efficiencies, ensure compliance, and strengthen market positioning. His experience in navigating complex regulatory landscapes has made him a trusted advisor to businesses looking to enhance financial stability.

Connor is also a frequent speaker at industry conferences, sharing his expertise on regulatory compliance, market trends, and operational excellence. His thought leadership has earned him respect as a key voice among peers and clients alike.



Patricia Rosi-Santucci is a dynamic leader with a proven track record in driving growth and innovation in the cannabis industry. Patricia served as Chief Marketing & Strategy Officer at Acreage Holdings for the past five years, where she led cross-functional teams in marketing, branding, technology and business development. In this role, she was instrumental in shaping the company's vision, expanding its brand presence, and driving business performance. Patricia's leadership was key to Acreage's strategic expansion, and her efforts contributed to the company's growth trajectory, laying the foundation for its continued success.

Prior to her role at Acreage Holdings, Patricia helped launch and became Chief Executive Officer of Wellness Connection of Maine, one of the first vertically integrated operators in the northeast. In this capacity, Patricia developed operations across multiple locations, oversaw 100 employees, and led the company through complex regulatory and policy challenges. Ultimately, Patricia helped prepare the company for strategic acquisition by establishing a market-leading position.

## Patricia Rosi-Santucci
Director

With a keen understanding of the regulatory, operational, and business challenges facing MSOs, Patricia has been instrumental in scaling organizations, optimizing operational efficiencies, and driving sustained revenue growth. Her ability to integrate creative strategies with business acumen has allowed her to consistently deliver results in an evolving and highly competitive industry.

As an award-winning marketing and branding expert, Patricia has garnered over 50 industry accolades. Her deep expertise in consumer packaged goods (CPG) and entrepreneurship in emerging sectors like cannabis has made her a sought-after advisor in the industry and beyond.

Patricia is known for her ability to build high-performing teams, cultivate talent, and create a culture of innovation. A forward-thinking and results-driven executive, she continues to be recognized as a pioneering force in the cannabis industry, setting new standards for leadership and business excellence.

# MEET OUR TEAM



OPUS CONSULTING



**Casey Skovran**
Senior Consultant

Casey is a Senior Consultant at Opus Consulting with extensive experience in managing turnaround and restructuring processes for various businesses and industries. He specializes in overseeing financial operations and ensuring compliance, providing critical support during distressed situations. As an Outsourced CFO/Controller for small businesses and non-profits, Casey has played an integral role in cash management, forecasting, and optimizing financial reporting systems to enhance operational profitability.

In his role managing a restructuring engagement, Casey has been responsible for financial management, including cash flow, budget forecasting, and financial reporting for distressed entities. He ensures business continuity while safeguarding creditor protection throughout the process as well as improving the relationship with lenders and banking partners. Additionally, Casey has worked closely with legal teams to identify, catalog, and market assets for sale, maximizing value recovery for creditors during the asset sale process.

Another key area of Casey's expertise is ensuring compliance with federal, state, and local regulations during a restructuring process. He handles complex financial reporting, making sure that all necessary legal requirements are met and that the business is in compliance throughout the distressed period.

Beyond his turnaround and restructuring work, Casey has developed business valuations to support merger and acquisition analysis, providing crucial financial insights to facilitate corporate transactions. He also manages entire accounting departments and implements new accounting software to streamline financial operations and improve reporting for clients.



**Alice Evans**
Senior Consultant

Alice is a seasoned consultant with deep expertise in business management, corporate strategy and turnarounds as well as knowledge of the legal cannabis industry. She specializes in corporate and brand strategy, market expansion, financial modeling, manufacturing projections, and regulatory compliance. Alice works closely with cannabis startups, helping them navigate complex market dynamics to drive penetration, foster growth, and ensure profitability. Her ability to craft strategic roadmaps tailored to each client's needs has been a key factor in their success in the competitive cannabis sector.

With nearly five years of experience working with Tribal organizations, Alice has honed her skills in conducting feasibility studies and developing strategic and operational plans that diversify revenue streams and create sustainable employment opportunities. Her strong analytical framework and hands-on approach help organizations make complex decisions and achieve operational efficiency.

Alice also has significant expertise in managing distressed businesses. She has a proven track record of providing leadership during restructuring phases, where she focuses on optimizing workflow, improving staff retention, and ensuring transparent communication with creditors, stakeholders, and courts. Her work in financial recovery, asset sales, and managing stakeholder relations has been pivotal in helping businesses realign their financial strategies, stabilize operations, and set the stage for long-term recovery and growth. Alice's extensive experience in managing turnaround situations has made her an invaluable asset to companies in transition, ensuring that they emerge stronger, more efficient, and poised for sustained success.

# MEET OUR TEAM



OPUS CONSULTING



**Garrett Krisko**
Consultant

Garrett is an experienced Consultant at Opus Consulting, specializing in operational strategy, financial modeling, and industry research within the legal cannabis sector. He works closely with clients to improve operations, leveraging data analysis to implement tactical improvements that drive performance. Garrett is also highly skilled in building financial and cash flow forecasts, which help companies prepare for transactions such as acquisitions, sales, or restructurings.

Garrett has played a pivotal role in large-scale receiverships within the cannabis industry, navigating the complexities of distressed asset management. His involvement in two cannabis receivership cases has showcased his expertise in guiding companies through financial and operational challenges. Additionally, he is highly skilled in court reporting, ensuring accurate documentation and compliance throughout these high-stakes processes.

Garrett's financial expertise extends to analyzing key performance indicators (KPIs) and preparing detailed sales reports for dispensaries across multiple states. His proficiency in financial modeling has been crucial in assessing and optimizing operational performance for retail and cultivation companies, ensuring both financial health and operational efficiency. His work has been instrumental in starting and managing Tribal-owned cannabis operations, particularly through developing training manuals and regular reporting processes.

In addition to his financial expertise, Garrett has led market report generation for Opus, creating cannabis market reports for several state markets. He has also developed educational materials and investor slide decks to help cannabis businesses evaluate opportunities. Garrett actively supports compliance teams in key markets such as New York, Michigan, and Nevada, helping businesses navigate regulatory landscapes and implement operational best practices for long-term success.



**Mike Ascanio**
Consultant

Mike is a seasoned consultant with over ten years of experience in the cannabis industry, creating operational solutions across cultivation, horticultural, agriculture, and manufacturing sectors.

For the past several years, Mike has gained hands-on experience in the cannabis sector, where he excels in managing business operations from cultivation design and planning through to product development, manufacturing, and retail strategy. As an independent consultant across New England, Mike has been instrumental in guiding many cannabis businesses through critical stages of development. He has a deep understanding of the unique challenges facing small businesses in the cannabis industry, from navigating regulatory landscapes to optimizing production and retail operations to generate strong ROI and market presence.

During his tenure at Opus Consulting, Mike has continued to leverage his extensive industry knowledge to deliver impactful solutions. He has played a key role in 6 large-scale cannabis startup projects. Mike's ability to apply real world knowledge to conceptual planning makes him an incredible asset to clients in the planning and setup phases of their business. Mike has served as an "Owner's Representative" on two large projects in recent months overseeing all aspects of design, construction, and vendor selection and contracting for his clients to ensure smooth project delivery and problem-solving.

Additionally, Mike has been deeply involved in cannabis operations in Michigan, where he plays a critical role in managing administrative aspects of turnaround strategies and receiverships. His expertise in restructuring and overseeing distressed cannabis businesses helps companies navigate complex legal and financial challenges, ensuring sustainable operations and long-term success.

# SERVICES



Opus Consulting is a full service business advisory firm with a cross-functional approach to performance management. We support companies from start-up to turnaround, offering management and advisory services to enable long-term growth

## WHAT WE PROVIDE

 NATIONWIDE EXPERIENCE

 BROAD-RANGING EXPERTISE

 ONGOING SUPPORT

## NATIONAL REACH



## CURRENT & PAST CLIENTS




THE SOURCE



**Parallel**

planet 13







# RELEVANT CANNABIS EXPERIENCE



**Project:** Northeast Patients Group d/b/a Wellness Connection of Maine
**State:** Maine
**Dates:** 2010 – 2020
**Scope:** Jacques Santucci, Patricia Rosi and the Opus team have been involved in the formation and creation of Wellness Connection of Maine (WCM) since the application phase and help build the program from the ground up. Our work detailed writing the application that won 4 out of 8 medical cannabis dispensary licenses in Maine, prepare the business plan and related modeling, selection and design of all facilities, project managing construction, budgets and projection cash flow needs and sales projections, oversee SOP drafting and coordinate training, manage administrative function and all vendor relationship and other tasks as needed. As part of the leadership and management of the company, Jacques and Patricia have been involved in all strategic decisions for the company. As of 2024, WCM successfully operates 4 dispensaries and one centralized vertically integrated cultivation center as well as an ISO-8 clean room certified $CO_2$ extraction laboratory and licensed commercial kitchen, employing 100+ employees and has served over 12,000 patients.  This company is the first cannabis licensed company on the East coast and a pioneer in the industry and is now managed by Acreage Holdings, a public company and leader in the cannabis industry.

**Project:** Liberty Compassion Center – cannabis operation
**State:** Massachusetts
**Dates:** 2017 – 2020
**Scope:** Liberty is a licensed, vertically integrated medical marijuana cultivator and retailer in MA. Opus was integral in designing the 62,000 square foot cultivation facility and has worked closely with the construction team. Opus served as a project manager, assisting the company with hiring, branding, compliance and a successful capital raise of over $16 million.
The company has since been sold to Green Thumb Industries, a public company and leader in the cannabis industry.

**Project:** Summit Medical Compassion Center – vertically medical cannabis operation
**State:** Rhode Island
**Dates:** 2013 – 2017
**Scope:** Summit Medical Compassion Center is a medical marijuana dispensary located in Warwick, RI. The Opus Team worked onsite to help build, manage and launch SMCC from the ground up after it was awarded a license to operate a dispensary and cultivation center. After SMCC became fully operational, the Opus team served as financial and operational advisors. The company is now managed by Green Thumb Industries.

**Project:** Prime Wellness of Connecticut
**State:** Connecticut
**Scope:** Prime Wellness of Connecticut is a medical marijuana dispensary that opened in 2014. Opus played an integral part in writing the PWC dispensary license application. The company is now integrated in Acreage Holdings.

# RELEVANT CANNABIS EXPERIENCE



**Project:** Pokagon Band of Potawatomi / Rolling Embers Cannabis
**State:** Michigan
**Dates:** 2021 – current
**Scope:** As acting manager of the company, Opus prepared the feasibility study and business plan for a vertically integrated Cannabis operation. The Tribe's Development Authority selected Opus to implement the vision and strategy over a three-year period, starting with business planning, financial modeling, site selection and design, and ultimately managing all project deliverables. Our team planned and managed the successful opening of a recreational cannabis store and combined consumption lounge in 2023 under the Rolling Embers brand and is currently working on plans for innovative value-added manufacturing. In addition to managing the planning, construction and startup phases, Opus spearheaded developing the brand as well as setting up operational and financial protocols including procurement, hiring staff, training sales, setting up financial management, and all administrative oversight activities. Opus provides weekly, monthly, and annual reporting packages and serves in a controller capacity for the company, as well as a strategic partner mapping out next steps. As part of the Leadership team, our team reports to the Board.

**Project:** Seneca Nation / Nativa Cannabis
**State:** New York
**Dates:** 2022 – current
**Scope:** As part of the leadership team of this project, Opus prepared the feasibility study and business plan for this project, outlining all operational and economic inputs required for a large scale vertically-integrated cannabis operation. The Nation's Development Authority selected Opus to implement the vision and strategy over a three-year period, partnering with them to design, implement, and oversee the execution of retail, cultivation, and processing segments for the company. Nativa successfully opened a retail store in April 2023 and our team has now shifted focus to managing the operation and executing the cultivation and processing strategy. Opus consultants were involved in every step of the Nativa project, from building the initial business plan and financial projections to serving as an Owner's representative throughout construction and vendor selection. Our team recruited and hired key personnel, and subsequently trained them all on SOPs developed by Opus for retail cannabis employees. The Opus team also assisted with developing and honing the brand elements and launch strategy for the company.

**Aside from the examples listed above, Opus has notably worked on the following Independent Cannabis engagements:**

1. Planet 13 (NV)
2. Native Sun (MA)
3. Rodeo Cannabis (CT)
4. Maui Grown Therapies (HI)
5. Fire on Fore (ME)
6. Reverie 73 (MA)
7. Soothe (OH)
8. Fernway (NY)
9. Ermont Inc
10. The Source (NV)



# CANNABIS RECEIVERSHIPS

**Project:** Ermont Inc.
**State:** Massachusetts
**Dates:** 2021 – 2023

**Background:** Ermont, founded in 2016, was one of the first vertically integrated medical cannabis operators in Massachusetts, serving both medical and recreational markets. However, after the state legalized recreational cannabis, the company faced increasing competition. To fund its growth, Ermont secured a high-interest loan, but it was unable to meet repayment obligations, eventually defaulting. In November 2021, Opus was appointed Receiver by the Court after having been pre-approved by the Cannabis Control Commission to manage Ermont's assets, protect the interests of creditors, and guide the business through the receivership process.

**Objectives:** Opus's primary goal was to ensure operational continuity during the receivership while working to maximize the repayment to creditors. This involved optimizing the estate, managing operations, auditing cash flows, identifying assets, notifying creditors, and ultimately marketing and selling the assets.

**Approach:** Opus's first step was to gain a deep understanding of Ermont's operations. This included meeting with key managers, observing day-to-day activities, and analyzing financials to assess the business's cash flow and operational health. Opus then assumed full oversight of the business, including taking control of cash management and making critical operational decisions. A weekly cash flow budget was developed and implemented, resulting in cost reductions and operational efficiencies. By identifying redundancies and focusing on staff retention, Opus ensured the business continued to operate smoothly during the receivership. Operational inefficiencies, such as ineffective product output due to suboptimal growing conditions, were addressed by reworking production strategies. A wholesale initiative was introduced to reduce unsold inventory.

**Findings:** Ermont's competitive position in the market had significantly weakened after the legalization of recreational cannabis. Ineffective operating procedures and an ongoing grow room expansion led to surplus inventory that was unsaleable. Additionally, upon reviewing past tax returns, Opus discovered that Ermont had incorrectly treated IRS 280E, which impacted their tax filings. As a result, tax returns were recast to reflect proper compliance. Despite operational improvements, Ermont was unable to generate enough cash flow to satisfy its mounting debts. Consequently, the sale of assets became the most viable option to repay creditors. Opus worked with the Court and the Massachusetts Cannabis Control Commission (MA CCC) to identify potential buyers. After receiving approval, Opus successfully sold the assets in Q1 2023 to Marimed, a Massachusetts-based multi-state operator (MSO).

**Outcome:** Through strategic financial management and operational oversight, Opus was able to stabilize Ermont's operations, reduce liabilities, and maximize the value of its assets. The asset sale to Marimed helped repay creditors to the greatest extent possible, fulfilling the primary objectives of the receivership. The process also provided valuable lessons in navigating challenges unique to the cannabis industry, particularly in a competitive, rapidly evolving market.

# CANNABIS RECEIVERSHIPS



**Project:** The Source
**State:** Nevada
**Dates:** 2023 – 2024

**Background:** The Source, a key player in Nevada's cannabis market, operates five retail stores and three cultivation sites, primarily in Las Vegas and Reno. Founded in 2015, it became a leading cannabis operator but faced management struggles and an over-leveraged balance sheet. As competition increased, the company entered court-appointed receivership in mid-2023, with Opus Consulting appointed as Receiver, approved by the Nevada Cannabis Compliance Board (CCB). The primary objective was to ensure operational efficiency, protect creditor interests, and facilitate an asset sale to maximize creditor recovery.

## Scope of Work / Outcomes:

- **Ongoing Management:** Opus managed the company's operations, ensuring compliance and stability during the receivership while preparing for asset sale opportunities.

- **Restructuring Initiatives:** The team focused on improving profitability by reducing costs, optimizing cash flow, enhancing sales, and increasing staff efficiency. Weekly financial reporting was implemented to track progress.

- **Creditor Protection:** Opus worked closely with legal advisors to maintain transparency and communication with creditors, seeking solutions to address claims.

- **Financial Management:** Opus recast past tax returns and adjusted IRS 280E filings to better reflect the company's financial position.

- **Asset Sale Preparation:** Recognizing that selling assets was the best option, Opus marketed The Source's operational assets in late 2023 and early 2024. With court and CCB approval, assets were sold to High Sierra (Reno store) and Deep Roots Harvest (other retail and operational assets) in early 2024. Additionally, assets in Ohio and Massachusetts were also sold during this period.

**Outcome:** The asset sales preserved operations, keeping all stores open and retaining 80% of staff. Deep Roots Harvest became the largest cannabis operator in Nevada, positioning the company for continued growth.

Opus Consulting successfully managed The Source's receivership by optimizing operations, restructuring finances, and negotiating asset sales. This process protected creditor interests while maintaining stability in Nevada's cannabis market.



Jacques
Santucci

President & Founder

Strategic Leadership

Operational Efficiency

Turnaround Management

Investor Relations

Fiduciary Services

Restructuring

Crisis Management

Regulatory Compliance

jacques@opuscg.com

Office / 207.619.1899

opuscg.com

OPUS

## *Experience*

### OPUS CONSULTING
**President & Founder**

2009 - PRESENT

Jacques Santucci is the President of Opus Consulting, a business performance management firm specializing in the cannabis industry as well as hospitality, financial services, real estate and technology industries.

His team assists clients around the country navigate the complex and evolving challenges of starting, operating and improving a cannabis business. They have successfully guided clients through challenging workout situations in various sectors including hospitality and social services. Jacques has facilitated the launch and assisted in the management of several cannabis companies in states including in Maine, Rhode Island, Connecticut, Massachusetts, New York, Ohio, Michigan and Hawaii among others. In 2010, Jacques co-founded Wellness Connection of Maine, the state's largest group of marijuana dispensaries, and the first operation on the East Coast market, operating four state-licensed dispensaries and one growing and manufacturing facility. His role as co-founder and CFO focused particularly on the strategy and management, setting up operations, compliance and administration, banking relationship, taxes and audit and overseeing construction of facilities and systems as well as creating relationships with financing partners and vendors.

Jacques has deep experience in restructuring and turnaround work for over 20 years, having assisted as a turnaround manager or restructuring officer or successfully navigated numerous court-appointed receiverships as well as bankruptcy proceedings. In recent years, Jacques has served as court-appointed receiver for two large cannabis enterprises, managing the operations and leading the company through the complexities of the process. He is approved as receiver for cannabis operations in Massachusetts where he led the first receivership, Ermont. He was also appointed receiver for The Source in Nevada.

He is a sought-after speaker on the topics of the impact of IRS280E and the primary business management basics in the cannabis industry. He is an active member of the Turnaround Management Association, as Board Member of The New England chapter.

Santucci began his career at Ernst & Young as an auditor and then at Universal Pictures in Paris, France. Jacques has also worked for international groups in Europe and in the USA in leadership capacities.

## Exhibit B

### Definitions

"*Project Documents*" is defined to the broadest extent permitted under Michigan law and specifically includes, without limitation: the originals of all books, records, statements, checkbooks, check registers, cancelled checks, bank and other statements, worksheets, spread sheets, memoranda, statements of account, receipts, files and other financial information; the originals of all leases, subleases, rental agreements, occupancy agreements, license agreements and other agreements relating to the rental, occupancy, licensing and/or use of the Premises, together with all files, correspondence and communications with all past, current and prospective lessees, tenants, occupants, licensees and/or users of the Premises and their agents and representatives; the originals of all marketing, advertising, listing and promotional materials; all telephone, facsimile, e-mail and post office box numbers and addresses, the originals of all listing and commission contracts, agreements and commitments, together with all files, correspondence and communications with all brokers and their agents and representatives; the originals of all pictures, plans, specifications, drawings and other depictions and descriptions of the Premises; the originals of all permits, licenses, authorizations and other approvals; the originals of all contracts, agreements, purchase orders, invoices, bills, receipts, account statements, files, correspondence and communications with all utility companies, service providers, contractors, subcontractors, vendors, vendees, governmental authorities, adjacent land owners and other third parties in any way relating to ownership, repair, maintenance, improvement, management, leasing, operation, use, operation, preservation and/or protection of the Premises; the originals of all insurance policies and of all files, correspondence and communications with all insurance companies and their respective agents, brokers and representatives; copies of all local, state and federal tax returns for Borrowers and for the Premises; the originals of all employee contracts and agreements and of all correspondence and communications with employees of Borrowers, all employer and employee files, all payroll and employee records and copies of all local, state and federal employer and employee reports, tax deposits and returns; the originals of all notices, protests, objections, claims, demands, suits, complaints, petitions, injunctions, restraining orders, pleadings and mediation and arbitration proceedings received, sent or filed by or against the Premises or Borrowers which in any way relates to or involves the Receivership Property. Additionally, the term "*Project*

46

*Documents*" means and includes all such documents, information, instruments and materials, whether in tangible form or in the form of computer or electronically stored or generated images, e-mails or other data, all login names and passwords and to the extent any of such documents, information, instruments or materials are computer or electronically stored or generated, Borrowers shall provide, or cause to be provided, to the Receiver the original or copies of such computer programs or other computer software as may be necessary or reasonably required by the Receiver to access, read and make tangible copies thereof.

## Exhibit C

### Licenses

1. Massachusetts Licenses

   a. Product Manufacturer License No. MP282173 issued to TSC Operations, LLC

   b. Cultivation, Tier 3 – Indoor License No. MC281604 issued to TSC Operations, LLC

2. Michigan Licenses

   a. Processor License No. PR-000005 issued to Choice Labs, LLC (LARA Identification Number 802126341)

   b. Provisioning Center License No. PC-000006 issued to Choice Labs, LLC

   c. Marihuana Retailer License No. AU-R-000150 issued to Choice Labs, LLC

   d. Marihuana Processor License No. AU-P-000104 issued to Choice Labs, LLC

   e. Adult-Use Entity Registration License No. AU-ER-000190 issued to Choice Labs, LLC

   f. Excess Marihuana Grower License No. AU-G-EX-000336 issued to Pure Green, LLC

   g. Excess Marihuana Grower License No. AU-G-EX-000337 issued to Pure Green, LLC

   h. Class C Grower License No. GR-C-000735 issued to Pure Green, LLC dba Glorious Cannabis Company

   i. Class C Grower License No. GR-C-000600 issued to Pure Green, LLC dba Glorious Cannabis Company

   j. Class C Grower License No. GR-C-000601 issued to Pure Green, LLC dba Glorious Cannabis Company

   k. Class C Grower License No. AU-G-C-000860 issued to Pure Green, LLC dba Glorious Cannabis Company

   l. Class C Grower License No. AU-G-C-000861 issued to Pure Green, LLC dba Glorious Cannabis Company

   m. Class C Grower License No. AU-G-C-000867 issued to Pure Green, LLC dba Glorious Cannabis Company

n. Class C Grower License No. AU-G-C-000868 issued to Pure Green, LLC dba
Glorious Cannabis Company

o. Class C Grower License No. AU-G-C-000878 issued to Pure Green, LLC dba
Glorious Cannabis Company

p. Class C Grower License No. GR-C-000753 issued to Tycoon I Operations, LLC

q. Class C Grower License No. GR-C-000754 issued to Tycoon I Operations, LLC

r. Class C Grower License No. GR-C-000755 issued to Tycoon I Operations, LLC

s. Class C Grower License No. GR-C-000756 issued to Tycoon I Operations, LLC

t. Excess Marihuana Grower License No. AU-G-EX-000147 issued to Tycoon I
Operations, LLC

u. Excess Marihuana Grower License No. AU-G-EX-000148 issued to Tycoon I
Operations, LLC

v. Excess Marihuana Grower License No. AU-G-EX-000149 issued to Tycoon I
Operations, LLC

w. Class C Grower License No. AU-G-C -000388 issued to Tycoon I Operations,
LLC

x. Class C Grower License No. AU-G-C -000389 issued to Tycoon I Operations,
LLC

y. Class C Grower License No. AU-G-C -000390 issued to Tycoon I Operations,
LLC

z. Class C Grower License No. AU-G-C-000391 issued to Tycoon I Operations,
LLC

aa. Class C Grower License No. AU-G-C-000392 issued to Tycoon I Operations,
LLC

## Exhibit D

**Receiver's Fee Schedule**
[to be attached]



CONFIDENTIAL
Business Performance Consulting
Portland ·· Boston
opuscg.com | 207-619-1899

January, 2025

## Hourly Rates

| | |
|---|---|
| Partners / Principal | $500/hour |
| Senior Consultant | $400/hour |
| Consultant | $350/hour |
| Analyst | $300/hour |
| Consultant Jr | $250/hour |
| Travel | $150/hour |

## Exhibit E

**Receiver's Legal Counsel's Fee Schedule**
[to be attached]



### 2025 Hourly Rates

Michael J. Fencer (Equity Partner): $725/hr.

John T. Morrier (Equity Partner): $725/hr.

Michael J. Goldberg (Partner): $725/hr.

A. Davis Whitesell (Partner): $650/hr.

James G. Atchison (Counsel): $525/hr.

David Koha (Associate): $500/hr.

Paralegals: $295/hr.

# Howard & Howard

law for business·

| Chicago | Detroit | Las Vegas | Los Angeles | Peoria |
|---------|---------|-----------|-------------|--------|

## 2025 Hourly Rates

Alexander M. Leonowicz (partner) – $460/hour

Mark C. Vanneste (partner) – $475/hour

Bridget L. Underhill (associate) – $380/hour

Paul Astras (paralegal) – $275/hour