**STARK & STARK, P.C.**
A Professional Corporation
Marshall T. Kizner, Esq.
Joseph H. Lemkin, Esq.
00 American Metro Boulevard
Hamilton, NJ 08619-2319
(609) 791-7022
*Attorneys for Prestige*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| In Re: | Chapter 11 |
|---|---|
| DARYL FRED HELLER, | Case No. 25-11354 (JNP) |
| Debtor. | |

**PRESTIGE'S BRIEF IN (I) REPLY TO DEBTOR'S OPPOSITION TO PRESTIGE'S MOTION FOR AN ORDER CONFIRMING THAT IT IS NOT STAYED FROM PROCEEDING WITH DISCOVERY AND CIVIL CONTEMPT PROCEEDINGS PURSUANT TO 11 U.S.C. §362(B)(4), AND (II) OPPOSITION TO CROSS MOTION FOR STAY RELEIF TO ALLOW FOR THE PENNSYLVANIA COURT APPEAL TO CONTINUE**

Prestige Fund A, LLC, Prestige Fund A IV, LLC, Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund B II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC, Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC, Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC, Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund VI, LLC and WF Velocity Fund VII, LLC (collectively, "Prestige") hereby files this brief in (I) Reply to Debtor's Opposition to Prestige's Motion for an Order Confirming That it is Not Stayed From Proceeding With Discovery

and Civil Contempt Proceedings Pursuant to 11 U.S.C. §362(B)(4), and (II) Opposition to Cross Motion for Stay Relief to Allow for Pennsylvania Court Appeal to Continue.

## **PRELIMINARY STATEMENT**

The opposition and cross-motion ("Opposition and Cross-Motion") filed by Darryl Heller ("Debtor") to Prestige's Motion for an Order Confirming That it is Not Stayed from Proceeding With Discovery and Civil Contempt Proceedings Pursuant to 11 U.S.C. §362(B)(4) (the "Motion") fails to provide evidentiary or legal support for the relief sought by Debtor. Indeed, as set forth below, the Opposition and Cross-Motion relies upon largely incorrect and untrue averments. Regarding, Debtor's opposition to the Motion, his position is almost entirely based upon a procedurally defective effort to extend the automatic stay to Paramount Management Group LLC ("Paramount"), which effort is based on inapplicable law, and without supporting admissible evidence. Similarly, the Opposition and Cross-Motion fails to cite or apply any law warranting stay relief, and improperly seeks to attack Prestige's presumptively valid proofs of claim.

## **BACKGROUND**

As noted above, Debtor's Opposition and Cross-Motion is premised on a number of unsupported and untrue averments. For example, Debtor alleges he "did not run the day-to-day affairs for Paramount." Doc. 192-1 at ¶19; Doc. 192-2 at ¶ 10. The only affiant for that "fact" is his counsel (not Debtor personally), who certifies the truth of the matter asserted: classic hearsay. *See* Doc. 192-2 at ¶ 10 (Certification of Sari B. Placona). The opposition is further supported by the hearsay averment from counsel that "all documents have been turned over to Prestige." Doc.

2

192-1 at ¶ 19; Doc. 192-2 at ¶ 10. The Opposition and Cross-Motion also suggests, as a fact (one not certified by anybody) that "the operating business of Paramount was turned over to Prestige in November 21, 2024." Doc. 192-1 at 3. What the Opposition and Cross-Motion does finally acknowledge—which was not acknowledged in Debtor's previously filed list of the 20 largest unsecured claims, Doc. 62—is that Prestige has a $2 million contempt order (the "Contempt Order") against Debtor. Doc. 192-1 at ¶ 6; Doc. 192-d at ¶ 8. All the foregoing averments are in service of Debtor's argument that he should be reprieved of serial contemptuous conduct in state court and that he should, at the same time, be permitted to use the state court to proceed with an appeal (the "Appeal") from the Pennsylvania State Court Action (the "PA Action"). But as the following facts and subsequent legal analysis reveal, this Court should not grant Debtor any relief.

A.    **State Court Proceedings**

Some brief procedural history from the PA Action sets important context here. Prestige entered a consent judgment against Paramount on November 21, 2024. Motion, Doc. 158, Ex. A. The judgment did not, as Debtor represents, result in Prestige taking over Paramount's operations, *see* Doc. 192-1 at 3, nor did the judgment actually result in Paramount turning over anything on November 21, 2024. Instead, as reflected in the Hon. Leonard G. Brown III's opinion, Doc. 158, Ex. B, Prestige was forced to twice go to state court to seek contempt orders against Paramount, and eventually Debtor personally, due to serial failures by Paramount to transmit Prestige's assets as required under the consent judgment. *See* Doc. 158, Ex. B, at 6-7. Notably, through the date of this filing, Prestige is still missing critical information, including, but not limited to, a complete list of BTM devices sold to Prestige by Paramount.

Meanwhile, in service of the judgment, on November 21, 2024, Prestige served on Paramount interrogatories in aid of execution, which are extensively discussed in Prestige's Motion and not cataloged here. *See* Doc. 158 at ¶¶ 17-37. What is important to emphasize, however, is that the discovery at issue prompting the present Motion is *interrogatories* and not requests for production of documents. And so, when Debtor emphasizes in the Opposition and Cross-motion that "all documents have been turned over to Prestige," *see* Doc. 192-1 at ¶ 19; Doc. 192-2 at ¶ 10, that is a misdirection: the underlying issue is answers to interrogatories, not missing documents. Moreover, the inference that Prestige has learned answers to all questions in the interrogatories is untrue; the hunt for information remains ongoing, prolonged by Debtor's steadfast refusal to aid in the execution of judgment against Paramount. Also, notably, before Debtor filed the Petition in this Court on February 10, 2025, the interrogatories had been served and pending for *80 days*. Thus, why he is only just now "dedicating his time to discovery issues," Doc. 192-1 at ¶ 18, is perplexing and a testament to his ongoing contempt for state court commands.

Regardless, counsel's averment that "all documents have been turned over to Prestige" (Debtor does not certify this "fact," only his counsel does, *see* Doc. 192-2 at ¶ 10), also happens to be untrue. For starters, Paramount hasn't "turned over" anything: it has done nothing in response to Prestige's discovery demands in aid of execution. It has turned over no documents; it has answered no interrogatories. Nevertheless, the premise for this averment from Debtor's counsel is the allegation that "Prestige went into Paramount's office and obtained the company files and computers." Doc. 192-1 at 3. This is only *partially* true. While Prestige did, in fact, get a state court order permitting it to enter Paramount's former leased office space and take files

4

and computers found there, *see* Exhibit A[1], and while Prestige did find records and a handful of computing devices there, *see* Exhibit B, Prestige did not get the complete "company files and computers." In fact, *most* of the pertinent records were gone—something Prestige believes is attributable to the FBI raid of the offices in December 2024. Further, Prestige found only one recently used computer (and 6 computers that appeared long-ago discarded). Yet, Prestige learned through the deposition of Randall Leaman last week (former CEO of Paramount) that the company once had at least 70 computers, *see* Exhibit C at 77:7-17—where they are today is unknown to Prestige and is perhaps only known to Debtor.

      **B.**      **Debtor Ran the Day to Day Affairs of Paramount**

As noted at the outset, Debtor's Opposition and Cross-motion is supported by the attorney-hearsay averment that Debtor "did not run the day to day affairs for Paramount." Doc. 192-1 at ¶19; Doc. 192-2 at ¶ 10. That averment is utterly untrue.

For starters, let's just take Debtor's own description of his role at Paramount as proof of his intimate involvement in the company's affairs. In the PA Action, Debtor filed an affidavit—subject to penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities—in opposition to a then-pending injunction request. He identified himself as "the Chairman and majority of owner of Paramount." *See* Exhibit D at ¶ 3. Debtor then went on to describe his knowledge of operations at the company, stating: "I believe, based on my knowledge of the Paramount's merchant customers and the market *from my time operating Paramount's business*, that significant numbers of Paramount's merchant customers will cease to do business with Paramount if the injunction is entered." *Id.* at ¶ 11 (emphasis added). He further described his close knowledge of operations, stating: "I believe, based on my knowledge of the Paramount's

---

[1] Exhibits referenced herein relate to exhibits attached to the Certification of Joseph H. Lemkin, Esq. simultaneously submitted herewith.

5

vendors and the market *from my time operating Paramount's business*, that significant numbers of Paramount's vendors … will cease to do business with Paramount if the injunction is granted." *Id.* at ¶ 13 (emphasis added). Those averments by Debtor, subject to Pennsylvania criminal sanctions if untrue, certainly do not sound like someone who "did not run the day-to-day affairs for Paramount." *Cf.* Doc. 192-2 at ¶ 10.

But don't just take Debtor's word for it that he operated Paramount on a day-to-day basis, take Paramount's former Chief Financial Officer's word for it. As Debtor points out, Prestige has deposed Dennis Ream, the former CFO of Paramount. *See* Doc. 192-2 at ¶ 10. His deposition was conducted in writing rather than orally. He was asked in writing: "What was Daryl Heller's role in Paramount?" *See* Exhibit E at 33 pg. 15. His answer: "Chairman (most recently at the time of my separation from Paramount); Daryl was *very involved with day-to-day with Paramount*. He interacted with numerous individuals/departments within the company routinely. Among others, *he made all financial decisions, critical organizational decisions, directed financial transactions and relationships, approved and closed acquisitions, and served as Paramount's leader*." *See id.* at 15-16 (emphasis added). Just in case any confusion existed about Debtor's role at Paramount, Mr. Ream later reiterated it: "As noted, Daryl was *very involved with Paramount* and it was his role to manage Prestige and other funds. *The teams and I took direction from him with every aspect*." *Id.* at 30. Finally, when asked about persons who would know where Paramount's assets are—the very thing Prestige is trying to learn from its interrogatories—Mr. Ream responded: "Daryl Heller would be the primary person with this information." *Id.* at 41.

Lest the Court think Mr. Ream—and Daryl Heller himself—didn't understand Debtor's daily role at Paramount, former CEO Randall Leaman, who was also deposed by Prestige, *see*

6

Doc. 192-2 at ¶ 10, provided identical information about Heller's intimate relationship with the company. When asked about Debtor's role "on a day-to-day basis at Paramount," Mr. Leaman responded that "Daryl was not involved from an *operational* standpoint." *See* Exhibit ## at 43:21-24 (emphasis added). The emphasized language is an important qualifier because Mr. Leaman made clear that outside of operations (i.e., running ATMs), Debtor was very involved. For instance, he stated Debtor "managed the funding that would come to Paramount in conjunction with Dennis Ream." *Id.* at 44:2-4. Mr. Leaman was asked: "Fair to say [Debtor] was intimately involved in the finances of Paramount?" He answered: "Yes." When asked: "Did he control money in and out of the company?" He answered: "Yes." *Id.* at 44:14-19. The balance of Mr. Leaman's deposition was likewise replete with examples of Debtor intimately controlling Paramount's affairs, including directing payments and sales of assets, including thousands of ATM in the company portfolio. *See, e.g.*, *id.* at 63:13-65:2; 89:23-90:4. The testimony even included an exchange where Mr. Leaman revealed that Debtor directed Paramount to pay payroll for two *other* Heller-related companies (Heller Capital and a restaurant), and when asked the basis for Debtor's authority to direct such payments, Mr. Leaman responded: "He was the owner of the company and that's what he directed." *Id.* at 65:14-21. Let's pause there for a moment: the CEO of Paramount, the top officer, took direction from Debtor, without question. That certainly sounds like Debtor was involved in the day to day affairs of Paramount, given he had unilateral authority, in the CEO's opinion, to direct transactions, even ones to the detriment of the company.

And Debtor's intimate and all-encompassing authority over Paramount's internal affairs is even more fully reflected in the extensive text communications between Debtor and Mr. Leaman, which were disclosed to Prestige under subpoena. Those texts—just a few months of

7

which are attached as Exhibit F—are too legion to fully describe here. But suffice it say, they reveal *all* major decisions at Paramount ran through Debtor (right up to the end of its operating life), including funding, paying vendors, meeting payroll, making tax decisions, responding to Paramount litigation (including planning strategy), and disposing of assets. *See, e.g.*, Exhibit F at RL1159, RL1161-1164, RL1167, RL1169, RL1170-1172, RL1174, RL1177, RL1180, RL1199, RL1203, RL1232, RL1280-81, RL1306-1307, RL1353, RL1433, RL1492, RL1523-1524, RL1572, RL1630, RL1661, RL1684, RL1700, RL1717, RL1740, RL1748, RL1768, RL1789, R.1801, RL1806-1807, RL1813, RL1814-1815.

Finally, though not noted by Debtor, Prestige has also deposed Aaron Fogleman, the former Chief Operating Officer of Heller Capital Group, LLC, the company atop Debtor's business empire. Mr. Fogleman likewise confirmed that Debtor was intimately involved in the affairs of Paramount (and, indeed, every Debtor-related entity). For example, when asked if he'd be shocked to learn that Debtor removed operating revenue from Paramount, Mr. Fogleman answered as follows: "Daryl moved money around a lot in his, yeah, in his day-to-day. So it doesn't, you know, wouldn't shock me necessarily." *See* Exhibit G at 77:6-9. He was then asked: "When you say he moved revenue around a lot, do you mean between the 140 or so entities?" He answered: "Yeah. Yes." And then Mr. Fogleman was asked: "Did he give explanations for why he was moving money around?" His answer: "Not typically, no." *See id.* at 77:10-16; *see also* 73:12-74:7 (describing money sent from Heller Capital to Paramount at Debtor's direction).

All of the above confirms that Debtor was not only involved in the daily affairs of Paramount, but also that he was *actively* involved in such affairs.

8

### C.  Proofs of Claim

As a final note, Debtor several times refers to just *four* filed proofs of claim filed by Prestige, identifying them as claims 16-19. *See* Doc. 192-1 at ¶ 28; Doc. 192-2 at ¶ 12. For the record, Prestige filed *twenty-five* proofs of claim, found on the Claims Register at claims 13-37 (the "Claims"). Why Debtor focuses on just four of the twenty-five is unclear.

## LEGAL ARGUMENT

Debtor's opposition to the Motion order primarily relies upon his back-door effort to extend the automatic stay to Paramount, a non-debtor third-party. Debtor's summary effort to extend the automatic stay must fail on multiple grounds. First, the request is procedurally defective. Next, the request relies on inapplicable Second Circuit law regarding extension of the automatic stay. Finally, Debtor has failed to present any evidence that supports extension of the automatic stay.

## REPLY TO DEBTOR'S OPPOSITION

### A.  Opposition to Motion Is Procedurally Deficient

It is well established that a request for extension of the automatic stay provisions of Section 362(a) to a non-debtor constitutes an action for injunctive relief and should be initiated by an adversary proceeding. *In re Bora Bora*, 424 B.R. 17, 24-25 (Bankr. D.P.R., 2010); *Fed. R. Bankr*. P. 7001(7); *See also*; *Alan N. Resnick and Henry J. Sommer*, 3 Collier on Bankruptcy, ¶362.04[1] (16th ed. 2010)("Rule 7001(7) provides that a request for injunctive relief is governed by part VII of the Bankruptcy Rules. This will mean that when the automatic stay of section 362 does not apply, injunctive relief will have to be sought by filing a complaint initiating an adversary proceeding and then seeking a temporary restraining order"). Therefore, for a third party to obtain the protection of the automatic stay, a party must file an adversary

9

complaint requesting an injunction under 11 U.S.C. § 105. *Hamilton v. Ream Props., LLC (In re Ream Props., LLC)*, 2017 Bankr. LEXIS 80 (Bankr. M.D.Pa., Decided January 9, 2017).

In *Hamilton*, the Court held that guarantors of a loan of a debtor were entitled to seek relief in state court against the debtor's principal as a co-guarantor of the debt because the debtor did not commence an adversary proceeding seeking to extend the automatic stay to the principal. *Id.* Here, Debtor has not filed an action to extend the automatic stay as to any third-party. Indeed, by way of the Cross-Motion, Debtor seeks stay relief so the Appeal can proceed. Accordingly, his summary effort to extend the automatic stay to Paramount is procedurally defective. Debtor's conduct in this case, through removal and continuation of various litigations/adversary proceedings without seeking injunctive relief, runs counter to his newly minted theory that the automatic stay applies to Paramount.

### B.    Inapplicable Law

The entirety of Debtor's argument relating to extension of the automatic stay to Paramount relies upon a conclusory reference to *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003), a 2003 Second Circuit Court of Appeals case, which is not applicable to the case *sub-judice*. Debtor's objection fails to address whatsoever the standards for extending the automatic stay in the Third Circuit. In determining whether to extend the automatic to a non-debtor third party, a court in the Third Circuit must consider: (1) whether it has jurisdiction to issue the injunction; (2) whether extension of the automatic stay under § 362(a) to the non-debtors is appropriate; and (3) whether the Court should, in its discretion, issue the injunction. *In re LTL Mgmt., LLC*, 645 B.R. 59, 67 (Bankr. D.N.J. 2022) (citing *In re LTL Mgmt., LLC*, 638 B.R. 291) (other citations omitted). Here, Debtor has not addressed whether this Court has jurisdiction to issue the injunction or whether, in its discretion, it should issue the injunction.

Based upon this failure alone, coupled with the fatal procedural defect noted above, the stay should not be extended to Paramount.

The only consideration "addressed" in Debtor's opposition relates to whether the automatic stay extension is appropriate. The Third Circuit recognizes that the automatic stay's protection is applicable to non-debtors where "unusual circumstances" exist. *Id.* at 69 (citing *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 510 (3d Cir. 1997) (citing *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876, 107 S. Ct. 251, 93 L.Ed.2d 177 (1986)); *see also In re Philadelphia Newspapers, LLC*, 423 B.R. at 104. Unusual circumstances exist warranting extension of the stay to non-debtors when: "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor; or (ii) the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization. *Id. (citing In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (E.D. Pa. 2009), and *In re LTL Management, LLC*, 638 B.R. 291, 2022 WL 586161, at *9 (explaining that "a critical factor in deciding whether to extend the stay is the potential adverse impact on a debtor's estate and prospect of reorganization").

In arguing the stay should apply to Paramount, Debtor summarily notes that the March 11th Order found that he was the "sole remaining representative of Paramount." *See* Doc. 192-1 at ¶ 17. Based upon this sole kernel of information, Debtor leaps to assert that "adjudication against Paramount will have an immediate adverse impact on his ability to reorganize." *Id.* Simply stated, not a scintilla of evidence exists showing that adjudication against Paramount will impact Debtor's estate. Certainly, compliance with rudimentary interrogatories served almost three months ago will not be a hardship on Debtor.

### C. Evidentiary Support

Even if seeking extension of the stay in its opposition was procedurally proper, and assuming Debtor cited to applicable Third Circuit law, Debtor has presented no evidence whatsoever to support the unusual circumstances required in the Third Circuit to extend the automatic stay. Debtor's sole reference to the March 11th Order reference to him being the "sole remaining representative" is wholly inadequate to support the required circumstances. Instead, given the overwhelming evidentiary support supplied herewith, there is no doubt that Debtor had a significant an all-encompassing role with Paramount. Accordingly, this Court should hold that the automatic stay is not in place as to Paramount; that Prestige may Serve the March 11th Order and that Debtor should comply with obligations to respond to interrogatories on behalf of Paramount.

## OPPOSITION TO CROSS-MOTION

### A. Standard for Relief from the Automatic Stay

In the Cross-Motion, Debtor has failed to set forth or satisfy the standards for relief from the automatic stay. A party may be entitled to stay relief upon a showing of "cause." *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997). Cause is broadly defined, and the Court has wide discretion "to consider what constitutes cause based upon the totality of the circumstances in each particular case." *Id.* (citing *In re Trident Assocs.*, 52 F.3d 127 (6th Cir.1995)). The decision to grant stay relief to permit litigation involving a bankruptcy debtor to continue elsewhere is subject to a 12-factor analysis described in *In re Mid-Atlantic Handling Sys., LLC*, 304 B.R. 111, 130 (Bankr. D.N.J. 2003). Here Debtor seeks to continue his appeal of the State Court's January 5 10, 2025 Order. He has failed to identify any factors which warrant stay relief. Debtor has not set forth whether there is a likelihood of success in pursuing the appeal nor the anticipated cost

of pursuing same. Without some analysis of cause, Debtor's conclusory request for stay relief is simply inadequate.

### B. Prestige's Proofs of Claim

Under section 502(a) of the Bankruptcy Code, a proof of claim is deemed allowed, unless a party in interest objects. 11 U.S.C. § 502(a). Federal Rule of Bankruptcy Procedure 3001(f), provides that a properly filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." A party objecting to a claim must present evidence sufficient to rebut the claim's presumptive validity. *In re Monroe Ctr. II Urban Renewal Co., LLC*, 2012 Bankr. LEXIS 3857 (Bankr. DNJ Decided August 22, 2012) (citing *Cornell & Co. v. Seaway Painting (In re Cornell & Co.)*, 229 B.R. 97, 103 (Bankr. E.D. Pa. 1999)); *see also Promise Healthcare Grp., LLC v. Michaelson*, 130 F.4th 56 (3d. Cir. 2025).

Here, Debtor endeavors to use the Cross-Motion as a back-door effort to object to three of Prestige's twenty-five Claims. Rather than addressing any legal basis for stay relief, Debtor, summarily attacks the Claims as an "erroneous claim against the Debtor … for debt owed by Paramount, a non-debtor entity." *See* Doc. 192-1 at ¶28. This is a gross misrepresentation of the Claims, which set forth in detail Debtor's actions "which constitute fraud in the inducement and fraudulent misrepresentations, inter alia, as detailed in a second lawsuit filed in the Commonwealth of Pennsylvania Court of Common Please, Lancaster County in a matter styled, *Prestige Fund A, LLC et. al. v. Darryl Heller, et.al.*, No. CI-25-00491 (CP Lancaster). *See for example*, Claim No. 37-1.  While irrelevant to the Cross-Motion, it should be made clear that Prestige's twenty five Claims directly against Debtor are deemed prima facie valid and do not serve as a basis to grant the Cross-Motion.

### C. Debtor Must Comply With Pennsylvania Appellate Practice

Finally, Debtor's requested cross-relief fails to fully apprise this Court of Pennsylvania law. If the Court allows Debtor to pursue his pending appeal in the Pennsylvania Superior Court, the appeal will be governed by the Pennsylvania Rules of Appellate Procedure. Under Pa.R.A.P. 1731(a), since his appeal concerns "an order involving solely the payment of money," the enforceability of the contempt order is only stayed if Debtor remits "appropriate security in the amount of 120% of the amount found due by the lower court and remaining unpaid." Thus, insofar has he is asking this Court to excuse him from the automatic stay so that he can pursue a Pennsylvania appeal, such relief will require Debtor to immediately remit to the state court security in the sum of $2,460,000 on pain of Prestige being permitted to fully collect on the sum set forth in the appealed order. And so, falling squarely into the category of "be careful what you ask for," Debtor's requested relief will have immediate financial consequences for him—one way or the other. This certainly augurs against the Court granting him the reprieve he asks for, or, at a minimum, counsels that this Court should be clear that the state court must be paid the appropriate security.

### CONCLUSION

Based upon the foregoing, it is respectfully submitted that this Court grant Prestige's Motion, Deny Debtor's Cross-Motion and grant such additional relief as the Court deems necessary.

Respectfully submitted,

**STARK & STARK**
A Professional Corporation

By: /s/ *Joseph H. Lemkin*
JOSEPH H. LEMKIN, ESQ.

By: /s/ *Marshall T. Kizner*
MARSHALL T. KIZNER, ESQ.
100 American Metro Blvd.
Hamilton, NJ 08619
(609) 791-7022 (direct)
(609) 896-9060 (main)
(609) 895-7395 (facsimile)

Attorneys for Prestige Fund A, LLC, Prestige Fund A IV, LLC, Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund B II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC, Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC, Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC, Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund VI, LLC and WF Velocity Fund VII, LLC

Dated: April 25, 2025

4923-6568-0955, v. 2