| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| Gerard Catalanello, Esq.<br>James J. Vincequerra, Esq. (admitted *pro hac vice*)<br>Kimberly Schiffman, Esq. (admitted *pro hac vice*)<br>**ALSTON & BIRD LLP**<br>90 Park Avenue<br>15th Floor<br>New York, New York 10016-1387<br>Telephone: (212) 210-9400<br>Facsimile: (212) 210-9444<br>Email:  Gerard.Catalanello@alston.com<br>            James.Vincequerra@alston.com<br>            Kimberly.Schiffman@alston.com<br><br>– *and* –<br><br>Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)<br>1201 West Peachtree Street<br>Atlanta, Georgia 30309<br>Telephone: (404) 881-7000<br>Facsimile: (404) 881-7777<br>Email: Enrique.Chaljub@alston.com<br><br>*Counsel to Plaintiff Silverview Credit Partners LP* | |
| In re:<br><br>DARYL FRED HELLER,<br><br>                              Debtor. | Case No.: 25-11354-JNP<br>Hon. Jerrold N. Poslusny, Jr.<br>Chapter 11 |
| SILVERVIEW CREDIT PARTNERS LP,<br><br>                              Plaintiff,<br><br>v.<br><br>DARYL FRED HELLER,<br><br>                              Defendant. | Adv. Pro. No.: 25-___-JNP |

**COMPLAINT TO DETERMINE EXCEPTIONS TO DISCHARGE
OF DEBTS, PURSUANT TO 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) AND (a)(6) OWED
BY DARYL FRED HELLER TO SILVERVIEW CREDIT PARTNERS LP**

Silverview Credit Partners LP ("Silverview" or the "Plaintiff"), a creditor and party in interest in the above-styled bankruptcy case, pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(6) and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure, files this complaint (the "Complaint"), through undersigned counsel, seeking a ruling that certain debts owed to Silverview by Daryl Fred Heller, the above-referenced chapter 11 debtor and defendant ("Heller" or the "Defendant"), are nondischargeable. In support thereof, Silverview respectfully alleges as follows:

## JURISDICTION AND VENUE

1. This civil proceeding arises under and otherwise relates to a case under 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). This is a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and 11 U.S.C. § 523, since this is a proceeding to determine the dischargeability of particular debts. Pursuant to Rule 7008 of the Federal Rule of Bankruptcy Procedure (collectively, the "Bankruptcy Rules" and each, a "Bankruptcy Rule"), the Plaintiff consents to entry of final orders or judgments by the United States Bankruptcy Court for the District of New Jersey (the "Court").

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This proceeding is initiated under Bankruptcy Rule 7001.

4. By timely filing this Complaint,[1] pursuant to 11 U.S.C. § 523(c) and Bankruptcy Rule 4007(c), Silverview preserves its right to have the Court determine that the debts owed to Silverview by the Defendant are excepted from discharge on the basis of fraud and related misconduct.

---

[1] "[A] Complaint to determine [the dischargeability of a debt] under §523(c) [shall] be filed [no later than] 60 days after the first date set for the . . . meeting of creditors [under §341(a)]." FED. R. BANKR. P. 4007(c). Here, the first date set for the meeting of the creditors under §341(a) was March 19, 2025. *See* D.I. 39, Case No.: 25-11354-JNP. *See also* FED. R. BANKR. P. 9006.

5. The statutory predicates for the relief requested herein are 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6).

## THE PARTIES

6. Silverview is a Delaware limited partnership with a principal place of business in Tampa, Florida, a judgment creditor of the Defendant and the Agent for the Lenders under the Loan Agreement (each as defined herein).

7. Heller is an individual that is a citizen and resident of the State of Pennsylvania and the chapter 11 debtor in the above-captioned case pending before this Court.[2] Heller was, at all times, the Founder and Chief Executive of Heller Capital Group, LLC and authorized to bind the Blackford Entities to agreements, including the Loan Documentation (each as defined herein).

## FACTUAL ALLEGATIONS

**I.    The Defendant, On Behalf of the Blackford Entities, Approached the Plaintiff for a Loan, and the Defendant Provided Information to the Plaintiff with Respect Thereto.**

8. On or about June 26, 2023, Heller, on behalf of (a) Blackford ATM Ventures Fund D, LLC; (b) Blackford ATM Ventures Fund M, LLC; (c) Blackford ATM Ventures Fund M II, LLC; (d) Blackford ATM Ventures Fund M IV, LLC; (e) Blackford ATM Ventures Fund M V, LLC; (f) Blackford ATM Ventures, LLC ((a) – (f), the "Blackford Debtors" and each, a "Blackford Debtor"); and (g) Blackford Holdings, LLC ("Blackford Holdings," and together with the Blackford Debtors, the "Blackford Entities" and each, a "Blackford Entity"), approached Silverview, Silverview Special Situations Lending LP, Silverview Special Situations Lending II

---

[2] Heller also owned real property located in the State of New Jersey. Pursuant to the *Order Authorizing Daryl Fred Heller, Chapter 11 Debtor and Debtor-in-Possession, to Sell Real Property Located at 7605 Pleasure Avenue, Sea Isle City, NJ, Free and Clear of all Liens, Claims and Encumbrances Pursuant to 11 U.S.C. § 363(b), (f) and (m); and Granting Related Relief* [D.I. 169] (the "Sale Order"), Heller was authorized to sell the Property (as defined in the Sale Order).

2

LP,[3] and Spearhead Insurance Solutions IDF, LLC – Series SCL[4] (collectively, the "Silverview Plaintiffs") for a loan.

9.  As part of its due diligence process, the Plaintiff requested detailed financial information from the Blackford Entities and Heller, as Guarantor of the Obligations under the Loan Documentation (each as defined herein), to assess their ability to repay the loan. As set forth more fully below, this included, without limitation, financial statements, balance sheets, profit and loss statements, and other relevant documentation reflecting the Blackford Entities' and Heller's assets, liabilities, income, and overall financial condition. Heller, on behalf of the Blackford Entities and himself, provided these materials with the understanding that Plaintiff would reasonably rely on them in making its lending decision. The Plaintiff's request for this information was a critical and material component of the underwriting process, ensuring that the Blackford Entities and Heller had the financial wherewithal to satisfy its obligations under the Loan Agreement.

10. As part of the Plaintiff's due diligence process, and at its request, Heller, on behalf of the Blackford Entities, provided written documentation and made oral representations (the "Blackford Diligence Documentation") concerning, among other things, the value, location, and quantity of certain collateral pledged to secure the loan, which included a series of Automated Teller Machines purportedly owned by the Blackford Entities (collectively, the "Blackford ATMs" and each, a "Blackford ATM") located throughout the United States. These documents included appraisals, inventory reports, financial statements and other records purporting to reflect the true nature and worth of the Collateral (as defined herein).

---

[3] Together, Silverview Special Situations Lending LP and Silverview Special Situations Lending II LP are referred to herein as "Silverview Lending."
[4] Spearhead Insurance Solutions IDF, LLC – Series SCL is referred to herein as "Spearhead."

3

11. Heller, on behalf of the Blackford Entities, represented that these materials were accurate, complete and reliable, knowing that the Plaintiff would rely on them in determining whether to extend credit. The Plaintiff, in turn, reasonably relied on these representations in approving the loan and structuring its terms.

12. As part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that the Blackford Entities owned 3,697 Blackford ATMs.

13. As part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that the Blackford ATMs were unencumbered, except as otherwise disclosed to Silverview.

14. As part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that the average purchase value of a Blackford ATM was $26,827.00.

15. As part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that, collectively, the Blackford ATMs had a fair market value of over $90 million.

16. As part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that in 2022, the Blackford ATMs had a collective total operating revenue of $71,363,970.00.

17. As part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that each Blackford ATM was managed and operated by Heller-controlled servicer, Paramount Management Group, LLC ("Paramount"), pursuant to

certain Management Services Agreements (the "MSAs") between the Blackford Entities and Paramount. The MSAs were included as part of the Collateral package under the Loan Agreement.

18. During the due diligence process, Heller, on behalf of the Blackford Entities, made oral representations regarding Paramount's responsibilities pursuant to the MSAs, including that Paramount worked with a "sponsor bank" to ensure Paramount's regulatory compliance in its management of the Blackford ATMs. Heller represented that if Paramount were to cease managing and operating the Blackford ATMs, the sponsor bank would serve as a "backstop" and was legally required to manage and operate the Blackford ATMs for the benefit of the Blackford Entities and in Paramount's absence.

19. During the due diligence process, Heller, on behalf of the Blackford Entities, made oral representations that each Blackford Entity, each Blackford ATM, and the cash in each Blackford ATM was covered by insurance.

20. During the due diligence process, Heller, as Guarantor, provided written documentation and made oral representations regarding his personal financial condition (the "Heller Diligence Documentation").

21. As part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, he had a net worth of $318,140,004.00.

22. As part of the Heller-provided Heller Diligence Documentation, Heller represented that as of June 30, 2023, his assets were held at three entities: (1) Heller Capital Group, LLC ("Heller Capital"); (2) Heller Investment Holdings, LLC; ("Heller Investment"); and (3) Accordo LP.

23. As part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his interest in Heller Capital had a "highly conservative" valuation of $255,700,000.00.

24. As part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his interest in Heller Investment had a "highly conservative" valuation of $48,150,000.00.

25. As part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his interest in Accordo, LP had a "highly conservative" valuation of $13,683,000.00.

26. As part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his personal liabilities did not exceed $1,600,000.00.

27. As part of the Heller-provided Heller Diligence Documentation, Heller made the representation that he was "fully insured."

II. **Silverview and the Blackford Entities Entered into the Loan Agreement and the Blackford Entities' Subsequent Default Thereon.**

28. On August 23, 2023, the Silverview Plaintiffs entered into a series of agreements with the Heller-controlled Blackford Entities including: (i) that certain loan agreement between the Silverview Plaintiffs and the Blackford Entities (the "Loan Agreement"); (ii) a Collateral Assignment of Management Service Agreements (the "Collateral Assignment"); and (iii) a Pledge and Security Agreement (the "Pledge Agreement" and collectively with the Loan Agreement and

the Collateral Assignment, the "Loan Documentation").[5, 6] Heller, on behalf of Heller-controlled Heller Capital, the Borrower Representative under the Loan Agreement, executed the Loan Documentation.

29. The Obligations under the Loan Documentation were guaranteed by Heller pursuant to that certain Guaranty Agreement, dated August 23, 2023, executed by Heller in favor of Silverview (the "Guaranty"). The Guaranty provided that the "Guarantor hereby unconditionally and irrevocably guarantees to the [Silverview Plaintiffs], for the benefit of the [Silverview Plaintiffs], the full and punctual payment and performance, when due, of all of the Obligations, whether such Obligations would have arisen at maturity or earlier by reason of acceleration."

30. Pursuant to the Loan Documentation, all of the Blackford Entities' Obligations are secured by a continuing security interest and Lien upon the Collateral, as defined in the Security Agreement and the other Security Documents (together with the Collateral Assignment, the "Collateral"). The Collateral includes, but is not limited to, the Blackford ATMs.

31. After closing, the Silverview Plaintiffs promptly perfected their security interest in the Blackford ATMs, each of which bear identifying serial numbers.

32. Approximately 400 of the 3,697 Blackford ATMs securing the Silverview Plaintiffs' investment have serial numbers starting with "PH."

33. As evidenced by the Loan Documentation, Heller, on behalf of the Blackford Entities, made affirmative representations, both orally and in writing, regarding title to the

---

[5] Due to the voluminous nature of the Loan Documentation, copies of such documents are not attached hereto. Upon information and belief, copies of such documents are already in the Defendant's possession. However, the Plaintiff will make such documents available to the Court and the Defendant upon request. Any summary in this Complaint of the underlying documents discussed herein is qualified in its entirety by the terms of the applicable documentation.

[6] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Documentation.

7

Blackford Entities assets, including the Blackford ATMs, and any encumbrances thereon. Specifically, under Section 4.7 of the Loan Agreement, Heller represented that each Blackford Entity had "good title to its assets . . . and the same are not subject to any Liens other than Permitted Liens."[7]

34. Pursuant to the Loan Agreement, Heller, on behalf of the Blackford Entities, also represented that with respect to certain of the Blackford Entities, "[t]he Liens in favor of [Silverview] provided pursuant to the Security Documents are valid and perfected second priority security interests in the Collateral (subject only to Permitted Liens)." Loan Agreement § 4.16. With respect to other of the Blackford Entities, Heller, on behalf of the Blackford Entities, provided evidence that "each Lien granted by any Obligor under any Loan Document is a valid, first priority Lien, and that there are no Liens upon any Collateral other than Permitted Liens." Loan Agreement § 3.1(vi).[8]

35. Further, pursuant to the Pledge Agreement, Heller, on behalf of the Blackford Entities, represented that each Blackford Entity had "good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Permitted Liens." Pledge Agreement § 3.1.

36. The Plaintiff also received the Perfection Certificate, executed by Heller for and on behalf of the Blackford Entities. The Perfection Certificate, among other things, set forth the serial

---

[7] Pursuant to the Loan Agreement, "Permitted Liens" encompassed a defined and limited set of liens that the Blackford Entities had disclosed or could grant either in the ordinary course of business or with the consent of the Silverview Plaintiffs. *See* Loan Agreement, Definitions Schedule pp. 15-16.

[8] Pursuant to the Loan Agreement, "Obligors" means, in relevant part, each Blackford Entity, and Heller "that [are] at any time liable for the payment of the whole or any part of the Obligations or that has granted in favor of the Agent for the benefit of the Lenders a Lien upon any of such Person's assets to secure payment of any of the Obligations."

8

number and state of location of each Blackford ATM and was represented and warranted to be true and accurate as of the date of the Loan Agreement's execution. Loan Agreement § 4.14.

37. As a result of the foregoing, Silverview Lending and Spearhead agreed to make two tranches of loans to the Blackford Entities—a Tranche 1 Term Loan of $18,000,000 and a Tranche 2 Term Loan of up to $7,000,000 (the "Term Loans"), for a total loan sum of up to $25,000,000. The Blackford Entities, in turn, agreed to pay interest on the principal of the Term Loans of 15.50% along with certain other fees. In total, the Silverview Plaintiffs lent the Blackford Entities $23,000,000.00 pursuant to the Loan Agreement.

38. As represented by Heller, the Blackford Entities' revenue was purportedly derived from fees charged to users of the Blackford ATMs for completing a transaction.

39. As part of post-closing obligations under the Loan Agreement, on or about September 22, 2023, the Blackford Entities were required to provide Silverview with, among other things, a list of each of the Blackford ATM units by serial number and the address where such Blackford ATM was physically located. *See* Loan Agreement § 5.15(c). Silverview never received this information, despite repeated requests to Heller.

40. Beginning on or about June 15, 2024, and continuing through the date hereof, the Blackford Entities failed to make any of the principal and interest payments as required under the Loan Agreement, including any payments after receipt of written notices of default and acceleration.

**III.    The Silverview Plaintiffs Initiated a Lawsuit Against the Blackford Entities and Heller.**

41. On September 11, 2024, the Silverview Plaintiffs initiated a lawsuit against the Blackford Entities and Heller in the Supreme Court of the State of New York County of New York

9

(the "State Court"), Index No. 654755/2024 (the "Breach of Contract Action"),[9] via a motion for summary judgment in lieu of complaint [NYSECF No. 26] (the "Summary Judgment Motion").

42. The Silverview Plaintiffs, through the Breach of Contract Action, sought to recover sums due and owing under the Loan Agreement. Specifically, the Silverview Plaintiffs sought to enforce their rights under the Loan Agreement as a result of the Blackford Entities' default on their obligations under the Loan Agreement. The Silverview Plaintiffs sought recovery from Heller personally as a guarantor of the Blackford Entities' financial obligations under the Loan Agreement, pursuant to the Guaranty.

43. Neither the Blackford Entities nor Heller responded to the Summary Judgment Motion.[10]

44. On November 25, 2024, the State Court entered an order granting the Silverview Plaintiffs' Summary Judgment Motion against the Blackford Entities and Heller, jointly and severally, in the amount of $28,554,186.80, as well as attorneys' fees, costs, and interest at the Default Rate arising from the Blackford Entities' foregoing default, and additional interest accruing thereafter at the statutory rate of 9% per annum until the judgment is paid in full [NYSCEF No. 42] (the "Summary Judgment Decision").[11]

45. Neither the Blackford Entities nor Heller appealed the Summary Judgment Decision, and the time for any appeal has expired.

---

[9] References to the docket of the Breach of Contract Action shall appear as "NYSECF No. _." *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. App'x 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket).

[10] *See* Summary Judgment Decision (as defined herein) p. 1.

[11] *See* Summary Judgment Decision p. 4 ("ORDERED Plaintiffs are granted judgment against Defendants, jointly and severally, for attorneys' fees and costs."). On April 10, 2025, the State Court entered Judgment against Heller and the Blackford Entities in the total amount of $32,045,229.41 [NYSECF No. 77].

10

46. On December 9, 2024, the Silverview Plaintiffs filed the *Order to Show Cause for Restraining Order and Leave to Examine Under CPLR § 5229* [NYSCEF No. 46] (the "OSC") and *Memorandum of Law in Support of an Order to Show Cause for a Restraining Order and Leave to Examine Under CPLR § 5229* [NYSCEF No. 47]. Through the OSC, the Silverview Plaintiffs sought to prohibit the Blackford Entities and Heller from transferring any assets and require Heller and a Blackford Entities' corporate representative to be examined by the Silverview Plaintiffs.

47. On December 17, 2024, the State Court entered the OSC and ordered the parties to sit for depositions [NYSECF No. 65]. Pursuant to the OSC, in relevant part, Heller was required to "truthfully answer questions about the location and quantity of [the Blackford Entities'] and Heller's assets, under penalty of perjury."

48. Heller and a Blackford Entities' corporate representative failed to appear at their scheduled depositions and did not respond to subsequent requests to reschedule the same.

49. On January 13, 2025, the State Court entered the *Order Granting Plaintiffs' Attorneys Fees and Costs* [NYSECF No. 73] (the "Fee Order") and granted the Silverview Plaintiffs attorneys' fees in the sum of $283,961.52, plus additional attorneys' fees from any of the Silverview Plaintiffs' efforts to enforce the judgment.

50. On April 10, 2025, the State Court entered judgment against, among others, the Blackford Debtors, jointly and severally, in an amount no less than $28,554,186.72 [NYSECF No. 77].

51. Silverview holds a liquidated, fixed and undisputed debt against Heller and the Blackford Entities, jointly and severally, in an amount no less than $28,838,148.32.

**IV.     Facts Evidencing the Defendant's Fraud Evidenced by Related Litigation Events.**

52.     On August 23, 2024, a group of investors (the "Prestige Funds") filed a lawsuit in Lancaster, Pennsylvania against Paramount alleging, among other things, that Paramount had defaulted on "Monthly Revenue Remittances" under several "ATM Management Services Agreements." *See Prestige Fund A, LLC v. Daryl Heller (Paramount Mgmt. Grp., LLC)*, Case No. CI-24-06012 (Pa. C.P. Aug. 23, 2024) (the "Prestige Litigation").[12]

53.     In hearings held in connection with the request to find Paramount in contempt (the "Contempt Hearings"), a number of witnesses were called to testify either live or through stipulated testimony. Expert testimony elicited from Paramount's former Vice President of Information Systems revealed that "PH" stood for "placeholder," and Automated Teller Machines' serial numbers preceded by such designation may be fictitious.[13] As set forth above, approximately 400 of the 3,697 Blackford ATMs have serial numbers starting with "PH."

54.     Silverview also analyzed the Blackford ATMs in relation to the list of Automated Teller Machines held by the Prestige Funds (the "Prestige ATMs") that was used as an exhibit at the Contempt Hearings. Those lists should have been completely different. However, by comparing the Prestige Funds' list to its Collateral list, the Silverview Plaintiffs determined that certain serial numbers of the Prestige ATMs matched serial numbers associated with the Blackford ATMs in the Collateral list the Blackford Entities provided at closing. Further, Heller, on behalf of Paramount, represented to the Prestige Funds that Paramount owned the Prestige ATMs.

55.     Based on the observable events that transpired in the Prestige Litigation, along with the facts set forth herein, it is evident that Heller orchestrated a scheme in which Silverview is just

---

[12]  References to the docket of the Prestige Litigation shall appear as "Pa. C.P. _." The case is pending in the Court of Common Pleas of Lancaster Country, Pennsylvania.
[13]  *See* Pa. C.P. Tr. of Civil Contempt Hr'g at 27 (dated Dec. 6, 2024).

12

one of many victims. The financial harm suffered by Silverview is not an isolated incident but rather part of a broader fraudulent enterprise designed by Heller to misappropriate funds.

## V. Heller Filed for Bankruptcy.

56. On February 10, 2025, Heller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Case").[14]

57. On March 7, 2025, the Court entered the *Order Directing the Appointment of an Examiner* [D.I. 99] (the "Examiner Order"). Pursuant to the Examiner Order, in relevant part, "[t]he Examiner shall (a) investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, of the affairs of the [Defendant] or any entity or entities owned or controlled by the [Defendant], either directly or indirectly, or through any intermediate entity" and investigate the accuracy and completeness of Heller's financial disclosures.

58. On March 13, 2025, Silverview timely filed an unsecured claim in the Defendant's Bankruptcy Case in an amount no less than $28,838,148.3 with respect to sums due and owing under the Summary Judgment Decision and Fee Order.

59. On March 14, 2025, the United States Trustee for Region 3 filed the *Notice of Appointment* (the "Appointment Notice"), which appointed Edward A. Phillips as the examiner (the "Examiner").

60. On March 18, 2025, the Court entered the *Order Approving the Appointment of a Chapter 11 Examiner by United States Trustee* [D.I. 131].

---

[14] References to the docket of the Bankruptcy Case shall appear as "D.I. _."

13

**FIRST CAUSE OF ACTION**
**(Holding Debt Non-Dischargeable**
**Pursuant to 1 1 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523 (a)(2)(B))**

61. The allegations of paragraphs one (1) through sixty (60) above are repeated and realleged above as if fully set forth herein.

62. Section 523(a)(2) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" or "(B) use of statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(A) and (B).

**I.     The Defendant's Misrepresentation Regarding Quantity of Blackford ATMs.**

63. In negotiating the terms of the Loan Agreement, the Blackford Entities agreed to grant a security interest and lien upon the Collateral, which included the Blackford ATMs.

64. To entice Silverview to enter into the Loan Agreement and fund the Term Loans, the Defendant, on behalf of the Blackford Entities, represented to the Plaintiff that the Blackford Entities owned 3,697 Blackford ATMs.

65. Additionally, at closing, the Defendant, on behalf of the Blackford Entities, executed the Perfection Certificate, which listed the purportedly 3,967 Blackford-owned and unencumbered Blackford ATMs, along with the corresponding serial numbers.

66. At the time the Defendant made the foregoing representations, the Defendant knew that the Blackford Entities (a) did not own 3,697 Blackford ATMs; (b) some or all of the Blackford

14

ATMs were pledged to other parties; or (c) some or all of the Blackford ATMs did not and do not exist.

67. The Defendant's falsities are also evidenced by his subsequent acts, including, without limitation, (a) his failure to fulfill the post-closing obligation to provide the physical locations of the Blackford ATMs, despite repeated requests to do so, and (b) information elicited during the Prestige Litigation regarding the size of the Automated Teller Machine network.

68. The Defendant represented to the Plaintiff that 3,697 Blackford ATMs existed and formed part of the Collateral package while knowing this was false or with reckless disregard for the truth of that representation.

69. The Defendant intentionally misrepresented the quantity of Blackford ATMs that would form part of the Collateral package to induce the Plaintiff into entering the Loan Agreement.

70. If not for the Defendant's representation regarding the quantity of Blackford ATMs, the Plaintiff would not have agreed to extend the Term Loans or enter into the Loan Agreement.

71. When entering into the Loan Agreement, the Plaintiff actually, reasonably, and justifiably relied on the Defendant's representations regarding the quantity of Blackford ATMs that formed part of the Collateral package.

72. The Plaintiff suffered damages proximately caused by the Defendant's misrepresentation of the quantity of Blackford ATMs because he induced the Plaintiff into loaning money under terms materially less favorable than those bargained for.

**II.  The Defendant's Misrepresentation Regarding Ownership of and Encumbrances on Blackford ATMs.**

73. In negotiating the terms of the Loan Agreement, the Defendant represented that the Collateral, including the Blackford ATMs, were owned by the Blackford Entities and unencumbered other than by the Permitted Liens.

15

74. According to the list of Prestige ATMs produced in connection with the Prestige Litigation, approximately 40 Prestige ATMs on the Prestige Funds' list matched the serial numbers on the Blackford ATMs list provided at closing.

75. Any interest in the Blackford ATMs purportedly held by the Prestige Funds (and others) is not part of the Permitted Liens under the Loan Agreement.

76. The Defendant represented to the Plaintiff that the Blackford ATMs were unencumbered other than by Permitted Liens while knowing it was false or with reckless disregard for the truth of his representation.

77. The Defendant intentionally misrepresented that the Blackford ATMs were unencumbered other than by Permitted Liens to induce the Plaintiff into entering the Loan Agreement.

78. If not for the Defendant's representation that the Blackford ATMs were unencumbered, other than with respect to Permitted Liens, the Plaintiff would not have agreed to extend the Term Loans or enter into the Loan Agreement.

79. When entering into the Loan Agreement, the Plaintiff actually, reasonably, and justifiably relied on the Defendant's representations regarding the ownership of and encumbrances on the Blackford ATMs.

80. The Plaintiff suffered damages proximately caused by the Defendant's misrepresentation that the Blackford ATMs were owned by the Blackford Entities and unencumbered other than by Permitted Liens because it induced the Plaintiff into loaning money under terms materially less favorable than those bargained for.

**III.  The Defendant's Intent to Deceive Silverview When Entering into the Loan Documentation.**

81. The Defendant made material misrepresentations regarding the quantity and ownership of and encumbrances on the Collateral and, as a result, fraudulently inflated the value, if any, of the Collateral, which fraudulently induced the Plaintiff to extend the loan and enter into the Loan Documentation.

82. The Defendant made material representations regarding the financial condition of the Blackford Entities and the Defendant, himself, which fraudulently induced the Plaintiff to extend the loan and enter into the Loan Documentation.

83. The facts and circumstances set forth herein present a picture of the Defendant's deceptive conduct and intent to deceive the Plaintiff in negotiating the Loan Agreement. Accordingly, upon information and belief, the Blackford Entities, under the Defendant's direction, entered into the Loan Agreement with an intent to deceive and mislead the Plaintiff and/or no intent of performing their obligations thereunder.

84. The Plaintiff suffered damages proximately caused by the Defendant's fraudulent conduct because it induced the Plaintiff into loaning money that the Blackford Entities had no intention of repaying and which the Defendant, if called upon to satisfy as Guarantor, could not.

**SECOND CAUSE OF ACTION**
**(Holding Debt Non-Dischargeable Pursuant to 11 U.S.C. §523(a)(6))**

85. The allegations of paragraphs one (1) through eighty-four (84) above are repeated and realleged above as if fully set forth herein.

86. In relevant part, 11 U.S.C. § 523(a)(6) provides that "[a] discharge under section . . . 1141 of . . . title [11] does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6).

87. The acts of Defendant detailed herein establish willful and malicious injury by the Defendant to the Plaintiff.

88. The Defendant willfully, maliciously and deliberately injured the Plaintiff by inducing it to extend the Term Loans, which the Defendant knew the Blackford Entities, controlled by the Defendant, had no intention of paying, was used to pay others, and/or was used to enrich the Defendant.

89. The Plaintiff's injuries were the direct result of the Defendant's wrongful and intentional acts.

90. The Plaintiff's conduct resulting in injury to the Plaintiff was without cause or just excuse.

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests judgment in this Court that:

A. Defendant's indebtedness to Plaintiff in an amount no less than $28,838,148.32 on account of the Defendant's conduct set forth above constitutes a nondischargeable debt pursuant to 11 U.S.C. §523(a)(2);

B. Defendant's indebtedness to Plaintiff in an amount no less than $28,838,148.32 on account of the Defendant's conduct set forth above constitutes a nondischargeable debt pursuant to 11 U.S.C. §523(a)(6);

C. Defendant shall pay to Plaintiff all costs of suit incurred herein; and

D. Grant Plaintiff such other and further relief which the Court deems appropriate.

Dated: May 16, 2025

**ALSTON & BIRD LLP**

By: */s/ Gerard Catalanello*
Gerard Catalanello, Esq.
James J. Vincequerra, Esq. (admitted *pro hac vice*)
Kimberly Schiffman Esq. (admitted *pro hac vice*)
90 Park Avenue
15th Floor
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: Gerard.Catalanello@alston.com
James.Vincequerra@alston.com
Kimberly.Schiffman@alston.com

*– and –*

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Plaintiff Silverview Credit Partners LP*