| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| **MCMANIMON, SCOTLAND & BAUMANN, LLC** <br> 75 Livingston Avenue, Suite 201 <br> Roseland, NJ 07068 <br> (973) 622-1800 <br> Anthony Sodono III (asodono@msbnj.com) <br> Sari B. Placona (splacona@msbnj.com) <br> *Counsel to Daryl Fred Heller* <br> *Chapter 11 Debtor and Debtor-in-Possession* |

| | |
|---|---|
| In re: <br><br> DARYL FRED HELLER, <br><br> Debtor. | Case No. 25-11354 (JNP) <br><br> Chapter 11 |

**BRIEF IN SUPPORT OF MOTION FOR AN ORDER APPROVING THE AGREEMENT AMONGST THE DEBTOR, HELLER CAPITAL GROUP, LLC, HELLER INVESTMENT HOLDINGS, LLC, AND DEERFIELD CAPITAL, LLC PURSUANT TO 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Daryl Fred Heller (the "Debtor"), the Chapter 11 debtor and debtor-in-possession, by and through his counsel, McManimon, Scotland & Baumann, LLC ("MSB"), respectfully submits this Brief in Support of his Motion to approve the Agreement (defined below) amongst the Debtor, Heller Capital Group, LLC ("HCG"), Heller Investment Holdings, LLC ("HIH"), and Deerfield Capital, LLC ("Deerfield") pursuant to 9019 of the Federal Rules of Bankruptcy Procedure (the "Motion").

**JURISDICTION**

1. This Court has jurisdiction over this proceeding under chapter 11 of the Bankruptcy Code, pursuant to 28 U.S.C. §§151, 157 and 1334.

2. Venue in this Court is proper, pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A), (B) and (O).

#124983040v1

4. The legal predicate for the relief sought herein is Fed. R. Bankr. P. 9019.

**BACKGROUND**

5. The Debtor filed a voluntary Chapter 11 bankruptcy proceeding on February 10, 2025. ECF 1.

6. The Debtor and Deerfield have the following pending matters in the Debtor's bankruptcy case:

   a. Adversary Proceeding No. 25-01092 (JNP) captioned <u>Daryl Fred Heller v. Deerfield Capital LLC and Orrstown Bank</u>, pursuant to which the Debtor is challenging, among other things, the extent, validity, and priority of Deerfield's liens (the "Adversary Proceeding");

   b. Deerfield's Motion for Relief from the Automatic Stay to Continue the State Court Proceedings Against the Debtor in Pennsylvania and New Jersey, Prohibit Use of Cash Collateral, Transfer Venue and Expedited Discovery (ECF 9) (the "Stay Motion");

   c. Deerfield's Motion to Appoint Trustee (ECF 30) (the "Trustee Motion");

   d. Beach House Sale Proceeds Dispute. Pursuant to an Order of the Bankruptcy Court dated April 3, 2025 (the "Sale Order") [ECF 169], net proceeds of the sale of the Debtor's interest in certain real property located at 7605 Pleasure Avenue, Sea Isle City, New Jersey (the "Beach House") in the approximate amount of $1,563,231.69 were placed in escrow with the Debtor's law firm, MSB's Escrow Account (the "MSB Escrow") pending further order of the Bankruptcy Court so as to permit the sale of the Beach House to occur while preserving the claims of certain objecting parties to the net proceeds.

   e. The Agreement reflects Deerfield is owed a total of $8,916,414.44 as of the Petition Date (the "Deerfield Claim") and that Deerfield Claim is owed for principal, interest and attorneys' fees, which amount will increase by actual fees incurred and interest at the default rate until paid in full.

 7. On March 7, 2025, upon the request of Deerfield, the court entered an Order Directing the Appointment of an Examiner after numerous negotiations between Deerfield and the Debtor. ECF 99.

 8. On March 14, 2025, the Office of the United States Trustee appointed Edward A. Phillips, CPA (the "Examiner") as the Examiner. ECF 118. As part of the Agreement, the parties wish for the Examiner to withdraw from the matter, thus saving the estate approximately $1,700,000. See Certification in Support of Motion ("Debtor's Cert."), at ¶ 6.

 9. The Examiner provided a budget estimating total fees in the amount of $1,416,195 and his attorneys' fees in the amount of $350,005. Id., at ¶ 7. This cost is no longer necessary to the estate now that an agreement has been reached with Deerfield, the primary movant to appoint a trustee which ultimately resulted in the appointment of the Examiner. Id. On May 12, 2025, Deerfield advised the Examiner to cease his examination to stop costs since Deerfield and the Debtor settled the issues as set forth in the Agreement. Id. Counsel for the Examiner did not reply to Deerfield's request until May 15, 2025, advising that, "[a]s the Order Appointing the Examiner is an agreed Court order that was negotiated by the Debtor, Deerfield and other parties, I believe that it would be inappropriate for the Examiner to stand down based on a request of less than all or nearly all parties in interest." Id. Therefore, it is uncertain as to whether the Examiner is still incurring fees and costs. Id. Should the Examiner be continuing to assess fees against the estate, this would be adding unnecessary costs to the estate which could be better used to satisfy creditors'

3

claims. Id. The Debtor and his counsel would not have agreed to the appointment of the Examiner had they known the Examiner's costs would be this high, which is why they negotiated for language in the order appointing the Examiner to be reasonable. Id.

10. The Claim filed by Deerfield is pursuant to certain loans issued to or guaranteed by the Debtor. Id., at ¶ 8. The term sheet (the "Term Sheet") resulted in the Agreement. The Agreement between the parties is annexed as **Exhibit A** to the Debtor's Cert. Id., at ¶ 9, Exh. A.

11. The Agreement represents an amicable resolution to resolve certain matters pending in the bankruptcy case between Deerfield and the Debtor. Id., at ¶ 10. Such matters include the following: (i) the Claim and judgments held by Deerfield against the Debtor, (ii) Deerfield's asserted entitlements to the net sales proceeds of the Beach House, and (iii) to address Deerfield's rights regarding its claims against HCG and HIG. Id.

12. Under the terms of the Agreement, the Debtor, HCG, and HIH acknowledge that obligations for certain loans and judgments to Deerfield remain outstanding. Id., at ¶ 11.

## BASIS FOR RELIEF REQUESTED

13. Pursuant to Fed. R. Bankr. P. 9019, as set forth below, the Debtor submits the Agreement should be authorized and approved because it is in the best interest of the estate, represents the sound business judgment of the Debtor, and is fair and reasonable under the circumstances.

14. Fed. R. Bankr. P. 9019(a) provides, in relevant part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bank. P. 9019(a). Fed. R. Bankr. P. 9019 empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate." Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). In fact,

4

settlements and compromises are "a normal part of the process of reorganization." <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968) (quoting <u>Case v. Los Angeles Lumber Prods. Co.</u>, 308 U.S. 106, 130 (1939)). Accordingly, the Court is authorized to approve the settlement, on the terms set forth in the Agreement.

15. Bankruptcy law favors settlement of disputes. <u>See</u>, e.g., <u>Will v. Nw. Univ. (In re Nutraquest, Inc.)</u>, 434 F.3d 639, 644 (3d Cir. 2006); see also TMT Trailer Ferry, 390 U.S. at 424 ("[I]n administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange a settlement of claims in which there is substantial and reasonable doubts."); <u>Tindall v. Mavrode (In re Mavrode)</u>, 205 B.R. 716, 719–20 (Bankr. D.N.J. 1997) (noting that the Third Circuit favors settlement in bankruptcy cases).

16. Thus, under Fed. R. Bankr. P. 9019(a), upon motion and after notice and a hearing, a bankruptcy court may approve a compromise or settlement. In determining whether to approve a settlement, a bankruptcy court should consider four criteria: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of litigation involved and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors. <u>Martin v. Myers (In re Martin)</u>, 91 F.3d 389, 393 (3d Cir. 1996).

17. In making its determination, a court must not substitute its judgment for that of the Parties. It is a decision to be made in the board room, not the court room. Indeed, under normal circumstances, the court should defer to the Debtor's business judgment so long as legitimate business justification for the settlement exists. Moreover, the settlement need not qualify as the best possible compromise. Instead, the court need find only that the settlement is fair, reasonable, and in the best interest of the estate. Next, the court should not decide questions of law and fact raised by any objections. Rather, the court should only canvas the issues to determine whether the

5

settlement falls "below the lowest point in the range of reasonableness." Martin, 91 F.3d at 393.

18. Applying this standard, bankruptcy courts in this District routinely approve settlements in bankruptcy cases. See, e.g., In re Grand Prix Assocs. Inc., 2009 WL 1850966 at **6-8 (Bankr. D.N.J. June 26, 2009) (approving settlement because, among other reasons, litigation was certain to be extremely costly and time consuming and parties could not demonstrate whether there would be sufficient monetary collection that would benefit estate); In re McDermott, 2008 WL 877964 at *6 (granting chapter 7 trustee's motion to approve settlement of debtors' state court action asserting fraud, mismanagement, and other claims, where trustee had undertaken extensive due diligence when she evaluated probability of success; trial issues were complex; there was no guarantee of favorable outcome on merit; administration costs would likely consume any potential recovery by unsecured creditors unless recovery was well in excess of $1 million; and serious issues as to collectability of any money judgment existed because defendants resided in Florida); In re NJ Affordable Homes Corp., 2007 WL 4300153 at **3-4 (Bankr. D.N.J. Dec. 5, 2007) (approving chapter 7 trustee's settlement providing for transfer of certain real properties to title insurance company, where proposed settlement would net for estate $20,000.00 per property, and thus, $900,000.00 for forty-five properties; such recovery represented significant consideration in exchange for release of claims which might eventually have no value, given lack of equity remaining in properties; such recovery was far more beneficial than possibility of zero recovery plus accumulation of significant professional fees in litigation; management of properties had ceased; and real estate market had deteriorated); In re NJ Affordable Homes Corp., 2007 WL 3166950 at **8-11 (Bankr. D.N.J. Oct. 22, 2007) (approving chapter 7 trustee's settlement whereby chapter 7 trustee would pursuant to certain procedures enter into consent judgments with Ponzi scheme investors, where litigation was complex and expensive, continuing litigation would

require extensive discovery with large number of defendants, collection efforts against defendants would likely be fruitless, and requiring defendants to litigate, rather than cut their losses, would be punitive and unfair); In re NJ Affordable Homes Corp., 2007 WL 2713046 at **8-10 (Bankr. D.N.J. Sept. 13, 2007) (approving chapter 7 trustee's settlement providing for transfer of certain real properties to certain institutional lenders, where adversary proceedings at issue were complex and litigious, litigation expenses were enormous, settlement would neither affect nor prejudice rights of competing mortgage holders in properties, individual investors in case sought finality, and settlement was designed to minimize claims against estate).

19. In the present case, four (4) Martin factors are addressed or have been satisfied. The controversy between the Debtor and Deerfield is a contractual dispute arising out of certain loans. The probability of success is unknown. The dispute centers around loans that the Debtor has personally guaranteed. The likelihood of collection is not foreseeable. The litigations have spanned over a year and are very complex. Depositions and discovery will be needed, and costs will continue to accrue. Lastly, considering the interest of creditors, resolving this dispute will allow the Debtor to move towards confirmation of his reorganization plan. For these reasons, the time and expense of getting to that point would diminish any benefit to the estate due to the administrative fees which would be incurred based upon the pending litigation.

20. Third, the complexity and time involved in litigating the matter and resulting recovery for creditors would be speculative at best.

21. Lastly, eliminating the cost and fees of the Examiner and his counsel are a benefit to the estate and the Debtor's creditors.

22. The Debtor strongly disputes the positions taken by Deerfield but notes that the Agreement resolves the Stay Motion and the lien litigation as to the Beach House and the net

7

proceeds of the sale. The parties reserve their rights in connection with Stay Motion.

23. Accordingly, the Debtor submits the Agreement is fair and equitable and falls within the range of reasonableness. Martin, 91 F.3d at 393.

24. The relief requested by the Debtor in the Motion is also consistent with this Court's equitable powers pursuant to Section 105(a) of the Bankruptcy Code. Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a). As one court acknowledged, Section 105 of the Bankruptcy Code confers broad powers on bankruptcy courts:

> [Section] 105 [is] an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of [section] 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of its jurisdiction . . . .

Davis v. Davis (In re Davis), 170 F.3d 475, 492 (5th Cir. 1999) (internal citations and quotations omitted); see also In re Kaiser Aluminum Corp., 456 F.3d 328, 340 (3rd Cir. 2006). Under Section 105(a) of the Bankruptcy Code, this Court has expansive equitable power to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets. See Coie v. Sadkin (In re Sadkin), 36 F.3d 473, 478 (5th Cir. 1994). The facts of this case further Section 105's purpose.

25. Therefore, the Agreement should be approved by the Court, because Deerfield shall hereby forbear from exercising remedies available to it.

26. The relevant terms and conditions of the Agreement[1] are as follows:

1) Heller, HIH and HCG agree and confirm that as of the Petition Date, the Deerfield Claim is owed for principal, interest, and attorneys' fees which amount will increase by actual fees incurred and interest at the default rate until paid in full. Such Claim is the result of the Debtor borrowing the sum of $5,900,000.00 pursuant to a Promissory Note.

---

[1] See Debtor's Cert., at ¶ 12.

2) Debtor waives any defenses or counterclaims to Deerfield's liens and Claim, if any, however, Deerfield agrees that it does not have a lien on the sales proceeds of the Beach House or the proceeds thereof.
3) Heller confirms that Deerfield owns fifteen percent (15%) of the LLC interests in HIH and has a valid but unexercised pledge of the remaining eighty-five percent (85%) LLC interest and a valid but unexercised pledge of the membership interest in GCC Investment Holdings LLC ("GCC Investment Holdings").[2]
4) Heller agrees that there are no defenses to the exercise of the pledge on (i) Heller's membership interest in HIH or (ii) pledge on GCC Investment Holdings other than the pending bankruptcy stay if it constitutes a "defense."
5) Deerfield has agreed to forbear from executing its pledge on its entire membership interest on HIH to allow Heller to utilize a portion of his membership interest in HIH to fund his plan of reorganization.
6) The parties agree that Deerfield will receive an additional ten-percent (10%) membership interest in HIH free and clear of liens ("Additional HIH Interest") and release its forty-nine percent (49%) of Heller's remaining interests in HIH, which Heller can use to fund a Plan. The remaining interests of 26% in HIH owned by Heller shall remain subject to the pledge currently held by Deerfield. So long as there is no default on the terms of this Agreement, Deerfield shall forbear from exercising its pledge on the remaining membership interests owned by Heller. The membership interests provided to creditors under a Plan shall be subject to an operating agreement prohibiting dilution of Deerfield without consent and providing "tag along"[3] and veto/oversight rights and the shares provided to any creditors are no greater than the rights provided to Deerfield. The parties shall all execute an Amended Operating Agreement which shall address any succession issues if Heller can no longer manage HIH.
7) Heller agrees that he will not contest nor have HIH contest the exercise by Deerfield of its pledge of the membership interests of GCC Investment Holdings which exercise shall not affect or diminish the rights and claims of Deerfield against Heller, HIH, HCG or any other person or entity. Deerfield agrees that upon payment in full of the Deerfield Claim, its GCC Investment Holdings membership interests will be returned by Deerfield to Heller and/or HIH.
8) The parties agree that Deerfield will return five-percent (5%) of the Additional HIH membership Interests to HIH upon the Deerfield Claim being paid in full after which point Deerfield will own a twenty-percent (20%) membership interest in HIH.
9) HIH will pledge as the collateral to Deerfield, free and clear of all other claims, the three notes (the "Notes") which HIH holds from Glorious[4] up to $8,000,000 allocation of those Notes (unless Deerfield Claim is already paid in full). This will be evidenced by a pledge agreement and allonge to be executed upon approval of this settlement agreement, may file an additional UCC, and take such other steps to perfect and confirm its lien and security interest in all three (3) Notes, however notes can only be used up to $8,000,000 of their

---

[2] GCC Investment Holdings LLC is owned by HIH, and is a holding company that holds assets, such as various real estate assets and operating assets in the cannabis industry.
[3] Tag-along rights, also known as co-sale rights, protect minority shareholders by allowing them to participate in a sale of a majority stake of a company on the same terms as the majority shareholder. This provision ensures that minority shareholders aren't left behind and can realize their investment alongside the majority shareholders.
[4] The three notes total approximately $22,000,000, in which up to $8,000,000 will be allocated to Deerfield. Glorious is a holding company owned by HIH. See footnote 1.

9

face value. Deerfield agrees that upon payment in full of the Deerfield Claim, the three (3) Notes will be returned by Deerfield to HIH unless paid in part to Deerfield, however if paid in part to Deerfield, any excess amount to HIH and any unpaid notes to HIH.

10) HIH shall pay Deerfield $15,000 /month with the first payment commencing thirty (30) days from court approval of the Agreement and then each month thereafter on the same date.

11) HIH will distribute dividends or distributions pro-rata to members of proceeds received from free cash flow and liquidity events subject to reserves for normal operating expenses.[5] The payments pursuant to the Deerfield Claim will not affect Deerfield's right to receive distributions as a member of HIH but distribution on the Additional HIH Interest will be used to pay the Deerfield Claim. Any distribution made on the initial Deerfield fifteen percent (15%) HIH membership Interest shall not be applied to the Deerfield Claim.

12) Deerfield agrees to a joint defense agreement with HIH to assist HIH in litigation with GCC Investment Holdings and Glorious Cannabis Company Multi State Operator ("GCC MSO")[6] and other individual parties regarding the alleged seizure of HIH's interest in GCC Investment Holdings and the entities owned by GCC MSO. Deerfield's legal fees under the joint defense can be accrued on HIH balance sheet and paid with free cash flow at a time to be determined until the Deerfield Claim is paid in full. Heller or parties connected to him shall provide all information requested by Deerfield upon due diligence of its claim. Heller will be provided with status updates on a continual basis at the discretion of Deerfield.

13) Deerfield is an interested party in claims held by HIH in all claims against the other members of GCC Investment Holdings, GCC MSO, the Receiver[7] of Glorious Cannabis and all entities in the HIH portfolio.

14) HCG agrees to file a liquidating Chapter 11 bankruptcy petition in New Jersey within thirty (30) days of execution of the Term Sheet in exchange for the support of Deerfield in a Plan of Reorganization. The Agreement was to be filed within five (5) days of execution of the Term Sheet, however, this deadline was not met. HCG agrees that Deerfield's security interest in HCG shall be treated as follows:
    a. Cohn Reznick shall be appointed as the liquidating agent in the Chapter 11 Plan of HCG to be filed with the Petition to liquidate the assets of HCG for the benefit of the creditors of HCG.
    b. Deerfield shall receive twenty-five percent (25%) of each portfolio company owned by HCG, liquidation and 25% recovery from PAAS/Green Cabbage up to $5,000,000 as a secured creditor of HCG until the Deerfield Claim is paid in full, subject to senior liens ahead of Deerfield.

15) <u>Payment on the Deerfield Claim.</u>
    a. Deerfield shall receive $350,000 from the sale proceeds of the Beach House upon court approval and in exchange for the partial release of the pledge of HIH referenced above;
    b. Deerfield shall receive $300,000 from non-Debtor entity upon sale of real property owned by non-Debtor entity; and

---

[5] HIH will either distribute free cash flow funds in the ordinary course to members.
[6] A Multi State Operator has operations in more than one state within the United States.
[7] A Receiver of Glorious Cannabis was brought in by Needham Bank in Michigan and Massachusetts to evaluate the business.

10

      c. If Heller sells HIH's or HCG's assets on or before August 31, 2025, Heller shall pay discounted amount of $5,000,000 in full satisfaction of the Deerfield Claim.

16) Upon approval of a settlement agreement/plan support agreement and the executed ancillary documents, HCH, HIH, Heller and Deerfield shall execute a tolling agreement which shall toll the Statute of Limitations on all claims against the Debtor's spouse, Debtor's son, Debtor's daughter, Accordo, L.P., Brigantine Group, Inc, and Brookfield L.P. Upon receipt of a total of $2,000,000 by December 31, 2025, from the payments in 15(a), 15(b) and 15(c) of Section 15 and any payments from HIH and HCG, Deerfield will release its claims against the Debtor's spouse, Debtor's son, Debtor's daughter, Accordo, L.P., Brigantine Group, Inc, and Brookfield L.P. No funds received by Deerfield from GCC Investment Holdings or the claims, if any, against Joel Getter ("Getter"), Gold Capital ("Gold") or Madison Capital ("Madison")[8] shall count towards this target of $2,000,000. If payment is not made by December 31, 2025, this does not constitute a default under this Term Sheet.

17) As part of signing the settlement agreement, Deerfield agrees to suspend all existing actions and potential claims until this settlement agreement is approved by the Bankruptcy Court in New Jersey and then continues to suspend all existing actions and potential claims unless there is a default.

18) Defaults. The following are self-executing Events of Default which result in the immediate termination of this Term Sheet:
      a. The failure of HCG to file its Chapter 11 petition within thirty (30) days of execution of this Term Sheet settlement;
      b. The failure of HCG to retain Cohn Reznick as Liquidating Agent and file a Plan of Liquidation within forty-five (45) days of the signed Term Sheet.
      c. The execution of the Agreement within five (5) days of execution of the term Sheet and approval of that Settlement Agreement within thirty (30) days thereafter subject to the Court's calendar and any opposition. If there is any filed opposition to approval of the proposed Settlement Agreement, that timing shall not be construed as a default by Heller. Approval of the Settlement Agreement shall not exceed seventy-five (75) days from execution of the Term Sheet unless consented to by the parties to extend such time.
      d. HCG or Heller propose or confirm a Plan which is materially different from the treatment set forth in this Term Sheet or in an approved Settlement Agreement.
      e. The failure to make any payment called for in this Agreement in the time period required by this Agreement. If payments in paragraph 15 b. or c and 16 are not received, that is not considered a default.
      f. The failure to obtain the approval of the terms contained in the signed Term Sheet or Agreement.
      g. The failure to make the payment in 15a or obtain its approval, the failure to make any of the payments in 10, the failure to deliver or obtain court approval of any of the additional collateral to be provided herein or to perform any of the material provisions herein.

19) Deerfield further agrees to the following:

---

[8] Getter, Gold and Madison are entities HCG has claims against that Deerfield will pursue to satisfy debts owed by the Debtor.

11

    a. A stand-still of all claims, litigation and/or discovery against the Debtor's spouse, Debtor's son, Debtor's daughter, Accordo,[9] Brigantine, and Brookfield[10] unless there is a default under the Settlement Agreement. Deerfield also provides a release to Debtor's daughter upon approval of an Agreement by the Bankruptcy Court and payment of the NJ Sale proceeds in the amount of $350,000, however, should there be a default under this Settlement Agreement, the release executed in favor of his daughter shall be terminated as null and void.

    b. The status quo order [ECF 119] shall remain in effect until confirmation of Heller's Plan at which point it will be terminated with filing of Heller Plan. Post confirmation, Heller will provide Deerfield protections similar to the status quo order and Deerfield shall receive notice of all sales and purchases over $150,000 with a thirty (30) day notice until Deerfield receives $5,000,000. However, if $2,000,000 is received by December 31, 2025, the post confirmation status quo provisions shall completely expire.

    c. Upon execution of the signed Term Sheet, Deerfield was to withdraw all subpoenas without prejudice. Additionally, as the movant and along with Heller counsel, Deerfield will file a motion to remove the Examiner with the court upon one (1) day of execution of the settlement document.

    d. Deerfield shall support and vote in favor of Heller and HCG's Plans.

    e. Upon signing this Term Sheet, Deerfield shall advise the Examiner to stand down from performing any further services as Deerfield has an agreement in place to settle with the Debtor; Deerfield being the movant which resulted in the appointment of the Examiner.

    f. The Debtor and Deerfield will file a motion to remove the Examiner upon three (3) day of execution of the signed Term Sheet so as to be heard at the same time as the motion to approve the settlement agreement with Deerfield.

    g. Deerfield will agree to discuss a resolution of all claims with all creditors of Heller, HIH, and HCG.

20) HCG or HIH agrees to provide all emails, communications or documents not already provided relating or with Getter, Gold or Madison from the period 1/1/24 to 4/30/24 and by approval of these Settlement Agreement all communications and emails with the foregoing from 1/1/24 to 9/30/24 within seventy-two (72) hours of execution of the Term Sheet.

27. These terms and conditions were negotiated at length by the parties prior to reaching the Agreement. The Debtor particularly focused on the settlement being received versus the anticipated cost of litigation that would be required if litigation with Deerfield was to be prosecuted or defended. Even if the Debtor was successful, it is anticipated that Deerfield would

---

[9] See footnote 8.
[10] Accordo, Brigantine and Brookfield are entities not owned by the Debtor.

appeal any decision and the time, expense and uncertainty involved with continued contentious litigation and the resulting administrative costs would outweigh the benefits.

28. The Debtor respectfully submits that the Agreement satisfies the applicable legal standards, is fair, equitable and reasonable, and should be approved by this Court. Martin, 91 F.3d at 393. Therefore, the Agreement not only surpasses the minimum threshold of reasonableness necessary to warrant approval it produces the best economic result possible for the Debtor's estate and creditors. Id.

29. Deerfield has a pledge of all of Debtor's membership interests in HIH. See Debtor's Cert., at ¶ 13. The appointment of the Glorious receiver, by its very nature, has caused the valuation of Glorious to significantly drop. Id. Since Glorious is one of HIH's larger assets, this has lowered the value of HIH as well. Id. HIH is valued at approximately $20,000,000 to $30,000.000, (i) when taking into consideration Glorious's value was significantly impacted by appointment of the Glorious receiver, one of HIH's largest assets, and (ii) the stock that has been unlawfully taken by GCC Investment Holdings. Id. Deerfield's ten percent (10%) interest in HIH is therefore valued at $2,000,000 to $3,000,000. Id. Deerfield also has a pledge where other creditors do not. Id.

30. Deerfield has the right to exercise its pledge on all the membership interests on HIH as well as its interests in GCC Investment Holdings, which is not in receivership or subject to the stay that owns the Glorious entities. Id., at ¶ 14. There were valuations provided to Debtor by Glorious Management Team in 2024 reflecting that Glorious entities pre-receivership were valued at approximately enterprise valuation of $280,000,000, less approximately $100,000,000 in debt, which leaves a pre-receivership net equity valuation of approximately $180,000,000. Id. HIH's pre-receivership ownership in the Glorious entities was approximately an effective nineteen percent (19%), therefore its ownership was valued at approximately $35,000,000. Id.

13

31. Under the Agreement, Deerfield is only exercising its pledge on collateral and is releasing from the pledge interests in HIH which the Debtor can use to fund its plan. Id., at ¶ 15. HIH is only agreeing to this measure with Deerfield in order to reach a resolution as outlined in this Motion. Id.

32. The interests in HIH and the $350,000 cash is the only guaranteed money to Deerfield. Id., at ¶ 16.

33. Deerfield has agreed to limit its recovery to $5,000,000 from HCG and not the entirety of the Deerfield Claim. Id., at ¶ 17.

## CONCLUSION

34. As set forth in the above paragraphs, by allowing the Agreement to be approved, it will benefit the Debtor's estate and creditors. As such, the Debtor respectfully submits that an Order approving the Agreement is in the best interest of the Debtor and his estate and should be granted. Id., at ¶ 18.

35. The Agreement is fair and equitable and in the best interest of the estate, approval of the Agreement meets the criteria set forth in Fed. R. Bankr. P. 9019 and the applicable case law, and therefore the proposed order approving the Agreement should be granted.

**WHEREFORE**, the Debtor respectfully request that this Court enter an Order, in form similar to the attached proposed order.

          **McMANIMON, SCOTLAND,**
          **& BAUMANN, LLC**
          *Counsel to Daryl Fred Heller,*
          *Chapter 11 Debtor and Debtor-in-Possession*

          By:   */s/* Sari B. Placona
                 **SARI B. PLACONA**

Dated: May 20, 2025

4904-5462-0997, v. 1