**STARK & STARK, P.C.**
A Professional Corporation
Marshall T. Kizner, Esq.
Joseph H. Lemkin, Esq.
100 American Metro Boulevard
Hamilton, NJ 08619-2319
(609) 791-7022
*Attorneys for Prestige*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: <br><br> DARYL FRED HELLER, <br><br> Debtor. | Chapter 11 <br><br> Case No. 25-11354 (JNP) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR THE APPOINTMENT OF CHAPTER 11 TRUSTEE AND TO MODIFY EXAMINER'S ORDER

Prestige Fund A, LLC, Prestige Fund A IV, LLC, Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund B II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC, Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC, Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC, Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund VI, LLC and WF Velocity Fund VII, LLC (collectively, "Prestige Funds" or "Movant") submits this Memorandum of Law in Support of its Motion for Appointment of Chapter 11 Trustee and to Modify Examiner's Order ("Second Motion").

Movant incorporates, by reference, as if set forth herein, in full, the contents of Deerfield Capital LLC's Motion to Appoint a Chapter 11 Trustee ("First Motion") [ECF. No. 30]; Response in support filed by Deerfield Capital, L.L.C. [ECF. No. 63]; Response in support filed by

Orrstown Bank [ECF. No. 66]; Response in support filed by Orrstown Bank [ECF. No. 66];

Response in support filed by Steven Mitnick, Receiver [ECF. No. 80]; and Response in support

filed by the Prestige Funds [ECF. No. 80].

Movant also seeks to amend the Order Directing the Appointment of an Examiner [ECF

No. 99]. The Examiner has issued numerous Rule 2004 Examination Subpoenas and received

responses from many of the third parties. Examiner is willing to share this information with

interested parties in the case, including Movant, but there is nothing in the Examiner Order

expressly allowing disclosure. It is important the Court amend the Examiner Order so creditors

and parties of interest can receive discovery in the Examiner's possession. This is discovery

creditors are entitled to, but Debtor has resisted allowing Movant to engage in any Rule 2004

discovery by filing motions to quash. Notwithstanding the fact that during the meeting of

creditors, Debtor directed creditors to seek additional information through Rule 2004 subpoenas.

## **PRELIMINARY STATEMENT**

Daryl Fred Heller ("Debtor") engaged in a massive Ponzi scheme that led to numerous

creditors being defrauded out of hundreds of millions of dollars. Creditors have collectively filed

claims totaling more than $800,000,000.

To prevail on the appointment of  a Chapter 11 Trustee, the movant must show "cause,

including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by

current management, either before or after the commencement of the case, or similar cause, but

not including the number of holders of securities of the debtor or the amount of assets or liabilities

of the debtor." 11 U.S.C. § 1104(a)(1). Or, "if such appointment is in the interests of creditors, any

equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor." 11 U.S.C. § 1104(a)(2).

The evidence is overwhelming in this matter, as highlighted in the prior pleadings filed with the Court and detailed, with specificity in the fifteen nondischargeabilty actions filed between May 15th and May 19th. The Court should grant the motion, in full,[1] due to the pervasive fraudulent conduct of the Debtor, interest of the creditors and interest of properly administering the estate.

The Motion is also critical because Debtor continues to abuse the bankruptcy process by seeking to effectively approve a plan of reorganization through a 9019 Motion to Approve a Settlement, which is also returnable on June 10, 2025 [ECF No. 258]. As part of Debtor's motions, it seeks to liquidate within thirty (30) days of execution of the Term Sheet in exchange for the support of Deerfield in a Plan of Reorganization. Debtor also has agreed with one of its many creditors that Cohn Reznick shall be appointed as the liquidating agent in the Chapter 11 Plan to be filed with a plan to liquidate the assets of Debtor and third party entities for the benefit of Debtor and his entities. Further, Deerfield shall receive a contingent fee based on additional collections and liquidations under an unknown and unseen Chapter 11 Plan.

So, Debtor, while engaging in a massive fraud scheme, resisting disclosure of any discovery pursuant to Rule 2004, now seeks to control his own fate and improperly force a plan down his creditors' throats.

---

[1] The Court appointed an examiner [ECF No. 99] to review the Debtor's records and report back to the Court. The movant does not seek to impede the examiner's work, but, once the work is concluded or within 30 days of disposition of this motion, whichever is sooner, the Court should order the transition of the materials in the examiner's possession to a Chapter 11 Trustee.

## **STATEMENT OF FACTS**

Movant does not want to "beat a dead horse" reviewing the scope and extent of the

Debtor's Ponzi fraud scheme that is already detailed throughout the pleadings. Still, a summary of

the fifteen nondischargeability actions provides additional context in support of the motion. Each

of the nondischargeability actions, pleads, with specificity, facts to support causes of action under

11 U.S.C. § 523(a)(2) (for money obtained by fraud or false representations); 11 U.S.C.

§ 523(a)(4) (embezzlement and larceny) and § 523(a)(6) (for willful and malicious injury), among

other sections of 11 U.S.C. § 523.

    1.    Prestige Funds, Case No. 25-01199.

Debtor orchestrated a widespread fraudulent scheme involving the sale and operation of

automated teller machines and Bitcoin machines (collectively, "ATMs"). Heller, through his

company Paramount Management Group, LLC, solicited investments from over 2,700 investors,

who collectively invested hundreds of millions of dollars in the purchase and operation of more

than 30,000 ATMs. Heller made numerous fraudulent representations regarding the number of

ATMs purchased, their operation, the viability of the Funds' investments, and the profits being

earned. Heller provided bills of sale with placeholder serial numbers, failed to buy the number of

ATMs corresponding to the investments, and in some cases, never deployed ATMs or sold the

same ATMs to multiple entities.

Further, Heller misrepresented the financial health and operations of the ATM business,

including testifying under oath to exaggerated numbers of operational ATMs and the viability of

the business, while internal documents showed significant losses and a much smaller network.

When the Funds sued in the Pennsylvania Court of Common Pleas for breach of contract after

payments ceased, contempt proceedings revealed that many of the ATMs either never existed,

were never deployed, or were double-sold. Heller operated a Ponzi scheme by using new investments to pay prior obligations, diverted investor funds for unauthorized purposes, and, after a consent judgment, transferred funds to related entities to evade payment. Prestige was collectively defrauded out of over $540,000,000 in funds. These actions constitute intentional fraud, misappropriation, and willful and malicious injury to the Funds and their investors.

        2.        <u>Deerfield Capital, LLC, Case No. 25-01211</u>

Debtor, as CEO of Heller Capital Group and manager of Heller Investment Holdings, engaged in a pattern of fraudulent conduct to induce Deerfield Capital, LLC to lend millions of dollars. Debtor and his entities repeatedly defaulted on a series of promissory notes and forbearance agreements, ultimately confessing judgment for over $8.7 million. To induce Deerfield to enter into these agreements, Debtor provided financial statements and documents that were either fraudulent or contained material misrepresentations. For example, Debtor submitted different personal financial statements to Deerfield, another creditor, and the IRS bearing the same date, and provided Deerfield with documents purporting to show imminent distributions from entities he owned, which were revealed by metadata and third-party confirmation to be fabricated.

Additionally, after defaulting, Debtor transferred or sold assets—including interests in companies and real property—out of the reach of creditors, despite Deerfield's security interests. Debtor also provided Deerfield with false assurances about the availability of funds and the status of assets, while actually diverting proceeds for his own benefit and failing to remit any to Deerfield. These actions, including the creation of fraudulent documents and the concealment or transfer of assets to hinder, delay, or defraud creditors, are alleged to constitute actual fraud, embezzlement, and willful and malicious injury.

3.     Silverview, Case No. 25-01202.

Debtor, acting as CEO of Heller Capital Group and on behalf of the Blackford Entities, engaged in a fraudulent scheme to induce Silverview to extend over $23 million in loans. Debtor provided Silverview with financial statements, collateral documentation, and oral representations that the Blackford Entities owned 3,697 unencumbered Automated Teller Machines (ATMs) valued at over $90 million, and that these ATMs were generating substantial revenue. Heller further represented that the ATMs were managed by a related entity, Paramount Management Group, and that all collateral was properly insured and free of undisclosed liens. These representations were material to Silverview's decision to enter into the loan agreements and were relied upon in good faith.

But these representations were fraudulent. Evidence from related litigation and post-closing events revealed that a significant number of the ATMs either did not exist, were double-pledged to other parties, or were encumbered by undisclosed liens. Some serial numbers provided as collateral were found to be fictitious placeholders. Heller failed to provide required post-closing documentation regarding the physical location of the ATMs and defaulted on the loan obligations. Debtor's misrepresentations were intentional and designed to fraudulently inflate the value of the collateral, induce Silverview to lend funds, and ultimately misappropriate those funds for purposes other than repaying the loan, resulting in substantial financial harm.

4.     Reliance Financial, LLC, Case No. 25-01212.

Debtor, as owner and controller of Paramount Management Group, LLC, engaged in a fraudulent scheme to obtain working capital from Reliance Financial, LLC ("RF"). Heller represented to RF that all deposits into Paramount's bank accounts were revenue generated from the sale and operation of automated teller machines (ATMs). In reality, a substantial portion of the

funds reflected in the bank statements provided to RF were not business revenue, but investor funds. Relying on these misrepresentations, RF entered into two purchase agreements with Paramount, paying a total of $5,330,000 to purchase future receivables. Heller personally guaranteed the accuracy of all representations and warranties made to RF, including the source of the deposits and Paramount's title to the receivables.

Debtor's misrepresentations were material and made with the intent to deceive RF into entering the transactions. RF would not have entered into the agreements had it known the true nature of the deposits. Additional false representations included Paramount's claim to have good, complete, and marketable title to all receivables and that it would not enter into conflicting arrangements with other parties. Further, written and oral misrepresentations induced RF to provide significant funding, resulting in damages exceeding $4.6 million, when the true nature of Paramount's finances was revealed.

5. Steward Capital Holdings, Case No. 25-01216.

Debtor, as CEO and authorized signatory of Heller Capital Group, LLC, made material misrepresentations to Steward Capital Holdings LP and Avenaero Holdings, LLC to induce them into making loans totaling $5,000,000. Debtor fraudulently represented that Golden Gate Investment Company, LLC owned approximately 584 digital currency kiosk machines (DCMs) free and clear of any liens except those created by the loan agreements, and that these DCMs would serve as collateral for the loans. In reality, the majority of the DCMs pledged as collateral had already been pledged to another lender (Chicago Atlantic Admin, LLC) by PowerCoin, LLC before the Plaintiffs' loans. Debtor signed the loan documents and specifically represented the DCMs' ownership and lien status with knowledge of their falsity, intending Plaintiffs to rely on these misrepresentations.

Debtor also made further fraudulent misrepresentations to induce Plaintiffs to invest in Project Catapult, LLC, presenting prospectuses and financial projections that materially misrepresented the company's assets, liabilities, and investment structure. Plaintiffs relied on these false statements and invested a total of $3,000,000 in Project Catapult. Debtor's conduct was intentional and designed to deceive Plaintiffs, resulting in substantial financial harm, and seeks a determination that the resulting debts are non-dischargeable in bankruptcy due to fraud, embezzlement, and willful and malicious injury.

6.      Karen L. Parreira 2023 Irrevocable Trust, Case No. 25-01213.

Debtor, as CEO of Heller Capital Group and manager of Heller Investment Holdings, orchestrated a fraudulent scheme involving investments solicited from the Karen L. Parreira 2023 Irrevocable Trust, the David L. Parreira 2023 Irrevocable Trust, and the Paul and Deborah Parreira Family 2005 Irrevocable Trust (collectively, the "Trusts"). Debtor represented that the Trusts' loans, totaling $2,000,000, would be used to finance Glorious Cannabis Co. ("Glorious") through convertible debt instruments for legitimate business purposes such as working capital, capital expenditures, and equipment acquisition. In reliance on these representations, the Trusts provided the funds, which were documented in promissory notes.

At any rate, none of the loaned funds were actually provided to Glorious. Instead, Debtor retained and/or diverted the funds for his own benefit or for the benefit of other entities under his control. At the time the loans were made, Debtor and his related entities were under severe financial distress due to the unraveling of a Ponzi scheme involving Paramount Management Group, LLC. Debtor failed to disclose the true financial circumstances of his businesses or the existence of the Ponzi scheme, and that funds raised from the Trusts were used to prop up other failing businesses.

7.    Funders App, LLC, Case No. 25-01214

Debtor, as owner of Paramount Management Group, LLC, committed fraud by misrepresenting the true nature of Paramount's revenue to Funders App, LLC (d/b/a Fundonatic). In March 2024, Debtor sought working capital from Fundonatic and represented that all deposits into Paramount's bank accounts were revenue generated from the sale and operation of automated teller machines (ATMs). In reality, a substantial portion of the funds reflected in the bank statements provided to Fundonatic were not business revenue, but investor funds. Fundonatic relied on these misrepresentations and entered into an Agreement to Purchase Future Receivables, paying Paramount $1,250,000 to purchase $1,873,750 of future receipts. Debtor personally guaranteed the accuracy of all representations and warranties made to Fundonatic, including the source of the deposits and Paramount's title to the receivables.

Debtor's misrepresentations were material and made with the intent to deceive Fundonatic into entering the transaction. Fundonatic would not have entered into the agreement had it known the true nature of the deposits. Debtor also falsely represented Paramount's claim to have good, complete, and marketable title to all future receipts and that it would not enter into conflicting arrangements with other parties. These written and oral misrepresentations induced Fundonatic to provide significant funding, resulting in damages exceeding $1.1 million when the true nature of Paramount's finances was revealed.

8.    Pinnacle, Case No. 25-01209

Debtor as CEO of Heller Capital Group and manager of Heller Investment Holdings, solicited a $500,000 loan from Pinnacle Asset Management, LLC for Project Catapult, purportedly to meet short-term financial needs. At the time of the loan, Debtor and his related entities were under significant financial distress due to the collapse of a Ponzi scheme involving Paramount

Management Group, another Heller-controlled entity. Debtor diverted the loan funds and other investments away from their intended purpose, instead using them to benefit himself or other entities under his control, without the knowledge or consent of Pinnacle. Debtor also induced others to issue loans around the same time; despite knowing he lacked the means to repay them, and to have lied about the need for funding.

Debtor further failed to disclose the true financial circumstances of his businesses or the existence of the Ponzi scheme to Pinnacle. Instead, he misrepresented the use and security of the loaned funds, which were not used for Project Catapult as promised, but were instead diverted to prop up failing businesses or for Heller's personal benefit. These actions constituted fraud in the inducement and fraudulent misrepresentations, as Pinnacle would not have provided the loan had it known the true facts.

9.    Summit Asset Management, Case No. 25-01208

Debtor, as CEO of Heller Capital Group and manager of Heller Investment Holdings, solicited $1,750,000 in investments from Summit Asset Management, LLC for DOBE Investment Group, which was presented as a direct-to-consumer cannabis business. Debtor fraudulently diverted these funds from DOBE to himself and other entities under his control, and further pledged DOBE's assets to secure debt obligations for his own benefit and that of his related businesses, all without the knowledge or consent of Summit. Debtor also induced other individuals to provide loans at or around the same time; despite knowing he lacked the means to repay them, and to have lied about the need for funding.

Debtor also failed to disclose the true financial circumstances of his businesses or the existence of a Ponzi scheme he was operating. Instead, he misrepresented the use and security of the loaned funds, which were not used for DOBE as promised, but were instead diverted to prop

up failing businesses or for Heller's personal benefit. These actions are alleged to constitute fraud in the inducement and fraudulent misrepresentation, as Summit would not have provided the investment had it known the true facts.

10.     WebBank, Case No. 25-01218.

Debtor, as CEO and principal of Heller Capital Group, Premier Technology Group, and Paramount Management Group, fraudulently induced WebBank to extend three business loans totaling $3,750,000 by materially misrepresenting the financial health and revenue sources of the borrower entities. Debtor represented that all deposits into the relevant bank accounts were proceeds from the sale and operation of ATMs, and that the financial statements provided were true and accurate. In reality, large portions of the funds reflected in the bank statements were not operational revenue, but funds from investors and other lenders. Debtor executed personal guarantees for each loan, attesting to the truthfulness of all representations and warranties, and further warranted that the entities were not insolvent or contemplating bankruptcy.

WebBank relied on these false representations and extended the loans, only to later discover that the financial condition of the borrower entities was misrepresented and that Debtor had concealed the true sources of the deposits. Debtor's misrepresentations were made knowingly and with the intent to deceive WebBank, and that he failed to disclose the actual financial status of the entities or his own, in order to obtain the loans. As a result, WebBank suffered damages exceeding $3.7 million and seeks a determination that the debt is non-dischargeable due to Heller's fraud, willful and malicious conduct, and the provision of materially false written statements.

11.   Jerry D. Hostetter, Case No. 25-01205.

Debtor, as CEO of Heller Capital Group and manager of Heller Investment Holdings, solicited investments from Mr. Hostetter and others by making fraudulent representations about the use and security of those funds. Mr. Hostetter invested over $1.3 million in various entities controlled by Heller, including Glorious Cannabis Co. Investment Holdings, Pere, Halo RS, Prestige Investment Group, HKMS, Frank RE, Innoventures Fund I and II, and Provectus Management Services. Debtor fraudulently diverted funds from these entities to himself and other entities under his control, pledged the assets of these entities to secure his own debts, and failed to disclose these actions to investors. Debtor also failed to follow corporate formalities and co-mingled assets, further concealing the true financial state of the businesses.

At the time Mr. Hostetter made his investment, Debtor and his entities were under significant financial pressure due to the unraveling of a Ponzi scheme involving Paramount Management Group, another Heller-controlled entity. Heller did not disclose the precarious financial circumstances or the existence of the Ponzi scheme to Mr. Hostetter. Instead, funds procured from new investors, including Mr. Hostetter, were used to prop up failing businesses rather than for their intended purposes. Mr. Hostetter would not have invested had he known the true facts, and Debtor's actions constitute fraud in the inducement, misappropriation, and willful and malicious injury, resulting in substantial financial harm.

12.   Libertas Funding LLC, Case No. 25-01217

Debtor, as CEO and principal of several business entities, committed fraud by materially misrepresenting the financial health and revenue sources of his companies to induce Libertas to enter into a series of merchant cash advance agreements. Debtor represented that all deposits into the relevant bank accounts were proceeds from the sale and operation of ATMs, and that the

financial statements provided were true and accurate. In reality, large portions of the funds reflected in the bank statements were not operational revenue, but funds from investors and other lenders. Debtor executed personal guarantees for each agreement, attesting to the truthfulness of all representations and warranties, and further warranted that the entities were not insolvent or contemplating bankruptcy.

Libertas relied on these false representations and entered into five purchase agreements, only to later discover that the financial condition of the entities was misrepresented and that Debtor had concealed the true sources of the deposits. Debtor's misrepresentations were made knowingly and with the intent to deceive Libertas, and that he failed to disclose the actual financial status of the entities or his own, in order to obtain the advances. As a result, Libertas suffered damages exceeding $11 million and seeks a determination that the debt is non-dischargeable due to Debtor's fraud, willful and malicious conduct, and the provision of materially false written statements.

13.   David Zook, Case No. 25-01210

Debtor, as CEO of Heller Capital Group and manager of Heller Investment Holdings, solicited a $1,000,000 personal loan from Mr. Zook for Heller Capital, purportedly for short-term credit needs. Debtor represented that the loan was necessary due to a recent acquisition, but at the time, Debtor and his related entities were under significant financial distress due to the collapse of a Ponzi scheme involving Paramount Management Group, another Heller-controlled entity. Debtor diverted the loan funds and other investments away from their intended purpose, instead using them to benefit himself or other entities under his control, without the knowledge or consent of Mr. Zook. Debtor is also alleged to have induced other individuals to provide loans around the

same time; despite knowing he lacked the means to repay them, and to have lied about the need for funding.

Debtor also failed to disclose the true financial circumstances of his businesses or the existence of the Ponzi scheme to Mr. Zook. Instead, he misrepresented the use and security of the loaned funds, which were not used for Heller Capital as promised, but were instead diverted to prop up failing businesses or for Debtor's personal benefit. These actions are alleged to constitute fraud in the inducement and fraudulent misrepresentation, as Mr. Zook would not have provided the loan had he known the true facts.

14.     Hostetter Family Trust, Case No. 25-01206.

Debtor, as CEO of Heller Capital Group, LLC and manager of Heller Investment Holdings, LLC, solicited a $100,000 investment from the Hostetter Family Trust, representing that the funds would be used to capitalize Glorious, a Michigan-based cannabis grower controlled by Heller Capital. Debtor made those representations that were knowingly false and material, and that it relied on them in making the investment.

Further, rather than using the funds for Glorious as promised, Debtor diverted the investment for his own benefit and to support other entities under his control, without the knowledge or consent of the Hostetter Family Trust or other investors. Debtor failed to observe corporate formalities, commingled assets among various entities, and pledged company assets to secure debts for his own benefit. At the time of the investment, Debtor and his businesses were under severe financial distress due to the collapse of a Ponzi scheme involving Paramount Management Group, LLC, another entity owned and controlled by Heller. Debtor concealed these financial difficulties and the existence of the Ponzi scheme, and that funds from the scheme were used to finance Glorious. Hostetter Family Trust, had it known the true facts, would not have

invested. As a result of Debtor engaged in fraudulent inducement, embezzlement, and willful and malicious conduct.

15.     Diane K. Poole, Case No. 25-01207.

Debtor, as CEO and manager of various business entities, including Heller Capital Group, LLC, Heller Investment Holdings, LLC, Paramount Management Group, LLC, and Glorious Cannabis, solicited investments from Ms. Poole and others, representing that the funds would be used to finance Glorious's operations through convertible debt instruments. These funds were purportedly intended for working capital, equipment acquisition, and other legitimate business purposes.

Ms. Poole invested a total of $673,333.00 between 2018 and 2020, acquiring fractional interests in Glorious and GCC MSO Holdings. But it was later discovered that Debtor had unlawfully and fraudulently diverted these invested funds for his personal benefit and for the benefit of other entities under his control, rather than for the stated purposes. Additionally, Debtor pledged assets of Glorious to secure debts for himself and related entities, further misusing the invested capital.

Debtor failed to disclose the true financial condition of his businesses or the existence of the Ponzi scheme to plaintiff. Instead, funds procured from the Ponzi scheme were used to finance Glorious's operations. Debtor's actions constitute false pretenses, false representations, actual fraud, embezzlement, and willful and malicious injury.

Amendment to Examiner Order

Movant also requests that the Court amend the Order Directing the Appointment of an Examiner [ECF No. 99]. The Examiner has issued numerous Rule 2004 Examination Subpoenas and received responses from many of the third parties. [ECF No. 180, 183, 184, 185, 187, 190, 191, 232 and 261]. Examiner is willing to share this information with interested parties in the case, including Movant, but there is nothing in the Examiner Order expressly allowing disclosure. It is important the Court amend the Examiner Order so creditors and parties of interest can receive discovery in the Examiner's possession. This is discovery creditors are entitled to, but Debtor has resisted allowing Movant to engage in any Rule 2004 discovery by filing motions to quash [ECF No. 193]; notwithstanding the fact that during the meeting of creditors, Debtor directed creditors to seek additional information through Rule 2004 subpoenas.

9019 Motions

Debtor filed two Motions under Rule 9019, which should both be returnable on June 10, 2025 [ECF No. 213 and 258]. As part of Debtor's motions, it seeks to liquate within thirty (30) days of execution of the Term Sheet, in exchange for the support by Deerfield of a Plan of Reorganization. Debtor also has agreed with one of its many creditors that Cohn Reznick shall be appointed as the liquidating agent in the Chapter 11 Plan, to be filed with the plan to liquidate the assets of Debtor and third party entities for the benefit of Debtor and his entities. Further, Deerfield shall receive a contingent fee based on additional collections and liquidations under the unknown and unseen Chapter 11 Plan.

## **LEGAL ARGUMENT**

### *A.    STANDARD*

Section 1104 of the Bankruptcy Code provides, in relevant part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee-

    1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

    2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

See 11 U.S.C. § 1104.

Subsection (1) of Section 1104(a) addresses management's pre- and post-petition misdeeds or mismanagement, while subsection (2) provides the court with "particularly wide discretion" to appoint a trustee even absent wrongdoing or mismanagement. *See In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (N.D. Ill. 1994). If the court finds either that cause exists or that appointment is in the parties' interest, an order for the appointment of a trustee is mandatory. *See Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002). The categories enumerated in 11 U.S.C. § 1104(a)(l) "cover a wide range of conduct" and, thus, are best described as illustrative, rather than exclusive. *See In re Marvel Entertainment Corp.*, 140 F.3d 463,472 (3d Cir. 1998) (quoting *Committee of Dalkon Shield Claimants v. A.H. Robbins Co.*, 828 F.2d at 242). Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(l). *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Construction Corp.*, 51 B.R. 113, 116-118 (Bankr. S.D.N. Y. 1985).

17

The determination of whether cause exists must be taken case-by-case, considering all relevant factors. *Sharon Steel*, 871 F.2d at 1225. Pre-petition conduct alone may provide the basis for a court to appoint a trustee. *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615,619 (Bankr. D. Wyo. 1995).

The court is vested with even broader discretionary powers under § 1104(a)(2) and may consider equitable factors to determine whether a trustee is in the interests of an estate and its creditors. *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518,525 (Bankr. E.D.N.Y. 1989). *See also Tradex v. Morse*, 339 B.R. 823, 829 (D. Mass. 2006) ("The bankruptcy court appears to enjoy even more sweeping discretion under subsection (a)(2)."). If the court finds that the facts of the case support the appointment of a trustee under subsection (a)(l) or (2), then the court has no discretion, and must appoint a trustee. *See, e.g., In re Marvel Entm't Grp.*, 140 F.3d 463, 472 (3d Cir. 1998); *Sharon Steel*, 871 F.2d at 1226.

Several specifically pled nondischargeability filings under 11 U.S.C. § 523 contribute to the finding of "cause" under § 1104(a)(1) if the filings are indicative of fraud, dishonesty, incompetence, or gross mismanagement by the debtor. *See e.g., United Sur. & Indem. Co. v. López-Muñoz (In re López-Muñoz)*, 553 B.R. 179, 191 (B.A.P. 1st Cir. 2016) (reviewing the definition of fraud under 11 U.S.C.S. § 523(a)(2)(A), when analyzing fraud under 11 U.S.C. § 1104(a)(1)).

Under § 1104(a)(2), the court may appoint a trustee if it is in the best interests of creditors, equity security holders, and the estate. The court also considers the benefits of appointing a trustee against the associated costs. If a slew of nondischargeability filings suggest that the debtor's management is untrustworthy or incapable of effectively managing the estate, this could justify the appointment of a trustee under § 1104(a)(2). *See e.g., Keeley & Grabanski Land P'ship v. Keeley*

*(In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 165 (B.A.P. 8th Cir. 2011) (concluding that the appointment of a Chapter 11 trustee was warranted due to, among other things, the untrustworthiness of debtor's principals and debtor's past performance casts serious doubt on its prospects of reorganization). Further, inability to effectively manage the estate, in light of pending adversary proceedings, is a factor warranting appointment of a Chapter 11 Trustee. *Id.*

### B.    ARGUMENT

Prestige, and fourteen other creditors, have filed complaints commencing adversary proceedings pursuant to 11 U.S.C. § 523(a), pleading, with specificity, the nature of Debtor's fraudulent conduct. The Debtor engaged in a massive Ponzi scheme and defrauded creditors out of over $800,000,000. Prestige, as well as numerous other creditors have been defrauded by the Debtor, have commenced non-dischargeability proceedings, do not and cannot trust the Debtor given the documented widespread fraud. Given the scope and depth of the fraud, only an independent trustee can evaluate all of the potential fraudulent transfers, uncover all assets, and commence appropriate claims and causes of action on behalf of the Debtor's estate.

Debtor has not followed Rule 2015.3 as well. Under the Rule "[i]n Chapter 11 case, the…debtor in possession must file periodic financial reports of the value, operations, and profitability of each entity in which the estate holds a substantial or controlling interest—unless the entity is a publicly traded corporation or a debtor in a bankruptcy case. The reports must be prepared as prescribed by Form 426 and be based on the most recent information reasonably available to the filer." Rule 2015 (a). The "first report must be filed at least 7 days before the first date set for the meeting of creditors under §341." Debtor has not filed any reports on behalf of the 140 entities he holds a substantial or controlling interest. This, alone, provides another reason why a Chapter 11 Trustee should be appointed.

Appointment of a trustee is also important because Debtor continues to burn through assets of the estate, without explaining how the Debtor is funding the estate. At his 341(a) meeting of creditors Debtor failed and refused to answer questions concerning his various business enterprises, and indicated such information would be made available through the issuance of Rule 2004 subpoenas. Prestige sought answers to basic disclosure regarding the Debtor's estate by way of a Rule 2004 Examination Subpoena, but the Debtor moved to quash the subpoena. [ECF No. 193]. Debtor—who engaged in a massive Ponzi scheme—has not and will not explain how he is funding this case and resists efforts to investigate the ongoing finances of his estate.

Prestige understandably has no reason to believe in the Debtor's ability to act as a fiduciary or to confirm a plan. Instead, Debtor seeks to improperly liquidate its estate, while continuing to hide and refuse to answer information about his assets. The independent Examiner appointed by the Court should also not be discharged, without any viable explanation. The creditors of the Debtor should have the right to have their claims and the assets to which they have rights be liquidated by a fair, impartial and competent trustee, not by a Debtor who has grossly and repeatedly demonstrated his lack of fitness to handle his financial affairs and who continues to do so in the administration of his case. This Court should order the appointment of a Chapter 11 Trustee by the Office of the U.S. Trustee in this regard.

Further, the Court should Order that the Examiner's order be amended so Examiner can expressly share information received from duly noticed Rule 2004 Examination subpoenas with creditors and parties in interest, and, further, any Court-appointed trustee.

## **CONCLUSION**

WHEREFORE, for the above reasons, Movant respectfully requests that the Court enter an

order directing the appointment of a Chapter 11 Trustee, Amending the Examiner Order, and for

such other and further relief as is just, necessary or appropriate.

Respectfully submitted,

STARK & STARK
A Professional Corporation

By:/s/ *Marshall T. Kizner*
   MARSHALL T. KIZNER, ESQ.

By:/s/ *Joseph H. Lemkin*
   JOSEPH H. LEMKIN, ESQ.
   100 American Metro Blvd.
   Hamilton, NJ 08619
   (609) 791-7922 (direct)
   (609) 896-9060 (main)
   (609) 895-7395 (facsimile)

Attorneys for Prestige Fund A, LLC, Prestige Fund A IV, LLC,
Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund B
II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC,
Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige
Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A V,
LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC,
Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund D
IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC,
Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity
Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund VI,
LLC and WF Velocity Fund VII, LLC

Dated:  May 21, 2025