| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **McMANIMON, SCOTLAND & BAUMANN, LLC**<br>75 Livingston Avenue, Suite 201<br>Roseland, New Jersey 07068<br>(973) 622-1800<br>Anthony Sodono, III, Esq. (asodono@msbnj.com)<br>Sari B. Placona, Esq. (splacona@msbnj.com)<br>*Counsel for Daryl Fred Heller, Chapter 11 Debtor and Debtor-in-Possession* | |
| In re:<br><br>DARYL FRED HELLER,<br><br>   Debtor. | Case No. 25-11354 (JNP)<br><br>Chapter 11 |

### DEBTOR'S MOTION EXPUNGING CLAIM NOS. 13 THROUGH 32 FILED BY PRESTIGE FUND A II, LLC, ET AL. PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007

Daryl Fred Heller (the "Debtor"), the Chapter 11 Debtor and Debtor-in-Possession, by and through his attorneys, McManimon, Scotland & Baumann, LLC, submits this Motion Expunging Claim Nos. 13 through 32 (collectively, the "Claims") Filed by Prestige Fund A, LLC, et al. (collectively, "Prestige" or "Prestige Funds")[1] Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (the "Motion"). In support of this Motion, the Debtor relies on the arguments set forth herein and respectfully states as follows:

---

[1] Claim Nos. 13 through 32 were filed by related entities as follows: Prestige Fund A II, LLC (Claim No. 13); Prestige Fund A IV, LLC (Claim No. 14); Prestige Fund A IX, LLC (Claim No. 15); Prestige Fund A V, LLC (Claim No. 16); Prestige Fund A VI, LLC (Claim No. 17); Prestige Fund A VII, LLC (Claim No. 18); Prestige Fund A, LLC (Claim No. 19); Prestige Fund B BTM I, LLC (Claim No. 20); Prestige Fund B II, LLC (Claim No. 21); Prestige Fund B IV, LLC (Claim No. 22); Prestige Fund B V, LLC (Claim No. 23); Prestige Fund B VI, LLC (Claim No. 24); Prestige Fund B VII, LLC (Claim No. 25); Prestige Fund B, LLC (Claim No. 26); Prestige Fund D BTM I, LLC (Claim No. 27); Prestige Fund D III, LLC (Claim No. 28); Prestige Fund D IV, LLC (Claim No. 29); Prestige Fund D V, LLC (Claim No. 30); Prestige Fund D VI, LLC (Claim No. 31); and Prestige Fund D, LLC (Claim No. 32).

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are section 502 of the Bankruptcy Code and Rule 3007 of the Bankruptcy Rules.

## STATEMENT OF FACTS

4. On February 10, 2025, the Debtor caused to be filed a voluntary petition under Title 11, Chapter 11 of the United States Code (the "Bankruptcy Code"). ECF 1.

5. The Debtor does not own any interest in Paramount Management Group, LLC ("Paramount").

6. The Debtor is an entirely separate legal entity from Paramount and only serves in a representative capacity.

7. Heller Capital Group, LLC ("HCG") owns a majority membership interest in Paramount.

8. The Debtor owns ninety-nine percent (99%) of the membership interest in HCG.

9. Prestige is a judgment creditor against Paramount in the matter entitled <u>Prestige Funds A, LLC, et al. v. Paramount Management Group, LLC,</u> pending in the Court of Common Pleas of Lancaster County Pennsylvania's Civil Division, bearing docket number CI-24-06012 (the "PA Action"). A copy of the complaint in the PA Action is annexed to the Certification of Sari. B. Placona, Esq. ("SBP Cert."), at ¶ 4, Exh. A.

10. On January 10, 2025, Prestige obtained an Order against Paramount, holding Paramount in civil contempt for $2,050,500.00, jointly and severally, against Paramount and the

2

Debtor (the "January Order"). A copy of the January Order is annexed to the SBP Cert., at ¶ 5, Exh. B.

11. Notably, the Debtor is **not** a defendant in the PA Action.

12. Prestige erroneously asserts that the Claims with an aggregate amount of $503,290,225.46[2] are allegedly owed by the Debtor, which they are not. Prestige only has a judgement of $138,156,118.38 against Paramount, therefore the $503,290,225 is an erroneous amount in general and has nothing to do with the Debtor in particular. Prestige sensationalizes the $138,156,118.38 judgment owed against Paramount and the other alleged amounts, by suggesting the Debtor owes the Claims. At most, Prestige has a claim against the Debtor for $2,050,500 pursuant to the January Order which is on appeal as described below.

13. On February 28, 2025, a Statement of Errors Complained of On Appeal Pursuant to Pa.R.A.P. 1925(b) was filed by Heidi R. Freese, Esq. in the PA Action (the "Appeal Statement") on behalf of the Debtor. A copy of the Appeal Statement is annexed to the SBP Cert., at ¶ 6, Exh. C. The Appeal Statement refers to the January Order. The purpose of the PA Action appeal is to seek a determination that the trial court erred in assessing the civil contempt finding of $2,050,500.00, jointly and severally, against Paramount and the Debtor.

14. On March 11, 2025, the Honorable Leonard G. Brown, for the Court of Common Pleas of Lancaster County, Pennsylvania, entered an order (post-petition) granting Prestige's motion for sanctions and attorneys fee (the "Fees Order") against Paramount. A copy of the Fees Order is annexed to the SBP Cert., at ¶ 7, Exh. D.

15. The Fees Order required Prestige to serve it by personal service upon the Debtor, once served, $500 per day would be assessed against Paramount and the Debtor, jointly and

---

[2] This is the total of claims 13 through 32.

severally, for each day that Paramount fails to fully and completely answer Prestige's interrogatories in aid of execution.

16. On March 28, 2025, Prestige filed a Motion seeking an Order Confirming that it is not Stayed from Proceeding with Discovery and Civil Contempt Proceedings Pursuant to 11 U.S.C. 362(B)(4) (the "Stay Relief Motion"). ECF 158. The Debtor filed opposition and a cross-motion (the "Cross Motion") to the Stay Relief Motion to allow for stay relief for the PA Action appeal, filed February 28, 2025, to continue pursuant to the Appeal Statement. ECF 192. The Debtor is seeking a determination as to whether the trial court abused its discretion by entering the January Order assessing joint and several liability of $2,050,000 against the Debtor and Paramount on statutory grounds. Thereafter, the Court granted the Stay Relief Motion and the Debtor's Cross-Motion. ECF 222, 275.

17. On May 22, 2025, this Court entered an Order Confirming that Prestige Is Not Stayed From Proceeding With Discovery and Civil Contempt Proceedings Pursuant to 11 U.S.C. 362(B)(4) (the "Prestige Stay Relief Order"). ECF 274. Also on May 22, 2025, this Court entered an Order Granting Cross Motion for Stay Relief to Allow for the Pennsylvania State Court Appeal to Continue (the "Debtor Stay Relief Order"). ECF 276. A copy of the Prestige Stay Relief Order and Debtor Stay Relief Order are annexed to the SBP Cert., at ¶ 8, Exh. E.

18. Debtor continues to manage his affairs as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

19. Between April 4, 2025 and April 7, 2025, Prestige filed the Claims for alleged sums due and owing from Paramount. A chart of the Claims is annexed to the SBP Cert., at ¶ 9, Exh. F.

20. Prestige's Claims are unrelated to his bankruptcy estate, and instead *is debt owed by Paramount, or allegedly to be owed, and not by him personally*. The sole possible claim by

Prestige against the Debtor is pursuant to the January Order which is subject to an appeal -- pursuant to the Appeal Statement -- to determine whether the trial court erred in assessing the civil contempt finding for $2,050,500.00, jointly and severally, against Paramount and the Debtor.

## RELIEF REQUESTED

21. The Debtor has reviewed the Claims and has concluded that the Claims should be expunged as the debt alleged in the Claims are not against the Debtor. Moreover, the debt alleged in the Claims does not concern the Debtor's bankruptcy estate.

22. Accordingly, through this Motion, the Debtor respectfully requests entry of the proposed order pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007(d), expunging the Claims.

## BASIS FOR RELIEF

23. A proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). Section 502(b) of the Bankruptcy Code provides that:

> the court, after notice and a hearing, shall determine the amount of [a] claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

11 U.S.C. § 502(b)(1).

24. When asserting a proof of claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992). A proof of claim filed in accordance with section 501 of the Bankruptcy Code and the Bankruptcy Rules typically constitutes "prima facie evidence of the validity and amount of the claim." Fed R. Bankr. P. 3001(f).

25. To receive the benefit of *prima facie* validity, however, the proof of claim must "set forth facts necessary to support the claim." In re Stoecker, 143 B.R. 879, 883 (N.D. Ill. 1992); Allegheny, 954 F.2d at 167 ("[A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward."). Initially, the burden of proof lies on the claimant; if the claimant supports his claim with sufficient facts or documentation, the claim is deemed *prima facie* valid. In re Devonshire PGA Holdings LLC, 548 B.R. 689, 697 (Bankr. D. Del. 2016) (citing In re Allegheny Int'l, Inc., 954 F.2d at 173–74); Lampe v. Lampe, 665 F.3d 506, 514 (3d Cir. 2011).

26. A claimant's failure to allege facts and to provide sufficient support for a claim deprives the claim of prima facie validity. See, e.g., In re Jorczak, 314 B.R. 474, 481-82 (Bankr. D. Conn. 2004) (discussing the evidentiary requirements and burden of proof with respect to the allowance of claims); In re Los Angeles Int'l Airport Hotel Assoc., 196 B.R. 134, 139 (9th Cir. BAP 1996). Moreover, while a properly filed proof of claim is prima facie evidence of the claim's allowed amount, when an objecting party presents evidence to rebut a claim's prima facie validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence. See In re Allegheny Int'l, Inc., 954 F.2d at 173-74. The burden of persuasion with respect to the claim is always on the claimant. See, e.g., Biolitec, AG v. Cyganowski, No. 13-cv-5864, 2013 WL 6795400, *3 (D.N.J. Dec. 16, 2013); In re Allegheny Int'l, Inc., 954 F.2d at 173-74.

27. The Debtor has standing to file objections to claims under sections 502 and 1109(b) of the Bankruptcy Code. In fact, a debtor in possession in a chapter 11 case "has the duty to object to the allowance of any claim that is improper." In re Int'l Yacht & Tennis, Inc., 922 F.2d 659, 661-62 (11th Cir. 1991); see also 11 U.S.C. §§ 704(a)(5), 1106(a)(1), & 1107(a). Once an

6

objection to a claim is filed, the Court, after notice and hearing, shall determine the allowed amount of the claim. 11 U.S.C. § 502(b).

28. The Claims are based on debt and alleged debt against Paramount, not the Debtor. But for the $2,050,500 claim pursuant to the January Order, the Claims do not relate to the Debtor or the bankruptcy estate, which may be reversed subject to the Appeal Statement.

29. Failure to disallow and/or expunge the Claims as set forth herein will result in Prestige receiving an unwarranted recovery for an unproven claim. This will reduce any recovery by other creditors.

30. Prestige seeks to establish its "prima facie" case and "burden of persuasion" by suggesting that since Prestige has a judgment against Paramount; therefore it has a Claims against the Debtor as the alleged owner, operator and/or person in control. The Debtor disputes such allegations.

31. Each of the Claims has a "Schedule to Proof of Claim" (the "Schedule(s)") annexed to each respective claim. Each Schedule contains the same information for each claim and only differ with regards to the total amount claimed by each individual Prestige entity.

32. The Debtor disputes certain statements in the Schedules, first that HCG was not the sole member of Paramount. Randall Leaman and Dennis Ream transferred shares on or about October 2024, which resulted in HCG being the majority member in Paramount.

33. The statement in schedules that the Debtor was the primary person who pitched investments to Automated Teller Machines ("ATM") and/or Bitcoin ATMs ("BTM") investors, is inaccurate. It was Prestige's fund managers (the "Fund Managers") that presented investment opportunities to their investors as the primary Fund Managers are investment syndicators and sponsors with tens of thousands of investors who subscribe to them. The Debtor was seldom

7

involved in presentations and only when requested by a Fund Manager, which was infrequent, and a very low percentage of the presentations Fund Managers made. Fund Managers often developed marketing materials and frequently conducted investment presentations, webinars, and seminars throughout the United States, which the Debtor was not involved with. Fund Managers emailed their own respective proprietary investor databases weekly, monthly, or bimonthly pitching the ATM/BTM investment, Prestige Fund Managers were also owners of the Prestige funds that they recruited investors into and the primary responsible party to market the Funds they owned. In summary, the statement that the Debtor was the primary person who pitched investments could not be more inaccurate as it was the Fund Managers who are syndicators that recruited investors into Funds that they also owned and had completed diligence on.

34. Regarding Prestige's statements in the Schedules that as an investor it would receive revenues generated from ATM or BTM and Paramount would only keep revenue for purposes of operational cost, is inaccurate. The investors, including Prestige, were only entitled to a fixed return that ended at six (6) or seven (7) years. The analog for the model is a "sales leaseback" model with defined payment amount and a defined end date of payment to investors, including Prestige. Additionally, there were various other provisions that allowed Paramount/Affiliates to terminate the investment with the Prestige Fund even prior to the six (6) or seven (7) years investment period.

35. Exhibit 3 to the Schedules depicts a "Consent Judgment and Order" between Prestige and other funds, and Paramount in the total amount of $138,156,118.38. Regarding Prestige's statement in the Schedules that Paramount did not comply with obligations under the Consent Judgment and Order attached thereto, this is inaccurate. Paramount complied with the original terms of the Consent Judgment and Order, however at the December 6, 2024 hearing, in

8

which Paramount did not have attorney representation, Prestige requested changes to the information they wanted, some of which was theoretically and practically impossible to achieve. Paramount was unable to object, however, given it did not have counsel at said hearing as the state court judge had provided Paramount until December 30, 2024 to retain counsel, therefore Paramount thought hearing would be adjourned until that date. All this and much more will be part the appeal pursuant to the Appeal Statement of the January Order and why the Debtor believes the $2,050,000.00 joint and several liability finding against Paramount and the Debtor will be overturned.

36. Regarding Prestige's statements in the Schedules, that they should have 36,000-38,000 ATMs or BTMs, it is inaccurate. Paramount never stated they had 36,000-38,000 units, rather Prestige and Fund Managers in various court and other documents have alleged that is the amount the Prestige Funds own. ATM/BTM program also goes beyond Paramount to other affiliates as well which is not noted by Fund Managers. Each ATM/BTM investment had a maximum life cycle of six (6) or seven (7) years with a termination or buyback of ATMS/BTMs. and Paramount/affiliates sold less than the purported number by Fund Managers since 2012 to Prestige funds. Fund Managers are aware and were part of managing the monthly buybacks occurring by Paramount/affiliates with their Funds, some months hundreds, which are evidenced by asset purchase agreements executed between Prestige Funds and Paramount/affiliates. Therefore, if the program has been operating since 2012 and it purchased less than the purported number by Fund Managers and ATMs/BTMs were in either six (6) or seven (7) year-terms, then Prestige would have thousands of less ATMs/BTMs than they purchased. Therefore, 36,000 to 38,000 units cannot be accurate given thousands were sold by Prestige's funds back to Paramount/Affiliates and/or the investment period expired by the end of 2024 notwithstanding the

9

fact that Prestige Funds purchased less than amount they purport. At a minimum, it is disingenuous, misleading, and inaccurate not to acknowledge the monthly buybacks that occurred by Paramount/affiliates from Prestige funds and purport a number that does not give consideration to the buying back of ATM/BTMs. An example of one (1) of the innumerable Asset Purchase Agreements ("APA") executed between Prestige and Paramount terminating the Prestige Funds ownership of ATMs/ BTMs they previously purchased and owned, however no longer do. An example of one of the APAs is annexed to the SBP Cert., at ¶ 10, Exh. G.

37.     Regarding Prestige's statements in the Schedules that Paramount only managed a maximum of 20,000 ATMs/BTMs is in accurate as it leaves out the various affiliates that were part of ATM/BTM program. Further, the alleged lower amount of ATMs/BTMs occurred as a result Prestige Funds managers actions which created a mass exodus of customers and key vendor relationship in the months leading up to conversion of network. Key customer and vendors wanted nothing to do with the Fund Manager rouge actions with lawsuits, harassment from private investigator they deployed, and aggressive media tactics that would ultimately result in massive impairment of the network and collateral damage created by Fund Managers based on fear of hostile takeover when it should have been an orderly and professionally managed transition.

38.     Exhibit 1 to the Schedules contains the complaint for an action in the Commonwealth of Pennsylvania, Court of Common Pleas, Lancaster County in a matter styled *Prestige Fund A, LLC et. al. v. Darry Heller, et al.*, No. CI-25-00491(C.P. Lancaster) (referred to in the Schedules as "Second Lawsuit"). Prestige's allegations regarding the Second Lawsuit that the Debtor's actions constituted fraud in the inducement and fraudulent misrepresentations are mostly gross misinformation and not factually accurate, which will be disputed with facts at the appropriate time.

39. The Debtor also disputes the calculations in the Schedules substantiating the amounts owed per each of the Claims. Exhibit 3 to the Schedules depicts a "Consent Judgment and Order" between Prestige and other funds, and Paramount in the total amount of $138,156,118.38. Yet somehow, Prestige's Claims total 503,290,225.46. How Prestige calculates half a billion dollars owed from a $138,156,118.38 is obscure and frivolous.

40. Moreover, the Debtor was not a party to the "Consent Judgment and Order" annexed to the Schedules. Thus, the bulk of the amounts in the Claims are not owed by the Debtor personally. Again, at most the Debtor is possibly liable for the civil contempt finding for $2,050,500.00 of joint and several liability against Paramount and the Debtor pursuant to the January Order, which is subject to appeal and the Debtor believes ultimately will be reversed.

41. Pursuant to the Schedules, Prestige states that the total number for each of the respective Claims is:

> comprised of sums due and owing to [Prestige], which is inclusive of a 1/25th interest in the $2,050,000 contempt order dated January 10, 2025 entered in the Lawsuit . . .That sum is also inclusive of amounts due and owing that were reduced to judgment in the Lawsuit, [] which resulted from Debtor's fraudulent conduct.

Prestige's calculations on the Schedules do no support each of the respective Claims. The total amounts on the Claims are not supported by the Schedules. Prestige needs to express how it calculated each amount on the Claims, instead of through its convoluted methods.

42. Accordingly, the Debtor hereby objects to the Claims and requests entry of an Order expunging the Claims.

## **CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order granting the relief set forth in the Motion and any further relief the Court deems just and proper.

                                    **McMANIMON, SCOTLAND & BAUMANN, LLC**
*Counsel to Daryl Fred Heller Chapter 11 Debtor and Debtor-in-Possession*

By:  */s/ Sari B. Placona*
       Sari B. Placona

Dated: May 30, 2025