UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Gerard Catalanello, Esq.
James J. Vincequerra, Esq. (admitted *pro hac vice*)
Kimberly Schiffman, Esq. (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: Gerard.Catalanello@alston.com
       James.Vincequerra@alston.com
       Kimberly.Schiffman@alston.com

– and –

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Silverview Credit Partners LP*

| | |
|---|---|
| In re:<br><br><br>DARYL FRED HELLER,<br><br><br><br>         Debtor. | Case No.: 25-11354-JNP<br>Hon. Jerrold N. Poslusny, Jr.<br>Chapter 11 |

**SILVERVIEW CREDIT PARTNERS LP'S (I) OMNIBUS OBJECTION
TO (A) DEBTOR'S MOTION TO APPROVE COMPROMISE OR
SETTLEMENT UNDER RULE 9019, AND (B) DEERFIELD'S MOTION FOR
AN ORDER STAYING AND/OR SUSPENDING THE EXAMINER; AND (II)
STATEMENT IN SUPPORT OF PRESTIGE'S MOTION TO APPOINT TRUSTEE**

Silverview Credit Partners LP ("Silverview"), by and through undersigned counsel, files

this (i) omnibus objection (the "Omnibus Objection") to (a) Daryl Fred Heller's (the "Debtor")

*Motion for an Order Approving the Agreement Amongst the Debtor, Heller Capital Group, LLC,*

*Heller Investment Holdings, LLC, and Deerfield Capital, LLC Pursuant to 9019 of the Federal*

*Rules of Bankruptcy Procedure* [D.I. 258] (the "Settlement Motion"), and (b) Deerfield Capital,

LLC's ("Deerfield" and together with the Debtor, the "Settlement Parties") *Motion for an Order*

*Staying and/or Suspending the Examiner* [D.I. 271] (the "Motion to Suspend Examiner" and

together with the Settlement Motion, the "Debtor Side Motions"); and (ii) statement in  support of

the *Motion for the Appointment of Chapter 11 Trustee and to Modify Examiner's Order* [D.I. 265]

(the "Trustee Motion"), filed by the Prestige Funds (as defined therein). In support hereof,

Silverview incorporates by reference, as if fully set forth herein, the contents of *Silverview Credit*

*Partners LP's Statement in Support of Deerfield Capital, LLC's Motion for the Appointment of a*

*Chapter 11 Trustee* [D.I. 63] and respectfully states as follows:[1]

## PRELIMINARY STATEMENT[2]

1.      The Debtor Side Motions now before this Court—seeking approval of a so-called

"settlement agreement" and the unilateral suspension of a Court-appointed examiner—are nothing

short of a brazen attempt to obstruct justice, manipulate the bankruptcy process, and mitigate the

fallout of extensive financial fraud. The Debtor Side Motions must be denied.

2.      The Debtor orchestrated a massive Ponzi scheme. That is not hyperbole; it is the

inescapable conclusion drawn from the growing mountain of evidence: a cascade of lawsuits,

including no less than fifteen adversary proceeding complaints filed in this Court against the

Debtor; a litany of judgments, including Silverview's judgment against the Debtor in an amount

no less than $28,554,186.72; and active investigations by both the Securities and Exchange

Commission and Department of Justice. The Debtor's financial affairs are not merely opaque—

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
      Debtor Side Motions or Trustee Motion, as applicable.
[2]   Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to such terms
      elsewhere in this Omnibus Objection.

they are riddled with indicia of fraudulent conduct.[3] In response, and consistent with the needs of this estate, this Court appointed an independent examiner to investigate, *inter alia*, (a) any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, in the management of the affairs of the Debtor or in any entity or entities owned or controlled by the Debtor;[4] (b) any and all transfers by the Debtor and any Debtor entities, (c) the accuracy and completeness of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, and (d) otherwise perform the duties of an examiner set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code. *See* Examiner Order ¶ 3.

3.      Now, in an extraordinary act of overreach, the Settlement Parties have taken it upon themselves—not only to strike a preferential settlement that functions as a *sub rosa* chapter 11 plan—but to dismantle the very oversight designed to uncover the truth. The proposed "termination" of the examiner, sought, in part, through an improper and collusive settlement, is a direct affront to the authority of this Court and statutory framework of the Bankruptcy Code. The Settlement Parties have no standing to extinguish a fiduciary appointed under 11 U.S.C. § 1104(c).[5] Their effort to do so is both unlawful and deeply suspect.

4.      The settlement agreement itself is no less egregious. Among other things, it seeks to confer outsized benefits on Deerfield, delivering to it more than it is legally entitled to receive while potentially encumbering otherwise unencumbered assets that must be preserved for all unsecured creditors, including Silverview. The settlement agreement is also a transparent attempt

---

[3]     *See* Tr. of 341 Meeting of Creditors at 104:25-105-2 (following the Debtor's evasive responses to Deerfield's questions, counsel for Deerfield remarked that although "[the Debtor] started [the meeting] off saying he wanted to be transparent, . . . [the Debtor was] very opaque and the opposite of transparent") (Albert Anthony Ciardi, III, Esq., Counsel for Deerfield).

[4]     Significantly, and contrary to Deerfield's position, the *Order Directing the Appointment of an Examiner* [D.I. 99] (the "Examiner Order") *did not* limit the Investigation (as defined therein) into HGC and HIH. *See* Motion to Suspend Examiner ¶¶ 24-25.

[5]     *See infra* ¶ 25.

to orchestrate a backdoor reorganization for an entity—Heller Capital Group, LLC—not in bankruptcy, bypassing the plan confirmation process and gutting the core protections of creditor equality. This is precisely the type of clandestine, preferential dealing that courts have repeatedly rejected under the prohibition on *sub rosa* plans.

5.      Taken together, the Debtor Side Motions represent an alarming power grab by a Debtor under siege and a complicit creditor seeking to cut its own deal before the house of cards collapses. The Settlement Parties cannot be permitted to extinguish independent oversight and distort the distribution scheme of the Bankruptcy Code, all while the Examiner's investigation remains incomplete and critical questions about the Debtor's conduct remain unanswered.[6] This Court should categorically deny the Debtor Side Motions.

6.      Against this backdrop, the appointment of a chapter 11 trustee is not only appropriate, it is imperative. The record already reflects cause under 11 U.S.C. § 1104(a), including gross management, dishonesty and fraudulent conduct. But even absent such cause, appointment is warranted "in the interests of creditors" under 11 U.S.C. §1104(a)(2) particularly where, as here, the Debtor has lost all credibility,[7] and the estate is in jeopardy. The Debtor's improper attempt to sideline the Examiner only underscores that he cannot be trusted to act as a fiduciary for the estate. Independent stewardship is urgently required to protect estate assets, preserve the integrity of the investigative process and ensure that creditors, particularly unsecured creditors in the absence of a committee, receive fair treatment.

---

[6]     Indeed, the Debtor's 341 Meeting of Creditors was kept open by the United States Trustee because substantial questions regarding estate assets and prepetition transfers remained unanswered, and the Debtor promised to amend prior pleadings and provide additional disclosure to address inconsistencies and omissions. *See* Tr. of 341 Meeting at 128:5-12. To date, the Debtor has failed to make any amendments and additional filings.

[7]     Ironically, this sentiment was properly captured by Deerfield when it stated "[t]he Debtor is a complete fraud whose financial statements and records provided to creditors and others bear at best a loose resemblance to the truth and mostly have no connection to the truth." *Motion for Relief from the Automatic Stay to Continue the State Court Proceeding Against the Debtor in Pennsylvania and New Jersey, Prohibit Use of Cash Collateral, Transfer Venue and Expedited Discovery* [D.I. 9] (the "Deerfield Stay Relief Motion") ¶ 75.

7.    For these reasons, and for the additional reasons set forth herein, Silverview respectfully submits that this Court should (a) deny the Debtor Side Motions, (b) grant the Trustee Motion, including amending the Examiner Order, and (c) grant such other and further relief as is just, necessary or appropriate under the circumstances of this case.

## OBJECTION

8.    Silverview respectfully requests that this Court deny (a) the Settlement Motion, and (b) Motion to Suspend Examiner.

### I.    The Settlement Motion

9.    "Although compromises are a normal part of the bankruptcy process, the court must determine whether the settlement is 'fair and equitable' and 'in the best interest of the estate.'" *In re Tawil*, 2017 Bankr. LEXIS 2165, *3 (Bankr. D.N.J. 2017). The settlement is neither fair and equitable nor in the best interest of the estate.

#### a.    The Settlement Should be Denied as a Sub Rosa Plan.

10.    "It is well-established that courts may not approve settlements that have the effect of a *sub rosa* plan and accomplish 'an end run around the protection granted [to] creditors in Chapter 11 of the Bankruptcy Code.'" *In re Biolitec, Inc.*, 528 B.R. 261, 269, 272 (Bankr. D.N.J. 2014) (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1224 (5th Cir. 1986)) (holding that "the Court is precluded from approving a settlement that alters parties' rights but ignores many of the [Bankruptcy] Code's most important creditor protections"). A settlement that circumvents creditors' rights to vote on key provisions, such as the principal source of funding for creditors' recovery, dictates the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec.*

*Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

11. Through the settlement, the Debtor has preemptively agreed that, through HCG's (as defined herein) liquidating chapter 11 plan, Deerfield will receive, *inter alia*, "twenty-five percent of each portfolio company owned by HCG [and] liquidation." Settlement Motion ¶ 26(14)(b). HCG is *not* in bankruptcy. In doing so, the Debtor is effectively seeking to implement, through the guise of a settlement, a *sub rosa* plan of liquidation for a non-debtor affiliate—without the procedural safeguards, creditor input or judicial scrutiny required under the Bankruptcy Code—thereby circumventing the core protections that chapter 11 is designed to afford all stakeholders.[8]

12. Moreover, the settlement agreement, along with the Settlement Motion, set forth the key terms of a non-consensual chapter 11 plan of the Debtor, including total consideration funding available to Deerfield. *See Energy Future Holdings Corp. v. Del. Trust Co.*, 648 Fed. Appx. 277, 284-285 (3rd Cir. 2016) ("When a transaction or settlement in bankruptcy has the effect of dictating some of the terms of any future reorganization plan, a court deems the transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa*."). Silverview suspects that it would vote resoundingly to reject a plan that embodies the terms of the settlement agreement as described in the Settlement Motion.

### b. The Settlement Cannot be Approved because the Martin Factors have Not been Satisfied.

13. In relevant part, Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (each, a "Bankruptcy Rule") provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). The Third Circuit set

---

[8] *See infra* ¶ 17.

forth a four-factor balancing test for courts to "assess and balance the value of the claim that is being compromised against the value to the estate of the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In making this assessment, courts must consider: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin*, 91 F.3d at 393. Here, the *Martin* factors have not been met.

14.　　By Deerfield's own admission, as of the Petition Date, Deerfield was <u>*in the process*</u> of domesticating the judgment it had obtained against the Debtor and that, only then, would Deerfield take steps to register a judgment lien on the Debtor's property (the "<u>Sea Isle Property</u>").[9] Accordingly, the Debtor will most likely succeed in challenging the validity of Deerfield's purported lien on the Sea Isle Property.[10] *Relatedly*—at this juncture, it is arguably impossible to properly assess the difficulties Deerfield, if successful, would face in collecting because there has been no disclosure by the Debtor as to the assets Deerfield would seek to be collecting against. *Moreover*—the Adversary Proceeding is neither complex nor prohibitively expensive. It is a straightforward process well within the capabilities of the estate. That is a far cry from what the Debtor proposes here—a sweetheart deal that bypasses judicial determination in favor of

---

[9]　*See* Deerfield Stay Relief Motion ¶ 27.
[10]　*See generally Daryl F. Heller v. Deerfield Capital, LLC and Orrstown Bank*, Adv. No. 25-01092 (JNP) (the "<u>Adversary Proceeding</u>").

expediency, all at the direct expense of the broader creditor body whose recoveries stand to be diluted without justification.

15.     *Fourth*—and perhaps most importantly—the paramount interest of creditors demands denial of the Settlement Motion.

16.     "Unsecured creditors are not voluntary investors in the Debtor and their position on the settlement . . . *is entitled to substantial weight*." *In re Exide Techs.*, 303 B.R. 48, 70 (Bankr. D. Del. 2003) (emphasis supplied); *see also In re Matco Elecs. Group, Inc.*, 287 B.R. 68, 77, 79 (Bankr. N.D.N.Y. 2002) (denying Rule 9019 motion based on "serious objections" expressed by unsecured creditors through creditors committee, which had concluded that pursuing adversary proceeding presented best chance for recovery); *Comm. of Unsecured Creditors of Interstate Cigar Co. v. Interstate Cigar Distrib. (In re Interstate Cigar Co.),* 240 B.R. 816, 824-25 (Bankr. E.D.N.Y. 1999) (finding more harm to debtor's largest unsecured creditor than benefit to bankruptcy estate where settlement amount was significantly below potential recovery in pending litigation, and party with most to lose from proposed settlement, debtor's largest unsecured creditor, strongly opposed it). Balanced against the strong opposition of a real party in interest, the support of a Debtor looking for a quick and cheap exit from bankruptcy is entitled to significantly less weight.

17.     The Debtor requests that the Court approve a settlement that grants a single creditor a twenty-five percent interest in what is potentially the estate's most valuable asset, Heller Capital Group, LLC ("HCG"), and a fifty-one percent interest (and virtual control) over the estate's second apparent most valuable asset, Heller Investment Holdings, LLC ("HIH")—[11] all while the

---

[11]     According to the Debtor's Schedule A/B [D.I. 72], the Debtor placed a $227 million valuation on estate assets. HCG purportedly accounts for $160 million of this valuation, and HIH accounts for $60 million of this valuation, together making up $220 million, or approximately 97% of estate assets.

remaining creditors still have little to no information regarding the nature and value of the assets

the Debtor is pledging away and, at the same time, seeking to sideline the Examiner from being

able to investigate and provide stakeholders with any clarity around these issues, including the

valuation of these entities. Indeed, the Debtor has yet to file *any* disclosures mandated by

Bankruptcy Rule 2015.3[12] or amendments with respect to the Debtor's statement of financial affairs

and certain payments.[13]

18.     With respect to HCG, the Debtor seeks to give Deerfield—who's claim is valued

at approximately $8.9 million as of the Petition Date—[14]a twenty-five percent interest in an entity

he valued at approximately $160 million. Meanwhile, creditors have collectively filed proofs of

claim in this case totaling over $800 million. That is, the settlement agreement not only

contemplates providing Deerfield with recoveries vastly disproportionate to the value or priority

of its claim but also threatens to improperly burden unencumbered assets —assets that very well

ought to remain available for equitable distribution to the broader body of unsecured creditors. The

benefits seeking to be conferred upon Deerfield under the settlement agreement, are, in and of

themselves, troubling, as they are vastly disproportionate to the asserted amount of its claim.

19.     With respect to HIH, while the Debtor now purports to "confirm" Deerfield's

ownership therein and the existence of certain unexercised pledges therein and with respect to

---

[12]   Pursuant to Bankruptcy Rule 2015.3, the Debtor "must file periodic financial reports of the value, operations, and
profitability of each entity in which the estate holds a substantial or controlling interest" (each, an "Entity Report")
and must file the first Entity Report "at least 7 days before the first date set for the [341 Meeting]."
[13]   *See* Tr. of 341 Meeting of Creditors at 128:4-128-7.
[14]   *See* Settlement Motion ¶ 6(e).

another Heller-related entity, pursuant to a "Membership Pledge Agreement," in favor of Deerfield, this confirmation raises noteworthy concerns.[15]

20.      *First*, while loan documents seemingly reference each other, they are inconsistent regarding the collateral being pledged. The promissory note (the "Promissory Note") provides that HCG and HIH pledged "a security interest to [Deerfield] in [HCG]'s and [HIH]'s direct and indirect interest in [GCC], including ownership interest, capital invested, right to return of capital, right to return of payments, [and] the proceeds of any loans."[16] The Promissory Note does not provide that the Debtor or HCG pledged to Deerfield <u>any</u> of their interests in HIH in consideration for the loan. That is, the Promissory Note does not support the assertion that the loan was secured by all equity in HIH. On the other hand, the Membership Pledge Agreement provides that, "[p]ursuant to the [Promissory Note] [HGC] and [the Debtor] are required to pledge as collateral all of their direct and indirect ownership, equity or right to receive payments from [HIH]."[17]

21.      *Second*, the Membership Pledge Agreement itself states that, upon default, Deerfield may transfer all the interest pledged in HIH to itself, "which shall result in satisfaction of all payment and performance obligations . . . under the [Promissory Note]."[18] Thus, if the Membership Pledge Agreement is valid, then the Debtor's confirmation that Deerfield owns all membership interest in HIH would satisfy Deerfield's claim in its entirety. All of the additional

---

[15]    *See* Settlement Motion ¶ 26.
[16]    Claim No. 38-1 (Promissory Note ¶ 6(b)).
[17]    *Daryl F. Heller v. Deerfield Capital, LLC*, Adv. No. 25-01038 (JNP), *Submission of Records Pursuant to D.N.J. LBR 9027-1I* [D.I. 7] at p. 134.
[18]    *Id.*

concessions the Debtor makes to Deerfield under the settlement agreement, such as the twenty-five percent interest in HGC's assets, are wholly unnecessary.

22.    *Third*, the circumstances surrounding Deerfield's loan are suspect and call into question the legitimacy and commercial substance of the transaction. Notably, the loan matured a mere four days after its execution—an atypical and commercially unreasonable term. The accelerated maturity raises serious concerns regarding the Deerfield's intent, the arm's-length nature of the transaction, and the enforceability of any rights purportedly arising therefrom. These red flags warrant heightened scrutiny by the Court.

23.    Accordingly, the *Martin* factors have not been satisfied, the settlement agreement cannot be approved, and the Settlement Motion should be denied.

## II.    Motion to Suspend Examiner

24.    The Court should deny Deerfield's Motion to Suspend Examiner because, *inter alia*, Deerfield's argument that the Examiner's scope will necessarily be limited by the proposed settlement is deeply flawed, and removing the Examiner would eliminate the only real oversight of a Debtor that has otherwise lacked candor and has provided limited to no disclosures during the pendency of this case.

25.    While Deerfield may wish to unilaterally remove the Court-appointed Examiner, it is well-established that such removal cannot be affected at the unsubstantiated request of a single creditor. The Bankruptcy Code provides a clear and exclusive mechanism for such relief under section 324, which requires a showing of cause and is subject to the Court's discretion—not Deerfield's whims. *See* 11 U.S.C. § 324(a) ("The court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause."); *In re Marvel Ent. Grp.*, 140 F.3d 463, 471 (3rd Cir. 1998) (holding a trustee appointed under 11 U.S.C. § 1104 "may only

be removed" pursuant to 11 U.S.C. § 324(a)). While "cause" is not defined in the Bankruptcy Code, cause for removal of a trustee or examiner "has been found only where there is evidence of fraud, an injury to the debtor's estate, or a breach of fiduciary duty by the trustee." *In re Federowicz*, 1989 U.S. Dist. LEXIS 16555, *11 (D.N.J. 1989).

26.     Deerfield argues that the Deerfield Settlement "structurally changes" the case and necessarily limits the scope of the Examiner. Deerfield premises its argument on the assumption that the Examiner will no longer need to examine the assets of HCG or HIG because (a) HCG would file a liquidating chapter 11 bankruptcy and seek to appoint a liquidating agent who would independently examine HCG's assets, and (b) Deerfield will exercise its rights over HIH to remove the Debtor from HIH's management. Deerfield also argues that the Examiner (x) is too expensive (notwithstanding Deerfield's agreement to the Examiner's budget), and (y) has not filed the Initial Report, arguments that amount to little more than baseless grievances and strategic posturing.

27.     As shown above, the settlement should not be approved. However, even if it were, Deerfield simply assumes that if were granted interests in HIH and HCG, all other creditors cease to have a vested interest in investigating the extent and value of such assets. That is simply not the case as this estate retains significant interests in such potential value. What's more, as stated herein, the Examiner Order does not limit the Examiner's role in investigating the Debtor's assets or in HIH or HCG for that matter.[19] Suspension of the Examiner would, at best, only partially limit the scope of multiple matters that the Examiner is tasked with investigating.

28.     Further, Deerfield argues that it is entitled to unilaterally seek the Examiner's removal once it is satisfied with the Debtor's treatment of its individual grievances because the Examiner was appointed, in part, as the result of the Deerfield's motion to appoint a chapter 11

---

[19]     *See supra* at ¶¶ 2, 26-27.

trustee [D.I. 30] (the "Deerfield Trustee Motion.") However, the appointment of the Examiner was the product of a carefully negotiated, multilateral, consensual resolution among Silverview, Deerfield, Orrstown Bank, Steven Mitnick, the court-appointed receiver over certain assets of certain Heller-connected entities, and the Prestige Funds, designed to resolve the Deerfield Trustee Motion. Indeed, prior to submission to the Court, the Examiner Order was extensively negotiated between the aforementioned parties,[20] with multiple iterations exchanged and refined until all parties reached a unanimous agreement in its contents. This collaborative process underscored the parties' shared recognition of the necessity for independent oversight at that critical juncture in the Debtor's case. This is evidenced by the Examiner Order's requirement that the Examiner "meet and confer with representatives from [Deerfield], the Debtor, Silverview, Orrstown, Steward, Avenaero, the Golden, Gate Receiver, [and] Prestige Funds." Examiner Order ¶ 10.

29.     Removing, staying, or suspending the Examiner would also do away with the only watchdog that creditors have over the Debtor's highly suspect management of the estate. Indeed, a creditor's committee has yet to be appointed, and the Debtor has not provided the initial Entity Report that was due over two months ago. Moreover, the Debtor has stubbornly objected to every Bankruptcy Rule 2004 discovery request regarding his business entities and prohibited the Examiner from sharing discovery with creditors, further exacerbating Silverview's concerns over the Debtor's lack of disclosure and ability to manage its financial affairs.

30.     For these reasons, Silverview respectfully requests that the Court deny the Motion to Suspend Examiner.

**STATEMENT IN SUPPORT**

---

[20]   According to Deerfield, in response to its request to the Examiner to suspend its investigation, counsel to the Examiner responded—correctly observing that "[the] Order Appointing the Examiner is *an agreed Court order* that was *negotiated by* the Debtor, Deerfield and *other parties*." See Motion to Suspend Examiner ¶ 10 (emphasis supplied).

31.     Silverview agrees with the arguments advanced by the Prestige Funds in the Trustee Motion and the authorities cited therein. The Debtor has continued to rebuff all attempts by creditors to gain insight into estate assets and has failed to abide by the Bankruptcy Code's disclosure requirements.

32.     "It is a long-standing tenet of bankruptcy law that one seeking benefits under the terms of the Bankruptcy Code is required to [disclose] all interests and property rights." *DePasquale v. Morgan Stanley Smith Barney LLC*, 2011 U.S. Dist. LEXIS 94058, *7 (D.N.J. 2011). "Such a disclosure obligation is at the very core of the bankruptcy process and meeting these obligations is part of the price debtors pay" to avail themselves of its protections. *Stanley v. FCA United States LLC*, 51 F.4th 215, 220 (6th Cir. 2022).

33.     Here, months after filing the case, the Debtor has failed to comply with basic disclosure requirements. As previously mentioned, the Debtor has, *inter alia*, (a) not produced the initial Entity Report he was required to over two months ago pursuant to Bankruptcy Rule 2015.3, (b) stubbornly objected to every Bankruptcy Rule 2004 discovery request regarding his business entities, (c) not filed amended schedules and states as was promised at the 341 Meeting, (d) and bent over backwards to prevent the Examiner from sharing discovery with creditors.

34.     For these reasons, Silverview believes that there is substantial danger that the Debtor will take steps to hide, transfer and otherwise dissipate estate assets to the detriment of his

creditors if a Chapter 11 Trustee is not appointed. Indeed, the record is replete with serious and well-grounded facts of misconduct, fraud and deceit by the Debtor in this regard.

35.     As such, Silverview believes that the appointment of a Chapter 11 Trustee is warranted and necessary, and the Trustee Motion should be granted.

## CONCLUSION

36.     The Debtor has no justification for entering into the settlement agreement. The settlement agreement is a *sub rosa* plan that inappropriately attempts to bypass creditors' rights to disclosure and voting. The settlement agreement is not in the creditors' best interest and, more likely than not, will be opposed by an overwhelming majority of affected creditors. The motion to suspend the Examiner—the sole independent fiduciary charged with providing transparency in a case marred by allegations of fraud—should be denied outright. The very circumstances prompting the Motion to Suspend Examiner only underscore the urgent need for the appointment of a Chapter 11 Trustee to protect the integrity of the estate, restore creditor confidence and ensure that this case proceeds under the oversight of a truly independent fiduciary.

WHEREFORE, Silverview respectfully requests that the Court (a) deny the Debtor Side Motions, (b) grant the Trustee Motion, and (c) grant such other and further relief as is just and proper.

Dated: June 2, 2025

**ALSTON & BIRD LLP**

By: */s/ Gerard Catalanello*
  Gerard Catalanello, Esq.
  James J. Vincequerra, Esq. (admitted *pro hac vice*)
  Kimberly Schiffman Esq. (admitted *pro hac vice*)
  90 Park Avenue
  15th Floor
  New York, New York 10016-1387
  Telephone: (212) 210-9400
  Facsimile: (212) 210-9444
  Email: Gerard.Catalanello@alston.com
     James.Vincequerra@alston.com
     Kimberly.Schiffman@alston.com

*– and –*

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Silverview Credit Partners LP*

16

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2025, I caused to be electronically filed the foregoing *Silverview Credit Partners LP's (I) Omnibus Objection to (A) Debtor's Motion to Approve Compromise or Settlement Under Rule 9019, and (B) Deerfield's Motion for an Order Staying and/or Suspending the Examiner; and (II) Statement in Support of Prestige's Motion to Appoint Trustee* with the Clerk of the Court using the CM/ECF system and further caused the same to be served on counsel of record, listed below, via CM/ECF and Email.

| | |
|---|---|
| Joseph H. Lemkin, Esq.<br>Stark & Stark<br>100 American Metro Blvd.<br>Hamilton, NJ 08619<br>jlemkin@stark-stark.com<br>mkizner@stark-stark.com | Sari B. Placona, Esq.<br>Anthony Sodono, III, Esq.<br>McManimon, Scotland & Baumann, LLC<br>75 Livingston Avenue<br>Suite 201<br>Roseland, NJ 0706<br>asodono@msbnj.com<br>splacona@msbnj.com |
| Albert A. Ciardi, III, Esquire<br>Daniel S. Siedman, Esquire<br>Ciardi Ciardi & Astin<br>1905 Spruce Street,<br>Philadelphia, PA 19103<br>aciardi @ciardilaw.com<br>dsiedman@ciardilaw.com | Jeffrey M. Sponder, Esq.<br>Office of U.S. Trustee<br>One Newark Center<br>Newark, NJ 07102<br>973-645-2379<br>jeffrey.m.sponder@usdoj.gov |
| Kurt F. Gwynne, Esq.<br>Reed Smith LLP<br>506 Carnegie Center, Suite 300<br>Princeton, NJ 08540<br>kgwynne@reedsmith.com | |

Respectfully submitted,

/s/ *Gerard S. Catalanello*
Gerard S. Catalanello
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9453
Facsimile: (212) 210-9444
gerard.catalanello@alston.com

*Attorney for Silverview Credit Partners LP*