```
 1              In the Court of Common Pleas
            Lancaster County, Pennsylvania
 2                 Civil Action - Law
    ----------------------------x
 3  Prestige Fund A, LLC, et al.,

 4            Plaintiffs

 5      vs                              No. CI-24-06012

 6  Paramount Management Group, LLC,

 7            Defendant
    ----------------------------x
 8

 9

10                                 MAY 9, 2025

11  DEPOSITION OF:               BARRY RYNEARSON

12  called for oral examination by counsel for the

13  Plaintiffs, pursuant to Notice at 280 Granite Run

14  Drive, Lancaster, Pennsylvania before Hillary

15  Hazlett Walsh of Everest Court Reporting, a Notary

16  Public in and for the Commonwealth of Pennsylvania,

17  beginning at 9:53 a.m., when were present on behalf

18  of the respective parties.

19

20

21

22

23  Everest Job No. 40686

24

25
```

```
 1                 A P P E A R A N C E S

 2    On behalf of the Plaintiffs:

 3        Saxton & Stump, LLC

 4        By:  Joshua J. Voss, Esquire

 5        Alec J. Johnson, Esquire

 6        280 Granite Run Drive, Suite 300

 7        Lancaster, PA 17601

 8        (717) 556-1072

 9        jvoss@saxtonstump.com

10        ajj@saxtonstump.com

11

12    On behalf of the witness:

13        Boyle & Jasari

14        By:  Dennis Boyle, Esquire

15        1339 Chestnut Street, Suite 500

16        Philadelphia, PA 19107

17        (771) 217-2400

18        dboyle@boylejasari.com

19

20

21

22

23

24

25
```

1                          I N D E X

2                          EXAMINATION

3    DEPOSITION OF                                    PAGE

4    Barry Rynearson

5       By Mr. Voss                                     4

6

7                           EXHIBITS

8    RYNEARSON EXHIBIT NO.                         MARKED

9    Exhibit 1 - Subpoena                              6

10   Exhibit 2 - Proof of Claim                       68

11   Exhibit 3 - Management Report 7/31/2022          78

12   Exhibit 4 - Management Report 12/31/2021         90

13   Exhibit 5 - Spreadsheet                         102

14   Exhibit 6 - Spreadsheet                         108

15   Exhibit 7 - Raw Glorious Transactions           111

16   Exhibit 8 - 2024 PMG Financial Statements       117

17

18                 REQUEST FOR PRODUCTION

19   PAGE/LINE

20   77/12

21   77/25

22   114/23

23

24

25

Page 4

1  STIPULATION
2      It is hereby stipulated by and between
3  counsel for the respective parties that sealing,
4  certification, and filing are waived and that
5  all objections except as to the form of the
6  question are reserved to the time of the trial.
7      BARRY RYNEARSON, called as a witness,
8  being duly sworn, testified as follows:
9  EXAMINATION BY
10 MR. VOSS:
11     Q   Good morning, Mr. Rynearson.  My name is
12 Joshua Voss.  I represent a group of Plaintiffs
13 collectively know as the Prestige Funds pending
14 in Lancaster County Common Pleas.
15     Have you been deposed before?
16     A   I don't believe so.
17     Q   Okay.  So I'm going to give you some
18 basic instructions that will carry us through
19 the day.
20     We will start with to my right and
21 across from you is a court reporter.  You will
22 see, she types as I speak.
23     She is producing a written record of
24 everything said in this room.  To get the best
25 record possible, you need me to finish my

Page 5

1  question before you answer and I will do my best
2  to wait for your answer to complete before I ask
3  my next question.
4      In normal human conversation, that is
5  what we do.  But for deps, if we want the best
6  transcript, you need to wait, even if you know
7  exactly what I'm going to ask to complete the
8  question.
9      The second piece is we need oral
10 responses.  This isn't a videotape deposition,
11 so I need you to say yes or no or I don't know,
12 what have you, but head shakes or nods are not
13 going to show up on the record.  So we need to
14 make sure we have oral responses to the
15 questions.
16     If I ask you a question and you answer
17 it, I will assume you understood it.  So if you
18 don't understand, please ask for clarification
19 or whatever piece you don't understand, we will
20 ask -- we will -- I will do my best to restate
21 it.
22     I'm not looking for guesses today unless
23 I specifically ask for a guess.  Same thing with
24 estimates, I'll let you know when I'm looking
25 for an estimate.  Other than that, I will ask

Page 6

1  for answers to the best of your recollection.
2      Do you understand all of that?
3      A   I do.
4      Q   Okay.  Are you under the influence of
5  any drugs or any other impediments that would
6  impede your ability to be truthful with your
7  answers today?
8      A   No.
9      Q   Okay.  Good.
10     I will start with Exhibit 1.  We can
11 call this Rynearson 1.
12     I'm handing the witness what has been
13 marked as Rynearson 1.
14     Mr. Rynearson, have you seen this
15 before?
16     A   I have.
17     (Rynearson Exhibit No. 1 was marked for
18 identification.)
19 BY MR. VOSS:
20     Q   And this is a subpoena to attend and
21 testify.  Is that why you are here today, sir?
22     A   Yes.
23     Q   And will you see in numbered Paragraph
24 2, there is a number of documents that are
25 requested of you.

Page 7

1      Do you see that request?
2      A   I do.
3      Q   Did you look for those documents before
4  coming here today?
5      A   Yes.
6      Q   Did you find any materials responsive to
7  those requests?
8      A   No.
9      Q   What efforts did you undertake to look
10 for those records?
11     A   I looked in my -- I looked in my files.
12 I have some files related to Glorious, which is
13 the Michigan entity.
14     Q   What other files did you look at?
15     A   That is -- that is what I had.
16     Q   Okay.  And when you say Glorious, what
17 do you mean specifically?
18     A   So Glorious is an entity that exists in
19 Michigan.  Glorious Cannibis Company.  It
20 comprises about 25 legal entities.
21     Q   Okay.  We will talk about that at length
22 later.  So we will put a pin in that now.
23     A   Okay.
24     Q   Let's talk about your preparation today.
25     Did you have preparations with anybody

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification   Page 5 of 68
Deposition of Barry Rynearson                                          et al. v. Paramount Management Group, LLC

Page 8

1  before you appeared here today?
2      A   No.  Just my attorney.
3      Q   Anyone else in the room other than your
4  attorney?
5      A   No.
6      Q   Anyone else you spoke with about this
7  deposition?
8      A   No.
9      Q   Did you talk to Daryl Heller about this
10  deposition?
11      A   No.
12      Q   Does he know you are appearing here
13  today?
14      A   Not to my knowledge.
15      Q   Okay.  Did you look at any documents in
16  preparation for today's deposition?
17      A   I did not.
18      Q   All right.  Let's go into your
19  background a little bit.
20          Who is your current employer?
21      A   Current employer is sportsmansdeals.com.
22      Q   And what is, just generally, your role
23  there?
24      A   Finance related.
25      Q   Okay.  At some point in time, did you

Page 9

1  work at Heller Capital Group, LLC?
2      A   Yes.
3      Q   What period of time did you work there
4  start to stop?
5      A   I started in August of 2018, and I
6  resigned in April of 2024.
7      Q   And the resignation date, do you have an
8  exact date for that?
9      A   I don't have the exact date.  It would
10  be the third week though.  Third week of April.
11      Q   Third week.  Okay.
12          What titles did you have at Heller
13  Capital?
14      A   In the beginning, I was a consultant.
15  So I was hired on as a financial consultant.  So
16  that would have been August of 2018; and then in
17  December of 2018, he hired me as the CFO.
18      Q   When you say he, who do you mean?
19      A   Sorry.  Daryl Heller.
20      Q   And from December 2018 to April 2024,
21  you had the title of CFO?
22      A   I did.
23      Q   Were you an officer of any other
24  entities -- I sort of just call it the Heller
25  universe.  I understand from other witnesses it

Page 10

1  was approximately 140 entities.
2          Were you an officer of any of those
3  entities?
4      A   No.
5      Q   Did you work at any of those entities?
6      A   Help me understand.  Did I work?
7      Q   Well, did you -- were you a W-2
8  employee?
9      A   No.  My paycheck was 100 percent from
10  Heller Capital.
11      Q   You never got a 1099 from any other
12  entity?
13      A   I did not.
14      Q   As far as -- well, what do you -- what
15  was your work for -- for Heller Capital as CFO?
16  That is what I'm most interested in.
17          What did you do kind of on a
18  month-to-month, day-to-day, year-to-year basis?
19      A   Sure.  So my job at Heller Capital
20  focused on Daryl's startup companies, as well as
21  his troubled entities, financially-troubled
22  entities, entities that were operationally not
23  performing well.
24      Q   Okay.  Let's start with the startup
25  entities.

Page 11

1          What does that mean startup entity?
2      A   It would be a brand new entity.  It is
3  organized, created, and go out and try to
4  achieve the investment objective.  Glorious is a
5  perfect example of that, Josh.
6      Q   And what specifically did you do to aid
7  these startup organizations?
8      A   Whatever needed to be done.  So
9  financial operational, the legal setup, and
10  hiring employees, managing employees, sending
11  KPIs, Key Performance Indicators.
12      Q   Okay.  A minute ago you spoke about
13  troubled organizations.
14          What were troubled organizations?  What
15  do you mean by that?
16      A   Like entities that weren't doing well.
17  Financially, they were not doing well.  So
18  example of that would be the Rockford Capital
19  Companies.  That was a real estate portfolio.
20      Q   And why were they troubled?
21      A   That specific example was just bad
22  management.
23      Q   Who performed the management for that
24  company?
25      A   So that would have been Will Stoltzfus.

Page 12

Q   And any other examples of troubled entities that you can recall?

A   Not right now.  Most of it was startup.

Q   Okay.  Did you have a role at Paramount Management Group, LLC?

A   I did not.

Q   Okay.  It was neither a startup nor a troubled entity as you described them?

A   Correct.

Q   I think you mentioned this a minute ago; but for clarification, how were you paid by Heller Capital?  Meaning were you biweekly?  Check?  A K-1?  Distributions?  How were you paid?

A   Employee, at-will employee.  Check, biweekly checks.

Q   I got you.

Were you ever an owner of Heller Capital?

A   No.

Q   Were you ever an owner of any entity within the Heller Capital or Daryl Heller universe of entities?

A   I was a member of an entity that had an equity ownership in a Glorious Company.

Page 13

Q   What company was that?

A   Tycoon -- Tycoon Holdings and Frank RE.  They no longer exist.  They were rolled into Glorious Cannabis Company.

Q   So you used to be a member of Tycoon Holdings?

A   Um-hum.

Q   But are not presently?

A   I believe that is correct how the legal structure -- my K-1 for 2020 -- my K-1 for 2024 is going to come from GCC MSO Holdings.

Q   When did your interest in Tycoon Holdings end?

A   So we did a -- Glorious did a large acquisition of -- of Choice Labs; and when those two entities merged, we came together and all of the -- all of the legal entities, all of the entities that had members rolled up into one consolidated membership.

Q   And that membership is GCC MSO Holdings?

A   Let me just make sure -- that is the very top level.  Yeah, that is very top level.

Q   And that is the only entity that you presently --

A   Let me just back -- it is GCC Investment

Page 14

Holdings.  There is two entities that roll up into GCC MSO Holdings.  And the cap table that I'm a part of is GCC Investment Holdings.

Q   Which entity is issuing a K-1?

A   It would be GCC Investment Holdings.

Q   And is that an LLC?

A   Yes.

Q   Any other entities within the Heller Capital universe or Daryl Heller's universe that you owned previously or owned now?

A   No.

Q   Were you ever an owner in Paramount?

A   No.

Q   Regarding Heller Capital from 2018 to 2024, can you identify the officers by year and duration?  And I'm really just looking for C-Suite type folks.

A   Daryl Heller, CEO the entire time.  Aaron Fogleman, COO.  I'm not going to be able to give you the dates unfortunately, Josh.  Last two years for sure, maybe three.

Dan Burkholder would have been the Chief Cultural Officer and President.  Again, I'm going to struggle with dates at least the last two or three years.

Page 15

Erin Farabaugh.  She was the CLO.  She was there probably the last two years, year and a half of me being there.

And then there was one other individual, his name is Neil Leininger and his title was Chief Project Officer.

Q   Was there an accounting department at Heller Capital?

A   Yes.

Q   How many folks worked in that?

A   We had like five.  Can I have a pen to write this down?  Can I write on this?

Q   That is a -- here is a notepad.

A   That will just help me.  Thank you.  I feel like I'm forgetting people.

Q   That is fine.  It is a memory test.

A   I'm failing.

Q   Where did the --

A   I got four that I think of right now.

Q   What were their names and to the extent you are able to recall their titles?

A   So Dana Schlicker, she was the controller.  And then Austin Quinones was a senior accountant.  Josh Baker was a senior accountant.

Page 16

1      There was another Josh.  I don't
2  remember his last name.  He was the lowest level
3  accountant.
4      And then Pete Wisniewski, he did some
5  accounting for us as well.  He was staff
6  accountant, lower level.
7      Q   Who succeeded you as CFO?
8      A   Nobody to my knowledge.
9      Q   Do you know who performed the role of
10 CFO?
11     A   I don't.  I think they kind of shared
12 it.
13     Q   Who is the they?
14     A   Aaron Fogleman and Dana.
15     Q   Are you familiar with an entity called
16 Luma Financial Group?
17     A   I am.
18     Q   What do you understand that entity is
19 and does?
20     A   It was an entity that I believe that
21 Dana Schlicker established to do the accounting
22 work for Daryl Heller's entities.
23     Q   Did you -- have you ever worked there?
24     A   No.
25     Q   Do you believe that they are performing

Page 17

1  those services?
2      A   I -- I don't know.
3      Q   Do you know why that entity was formed?
4      A   I do not.
5      Q   Let's talk about Daryl Heller's role at
6  Heller Capital.
7      What did he do on a day-to-day,
8  month-to-month, year-to-year basis?
9      A   Daryl was the visionary strategic
10 thinker.  He was always looking for investment
11 opportunity and then he would manage the -- we
12 call them portfolio companies.  He would engage
13 in managing the portfolio companies.
14     Q   Did he control the finances?
15     A   Control them?  Help me understand.
16     Q   Did he make major financial decisions?
17     A   Definitely.
18     Q   Did he make medium financial decisions?
19     A   Could have, yeah.
20     Q   How about minor financial decisions?
21     A   Probably not.
22     Q   Fair to say he -- he controlled the
23 finances that -- at a significant level?
24     A   Yes.
25     Q   Did he follow corporate formalities?

Page 18

1      A   We would have -- we would have an
2  executive team meeting once a month.
3      Q   Were there minutes of those meetings?
4      A   No.
5      Q   How about was there any board for Heller
6  Capital?
7      A   No.
8      Q   No board meetings that you are aware of?
9      A   No.
10     Q   Minutes?
11     A   No.
12     Q   How about intermingling of funds?
13 Intermingling of funds between Heller Capital
14 and entities within the Heller Capital universe?
15     A   Not that I'm aware of.
16     Q   How about funds of Heller Capital?  Did
17 Daryl ever use those for personal purposes?
18     A   If he did, they would be a distribution
19 out of Heller Capital into Daryl's personal
20 account.
21     Q   Well, did he have a personal American
22 Express card?
23     A   It was a company card, to the best of my
24 knowledge.
25     Q   To the best of your knowledge, he had

Page 19

1  just one AMEX card?
2      A   To the best of my knowledge, yes.
3      Q   Okay.  You are not aware that he had a
4  personal AMEX card -- or if he had a personal
5  AMEX card that was billed to Heller Capital?
6      A   What I recall is we had a Heller Capital
7  AMEX account and anybody who was an employee of
8  Heller Capital received a credit card that had
9  Heller Capital on the card.
10     Q   A moment ago you said that Daryl managed
11 the portfolio company?
12     A   You mentioned earlier the 140 entities,
13 that would be the whole entire group of entities
14 that would roll up.
15     Q   To your knowledge, how many entities
16 were underneath Heller Capital in sort of a
17 corporate org chart?
18     A   Your 140 number is probably right and
19 the only reason I know that is because of the
20 taxes.  I would make sure all of the taxes were
21 filed.
22     Q   Did each entity file its own tax return?
23     A   If it was -- if it was a reporting
24 entity, yes.
25     Q   Reporting entity meaning it wasn't just

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Deposition of Barry Rynearson
Exhibit B to Certification Page 8 of 68
Prestige Investment Group et al. v. Paramount Management Group, LLC

Page 20

a mere passthrough?

A  Yes.  Like a single member LLC would not be a reporting entity.  It would flow through to the individual who owned it.

Q  What did -- what did Heller Capital do?  What was its business?  How would you describe it?

A  Daryl used to describe it as a boutique private equity firm.  It was more akin to a family office.

Q  What do you mean by that?

A  It was Daryl's money that was mostly invested.  It was friends and family money that was mostly invested.

Q  How did it make money?

A  It made money through the portfolio companies.

Q  Well, what did they do?  Give me some industries, for example.

A  So Paramount was a good example.  So Paramount -- Paramount when I started with Daryl Heller in '18, they were portrayed to be the fourth largest ATM company in the country and they were generating significant cash flow at full C-Suite.

Page 21

So dividends would come out of Paramount or distributions rather into Heller.  So that is how Heller -- how it made its money.

Q  From other businesses essentially doing the same?

A  Yeah.  The ones that were profitable.  The ones that had cash flow, yes.

Q  Is that a lengthy list of ones that were cash flow positive?

A  Not really, no.

Q  Well, in that case, can you give me the list?

A  Sure.  So you would have had Prestige would have cash flowed.

Q  What do you mean by Prestige?

A  Prestige Investment Group.

Q  Okay.  What else?

A  He would have had -- there is more.  Give me a second.  I'm just thinking.  PTG, so that was a company, Premiere Technology Group, Avail Solutions.

Q  Any others?

A  I don't recall any others, Josh.

Q  So the ones that cash flow -- cash flowed to the best of your recollection were

Page 22

Prestige Investment Group, Premiere Technology Group, and Avail?  Just those three?

A  And Paramount.  Did you say Paramount?

Q  I did not say Paramount.

A  Okay.

Q  So that is a fourth.

Any others you can recall?

A  No.

Q  Do you believe there were others there?

A  Could be.  They weren't significant.  They would break even, a couple hundred thousand.  So those were the ones that were pulling in some cash.

Q  Well, did those four contribute equally or was one more important than another?

A  Oh, definitely Paramount was by far the biggest.

Q  Paramount, if you had to represent it as a percentage of Heller Capital earnings, what would you estimate that percentage to be?

A  Very high.  Like 90th.  Ninetieth percentile.

Q  So 90 percent of the money that Heller Capital was making while you were their CFO was out of Paramount?

Page 23

A  That is correct.

Q  A minute ago -- I just want to follow up on your answers.

You said Paramount was portrayed to be the fourth largest ATM company.

Who portrayed that to you?

A  Daryl.

Q  Anybody else?

A  No, not that I can recall.

Q  And when you say these entities including Paramount cash flowed, what do you mean?

A  They were cash flow positive.

Q  Meaning they were profitable?

A  The operations were generating positive cash flow.

Q  Okay.  You are going to know a lot of accounting terms that seem real obvious to you that are not to me.

A  Sure.

Q  So some of these questions are legitimately just me trying to understand the vernacular you are using so I'm not thinking they mean something other than what a guy with a law degree who is bad at math would think they

Page 24

mean.

A   Okay.

Q   You said that Paramount got paid dividends to Heller Capital.  I think I wrote that down correctly.

Is that what you said?

A   It would be distributions actually --

Q   Distributions.

A   -- because it is an LLC.

Q   And how often would distributions flow from Paramount to Heller Capital?

A   I mean, they would -- they would flow on a regular basis.  Weekly, there could be a distribution every week.

Q   Okay.  Did Heller Capital make any money from PowerCoin sometimes referred to as Margo?

A   Not to my knowledge.

Q   How about from an entity call Bitstop?

A   Bitstop might have been a profitable company as well actually.  I think they were profitable.  But again not significantly profitable, but they were cash flowing.

Q   So maybe that is a fifth entity with cash flow?

A   Yes.  Thank you.

Page 25

Q   To be clear, this is a memory test.  There is nothing in front of you.  So if we come up with others --

A   Okay.

Q   -- we will add them to the list.

How about Raw Ventures?  Was that cash flow?

A   Definitely not.

Q   I keep saying we are going to get to it so I don't get out of order, we are going to talk about Raw --

A   Okay.

Q   -- and the next entity a little bit more.

Glorious, did that cash flow?

A   Glorious did not always have cash flow and when it did, it needed the funds for expansion.  There was an expansion to other states, new capital equipment.

So it did hold its own from 2018 to 2021, it did not cash flow.  And then about '21 is when it turned and started to cash flow but not enough to be able to pay distributions to Heller Capital.

Q   When you left in April of 2024, was

Page 26

Heller Capital earning money?

A   Was Heller Capital earning money?

Q   Yes.

A   The only way Heller Capital earned income was from portfolio companies.

Q   Okay.  Same question.  Was it earning money in 2024?

A   It was -- it had cash.

Q   Was it profitable?

A   So Heller Capital, again, is not an operating entity.  So it didn't really have like an operating P&L.

Q   What do you mean it wasn't an operating entity?

A   It didn't -- it didn't -- it did not produce a product.

Q   Okay.  But it had employees?

A   Who all had services to the portfolio companies.

Q   Right.

It filed a tax return?

A   It did.

Q   It was an entity formed under Pennsylvania law?

A   Yes.

Page 27

Q   Okay.  So --

MR. BOYLE:  If I could just interrupt and go off the record for a second.

THE REPORTER:  Is that okay?

MR. BOYLE:  You are making a distinction between holding and operating companies.

MR. VOSS:  Okay.  Yes.  Is this accounting?

MR. BOYLE:  Pardon?

MR. VOSS:  Am I falling into an accounting trap here?

MR. BOYLE:  I think so.

MR. VOSS:  Okay.

MR. BOYLE:  I think he is speaking of profits coming from operating companies.  Whereas Heller Capital was a holding company, it received the profits from the other companies but it did not produce a product or service of its own.

MR. VOSS:  Understood.

MR. JOHNSON:  We are just looking for income and expenses.

MR. VOSS:  Yeah.  I want to go back on the record before he says anything else but yeah.

Page 28

1    MR. BOYLE: Okay.
2    THE REPORTER: I actually stayed on the
3 record because you didn't answer my question. I
4 stay on the record until both sides agree.
5    MR. BOYLE: No problem.
6    MR. VOSS: Is that okay if that stays on
7 the record? I think it is an important
8 clarification.
9    MR. BOYLE: Yes.
10 BY MR. VOSS:
11    Q  Was Heller Capital earning money when
12 you left in 2024?
13    A  They would have build -- built portfolio
14 companies for services -- so Heller Capital
15 would receive cash flow two ways through
16 distributions and through billing out the
17 portfolio companies for services performed.
18    So there was like a monthly management
19 fee that the portfolio companies would pay. So
20 they would have been earning money on a P&L and
21 on a P&L you would have income coming in from
22 management income.
23    Q  So when you left in April of '24, it was
24 still receiving -- let's try a different term --
25 deposits from the portfolio companies?

Page 29

1    A  Yes.
2    Q  Okay. Was it receiving sufficient
3 deposits to cover its expenses?
4    A  I believe so.
5    Q  Okay. Did you come to learn at some
6 point in time that Heller Capital was out of
7 money?
8    A  Not -- not in my tenure.
9    Q  Okay. So if I represented to you I had
10 testimony that by April -- May of 2024 it was --
11 it was not earning money and not profitable, you
12 don't have any information about that?
13    A  I don't because I would have left in
14 April.
15    Q  Okay. I think we covered this.
16    You believe 140 is a good approximate
17 number of entities under Heller Capital; is that
18 right?
19    A  Again, I don't want to misspeak. There
20 was 140 companies that were either under Heller
21 Capital and I want to say like Heller Capital
22 invested into them or they were a special
23 purpose entity that was set up and in the family
24 of portfolio companies.
25    Q  Everything rolls up to Heller Capital

Page 30

1 though?
2    A  From a -- from a tax perspective and
3 from an income book perspective, it wouldn't --
4 it wouldn't have consolidated up. And they were
5 all standalone separate legal entities.
6    Q  To your knowledge, was Heller Capital
7 either the sole or majority member of each of
8 those 140 entities?
9    A  Definitely not.
10    Q  Who else would have been involved with
11 them? Is that a long answer?
12    A  I couldn't even tell you. Like,
13 Prestige, I could tell you that 60 percent --
14 Heller Capital owned 60 percent of Prestige.
15    I could tell you they own 83 percent of
16 Paramount. Of Glorious, it is about 25 to 30
17 percent of Glorious.
18    You know, with some entities, it is --
19 some entities it is over 50 percent and some
20 entities it is below 50 percent.
21    Q  I see. I said majority. Fair answer.
22    A  Okay.
23    Q  Was Heller Capital an owner of any stake
24 in the 140 entities?
25    A  Yes.

Page 31

1    A  Yes.
2    Q  Okay. Owner in all of them?
3    A  Not always, no.
4    Q  Okay.
5    A  I would say the majority.
6    Q  And the majority where they didn't or
7 just performing services? A vendor? I don't
8 understand the corporate relationship. That is
9 what I'm trying to get at.
10    A  I know. I'm trying to recall, Josh.
11 Just give me a second to think.
12    There were -- there definitely were
13 entities where Daryl didn't have an ownership
14 in -- like in the beginning, I can remember Raw
15 Ventures, we have mentioned that before Daryl or
16 Heller Capital didn't have any ownership
17 interest in Raw at one time.
18    There was another entity i Employee
19 Services didn't have an ownership interest in
20 that at any point of time.
21    They were service entities, to your
22 point that provided services out to portfolio
23 companies.
24    Q  Those Raw and i Services?
25    A  In i Employee.
26    Q  They provided services to other

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Deposition of Barry Rynearson    Exhibit B to Certification   Page 11 of 68
In re: investigation of Paramount et al. v. Paramount Management Group, LLC

Page 32

entities?

A   They did.

Q   How did Heller Capital receive money from those entities?

A   He didn't.

Q   Okay.

A   He did not.

Q   Were there entities over top of Heller Capital?

A   No.

Q   Okay.  Do you know what the percentage ownership stake in Heller Capital, who were the percentage owners in Heller Capital?

A   Yeah, I believe it was Daryl was 99 percent and Accordo I believe was 1 percent.

Q   And that was true at the time you left in April of last year?

A   I believe so, correct.

Q   Is that always true the entire time you are there?

A   Yeah.  I'm pretty sure it was.

Q   Okay.  Are you familiar with Heller Investment Holdings?

A   I am, yes.

Q   Okay.  Is there any kind of corporate

Page 33

tie between Heller Capital Group and Heller Investment Holdings?

A   There is no corporate tie.  So Daryl was the sole owner of Heller Investment Holdings.  So when I left in '24, April of '24, he was the sole owner of Heller Investment Holdings.

Q   And what did Heller Investment Holdings do?

A   So Heller Investment Holdings was established to hold the investment in the cannabis companies.

Q   That is all it did?

A   That is all it did.

Q   And when was it formed?

A   Probably 2019.

Q   I see.

Did you keep the books and records for that entity?

A   Heller Investment Holdings, we did.

Q   And the we -- who is the we?

A   Heller Capital staff.

Q   Okay.  In or around February or March of 2024, did you go to a meeting at Dan Burkholder's house?

A   February or March of 2024?  So I was in

Page 34

Florida the entire month of March of 2024.  So if it was March, I definitely wasn't there.  I don't recall going -- actually, I don't think I have ever been to Dan's house.

Q   Did you ever have a meeting in that timeframe, February and March of 2024, with Dan Burkholder and Daryl Heller and you?

A   Could have.

Q   Okay.  Do you recall asking Daryl -- well, let's try this.

At some point in time, did you have concerns that Paramount was running a Ponzi scheme?

A   So can I just back up?

Q   That is a yes-or-no question.

MR. BOYLE:  That is a yes or no.

THE WITNESS:  Okay.  Did I have concerns?  I don't honestly know how to answer that question.  I didn't have concerns -- I don't know how to answer that question.

BY MR. VOSS:

Q   Okay.  You said you wanted to back up a minute.  Go ahead and back up a minute and tell me what you wanted to say.

A   Do you mind if I take a bathroom break?

Page 35

MR. BOYLE:  You got to answer the question first.

THE WITNESS:  Okay.  So I took a sabbatical in the month of March.  That is how I knew the meeting couldn't take place in the month of March.

I was in Florida the entire month of March; and when I came back from being on sabbatical for an entire month, you come in and have a completely different perspective of what is going on.

You have that when you take a week vacation and you come back.  And when you come in for a month, you have a different perspective.

I was at a point in my career I didn't want to work the hours that I was working.  I was burnt out.  I wanted to slow down a little bit.

So when I came back -- the reason why I ended up leaving in April was a couple of reasons and one of them was the Ponzi concern.

So I come in and Daryl is not behaving the way that he typically had behaved.  And by that, I mean, he was -- he was not communicating

Page 36

1 with the investors on Prestige, which is really
2 odd.
3        I know they were upset and they were,
4 you know, raising concerns of why they weren't
5 getting their dividends and he wasn't
6 communicating with Will Powers or Matt Eby and
7 he was kind of leaving them on the front lines
8 to fend for themselves.
9        That was completely out of character for
10 Daryl.  That made no sense to me that he
11 wouldn't be communicating to the investors and
12 the people on the front line of Prestige.  So
13 that was odd.
14       There were funds being deposited into
15 Heller's bank account for which my controller
16 was asking for documentation and support, which,
17 again, was odd that Daryl wasn't furnishing the
18 documentation and support.
19       So when I came back from my sabbatical,
20 Dana communicates this to me.  And I said, well,
21 don't worry about it.  I'll get it.  And I asked
22 him multiple times and he didn't give it to me
23 and that is --
24       MR. BOYLE:  Who?
25       THE WITNESS:  I'm sorry.  Daryl Heller.

Page 37

1        So just very odd.  So those are two
2 flags that I'm looking at that doesn't make
3 sense to me.
4        So I'm -- I'm talking about Matt Eby and
5 he says to me the first time I ever hear the
6 word Ponzi is from Matt Eby and he is saying the
7 investors are saying this is a potential Ponzi
8 scheme and I was like, you got to be kidding me.
9 Right?
10       So that was -- so concern, yeah, he is
11 telling me there is a potential Ponzi scheme.
12 That is the first I'm hearing about it.  It is
13 obviously alarming.  So there is concern to the
14 sense that it is alarming and I'm hearing this.
15       And then the other thing honestly, Josh,
16 is that he had a five-million-dollar tax
17 liability, he being Daryl, had a
18 five-million-dollar tax liability that was
19 due -- that was due April of '23 for his '22
20 taxes and still hadn't been paid and that didn't
21 make any sense to me and I knew I didn't like
22 the fact that he wasn't paying his taxes.
23       So all of this is kind of coming
24 together at the same time and I talked to Matt
25 Eby and he mentions the word Ponzi and at that

Page 38

1 point, I'm thinking this is not an environment I
2 want to be a part of anymore.
3        MR. VOSS:  I'm going to have a lot of
4 followups but let's let you take that break.
5        (Break.)
6 BY MR. VOSS:
7    Q   What did Matt Eby say to you
8 specifically?
9    A   He said specifically that the investors
10 were saying that they were concerned that this
11 could be a Ponzi.
12    Q   And what was your response?
13    A   Shock.
14    Q   What did you say to Matt?
15    A   Do you think it is a Ponzi?
16    Q   What was his response?
17    A   He -- he was -- didn't believe that it
18 was.
19    Q   Okay.  What did you do to follow up on
20 that discussion with Matt?
21    A   So I prepared my resignation for one.
22 That was the icing on the cake for me to hear
23 that.
24       The other thing I said to Daryl, I gave
25 him the reasons and one of the reasons I gave

Page 39

1 him was this word Ponzi is coming up and I don't
2 want to be a part of it.  And he said to me it
3 is not a Ponzi.  He goes, I can show you that it
4 is not a Ponzi.
5    Q   Okay.  What did you show you?
6    A   He prepared a -- he prepared a
7 presentation and the presentation was the P&L of
8 Paramount Management Group that showed that it
9 was cash flow and be able to make the payments
10 to the investors.
11    Q   It was a written presentation?
12    A   Yeah.  It was -- it was a P&L, like a
13 Profit and Loss Statement.
14    Q   When you say he prepared a presentation,
15 was it like you are in a room with a screen or
16 documents he is handing you?  What do you mean
17 by presentation?
18    A   It was a P&L.  He prepared a P&L to
19 present to myself to show me that Paramount
20 Management Group was going to cash flow and be
21 able to pay the dividend payments.
22    Q   Okay.  Let's talk about that document.
23       Do you still have it?
24    A   No.
25    Q   Were you given a copy?

Page 40

1  A  That would have been when I worked for
2  Heller Capital.  I don't even know if I actually
3  had a copy of it or if he shared his screen, to
4  be honest with you.  But it would have been in
5  my e-mail for Heller Capital, if it existed that
6  way.
7  Q  How was this meeting done?  Teams?
8  Zoom?  In person?
9  A  It would have been Teams.
10 Q  Was it recorded?
11 A  No.
12 Q  You know for sure it wasn't recorded?
13 A  I know that because we -- that wasn't
14 protocol.  We typically didn't record Teams
15 calls.
16 Q  Who was on this Teams meeting?
17 A  So it would have been myself, Daryl
18 Heller, and Dan Burkholder.
19 Q  When was this?
20 A  It would have been like the third week
21 of April.
22 Q  Let's talk about the P&L.
23    What -- did it look like it was a
24 Paramount P&L that existed or was it a P&L that
25 he created for this meeting or other?

Page 41

1  A  I don't know.
2  Q  Okay.  Did -- did the P&L look to be
3  sort of in a format that somebody with your
4  credentials and qualifications would recognize
5  as legitimate --
6  A  Yes.
7  Q  -- and had the points and data that it
8  should have?
9  A  Yes.
10    MR. BOYLE:  Wait for him to finish.
11 BY MR. VOSS:
12 Q  What do you recall about the P&L?
13 A  The only thing that I truly recall is
14 that it showed that Paramount operationally cash
15 flowed to be able to make the dividends to the
16 investors.
17 Q  Do you recall if it had a line regarding
18 ATM sales?
19 A  No.  I don't recall.
20 Q  Do you recall if it had a line in it
21 regarding PE debt payments?
22 A  No.  I don't recall.
23 Q  Okay.  Is it possible that those were in
24 it?
25 A  PE debt payments?  Debt payments

Page 42

1  wouldn't be part of a P&L, so it is probably not
2  in there.
3     ATM sales, that is possible.  That could
4  be in a P&L.  That could have possibly been in
5  there.
6  Q  Was this P&L that you saw in this
7  meeting with Daryl Heller, was it a single
8  month?  A year?  What was the timeframe covered
9  by the P&L?
10 A  That is a good question.  I don't
11 recall.
12 Q  Did it have more than one month
13 represented in it?
14 A  It was a consolidated P&L like one
15 period.
16 Q  What is that period?
17 A  It is -- a period is a month, a quarter,
18 a year.
19 Q  You don't recall if it was any of those?
20 A  I don't.
21 Q  But it was one of whatever unit it was
22 in?
23 A  Correct.
24 Q  Did he tell you who created that P&L?
25 A  He did not.

Page 43

1  Q  Okay.  And you believe it is possible
2  that you were e-mailed it?
3  A  Could have been in my Heller Capital
4  e-mail, correct.
5  Q  Did Daryl tell you who created the P&L?
6  A  He did not.
7  Q  Okay.  How did he explain that that P&L
8  showed Paramount wasn't a Ponzi scheme?
9  A  Because it was showing operational cash
10 flow sufficient to make the dividend payments to
11 the Prestige investors.
12 Q  Let's talk about operational cash flow.
13    What do you mean by that?
14 A  So the business was -- so Paramount was
15 in the business of managing ATM machines,
16 generating revenue from the ATM machines, and
17 that revenue creates operating income that was
18 sufficient to pay the investors.
19 Q  What was your understanding of how much
20 the investors were owed each month?
21 A  That, I had no knowledge of.  Other than
22 for the payment he said this was sufficient
23 to pay the payment.
24    So like -- I know there was, like,
25 negotiating payments -- again, I was not a part

Page 44

1  of any of those conversations.  So I -- I don't
2  really know exactly what the amounts due each
3  month were.
4      Q   Do you recall how much operating revenue
5  that P&L showed for Paramount?
6      A   I don't.
7      Q   Do you have a sense of the scale of it?
8  A million?  Ten million?  One hundred million?
9      A   I -- I don't recall the exact numbers.
10     Q   Okay.  And you had no idea how much
11  Paramount owed the investors each month?
12     A   No.
13     Q   Would it surprise you in this April of
14  2024 timeframe the amount was around 19 million
15  dollars?
16     A   Nineteen million?  It is not surprising
17  or -- I mean, I -- I have no knowledge of how
18  much the payments due were.
19     Q   And this P&L that you looked at that
20  Daryl presented to you, did it show operating
21  income from ATMs in excess of 19 million
22  dollars?
23     A   He had -- the way it was presented,
24  Josh, is he showed the operating income and then
25  what the payments due were and it exceeded what

Page 45

1  the payments due were.  I just don't recall
2  either of those amounts.
3      Q   Before we -- well, let's -- before we
4  leave this meeting, what questions did you have
5  of Daryl Heller?
6      A   At that meeting?
7      Q   Yes, sir.
8      A   I think I for the most part listened.
9      Q   Did you come away satisfied that
10  Paramount wasn't a Ponzi scheme?
11     A   I came away satisfied that it appeared
12  that there was not a Ponzi scheme, yes.
13     Q   Based solely on Daryl's representations
14  and that P&L?
15     A   That is correct.
16     Q   Did you do any independent examination
17  before or after that meeting to --
18     A   No.
19     Q   What questions did Dan Burkholder have?
20     A   I don't recall.  He -- same thing that
21  he would have done most of the listening.  I
22  don't recall any specific questions.
23     Q   Okay.  So to clarify some questions from
24  before, you don't recall an in-person meeting at
25  anyone's home to discuss these matters?

Page 46

1      A   No.
2      Q   Did he have sort of a ten-point outline
3  of why it wasn't a Ponzi scheme?
4      A   I don't recall like a ten-point
5  presentation.
6      Q   Did he have sort of agenda points or
7  bullet points?
8      A   To the best of my recollection, I don't
9  recall that.  There could have been.  My focus
10  was on the P&L.  I was studying the P&L to see
11  if it cash flowed.
12     Q   Okay.  Was there an agenda for this
13  meeting?
14     A   The agenda was to show that Paramount
15  could support the payments.
16     Q   And I apologize.  I mean a physical
17  written document.
18     A   No.
19     Q   Okay.  So the only document used or
20  created about the meeting was this P&L?
21     A   Yes.
22     Q   Did he follow up with any written
23  communications?
24     A   No.  I resigned the next day.
25     Q   And the reason you resigned the next day

Page 47

1  was?
2      A   All of the reasons I previously
3  mentioned.
4      Q   But not because you were concerned that
5  there was a Ponzi scheme?
6      A   Correct.  At that point, he -- at that
7  point, he showed me that it was going to cash
8  flow, so I felt better honestly.
9      Q   You feel the same way now?
10     A   No.
11     Q   How do you feel differently?
12     A   Because a lot has transpired since
13  April.
14     Q   What, for example?
15     A   For example, in between Thanksgiving and
16  first week of December, the judgment came out.
17  There was testimony that was given saying that
18  there was way less ATM machines than Daryl had
19  represented.
20         I never suspected any of that was going
21  to be the case.  As a matter of fact, I thought
22  Daryl was going to sell Paramount for a half a
23  billion dollars and make everybody whole.
24     Q   Why did you think he was going to sell
25  it for half a billion dollars?

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification    Page 15 of 68
Deposition of Barry Rynearson                    Investigation Partners, et al. v. Paramount Management Group, LLC

Page 48

1  A  Because he communicated that to me.
2  Q  Who was he selling it to?
3  A  I don't know.  That I don't know.
4  Q  When did he communicate this?
5  A  So when I left Heller Capital, I still
6  did consulting work for Glorious; and Daryl was
7  an active board member on Glorious at that time.
8       And he -- he was telling me that he was
9  going to sell Paramount.  He was in the process
10 of trying to sell Paramount.
11      Somewhere between maybe May and
12 November, beginning of November, he told me that
13 he was in active discussions to sell Paramount.
14 Q  So the sale -- and I probably just
15 misheard it but let's make sure the transcript
16 is clear.
17      When Daryl told you something was going
18 to be sold for half a billion dollars, he was
19 talking about Paramount?
20 A  Correct.
21 Q  Not Heller Capital?
22 A  Correct.
23 Q  And when was this discussion?
24 A  I didn't talk to Daryl that often.
25 Probably maybe like once every 30 days, every 45

Page 49

1  days in my capacity of doing consulting work for
2  Glorious because I was doing work directly to
3  the board of Glorious.
4       And in those conversations, Daryl had
5  mentioned to me probably like twice maybe that
6  he was going to sell Paramount for the half a
7  billion dollars.
8  Q  These were oral discussions?  Text
9  discussions?
10 A  Right, oral.
11 Q  Before we took a break, you said you
12 started seeing deposits into Heller's bank
13 account and I want to get a clarification on
14 that.
15      When you say Heller's, do you mean
16 Heller Capital?
17 A  Correct.
18 Q  Okay.  And who were the deposits from?
19 A  I don't recall.
20 Q  Were they -- did you understand them to
21 be loans?
22 A  I didn't understand them -- I didn't
23 know the nature.  That is why we were asking for
24 the documentation.  I didn't know how to record
25 them on the books without the -- without the

Page 50

1  records.
2  Q  And you asked Daryl for those records?
3  A  Correct.
4  Q  And what was his response?
5  A  Get them.  Yep.  No problem.  I'll get
6  them to you.
7  Q  But he never supplied them?
8  A  Never supplied them.
9  Q  Did you see money from an entity called
10 Silverview Credit Partners?
11 A  Yeah.  I believe, yes.
12 Q  How about an entity -- I don't know the
13 full name but I know it as Reliance?
14 A  No.  Not that I recall.
15 Q  How about Deerfield?
16 A  I never saw the money, but I have heard
17 that name before.
18 Q  Was that one of the entities you were
19 asking about when you were asking Daryl?
20 A  I don't recall that.  I have seen
21 Deerfield through a lawsuit that came out
22 through Glorious.  That is how I saw that name.
23 Q  How about an entity called Fundonatic?
24 A  Don't recall that name.
25 Q  Web Bank?

Page 51

1  A  I don't recall that name.
2  Q  We Bank?
3  A  What was it?
4  Q  We Bank.  W-e Bank?
5  A  No.  Don't recall that.
6  Q  And I apologize if I'm asking this
7  twice.
8       Did he ever supply the documentation
9  that you asked for?
10 A  He did not.
11 Q  Do you know if he supplied it to
12 anybody?
13 A  I do not.
14 Q  As I recall, I think you said Dana
15 Schlicker was asking for it as well.  Your
16 understanding is she didn't receive it either?
17 A  Not before I left.
18 Q  Did Daryl give you an explanation of why
19 he had a five-million-dollar tax liability?
20 A  Well, I know why.  He -- his tax return
21 calculated a five-million-dollar tax liability.
22 Q  I asked a poor question.
23      Why was it unpaid?  Did he explain why
24 it was unpaid?
25 A  He did not.

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Deposition of Barry Rynearson    Exhibit B to Certification Page 16 of 68
Investigation, et al. v. Paramount Management Group, LLC

Page 52

1  Q  Did you have discussions -- let's keep
2  it in this timeframe; early '24 up to April of
3  '24 discussions with anybody else about
4  Paramount being a Ponzi scheme?
5  A  Up until April of '24, did I have
6  discussions with anybody about a Ponzi scheme?
7  No.
8  Q  How about since that time?
9  A  No.
10  Q  When you are at Heller Capital, did you
11  have access to its books and records generally?
12  A  Yes.
13  Q  What records -- let's -- by class did
14  you access to?
15  A  Clarify that for me.
16  Q  Financials?  Corporate minutes?
17  Ledgers?
18  A  Yeah.  I had full access to the
19  financial statements.
20  Q  Anything you were excluded from?
21  A  Specifically with Heller Capital Group?
22  No.
23  Q  Well, is there anything that Daryl ever
24  stopped you from getting besides the loan
25  documents that we just discussed?  Anything

Page 53

1  else?
2  A  I never saw financials for Prestige.  I
3  never saw financials for Paramount.
4  Q  Is that because Daryl didn't give them
5  to you?
6  A  Because I didn't have responsibility
7  there.
8  Q  Did you want those?
9  A  I got the tax returns.
10  Q  Well, that wasn't my question.
11  A  Okay.
12  Q  Did you want those?
13  A  At one point, I probably would have
14  liked to have seen them.
15  Q  It sounds like your answer is yes.
16  A  Yes.
17  Q  Yes, you wanted them?
18  A  At one point.
19  Q  What was that point?
20  A  When I started working for Heller
21  Capital.
22  Q  And who did you ask for them?
23  A  Daryl.
24  Q  And what did he say?
25  A  He said you don't need to worry about

Page 54

1  those two entities because they are mature
2  profitable full C-Suite entities.
3  I need you to focus on startups and
4  troubled entities.  So that would have been like
5  2019.
6  I'm sorry.  It would have been 2020
7  because my first year and a half, I was 100
8  percent in Michigan.
9  Q  Did you ever ask again?
10  A  I did not.
11  Q  Were you satisfied with his response?
12  A  I was.
13  Q  You felt you were able to perform your
14  role as CFO of Heller Capital without that
15  information?
16  A  I did, yes.
17  Q  Felt comfortable reporting financial
18  results from those entities on management
19  reports among other things?
20  A  I didn't report financial results from
21  those entities.
22  Q  Well, for Heller Capital, sir.
23  A  Yes, for Heller Capital.
24  Q  You felt comfortable reporting earnings
25  or liabilities on those entities on the Heller

Page 55

1  Capital management report?
2  A  One hundred percent, yes.
3  Q  Without seeing the underlying
4  documentation?
5  A  It would be based on transactions that
6  existed between Heller Capital and Paramount.
7  So with distributions and dividends, those type
8  of things, 100 percent.
9  MR. BOYLE:  I think you two are talking
10  about two different things.
11  THE WITNESS:  Okay.  I'm sorry.
12  BY MR. VOSS:
13  Q  What documents do you have now that
14  were -- that belonged to Heller Capital Group?
15  A  I don't have any documents.
16  Q  Did you ever personally hold documents
17  of Heller Capital, meaning at your home,
18  personal computer?
19  A  While I worked for Heller, I mean, I
20  worked from my home.
21  Q  All right.
22  A  Yeah.
23  Q  I'm really looking for materials on
24  personal resources.
25  Did you have a laptop?  External hard

Page 56

1  drive?  Flash drive?  Printed files?
2      A   I worked from home, and I had a laptop.
3      Q   Where is that laptop now?
4      A   I use it.
5      Q   Heller Capital gave you that laptop?
6      A   They did.
7      Q   And at one point in time that laptop had
8  Heller Capital files on it?
9      A   It did.
10     Q   Where are those files now?
11     A   I completely wiped the computer clean.
12     Q   When was that?
13     A   When I resigned.
14     Q   Were you instructed to do that?
15     A   Nope.  No.
16     Q   You did that on your own?
17     A   I did.
18     Q   What do you mean by you wiped it clean?
19     A   I just did a factory reset to put new
20  software on it and be able to use the computer.
21     Q   Any printed materials?
22     A   No.
23     Q   All right.  Let's talk about Paramount
24  now.
25          Were you generally familiar with

Page 57

1  Paramount?
2      A   You mean familiar in a sense I know they
3  were a portfolio company?  I know Dennis and
4  Randall.
5      Q   What did you understand Paramount's
6  business to be?
7      A   ATMs.  So they were -- they would
8  service ATM networks.
9      Q   Did you understand Daryl to be an
10 officer in that company?
11     A   Yes.
12     Q   What did you think his role was?
13     A   Chairman of the Board possibly, yeah.
14     Q   What do you think -- what was your
15 understanding of what did he as Chairman?
16     A   Set the strategic direction.
17     Q   What does that mean?
18     A   Just visionary, like where -- where the
19 company is going tomorrow.
20     Q   Okay.  Did he control Paramount's
21 finances?
22     A   I don't know.
23     Q   Who would know that?
24     A   I would assume Dennis and Randall.
25     Q   Do you know if Paramount filed corporate

Page 58

1  formalities?
2      A   I don't know.
3      Q   Do you know if Daryl Heller used
4  Paramount money for personal purposes?
5      A   I don't know.
6      Q   Do you know if he used Paramount money
7  for other company purposes, meaning he used
8  Paramount money for Glorious or for his
9  restaurant or for any other entity within that
10 Heller universe?
11     A   So Paramount would make it so Heller
12 Capital would ask for a distribution from
13 Paramount and the distribution would come into
14 Heller and Daryl would disburse money out for
15 other investments.  That would happen on a
16 regular basis.
17     Q   Were those distributions for Paramount's
18 benefit?
19     A   They would have been for the benefit of
20 Daryl Heller.
21     Q   Okay.  Were they required by some sort
22 of contract between Paramount and Heller Capital
23 or some agreement?
24     A   Daryl owned 83 percent of Paramount.
25     Q   So fair to say if he asked for money

Page 59

1  from Paramount, he got it?
2      A   Yes.
3      Q   Did you think those withdrawals or
4  distributions or whatever you described them as
5  were always reasonable?
6      A   Yes.
7      Q   What -- what -- what gave you that
8  comfort?
9      A   Seeing that the K-1 that would come out
10 every year for Paramount.  So the 25 million
11 dollars was the K-1 income to Heller Capital in
12 2022.
13     Q   Did you ever become aware that operating
14 revenue from Paramount was being removed by
15 Daryl Heller?
16     A   No.
17     Q   How did Paramount make money?
18     A   They made money by the service fees that
19 were on the ATM machines.
20     Q   You mean the transaction fee?
21     A   Yes.
22     Q   What did it do to earn its portion of
23 those fees?
24     A   A vague -- a general understanding of
25 what they did.  They managed the network and

Page 60

picked up cash at the ATMs and they made sure
the ATMS had enough cash when people were taking
money out of the ATMs, repairs and maintenance
on them. They serviced the ATMs. That was --
that was my understanding.

Q   To your knowledge, was ATM revenue
alone, so the service fees, sufficient to cover
Paramount's liabilities?

A   I don't know.

Q   Who would know that?

A   People who worked the Paramount, like I
would say, Dennis and Randall.

Q   And when you say Dennis, Dennis Ream?

A   Correct.

Q   And Randall Leaman?

A   Correct.

Q   Are you aware of payments to Heller
Capital from Paramount?

A   From Paramount to Heller Capital?

Q   Yes.

A   Yes.

Q   What types of payments?

A   Strictly dividends.

Q   Anything else?

A   Distributions and sometimes Daryl would

Page 61

put it, he put it as a note that he would owe
the money back to Paramount.

      And what he told me there, Josh, is that
these were amounts that were above his 83
percent.

Q   How often did that happen?

A   Not often.

Q   Let's go for an estimate.
      More than ten times?

A   Over five years, yes.

Q   More than 100 times?

A   Maybe. I don't know.

Q   Were those notes documented in some kind
of way?

A   So we always made sure that between the
two companies records that they always balanced
out.

      If we had a payable on our books, we
always made sure the receivable on Paramount's
books matched.

Q   Other than the book matching that you
just described, was there a formal note
contract? Some formal document that says IOU?

A   Not to my knowledge. I don't believe
so.

Page 62

Q   So these -- the notes that you described
from -- from that Heller Capital owed to
Paramount were documented only in the books?

A   Correct.

Q   And when you say the books, what do you
mean specifically?

A   Balance sheet.

Q   Balance sheet.
      Anywhere else?

A   No.

Q   Is the terminology there due to/due
from?

A   Or no payable/no receivable.

Q   So I'll skip -- we'll skip down here.
      Are you aware of PowerCoin owing money
to Paramount?

A   I'm not, no.

Q   Are you aware of Heller Capital loaning
money to Paramount in 2024?

A   Heller Capital loaning to Paramount?
No.

Q   Would that seem unusual to you?

A   Yes.

Q   Why?

A   Because the money typically flowed the

Page 63

other way.

Q   To your knowledge, what is the most
number of ATMs that Paramount ever had online?

A   I don't know.

Q   Do you know how many it owned anywhere?
Online? Warehouse?

A   I don't.

Q   Okay. Do you know why Paramount failed?

A   I don't.

Q   As you sit here today, do you believe it
was a Ponzi scheme?

A   I don't know.

Q   Okay. All right. I want to talk about
Raw.
      Did Paramount have a receivable with
Raw?

A   Paramount would have had a receivable
with Raw, correct.

Q   Okay. How is that documented?

A   There was like a -- there was an open
line of credit agreement.

Q   So this -- this one was a formal
agreement?

A   Yeah. There was a note. There was a
note.

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification   Page 19 of 68
Deposition of Barry Rynearson   In re: Investigative Consultants, et al. v. Paramount Management Group, LLC

Page 64

1    Q   Who had the note?
2    A   So that would have been -- that would
3    have been on Raw's books as well as on
4    Paramount's books.
5    Q   So again, we are talking about balance
6    sheets?
7    A   Correct.
8    Q   When you say there is a note, there is
9    not a formal document saying IOU?
10   A   I remember there being a note, a formal
11   document.
12   Q   You saw it?
13   A   Yes.
14   Q   Who were the parties to that?
15   A   It would have had to have been Paramount
16   and Raw.
17   Q   And when we say Raw, can you tell me the
18   full name of the entity?
19   A   Yeah.  It was Raw Ventures.  It was Raw
20   Ventures, LLC.
21   Q   Is that a Michigan entity?
22   A   I believe it was.
23   Q   Okay.  When was this note -- this formal
24   note executed?  Signed?
25   A   Somewhere between 2020 and 2022.

Page 65

1    Q   How much was it for?
2    A   It was an open-ended line of credit.
3    Q   Who -- what -- what did Raw Ventures do?
4    A   That is -- they were just set up to be
5    the passthrough entity for the loan money coming
6    in.
7        So Raw would receive the money and Raw
8    would distribute it out to the various entities
9    in Glorious whether they needed it for
10   operations or capital expenditures.
11   Q   Who were the owners of Raw Ventures,
12   LLC?
13   A   At the time, when it was first
14   established it was Will Stoltzfus.  And then at
15   sometime after it was formed, Daryl became the
16   sole owner.
17   Q   Daryl personally?
18   A   I believe it was him personally.
19   Q   Daryl Heller personally owned 100
20   percent of Raw Ventures at one point in time?
21   A   Correct.
22   Q   Not Heller Capital?
23   A   Correct.
24   Q   When was -- when was the entity formed
25   to your knowledge?

Page 66

1    A   I'm going to say it was like 2019.
2    Q   When do you think this ownership change
3    happened?
4    A   '22ish.
5    Q   Okay.  To your knowledge, did Paramount
6    loan money to Raw for this receivable -- or this
7    note?  Excuse me.
8    A   Paramount loaned money to Raw, yes.
9    Q   Do you know how much that was?
10   A   Yeah.  So the financials at the end of
11   12/31/24, the note was like 21 million dollars
12   at that point in time.
13   Q   12/31/2024?
14   A   Correct.
15   Q   The number you said again?
16   A   Twenty-one million.
17   Q   And how do you know that number?
18   A   Because I work with Glorious
19   religiously.  That was my No. 1, you know, that
20   was my, you know, priority when I worked for
21   Heller Capital.
22       And when I left Heller Capital, I
23   continued to work for them until the end of the
24   year.
25   Q   End of the year of 2024?

Page 67

1    A   Correct.
2    Q   Glorious has -- well, let's try this.
3        How did the money from Raw to
4    Glorious -- how was it documented?  Was it a
5    note?
6    A   Yeah.  So there would have been a note
7    between Raw and the Glorious entity.
8    Q   A single Glorious entity?
9    A   I don't recall.
10   Q   And is this one a formal note or is this
11   a bookkeeping note like we described before?
12   A   I believe it was a written note.
13   Q   Who were the signatories to that?
14   A   I don't recall.
15   Q   When was it created?
16   A   Pretty much around the same time that
17   the other note was created.  So I would say
18   somewhere between, you know, '20 and '22.
19   Q   What document or documents showed the 21
20   million dollars that Glorious received from Raw
21   as of 12/3/24?
22   A   The balance sheet.
23   Q   Of what?
24   A   Of Glorious.  Of the consolidated
25   Glorious entities.

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification    Page 20 of 68
Deposition of Barry Rynearson                                    Investigation, et al. v. Paramount Management Group, LLC

Page 68

1    Q  I'm going to see if we can really drill
2  down to that.  Maybe we can do this without
3  marking it.  I want you to look at Page 2 of
4  this document.
5       MR. VOSS:  Let's call this 2.
6       (Rynearson Exhibit No. 2 was marked for
7  identification.)
8  BY MR. VOSS:
9    Q  Mr. Rynearson, I will represent to you
10  this is a proof of claim for a case that is
11  proceeding in Michigan State Court.
12    A  Okay.
13    Q  I really just want to direct your
14  attention to Page 2 of this document that has
15  been marked Rynearson 2.
16       Do you see all of the entities listed in
17  Question No. 3?
18    A  I do.
19    Q  Do you know these entities collectively
20  as Glorious?
21    A  I do.
22    Q  Okay.  So this 21-million-dollar note
23  from Raw to Glorious, which of these entities
24  received -- are on that note?
25    A  That, I'm not going to be able to

Page 69

1  identify for you, unfortunately.  Just know that
2  some of it is going to add up to 21 million --
3  21 million dollars.
4    Q  If I have done my math, there are 24
5  entities listed in Question 3.  Did all 24 of
6  these receive this 21 million dollars?
7    A  I don't know how to answer that
8  question.  So the 21 million dollars was -- this
9  operated as one company.
10       Just to kind of give you a perception of
11  how -- this is one big company.  Okay?  They are
12  all like different operating entities with
13  inside of the one big company.
14       So if Premiere -- or let me say this --
15  Tycoon needed money, Tycoon would get money from
16  Raw.
17    Q  Well, you say Tycoon, which Tycoon?
18  There is Tycoon Holdings.  There is Tycoon 1 RE.
19  There is Tycoon 1 Operations?
20    A  So Tycoon -- so Tycoon 1 Operations
21  would have been the actual operating entity
22  itself.
23    Q  Oh, I see that one.  Okay.
24    A  Tycoon Holdings would have just simply
25  been that, a holding company where the original

Page 70

1  shareholders were invested in that company.
2       Tycoon 1 RE was a real estate entity.
3  That is where the deed -- the property was
4  deeded inside that entity.
5    Q  You worked -- this consulting work you
6  did for Glorious, was it on behalf of all --
7    A  Yes.
8    Q  -- 24 of these entities?
9       Just was it on behalf of all 24 of these
10  entities?
11    A  Yes.  Sorry.
12    Q  When did that work end?
13    A  End of the year.  End of 2024.
14    Q  And you had access to the balance sheet?
15    A  Yeah.  The consolidated financials.
16    Q  And if I were to ask for that document
17  from one or more of these entities, what
18  specifically would I be asking for?
19    A  You would be asking for the
20  consolidating financials for Glorious.  Let me
21  give you the exact name, but it would be GCC MSO
22  Holdings.
23    Q  That is the entity at the top?
24    A  That is the entity at the top.
25    Q  That is one of these 24 entities?

Page 71

1    A  That is correct.  It is the second one
2  on that list there.
3    Q  I see.
4       And you said Consolidating.
5    A  Yeah, i-n-g.
6    Q  Financials for GCC MSO Holding, LLC
7  would reflect this 21-million-dollar balance
8  owed to Raw?
9    A  Correct.
10    Q  And if 21 million came from Raw to
11  Glorious as a group, they all would have
12  benefited from it?
13    A  Yes.
14    Q  And it would have been a liability of
15  all 24 of these entities?
16    A  The liability would have been specific
17  to who owed the money; but collectively, it
18  would have added up to 21 million dollars.
19    Q  Okay.  Were there any officers in Raw --
20  were there any officers in Raw?
21    A  No.
22    Q  So it is just Daryl as an owner?
23    A  Correct.
24    Q  Okay.  Does it strike you unusual that
25  an ATM company was loaning 21 million dollars to

Page 72

a cannabis enterprise in Michigan?

A  It didn't.

Q  What was the explanation given for why that loan was made?

A  Paramount was cash flowing and Daryl would send the money to Glorious to make -- so Glorious could continue to grow and meet its capital requirements.

Q  Whose decision was it to loan that money --

A  Daryl.

Q  -- from Paramount to Raw --

MR. BOYLE:  Let him finish.

THE WITNESS:  I'm sorry.

BY MR. VOSS:

Q  Whose decision was it to loan that money from Paramount to Raw?

A  Daryl.

Q  And whose decision was it to give that money from Raw to Glorious?

A  That would -- Daryl would have been at the board level at that point in time.  So the operating entity would request funding, you know, we need money for operations, we need money for strategic growth.

Page 73

And then so Daryl would say, okay, and he would go and talk with Paramount and Paramount would send the money to Raw and then Raw would send the money to the operating entity.

Q  Did Paramount ever give money directly to Glorious?

A  The only time that that would happen was when it was like, hey, I need the money right now.  Like, I need it today.

Q  That was a yes?

A  Yes.

Q  When was that done --

MR. BOYLE:  Take a second and let him finish before you talk.

BY MR. VOSS:

Q  When -- was that -- how many times was that done?

A  I don't know.

Q  When was it done that you are aware of?

A  I -- I don't know when it was done. It -- I don't know.

Q  But you do believe that at some point Paramount gave money directly to Glorious?

A  Yes.

Page 74

Q  Would it be money -- was it a loan?

A  It would be part of that 21 million.

Q  Part of the 21 million.  Great.

A  So it was part of that 21 million.

Q  You jumped the end.  It saved me several steps.  I appreciate that.

A  Okay.

Q  Was Daryl an owner of GCC MSO Holdings?

A  He would -- he was an owner in GCC Investment Holdings, the very first one.  So that was the -- so the two entities, GCC Investment Holdings and Choice Holdings, LLC, those are the two entities that come up to form GCC MSO Holdings.  Does that make sense?

Q  It does.

Was he an officer in -- let's start with the first three.

GCC Investment Holdings, LLC, was he an owner there?

A  He -- Heller Investment Holdings had membership/ownership in GCC Investment Holdings.

Q  Do you know what the percent was?

A  Yeah, it was like -- it was about 25 percent directly.  And then there was another like three or four points that he owned

Page 75

indirectly through other members that were on that cap table.

So Heller Investment Holdings had by itself right on the cap table Heller Investment Holdings, 25 percent.

And then there was Halo RE -- Halo RE and that was like three -- three points that Daryl would -- Heller Investment Holdings would have owned through that entity because it was on that entity's cap table.

Q  Was Heller Capital on the cap table?

A  Yes.

Q  Same question regarding GCC MSO Holding. Was HIH an owner there?

A  Seventy percent.  Hold on.  GCC Investment Holding was a 70 percent of GCC MSO Holding.

Q  Oh, I see.

And then Choice Holdings, what was the ownership structure?

A  Thirty percent to GCC MSO Holding.

Q  Why were there so many tiers of entities here?

A  Because that is the -- that is the -- that was the advice that we were given by legal

Page 76

counsel.

Q   Okay.  We will stop there.

What -- GCC Investment, you had HIH at 25, 3 to 4 percent through Halo RE.

Do you know who the balance of owners are of GCC Investment Holdings?

A   GCC Investment Holding was 100 percent owned by Daryl Heller when I left.

I'm sorry.  What did you ask me?  I don't think I answered that question right.

Q   Yeah.  I think I got my numbers turned around here.

GCC Investment Holdings --

A   GCC Investment Holdings is a 70 percent owner of --

Q   I'm just asking about that entity.

Who is inside it as an owner?

A   There is 50 people.  Fifty different entities.

Q   And what percent of that entity is HIH?

A   The number that I gave you is the number inside of HIH.

Q   Okay.  I think our time is maybe better spent by me requesting this from people who have these documents.

Page 77

A   I can give it to you, Josh.  I do know this.  I'm sorry if I'm making it confusing.

Q   No.  The memory test is probably a little strained here, but fair to say HIH and/or Daryl Heller and/or both is inside one of these -- each of these first three?

A   They are 100 percent GCC Investment Holdings.  That is where HIH resides is in GCC Investment Holdings and he owns 25 percent of GCC Investment Holdings.

Q   Do you personally right now possess paperwork that would reflect those ownership structures?

A   I believe I do.

MR. VOSS:  I'm going to call for production on that.  And, Counsel, if you need a subpoena, I'm glad to issue a subpoena for that.

MR. BOYLE:  I believe you do.  Search for it and give it to me and I will give it to you.  We do not need a subpoena.

BY MR. VOSS:

Q   Okay.  The 21-million-dollar note reflected on consolidating financials, do you have that document?

A   I would have the financials.

Page 78

Q   Would the financials reflect this debt?

A   Yes.

MR. VOSS:  I will call for production of those financials as well counsel.

MR. BOYLE:  Same answer.

BY MR. VOSS:

Q   Do you need a break?

A   I'm good.

Q   Okay.  I'm hoping we can go fast, but let's -- those are famous last words.

MR. VOSS:  What are we up to?

THE REPORTER:  Three.

(Rynearson Exhibit No. 3 was marked for identification.)

BY MR. VOSS:

Q   I'm handing you, the witness, what is marked Rynearson 3 titled management report Heller Capital Group, LLC for the period ended July 31, 2022.

Sir, do you recognize that document?

And if it helps, the pages are numbered in the corner RL and then the numbers, if you jump to RL6, you will see your name, your typewritten name and digital signature that may or may not be yours.

Page 79

Do you see that?

A   I do.

Q   Do you recognize this document?

A   I'm not recalling it, honestly.

Q   Is it possible that it is something you created?

A   It is possible.

Q   I'll direct your attention to RL16, your printed name and title and digital signature appears there as well.

Does that look like something that you would have affixed to this document?

A   It is odd, Josh.  I don't ever recall doing that.

Q   Is it possible this document was created without your review?

A   It is possible.

Q   Do you know what this thing is?

A   Sure.  This would be a report right out of QuickBooks.  It would be a report right out of QuickBooks.

Q   This was a document that was created -- documents like these, not this one in particular, documents like these, is that something that you create in the ordinary course

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification Page 23 of 68
Deposition of Barry Rynearson                Investigation et al. v. Paramount Management Group, LLC

Page 80

of your duties at Heller Capital Group?

A   Not often.  I mean, we would create a management report but not very often.  We just typically would print out the balance sheet and P&L straight out of QuickBooks.

Q   Any idea what this was created for?

A   That is what I -- this is very odd. This is something that was not done on a regular basis.

It is odd that it is January through July.  It is super odd that I have my signature on the end there.  I don't ever recall doing that.

Q   Is that your signature on Page 6?

A   Yes.

Q   But it is a digital version that could be applied by whoever had it?

A   Correct.

Q   Was that signature available to others within Heller Capital?

A   It could have been.

Q   Do you believe this document to be fraudulent?

MR. BOYLE:  I'm going to object to the form of the question since that is a term of --

Page 81

legal term of art.

Do you mean that specifically as a legal fraud or are you using it in the common vernacular?

MR. VOSS:  I think my question goes to the witness whose name is on this several times doesn't recognize the document and I think in common parlance, let's set aside this, the evidence of a tort --

MR. BOYLE:  That is fine.

BY MR. VOSS:

Q   Does this look fraudulent to you?  Is it not something that you prepared that shouldn't be represented as something you prepared?

A   So the financial presentation itself looks reasonable to me, like the information as it is presented.

Q   Have you ever seen another management report?

A   From Heller Capital?

Q   Correct.

A   I'm sure I have.

Q   Would your signature have been on those?

A   It is really odd.  I don't ever recall putting my signature on financial statements.

Page 82

It is really odd.

Q   I was hoping to direct you to some lines on this document but let's see if you are able to answer --

A   Okay.

Q   -- based on the set up there.

Again, I'm going to refer to the numbers in the corner.  RL0004, which happens to be Page 4 of the 16-page document and I'm going to hold up mine so you can see where I am at here.

About halfway the down the page, there is something that say Paramount MGM fee.  Do you see that?

A   Yes.

Q   And you see there is an amount there that says $94,050?

A   Yes.

Q   What was that for?

A   So that would have been the monthly fees, the monthly Heller Capital fees that would go out to the portfolio companies for the services that the Heller Capital Group employees provided.

Q   What services did Heller Capital provide for Paramount?

Page 83

A   Accounting, finance, HR, IT, legal.  We would help them with legal.

Q   Let's go to RL0007 and I'm going to hold up mine so you can see it, the top third there is a line that says due from Paramount 37 -- $375.86.

Do you see that?

A   I do.

Q   Any idea what that would be?

A   No.

Q   De minimus.

Let's jump to RL0011.  RL0011.

And at this point in the document, we are pretty far past the header.  So if you need to flip back to understand what you are looking at, that is fine.

A   Thank you.

Q   But my question concerns a box at the top bolded under total investment Paramount Management Group, LLC, and then there is a sum there of 73.3 million dollars and some particulars.

Do you see that?

A   I do.

Q   What does that sum represent?  What is a

Page 84

total investment in Paramount?

A  So that would represent what Daryl --
Daryl would fair market value his investment
portfolio because these were all privately held
investments.

He would fair market value his
investment portfolio.  So that adjustment would
represent the amount above the capital invested.

Q  Is the representation here that as of
July 31, 2022, Paramount was worth 73.3 million
dollars?

A  Yeah.

Q  Again, consult the report as much as you
need.

A  Yeah.  Sure.  Give me one sec.
It is not tying exactly.  It is close, Josh.

What I'm looking at is on Page RL0013.
There is a fair market adjustment there of 203
million dollars.

Q  I see that.

A  So I would have expected that 203
million to tie into on Page RL0012 to tie into
that 207 million that is at the top there.  It
is off like four million bucks.

Q  What does that tell you?

Page 85

A  That there is a reconciliation somewhere
that needs to occur.

Q  That suggests to you that you didn't, in
fact, create this document that has an obvious
error?

A  It is possible, yes.

Q  Let's toggle back to 11.
What is the basis for that fair market
value?  How is that calculated?

A  You would have to talk to Daryl Heller.
He is solely responsible for determining the
fair market value.

Q  I see.
How did he communicate that
information -- well, I want to say to you
because your name is on it.

How is that information communicated --
well, in general, was that information
communicated to you?

A  It would have been.

Q  How did he communicate that to you?

A  We would have had a Teams call and we
would have just went through the entities and he
would just rattle off what he thought the fair
market value was of each entity.

Page 86

Q  So just straight gave you a number?

A  Correct.

Q  It wasn't a worksheet or an Excel or
anything to document it?

A  Not to me.

Q  Okay.  Would somebody else within Heller
Capital?

A  No.

Q  Somebody else anywhere?

A  No.

Q  Do you have any idea what his
methodology was?

A  Not specifically.  I could surmise or
take a guess.

Q  I will take an educated guess here.

A  He would have looked at the operating
cash flow of the business and put a multiple on
it.

Q  I see.
I would ask you to look at RL0013.
Again, I'm going to hold up mine so you can see.
It is three lines down there, it says N/P
Paramount/pledges and when we carry that over,
it is $34,945,085.48.
Do you see that?

Page 87

A  I do.

Q  What does that represent?

A  What I believe that represented was the
amount that was above the distribution from the
83 percent.

Q  Is it your understanding that that sum
34.9 million with the additional numbers that
are reflected in this document was a debt owed
by Heller Capital Group to Paramount?

A  Correct.

Q  Do you have any reason to believe that
that had been paid off?

A  I know that when I left I believe it was
down to like 11 million dollars.

Q  Let's jump ahead to 14.  And again, I'm
going to hold up mine so you can see it.  Maybe
about six lines down there is a line called
Expense Reimb due from related entities:  Due
from Paramount $4,145.03.

Any idea what that is?

A  No.

Q  Okay.  We will call that one de minimus.
Let's jump ahead to RL0015 and ask you
about two lines on this one.  Again, I will hold
mine up so I can direct your attention, about

Page 88

half down N/P Portfolio Company/Personal: N/P
Paramount/pledges minus 500,000.

What is that 500,000 there?

A   Let me see what that is in.  That is
in -- I had a comparative balance sheet.  I
don't know without seeing additional balance
sheet periods.

Q   Let me ask you this question.

A   It is related to the 34 million, I would
say.

Q   Is this 500,000 a debt owed by Heller
Capital Group to Paramount Management Group?

A   What that would represent, Josh, is the
change in that 34 million dollars on this period
that is reported.  So the period reported here
is -- it is probably January 1st to July 31st,
2022.

Q   I see.

A   And so you are in a statement of cash
flows.  So what that is -- it is taking the
change between January 1st and the balance sheet
of July 31st of 2022.

That 500,000 represents the change in
that 34 million.  So in seven months, that 34
million changed by $500,000.

Page 89

Q   Changed down or changed up?

A   That is a good question.

Q   Did it -- actually, let me ask a
question so the answer will make perfect sense
to me.

Did the debt increase by 500,000 or
decrease by 500,000?

A   I would need to see the 12/31/21 balance
sheet to answer that question.

Q   That we can get to.  So we will stick a
pin in that pending review of that document.

And then another entry on that same page
towards the bottom, second from the bottom,
investments in portfolio companies:  Investment
Paramount Management Group, LLC:  Tax
balance-Paramount 3.85 million.

Do you see that line?

A   I do.

Q   What does that represent?

A   That again, if I got that 12/31 balance
sheet, that will help me with the 12/31/21.
That is the distribution that was provided out
of Paramount related to Heller Capital's 83
percent ownership.

Q   So we will see --

Page 90

A   The investment should go down.  I should
see the investment should be going down on this
balance sheet here.

Q   So that is money that Heller Capital
received from Paramount?

A   That is what I believe it is, yes.

Q   Okay.  And that would have been, as you
described it, not an additional debt but a
distribution?

A   Yes.

Q   Okay.  We are done with that one.

I will hand that to you so I don't get
confused.  I'm handing the witness what has been
marked Exhibit 4, title management report Heller
Capital Group, LLC for the period ended December
31, 2021.

Mr. Rynearson, do you recognize this
document?  Same as before, I'll direct your
attention to -- I'm using the Bates now RL0022.
You see your printed name and digital signature?

A   I do.

(Rynearson Exhibit No. 4 was marked for
identification.)

BY MR. VOSS:

Q   Same thing on RL0032, your name and

Page 91

printed signature.

Do you recognize this document?

A   I don't recall specifically this
document.

Q   Do you think you created this?

A   I could have.

Q   Do you think you reviewed it?

A   I don't recall.  It is odd that, again,
I'm signing off on the document.  It is very
odd.

Q   Why is that odd?

A   Because it is just -- it wasn't a
standard practice.

Q   Wasn't a standard practice at Heller
practice or a standard accounting practice or
both?

A   It wasn't a standard practice for me to
issue management reports and put my signature on
the report at the end of it.

Q   And I should ask this about the last
document; but if we look at Page 1, RL00172 says
prepared by Heller Capital Group portfolio
company.

Do you see that?

A   Yes.

Page 92

Q   What does that mean?  What are Heller Capital Group portfolio companies?

A   That would be all of the entities listed in here where there is an investment.

Q   Actually, can I get you to look at 3 again and then cover of this one and the cover of each?

A   Okay.

Q   You see 3 was prepared at least on its face August 20, 2022 and 4 was prepared at least on its face July 12th, 2022.

Do you see that?

A   I do.

Q   Does that strike you as unusual you would have prepared these reports essentially one month apart?

A   Yes.

Q   Why?

A   I don't know.  It is -- I'm trying to think the date of the report dated August 22nd, 2022 would make sense based on the balance sheet of July 31st, 2022 that would make perfect sense to me that is three weeks after closing the books down.  That would be the perfect time to create that report.

Page 93

This one would have been done in more of the February/March timeframe.  Again, this was not a standard practice to create a management report to report the financials.

We would have printed just standard balance sheet and P&L right out of QuickBooks. This is a CAN report that is in QuickBooks.  It is like a CAN report, management reports, it is like a special presentation, if you will.  That is what -- that wasn't the standard practice.

Q   I see.

Is it possible that you didn't create either Exhibit 3 or 4?

A   It is possible.

Q   One more thing about the cover of each and then we will get into the substance.

In the corner, it says for management use only.

Do you see that on both of those?

A   Yes.

Q   Any idea what that indicates?

A   Standard stamp coming off of the QuickBooks software.

Q   I'll direct you to RL0020 and I'll help you by holding mine up.

Page 94

MR. BOYLE:  Are you on Exhibit 3 or 4?

MR. VOSS:  Thank you, Counsel.  I'm on 4.  We are done with 3 unless we reconcile.

BY MS. VOSS:

Q   For now let's focus on 4, RL0020, fourth of the way down Paramount MGM fee 114,000.

Do you see that?

A   I do.

Q   And that is a -- what is that?

A   Same -- same as the previous period.  It would be for Heller Capital Group Services to the portfolio company.

Q   Any idea why that is more than the management services fee in the last report that we just looked at?

A   Well, this is a year.  So the one we are looking at right now is for an entire year period.  The one we were looking at previously was for seven months.

Q   Fair.

Okay.  Let's go to RL0023.  In fact, let's skip that.  I'm not interested in that.

So let's go to RL0026.  I'll hold mine up again so you can find it.  But I'm looking at the second from bottom kind of grouping there.

Page 95

Specifically, the bolded line that says total investment, Paramount Management Group, LLC and there is a sum there of $35,201,490.

Do you see that?

A   Yes.

Q   What does that represent?

A   That would be the fair market value adjustment again.

Q   So as of this report, the company according to this report was worth 35 million?

A   Yes.

Q   And on the previous report Exhibit 3, it was worth 73 million?

A   Yes.

Q   And I'm talking about Line RL0011 in the previous report.

Do you have any idea why the value of the company went up almost 40 million dollars?

A   I don't.

Q   Do you recall talking to Mr. Heller about that?

A   No, because I didn't pay much attention to the fair market values because those adjustments weren't cash flow adjustments.

Q   Do you think either of those fair market

Page 96

1 evaluations are accurate?
2    A  I couldn't speak to it.
3    Q  Let's jump to RL0028.
4       Did we staple these out of order?
5       And I'm interested in the line about the
6 third of the way from the bottom bolded total
7 N/P portfolio companies personal.  I'm
8 interested in the line just above that.  I
9 apologize.
10       N/P Paramount/pledges the summary
11 reflected there is 35 million -- we will say --
12 .4 but do you see the sum there?
13    A  Yep.
14    Q  What does that represent?
15    A  That represents the distributions above
16 the 83 percent.
17    Q  So as of this report, that is money that
18 Paramount owed to -- excuse me.
19       As of this report, that sum was the
20 amount that Heller Capital owed to Paramount?
21    A  Correct.  Yep.
22    Q  Okay.  I will direct your attention to
23 RL0031.
24    A  31?  Okay.
25    Q  And the text gets small and I'll hold

Page 97

1 mine up so you can see where I'm indicating, a
2 line about a third of the way down, it says N/P
3 portfolio companies/personal N/P
4 Paramount/pledges.
5    A  Yes.
6    Q  End the summary reflected there -- if
7 I've carried my pen across correctly -- is 1.2
8 million dollars in change?
9    A  I see that.
10    Q  What does that represent?
11    A  That represents the change when this
12 reporting period -- so the note would have went
13 up -- let me make sure I'm getting this right.
14 I want to make sure.  Here it is.
15       Okay.  So let's go back.  I'm going to
16 answer your question.  Let's walk through this.
17 Bear with me.
18       So you see -- you asked me the question
19 previously on RL0015 what that 500,000
20 represented?
21    Q  Yes, sir.
22    A  And I told you that was the change
23 between 12/31/21 and July 31st of 2022.  So
24 let's go -- I want to look at the note as it
25 existed 12/31/21.  You asked me that question.

Page 98

1    Q  And I think that is on RL0028 --
2    A  Thank you.
3    Q  -- if that helps.
4    A  Yes.  Okay.  Good.  So it is 34.4
5 million there.
6    Q  In -- you are looking at exhibit --
7    A  RL0028.
8    Q  Yes.
9    A  It is 34 million.
10    Q  No.  I believe it says 35 million.
11    A  34.5 million.  Thank you.  35.4 million.
12    Q  Okay.
13    A  And if we go back to in July of 2022 and
14 look at that same number that was on RL0013, it
15 was 34.9.  So it went up $550,000.
16    Q  The it being what?
17    A  I'm sorry.  The 34 -- I'm sorry --
18 35.445 --
19       MR. BOYLE:  Describe what it is.
20       THE WITNESS:  It is the -- it is the
21 note payable Paramount/pledges on RL0028.
22 BY MR. VOSS:
23    Q  Yep.
24    A  It was 35.4 and in the previous report,
25 which is on RL0013, the note payable

Page 99

1 Paramount/pledges is 34.9.
2    Q  So from Report 4 to Report 3, the note
3 went down and how does the sum on Page RL31
4 relate to that?
5    A  So in -- if we look at -- you are right.
6 It went down.  So that 500,000 question that you
7 asked me, that was on RL0015.  You said what
8 does that 500,000 represent.  It was a note
9 payable portfolio Paramount/pledges.
10    Q  Yes, sir.
11    A  That is the 500,000.  That note went
12 down.  That 500,000.  That 500,000 represents a
13 payment that was made back from Heller Capital
14 to Paramount.
15    Q  Okay.  So we got that one tied up.
16       How about RL31, what does the 1.2
17 million there represent?
18    A  So that is positive.  So that is going
19 to represent 1.2 million that came in.  If we
20 would get the beginning balance sheet and get
21 December 31st, 2020, you would see the note
22 balance go up.
23    Q  It would go up?
24    A  It would go up by RL0031 the 1 million
25 260.

Page 100

1  Q  But whatever this number represents, an
2  increase or a decrease, in this case it is an
3  increase, it is rolled into RL28?
4  A  You got it.
5  Q  Perfect.
6     Last question on this document RL32,
7  once again hold mine up so you can see it.
8  There is two Paramount-related entities on Line
9  3 and 4.
10    I'm going to skip to the end FMB ADJ and
11 the end of the next one is tax balance.  Let's
12 start with FMB adjustment, it looks like minus
13 32 million -- minus 32.3 million and change.
14    Do you see that?
15 A  I do.
16 Q  What does that represent?
17 A  That is going to represent the change in
18 the fair market value that was on page --
19 Q  26?
20 A  Correct.
21 Q  So --
22 A  And that is the change, Josh, between
23 12/31/2020 and 12/31/21.
24 Q  So in this reporting period, the fair
25 market value of Paramount went down by 32

Page 101

1  million dollars?
2  A  Let me see.  Just let me get my
3  bearings.  I don't know if it went up or went
4  down.
5     I'm sorry.  I just got to -- yes, I
6  believe it went up.  That is what it means.  It
7  went up.
8  Q  The value of the company went up or went
9  down by that sum?
10 A  I believe it went up.
11 Q  Okay.  Next line down tax balance 2.9
12 million, what does that represent?
13 A  It would be tied back to that same
14 section in the balance sheet.
15 Q  Which means?
16 A  It would be tied back to there is a tax
17 adjustment.
18 Q  So that is money that Heller Capital
19 received from Paramount?
20 A  I don't recall what that tax adjustment
21 represents.
22 Q  Is it maybe more generally, the money
23 into Heller Capital or out of Heller Capital?
24 A  I don't recall what that represents.
25    MR. VOSS:  Can we -- is it okay if we

Page 102

1  take a break right here?  I'm going to need the
2  computer next for the spreadsheets that print
3  out rather small.  Can we go off the record?
4     MR. BOYLE:  Sure.
5     (Break.)
6     MR. VOSS:  Let's mark this one Exhibit
7  5.
8     (Rynearson Exhibit No. 5 was marked for
9  identification.)
10 BY MR. VOSS:
11 Q  I'm handing the witness what I will
12 admit is a very small printed spreadsheet that
13 we displayed on screen.
14    I represent to the witness that I
15 received under a subpoena from -- to Dana
16 Schlicker a spreadsheet in its native format which
17 we have displayed on screen that you are holding
18 on your hand titled HC NP v PMG Detail 1.
19    Sir, the spreadsheet in your hand is a
20 printout of what is on screen.  Is that a
21 spreadsheet you have seen before?
22 A  I can't speak to the exact spreadsheet,
23 but I understand what it is representing.
24 Q  What does this spreadsheet represent to
25 you?

Page 103

1  A  It represents the balance that you were
2  asking me about previously on the balance sheets
3  of the Exhibit 3 and Exhibit 4.
4  Q  So this would be a balance that Heller
5  Capital owes to Paramount?
6  A  Correct.
7  Q  And again, it is small on your document;
8  but I see there is a subtotal at Line 101 and I
9  will get that on screen.  Of course, the headers
10 aren't carrying through.
11 A  That is all right.
12 Q  This is as fancy as I can do in a
13 deposition.
14    So there in Column J on the screen Line
15 101, same in the printed document that we are
16 using as our exhibit, do you see a sum there as
17 7.4 million dollars and change?
18 A  I do.
19 Q  And its description, I believe, is total
20 for N/P Paramount/pledges.
21    Do you see that?
22 A  I do.
23 Q  What does that sum represent to you?
24 A  This should be analogous to RL0013 in
25 Exhibit 3 or it was a 34.9 million.  So that --

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification  Page 29 of 68
Deposition of Barry Rynearson                    In re Investigation et al. v. Paramount Management Group, LLC

Page 104

so the 34.9 million, the detail behind it would
be in the spreadsheet.  This is dated July 31st,
2022.  Let's see if we go to July 31st, 2022.
    Q   Sure.  Right tracking my outline.
        Which line are you looking for?
    A   Column B.  Let's see if we can find July
31st of 2022.
    Q   I think the closest we got is an
entry -- we are looking at Lines 39 and 40 for
purposes of the written record in Exhibit 5 the
spreadsheet?
    A   So now, let's look at Exhibit 4 and
let's go to --
    Q   Sir, are you looking at -- which
report --
    A   I'm sorry.  Exhibit 4, the period ending
December 31st, 2021.  I shifted gears because we
couldn't find that balance sheet date.
    Q   Yes, sir.  I'm with you.
    A   Hold on a second.  So then look at
RL0028.
    Q   Okay.
    A   And you will see 35,445,085.
    Q   And that matches exactly lines -- well,
39 and 40 but 39 is the last entity for that --

Page 105

the reporting period reflected in the management
report?
    A   Correct.
    Q   So this spreadsheet again returning to
Exhibit 5 represents -- what does it represent
to you?
    A   It represents the detail behind the
balance that we are looking at.  So this is a
balance at a point in time in Exhibit 3 and 4.
This would be the detail that would support the
balance.
    Q   Okay.  And then I want to go back to --
we are going to go to Line 102.  There is a
descriptor there loan payable Box 1 TVT
LendSpark.
        What are those things?  What is this box
describing, this description here in 102 Column
A?
    A   I don't know.
    Q   Do you know what TVT is?
    A   I do not.
    Q   How about LendSpark?
    A   I don't -- this one looks odd to me.
    Q   Okay.  Why does it look odd?
    A   Because this should flow.  The balances

Page 106

should flow.  So you see in Column K.  That is
the cumulative balance.
    Q   Um-hum.
    A   And you will see the transactional dates
are coming through in Column J.  So every time
you have a transactional date in Column J it is
taking the cumulative balance in Column K.
    Q   Um-hum.
    A   So, for example, K-87 is 9 million 123,
40,000 goes out and 9 million 123 goes down
40,000 to be 9 million 83.
    Q   It makes sense.  Yes, sir.
    A   Now, go down to where you pointed out
Row 102, you have this transactional description
but nothing there and the balance goes from 7
million .4 to 7,027,000.
    Q   Let's maybe jump to row -- these are all
in the printed documents.  I think these are
easier to look on the screen here?
        So it reaches a total in Column J, Row
127 of 2.7 million and I think would you agree
with me that that 2.7 in Line 127 appears to be
added to the sum total in Line 101?  I can
scroll back up on screen.
    A   Hold on.  You might have just nailed it.

Page 107

Yeah.  That is -- yeah.  Go back up there.
    Q   I'm returning to Row 101, Line J.
    A   Yeah.  Now, go back to where you were.
Yes.  They are added together.  So the 2.7 is
added to that 7.4.  That is up above.
    Q   Yes.
        Based on your experience with Heller
Capital, Heller Capital's account, accounting
practices, do you believe Row 129 the total
there is a sum owed from Heller Capital to
Paramount?
    A   Yes.
    Q   I'm done with that one.  We will mark
this one as 6.  I'm handing you, the witness,
Exhibit 6.
        This one is insanely small printed out.
That is why we have the screen.  I will
represent to you this is a spreadsheet provided
to me under subpoena to Dana Schlicker in native
format and Excel native format.  Title of which
was PMG Investment Asset on HCBS.
        And for the benefit of the record, we
have the same document displayed on screen that
we have printed in 6.  It is quite small to
read, so we displayed it for the witness.

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification    Page 30 of 68
Deposition of Barry Rynearson                    ... vestiga...in...et al. v. Paramount Management Group, LLC

Page 108

1    Mr. Rynearson, do you recognize this
2  spreadsheet?
3    A  I do not, but it looks like account
4  detail again.  It is a -- it is a transactional
5  report that supports an account.
6    (Rynearson Exhibit No. 6 was marked for
7  identification.)
8  BY MR. VOSS:
9    Q  Maybe I will make this one smaller so
10  you can see all of it.  Hopefully, that doesn't
11  make it worse.
12    A  That makes it helpful.
13    Q  What generally does this look like to
14  you?
15    A  It is the support for -- it is the
16  support for investment.  So in Row 7, it says
17  investment Paramount Management Group.
18    So it is the support for that balance.
19  It is the transactional detail to support the
20  balance.
21    Q  What I'm trying to figure out, sir, does
22  this reflect monies flowing from Paramount to
23  Heller Capital or from Heller Capital to
24  Paramount?
25    A  This looks like -- these are incoming

Page 109

1  wires so they are coming into Heller Capital.
2    Q  And again, does this to you look like it
3  is money for the benefit of Paramount or -- I
4  guess I'm trying to understand, what is
5  investments in portfolio companies.
6    I'm looking at Column H in the first
7  segment of this document.  I'm trying to
8  understand what I'm seeing here in real layman's
9  terms.
10    A  Understood.  So this would be -- this
11  would be -- these would be payments made that
12  are distributions.
13    So this -- these are -- these are monies
14  made -- or funds made related to Heller Capital
15  Group 80 percent management in Paramount
16  Management Group and that is why they are being
17  applied against the investment.
18    So it would be debit cash because we
19  received the cash and you are crediting the
20  investment to bring the investment down.
21    Q  What does that mean, the investment?
22    A  The investment in -- the investment, go
23  back to the left so you can see columns -- right
24  there, investment in Paramount Management Group.
25    So that is the -- that is the -- that is

Page 110

1  the balance sheet account investment in
2  Paramount Management Group.  So that when the
3  cash came in, you can see it is a deposit in
4  Column C, you can see they are deposits.
5    So they -- the account would have
6  debited cash and they would credit that
7  investment because it is the funds are related
8  to the ownership of Paramount Management Group.
9    Q  So these are sort of, I guess, I'm
10  really still struggling, these are
11  distributions?
12    A  Correct.
13    Q  -- that Heller Capital is taking out of
14  Paramount --
15    A  That is correct.
16    Q  -- in the ownership stake?
17    A  A hundred percent.  Correct.
18    Q  I see.
19    Okay.  So not loans?
20    A  Not loans.
21    Q  You don't happen to know anything about
22  the Cash Depot first iso transaction reflected
23  on 30 and 31, do you?
24    A  No.  Yeah, no.
25    Q  Okay.  I think we are done with the

Page 111

1  screen.
2    I'm going to hand you the next exhibit,
3  which is 7.  This is a document we received in
4  discovery in its native format, which is not
5  reflected here but the title of this document is
6  Raw Glorious transactions.
7    Sir, looking at this spreadsheet, does
8  this -- what does this look like to you?
9    A  This looks like this would have been
10  produced out of Paramount's book and the reason
11  why I say that is because it is a note
12  receivable.  So Paramount would have had a note
13  receivable from Raw Ventures.
14    (Rynearson Exhibit No. 7 was marked for
15  identification.)
16  BY MR. VOSS:
17    Q  I believe earlier today we had talked
18  about a sum of approximately 21 million Glorious
19  owed to Raw.
20    Am I recalling that correctly?
21    A  You are.
22    Q  And we see in Line 56, Column F a sum of
23  just over 20 million dollars.
24    Do you see that?
25    A  I do.

Page 112

1 Q  Do those two sums reconcile in some kind
2 of way?
3 A  I would -- the accountant teams would
4 reconcile this on a quarterly basis and I know
5 that because I directed them to do so.  So they
6 should reconcile the 21 million, and maybe I'm
7 off, Josh, because I'm pulling it from memory.
8 Maybe it is 20 million -- you know, maybe it is
9 just over 20 million.
10 Q  This document, does this represent sums
11 that Raw owed Paramount in your estimate?
12 A  Sums that Raw owed Paramount, yes.  Raw
13 would have had a note payable on its books for
14 the exact same amount when the balances were
15 reconciled.
16 Q  And the last transaction on here on Line
17 2 is from February of 2024.
18 Do you see that?
19 A  Oh, yeah.
20 Q  Row 2, Column A?
21 A  Yes.
22 Q  Do you have any reason to believe that
23 there was transactions between Paramount and Raw
24 after that time?
25 A  No.  To the best of my knowledge, there

Page 113

1 were no transactions after that time.
2 Q  Do you think this summary reflected in
3 Row 56, Column F is what Raw today owes to
4 Paramount?
5 A  I believe it could be that amount.  The
6 21 million that I mentioned before should be
7 analogous to that 20 million that is sitting
8 down there.
9 Q  Do you know somebody -- anybody who
10 would know with certainty what Raw owes to
11 Paramount?
12 A  So from Raw's perspectives, the books
13 were kept by Glorious -- by the Glorious
14 accounting team.
15 Q  Do you know a person or persons on that
16 team?
17 A  Yeah.  David Prill would be the CFO.
18 Q  Anybody else?
19 A  Danny Frank would have been the
20 controller.
21 Q  And when you say they were -- any
22 others?
23 A  Maybe staff members but I don't know.
24 Q  Glorious, do you know what entities
25 specifically the accountants worked out of?

Page 114

1 A  Say that again.
2 Q  Which entity specifically, if you know,
3 did these David Prill and Danny Frank you work
4 out of.
5 You said Glorious, but that is a
6 constellation.  Do you know specifically what
7 they worked for?
8 A  The 24 entities that you tallied up in
9 your head previously, there was -- there is a
10 service entity that is not mentioned in there
11 and that service entity is where everybody gets
12 their paycheck from.  So all 24 companies all
13 got a paycheck out of the service entity.
14 Q  What is that entity called?
15 A  It used to be i Employee Services but it
16 changed but I don't recall what it was changed
17 to.
18 Q  The name changed or the company changed?
19 A  The company.  It was -- it was a new
20 company.
21 Q  New company?
22 A  Yeah.
23 Q  And you don't know what that company is?
24 A  I do not remember the name of the
25 company.

Page 115

1 Q  Is that in your records?
2 A  That, I'm not sure of.
3 MR. VOSS:  Okay.  Counsel, I will call
4 production of documents sufficient to identify
5 the name of the company.
6 MR. BOYLE:  Okay.
7 THE WITNESS:  And just for clarity, it
8 is a passthrough entity.  That is where the
9 C-suite sets where all of the employees were
10 paid out of and all of the operational cash flow
11 would come into that entity to make those
12 payments.  So it is a nonoperating entity.
13 BY MR. VOSS:
14 Q  Here is what I'm looking for.
15 A  Okay.
16 Q  I want to make sure I have close to what
17 Raw owes Paramount.
18 A  Got you.
19 Q  I'm trying to figure out who I direct
20 the subpoena to, and it sounds like these folks,
21 David Prill and Danny Frank would have it in
22 your view, right?
23 A  Yes.
24 Q  Anybody else that might have it?
25 A  They would have it.

Page 116

Q   And you believe they work for an entity that you can't identify as you sit here right now?

A   So with all Daryl's, you know, legal issues, they stopped doing the accounting work for Daryl's entities.

So I believe that ended the end of last year '24. I believe they would be able to furnish you the balance as it existed in '24 but I don't believe there were any transactions that occurred after.

Q   Okay. Let me see if I want to do this one.

MR. BOYLE:  You had directed several requests of us and we are happy to comply with those.

We could ask that you follow up with a letter afterwards so we know specifically what we are looking for.

MR. VOSS:  Will do. Calls for production, so I can find them quickly when I get my transcript.

A smarter man would have sent this to the staff to make it big, but I did not. This is the last exhibit.

Page 117

I'm handing the witness Exhibit 8, which I will represent to you is a document we received in discovery in its native format called 2024 PMG financial statements.

BY MR. VOSS:

Q   And if I had been really doing my job, I would have numbered the pages. So I didn't. On the seventh page in very small font -- I apologize, Row 37?

A   What does your seventh page look like?

Q   Second to the last. I should have numbered them. I apologize. Row 37, very small it says notes receivable Raw Glorious, will carry out that says 2000466867.

Do you see that very tiny entity there?

A   I honestly can't see it.

(Rynearson Exhibit No. 8 was marked for identification.)

BY MR. VOSS:

Q   I'll represent to you that that is what it says, and the document will speak for itself.

A   Fair enough.

Q   Can we agree that it matches the exhibit in 7 the same sum?

A   Okay. Good.

Page 118

MR. BOYLE:  I got new glasses and I can't see it.

MR. VOSS:  I knew the last ones are small and this one I added after I directed staff what --

THE WITNESS:  What is the description, Josh? Is it the thing highlighted in red?

BY MR. VOSS:

Q   No. It is Line -- what did I just say -- Line 37?

A   So what is the description of Line 37.

Q   It says notes receivable-Raw, all caps parentheses, Glorious, end parentheses; and when you carry it over, it is the same sum as what we just looked at on the spreadsheet you can actually read.

A   Okay.

Q   I'll direct your attention to Page 1.

A   Yeah.

Q   This document purports to be as we understand it a balance sheet for Paramount as of July 31, 2024.

What I was simply hoping to show with that document is that balance we see on Exhibit 7 carried forward through at least July at the

Page 119

same amount.

A   And I'm assuming, Josh, that this sheet that we can't see the numbers totals up to the 94,000 that is on Page 1 of Exhibit 8 -- not 94,000 -- 94 million.

Q   I don't know if this has a sum total; and again, this is not a document we created. So we are at the mercy of the custodian.

A   I can help you out here. I never seen these documents. I don't know what they are or who prepared them.

Q   We will decide if we need to get this on screen. I just have one more question.

A   Okay.

Q   Do you know -- it is on here. It doesn't matter if you read it. If you see an entry HCG Orrstown Bank Pledge Account, any idea what that would be?

A   No.

Q   HCG Orrstown Bank Pledge Account No. 2, any idea?

A   No.

Q   Same description, No. 3, any idea?

A   No.

Q   How about HCG Portfolio M Pledge

Page 120

1  Account?
2      A  No.
3      Q  HCG Portfolio N Pledge Account, that is
4  N as in Nancy, the last time I said M as in
5  Mary.  This time I said N as in Nancy.
6      Any idea what that is?
7      A  No.
8      Q  Okay.  We don't need to make this
9  document bigger.  We are fine.
10     All right.  I think we can really quick
11  go through these.
12     Let's see if you even know the answers
13  to these.
14     Do you know what banks Paramount used?
15     A  No.
16     Q  Do you know if it had any brokerage
17  accounts?
18     A  I do not.
19     Q  Safe deposit boxes?
20     A  No.
21     Q  Actual safes?
22     A  No.
23     Q  Do you know any cars it owned?
24     A  No.
25     Q  Computers?

Page 121

1      A  I mean, they had computers.
2      Q  But do you know specifically where they
3  are?
4      A  No.
5      Q  I think we went through the Raw
6  receivable and the Heller Capital intercoming
7  balance.
8      Any other large receivables at Paramount
9  that you are aware of?
10     A  No.
11     Q  Okay.  Any loans it was owed?
12     A  No.
13     Q  Other than the ones we have discussed?
14     A  Right.
15     Q  Any debts owed to it other the ones we
16  discussed?
17     A  No.
18     Q  Any idea who it had insurance through
19  for general liability insurance?
20     A  This is Paramount?
21     Q  Yes.
22     A  No.
23     Q  All of these questions are about
24  Paramount.
25     A  Okay.

Page 122

1      Q  Any physical assets that you are aware
2  of?  Real property I mean.
3      A  No.
4      Q  Okay.  Are you familiar with the beach
5  house in New Jersey?
6      A  Yes.
7      Q  Do you know how that was funded?
8      A  Paramount.  It was -- it was a debt
9  transaction and Paramount.
10     Q  What does that mean, debt transaction?
11     A  A bank loan.
12     Q  What do you mean by that?
13     A  Dennis and Randall took out a loan to
14  purchase the beach house for the difference
15  between the purchase price and the amount that
16  they -- so they funded cash from Paramount, is
17  what I recall, to purchase the beach house and
18  then the difference was a bank loan.
19     Q  Did Paramount pay for that beach house?
20     A  I believe -- I believe -- I believe it
21  was -- I believe the money came into Daryl's.  I
22  believe the way it works it was funded out of
23  Paramount into Heller Capital, Heller Capital to
24  Daryl, and then Daryl paid for it out of his own
25  account.  I believe it was an individual

Page 123

1  purchase.
2      Q  Through all of that, did Daryl and
3  Randall pay for the house ultimately or did
4  Paramount?
5      A  The funds would have originated out of
6  Paramount, from what I recall.
7      Q  Fair enough.
8      But if it all nets out, was Paramount
9  paying for it or did they somehow pay for it
10  individually?
11     A  I'm trying to answer your question.  The
12  funds would have originated out of Paramount
13  into Daryl's personal account and Daryl would
14  have paid for the beach house out of his
15  personal account.
16     Q  What was the basis for the payment from
17  Paramount to Daryl?
18     A  Distribution.
19     Q  Is it a distribution he was entitled to?
20     A  I don't know.
21     Q  What I'm trying to get to -- I asked it
22  a couple of different ways -- my basic point is,
23  did Paramount pay for that house or did Randall
24  and Daryl pay for that house?
25     A  The funds would have originated -- I'm

Page 124

1  not trying to be evasive.  I'm trying to answer
2  your question.
3       The funds would have originated out of
4  Paramount, whatever it was.  Two million dollars
5  originated out of Paramount.
6       Those funds would have went into Daryl's
7  bank account as an individual and then Daryl
8  would have funded the purchase price out of his
9  account.
10      Q  And you have personal knowledge of the
11 money coming out of Paramount to purchase this
12 beach house?
13      A  That is what I recall.
14      Q  Okay.  Would in your view the proceeds
15 of that house belong to Paramount?
16      MR. BOYLE:  I'm going to object again.
17 Are you asking for a legal conclusion or just --
18      MR. VOSS:  I'm asking for his accounting
19 opinion on the transaction.
20      THE WITNESS:  So from an accounting
21 perspective, if the distributions were
22 appropriate, then no, because the money would
23 have been funded and would have been a
24 distribution and those funds would have been
25 Daryl's personally.

Page 125

1  BY MR. VOSS:
2       Q  And you would have expected if their
3  distribution -- there would have been a
4  reduction of the distribution for the year?
5       A  It would have been included as a
6  distribution, right.  So Paramount would have
7  recorded a distribution and Heller Capital would
8  have had the incoming and then Heller Capital
9  would have sent it to Daryl.
10      Q  I see.
11      Returning to Paramount, are you aware of
12 any physical cash that they have?
13      A  No.
14      Q  I'm talking about U.S. currency.
15      A  No.
16      Q  Fine art of any kind?
17      A  No.
18      Q  Equipment of value of over 10,000?
19      A  No.
20      MR. BOYLE:  Are you saying no or you
21 don't know?
22      THE WITNESS:  No.  I don't know.  I'm
23 not aware and no are synonymous.  I'm not aware.
24      MR. VOSS:  Thank you, Counsel.
25      THE WITNESS:  Yeah.  Thank you.

Page 126

1  BY MR. BOYLE:
2       Q  Are you familiar with TR-31?
3       A  No.
4       Q  You earlier talked about Daryl told you
5  at some point in 2024 about a deal to sell
6  Paramount; is that right?
7       A  Correct.
8       Q  And you have no idea who the deal
9  partner was?
10      A  I don't.
11      Q  Do you know why that deal did not come
12 together?
13      A  I do not.
14      Q  Do you think there was actually a deal
15 partner?
16      A  I don't know.
17      Q  Did Mr. Heller ever talk to you about an
18 exit plan for his companies?
19      A  Yes.
20      Q  When was that discussion?
21      A  It was -- it was a discussion that
22 Daryl -- that was always a strategic goal with
23 everything Daryl was doing, to always have an
24 exit out.
25      Q  And what did he say to you?

Page 127

1       A  Start the companies, get them cash
2  flowing, and at some point have an exit.
3       Q  That was the end game to get out of
4  these companies?
5       A  Yes.
6       Q  Are you familiar with flights of --
7  flights on a private jet with bags of cash?
8       A  No.
9       Q  Did Paramount pay any money to Daryl
10 Heller outside of distributions?
11      A  Not to my knowledge.
12      Q  When was the last time you talked to
13 Mr. Heller?
14      A  It would have been before Thanksgiving
15 of 2024.
16      Q  What was that discussion about?
17      A  It would have been something related to
18 Glorious.
19      Q  What do you recall the substance of that
20 conversation being?
21      A  In my role as a consultant with
22 Glorious, it was contentious with what was going
23 on with Daryl.
24      So I would be the one that was elected
25 to reach out to Daryl and communicate with

Page 128

1  Daryl.
2      So it would have been something related
3  to Glorious that would have been the impetus of
4  the conversation.
5      Q  Did you at any point discuss with him
6  losses by Paramount?
7      A  No.
8      Q  Did you ever discuss with him losses by
9  Heller Capital?
10     A  No.
11     Q  Did you ever discuss with him beyond the
12 conversation we already went through whether
13 this is a fraud or a Ponzi?
14     A  No.
15     Q  Are you familiar generally with the
16 Prestige Investment Group?
17     A  Yes.
18     Q  What was your understanding of the
19 relationship between Prestige Investment Group
20 and Paramount?
21     A  My understanding was that Prestige would
22 purchase the assets, the ATMs, and Paramount
23 would manage them.
24     Q  And was it your understanding that
25 Prestige was purchasing them through various

Page 129

1  funds?
2      A  Yes.
3      Q  Okay.  Do you know where the money went
4  to first when money came into -- well, scratch
5  that.
6      Did you ever see bills of sale for ATM
7  sales?
8      A  I don't believe so.
9      Q  Okay.  Do you know how much money the
10 funds invested in Paramount?
11     A  I don't.
12     Q  Would it shock you that it is over 700
13 million dollars?
14     A  Significantly shock me.
15     Q  Why is that shocking to you?
16     A  I just had no idea it was that much
17 money.
18     Q  Do you have any idea where the unpaid
19 investments are today?
20     A  No.
21     Q  Do you have any guesses?
22     A  Getting judgment for 138 million.  138
23 million?
24     MR. BOYLE:  No.  He is asking where they
25 are.

Page 130

1      THE WITNESS:  Where what is?
2      MR. BOYLE:  Where is the money?
3      THE WITNESS:  Oh, I don't know.
4  BY MR. VOSS:
5      Q  Are you familiar with a group of
6  entities called Blackford Funds?
7      A  Yes.
8      Q  What is your understanding of that
9  entities?
10     A  So the Blackford Funds, they were ATM
11 Funds that were originally Daryl Heller and
12 Richard Welkowitz.
13     And then Richard passed in December of
14 2018 and Daryl ended up purchasing the --
15 Richard's ownership percentage of those funds.
16     So that is -- that is my knowledge of
17 those -- of those funds.  So they were 100
18 percent owned by Heller Capital.  They were 100
19 percent owned by Heller Capital at that time.
20     Q  Do you know how many ATMs were inside
21 the Blackford Funds?
22     A  I don't.
23     Q  Any idea where they are?
24     A  I don't.
25     Q  Any reason to believe those ATMs are in

Page 131

1  any way separate from the ATMs that Paramount
2  managed?
3      A  Paramount -- my understanding was that
4  Paramount did manage those ATMs.
5      Q  Do you have any idea of the scale of the
6  ATMs in the Blackford Funds?
7      A  I don't.
8      Q  Did you ever at some point in time see
9  or hear about placeholder or PH serial numbers?
10 Did you have a discussion with anybody about
11 that?
12     A  I did not.
13     Q  Okay.  Are you familiar with Cash
14 Ventures?
15     A  No.
16     Q  Because I'm probably definitely going to
17 forget.
18     A  I think I misspoke.  What was the
19 question Cash --
20     Q  Are you familiar with Cash Ventures?
21     A  I have heard of Cash Ventures.
22     Q  What is your understanding of Cash
23 Ventures?
24     A  Very similar to Blackford, the Blackford
25 Funds.  So those were owned by Daryl Heller and

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification   Page 36 of 68
Deposition of Barry Rynearson                    Investigation Control et al. v. Paramount Management Group, LLC

Page 132

1  Rick Haller.
2      Q   Where did they come from?
3      A   Same setup.  They were purchasing the
4  ATMs and Paramount was managing them.
5      Q   Any idea of the scale of ATMs?
6      A   I don't.
7      Q   This was marked in a previous deposition
8  and I think we will -- I think we will refer to
9  it as its prior designation.  This is called
10 Leaman Deposition Exhibit No. 7.
11     What I will represent to you is this
12 is -- if you read the pages, 1 goes with 2, 2
13 goes with 3 and 3 goes with 4.  See, I managed
14 to stick with upside down.
15     What I will represent to you, sir, this
16 is -- we received a number of P&Ls in discovery
17 in this case and merged them into a consolidated
18 document, which is this document marked Leaman
19 Exhibit 7.
20     So earlier today, we had talked about at
21 some point in time Daryl put a P&L in front of
22 you.  Obviously, it wasn't this P&L.  I created
23 it.
24     But did the P&L he put in front of you
25 look similar to this?

Page 133

1      A   I don't recall.
2      Q   Okay.  Well, when he talked -- as I
3  recall, you said he talked to you about the
4  operating revenue of Paramount was sufficient to
5  cover their payments to the funds.
6      Did I -- did I describe your testimony
7  correctly?  Is that what he said?
8      A   Operating income --
9      Q   Operating income --
10     A   -- versus revenue.
11     Q   And what is the difference between
12 operating income and operating revenue?
13     A   Operating revenue would be your top line
14 and operating revenue would be the bottom line.
15 Revenues is the very top.  That is what comes in
16 to pay all of your expenses and then you have --
17     MR. BOYLE:  Revenue is gross.  Income is
18 the net.
19     MR. VOSS:  Appreciate that.
20     THE WITNESS:  Yep.  Thank you.
21     MR. BOYLE:  Sorry.
22 BY MR. VOSS:
23     Q   Let's try this way.  So you see there is
24 a line called total operating revenue in a box
25 called operating revenue and let's just look at

Page 134

1  September of 2019.
2      Do you see that --
3      A   I do.
4      Q   -- 3.3?
5      And then we have a segment called cost
6  of goods sold and expenses.  And if you continue
7  onto Page 2, we get adjusted net operating
8  income right there --
9      A   Yep.  I see that.
10     Q   -- 99,987.
11     Would you agree with me that that 99,987
12 is a representation of the net revenue off of
13 ATM's performance in this month?
14     A   This is -- let me see.  So that looks to
15 me -- again, I'm not familiar with this
16 presentation if you are asking for my opinion of
17 what it represents.
18     Q   Yes, sir.
19     A   It looks like that net operating income,
20 the adjusted nonoperating income looks like it
21 relates to the ATM business, the fees and so
22 forth collected from the ATMs.
23     And then down below -- so there is your
24 net operating income.  That is what Daryl would
25 have showed me, the net operating income from

Page 135

1  the business.  That is what he would have showed
2  me was sufficient to make the payment to the
3  Prestige investors.
4      Q   Are you talking about the adjusted or
5  the net operating income that is just --
6      A   I don't recall there being an adjusted
7  number, but it was net operating income.
8      Q   Okay.  So for the month that we are
9  talking about here, September of 2019, you are
10 talking about the 242,310.
11     A   Correct.
12     Q   $242,310.
13     A   Correct.
14     Q   Okay?
15     A   And then below, I don't know what the
16 consulting agreement is or any of that.  I don't
17 know what that is.
18     It must relate to the ATMs because that
19 is the section it is tied to.  And then down
20 below it looks like these are related to ATM
21 sales.  So I don't know if they sold machines.
22 I don't know what it represents.
23     Q   Okay.  And you may recall, I asked you
24 about PE debt payments.  And if you look down to
25 the other expenses, it is one, two, three, four

Page 136

1  from the bottom.
2      Do you see that?
3      A  I do.
4      Q  I'm circling it on mine.
5      Do you have any idea what that is?
6      A  I do not.
7      Q  Was PE debt payments on the P&L that
8  Daryl shared with you?
9      A  I don't recall.
10     Q  Were ATM sales on the sheet?
11     A  I don't recall.
12     Q  You did see net operating income,
13  correct?
14     A  I believe so.  That is in my -- in my --
15  it could have been something different.  In my
16  mind, it was the cash flow.  It was the
17  operating income from the business.
18     Q  Any idea what the scale of that number
19  was in the document that Daryl shared with you
20  in April of 2024?  Thousands?  Millions?
21  Billions?
22     A  It was millions.
23     Q  Millions?
24     A  Yeah.
25     Q  Tens of millions?

Page 137

1      A  Tens of millions.
2      Q  So he showed you a net operating income
3  showing tens of millions of dollars --
4      A  I believe so.
5      Q  -- from operations of the ATMs?
6      A  I believe so, yes.
7      Q  And that number as it was shown to you
8  and perhaps described by Mr. Heller was -- did
9  you understand that number or did he -- scratch
10  that.
11     Did he tell you that number was revenue
12  off of the machines and machines alone?
13     A  I don't recall exactly what -- how he
14  described it.  How I interpreted it was it was
15  the revenue from the operations of the ATM
16  machines.
17     Q  Okay.  But not ATM sales, for example?
18     A  I don't recall anything about ATM sales.
19  I didn't realize that was part of their
20  business.  I didn't realize that was part of
21  their business.
22     Q  Okay.  Well, you would agree with me
23  that the PE debt payments, again, just focusing
24  on this one month, 4.2 million dollars, is quite
25  a bit larger than the net operating income?

Page 138

1      A  It comes down to a positive number
2  though.  When you look, it is 13 million
3  positive all the way down the bottom line, all
4  the way at the bottom right.
5      Q  Yep.  I agree with that.
6      But my question to you, sir, are the PE
7  debt payments in September 2019 significantly
8  higher than the net operating income?
9      A  So you are asking me if the 4.2 million
10  is higher than the 242,000?
11     Q  Yes, sir.
12     A  Yes.
13     Q  And frankly, as we look at these things
14  but for ATM sales, they wouldn't be cash flow
15  positive.
16     Do you agree with that?
17     A  Yes.
18     Q  Okay.  And that -- none of that was
19  reflected on the spreadsheet that Daryl Heller
20  shared with you?
21     A  I don't recall ATM sales being a
22  component of the operating income.
23     Q  Are you aware of -- these will go quick.
24     Are you aware of Paramount owning any
25  Crypto assets of any kind?

Page 139

1      A  I don't know what they owned but there
2  was a Crypto division or a Crypto segment
3  with -- associated with Paramount.
4      Q  And is that PowerCoin?
5      A  Yeah, PowerCoin.  They called it
6  PowerCoin.
7      Q  Margo?
8      A  There you go.  Thank you.  Margo.
9      Q  I'm talking in the name of Paramount,
10  Paramount Management Group, LLC, are you aware
11  of any Bitcoin, Ethereum?
12     A  I'm not aware.
13     Q  Same thing with Heller Capital, any
14  Crypto assets that it owned that you are aware
15  of?
16     A  Not that I'm aware of.
17     Q  How about Daryl Heller personally, any
18  Crypto currency that he owned that you are aware
19  of personally?
20     A  Not that I'm aware of.
21     Q  Any Heller Capital entity other than
22  Margo or PowerCoin that owned Crypt assets?
23     A  I kind of think there were a couple of
24  different entities, but I don't recall the names
25  of them.  I had no involvement with that.

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification Page 38 of 68
Deposition of Barry Rynearson    ...Investigation ... ...et al. v. Paramount Management Group, LLC

Page 140

Q   Would it maybe be Bitstop?

A   There you go.  Bitstop.

Q   Okay.  Are you aware of any entities within the Heller Capital universe that are going concerns today?

A   Yeah.  Well, Glorious I know for a fact is going concern.

Q   Anything else?

A   I don't have direct knowledge of whether it is a going concern or not.  Glorious I have direct knowledge.  It is under receivership.

Q   And is that receivership to your knowledge sending money to Heller Capital?

A   No.

Q   Okay.  So that business is going concern but it is not generating money for Heller Capital?

A   Correct.

Q   Anything else that you know of that could be generating money actually to Heller Capital right now?

A   No.

Q   Okay.  Any other Paramount assets that you are aware of that we haven't discussed?

A   No.

Page 141

Q   Are you aware of girlfriends of Daryl Heller?

A   No.

Q   You are not aware of any gifts to paramours or girlfriends that he gave?

A   No.

Q   Are you aware of any real estate he owned abroad?

A   Abroad?  No.

Q   How about Heller Capital?  Did it own any real estate abroad?

A   No, not that I'm aware of.

Q   In your estimation, who else should we talk to that would know about the assets of Paramount Management?

A   Randall, Dennis, the other finance guy his name was Brett Davis.  On the Crypto side, it was Austin Haller.  He was an executive over there.

Q   Of course, Daryl Heller?  Yes?

A   Oh, definitely.

Q   Okay.  Any assets of Paramount that you think exist today?

A   Not that I'm aware of.

Q   Anything you would want to know if

Page 142

you wanted me to find assets through Paramount?  Anything I didn't ask you about?

MR. BOYLE:  I'm going to object to the form of the question but go ahead and answer.

THE WITNESS:  I'm not aware of any assets that are related to Paramount.  None.

BY MR. VOSS:

Q   Okay.  All right.  Two quick followups.

Did you give anyone authority to sign your name on the documents we referred to at 3 and 4?

A   No.

Q   Did you give anyone in Heller Capital your authority in general to put your name on documents?

A   No.

Q   Okay.  And then I'm remiss, I didn't do this at the beginning.

Can you just give me your general academic and professional background in a nutshell, CV kind of format to explain how you became qualified to be CFO?

A   Sure.  I went to the school of Kutztown University and graduated with degrees in accounting and marketing.

Page 143

I worked for KPMG and PricewaterhouseCoopers for approximately seven or eight years, left -- left public accounting, did finance roles for various entities, publishing, printing, went to work for a family office entrepreneur, spent 12 years with that individual in various roles, finance roles, operational roles, pretty much doing the exact same thing that I did when I went to work with Daryl, starting companies and building companies.

And then an attorney friend of mine introduced me to Daryl Heller and I started working for Daryl as a consultant in August of 2018.

MR. VOSS:  Okay.  Thank you, sir.  I have no further questions.

MR. BOYLE:  Okay.  We are finished.

(The deposition concluded at 12:45 p.m.)

THE REPORTER:  Do you want him to read and sign?

MR. BOYLE:  He will read and sign.

THE REPORTER:  And then do you need a copy of the transcript?

MR. BOYLE:  I don't believe so.

- - -

E R R A T A     S H E E T

- - -

PAGE          LINE          CHANGE

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

_____      _____      _____

Deposition of Barry Rynearson                    In re Investigation of C & D, et al. v. Paramount Management Group, LLC

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I,                        , do hereby

 4   certify that I have read the foregoing pages and

 5   that the same is a correct transcription of the

 6   answers given by me to the questions therein

 7   propounded, except for the corrections or

 8   changes in form or substance, if any, noted in

 9   the attached Errata Sheet.

10

11

12

13

14
         _____    _____
15        Date          Signature

16

17

18

19

20

21

22

23

24

25
```

Deposition of Barry Rynearson                    ...stig... ...t al. v. Paramount Management Group, LLC

1          I hereby certify that the proceedings

2     and evidence are contained fully and accurately

3     in the notes taken by me on the within

4     proceedings and that this is a correct

5     transcript of the same.

6

7

8

                    Hillary Hazlett Walsh, Reporter
9                   Notary Public

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## WORD INDEX

< $ >

**$242,310**  135:*12*
**$34,945,085.48**  86:*24*
**$35,201,490**  95:*3*
**$375.86**  83:*6*
**$4,145.03**  87:*19*
**$500,000**  88:*25*
**$550,000**  98:*15*
**$94,050**  82:*16*

< 1 >

**1**  3:*9*  6:*10, 11, 13, 17*
*32:15*  66:*19*  69:*18,
19, 20*  70:*2*  91:*21*
*99:24*  102:*18*  105:*14*
*118:18*  119:*4*  132:*12*
**1.2**  97:*7*  99:*16, 19*
**10,000**  125:*18*
**100**  10:*9*  54:*7*  55:*8*
*61:11*  65:*19*  76:*7*
*77:7*  130:*17, 18*
**101**  103:*8, 15*  106:*23*
*107:2*
**102**  3:*13*  105:*13, 17*
*106:14*
**108**  3:*14*
**1099**  10:*11*
**11**  85:*7*  87:*14*
**111**  3:*15*
**114,000**  94:*6*
**114/23**  3:*22*
**117**  3:*16*
**12**  143:*6*
**12/3/24**  67:*21*
**12/31**  89:*20*
**12/31/2020**  100:*23*
**12/31/2021**  3:*12*
**12/31/2024**  66:*13*
**12/31/21**  89:*8, 21*
*97:23, 25*  100:*23*
**12/31/24**  66:*11*
**12:45**  143:*19*
**123**  106:*9, 10*
**127**  106:*21, 22*
**129**  107:*9*
**12th**  92:*11*
**13**  138:*2*

**1339**  2:*15*
**138**  129:*22*
**14**  87:*15*
**140**  10:*1*  19:*12, 18*
*29:16, 20*  30:*8, 24*
**16-page**  82:*9*
**17601**  2:*7*
**18**  20:*22*
**19**  44:*14, 21*
**19107**  2:*16*
**1st**  88:*16, 21*

< 2 >

**2**  3:*10*  6:*24*  68:*3, 5,
6, 14, 15*  112:*17, 20*
*119:20*  132:*12*  134:*7*
**2.7**  106:*21, 22*  107:*4*
**2.9**  101:*11*
**20**  67:*18*  92:*10*
*111:23*  112:*8, 9*
*113:7*
**2000466867**  117:*14*
**2018**  9:*5, 16, 17, 20*
*14:14*  25:*20*  130:*14*
*143:15*
**2019**  33:*15*  54:*5*
*66:1*  134:*1*  135:*9*
*138:7*
**2020**  13:*10*  54:*6*
*64:25*  99:*21*
**2021**  25:*21*  90:*16*
*104:17*
**2022**  59:*12*  64:*25*
*78:19*  84:*10*  88:*17,
22*  92:*10, 11, 21, 22*
*97:23*  98:*13*  104:*3, 7*
**2024**  3:*16*  9:*6, 20*
*13:10*  14:*15*  25:*25*
*26:7*  28:*12*  29:*10*
*33:23, 25*  34:*1, 6*
*44:14*  62:*19*  66:*25*
*70:13*  112:*17*  117:*4*
*118:22*  126:*5*  127:*15*
*136:20*
**2025**  1:*10*
**203**  84:*18, 21*
**207**  84:*23*
**21**  25:*21*  66:*11*
*67:19*  69:*2, 3, 6, 8*
*71:10, 18, 25*  74:*2, 3,*

**4**  111:*18*  112:*6*
*113:6*
**217-2400**  2:*17*
**21-million-dollar**
*68:22*  71:*7*  77:*22*
**22**  37:*19*  67:*18*
**22ish**  66:*4*
**22nd**  92:*20*
**23**  37:*19*
**24**  28:*23*  33:*5*  52:*2,
3, 5*  69:*4, 5*  70:*8, 9,
25*  71:*15*  114:*8, 12*
*116:8, 9*
**242,000**  138:*10*
**242,310**  135:*10*
**25**  7:*20*  30:*16*  59:*10*
*74:23*  75:*5*  76:*4*
*77:9*
**26**  100:*19*
**260**  99:*25*
**280**  1:*13*  2:*6*

< 3 >

**3**  3:*11*  68:*17*  69:*5*
*76:4*  78:*13, 17*  92:*5,
9*  93:*13*  94:*1, 3*
*95:12*  99:*2*  100:*9*
*103:3, 25*  105:*9*
*119:23*  132:*13*
*142:10*
**3.3**  134:*4*
**3.85**  89:*16*
**30**  30:*16*  48:*25*
*110:23*
**300**  2:*6*
**31**  78:*19*  84:*10*
*90:16*  96:*24*  110:*23*
*118:22*
**31st**  88:*16, 22*  92:*22*
*97:23*  99:*21*  104:*2, 3,
7, 17*
**32**  100:*13, 25*
**32.3**  100:*13*
**34**  88:*9, 14, 24*  98:*9,
17*
**34.4**  98:*4*
**34.5**  98:*11*
**34.9**  87:*7*  98:*15*
*99:1*  103:*25*  104:*1*

**35**  95:*10*  96:*11*
*98:10*
**35,445,085**  104:*23*
**35.4**  98:*11, 24*
**35.445**  98:*18*
**37**  83:*5*  117:*9, 12*
*118:10, 11*
**39**  104:*9, 25*

< 4 >

**4**  3:*5, 12*  76:*4*  82:*9*
*90:14, 22*  92:*10*
*93:13*  94:*1, 3, 5*
*96:12*  99:*2*  100:*9*
*103:3*  104:*12, 16*
*105:9*  106:*16*  132:*13*
*142:11*
**4.2**  137:*24*  138:*9*
**40**  95:*18*  104:*9, 25*
**40,000**  106:*10, 11*
**40686**  1:*23*
**45**  48:*25*

< 5 >

**5**  3:*13*  102:*7, 8*
*104:10*  105:*5*
**50**  30:*19, 20*  76:*18*
**500**  2:*15*
**500,000**  88:*2, 3, 11,
23*  89:*6, 7*  97:*19*
*99:6, 8, 11, 12*
**556-1072**  2:*8*
**56**  111:*22*  113:*3*

< 6 >

**6**  3:*9, 14*  80:*14*
*107:14, 15, 24*  108:*6*
**60**  30:*13, 14*
**68**  3:*10*

< 7 >

**7**  3:*15*  106:*15*
*108:16*  111:*3, 14*
*117:24*  118:*25*
*132:10, 19*
**7,027,000**  106:*16*
**7.4**  103:*17*  107:*5*
**7/31/2022**  3:*11*
**70**  75:*16*  76:*14*

**700** 129:*12*
**717** 2:*8*
**73** 95:*13*
**73.3** 83:*21* 84:*10*
**77/12** 3:*20*
**77/25** 3:*21*
**771** 2:*17*
**78** 3:*11*

**< 8 >**
**8** 3:*16* 117:*1, 17*
119:*4*
**80** 109:*15*
**83** 30:*15* 58:*24* 61:*4*
87:*5* 89:*23* 96:*16*
106:*11*

**< 9 >**
**9** 1:*10* 106:*9, 10, 11*
**9:53** 1:*17*
**90** 3:*12* 22:*23*
**90th** 22:*21*
**94** 119:*5*
**94,000** 119:*4, 5*
**99** 32:*14*
**99,987** 134:*10, 11*

**< A >**
**a.m** 1:*17*
**Aaron** 14:*19* 16:*14*
**ability** 6:*6*
**able** 14:*19* 15:*21*
25:*23* 39:*9, 21* 41:*15*
54:*13* 56:*20* 68:*25*
82:*3* 116:*8*
**abroad** 141:*8, 9, 11*
**academic** 142:*20*
**access** 52:*11, 14, 18*
70:*14*
**Accordo** 32:*15*
**account** 18:*20* 19:*7*
36:*15* 49:*13* 107:*8*
108:*3, 5* 110:*1, 5*
119:*17, 20* 120:*1, 3*
122:*25* 123:*13, 15*
124:*7, 9*
**accountant** 15:*24, 25*
16:*3, 6* 112:*3*
**accountants** 113:*25*

**accounting** 15:*7*
16:*5, 21* 23:*18* 27:*8,*
*11* 83:*1* 91:*15* 107:*8*
113:*14* 116:*5* 124:*18,*
*20* 142:*25* 143:*3*
**accounts** 120:*17*
**accurate** 96:*1*
**accurately** 146:*2*
**achieve** 11:*4*
**ACKNOWLEDGMEN
T** 145:*1*
**acquisition** 13:*15*
**Action** 1:*2*
**active** 48:*7, 13*
**actual** 69:*21* 120:*21*
**add** 25:*5* 69:*2*
**added** 71:*18* 106:*23*
107:*4, 5* 118:*4*
**additional** 87:*7* 88:*6*
90:*8*
**adjusted** 134:*7, 20*
135:*4, 6*
**adjustment** 84:*7, 18*
95:*8* 100:*12* 101:*17,*
*20*
**adjustments** 95:*24*
**admit** 102:*12*
**advice** 75:*25*
**affixed** 79:*12*
**agenda** 46:*6, 12, 14*
**ago** 11:*12* 12:*10*
19:*10* 23:*2*
**agree** 28:*4* 106:*21*
117:*23* 134:*11*
137:*22* 138:*5, 16*
**agreement** 58:*23*
63:*21, 23* 135:*16*
**ahead** 34:*23* 87:*15,*
*23* 142:*4*
**aid** 11:*6*
**ajj@saxtonstump.com**
2:*10*
**akin** 20:*9*
**al** 1:*3*
**alarming** 37:*13, 14*
**Alec** 2:*5*
**American** 18:*21*
**AMEX** 19:*1, 4, 5, 7*
**amount** 44:*14* 82:*15*
84:*8* 87:*4* 96:*20*

112:*14* 113:*5* 119:*1*
122:*15*
**amounts** 44:*2* 45:*2*
61:*4*
**analogous** 103:*24*
113:*7*
**and/or** 77:*4, 5*
**answer** 5:*1, 2, 16*
28:*3* 30:*11, 21* 34:*18,*
*20* 35:*1* 53:*15* 69:*7*
78:*5* 82:*4* 89:*4, 9*
97:*16* 123:*11* 124:*1*
142:*4*
**answered** 76:*10*
**answers** 6:*1, 7* 23:*3*
120:*12* 145:*6*
**anybody** 7:*25* 19:*7*
23:*8* 51:*12* 52:*3, 6*
113:*9, 18* 115:*24*
131:*10*
**anymore** 38:*2*
**anyone's** 45:*25*
**apart** 92:*16*
**apologize** 46:*16* 51:*6*
96:*9* 117:*9, 12*
**appeared** 8:*1* 45:*11*
**appearing** 8:*12*
**appears** 79:*10*
106:*22*
**applied** 80:*17* 109:*17*
**appreciate** 74:*6*
133:*19*
**appropriate** 124:*22*
**approximate** 29:*16*
**approximately** 10:*1*
111:*18* 143:*2*
**April** 9:*6, 10, 20*
25:*25* 28:*23* 29:*10,*
*14* 32:*17* 33:*5* 35:*21*
37:*19* 40:*21* 44:*13*
47:*13* 52:*2, 5* 136:*20*
**art** 81:*1* 125:*16*
**aside** 81:*8*
**asked** 36:*21* 50:*2*
51:*9, 22* 58:*25* 97:*18,*
*25* 99:*7* 123:*21*
135:*23*
**asking** 34:*9* 36:*16*
49:*23* 50:*19* 51:*6, 15*
70:*18, 19* 76:*16*

103:*2* 124:*17, 18*
129:*24* 134:*16* 138:*9*
**Asset** 107:*21*
**assets** 122:*1* 128:*22*
138:*25* 139:*14, 22*
140:*23* 141:*14, 22*
142:*1, 6*
**associated** 139:*3*
**assume** 5:*17* 57:*24*
**assuming** 119:*2*
**ATM** 20:*23* 23:*5*
41:*18* 42:*3* 43:*15, 16*
47:*18* 57:*8* 59:*19*
60:*6* 71:*25* 129:*6*
130:*10* 134:*21*
135:*20* 136:*10*
137:*15, 17, 18* 138:*14,*
*21*
**ATMs** 44:*21* 57:*7*
60:*1, 2, 3, 4* 63:*3*
128:*22* 130:*20, 25*
131:*1, 4, 6* 132:*4, 5*
134:*22* 135:*18* 137:*5*
**ATM's** 134:*13*
**attached** 145:*9*
**attend** 6:*20*
**attention** 68:*14* 79:*8*
87:*25* 90:*19* 95:*22*
96:*22* 118:*18*
**attorney** 8:*2, 4*
143:*12*
**at-will** 12:*15*
**August** 9:*5, 16* 92:*10,*
*20* 143:*14*
**Austin** 15:*23* 141:*18*
**authority** 142:*9, 14*
**Avail** 21:*21* 22:*2*
**available** 80:*19*
**aware** 18:*8, 15* 19:*3*
59:*13* 60:*17* 62:*15,*
*18* 73:*20* 121:*9*
122:*1* 125:*11, 23*
138:*23, 24* 139:*10, 12,*
*14, 16, 18, 20* 140:*3,*
*24* 141:*1, 4, 7, 12, 24*
142:*5*

**< B >**
**back** 13:*25* 27:*23*
34:*14, 22, 23* 35:*8, 13,*

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification   Page 44 of 68
Deposition of Barry Rynearson   Investigation et al. v. Paramount Management Group, LLC

20 36:19 61:2 83:15
85:7 97:15 98:13
99:13 101:13, 16
105:12 106:24 107:1,
3 109:23
**background** 8:19
142:20
**bad** 11:21 23:25
**bags** 127:7
**Baker** 15:24
**Balance** 62:7, 8 64:5
67:22 70:14 71:7
76:5 80:4 88:5, 6, 21
89:8, 20 90:3 92:21
93:6 99:20, 22
100:11 101:11, 14
103:1, 2, 4 104:18
105:8, 9, 11 106:2, 7,
15 108:18, 20 110:1
116:9 118:21, 24
121:7
**balanced** 61:16
**balance-Paramount**
89:16
**balances** 105:25
112:14
**bank** 36:15 49:12
50:25 51:2, 4 119:17,
20 122:11, 18 124:7
**banks** 120:14
**BARRY** 1:11 3:4
4:7
**Based** 45:13 55:5
82:6 92:21 107:7
**basic** 4:18 123:22
**basis** 10:18 17:8
24:13 58:16 80:9
85:8 112:4 123:16
**Bates** 90:19
**bathroom** 34:25
**beach** 122:4, 14, 17,
19 123:14 124:12
**Bear** 97:17
**bearings** 101:3
**beginning** 1:17 9:14
31:13 48:12 99:20
142:18
**behalf** 1:17 2:2, 12
70:6, 9

**behaved** 35:24
**behaving** 35:23
**believe** 4:16 13:9
16:20, 25 22:9 29:4,
16 32:14, 15, 18
38:17 43:1 50:11
61:24 63:10 64:22
65:18 67:12 73:23
77:14, 18 80:22 87:3,
11, 13 90:6 98:10
101:6, 10 103:19
107:9 111:17 112:22
113:5 116:1, 7, 8, 10
122:20, 21, 22, 25
129:8 130:25 136:14
137:4, 6 143:25
**belong** 124:15
**belonged** 55:14
**benefit** 58:18, 19
107:22 109:3
**benefited** 71:12
**best** 4:24 5:1, 5, 20
6:1 18:23, 25 19:2
21:25 46:8 112:25
**better** 47:8 76:23
**beyond** 128:11
**big** 69:11, 13 116:24
**bigger** 120:9
**biggest** 22:17
**billed** 19:5
**billing** 28:16
**billion** 47:23, 25
48:18 49:7
**Billions** 136:21
**bills** 129:6
**bit** 8:19 25:13
35:19 137:25
**Bitcoin** 139:11
**Bitstop** 24:18, 19
140:1, 2
**biweekly** 12:12, 16
**Blackford** 130:6, 10,
21 131:6, 24
**board** 18:5, 8 48:7
49:3 57:13 72:22
**bolded** 83:19 95:1
96:6
**book** 30:3 61:21
111:10
**bookkeeping** 67:11

**books** 33:17 49:25
52:11 61:18, 20 62:3,
5 64:3, 4 92:24
112:13 113:12
**bottom** 89:13 94:25
96:6 133:14 136:1
138:3, 4
**boutique** 20:8
**box** 83:18 105:14, 16
133:24
**boxes** 120:19
**Boyle** 2:13, 14 27:2,
5, 9, 12, 14 28:1, 5, 9
34:16 35:1 36:24
41:10 55:9 72:13
73:14 77:18 78:5
80:24 81:10 94:1
98:19 102:4 115:6
116:14 118:1 124:16
125:20 126:1 129:24
130:2 133:17, 21
142:3 143:18, 22, 25
**brand** 11:2
**break** 22:11 34:25
38:4, 5 49:11 78:7
102:1, 5
**Brett** 141:17
**bring** 109:20
**brokerage** 120:16
**bucks** 84:24
**build** 28:13
**building** 143:10
**built** 28:13
**bullet** 46:7
**Burkholder** 14:22
34:7 40:18 45:19
**Burkholder's** 33:24
**burnt** 35:18
**business** 20:6 43:14,
15 57:6 86:17
134:21 135:1 136:17
137:20, 21 140:15
**businesses** 21:4

< C >
**cake** 38:22
**calculated** 51:21 85:9
**call** 6:11 9:24 17:12
24:18 68:5 77:15

78:3 85:22 87:22
115:3
**called** 1:12 4:7
16:15 50:9, 23 87:17
114:14 117:4 130:6
132:9 133:24, 25
134:5 139:5
**calls** 40:15 116:20
**Cannabis** 13:4 33:11
72:1
**Cannibis** 7:19
**cap** 14:2 75:2, 4, 10,
11
**capacity** 49:1
**Capital** 9:1, 13
10:10, 15, 19 11:18
12:12, 19, 22 14:9, 14
15:8 17:6 18:6, 13,
14, 16, 19 19:5, 6, 8, 9,
16 20:5 22:19, 24
24:4, 11, 15 25:19, 24
26:1, 2, 4, 10 27:16
28:11, 14 29:6, 17, 21,
25 30:6, 14, 23 31:15
32:3, 9, 12, 13 33:1,
21 40:2, 5 43:3 48:5,
21 49:16 52:10, 21
53:21 54:14, 22, 23
55:1, 6, 14, 17 56:5, 8
58:12, 22 59:11
60:18, 19 62:2, 18, 20
65:10, 22 66:21, 22
72:8 75:11 78:18
80:1, 20 81:20 82:20,
22, 24 84:8 86:7
87:9 88:12 90:4, 15
91:22 92:2 94:11
96:20 99:13 101:18,
23 103:5 107:8, 10
108:23 109:1, 14
110:13 121:6 122:23
125:7, 8 128:9
130:18, 19 139:13, 21
140:4, 13, 17, 21
141:10 142:13
**Capital's** 89:23 107:8
**caps** 118:12
**card** 18:22, 23 19:1,
4, 5, 8, 9

**career** 35:16
**carried** 97:7 118:25
**carry** 4:18 86:23
117:14 118:14
**carrying** 103:10
**cars** 120:23
**case** 21:11 47:21
68:10 100:2 132:17
**cash** 20:24 21:7, 9,
14, 24 22:13 23:11,
13, 16 24:22, 24 25:6,
15, 16, 21, 22 26:8
28:15 39:9, 20 41:14
43:9, 12 46:11 47:7
60:1, 2 72:5 86:17
88:19 95:24 109:18,
19 110:3, 6, 22
115:10 122:16
125:12 127:1, 7
131:13, 19, 20, 21, 22
136:16 138:14
**CEO** 14:18
**certainty** 113:10
**certification** 4:4
**certify** 145:4 146:1
**CFO** 9:17, 21 10:15
16:7, 10 22:24 54:14
113:17 142:22
**Chairman** 57:13, 15
**change** 66:2 88:14,
21, 23 97:8, 11, 22
100:13, 17, 22 103:17
144:5
**changed** 88:25 89:1
114:16, 18
**changes** 145:8
**character** 36:9
**chart** 19:17
**Check** 12:13, 15
**checks** 12:16
**Chestnut** 2:15
**Chief** 14:22 15:6
**Choice** 13:15 74:12
75:19
**CI-24-06012** 1:5
**circling** 136:4
**Civil** 1:2
**Claim** 3:10 68:10
**clarification** 5:18

12:11 28:8 49:13
**clarify** 45:23 52:15
**clarity** 115:7
**class** 52:13
**clean** 56:11, 18
**clear** 25:1 48:16
**CLO** 15:1
**close** 84:16 115:16
**closest** 104:8
**closing** 92:23
**collected** 134:22
**collectively** 4:13
68:19 71:17
**Column** 103:14
104:6 105:17 106:1,
5, 6, 7, 20 109:6
110:4 111:22 112:20
113:3
**columns** 109:23
**come** 13:11 21:1
25:2 29:5 35:9, 13,
23 45:9 58:13 59:9
74:13 115:11 126:11
132:2
**comes** 133:15 138:1
**comfort** 59:8
**comfortable** 54:17, 24
**coming** 7:4 27:15
28:21 37:23 39:1
65:5 93:22 106:5
109:1 124:11
**Common** 1:1 4:14
81:3, 8
**Commonwealth** 1:16
**communicate** 48:4
85:14, 21 127:25
**communicated** 48:1
85:17, 19
**communicates** 36:20
**communicating** 35:25
36:6, 11
**communications**
46:23
**companies** 10:20
11:19 17:12, 13
20:17 26:5, 19 27:6,
15, 17 28:14, 17, 19,
25 29:20, 24 31:22
33:11 61:16 82:21
89:14 92:2 96:7

109:5 114:12 126:18
127:1, 4 143:10, 11
**companies/personal**
97:3
**Company** 7:19
11:24 12:25 13:1, 4
18:23 19:11 20:23
21:20 23:5 24:20
27:16 57:3, 10, 19
58:7 69:9, 11, 13, 25
70:1 71:25 91:23
94:12 95:9, 18 101:8
114:18, 19, 20, 21, 23,
25 115:5
**Company/Personal**
88:1
**comparative** 88:5
**complete** 5:2, 7
**completely** 35:10
36:9 56:11
**comply** 116:15
**component** 138:22
**comprises** 7:20
**computer** 55:18
56:11, 20 102:2
**Computers** 120:25
121:1
**concern** 35:22 37:10,
13 140:7, 10, 15
**concerned** 38:10
47:4
**concerns** 34:12, 18,
19 36:4 83:18 140:5
**concluded** 143:19
**conclusion** 124:17
**confused** 90:13
**confusing** 77:2
**consolidated** 13:19
30:4 42:14 67:24
70:15 132:17
**consolidating** 70:20
71:4 77:23
**constellation** 114:6
**consult** 84:13
**consultant** 9:14, 15
127:21 143:14
**consulting** 48:6 49:1
70:5 135:16
**contained** 146:2

**contentious** 127:22
**continue** 72:7 134:6
**continued** 66:23
**contract** 58:22 61:23
**contribute** 22:14
**control** 17:14, 15
57:20
**controlled** 17:22
**controller** 15:23
36:15 113:20
**conversation** 5:4
127:20 128:4, 12
**conversations** 44:1
49:4
**COO** 14:19
**copy** 39:25 40:3
143:24
**corner** 78:22 82:8
93:17
**corporate** 17:25
19:17 31:7 32:25
33:3 52:16 57:25
**Correct** 12:9 13:9
23:1 32:18 42:23
43:4 45:15 47:6
48:20, 22 49:17 50:3
60:14, 16 62:4 63:18
64:7 65:21, 23 66:14
67:1 71:1, 9, 23
80:18 81:21 86:2
87:10 96:21 100:20
103:6 105:3 110:12,
15, 17 126:7 135:11,
13 136:13 140:18
145:5 146:4
**corrections** 145:7
**correctly** 24:5 97:7
111:20 133:7
**cost** 134:5
**counsel** 1:12 4:3
76:1 77:16 78:4
94:2 115:3 125:24
**country** 20:23
**County** 1:1 4:14
**couple** 22:11 35:21
123:22 139:23
**course** 79:25 103:9
141:20
**Court** 1:1, 15 4:21
68:11

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification of Investigation Page 46 of 68
Deposition of Barry Rynearson                                            al. v. Paramount Management Group, LLC

cover 29:3 60:7
92:6 93:15 133:5
covered 29:15 42:8
create 79:25 80:2
85:4 92:25 93:3, 12
created 11:3 40:25
42:24 43:5 46:20
67:15, 17 79:6, 15, 22
80:6 91:5 119:7
132:22
creates 43:17
credentials 41:4
credit 19:8 50:10
63:21 65:2 110:6
crediting 109:19
Crypt 139:22
Crypto 138:25 139:2,
14, 18 141:17
C-Suite 14:17 20:25
54:2 115:9
Cultural 14:23
cumulative 106:2, 7
currency 125:14
139:18
current 8:20, 21
custodian 119:8
CV 142:21

< D >
Dan 14:22 33:23
34:6 40:18 45:19
Dana 15:22 16:14,
21 36:20 51:14
102:15 107:19
Danny 113:19 114:3
115:21
Dan's 34:4
Daryl 8:9 9:19
12:22 14:9, 18 16:22
17:5, 9 18:17 19:10
20:8, 21 23:7 31:12,
14 32:14 33:3 34:7,
9 35:23 36:10, 17, 25
37:17 38:24 40:17
42:7 43:5 44:20
45:5 47:18, 22 48:6,
17, 24 49:4 50:2, 19
51:18 52:23 53:4, 23
57:9 58:3, 14, 20, 24
59:15 60:25 65:15,

17, 19 71:22 72:5, 11,
18, 21 73:1 74:8
75:8 76:8 77:5 84:2,
3 85:10 122:24
123:2, 13, 17, 24
124:7 125:9 126:4,
22, 23 127:9, 23, 25
128:1 130:11, 14
131:25 132:21
134:24 136:8, 19
138:19 139:17 141:1,
20 143:10, 13, 14
Daryl's 10:20 18:19
20:12 45:13 116:4, 6
122:21 123:13 124:6,
25
data 41:7
date 9:7, 8, 9 92:20
104:18 106:6 145:15
dated 92:20 104:2
dates 14:20, 24 106:4
David 113:17 114:3
115:21
Davis 141:17
day 4:19 46:24, 25
days 48:25 49:1
day-to-day 10:18
17:7
dboyle@boylejasari.co
m 2:18
De 83:11 87:22
deal 126:5, 8, 11, 14
debit 109:18
debited 110:6
debt 41:21, 25 78:1
87:8 88:11 89:6
90:8 122:8, 10
135:24 136:7 137:23
138:7
debts 121:15
December 9:17, 20
47:16 90:15 99:21
104:17 130:13
decide 119:12
decision 72:9, 16, 19
decisions 17:16, 18, 20
decrease 89:7 100:2
deed 70:3
deeded 70:4

Deerfield 50:15, 21
Defendant 1:7
Definitely 17:17
22:16 25:8 30:9
31:11 34:2 131:16
141:21
degree 23:25
degrees 142:24
Dennis 2:14 57:3, 24
60:12, 13 122:13
141:16
department 15:7
DEPONENT 145:1
deposed 4:15
deposit 110:3 120:19
deposited 36:14
DEPOSITION 1:11
3:3 5:10 8:7, 10, 16
103:13 132:7, 10
143:19
deposits 28:25 29:3
49:12, 18 110:4
Depot 110:22
deps 5:5
describe 20:6, 8
98:19 133:6
described 12:8 59:4
61:22 62:1 67:11
90:8 137:8, 14
describing 105:17
description 103:19
105:17 106:14 118:6,
11 119:23
descriptor 105:14
designation 132:9
Detail 102:18 104:1
105:7, 10 108:4, 19
determining 85:11
difference 122:14, 18
133:11
different 28:24
35:10, 14 55:10
69:12 76:18 123:22
136:15 139:24
differently 47:11
digital 78:24 79:9
80:16 90:20
direct 68:13 79:8
82:2 87:25 90:18

93:24 96:22 115:19
118:18 140:9, 11
directed 112:5
116:14 118:4
direction 57:16
directly 49:2 73:6,
24 74:24
disburse 58:14
discovery 111:4
117:3 132:16
discuss 45:25 128:5,
8, 11
discussed 52:25
121:13, 16 140:24
discussion 38:20
48:23 126:20, 21
127:16 131:10
discussions 48:13
49:8, 9 52:1, 3, 6
displayed 102:13, 17
107:23, 25
distinction 27:5
distribute 65:8
distribution 18:18
24:14 58:12, 13 87:4
89:22 90:9 123:18,
19 124:24 125:3, 4, 6,
7
Distributions 12:13
21:2 24:7, 8, 10
25:23 28:16 55:7
58:17 59:4 60:25
96:15 109:12 110:11
124:21 127:10
dividend 39:21 43:10
dividends 21:1 24:4
36:5 41:15 55:7
60:23
division 139:2
document 39:22
46:17, 19 61:23 64:9,
11 67:19 68:4, 14
70:16 77:24 78:20
79:3, 12, 15, 22 80:22
81:7 82:3, 9 83:13
85:4 86:4 87:8
89:11 90:18 91:2, 4,
9, 21 100:6 103:7, 15
107:23 109:7 111:3,
5 112:10 117:2, 21

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification    Page 47 of 68
Deposition of Barry Rynearson    Investigation of et al. v. Paramount Management Group, LLC

118:*20*, *24*  119:*7*
120:*9*  132:*18*  136:*19*
**documentation**  36:*16*,
*18*  49:*24*  51:*8*  55:*4*
**documented**  61:*13*
62:*3*  63:*19*  67:*4*
**documents**  6:*24*  7:*3*
8:*15*  39:*16*  52:*25*
55:*13*, *15*, *16*  67:*19*
76:*25*  79:*23*, *24*
106:*18*  115:*4*  119:*10*
142:*10*, *15*
**doing**  11:*16*, *17*  21:*4*
49:*1*, *2*  79:*14*  80:*12*
116:*5*  117:*6*  126:*23*
143:*8*
**dollars**  44:*15*, *22*
47:*23*, *25*  48:*18*  49:*7*
59:*11*  66:*11*  67:*20*
69:*3*, *6*, *8*  71:*18*, *25*
83:*21*  84:*11*, *19*
87:*14*  88:*14*  95:*18*
97:*8*  101:*1*  103:*17*
111:*23*  124:*4*  129:*13*
137:*3*, *24*
**drill**  68:*1*
**Drive**  1:*14*  2:*6*  56:*1*
**drugs**  6:*5*
**due**  37:*19*  44:*2*, *18*,
*25*  45:*1*  62:*11*  83:*5*
87:*18*
**duly**  4:*8*
**duration**  14:*16*
**duties**  80:*1*

**< E >**
**earlier**  19:*12*  111:*17*
126:*4*  132:*20*
**early**  52:*2*
**earn**  59:*22*
**earned**  26:*4*
**earning**  26:*1*, *2*, *6*
28:*11*, *20*  29:*11*
**earnings**  22:*19*  54:*24*
**easier**  106:*19*
**Eby**  36:*6*  37:*4*, *6*, *25*
38:*7*
**educated**  86:*15*
**efforts**  7:*9*
**eight**  143:*3*

**either**  29:*20*  30:*7*
45:*2*  51:*16*  93:*13*
95:*25*
**elected**  127:*24*
**e-mail**  40:*5*  43:*4*
**e-mailed**  43:*2*
**employee**  10:*8*  12:*15*
19:*7*  31:*17*, *24*
114:*15*
**employees**  11:*10*
26:*17*  82:*22*  115:*9*
**employer**  8:*20*, *21*
**ended**  35:*21*  78:*18*
90:*15*  116:*7*  130:*14*
**engage**  17:*12*
**enterprise**  72:*1*
**entire**  14:*18*  19:*13*
32:*19*  34:*1*  35:*7*, *9*
94:*17*
**entities**  7:*20*  9:*24*
10:*1*, *3*, *5*, *21*, *22*, *25*
11:*16*  12:*2*, *23*  13:*16*,
*17*, *18*  14:*1*, *8*  16:*22*
18:*14*  19:*12*, *13*, *15*
23:*10*  29:*17*  30:*5*, *8*,
*18*, *19*, *20*, *24*  31:*12*,
*20*  32:*1*, *4*, *8*  50:*18*
54:*1*, *2*, *4*, *18*, *21*, *25*
65:*8*  67:*25*  68:*16*, *19*,
*23*  69:*5*, *12*  70:*8*, *10*,
*17*, *25*  71:*15*  74:*11*,
*13*  75:*22*  76:*19*
85:*23*  87:*18*  92:*3*
100:*8*  113:*24*  114:*8*
116:*6*  130:*6*, *9*
139:*24*  140:*3*  143:*4*
**entitled**  123:*19*
**entity**  7:*13*, *18*  10:*12*
11:*1*, *2*  12:*8*, *21*, *24*
13:*23*  14:*4*  16:*15*, *18*,
*20*  17:*3*  19:*22*, *24*, *25*
20:*3*  24:*18*, *23*  25:*13*
26:*11*, *14*, *23*  29:*23*
31:*17*  33:*18*  50:*9*, *12*,
*23*  58:*9*  64:*18*, *21*
65:*5*, *24*  67:*7*, *8*
69:*21*  70:*2*, *4*, *23*, *24*
72:*23*  73:*5*  75:*9*
76:*16*, *20*  85:*25*
104:*25*  114:*2*, *10*, *11*,

*13*, *14*  115:*8*, *11*, *12*
116:*1*  117:*15*  139:*21*
**entity's**  75:*10*
**entrepreneur**  143:*6*
**entry**  89:*12*  104:*9*
119:*17*
**environment**  38:*1*
**equally**  22:*14*
**equipment**  25:*19*
125:*18*
**equity**  12:*25*  20:*9*
**Erin**  15:*1*
**Errata**  145:*9*
**error**  85:*5*
**Esquire**  2:*4*, *5*, *14*
**essentially**  21:*4*
92:*15*
**established**  16:*21*
33:*10*  65:*14*
**estate**  11:*19*  70:*2*
141:*7*, *11*
**estimate**  5:*25*  22:*20*
61:*8*  112:*11*
**estimates**  5:*24*
**estimation**  141:*13*
**et**  1:*3*
**Ethereum**  139:*11*
**evaluations**  96:*1*
**evasive**  124:*1*
**Everest**  1:*15*, *23*
**everybody**  47:*23*
114:*11*
**evidence**  81:*9*  146:*2*
**exact**  9:*8*, *9*  44:*9*
70:*21*  102:*22*  112:*14*
143:*8*
**exactly**  5:*7*  44:*2*
84:*16*  104:*24*  137:*13*
**examination**  1:*12*
3:*2*  4:*9*  45:*16*
**example**  11:*5*, *18*, *21*
20:*19*, *20*  47:*14*, *15*
106:*9*  137:*17*
**examples**  12:*1*
**exceeded**  44:*25*
**Excel**  86:*3*  107:*20*
**excess**  44:*21*
**excluded**  52:*20*
**Excuse**  66:*7*  96:*18*
**executed**  64:*24*

**executive**  18:*2*
141:*18*
**EXHIBIT**  3:*8*, *9*, *10*,
*11*, *12*, *13*, *14*, *15*, *16*
6:*10*, *17*  68:*6*  78:*13*
90:*14*, *22*  93:*13*  94:*1*
95:*12*  98:*6*  102:*6*, *8*
103:*3*, *16*, *25*  104:*10*,
*12*, *16*  105:*5*, *9*
107:*15*  108:*6*  111:*2*,
*14*  116:*25*  117:*1*, *17*,
*23*  118:*24*  119:*4*
132:*10*, *19*
**EXHIBITS**  3:*7*
**exist**  13:*3*  141:*23*
**existed**  40:*5*, *24*  55:*6*
97:*25*  116:*9*
**exists**  7:*18*
**exit**  126:*18*, *24*  127:*2*
**expansion**  25:*18*
**expected**  84:*21*  125:*2*
**expenditures**  65:*10*
**Expense**  87:*18*
**expenses**  27:*22*  29:*3*
133:*16*  134:*6*  135:*25*
**experience**  107:*7*
**explain**  43:*7*  51:*23*
142:*21*
**explanation**  51:*18*
72:*3*
**Express**  18:*22*
**extent**  15:*20*
**External**  55:*25*

**< F >**
**face**  92:*10*, *11*
**fact**  37:*22*  47:*21*
85:*4*  94:*21*  140:*6*
**factory**  56:*19*
**failed**  63:*8*
**failing**  15:*17*
**Fair**  17:*22*  30:*21*
58:*25*  77:*4*  84:*3*, *6*,
*18*  85:*8*, *12*, *24*  94:*20*
95:*7*, *23*, *25*  100:*18*,
*24*  117:*22*  123:*7*
**falling**  27:*10*
**familiar**  16:*15*  32:*22*
56:*25*  57:*2*  122:*4*
126:*2*  127:*6*  128:*15*

130:5  131:13, 20
134:15
**family**  20:10, 13
29:23  143:5
**famous**  78:10
**fancy**  103:12
**far**  10:14  22:16
83:14
**Farabaugh**  15:1
**fast**  78:9
**February**  33:22, 25
34:6  112:17
**February/March**  93:2
**fee**  28:19  59:20
82:12  94:6, 14
**feel**  15:15  47:9, 11
**fees**  59:18, 23  60:7
82:20  134:21
**felt**  47:8  54:13, 17,
24
**fend**  36:8
**fifth**  24:23
**Fifty**  76:18
**figure**  108:21  115:19
**file**  19:22
**filed**  19:21  26:21
57:25
**files**  7:11, 12, 14
56:1, 8, 10
**filing**  4:4
**Finance**  8:24  83:1
141:16  143:4, 7
**finances**  17:14, 23
57:21
**Financial**  3:16  9:15
11:9  16:16  17:16, 18,
20  52:19  54:17, 20
81:15, 25  117:4
**Financially**  11:17
**financially-troubled**
10:21
**Financials**  52:16
53:2, 3  66:10  70:15,
20  71:6  77:23, 25
78:1, 4  93:4
**find**  7:6  94:24
104:6, 18  116:21
142:1
**fine**  15:16  81:10
83:16  120:9  125:16

**finish**  4:25  41:10
72:13  73:15
**finished**  143:18
**firm**  20:9
**first**  35:2  37:5, 12
47:16  54:7  65:13
74:10, 17  77:6  109:6
110:22  129:4
**five**  15:11  61:10
**five-million-dollar**
37:16, 18  51:19, 21
**flags**  37:2
**Flash**  56:1
**flights**  127:6, 7
**flip**  83:15
**Florida**  34:1  35:7
**flow**  20:3, 24  21:7, 9,
24  23:13, 16  24:10,
12, 24  25:7, 15, 16, 21,
22  28:15  39:9, 20
43:10, 12  47:8  86:17
95:24  105:25  106:1
115:10  136:16
138:14
**flowed**  21:14, 25
23:11  41:15  46:11
62:25
**flowing**  24:22  72:5
108:22  127:2
**flows**  88:20
**FMB**  100:10, 12
**focus**  46:9  54:3  94:5
**focused**  10:20
**focusing**  137:23
**Fogleman**  14:19
16:14
**folks**  14:17  15:10
115:20
**follow**  17:25  23:2
38:19  46:22  116:17
**follows**  4:8
**followups**  38:4  142:8
**font**  117:8
**foregoing**  145:4
**forget**  131:17
**forgetting**  15:15
**form**  4:5  74:13
80:25  142:4  145:8

**formal**  61:22, 23
63:22  64:9, 10, 23
67:10
**formalities**  17:25
58:1
**format**  41:3  102:16
107:20  111:4  117:3
142:21
**formed**  17:3  26:23
33:14  65:15, 24
**forth**  134:22
**forward**  118:25
**four**  15:19  22:14
74:25  84:24  135:25
**fourth**  20:23  22:6
23:5  94:5
**Frank**  13:2  113:19
114:3  115:21
**frankly**  138:13
**fraud**  81:3  128:13
**fraudulent**  80:23
81:12
**friend**  143:12
**friends**  20:13
**front**  25:2  36:7, 12
132:21, 24
**full**  20:25  50:13
52:18  54:2  64:18
**fully**  146:2
**Fund**  1:3
**funded**  122:7, 16, 22
124:8, 23
**funding**  72:23
**Fundonatic**  50:23
**Funds**  4:13  18:12,
13, 16  25:17  36:14
109:14  110:7  123:5,
12, 25  124:3, 6, 24
129:1, 10  130:6, 10,
11, 15, 17, 21  131:6,
25  133:5
**furnish**  116:9
**furnishing**  36:17
**further**  143:17

**< G >**
**game**  127:3
**GCC**  13:11, 20, 25
14:2, 3, 5  70:21  71:6
74:8, 9, 11, 14, 18, 21

75:13, 15, 16, 21  76:3,
6, 7, 13, 14  77:7, 8, 10
**gears**  104:17
**general**  59:24  85:18
121:19  142:14, 19
**generally**  8:22  52:11
56:25  101:22  108:13
128:15
**generating**  20:24
23:15  43:16  140:16,
20
**getting**  36:5  52:24
97:13  129:22
**gifts**  141:4
**girlfriends**  141:1, 5
**give**  4:17  14:20
20:18  21:11, 19
31:10  36:22  51:18
53:4  69:10  70:21
72:19  73:6  77:1, 19
84:15  142:9, 13, 19
**given**  39:25  47:17
72:3  75:25  145:6
**glad**  77:17
**glasses**  118:1
**Glorious**  3:15  7:12,
16, 18, 19  11:4  12:25
13:4, 14  25:15, 16
30:16, 17  48:6, 7
49:2, 3  50:22  58:8
65:9  66:18  67:2, 4, 7,
8, 20, 24, 25  68:20, 23
70:6, 20  71:11  72:6,
7, 20  73:7, 24  111:6,
18  113:13, 24  114:5
117:13  118:13
127:18, 22  128:3
140:6, 10
**go**  8:18  11:3  27:3,
23  33:23  34:23  61:8
73:2  78:9  82:21
83:3  90:1  94:21, 23
97:15, 24  98:13
99:22, 23, 24  102:3
104:3, 13  105:12, 13
106:13  107:1, 3
109:22  120:11
138:23  139:8  140:2
142:4
**goal**  126:22

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification Page 49 of 68
Deposition of Barry Rynearson                                    Investigation et al. v. Paramount Management Group, LLC

**goes** 39:3 81:5
106:10, 15 132:12, 13
**going** 4:17 5:7, 13
13:11 14:19, 24
23:17 25:9, 10 34:3
35:11 38:3 39:20
47:7, 20, 22, 24 48:9,
17 49:6 57:19 66:1
68:1, 25 69:2 77:15
80:24 82:7, 9 83:3
86:21 87:16 90:2
97:15 99:18 100:10,
17 102:1 105:13
111:2 124:16 127:22
131:16 140:5, 7, 10,
15 142:3
**Good** 4:11 6:9
20:20 29:16 42:10
78:8 89:2 98:4
117:25
**goods** 134:6
**graduated** 142:24
**Granite** 1:13 2:6
**Great** 74:3
**gross** 133:17
**Group** 1:6 4:12 9:1
12:5 16:16 19:13
21:16, 20 22:1, 2
33:1 39:8, 20 52:21
55:14 71:11 78:18
80:1 82:22 83:20
87:9 88:12 89:15
90:15 91:22 92:2
94:11 95:2 108:17
109:15, 16, 24 110:2,
8 128:16, 19 130:5
139:10
**grouping** 94:25
**grow** 72:7
**growth** 72:25
**guess** 5:23 86:14, 15
109:4 110:9
**guesses** 5:22 129:21
**guy** 23:24 141:16

**< H >**
**half** 15:3 47:22, 25
48:18 49:6 54:7
88:1

**halfway** 82:11
**Haller** 132:1 141:18
**Halo** 75:6 76:4
**hand** 90:12 102:18,
19 111:2
**handing** 6:12 39:16
78:16 90:13 102:11
107:14 117:1
**happen** 58:15 61:6
73:8 110:21
**happened** 66:3
**happens** 82:8
**happy** 116:15
**hard** 55:25
**Hazlett** 1:15 146:5
**HC** 102:18
**HCBS** 107:21
**HCG** 119:17, 20, 25
120:3
**head** 5:12 114:9
**header** 83:14
**headers** 103:9
**hear** 37:5 38:22
131:9
**heard** 50:16 131:21
**hearing** 37:12, 14
**held** 84:4
**Heller** 8:9 9:1, 12,
19, 24 10:10, 15, 19
12:12, 18, 22 14:8, 14,
18 15:8 17:6 18:5,
13, 14, 16, 19 19:5, 6,
8, 9, 16 20:5, 22 21:2,
3 22:19, 23 24:4, 11,
15 25:24 26:1, 2, 4,
10 27:16 28:11, 14
29:6, 17, 20, 21, 25
30:6, 14, 23 31:15
32:3, 8, 12, 13, 22
33:1, 4, 6, 7, 9, 19, 21
34:7 36:25 40:2, 5,
18 42:7 43:3 45:5
48:5, 21 49:16 52:10,
21 53:20 54:14, 22,
23, 25 55:6, 14, 17, 19
56:5, 8 58:3, 10, 11,
14, 20, 22 59:11, 15
60:17, 19 62:2, 18, 20
65:19, 22 66:21, 22
74:20 75:3, 4, 8, 11

76:8 77:5 78:18
80:1, 20 81:20 82:20,
22, 24 85:10 86:6
87:9 88:11 89:23
90:4, 14 91:14, 22
92:1 94:11 95:20
96:20 99:13 101:18,
23 103:4 107:7, 8, 10
108:23 109:1, 14
110:13 121:6 122:23
125:7, 8 126:17
127:10, 13 128:9
130:11, 18, 19 131:25
137:8 138:19 139:13,
17, 21 140:4, 13, 16,
20 141:2, 10, 20
142:13 143:13
**Heller's** 14:9 16:22
17:5 36:15 49:12, 15
**Help** 10:6 15:14
17:15 83:2 89:21
93:24 119:9
**helpful** 108:12
**helps** 78:21 98:3
**hey** 73:9
**high** 22:21
**higher** 138:8, 10
**highlighted** 118:7
**HIH** 75:14 76:3, 20,
22 77:4, 8
**Hillary** 1:14 146:5
**hired** 9:15, 17
**hiring** 11:10
**hold** 25:20 33:10
55:16 75:15 82:9
83:3 86:21 87:16, 24
94:23 96:25 100:7
104:20 106:25
**holding** 27:6, 16
69:25 71:6 75:13, 16,
17, 21 76:7 93:25
102:17
**Holdings** 13:2, 6, 11,
13, 20 14:1, 2, 3, 5
32:23 33:2, 4, 6, 7, 9,
19 69:18, 24 70:22
74:8, 10, 12, 14, 18, 20,
21 75:3, 5, 8, 19 76:6,
13, 14 77:8, 9, 10

**home** 45:25 55:17,
20 56:2
**honest** 40:4
**honestly** 34:18 37:15
47:8 79:4 117:16
**Hopefully** 108:10
**hoping** 78:9 82:2
118:23
**hours** 35:17
**house** 33:24 34:4
122:5, 14, 17, 19
123:3, 14, 23, 24
124:12, 15
**HR** 83:1
**human** 5:4
**hundred** 22:11 44:8
55:2 110:17

**< I >**
**icing** 38:22
**idea** 44:10 80:6
83:9 86:11 87:20
93:21 94:13 95:17
119:17, 21, 23 120:6
121:18 126:8 129:16,
18 130:23 131:5
132:5 136:5, 18
**identification** 6:18
68:7 78:14 90:23
102:9 108:7 111:15
117:18
**identify** 14:15 69:1
115:4 116:2
**impede** 6:6
**impediments** 6:5
**impetus** 128:3
**important** 22:15 28:7
**included** 125:5
**including** 23:11
**income** 26:5 27:22
28:21, 22 30:2 43:17
44:21, 24 59:11
133:8, 9, 12, 17 134:8,
19, 20, 24, 25 135:5, 7
136:12, 17 137:2, 25
138:8, 22
**incoming** 108:25
125:8
**increase** 89:6 100:2,

*3*
**independent** 45:*16*
**indicates** 93:*21*
**indicating** 97:*1*
**Indicators** 11:*11*
**indirectly** 75:*1*
**individual** 15:*4* 20:*4*
122:*25* 124:*7* 143:*7*
**individually** 123:*10*
**industries** 20:*19*
**influence** 6:*4*
**information** 29:*12*
54:*15* 81:*16* 85:*15*,
*17*, *18*
**i-n-g** 71:*5*
**in-person** 45:*24*
**insanely** 107:*16*
**inside** 69:*13* 70:*4*
76:*17*, *22* 77:*5*
130:*20*
**instructed** 56:*14*
**instructions** 4:*18*
**insurance** 121:*18*, *19*
**intercoming** 121:*6*
**interest** 13:*12* 31:*16*,
*18*
**interested** 10:*16*
94:*22* 96:*5*, *8*
**intermingling** 18:*12*,
*13*
**interpreted** 137:*14*
**interrupt** 27:*2*
**introduced** 143:*13*
**invested** 20:*13*, *14*
29:*22* 70:*1* 84:*8*
129:*10*
**investment** 11:*4*
13:*25* 14:*3*, *5* 17:*10*
21:*16* 22:*1* 32:*23*
33:*2*, *4*, *6*, *7*, *9*, *10*, *19*
74:*10*, *12*, *18*, *20*, *21*
75:*3*, *4*, *8*, *16* 76:*3*, *6*,
*7*, *13*, *14* 77:*7*, *9*, *10*
83:*19* 84:*1*, *3*, *7*
89:*14* 90:*1*, *2* 92:*4*
95:*2* 107:*21* 108:*16*,
*17* 109:*17*, *20*, *21*, *22*,
*24* 110:*1*, *7* 128:*16*,
*19*

**investments** 58:*15*
84:*5* 89:*14* 109:*5*
129:*19*
**investors** 36:*1*, *11*
37:*7* 38:*9* 39:*10*
41:*16* 43:*11*, *18*, *20*
44:*11* 135:*3*
**involved** 30:*10*
**involvement** 139:*25*
**IOU** 61:*23* 64:*9*
**iso** 110:*22*
**issue** 77:*17* 91:*18*
**issues** 116:*5*
**issuing** 14:*4*
**its** 19:*22* 20:*6* 21:*3*
25:*20* 27:*19* 29:*3*
52:*11* 59:*22* 72:*7*
92:*9*, *11* 102:*16*
103:*19* 111:*4* 112:*13*
117:*3* 132:*9*

**< J >**
**January** 80:*10* 88:*16*,
*21*
**Jasari** 2:*13*
**Jersey** 122:*5*
**jet** 127:*7*
**Job** 1:*23* 10:*19*
117:*6*
**Johnson** 2:*5* 27:*21*
**Josh** 11:*5* 14:*20*
15:*24* 16:*1* 21:*23*
31:*9* 37:*15* 44:*24*
61:*3* 77:*1* 79:*13*
84:*16* 88:*13* 100:*22*
112:*7* 118:*7* 119:*2*
**Joshua** 2:*4* 4:*12*
**judgment** 47:*16*
129:*22*
**July** 78:*19* 80:*11*
84:*10* 88:*16*, *22*
92:*11*, *22* 97:*23*
98:*13* 104:*2*, *3*, *6*
118:*22*, *25*
**jump** 78:*23* 83:*12*
87:*15*, *23* 96:*3*
106:*17*
**jumped** 74:*5*
**jvoss@saxtonstump.co**

**m** 2:*9*

**< K >**
**K-1** 12:*13* 13:*10*
14:*1* 59:*9*, *11*
**K-87** 106:*9*
**keep** 25:*9* 33:*17*
52:*1*
**kept** 113:*13*
**Key** 11:*11*
**kidding** 37:*8*
**kind** 10:*17* 16:*11*
32:*25* 36:*7* 37:*23*
61:*13* 69:*10* 94:*25*
112:*1* 125:*16* 138:*25*
139:*23* 142:*21*
**knew** 35:*5* 37:*21*
118:*3*
**know** 4:*13* 5:*6*, *11*,
*24* 8:*12* 16:*9* 17:*2*, *3*
19:*19* 23:*17* 30:*18*
31:*9* 32:*11* 34:*18*, *20*
36:*3*, *4* 40:*2*, *12*, *13*
41:*1* 43:*24* 44:*2*
48:*3* 49:*23*, *24* 50:*12*,
*13* 51:*11*, *20* 57:*2*, *3*,
*22*, *23*, *25* 58:*2*, *3*, *5*, *6*
60:*9*, *10* 61:*12* 63:*4*,
*5*, *8*, *12* 66:*9*, *17*, *19*,
*20* 67:*18* 68:*19* 69:*1*,
*7* 72:*24* 73:*19*, *21*, *22*
74:*22* 76:*5* 77:*1*
79:*18* 87:*13* 88:*6*
92:*19* 101:*3* 105:*19*,
*20* 110:*21* 112:*4*, *8*
113:*9*, *10*, *15*, *23*, *24*
114:*2*, *6*, *23* 116:*4*, *18*
119:*6*, *10*, *15* 120:*12*,
*14*, *16*, *23* 121:*2*
122:*7* 123:*20* 125:*21*,
*22* 126:*11*, *16* 129:*3*,
*9* 130:*3*, *20* 135:*15*,
*17*, *21*, *22* 139:*1*
140:*6*, *19* 141:*14*, *25*
**knowledge** 8:*14* 16:*8*
18:*24*, *25* 19:*2*, *15*
24:*17* 30:*6* 43:*21*
44:*17* 60:*6* 61:*24*
63:*2* 65:*25* 66:*5*
112:*25* 124:*10*

127:*11* 130:*16* 140:*9*,
*11*, *13*
**KPIs** 11:*11*
**KPMG** 143:*1*
**Kutztown** 142:*23*

**< L >**
**Labs** 13:*15*
**Lancaster** 1:*1*, *14*
2:*7* 4:*14*
**laptop** 55:*25* 56:*2*, *3*,
*5*, *7*
**large** 13:*14* 121:*8*
**larger** 137:*25*
**largest** 20:*23* 23:*5*
**Law** 1:*2* 23:*25*
26:*24*
**lawsuit** 50:*21*
**layman's** 109:*18*
**Leaman** 60:*15*
132:*10*, *18*
**learn** 29:*5*
**leave** 45:*4*
**leaving** 35:*21* 36:*7*
**Ledgers** 52:*17*
**left** 25:*25* 28:*12*, *23*
29:*13* 32:*16* 33:*5*
48:*5* 51:*17* 66:*22*
76:*8* 87:*13* 109:*23*
143:*3*
**legal** 7:*20* 11:*9* 13:*9*,
*17* 30:*5* 75:*25* 81:*1*,
*2* 83:*1*, *2* 116:*4*
124:*17*
**legitimate** 41:*5*
**legitimately** 23:*22*
**Leininger** 15:*5*
**LendSpark** 105:*15*, *22*
**length** 7:*21*
**lengthy** 21:*8*
**letter** 116:*18*
**level** 13:*22* 16:*2*, *6*
17:*23* 72:*22*
**liabilities** 54:*25* 60:*8*
**liability** 37:*17*, *18*
51:*19*, *21* 71:*14*, *16*
121:*19*
**liked** 53:*14*
**line** 36:*12* 41:*17*, *20*
63:*21* 65:*2* 83:*5*

87:17  89:17  95:1, 15
96:5, 8  97:2  100:8
101:11  103:8, 14
104:5  105:13  106:22,
23  107:2  111:22
112:16  118:9, 10, 11
133:13, 14, 24  138:3
144:5
**lines**  36:7  82:2
86:22  87:17, 24
104:9, 24
**list**  21:8, 12  25:5
71:2
**listed**  68:16  69:5
92:3
**listened**  45:8
**listening**  45:21
**little**  8:19  25:13
35:18  77:4
**LLC**  1:3, 6  2:3  9:1
12:5  14:6  20:2  24:9
64:20  65:12  71:6
74:12, 18  78:18
83:20  89:15  90:15
95:3  139:10
**loan**  52:24  65:5
66:6  72:4, 9, 16  74:1
105:14  122:11, 13, 18
**loaned**  66:8
**loaning**  62:18, 20
71:25
**loans**  49:21  110:19,
20  121:11
**long**  30:11
**longer**  13:3
**look**  7:3, 9, 14  8:15
40:23  41:2  68:3
79:11  81:12  86:20
91:21  92:5  97:24
98:14  99:5  104:12,
20  105:24  106:19
108:13  109:2  111:8
117:10  132:25
133:25  135:24  138:2,
13
**looked**  7:11  44:19
86:16  94:15  118:15
**looking**  5:22, 24
14:16  17:10  27:21
37:2  55:23  83:15

84:17  94:17, 18, 24
98:6  104:5, 9, 14
105:8  109:6  111:7
115:14  116:19
**looks**  81:16  100:12
105:23  108:3, 25
111:9  134:14, 19, 20
135:20
**Loss**  39:13
**losses**  128:6, 8
**lot**  23:17  38:3  47:12
**lower**  16:6
**lowest**  16:2
**Luma**  16:16

**< M >**
**machines**  43:15, 16
47:18  59:19  135:21
137:12, 16
**maintenance**  60:3
**major**  17:16
**majority**  30:7, 21
31:4, 5
**making**  22:24  27:5
77:2
**man**  116:23
**manage**  17:11
128:23  131:4
**managed**  19:10
59:25  131:2  132:13
**Management**  1:6
3:11, 12  11:22, 23
12:5  28:18, 22  39:8,
20  54:18  55:1  78:17
80:3  81:18  83:20
88:12  89:15  90:14
91:18  93:3, 8, 17
94:14  95:2  105:1
108:17  109:15, 16, 24
110:2, 8  139:10
141:15
**managing**  11:10
17:13  43:15  132:4
**March**  33:22, 25
34:1, 2, 6  35:4, 6, 8
**Margo**  24:16  139:7,
8, 22
**mark**  102:6  107:13
**MARKED**  3:8  6:13,
17  68:6, 15  78:13, 17

90:14, 22  102:8
108:6  111:14  117:17
132:7, 18
**market**  84:3, 6, 18
85:8, 12, 25  95:7, 23,
25  100:18, 25
**marketing**  142:25
**marking**  68:3
**Mary**  120:5
**matched**  61:20
**matches**  104:24
117:23
**matching**  61:21
**materials**  7:6  55:23
56:21
**math**  23:25  69:4
**Matt**  36:6  37:4, 6, 24
38:7, 14, 20
**matter**  47:21  119:16
**matters**  45:25
**mature**  54:1
**mean**  7:17  9:18
11:1, 15  20:11  21:15
23:12, 24  24:1, 12
26:13  35:25  39:16
43:13  44:17  46:16
49:15  55:19  56:18
57:2, 17  59:20  62:6
80:2  81:2  92:1
109:21  121:1  122:2,
10, 12
**Meaning**  12:12
19:25  23:14  55:17
58:7
**means**  101:6, 15
**medium**  17:18
**meet**  72:7
**meeting**  18:2  33:23
34:5  35:5  40:7, 16,
25  42:7  45:4, 6, 17,
24  46:13, 20
**meetings**  18:3, 8
**member**  12:24  13:5
20:2  30:7  48:7
**members**  13:18  75:1
113:23
**membership**  13:19, 20
**membership/ownershi
p**  74:21

**memory**  15:16  25:1
77:3  112:7
**mentioned**  12:10
19:12  31:14  47:3
49:5  113:6  114:10
**mentions**  37:25
**mercy**  119:8
**mere**  20:1
**merged**  13:16  132:17
**methodology**  86:12
**MGM**  82:12  94:6
**Michigan**  7:13, 19
54:8  64:21  68:11
72:1
**million**  44:8, 14, 16,
21  59:10  66:11, 16
67:20  69:2, 3, 6, 8
71:10, 18, 25  74:2, 3,
4  83:21  84:10, 19, 22,
23, 24  87:7, 14  88:9,
14, 24, 25  89:16
95:10, 13, 18  96:11
97:8  98:5, 9, 10, 11
99:17, 19, 24  100:13
101:1, 12  103:17, 25
104:1  106:9, 10, 11,
16, 21  111:18, 23
112:6, 8, 9  113:6, 7
119:5  124:4  129:13,
22, 23  137:24  138:2,
9
**Millions**  136:20, 22,
23, 25  137:1, 3
**mind**  34:25  136:16
**mine**  82:10  83:4
86:21  87:16, 25
93:25  94:23  97:1
100:7  136:4  143:12
**minimus**  83:11  87:22
**minor**  17:20
**minus**  88:2  100:12,
13
**minute**  11:12  12:10
23:2  34:23
**minutes**  18:3, 10
52:16
**misheard**  48:15
**misspeak**  29:19
**misspoke**  131:18
**moment**  19:10

**money** 20:*12, 13, 15, 16* 21:*3* 22:*23* 24:*15* 26:*1, 2, 7* 28:*11, 20* 29:*7, 11* 32:*3* 50:*9, 16* 58:*4, 6, 8, 14, 25* 59:*17, 18* 60:*3* 61:*2* 62:*15, 19, 25* 65:*5, 7* 66:*6, 8* 67:*3* 69:*15* 71:*17* 72:*6, 10, 16, 20, 24, 25* 73:*3, 4, 6, 9, 24* 74:*1* 90:*4* 96:*17* 101:*18, 22* 109:*3* 122:*21* 124:*11, 22* 127:*9* 129:*3, 4, 9, 17* 130:*2* 140:*13, 16, 20*

**monies** 108:*22* 109:*13*

**month** 18:*2* 34:*1* 35:*4, 6, 7, 9, 14* 42:*8, 12, 17* 43:*20* 44:*3, 11* 92:*16* 134:*13* 135:*8* 137:*24*

**monthly** 28:*18* 82:*19, 20*

**months** 88:*24* 94:*19*

**month-to-month** 10:*18* 17:*8*

**morning** 4:*11*

**MSO** 13:*11, 20* 14:*2* 70:*21* 71:*6* 74:*8, 14* 75:*13, 16, 21*

**multiple** 36:*22* 86:*17*

**< N >**

**N/P** 86:*22* 88:*1* 96:*7, 10* 97:*2, 3* 103:*20*

**nailed** 106:*25*

**name** 4:*11* 15:*5* 16:*2* 50:*13, 17, 22, 24* 51:*1* 64:*18* 70:*21* 78:*23, 24* 79:*9* 81:*6* 85:*16* 90:*20, 25* 114:*18, 24* 115:*5* 139:*9* 141:*17* 142:*10, 14*

**names** 15:*20* 139:*24*

**Nancy** 120:*4, 5*

**native** 102:*16* 107:*19, 20* 111:*4* 117:*3*

**nature** 49:*23*

**need** 4:*25* 5:*6, 9, 11, 13* 53:*25* 54:*3* 72:*24* 73:*9, 10* 77:*16, 20* 78:*7* 83:*14* 84:*14* 89:*8* 102:*1* 119:*12* 120:*8* 143:*23*

**needed** 11:*8* 25:*17* 65:*9* 69:*15*

**needs** 85:*2*

**negotiating** 43:*25*

**Neil** 15:*5*

**neither** 12:*7*

**net** 133:*18* 134:*7, 12, 19, 24, 25* 135:*5, 7* 136:*12* 137:*2, 25* 138:*8*

**nets** 123:*8*

**network** 59:*25*

**networks** 57:*8*

**never** 10:*11* 47:*20* 50:*7, 8, 16* 53:*2, 3* 119:*9*

**new** 11:*2* 25:*19* 56:*19* 114:*19, 21* 118:*1* 122:*5*

**Nineteen** 44:*16*

**Ninetieth** 22:*21*

**nods** 5:*12*

**nonoperating** 115:*12* 134:*20*

**Nope** 56:*15*

**normal** 5:*4*

**Notary** 1:*15* 146:*9*

**note** 61:*1, 22* 63:*24, 25* 64:*1, 8, 10, 23, 24* 66:*7, 11* 67:*5, 6, 10, 11, 12, 17* 68:*22, 24* 77:*22* 97:*12, 24* 98:*21, 25* 99:*2, 8, 11, 21* 111:*11, 12* 112:*13*

**noted** 145:*8*

**notepad** 15:*13*

**notes** 61:*13* 62:*1* 117:*13* 118:*12* 146:*3*

**Notice** 1:*13*

**November** 48:*12*

**NP** 102:*18*

**number** 6:*24* 19:*18* 29:*17* 63:*3* 66:*15, 17* 76:*21* 86:*1* 98:*14* 100:*1* 132:*16* 135:*7* 136:*18* 137:*7, 9, 11* 138:*1*

**numbered** 6:*23* 78:*21* 117:*7, 12*

**numbers** 44:*9* 76:*11* 78:*22* 82:*7* 87:*7* 119:*3* 131:*9*

**nutshell** 142:*21*

**< O >**

**object** 80:*24* 124:*16* 142:*3*

**objections** 4:*5*

**objective** 11:*4*

**obvious** 23:*18* 85:*4*

**obviously** 37:*13* 132:*22*

**occur** 85:*2*

**occurred** 116:*11*

**odd** 36:*2, 13, 17* 37:*1* 79:*13* 80:*7, 10, 11* 81:*24* 82:*1* 91:*8, 10, 11* 105:*23, 24*

**office** 20:*10* 143:*6*

**officer** 9:*23* 10:*2* 14:*23* 15:*6* 57:*10* 74:*16*

**officers** 14:*15* 71:*19, 20*

**Oh** 22:*16* 69:*23* 75:*18* 112:*19* 130:*3* 141:*21*

**Okay** 4:*17* 6:*4, 9* 7:*16, 21, 23* 8:*15, 25* 9:*11* 10:*24* 11:*12* 12:*4, 7* 19:*3* 21:*17* 22:*5* 23:*17* 24:*2, 15* 25:*4, 12* 26:*6, 17* 27:*1, 4, 7, 13* 28:*1, 6* 29:*2, 5, 9, 15* 30:*22* 31:*1, 3* 32:*6, 11, 22, 25* 33:*22* 34:*9, 17, 22* 35:*3* 38:*19* 39:*5, 22* 41:*2, 23* 43:*1, 7*

44:*10* 45:*23* 46:*12, 19* 49:*18* 53:*11* 55:*11* 57:*20* 58:*21* 63:*8, 13, 19* 64:*23* 66:*5* 68:*12, 22* 69:*11, 23* 71:*19, 24* 73:*1* 74:*7* 76:*2, 23* 77:*22* 78:*9* 82:*5* 86:*6* 87:*22* 90:*7, 11* 92:*8* 94:*21* 96:*22, 24* 97:*15* 98:*4, 12* 99:*15* 101:*11, 25* 104:*22* 105:*12, 24* 110:*19, 25* 115:*3, 6, 15* 116:*12* 117:*25* 118:*17* 119:*14* 120:*8* 121:*11, 25* 122:*4* 124:*14* 129:*3, 9* 131:*13* 133:*2* 135:*8, 14, 23* 137:*17, 22* 138:*18* 140:*3, 15, 23* 141:*22* 142:*8, 17* 143:*16, 18*

**once** 18:*2* 48:*25* 100:*7*

**ones** 21:*6, 7, 8, 24* 22:*12* 118:*3* 121:*13, 15*

**online** 63:*3, 6*

**open** 63:*20*

**open-ended** 65:*2*

**operated** 69:*9*

**operating** 26:*11, 12, 13* 27:*6, 15* 43:*17* 44:*4, 20, 24* 59:*13* 69:*12, 21* 72:*23* 73:*4* 86:*16* 133:*4, 8, 9, 12, 13, 14, 24, 25* 134:*7, 19, 24, 25* 135:*5, 7* 136:*12, 17* 137:*2, 25* 138:*8, 22*

**operational** 11:*9* 43:*9, 12* 115:*10* 143:*8*

**operationally** 10:*22* 41:*14*

**operations** 23:*15* 65:*10* 69:*19, 20* 72:*24* 137:*5, 15*

**opinion** 124:*19*

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Deposition of Barry Rynearson
Exhibit B to Certification   Page 53 of 68
Investigation et al. v. Paramount Management Group, LLC

134:*16*
**opportunity** 17:*11*
**oral** 1:*12* 5:*9, 14*
49:*8, 10*
**order** 25:*10* 96:*4*
**ordinary** 79:*25*
**org** 19:*17*
**organizations** 11:*7,*
*13, 14*
**organized** 11:*3*
**original** 69:*25*
**originally** 130:*11*
**originated** 123:*5, 12,*
*25* 124:*3, 5*
**Orrstown** 119:*17, 20*
**outline** 46:*2* 104:*4*
**outside** 127:*10*
**owe** 61:*1*
**owed** 43:*20* 44:*11*
62:*2* 71:*8, 17* 87:*8*
88:*11* 96:*18, 20*
107:*10* 111:*19*
112:*11, 12* 121:*11, 15*
**owes** 103:*5* 113:*3, 10*
115:*17*
**owing** 62:*15*
**owned** 14:*10* 20:*4*
30:*14* 58:*24* 63:*5*
65:*19* 74:*25* 75:*9*
76:*8* 120:*23* 130:*18,*
*19* 131:*25* 139:*1, 14,*
*18, 22* 141:*8*
**owner** 12:*18, 21*
14:*12* 30:*23* 31:*1*
33:*4, 6* 65:*16* 71:*22*
74:*8, 9, 19* 75:*14*
76:*15, 17*
**owners** 32:*13* 65:*11*
76:*5*
**ownership** 12:*25*
31:*12, 15, 18* 32:*12*
66:*2* 75:*20* 77:*12*
89:*24* 110:*8, 16*
130:*15*
**owning** 138:*24*
**owns** 77:*9*

**< P >**
**P&L** 26:*12* 28:*20,*
*21* 39:*7, 12, 18* 40:*22,*
*24* 41:*2, 12* 42:*1, 4, 6,*
*9, 14, 24* 43:*5, 7* 44:*5,*
*19* 45:*14* 46:*10, 20*
80:*5* 93:*6* 132:*21, 22,*
*24* 136:*7*
**P&Ls** 132:*16*
**p.m** 143:*19*
**PA** 2:*7, 16*
**PAGE** 3:*3* 68:*3, 14*
80:*14* 82:*8, 11* 84:*17,*
*22* 89:*12* 91:*21* 99:*3*
100:*18* 117:*8, 10*
118:*18* 119:*4* 134:*7*
144:*5*
**PAGE/LINE** 3:*19*
**pages** 78:*21* 117:*7*
132:*12* 145:*4*
**paid** 12:*11, 14* 24:*3*
37:*20* 87:*12* 115:*10*
122:*24* 123:*14*
**paperwork** 77:*12*
**Paragraph** 6:*23*
**Paramount** 1:*6* 12:*4*
14:*12* 20:*20, 21* 21:*1*
22:*3, 4, 16, 18, 25*
23:*4, 11* 24:*3, 11*
30:*16* 34:*12* 39:*8, 19*
40:*24* 41:*14* 43:*8, 14*
44:*5, 11* 45:*10* 46:*14*
47:*22* 48:*9, 10, 13, 19*
49:*6* 52:*4* 53:*3* 55:*6*
56:*23* 57:*1, 25* 58:*4,*
*6, 8, 11, 13, 22, 24*
59:*1, 10, 14, 17* 60:*11,*
*18, 19* 61:*2* 62:*3, 16,*
*19, 20* 63:*3, 8, 15, 17*
64:*15* 66:*5, 8* 72:*5,*
*12, 17* 73:*2, 3, 6, 24*
82:*12, 25* 83:*5, 19*
84:*1, 10* 87:*9, 19*
88:*12* 89:*15, 23* 90:*5*
94:*6* 95:*2* 96:*18, 20*
99:*14* 100:*25* 101:*19*
103:*5* 107:*11* 108:*17,*
*22, 24* 109:*3, 15, 24*
110:*2, 8, 14* 111:*12*
112:*11, 12, 23* 113:*4,*
*11* 115:*17* 118:*21*
120:*14* 121:*8, 20, 24*
122:*8, 9, 16, 19, 23*
123:*4, 6, 8, 12, 17, 23*
124:*4, 5, 11, 15* 125:*6,*
*11* 126:*6* 127:*9*
128:*6, 20, 22* 129:*10*
131:*1, 3, 4* 132:*4*
133:*4* 138:*24* 139:*3,*
*9, 10* 140:*23* 141:*15,*
*22* 142:*1, 6*
**Paramount/pledges**
86:*23* 88:*2* 96:*10*
97:*4* 98:*21* 99:*1, 9*
103:*20*
**Paramount-related**
100:*8*
**Paramount's** 57:*5, 20*
58:*17* 60:*8* 61:*19*
64:*4* 111:*10*
**paramours** 141:*5*
**Pardon** 27:*9*
**parentheses** 118:*13*
**parlance** 81:*8*
**part** 14:*3* 38:*2* 39:*2*
42:*1* 43:*25* 45:*8*
74:*2, 3, 4* 137:*19, 20*
**particular** 79:*24*
**particulars** 83:*22*
**parties** 1:*18* 4:*3*
64:*14*
**partner** 126:*9, 15*
**Partners** 50:*10*
**passed** 130:*13*
**passthrough** 20:*1*
65:*5* 115:*8*
**pay** 25:*23* 28:*19*
39:*21* 43:*18, 23*
95:*22* 122:*19* 123:*3,*
*9, 23, 24* 127:*9*
133:*16*
**payable** 61:*18* 98:*21,*
*25* 99:*9* 105:*14*
112:*13*
**payable/no** 62:*13*
**paycheck** 10:*9*
114:*12, 13*
**paying** 37:*22* 123:*9*
**payment** 43:*22, 23*
99:*13* 123:*16* 135:*2*
**payments** 39:*9, 21*
41:*21, 25* 43:*10, 25*
44:*18, 25* 45:*1* 46:*15*
123:*4, 6, 8, 12, 17, 23*
124:*4, 5, 11, 15* 125:*6,*
*11* 126:*6* 127:*9*
128:*6, 20, 22* 129:*10*
131:*1, 3, 4* 132:*4*
133:*4* 138:*24* 139:*3,*
*9, 10* 140:*23* 141:*15,*
*22* 142:*1, 6*
60:*17, 22* 109:*11*
115:*12* 133:*5* 135:*24*
136:*7* 137:*23* 138:*7*
**PE** 41:*21, 25* 135:*24*
136:*7* 137:*23* 138:*6*
**pen** 15:*11* 97:*7*
**pending** 4:*13* 89:*11*
**Pennsylvania** 1:*1, 14,*
*16* 26:*24*
**people** 15:*15* 36:*12*
60:*2, 11* 76:*18, 24*
**percent** 10:*9* 22:*23*
30:*13, 14, 15, 17, 19,*
*20* 32:*15* 54:*8* 55:*2,*
*8* 58:*24* 61:*5* 65:*20*
74:*22, 24* 75:*5, 15, 16,*
*21* 76:*4, 7, 14, 20*
77:*7, 9* 87:*5* 89:*24*
96:*16* 109:*15* 110:*17*
130:*18, 19*
**percentage** 22:*19, 20*
32:*11, 13* 130:*15*
**percentile** 22:*22*
**perception** 69:*10*
**perfect** 11:*5* 89:*4*
92:*22, 24* 100:*5*
**perform** 54:*13*
**Performance** 11:*11*
134:*13*
**performed** 11:*23*
16:*9* 28:*17*
**performing** 10:*23*
16:*25* 31:*6*
**period** 9:*3* 42:*15, 16,*
*17* 78:*18* 88:*14, 15*
90:*15* 94:*10, 18*
97:*12* 100:*24* 104:*16*
105:*1*
**periods** 88:*7*
**person** 40:*8* 113:*15*
**personal** 18:*17, 19,*
*21* 19:*4* 55:*18, 24*
58:*4* 96:*7* 123:*13, 15*
124:*10*
**personally** 55:*16*
65:*17, 18, 19* 77:*11*
124:*25* 139:*17, 19*
**persons** 113:*15*
**perspective** 30:*2, 3*

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification Page 54 of 68
Deposition of Barry Rynearson    In re Prestige Worldwide et al. v. Paramount Management Group, LLC

35:*10, 15* 124:*21*
**perspectives** 113:*12*
**Pete** 16:*4*
**PH** 131:*9*
**Philadelphia** 2:*16*
**physical** 46:*16* 122:*1*
125:*12*
**picked** 60:*1*
**piece** 5:*9, 19*
**pin** 7:*22* 89:*11*
**place** 35:*5*
**placeholder** 131:*9*
**Plaintiffs** 1:*4, 13* 2:*2*
4:*12*
**plan** 126:*18*
**Pleas** 1:*1* 4:*14*
**please** 5:*18*
**Pledge** 119:*17, 20, 25*
120:*3*
**PMG** 3:*16* 102:*18*
107:*21* 117:*4*
**point** 8:*25* 29:*6*
31:*19, 21* 34:*11*
35:*16* 38:*1* 47:*6, 7*
53:*13, 18, 19* 56:*7*
65:*20* 66:*12* 72:*22*
73:*23* 83:*13* 105:*9*
123:*22* 126:*5* 127:*2*
128:*5* 131:*8* 132:*21*
**pointed** 106:*13*
**points** 41:*7* 46:*6, 7*
74:*25* 75:*7*
**Ponzi** 34:*12* 35:*22*
37:*6, 7, 11, 25* 38:*11,
15* 39:*1, 3, 4* 43:*8*
45:*10, 12* 46:*3* 47:*5*
52:*4, 6* 63:*11* 128:*13*
**poor** 51:*22*
**portfolio** 11:*19*
17:*12, 13* 19:*11*
20:*16* 26:*5, 18* 28:*13,
17, 19, 25* 29:*24*
31:*21* 57:*3* 82:*21*
84:*4, 7* 88:*1* 89:*14*
91:*22* 92:*2* 94:*12*
96:*7* 97:*3* 99:*9*
109:*5* 119:*25* 120:*3*
**portion** 59:*22*
**portrayed** 20:*22*
23:*4, 6*

**positive** 21:*9* 23:*13,
15* 99:*18* 138:*1, 3, 15*
**possess** 77:*11*
**possible** 4:*25* 41:*23*
42:*3* 43:*1* 79:*5, 7, 15,
17* 85:*6* 93:*12, 14*
**possibly** 42:*4* 57:*13*
**potential** 37:*7, 11*
**PowerCoin** 24:*16*
62:*15* 139:*4, 5, 6, 22*
**Powers** 36:*6*
**practice** 91:*13, 14, 15,
17* 93:*3, 10*
**practices** 107:*9*
**Premiere** 21:*20* 22:*1*
69:*14*
**preparation** 7:*24*
8:*16*
**preparations** 7:*25*
**prepared** 38:*21* 39:*6,
14, 18* 81:*13, 14*
91:*22* 92:*9, 10, 15*
119:*11*
**present** 1:*17* 39:*19*
**presentation** 39:*7, 11,
14, 17* 46:*5* 81:*15*
93:*9* 134:*16*
**presented** 44:*20, 23*
81:*17*
**presently** 13:*8, 24*
**President** 14:*23*
**Prestige** 1:*3* 4:*13*
21:*13, 15, 16* 22:*1*
30:*13, 14* 36:*1, 12*
43:*11* 53:*2* 128:*16,
19, 21, 25* 135:*3*
**pretty** 32:*21* 67:*16*
83:*14* 143:*8*
**previous** 94:*10*
95:*12, 16* 98:*24*
132:*7*
**previously** 14:*10*
47:*2* 94:*18* 97:*19*
103:*2* 114:*9*
**price** 122:*15* 124:*8*
**PricewaterhouseCoope
rs** 143:*2*
**Prill** 113:*17* 114:*3*
115:*21*
**print** 80:*4* 102:*2*

**Printed** 56:*1, 21*
79:*9* 90:*20* 91:*1*
93:*5* 102:*12* 103:*15*
106:*18* 107:*16, 24*
**printing** 143:*5*
**printout** 102:*20*
**prior** 132:*9*
**priority** 66:*20*
**private** 20:*9* 127:*7*
**privately** 84:*4*
**probably** 15:*2* 17:*21*
19:*18* 33:*15* 42:*1*
48:*14, 25* 49:*5* 53:*13*
77:*3* 88:*16* 131:*16*
**problem** 28:*5* 50:*5*
**proceeding** 68:*11*
**proceedings** 146:*1, 4*
**proceeds** 124:*14*
**process** 48:*9*
**produce** 26:*16* 27:*18*
**produced** 111:*10*
**producing** 4:*23*
**product** 26:*16* 27:*18*
**PRODUCTION** 3:*18*
77:*16* 78:*3* 115:*4*
116:*21*
**professional** 142:*20*
**Profit** 39:*13*
**profitable** 21:*6*
23:*14* 24:*19, 21, 22*
26:*9* 29:*11* 54:*2*
**profits** 27:*15, 17*
**Project** 15:*6*
**Proof** 3:*10* 68:*10*
**property** 70:*3* 122:*2*
**propounded** 145:*7*
**protocol** 40:*14*
**provide** 82:*24*
**provided** 31:*21, 25*
82:*23* 89:*22* 107:*18*
**PTG** 21:*19*
**Public** 1:*16* 143:*3*
146:*9*
**publishing** 143:*5*
**pulling** 22:*13* 112:*7*
**purchase** 122:*14, 15,
17* 123:*1* 124:*8, 11*
128:*22*
**purchasing** 128:*25*

130:*14* 132:*3*
**purports** 118:*20*
**purpose** 29:*23*
**purposes** 18:*17* 58:*4,
7* 104:*10*
**pursuant** 1:*13*
**put** 7:*22* 56:*19* 61:*1*
86:*17* 91:*18* 132:*21,
24* 142:*14*
**putting** 81:*25*

**< Q >**
**qualifications** 41:*4*
**qualified** 142:*22*
**quarter** 42:*17*
**quarterly** 112:*4*
**question** 4:*6* 5:*1, 3,
8, 16* 26:*6* 28:*3*
34:*15, 19, 20* 35:*2*
42:*10* 51:*22* 53:*10*
68:*17* 69:*5, 8* 75:*13*
76:*10* 80:*25* 81:*5*
83:*18* 88:*8* 89:*2, 4, 9*
97:*16, 18, 25* 99:*6*
100:*6* 119:*13* 123:*11*
124:*2* 131:*19* 138:*6*
142:*4*
**questions** 5:*15* 23:*21*
45:*4, 19, 22, 23*
121:*23* 143:*17* 145:*6*
**quick** 120:*10* 138:*23*
142:*8*
**QuickBooks** 79:*20,
21* 80:*5* 93:*6, 7, 23*
**quickly** 116:*21*
**Quinones** 15:*23*
**quite** 107:*24* 137:*24*

**< R >**
**raising** 36:*4*
**Randall** 57:*4, 24*
60:*12, 15* 122:*13*
123:*3, 23* 141:*16*
**rattle** 85:*24*
**Raw** 3:*15* 25:*6, 11*
31:*13, 16, 23* 63:*14,
16, 18* 64:*16, 17, 19*
65:*3, 7, 11, 20* 66:*6, 8*
67:*3, 7, 20* 68:*23*
69:*16* 71:*8, 10, 19, 20*

Case 25-11354-JNP    Doc 297-3    Filed 06/03/25    Entered 06/03/25 00:32:43    Desc
Exhibit B to Certification Page 55 of 68
Deposition of Barry Rynearson                                    Investigation et al. v. Paramount Management Group, LLC

72:*12*, *17*, *20*  73:*3*, *4*
111:*6*, *13*, *19*  112:*11*,
*12*, *23*  113:*3*, *10*
115:*17*  117:*13*  121:*5*
**Raw's**  64:*3*  113:*12*
**reach**  127:*25*
**reaches**  106:*20*
**read**  107:*25*  118:*16*
119:*16*  132:*12*
143:*20*, *22*  145:*4*
**real**  11:*19*  23:*18*
70:*2*  109:*8*  122:*2*
141:*7*, *11*
**realize**  137:*19*, *20*
**really**  14:*16*  21:*10*
26:*11*  36:*1*  44:*2*
55:*23*  68:*1*, *13*  81:*24*
82:*1*  110:*10*  117:*6*
120:*10*
**Ream**  60:*13*
**reason**  19:*19*  35:*20*
46:*25*  87:*11*  111:*10*
112:*22*  130:*25*
**reasonable**  59:*5*
81:*16*
**reasons**  35:*22*  38:*25*
47:*2*
**recall**  12:*2*  15:*21*
19:*6*  21:*23*  22:*7*
23:*9*  31:*9*  34:*3*, *9*
41:*12*, *13*, *17*, *19*, *20*,
*22*  42:*11*, *19*  44:*4*, *9*
45:*1*, *20*, *22*, *24*  46:*4*,
*9*  49:*19*  50:*14*, *20*, *24*
51:*1*, *5*, *14*  67:*9*, *14*
79:*13*  80:*12*  81:*24*
91:*3*, *8*  95:*20*  101:*20*,
*24*  114:*16*  122:*17*
123:*6*  124:*13*  127:*19*
133:*1*, *3*  135:*6*, *23*
136:*9*, *11*  137:*13*, *18*
138:*21*  139:*24*
**recalling**  79:*4*  111:*20*
**receivable**  61:*19*
62:*13*  63:*15*, *17*  66:*6*
111:*12*, *13*  117:*13*
121:*6*
**receivable-Raw**
118:*12*
**receivables**  121:*8*

**receive**  28:*15*  32:*3*
51:*16*  65:*7*  69:*6*
**received**  19:*8*  27:*17*
67:*20*  68:*24*  90:*5*
101:*19*  102:*15*
109:*19*  111:*3*  117:*3*
132:*16*
**receivership**  140:*11*,
*12*
**receiving**  28:*24*  29:*2*
**recognize**  41:*4*  78:*20*
79:*3*  81:*7*  90:*17*
91:*2*  108:*1*
**recollection**  6:*1*
21:*25*  46:*8*
**reconcile**  94:*3*  112:*1*,
*4*, *6*
**reconciled**  112:*15*
**reconciliation**  85:*1*
**record**  4:*23*, *25*  5:*13*
27:*3*, *24*  28:*3*, *4*, *7*
40:*14*  49:*24*  102:*3*
104:*10*  107:*22*
**recorded**  40:*10*, *12*
125:*7*
**records**  7:*10*  33:*17*
50:*1*, *2*  52:*11*, *13*
61:*16*  115:*1*
**red**  118:*7*
**reduction**  125:*4*
**refer**  82:*7*  132:*8*
**referred**  24:*16*
142:*10*
**reflect**  71:*7*  77:*12*
78:*1*  108:*22*
**reflected**  77:*23*  87:*8*
96:*11*  97:*6*  105:*1*
110:*22*  111:*5*  113:*2*
138:*19*
**Regarding**  14:*14*
41:*17*, *21*  75:*13*
**regular**  24:*13*  58:*16*
80:*8*
**Reimb**  87:*18*
**relate**  99:*4*  135:*18*
**related**  7:*12*  8:*24*
87:*18*  88:*9*  89:*23*
109:*14*  110:*7*  127:*17*
128:*2*  135:*20*  142:*6*
**relates**  134:*21*

**relationship**  31:*7*
128:*19*
**Reliance**  50:*13*
**religiously**  66:*19*
**remember**  16:*2*
31:*13*  64:*10*  114:*24*
**remiss**  142:*17*
**removed**  59:*14*
**repairs**  60:*3*
**Report**  3:*11*, *12*
54:*20*  55:*1*  78:*17*
79:*19*, *20*  80:*3*  81:*19*
84:*13*  90:*14*  91:*19*
92:*20*, *25*  93:*4*, *7*, *8*
94:*14*  95:*9*, *10*, *12*, *16*
96:*17*, *19*  98:*24*  99:*2*
104:*15*  105:*2*  108:*5*
**reported**  88:*15*
**reporter**  4:*21*  27:*4*
28:*2*  78:*12*  143:*20*,
*23*  146:*5*
**Reporting**  1:*15*
19:*23*, *25*  20:*3*  54:*17*,
*24*  97:*12*  100:*24*
105:*1*
**reports**  54:*19*  91:*18*
92:*15*  93:*8*
**represent**  4:*12*  22:*18*
68:*9*  83:*25*  84:*2*, *8*
87:*2*  88:*13*  89:*19*
95:*6*  96:*14*  97:*10*
99:*8*, *17*, *19*  100:*16*,
*17*  101:*12*  102:*14*, *24*
103:*23*  105:*5*  107:*18*
112:*10*  117:*2*, *20*
132:*11*, *15*
**representation**  84:*9*
134:*12*
**representations**  45:*13*
**represented**  29:*9*
42:*13*  47:*19*  81:*14*
87:*3*  97:*20*
**representing**  102:*23*
**represents**  88:*23*
96:*15*  97:*11*  99:*12*
100:*1*  101:*21*, *24*
103:*1*  105:*5*, *7*
134:*17*  135:*22*
**REQUEST**  3:*18*  7:*1*

72:*23*
**requested**  6:*25*
**requesting**  76:*24*
**requests**  7:*7*  116:*15*
**required**  58:*21*
**requirements**  72:*8*
**reserved**  4:*6*
**reset**  56:*19*
**resides**  77:*8*
**resignation**  9:*7*  38:*21*
**resigned**  9:*6*  46:*24*,
*25*  56:*13*
**resources**  55:*24*
**respective**  1:*18*  4:*3*
**response**  38:*12*, *16*
50:*4*  54:*11*
**responses**  5:*10*, *14*
**responsibility**  53:*6*
**responsible**  85:*11*
**responsive**  7:*6*
**restate**  5:*20*
**restaurant**  58:*9*
**results**  54:*18*, *20*
**return**  19:*22*  26:*21*
51:*20*
**returning**  105:*4*
107:*2*  125:*11*
**returns**  53:*9*
**revenue**  43:*16*, *17*
44:*4*  59:*14*  60:*6*
133:*4*, *10*, *12*, *13*, *14*,
*17*, *24*, *25*  134:*12*
137:*11*, *15*
**Revenues**  133:*15*
**review**  79:*16*  89:*11*
**reviewed**  91:*7*
**Richard**  130:*12*, *13*
**Richard's**  130:*15*
**Rick**  132:*1*
**right**  4:*20*  8:*18*
12:*3*  15:*19*  19:*18*
26:*20*  29:*18*  37:*9*
49:*10*  55:*21*  56:*23*
63:*13*  73:*9*  75:*4*
76:*10*  77:*11*  79:*19*,
*20*  93:*6*  94:*17*  97:*13*
99:*5*  102:*1*  103:*11*
104:*4*  109:*23*  115:*22*
116:*2*  120:*10*  121:*14*

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification Page 56 of 68
Deposition of Barry Rynearson                    Investigation, et al. v. Paramount Management Group, LLC

125:*6*  126:*6*  134:*8*
138:*4*  140:*21*  142:*8*
**RL**  78:*22*
**RL0004**  82:*8*
**RL0007**  83:*3*
**RL0011**  83:*12*  95:*15*
**RL0012**  84:*22*
**RL0013**  84:*17*  86:*20*
98:*14, 25*  103:*24*
**RL0015**  87:*23*  97:*19*
99:*7*
**RL00172**  91:*21*
**RL0020**  93:*24*  94:*5*
**RL0022**  90:*19*
**RL0023**  94:*21*
**RL0026**  94:*23*
**RL0028**  96:*3*  98:*1, 7,
21*  104:*21*
**RL0031**  96:*23*  99:*24*
**RL0032**  90:*25*
**RL16**  79:*8*
**RL28**  100:*3*
**RL31**  99:*3, 16*
**RL32**  100:*6*
**RL6**  78:*23*
**Rockford**  11:*18*
**role**  8:*22*  12:*4*  16:*9*
17:*5*  54:*14*  57:*12*
127:*21*
**roles**  143:*4, 7, 8*
**roll**  14:*1*  19:*14*
**rolled**  13:*3, 18*  100:*3*
**rolls**  29:*25*
**room**  4:*24*  8:*3*  39:*15*
**Row**  106:*14, 17, 20*
107:*2, 9*  108:*16*
112:*20*  113:*3*  117:*9,
12*
**Run**  1:*13*  2:*6*
**running**  34:*12*
**RYNEARSON**  1:*11*
3:*4, 8*  4:*7, 11*  6:*11,
13, 14, 17*  68:*6, 9, 15*
78:*13, 17*  90:*17, 22*
102:*8*  108:*1, 6*
111:*14*  117:*17*

**< S >**
**sabbatical**  35:*4, 9*

36:*19*
**Safe**  120:*19*
**safes**  120:*21*
**sale**  48:*14*  129:*6*
**sales**  41:*18*  42:*3*
129:*7*  135:*21*  136:*10*
137:*17, 18*  138:*14, 21*
**satisfied**  45:*9, 11*
54:*11*
**saved**  74:*5*
**saw**  42:*6*  50:*16, 22*
53:*2, 3*  64:*12*
**Saxton**  2:*3*
**saying**  25:*9*  37:*6, 7*
38:*10*  47:*17*  64:*9*
125:*20*
**says**  27:*24*  37:*5*
61:*23*  82:*16*  83:*5*
86:*22*  91:*21*  93:*17*
95:*1*  97:*2*  98:*10*
108:*16*  117:*13, 14, 21*
118:*12*
**scale**  44:*7*  131:*5*
132:*5*  136:*18*
**scheme**  34:*13*  37:*8,
11*  43:*8*  45:*10, 12*
46:*3*  47:*5*  52:*4, 6*
63:*11*
**Schlicker**  15:*22*
16:*21*  51:*15*  102:*16*
107:*19*
**school**  142:*23*
**scratch**  129:*4*  137:*9*
**screen**  39:*15*  40:*3*
102:*13, 17, 20*  103:*9,
14*  106:*19, 24*  107:*17,
23*  111:*1*  119:*13*
**scroll**  106:*24*
**sealing**  4:*3*
**Search**  77:*18*
**sec**  84:*15*
**second**  5:*9*  21:*19*
27:*3*  31:*10*  71:*1*
73:*14*  89:*13*  94:*25*
104:*20*  117:*11*
**section**  101:*14*
135:*19*
**see**  4:*22*  6:*23*  7:*1*
30:*21*  33:*16*  46:*10*
50:*9*  68:*1, 16*  69:*23*

71:*3*  75:*18*  78:*23*
79:*1*  82:*3, 10, 13, 15*
83:*4, 7, 23*  84:*20*
85:*13*  86:*19, 21, 25*
87:*16*  88:*4, 18*  89:*8,
17, 25*  90:*2, 20*  91:*24*
92:*9, 12*  93:*11, 19*
94:*7*  95:*4*  96:*12*
97:*1, 9, 18*  99:*21*
100:*7, 14*  101:*2*
103:*8, 16, 21*  104:*3, 6,
23*  106:*1, 4*  108:*10*
109:*23*  110:*3, 4, 18*
111:*22, 24*  112:*18*
116:*12*  117:*15, 16*
118:*2, 24*  119:*3, 16*
120:*12*  125:*10*  129:*6*
131:*8*  132:*13*  133:*23*
134:*2, 9, 14*  136:*2, 12*
**seeing**  49:*12*  55:*3*
59:*9*  88:*6*  109:*8*
**seen**  6:*14*  50:*20*
53:*14*  81:*18*  102:*21*
119:*9*
**segment**  109:*7*  134:*5*
139:*2*
**sell**  47:*22, 24*  48:*9,
10, 13*  49:*6*  126:*5*
**selling**  48:*2*
**send**  72:*6*  73:*3, 4*
**sending**  11:*10*  140:*13*
**senior**  15:*24*
**sense**  36:*10*  37:*3, 14,
21*  44:*7*  57:*2*  74:*14*
89:*4*  92:*21, 22*
106:*12*
**sent**  116:*23*  125:*9*
**separate**  30:*5*  131:*1*
**September**  134:*1*
135:*9*  138:*7*
**serial**  131:*9*
**service**  27:*18*  31:*20*
57:*8*  59:*18*  60:*7*
114:*10, 11, 13*
**serviced**  60:*4*
**services**  17:*1*  26:*18*
28:*14, 17*  31:*6, 18, 21,
23, 25*  82:*22, 24*
94:*11, 14*  114:*15*

**set**  29:*23*  57:*16*
65:*4*  81:*8*  82:*6*
**sets**  115:*9*
**setup**  11:*9*  132:*3*
**seven**  88:*24*  94:*19*
143:*2*
**seventh**  117:*8, 10*
**Seventy**  75:*15*
**shakes**  5:*12*
**shared**  16:*11*  40:*3*
136:*8, 19*  138:*20*
**shareholders**  70:*1*
**sheet**  62:*7, 8*  67:*22*
70:*14*  80:*4*  88:*5, 7,
21*  89:*9, 21*  90:*3*
92:*21*  93:*6*  99:*20*
101:*14*  104:*18*  110:*1*
118:*21*  119:*2*  136:*10*
145:*9*
**sheets**  64:*6*  103:*2*
**shifted**  104:*17*
**Shock**  38:*13*  129:*12,
14*
**shocking**  129:*15*
**show**  5:*13*  39:*3, 5,
19*  44:*20*  46:*14*
118:*23*
**showed**  39:*8*  41:*14*
43:*8*  44:*5, 24*  47:*7*
67:*19*  134:*25*  135:*1*
137:*2*
**showing**  43:*9*  137:*3*
**shown**  137:*7*
**side**  141:*17*
**sides**  28:*4*
**sign**  142:*9*  143:*21, 22*
**signatories**  67:*13*
**signature**  78:*24*  79:*9*
80:*11, 14, 19*  81:*23,
25*  90:*20*  91:*1, 18*
145:*15*
**Signed**  64:*24*
**significant**  17:*23*
20:*24*  22:*10*
**significantly**  24:*21*
129:*14*  138:*7*
**signing**  91:*9*
**Silverview**  50:*10*
**similar**  131:*24*

132:*25*

**simply** 69:*24* 118:*23*
**single** 20:*2* 42:*7*
67:*8*
**sir** 6:*21* 45:*7* 54:*22*
78:*20* 97:*21* 99:*10*
102:*19* 104:*14, 19*
106:*12* 108:*21* 111:*7*
132:*15* 134:*18* 138:*6,*
*11* 143:*16*
**sit** 63:*10* 116:*2*
**sitting** 113:*7*
**six** 87:*17*
**skip** 62:*14* 94:*22*
100:*10*
**slow** 35:*18*
**small** 96:*25* 102:*3,*
*12* 103:*7* 107:*16, 24*
117:*8, 12* 118:*4*
**smaller** 108:*9*
**smarter** 116:*23*
**software** 56:*20* 93:*23*
**sold** 48:*18* 134:*6*
135:*21*
**sole** 30:*7* 33:*4, 6*
65:*16*
**solely** 45:*13* 85:*11*
**Solutions** 21:*21*
**somebody** 41:*3* 86:*6,*
*9* 113:*9*
**Sorry** 9:*19* 36:*25*
54:*6* 55:*11* 70:*11*
72:*14* 76:*9* 77:*2*
98:*17* 101:*5* 104:*16*
133:*21*
**sort** 9:*24* 19:*16*
41:*3* 46:*2, 6* 58:*21*
110:*9*
**sounds** 53:*15* 115:*20*
**speak** 4:*22* 96:*2*
102:*22* 117:*21*
**speaking** 27:*14*
**special** 29:*22* 93:*9*
**specific** 11:*21* 45:*22*
71:*16*
**specifically** 5:*23*
7:*17* 11:*6* 38:*8, 9*
52:*21* 62:*6* 70:*18*
81:*2* 86:*13* 91:*3*

95:*1* 113:*25* 114:*2, 6*
116:*18* 121:*2*
**spent** 76:*24* 143:*6*
**spoke** 8:*6* 11:*12*
**sportsmansdeals.com**
8:*21*
**Spreadsheet** 3:*13, 14*
102:*12, 16, 19, 21, 22,*
*24* 104:*2, 11* 105:*4*
107:*18* 108:*2* 111:*7*
118:*15* 138:*19*
**spreadsheets** 102:*2*
**staff** 16:*5* 33:*21*
113:*23* 116:*24* 118:*5*
**stake** 30:*23* 32:*12*
110:*16*
**stamp** 93:*22*
**standalone** 30:*5*
**standard** 91:*13, 14,*
*15, 17* 93:*3, 5, 10, 22*
**staple** 96:*4*
**start** 4:*20* 6:*10* 9:*4*
10:*24* 74:*16* 100:*12*
127:*1*
**started** 9:*5* 20:*21*
25:*22* 49:*12* 53:*20*
143:*13*
**starting** 143:*10*
**startup** 10:*20, 24*
11:*1, 7* 12:*3, 7*
**startups** 54:*3*
**State** 68:*11*
**Statement** 39:*13*
88:*19*
**Statements** 3:*16*
52:*19* 81:*25* 117:*4*
**states** 25:*19*
**stay** 28:*4*
**stayed** 28:*2*
**stays** 28:*6*
**steps** 74:*6*
**stick** 89:*10* 132:*14*
**stipulated** 4:*2*
**STIPULATION** 4:*1*
**Stoltzfus** 11:*25* 65:*14*
**stop** 9:*4* 76:*2*
**stopped** 52:*24* 116:*5*
**straight** 80:*5* 86:*1*
**strained** 77:*4*

**strategic** 17:*9* 57:*16*
72:*25* 126:*22*
**Street** 2:*15*
**Strictly** 60:*23*
**strike** 71:*24* 92:*14*
**structure** 13:*10*
75:*20*
**structures** 77:*13*
**struggle** 14:*24*
**struggling** 110:*10*
**studying** 46:*10*
**Stump** 2:*3*
**Subpoena** 3:*9* 6:*20*
77:*17, 20* 102:*15*
107:*19* 115:*20*
**substance** 93:*16*
127:*19* 145:*8*
**subtotal** 103:*8*
**succeeded** 16:*7*
**sufficient** 29:*2* 43:*10,*
*18, 22* 60:*7* 115:*4*
133:*4* 135:*2*
**suggests** 85:*3*
**Suite** 2:*6, 15*
**sum** 83:*20, 25* 87:*6*
95:*3* 96:*12, 19* 99:*3*
101:*9* 103:*16, 23*
106:*23* 107:*10*
111:*18, 22* 117:*24*
118:*14* 119:*6*
**summary** 96:*10* 97:*6*
113:*2*
**sums** 112:*1, 10, 12*
**super** 80:*11*
**supplied** 50:*7, 8*
51:*11*
**supply** 51:*8*
**support** 36:*16, 18*
46:*15* 105:*10* 108:*15,*
*16, 18, 19*
**supports** 108:*5*
**sure** 5:*14* 10:*19*
13:*21* 14:*21* 19:*20*
21:*13* 23:*20* 32:*21*
40:*12* 48:*15* 60:*1*
61:*15, 19* 79:*19*
81:*22* 84:*15* 97:*13,*
*14* 102:*4* 104:*4*
115:*2, 16* 142:*23*

**surmise** 86:*13*
**surprise** 44:*13*
**surprising** 44:*16*
**suspected** 47:*20*
**sworn** 4:*8*
**synonymous** 125:*23*

**< T >**
**table** 14:*2* 75:*2, 4,*
*10, 11*
**take** 34:*25* 35:*5, 12*
38:*4* 73:*14* 86:*14, 15*
102:*1*
**taken** 146:*3*
**talk** 7:*21, 24* 8:*9*
17:*5* 25:*11* 39:*22*
40:*22* 43:*12* 48:*24*
56:*23* 63:*13* 73:*2, 15*
85:*10* 126:*17* 141:*14*
**talked** 37:*24* 111:*17*
126:*4* 127:*12* 132:*20*
133:*2, 3*
**talking** 37:*4* 48:*19*
55:*9* 64:*5* 95:*15, 20*
125:*14* 135:*4, 9, 10*
139:*9*
**tallied** 114:*8*
**tax** 19:*22* 26:*21*
30:*2* 37:*16, 18* 51:*19,*
*20, 21* 53:*9* 89:*15*
100:*11* 101:*11, 16, 20*
**taxes** 19:*20* 37:*20, 22*
**team** 18:*2* 113:*14, 16*
**Teams** 40:*7, 9, 14, 16*
85:*22* 112:*3*
**Technology** 21:*20*
22:*1*
**tell** 30:*12, 13, 15*
34:*23* 42:*24* 43:*5*
64:*17* 84:*25* 137:*11*
**telling** 37:*11* 48:*8*
**Ten** 44:*8* 61:*9*
**ten-point** 46:*2, 4*
**Tens** 136:*25* 137:*1, 3*
**tenure** 29:*8*
**term** 28:*24* 80:*25*
81:*1*
**terminology** 62:*11*
**terms** 23:*18* 109:*9*

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification Page 53 of 68
Deposition of Barry Rynearson                    In re: Investigation et al. v. Paramount Management Group, LLC

test 15:16 25:1 77:3
testified 4:8
testify 6:21
testimony 29:10 47:17 133:6
Text 49:8 96:25
Thank 15:14 24:25 83:17 94:2 98:2, 11 125:24, 25 133:20 139:8 143:16
Thanksgiving 47:15 127:14
thing 5:23 37:15 38:24 41:13 45:20 79:18 90:25 93:15 118:7 139:13 143:9
things 54:19 55:8, 10 105:16 138:13
think 12:10 15:19 16:11 23:25 24:4, 20 27:12, 14 28:7 29:15 31:10 34:3 38:15 45:8 47:24 51:14 55:9 57:12, 14 59:3 66:2 76:10, 11, 23 81:5, 7 91:5, 7 92:20 95:25 98:1 104:8 106:18, 21 110:25 113:2 120:10 121:5 126:14 131:18 132:8 139:23 141:23
thinker 17:10
thinking 21:19 23:23 38:1
third 9:10, 11 40:20 83:4 96:6 97:2
Thirty 75:21
thought 47:21 85:24
thousand 22:12
Thousands 136:20
three 14:21, 25 22:2 74:17, 25 75:7 77:6 78:12 86:22 92:23 135:25
tie 33:1, 3 84:22
tied 99:15 101:13, 16 135:19
tiers 75:22
time 4:6 8:25 9:3 14:18 29:6 31:16, 19

32:16, 19 34:11 37:5, 24 48:7 52:8 56:7 65:13, 20 66:12 67:16 72:22 73:8 76:23 92:24 105:9 106:5 112:24 113:1 120:4, 5 127:12 130:19 131:8 132:21
timeframe 34:6 42:8 44:14 52:2 93:2
times 36:22 61:9, 11 73:17 81:6
tiny 117:15
title 9:21 15:5 79:9 90:14 107:20 111:5
titled 78:17 102:18
titles 9:12 15:21
to/due 62:11
today 5:22 6:7, 21 7:4, 24 8:1, 13 63:10 73:10 111:17 113:3 129:19 132:20 140:5 141:23
today's 8:16
toggle 85:7
told 48:12, 17 61:3 97:22 126:4
tomorrow 57:19
top 13:22 32:8 70:23, 24 83:4, 19 84:23 133:13, 15
tort 81:9
total 83:19 84:1 95:2 96:6 103:19 106:20, 23 107:9 119:6 133:24
totals 119:3
TR-31 126:2
tracking 104:4
transaction 59:20 110:22 112:16 122:9, 10 124:19
transactional 106:4, 6, 14 108:4, 19
Transactions 3:15 55:5 111:6 112:23 113:1 116:10
transcript 5:6 48:15 116:22 143:24 146:5

transcription 145:5
transpired 47:12
trap 27:11
trial 4:6
troubled 10:21 11:13, 14, 20 12:1, 8 54:4
true 32:16, 19
truly 41:13
truthful 6:6
try 11:3 28:24 34:10 67:2 133:23
trying 23:22 31:8, 9 48:10 92:19 108:21 109:4, 7 115:19 123:11, 21 124:1
turned 25:22 76:11
TVT 105:14, 20
Twenty-one 66:16
twice 49:5 51:7
two 13:16 14:1, 21, 25 15:2 28:15 37:1 54:1 55:9, 10 61:16 74:11, 13 87:24 100:8 112:1 124:4 135:25 142:8
Tycoon 13:2, 5, 12 69:15, 17, 18, 19, 20, 24 70:2
tying 84:16
type 14:17 55:7
types 4:22 60:22
typewritten 78:24
typically 35:24 40:14 62:25 80:4

< U >
U.S 125:14
ultimately 123:3
Um-hum 13:7 106:3, 8
underlying 55:3
underneath 19:16
understand 5:18, 19 6:2 9:25 10:6 16:18 17:15 23:22 31:7 49:20, 22 57:5, 9 83:15 102:23 109:4, 8 118:21 137:9

understanding 43:19 51:16 57:15 59:24 60:5 87:6 128:18, 21, 24 130:8 131:3, 22
understood 5:17 27:20 109:10
undertake 7:9
unfortunately 14:20 69:1
unit 42:21
universe 9:25 12:23 14:9 18:14 58:10 140:4
University 142:24
unpaid 51:23, 24 129:18
unusual 62:22 71:24 92:14
upset 36:3
upside 132:14
use 18:17 56:4, 20 93:18

< V >
vacation 35:13
vague 59:24
value 84:3, 6 85:9, 12, 25 95:7, 17 100:18, 25 101:8 125:18
values 95:23
various 65:8 128:25 143:4, 7
vendor 31:6
Ventures 25:6 31:14 64:19, 20 65:3, 11, 20 111:13 131:14, 20, 21, 23
vernacular 23:23 81:4
version 80:16
versus 133:10
videotape 5:10
view 115:22 124:14
visionary 17:9 57:18
Voss 2:4 3:5 4:10, 12 6:19 27:7, 10, 13, 20, 23 28:6, 10 34:21 38:3, 6 41:11 55:12 68:5, 8 72:15 73:16

Case 25-11354-JNP   Doc 297-3   Filed 06/03/25   Entered 06/03/25 00:32:43   Desc
Exhibit B to Certification Page 59 of 68
Deposition of Barry Rynearson
Investigation et al. v. Paramount Management Group, LLC

77:15, 21  78:3, 6, 11,
15  81:5, 11  90:24
94:2, 4  98:22  101:25
102:6, 10  108:8
111:16  115:3, 13
116:20  117:5, 19
118:3, 8  124:18
125:1, 24  130:4
133:19, 22  142:7
143:16
**vs**  1:5

**< W >**
**W-2**  10:7
**wait**  5:2, 6  41:10
**waived**  4:4
**walk**  97:16
**Walsh**  1:15  146:5
**want**  5:5  23:2
27:23  29:19, 21
35:17  38:2  39:2
49:13  53:8, 12  63:13
68:3, 13  85:15  97:14,
24  105:12  115:16
116:12  141:25
143:20
**wanted**  34:22, 24
35:18  53:17  142:1
**Warehouse**  63:6
**way**  26:4  35:24
40:6  44:23  47:9, 18
61:14  63:1  94:6
96:6  97:2  112:2
122:22  131:1  133:23
138:3, 4
**ways**  28:15  123:22
**W-e**  51:4
**Web**  50:25
**week**  9:10, 11  24:14
35:12  40:20  47:16
**Weekly**  24:13
**weeks**  92:23
**Welkowitz**  130:12
**Well**  10:7, 14, 20, 23
11:16, 17  16:5  18:21
20:18  21:11  22:14
24:20  34:10  36:20
45:3  51:15, 20  52:23
53:10  54:22  64:3
67:2  69:17  78:4

79:10  85:15, 18
94:16  104:24  129:4
133:2  137:22  140:6
**went**  85:23  95:18
97:12  98:15  99:3, 6,
11  100:25  101:3, 6, 7,
8, 10  121:5  124:6
128:12  129:3  142:23
143:5, 9
**wiped**  56:11, 18
**wires**  109:1
**Wisniewski**  16:4
**withdrawals**  59:3
**witness**  2:12  4:7
6:12  34:17  35:3
36:25  55:11  72:14
78:16  81:6  90:13
98:20  102:11, 14
107:14, 25  115:7
117:1  118:6  124:20
125:22, 25  130:1, 3
133:20  142:5
**witnesses**  9:25
**word**  37:6, 25  39:1
**words**  78:10
**work**  9:1, 3  10:5, 6,
15  16:22  35:17  48:6
49:1, 2  66:18, 23
70:5, 12  114:3  116:1,
5  143:5, 9
**worked**  15:10  16:23
40:1  55:19, 20  56:2
60:11  66:20  70:5
113:25  114:7  143:1
**working**  35:17  53:20
143:14
**works**  122:22
**worksheet**  86:3
**worry**  36:21  53:25
**worse**  108:11
**worth**  84:10  95:10,
13
**write**  15:12
**written**  4:23  39:11
46:17, 22  67:12
104:10
**wrote**  24:4

**< Y >**

**Yeah**  13:22  17:19
21:6  27:23, 25  32:14,
21  37:10  39:12
50:11  52:18  55:22
57:13  63:24  64:19
66:10  67:6  70:15
71:5  74:23  76:11
84:12, 15  107:1, 3
110:24  112:19
113:17  114:22
118:19  125:25
136:24  139:5  140:6
**year**  14:15  15:2
32:17  42:8, 18  54:7
59:10  66:24, 25
70:13  94:16, 17
116:8  125:4
**years**  14:21, 25  15:2
61:10  143:3, 6
**year-to-year**  10:18
17:8
**Yep**  50:5  96:13, 21
98:23  133:20  134:9
138:5
**yes-or-no**  34:15

**< Z >**
**Zoom**  40:8

## WORD LIST

**< $ >**
**$242,310**  *(1)*
**$34,945,085.48**  *(1)*
**$35,201,490**  *(1)*
**$375.86**  *(1)*
**$4,145.03**  *(1)*
**$500,000**  *(1)*
**$550,000**  *(1)*
**$94,050**  *(1)*

**< 1 >**
**1**  *(18)*
**1.2**  *(3)*
**10,000**  *(1)*
**100**  *(9)*
**101**  *(4)*
**102**  *(4)*
**108**  *(1)*
**1099**  *(1)*
**11**  *(2)*
**111**  *(1)*
**114,000**  *(1)*
**114/23**  *(1)*
**117**  *(1)*
**12**  *(1)*
**12/3/24**  *(1)*
**12/31**  *(1)*
**12/31/2020**  *(1)*
**12/31/2021**  *(1)*
**12/31/2024**  *(1)*
**12/31/21**  *(5)*
**12/31/24**  *(1)*
**12:45**  *(1)*
**123**  *(2)*
**127**  *(2)*
**129**  *(1)*
**12th**  *(1)*
**13**  *(1)*
**1339**  *(1)*
**138**  *(2)*
**14**  *(1)*
**140**  *(7)*
**16-page**  *(1)*
**17601**  *(1)*
**18**  *(1)*
**19**  *(2)*
**19107**  *(1)*

**1st**  *(2)*

**< 2 >**
**2**  *(13)*
**2.7**  *(3)*
**2.9**  *(1)*
**20**  *(6)*
**2000466867**  *(1)*
**2018**  *(8)*
**2019**  *(6)*
**2020**  *(4)*
**2021**  *(3)*
**2022**  *(15)*
**2024**  *(23)*
**2025**  *(1)*
**203**  *(2)*
**207**  *(1)*
**21**  *(16)*
**217-2400**  *(1)*
**21-million-dollar**  *(3)*
**22**  *(2)*
**22ish**  *(1)*
**22nd**  *(1)*
**23**  *(1)*
**24**  *(16)*
**242,000**  *(1)*
**242,310**  *(1)*
**25**  *(7)*
**26**  *(1)*
**260**  *(1)*
**280**  *(2)*

**< 3 >**
**3**  *(21)*
**3.3**  *(1)*
**3.85**  *(1)*
**30**  *(3)*
**300**  *(1)*
**31**  *(6)*
**31st**  *(9)*
**32**  *(2)*
**32.3**  *(1)*
**34**  *(6)*
**34.4**  *(1)*
**34.5**  *(1)*
**34.9**  *(5)*
**35**  *(3)*
**35,445,085**  *(1)*
**35.4**  *(2)*

**35.445**  *(1)*
**37**  *(5)*
**39**  *(3)*

**< 4 >**
**4**  *(21)*
**4.2**  *(2)*
**40**  *(3)*
**40,000**  *(2)*
**40686**  *(1)*
**45**  *(1)*

**< 5 >**
**5**  *(5)*
**50**  *(3)*
**500**  *(1)*
**500,000**  *(12)*
**556-1072**  *(1)*
**56**  *(2)*

**< 6 >**
**6**  *(7)*
**60**  *(2)*
**68**  *(1)*

**< 7 >**
**7**  *(9)*
**7,027,000**  *(1)*
**7.4**  *(2)*
**7/31/2022**  *(1)*
**70**  *(2)*
**700**  *(1)*
**717**  *(1)*
**73**  *(1)*
**73.3**  *(2)*
**77/12**  *(1)*
**77/25**  *(1)*
**771**  *(1)*
**78**  *(1)*

**< 8 >**
**8**  *(4)*
**80**  *(1)*
**83**  *(7)*

**< 9 >**
**9**  *(4)*
**9:53**  *(1)*
**90**  *(2)*

**90th**  *(1)*
**94**  *(1)*
**94,000**  *(2)*
**99**  *(1)*
**99,987**  *(2)*

**< A >**
**a.m**  *(1)*
**Aaron**  *(2)*
**ability**  *(1)*
**able**  *(11)*
**abroad**  *(3)*
**academic**  *(1)*
**access**  *(4)*
**Accordo**  *(1)*
**account**  *(18)*
**accountant**  *(5)*
**accountants**  *(1)*
**accounting**  *(15)*
**accounts**  *(1)*
**accurate**  *(1)*
**accurately**  *(1)*
**achieve**  *(1)*
**ACKNOWLEDGMENT**  *(1)*
**acquisition**  *(1)*
**Action**  *(1)*
**active**  *(2)*
**actual**  *(2)*
**add**  *(2)*
**added**  *(5)*
**additional**  *(3)*
**adjusted**  *(4)*
**adjustment**  *(6)*
**adjustments**  *(2)*
**admit**  *(1)*
**advice**  *(1)*
**affixed**  *(1)*
**agenda**  *(3)*
**ago**  *(4)*
**agree**  *(7)*
**agreement**  *(4)*
**ahead**  *(4)*
**aid**  *(1)*
**ajj@saxtonstump.com**  *(1)*
**akin**  *(1)*
**al**  *(1)*
**alarming**  *(2)*

Alec *(1)*
American *(1)*
AMEX *(4)*
amount *(9)*
amounts *(3)*
analogous *(2)*
and/or *(2)*
answer *(19)*
answered *(1)*
answers *(5)*
anybody *(10)*
anymore *(1)*
anyone's *(1)*
apart *(1)*
apologize *(5)*
appeared *(2)*
appearing *(1)*
appears *(2)*
applied *(2)*
appreciate *(2)*
appropriate *(1)*
approximate *(1)*
approximately *(3)*
April *(17)*
art *(2)*
aside *(1)*
asked *(10)*
asking *(16)*
Asset *(1)*
assets *(10)*
associated *(1)*
assume *(2)*
assuming *(1)*
ATM *(21)*
ATMs *(18)*
ATM's *(1)*
attached *(1)*
attend *(1)*
attention *(7)*
attorney *(3)*
at-will *(1)*
August *(5)*
Austin *(2)*
authority *(2)*
Avail *(2)*
available *(1)*
aware *(29)*

**< B >**

back *(22)*
background *(2)*
bad *(2)*
bags *(1)*
Baker *(1)*
Balance *(38)*
balanced *(1)*
balance-Paramount *(1)*
balances *(2)*
bank *(11)*
banks *(1)*
BARRY *(3)*
Based *(5)*
basic *(2)*
basis *(8)*
Bates *(1)*
bathroom *(1)*
beach *(6)*
Bear *(1)*
bearings *(1)*
beginning *(6)*
behalf *(5)*
behaved *(1)*
behaving *(1)*
believe *(50)*
belong *(1)*
belonged *(1)*
benefit *(4)*
benefited *(1)*
best *(11)*
better *(2)*
beyond *(1)*
big *(3)*
bigger *(1)*
biggest *(1)*
billed *(1)*
billing *(1)*
billion *(4)*
Billions *(1)*
bills *(1)*
bit *(4)*
Bitcoin *(1)*
Bitstop *(4)*
biweekly *(2)*
Blackford *(6)*
board *(6)*
bolded *(3)*
book *(3)*

bookkeeping *(1)*
books *(12)*
bottom *(8)*
boutique *(1)*
box *(4)*
boxes *(1)*
Boyle *(38)*
brand *(1)*
break *(8)*
Brett *(1)*
bring *(1)*
brokerage *(1)*
bucks *(1)*
build *(1)*
building *(1)*
built *(1)*
bullet *(1)*
Burkholder *(4)*
Burkholder's *(1)*
burnt *(1)*
business *(11)*
businesses *(1)*

**< C >**

cake *(1)*
calculated *(2)*
call *(10)*
called *(14)*
calls *(2)*
Cannabis *(3)*
Cannibis *(1)*
cap *(5)*
capacity *(1)*
Capital *(130)*
Capital's *(2)*
caps *(1)*
card *(7)*
career *(1)*
carried *(2)*
carry *(4)*
carrying *(1)*
cars *(1)*
case *(5)*
cash *(49)*
CEO *(1)*
certainty *(1)*
certification *(1)*
certify *(2)*
CFO *(9)*

Chairman *(2)*
change *(12)*
changed *(7)*
changes *(1)*
character *(1)*
chart *(1)*
Check *(2)*
checks *(1)*
Chestnut *(1)*
Chief *(2)*
Choice *(3)*
CI-24-06012 *(1)*
circling *(1)*
Civil *(2)*
Claim *(1)*
clarification *(4)*
clarify *(2)*
clarity *(1)*
class *(1)*
clean *(2)*
clear *(2)*
CLO *(1)*
close *(2)*
closest *(1)*
closing *(1)*
collected *(1)*
collectively *(3)*
Column *(13)*
columns *(1)*
come *(15)*
comes *(2)*
comfort *(1)*
comfortable *(2)*
coming *(10)*
Common *(4)*
Commonwealth *(1)*
communicate *(4)*
communicated *(3)*
communicates *(1)*
communicating *(3)*
communications *(1)*
companies *(30)*
companies/personal *(1)*
Company *(34)*
Company/Personal *(1)*
comparative *(1)*
complete *(2)*

completely *(3)*
comply *(1)*
component *(1)*
comprises *(1)*
computer *(4)*
Computers *(2)*
concern *(6)*
concerned *(2)*
concerns *(6)*
concluded *(1)*
conclusion *(1)*
confused *(1)*
confusing *(1)*
consolidated *(6)*
consolidating *(3)*
constellation *(1)*
consult *(1)*
consultant *(4)*
consulting *(4)*
contained *(1)*
contentious *(1)*
continue *(2)*
continued *(1)*
contract *(2)*
contribute *(1)*
control *(3)*
controlled *(1)*
controller *(3)*
conversation *(4)*
conversations *(2)*
COO *(1)*
copy *(3)*
corner *(3)*
corporate *(7)*
Correct *(42)*
corrections *(1)*
correctly *(4)*
cost *(1)*
counsel *(8)*
country *(1)*
County *(2)*
couple *(4)*
course *(3)*
Court *(4)*
cover *(6)*
covered *(2)*
create *(6)*
created *(14)*
creates *(1)*

credentials *(1)*
credit *(5)*
crediting *(1)*
Crypt *(1)*
Crypto *(6)*
C-Suite *(4)*
Cultural *(1)*
cumulative *(2)*
currency *(2)*
current *(2)*
custodian *(1)*
CV *(1)*

< D >
Dan *(5)*
Dana *(7)*
Danny *(3)*
Dan's *(1)*
Daryl *(94)*
Daryl's *(10)*
data *(1)*
date *(7)*
dated *(2)*
dates *(3)*
David *(3)*
Davis *(1)*
day *(3)*
days *(2)*
day-to-day *(2)*
dboyle@boylejasari.com *(1)*
De *(2)*
deal *(4)*
debit *(1)*
debited *(1)*
debt *(14)*
debts *(1)*
December *(7)*
decide *(1)*
decision *(3)*
decisions *(3)*
decrease *(2)*
deed *(1)*
deeded *(1)*
Deerfield *(2)*
Defendant *(1)*
Definitely *(8)*
degree *(1)*
degrees *(1)*

Dennis *(8)*
department *(1)*
DEPONENT *(1)*
deposed *(1)*
deposit *(2)*
deposited *(1)*
DEPOSITION *(10)*
deposits *(5)*
Depot *(1)*
deps *(1)*
describe *(4)*
described *(8)*
describing *(1)*
description *(6)*
descriptor *(1)*
designation *(1)*
Detail *(6)*
determining *(1)*
difference *(3)*
different *(9)*
differently *(1)*
digital *(4)*
direct *(11)*
directed *(3)*
direction *(1)*
directly *(4)*
disburse *(1)*
discovery *(3)*
discuss *(4)*
discussed *(4)*
discussion *(6)*
discussions *(6)*
displayed *(4)*
distinction *(1)*
distribute *(1)*
distribution *(14)*
Distributions *(16)*
dividend *(2)*
dividends *(6)*
division *(1)*
document *(47)*
documentation *(5)*
documented *(4)*
documents *(17)*
doing *(11)*
dollars *(28)*
drill *(1)*
Drive *(4)*
drugs *(1)*

due *(10)*
duly *(1)*
duration *(1)*
duties *(1)*

< E >
earlier *(4)*
early *(1)*
earn *(1)*
earned *(1)*
earning *(6)*
earnings *(2)*
easier *(1)*
Eby *(5)*
educated *(1)*
efforts *(1)*
eight *(1)*
either *(6)*
elected *(1)*
e-mail *(2)*
e-mailed *(1)*
employee *(7)*
employees *(5)*
employer *(2)*
ended *(5)*
engage *(1)*
enterprise *(1)*
entire *(7)*
entities *(70)*
entitled *(1)*
entity *(60)*
entity's *(1)*
entrepreneur *(1)*
entry *(3)*
environment *(1)*
equally *(1)*
equipment *(2)*
equity *(2)*
Erin *(1)*
Errata *(1)*
error *(1)*
Esquire *(3)*
essentially *(2)*
established *(3)*
estate *(4)*
estimate *(4)*
estimates *(1)*
estimation *(1)*
et *(1)*

Ethereum (1)
evaluations (1)
evasive (1)
Everest (2)
everybody (2)
evidence (2)
exact (7)
exactly (5)
examination (4)
example (9)
examples (1)
exceeded (1)
Excel (2)
excess (1)
excluded (1)
Excuse (2)
executed (1)
executive (2)
EXHIBIT (42)
EXHIBITS (1)
exist (2)
existed (5)
exists (1)
exit (3)
expansion (2)
expected (2)
expenditures (1)
Expense (1)
expenses (5)
experience (1)
explain (3)
explanation (2)
Express (1)
extent (1)
External (1)

< F >
face (2)
fact (5)
factory (1)
failed (1)
failing (1)
Fair (18)
falling (1)
familiar (12)
family (4)
famous (1)
fancy (1)
far (3)

Farabaugh (1)
fast (1)
February (4)
February/March (1)
fee (5)
feel (3)
fees (6)
felt (4)
fend (1)
fifth (1)
Fifty (1)
figure (2)
file (1)
filed (3)
files (6)
filing (1)
Finance (5)
finances (3)
Financial (13)
Financially (1)
financially-troubled (1)
Financials (12)
find (6)
fine (5)
finish (4)
finished (1)
firm (1)
first (12)
five (2)
five-million-dollar (4)
flags (1)
Flash (1)
flights (2)
flip (1)
Florida (2)
flow (28)
flowed (6)
flowing (4)
flows (1)
FMB (2)
focus (3)
focused (1)
focusing (1)
Fogleman (2)
folks (3)
follow (5)
follows (1)
followups (2)

font (1)
foregoing (1)
forget (1)
forgetting (1)
form (5)
formal (7)
formalities (2)
format (7)
formed (5)
forth (1)
forward (1)
four (5)
fourth (4)
Frank (4)
frankly (1)
fraud (2)
fraudulent (2)
friend (1)
friends (1)
front (5)
full (5)
fully (1)
Fund (1)
funded (5)
funding (1)
Fundonatic (1)
Funds (25)
furnish (1)
furnishing (1)
further (1)

< G >
game (1)
GCC (26)
gears (1)
general (5)
generally (6)
generating (5)
getting (4)
gifts (1)
girlfriends (2)
give (20)
given (5)
glad (1)
glasses (1)
Glorious (51)
go (34)
goal (1)
goes (8)

going (48)
Good (9)
goods (1)
graduated (1)
Granite (2)
Great (1)
gross (1)
Group (39)
grouping (1)
grow (1)
growth (1)
guess (5)
guesses (2)
guy (2)

< H >
half (7)
halfway (1)
Haller (2)
Halo (3)
hand (4)
handing (7)
happen (4)
happened (1)
happens (1)
happy (1)
hard (1)
Hazlett (2)
HC (1)
HCBS (1)
HCG (4)
head (2)
header (1)
headers (1)
hear (3)
heard (2)
hearing (2)
held (1)
Heller (174)
Heller's (6)
Help (7)
helpful (1)
helps (2)
hey (1)
high (1)
higher (2)
highlighted (1)
HIH (6)
Hillary (2)

hired (2)
hiring (1)
hold (14)
holding (11)
Holdings (37)
home (4)
honest (1)
honestly (5)
Hopefully (1)
hoping (3)
hours (1)
house (12)
HR (1)
human (1)
hundred (4)

< I >
icing (1)
idea (21)
identification (8)
identify (4)
impede (1)
impediments (1)
impetus (1)
important (2)
included (1)
including (1)
income (26)
incoming (2)
increase (3)
independent (1)
indicates (1)
indicating (1)
Indicators (1)
indirectly (1)
individual (5)
individually (1)
industries (1)
influence (1)
information (6)
i-n-g (1)
in-person (1)
insanely (1)
inside (6)
instructed (1)
instructions (1)
insurance (2)
intercoming (1)
interest (3)

interested (4)
intermingling (2)
interpreted (1)
interrupt (1)
introduced (1)
invested (6)
investment (55)
investments (5)
investors (11)
involved (1)
involvement (1)
IOU (2)
iso (1)
issue (2)
issues (1)
issuing (1)
its (17)

< J >
January (3)
Jasari (1)
Jersey (1)
jet (1)
Job (3)
Johnson (2)
Josh (17)
Joshua (2)
judgment (2)
July (14)
jump (6)
jumped (1)
jvoss@saxtonstump.com (1)

< K >
K-1 (6)
K-87 (1)
keep (3)
kept (1)
Key (1)
kidding (1)
kind (13)
knew (3)
know (109)
knowledge (22)
KPIs (1)
KPMG (1)
Kutztown (1)

< L >
Labs (1)
Lancaster (4)
laptop (5)
large (2)
larger (1)
largest (2)
Law (3)
lawsuit (1)
layman's (1)
Leaman (3)
learn (1)
leave (1)
leaving (2)
Ledgers (1)
left (14)
legal (12)
legitimate (1)
legitimately (1)
Leininger (1)
LendSpark (2)
length (1)
lengthy (1)
letter (1)
level (6)
liabilities (2)
liability (7)
liked (1)
line (32)
lines (7)
list (4)
listed (3)
listened (1)
listening (1)
little (4)
LLC (19)
loan (11)
loaned (1)
loaning (3)
loans (4)
long (1)
longer (1)
look (28)
looked (6)
looking (21)
looks (10)
Loss (1)
losses (2)
lot (3)

lower (1)
lowest (1)
Luma (1)

< M >
machines (8)
maintenance (1)
major (1)
majority (4)
making (3)
man (1)
manage (3)
managed (4)
Management (34)
managing (4)
March (8)
Margo (4)
mark (2)
MARKED (15)
market (11)
marketing (1)
marking (1)
Mary (1)
matched (1)
matches (2)
matching (1)
materials (3)
math (2)
Matt (7)
matter (2)
matters (1)
mature (1)
mean (31)
Meaning (5)
means (2)
medium (1)
meet (1)
meeting (14)
meetings (2)
member (5)
members (3)
membership (2)
membership/ownership (1)
memory (4)
mentioned (7)
mentions (1)
mercy (1)
mere (1)

merged  *(2)*
methodology  *(1)*
MGM  *(2)*
Michigan  *(6)*
million  *(73)*
Millions  *(6)*
mind  *(2)*
mine  *(11)*
minimus  *(2)*
minor  *(1)*
minus  *(3)*
minute  *(5)*
minutes  *(3)*
misheard  *(1)*
misspeak  *(1)*
misspoke  *(1)*
moment  *(1)*
money  *(66)*
monies  *(2)*
month  *(17)*
monthly  *(3)*
months  *(2)*
month-to-month  *(2)*
morning  *(1)*
MSO  *(10)*
multiple  *(2)*

< N >
N/P  *(8)*
nailed  *(1)*
name  *(24)*
names  *(2)*
Nancy  *(2)*
native  *(5)*
nature  *(1)*
need  *(21)*
needed  *(4)*
needs  *(1)*
negotiating  *(1)*
Neil  *(1)*
neither  *(1)*
net  *(12)*
nets  *(1)*
network  *(1)*
networks  *(1)*
never  *(8)*
new  *(7)*
Nineteen  *(1)*
Ninetieth  *(1)*

nods  *(1)*
nonoperating  *(2)*
Nope  *(1)*
normal  *(1)*
Notary  *(2)*
note  *(31)*
noted  *(1)*
notepad  *(1)*
notes  *(5)*
Notice  *(1)*
November  *(2)*
NP  *(1)*
number  *(18)*
numbered  *(4)*
numbers  *(7)*
nutshell  *(1)*

< O >
object  *(3)*
objections  *(1)*
objective  *(1)*
obvious  *(2)*
obviously  *(2)*
occur  *(1)*
occurred  *(1)*
odd  *(15)*
office  *(2)*
officer  *(6)*
officers  *(3)*
Oh  *(6)*
Okay  *(128)*
once  *(3)*
ones  *(8)*
online  *(2)*
open  *(1)*
open-ended  *(1)*
operated  *(1)*
operating  *(36)*
operational  *(5)*
operationally  *(2)*
operations  *(7)*
opinion  *(2)*
opportunity  *(1)*
oral  *(5)*
order  *(2)*
ordinary  *(1)*
org  *(1)*
organizations  *(3)*
organized  *(1)*

original  *(1)*
originally  *(1)*
originated  *(5)*
Orrstown  *(2)*
outline  *(2)*
outside  *(1)*
owe  *(1)*
owed  *(15)*
owes  *(4)*
owing  *(1)*
owned  *(19)*
owner  *(15)*
owners  *(3)*
ownership  *(12)*
owning  *(1)*
owns  *(1)*

< P >
P&L  *(32)*
P&Ls  *(1)*
p.m  *(1)*
PA  *(2)*
PAGE  *(18)*
PAGE/LINE  *(1)*
pages  *(4)*
paid  *(8)*
paperwork  *(1)*
Paragraph  *(1)*
Paramount  *(153)*
Paramount/pledges
 *(8)*
Paramount-related
 *(1)*
Paramount's  *(7)*
paramours  *(1)*
Pardon  *(1)*
parentheses  *(2)*
parlance  *(1)*
part  *(11)*
particular  *(1)*
particulars  *(1)*
parties  *(3)*
partner  *(2)*
Partners  *(1)*
passed  *(1)*
passthrough  *(3)*
pay  *(13)*
payable  *(6)*
payable/no  *(1)*

paycheck  *(3)*
paying  *(2)*
payment  *(5)*
payments  *(20)*
PE  *(6)*
pen  *(2)*
pending  *(2)*
Pennsylvania  *(4)*
people  *(6)*
percent  *(35)*
percentage  *(5)*
percentile  *(1)*
perception  *(1)*
perfect  *(5)*
perform  *(1)*
Performance  *(2)*
performed  *(3)*
performing  *(3)*
period  *(14)*
periods  *(1)*
person  *(2)*
personal  *(12)*
personally  *(8)*
persons  *(1)*
perspective  *(5)*
perspectives  *(1)*
Pete  *(1)*
PH  *(1)*
Philadelphia  *(1)*
physical  *(3)*
picked  *(1)*
piece  *(2)*
pin  *(2)*
place  *(1)*
placeholder  *(1)*
Plaintiffs  *(4)*
plan  *(1)*
Pleas  *(2)*
please  *(1)*
Pledge  *(4)*
PMG  *(4)*
point  *(25)*
pointed  *(1)*
points  *(5)*
Ponzi  *(20)*
poor  *(1)*
portfolio  *(28)*
portion  *(1)*
portrayed  *(3)*

positive *(7)*
possess *(1)*
possible *(11)*
possibly *(2)*
potential *(2)*
PowerCoin *(6)*
Powers *(1)*
practice *(7)*
practices *(1)*
Premiere *(3)*
preparation *(2)*
preparations *(1)*
prepared *(12)*
present *(2)*
presentation *(9)*
presented *(3)*
presently *(2)*
President *(1)*
Prestige *(17)*
pretty *(4)*
previous *(5)*
previously *(6)*
price *(2)*
PricewaterhouseCoopers *(1)*
Prill *(3)*
print *(2)*
Printed *(11)*
printing *(1)*
printout *(1)*
prior *(1)*
priority *(1)*
private *(2)*
privately *(1)*
probably *(12)*
problem *(2)*
proceeding *(1)*
proceedings *(2)*
proceeds *(1)*
process *(1)*
produce *(2)*
produced *(1)*
producing *(1)*
product *(2)*
PRODUCTION *(5)*
professional *(1)*
Profit *(1)*
profitable *(8)*
profits *(2)*

Project *(1)*
Proof *(2)*
property *(2)*
propounded *(1)*
protocol *(1)*
provide *(1)*
provided *(5)*
PTG *(1)*
Public *(3)*
publishing *(1)*
pulling *(2)*
purchase *(7)*
purchasing *(3)*
purports *(1)*
purpose *(1)*
purposes *(4)*
pursuant *(1)*
put *(9)*
putting *(1)*

< Q >
qualifications *(1)*
qualified *(1)*
quarter *(1)*
quarterly *(1)*
question *(37)*
questions *(9)*
quick *(3)*
QuickBooks *(6)*
quickly *(1)*
Quinones *(1)*
quite *(2)*

< R >
raising *(1)*
Randall *(8)*
rattle *(1)*
Raw *(46)*
Raw's *(2)*
reach *(1)*
reaches *(1)*
read *(7)*
real *(7)*
realize *(2)*
really *(13)*
Ream *(1)*
reason *(7)*
reasonable *(2)*
reasons *(4)*

recall *(57)*
recalling *(2)*
receivable *(9)*
receivable-Raw *(1)*
receivables *(1)*
receive *(5)*
received *(11)*
receivership *(2)*
receiving *(2)*
recognize *(7)*
recollection *(3)*
reconcile *(4)*
reconciled *(1)*
reconciliation *(1)*
record *(13)*
recorded *(3)*
records *(8)*
red *(1)*
reduction *(1)*
refer *(2)*
referred *(2)*
reflect *(4)*
reflected *(9)*
Regarding *(4)*
regular *(3)*
Reimb *(1)*
relate *(2)*
related *(11)*
relates *(1)*
relationship *(2)*
Reliance *(1)*
religiously *(1)*
remember *(4)*
remiss *(1)*
removed *(1)*
repairs *(1)*
Report *(31)*
reported *(2)*
reporter *(7)*
Reporting *(9)*
reports *(4)*
represent *(28)*
representation *(2)*
representations *(1)*
represented *(6)*
representing *(1)*
represents *(12)*
REQUEST *(3)*
requested *(1)*

requesting *(1)*
requests *(2)*
required *(1)*
requirements *(1)*
reserved *(1)*
reset *(1)*
resides *(1)*
resignation *(2)*
resigned *(4)*
resources *(1)*
respective *(2)*
response *(4)*
responses *(2)*
responsibility *(1)*
responsible *(1)*
responsive *(1)*
restate *(1)*
restaurant *(1)*
results *(2)*
return *(3)*
returning *(3)*
returns *(1)*
revenue *(16)*
Revenues *(1)*
review *(2)*
reviewed *(1)*
Richard *(2)*
Richard's *(1)*
Rick *(1)*
right *(36)*
RL *(1)*
RL0004 *(1)*
RL0007 *(1)*
RL0011 *(3)*
RL0012 *(1)*
RL0013 *(5)*
RL0015 *(3)*
RL00172 *(1)*
RL0020 *(2)*
RL0022 *(1)*
RL0023 *(1)*
RL0026 *(1)*
RL0028 *(5)*
RL0031 *(2)*
RL0032 *(1)*
RL16 *(1)*
RL28 *(1)*
RL31 *(2)*
RL32 *(1)*

**RL6** *(1)*
**Rockford** *(1)*
**role** *(7)*
**roles** *(4)*
**roll** *(2)*
**rolled** *(3)*
**rolls** *(1)*
**room** *(3)*
**Row** *(10)*
**Run** *(2)*
**running** *(1)*
**RYNEARSON** *(21)*

**< S >**
**sabbatical** *(3)*
**Safe** *(1)*
**safes** *(1)*
**sale** *(2)*
**sales** *(9)*
**satisfied** *(3)*
**saved** *(1)*
**saw** *(6)*
**Saxton** *(1)*
**saying** *(7)*
**says** *(16)*
**scale** *(4)*
**scheme** *(11)*
**Schlicker** *(5)*
**school** *(1)*
**scratch** *(2)*
**screen** *(13)*
**scroll** *(1)*
**sealing** *(1)*
**Search** *(1)*
**sec** *(1)*
**second** *(10)*
**section** *(2)*
**see** *(83)*
**seeing** *(5)*
**seen** *(6)*
**segment** *(3)*
**sell** *(7)*
**selling** *(1)*
**send** *(3)*
**sending** *(2)*
**senior** *(2)*
**sense** *(11)*
**sent** *(2)*
**separate** *(2)*

**September** *(3)*
**serial** *(1)*
**service** *(8)*
**serviced** *(1)*
**services** *(14)*
**set** *(5)*
**sets** *(1)*
**setup** *(2)*
**seven** *(3)*
**seventh** *(2)*
**Seventy** *(1)*
**shakes** *(1)*
**shared** *(5)*
**shareholders** *(1)*
**sheet** *(21)*
**sheets** *(2)*
**shifted** *(1)*
**Shock** *(3)*
**shocking** *(1)*
**show** *(7)*
**showed** *(10)*
**showing** *(2)*
**shown** *(1)*
**side** *(1)*
**sides** *(1)*
**sign** *(3)*
**signatories** *(1)*
**signature** *(11)*
**Signed** *(1)*
**significant** *(3)*
**significantly** *(3)*
**signing** *(1)*
**Silverview** *(1)*
**similar** *(2)*
**simply** *(2)*
**single** *(3)*
**sir** *(17)*
**sit** *(2)*
**sitting** *(1)*
**six** *(1)*
**skip** *(4)*
**slow** *(1)*
**small** *(9)*
**smaller** *(1)*
**smarter** *(1)*
**software** *(2)*
**sold** *(3)*
**sole** *(4)*
**solely** *(2)*

**Solutions** *(1)*
**somebody** *(4)*
**Sorry** *(13)*
**sort** *(7)*
**sounds** *(2)*
**speak** *(4)*
**speaking** *(1)*
**special** *(2)*
**specific** *(3)*
**specifically** *(17)*
**spent** *(2)*
**spoke** *(2)*
**sportsmansdeals.com** *(1)*
**Spreadsheet** *(16)*
**spreadsheets** *(1)*
**staff** *(5)*
**stake** *(3)*
**stamp** *(1)*
**standalone** *(1)*
**standard** *(8)*
**staple** *(1)*
**start** *(7)*
**started** *(6)*
**starting** *(1)*
**startup** *(6)*
**startups** *(1)*
**State** *(1)*
**Statement** *(2)*
**Statements** *(4)*
**states** *(1)*
**stay** *(1)*
**stayed** *(1)*
**stays** *(1)*
**steps** *(1)*
**stick** *(2)*
**stipulated** *(1)*
**STIPULATION** *(1)*
**Stoltzfus** *(2)*
**stop** *(2)*
**stopped** *(2)*
**straight** *(2)*
**strained** *(1)*
**strategic** *(4)*
**Street** *(1)*
**Strictly** *(1)*
**strike** *(2)*
**structure** *(2)*
**structures** *(1)*

**struggle** *(1)*
**struggling** *(1)*
**studying** *(1)*
**Stump** *(1)*
**Subpoena** *(8)*
**substance** *(3)*
**subtotal** *(1)*
**succeeded** *(1)*
**sufficient** *(8)*
**suggests** *(1)*
**Suite** *(2)*
**sum** *(17)*
**summary** *(3)*
**sums** *(3)*
**super** *(1)*
**supplied** *(3)*
**supply** *(1)*
**support** *(8)*
**supports** *(1)*
**sure** *(23)*
**surmise** *(1)*
**surprise** *(1)*
**surprising** *(1)*
**suspected** *(1)*
**sworn** *(1)*
**synonymous** *(1)*

**< T >**
**table** *(5)*
**take** *(8)*
**taken** *(1)*
**talk** *(16)*
**talked** *(7)*
**talking** *(11)*
**tallied** *(1)*
**tax** *(14)*
**taxes** *(4)*
**team** *(3)*
**Teams** *(6)*
**Technology** *(2)*
**tell** *(9)*
**telling** *(2)*
**Ten** *(2)*
**ten-point** *(2)*
**Tens** *(2)*
**tenure** *(1)*
**term** *(3)*
**terminology** *(1)*
**terms** *(2)*

**test** *(3)*
**testified** *(1)*
**testify** *(1)*
**testimony** *(3)*
**Text** *(2)*
**Thank** *(11)*
**Thanksgiving** *(2)*
**thing** *(11)*
**things** *(5)*
**think** *(44)*
**thinker** *(1)*
**thinking** *(3)*
**third** *(7)*
**Thirty** *(1)*
**thought** *(2)*
**thousand** *(1)*
**Thousands** *(1)*
**three** *(12)*
**tie** *(4)*
**tied** *(4)*
**tiers** *(1)*
**time** *(33)*
**timeframe** *(5)*
**times** *(5)*
**tiny** *(1)*
**title** *(6)*
**titled** *(2)*
**titles** *(2)*
**to/due** *(1)*
**today** *(15)*
**today's** *(1)*
**toggle** *(1)*
**told** *(5)*
**tomorrow** *(1)*
**top** *(10)*
**tort** *(1)*
**total** *(10)*
**totals** *(1)*
**TR-31** *(1)*
**tracking** *(1)*
**transaction** *(6)*
**transactional** *(5)*
**Transactions** *(6)*
**transcript** *(5)*
**transcription** *(1)*
**transpired** *(1)*
**trap** *(1)*
**trial** *(1)*
**troubled** *(7)*

**true** *(2)*
**truly** *(1)*
**truthful** *(1)*
**try** *(5)*
**trying** *(13)*
**turned** *(2)*
**TVT** *(2)*
**Twenty-one** *(1)*
**twice** *(2)*
**two** *(19)*
**Tycoon** *(15)*
**tying** *(1)*
**type** *(2)*
**types** *(2)*
**typewritten** *(1)*
**typically** *(4)*

**< U >**
**U.S** *(1)*
**ultimately** *(1)*
**Um-hum** *(3)*
**underlying** *(1)*
**underneath** *(1)*
**understand** *(19)*
**understanding** *(12)*
**understood** *(3)*
**undertake** *(1)*
**unfortunately** *(2)*
**unit** *(1)*
**universe** *(7)*
**University** *(1)*
**unpaid** *(3)*
**unusual** *(3)*
**upset** *(1)*
**upside** *(1)*
**use** *(4)*

**< V >**
**vacation** *(1)*
**vague** *(1)*
**value** *(11)*
**values** *(1)*
**various** *(4)*
**vendor** *(1)*
**Ventures** *(12)*
**vernacular** *(2)*
**version** *(1)*
**versus** *(1)*
**videotape** *(1)*

**view** *(2)*
**visionary** *(2)*
**Voss** *(53)*
**vs** *(1)*

**< W >**
**W-2** *(1)*
**wait** *(3)*
**waived** *(1)*
**walk** *(1)*
**Walsh** *(2)*
**want** *(22)*
**wanted** *(5)*
**Warehouse** *(1)*
**way** *(17)*
**ways** *(2)*
**W-e** *(1)*
**Web** *(1)*
**week** *(7)*
**Weekly** *(1)*
**weeks** *(1)*
**Welkowitz** *(1)*
**Well** *(33)*
**went** *(22)*
**wiped** *(2)*
**wires** *(1)*
**Wisniewski** *(1)*
**withdrawals** *(1)*
**witness** *(26)*
**witnesses** *(1)*
**word** *(3)*
**words** *(1)*
**work** *(19)*
**worked** *(12)*
**working** *(3)*
**works** *(1)*
**worksheet** *(1)*
**worry** *(2)*
**worse** *(1)*
**worth** *(3)*
**write** *(2)*
**written** *(6)*
**wrote** *(1)*

**< Y >**
**Yeah** *(35)*
**year** *(14)*
**years** *(6)*
**year-to-year** *(2)*

**Yep** *(7)*
**yes-or-no** *(1)*

**< Z >**
**Zoom** *(1)*