| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| **McMANIMON, SCOTLAND & BAUMANN, LLC**<br>75 Livingston Avenue, Second Floor<br>Roseland, New Jersey 07068<br>(973) 622-1800<br>Anthony Sodono, III (asodono@msbnj.com)<br>Sari B. Placona (splacona@msbnj.com)<br>*Counsel for Daryl Fred Heller, the Chapter 11 Debtor and Debtor-in-Possession* | |
| In re:<br><br>DARYL FRED HELLER,<br><br>        Debtor. | Chapter 11<br><br>Case No. 25-11354 (JNP) |

**DEBTOR'S REPLY TO PRESTIGE'S OBJECTION TO DEBTOR'S MOTION FOR AN ORDER APPROVING THE AGREEMENT AMONGST THE DEBTOR, HELLER CAPITAL GROUP, LLC, HELLER INVESTMENT HOLDINGS, LLC AND DEERFIELD CAPITAL, LLC PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Daryl Fred Heller (the "Debtor"), the Chapter 11 Debtor and Debtor-in-Possession, by and through his counsel, McManimon, Scotland & Baumann, LLC, respectfully submits his reply ("Reply") to Prestige's[1] Objection to Debtor's Motion for an Order Approving the Agreement Amongst the Debtor, Heller Capital Group, LLC ("HCG"), Heller Investment Holdings, LLC ("HIH"), and Deerfield Capital, LLC ("Deerfield") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Motion")[2] ECF 258 (the "Objection"). ECF 290. The Debtor respectfully submits as follows:

---

[1] Prestige, as defined in the Objection, consists of Prestige Fund A, LLC, Prestige Fund A IV, LLC, Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund B II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC, Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC, Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC, Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund VI, LLC and WF Velocity Fund VII, LLC (collectively, "Prestige" or "Prestige Fund").

[2] Undefined capitalized terms herein shall have the same meaning as ascribed in the Motion.

I. **Debtor Disputes Prestige's Preliminary Statement in the Objection**

The Motion concerns a significant benefit to the Debtor's estate by way of the Agreement between the Debtor, HCG, HIH, and Deerfield. Since the beginning of the Debtor's case, Deerfield was far from an ally to the Debtor. In fact, Deerfield was the first creditor to file a motion against the Debtor, by way of Deerfield's Motion for Relief from the Automatic Stay to Continue the State Court Proceedings Against the Debtor in Pennsylvania and New Jersey, Prohibit Use of Cash Collateral, Transfer Venue and Expedited Discovery ("Deerfield's Motion"). ECF 9. Moreover, Deerfield filed its Motion to Appoint Trustee ("Deerfield's Trustee Motion"). ECF 30. The Debtor has expended significant estate funds defending against Deerfield's Motion and Deerfield's Trustee Motion – and but for the Agreement – would be continuing expending significant estate funds litigating issues with Deerfield to the detriment of all creditors, including Prestige. Thus, Prestige is far from a "preferred creditor" as framed by Prestige. See Objection, at ¶ 1.

Prestige obfuscates the issue presented in the Motion – whether the Agreement should be approved – by asserting bombastic and inflammatory allegations in its opening paragraph. Id. Prestige asserts baselessly that the Debtor's "Motion is yet another step by [the Debtor to] advance his massive Ponzi scheme and shell game . . . while also refusing to comply with rudimentary disclosure obligations". Id. Prestige cites to "fourteen other creditors, hav[ing] filed complaints commencing adversary proceedings" to disparage the Debtor's character, as a tactic to muddy the water, as if somehow that should affect whether this Agreement in this Motion should be approved. Id., at ¶ 3. What Prestige fails to tell the Court is that a majority of those complaint are by related parties to Prestige. Moreover, as all parties know, complaints are often filed as a place holder to avoid the statute of limitations issues regarding complaints objecting to discharge.

These false and defamatory statements by Prestige are unsupported and do nothing to advance any substantive argument as to why the Motion should not be granted and the Agreement

2

rejected. Regarding Prestige's reference to a Ponzi scheme and shell game, Prestige has tunnel vision in advancing this argument as it only refers to Paramount. Id. First and foremost, Paramount is a non-debtor. Nonetheless, by Prestige only focusing on Paramount, it neglects to reference many of the affiliates to Paramount that were generating millions of dollars in monthly revenue. By narrowly focusing on Paramount, Prestige neglects to account for the whole picture of monthly revenues by Paramount affiliates, which is a fatal flaw in asserting that a Ponzi scheme occurred. Id.

Also, Prestige falsely states the Debtor, "defrauded creditors out of over $800,000,000." Id. Prestige has time and again cited to staggering uncorroborated numbers in this bankruptcy case. By way of example, pursuant to its Claims Nos. 13 through 32[3] (the "Claims"), Prestige attached a judgment against Paramount – **not** the Debtor -- for $138,156,118.38 yet asserts an aggregate total amount owed for the Claims of $503,290,225.46. See Claims 13-32. This is done to sensationalize the amount it is owed, however, it is disingenuous if not outright improper as it seeks to conflate the Debtor with Paramount on debt exceeding over half a billion. Now, somehow Prestige arrives at the number $800,000,000. Prestige has yet to explain how it substantiates such sizeable numbers. While the Debtor disputes total current investments being $800,000,000, the Debtor notes Prestige Funds has been paid back approximately $400,000,000 in recent years, which does not even reflect the total amount paid back to Prestige since the inception of the funds in 2012. In that same period, Prestige Fund managers have siphoned approximately $70,000,000 into their management funds in which they own, of which the majority of this amount has been egregiously paid to said managers over this period.

Prestige cites to discovery it received from Venmo and lists out various transactions from

---

[3] The Debtor filed a Motion Expunging the Claims filed by Prestige Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 [ECF 288], currently returnable on June 10, 2025.

February 18, 2023 to August 25, 2024 where the total amount per transaction was over $600. Id., at ⁋ 5. Prestige argues the Venmo transactions "appear to be gifts that should have been disclosed by Debtor both in his disclosure forms and at the 341 Meeting of Creditors[]." Id. First, the Debtor's devices in which the Venmo account were logged that depict the Debtor's account, were confiscated due to a federal probe. Moreover, the password of the Venmo account was also confiscated, leaving the Debtor with no ability to access same. The Debtor did not have access to these devices, since prior to filing for bankruptcy. Furthermore, as described more further below, despite the Venmo account being in the Debtor's name, said account was also used for business purposes and expenses, as well as charitable gifts. A fact not accounted for by Prestige – again, another attempt to sensationalize its claims.

      Many of these Venmo charges were business expenses for the Debtor's businesses, and not for the Debtor personally, as a business cannot have a Venmo account. Moreover, Exhibit A to the Objection includes the complete record of Venmo transactions—a voluminous list that the Debtor could not reasonably be expected to recall from memory or may have been business and not personal. Thus, without access to the confiscated devices, nor access to the Venmo account, it is reasonable the Debtor did not recall this at the 341 Meeting of Creditors as to whether the Debtor made transaction of $600 or more over the prior (2) years since filing for bankruptcy. Moreover, with the Venmo account being used for the businesses, it is reasonable the Debtor did not recall the Venmo Account as a personal spending account. Exhibit A contains hundreds of Venmo transactions that were declined under either "risk declined," "risk," "or simply "declined" either because, (i) it was a fraudulent request in which Venmo or someone on the businesses' behalf declined the transaction as a request from an unknown or unauthorized person, or (ii) a person that was in need and requested money, however, was not approved.

Furthermore, the Debtor through his businesses generated millions of incomes annually and a material amount of these Venmo transactions are charitable contributions. Either the Debtor or his companies provided charitable contributions in the multi-million-dollar range, depending on the year the income was pass through to the Debtor from most of his entities. Many of these Venmo transactions are business transaction for services and are only tied to the Debtor because, as stated previously, a company cannot have a Venmo account. A social security number is needed for a Venmo account, and logically it made sense to use the Debtor's account and therefore account was multi-purpose. Some of the persons who were sent charitable gifts, did not have a bank account or institutional wire capability. Thus, to send charitable gifts to individuals, Venmo was the perfect vehicle to accomplish these charitable gifts. Lastly, these Venmo transactions occurred when the Debtor was solvent, and do not depict fiscal irresponsibility. In the full interest of transparency, the Debtor in recent weeks has been working to gain access to these Venmo statements to amend his Statement of Financial Affairs for Individuals Filing for Bankruptcy.

Prestige paints the picture that the Debtor's 341 Meeting with Creditors was disingenuous because counsel objected to questions about affiliated entities. See Objection, at ¶ 4. The Debtor's conduct at the 341 Meeting with Creditors was appropriate and consistent with bankruptcy procedure. Creditors seeking detailed information about non-debtor affiliates were properly directed to use Rule 2004 discovery, which provides the necessary process for such inquiries. The Debtor's Motion to Quash Prestige's 2004 subpoena was a legitimate exercise of procedural rights, not evidence of misconduct. Finally, any suggestion of "stonewalling" is unfounded, as courts recognize the limited evidentiary value of a testimony at the 341 Meeting with Creditors. Id. The Debtor's counsel has time and again advised creditors the Debtor did not plead the Fifth Amendment for the entire meeting and was more often than not cooperative at the 341 Meeting

5

with Creditors.

As for Prestige raising the issue of Rule 2015.3 and Form 426, the Debtor has been conducting due diligence since the case's inception by compiling relevant information with his accountant to file an accurate Form 426 as it is a complex estate. See Objection, at ¶¶ 6-7.

HCG and HIH are non-debtor entities in which the Debtor has a controlling interest, but both HCG and HIH have many entities beneath them which takes time to properly account. The Debtor has not yet filed Form 426, not due to bad faith, but rather due to the opposite. The Debtor had worked tirelessly to accumulate the requisite information of the non-debtor entities in which he has a controlling interest and will be filing same forthwith pending accountant approval. Form 426 will be filed in short order.  As a side note, the Examiner has not cited one instance of the Debtor's misconduct, delay, or anything else untoward.

Regarding the Debtor's answers on behalf of Paramount Management Group, LLC ("Paramount") in the Court of Common Pleas of Lancaster County, the reason for the delayed response was because the issue of whether discovery in that state court was subject to the automatic stay was being litigated in this Court. See Objection, at ¶ 8. Moreover, investors had seized control of Paramount and the Debtor has limited access to information on Paramount. As Prestige is aware, Prestige and the Debtor were in an active dispute whether said Pennsylvania state court discovery was stayed, since the filing of Prestige's Motion for Order Confirming That it is Not Stayed From Proceeding with Discovery and Civil Contempt Proceedings Pursuant to 11 U.S.C. § 362(B)(4) ("Prestige Stay Motion"). ECF 158. Prestige's Stay Motion was filed back on March 28, 2025, and the Court having granted Prestige's Stay Motion on May 22, 2025. ECF 274. Thus, once the Court confirmed the Pennsylvania state court discovery was not stayed, the Debtor furnished responses promptly. Prestige is entitled to interpret the Debtor's election to utilize his Fifth Amendment

6

privilege against self-incrimination pursuant to his discovery responses therein, however, the Fifth Amendment is an inalienable right there to protect citizens, and when faced with a federal probe it is only reasonable to utilize one's constitutional protections.

Prestige finally argues in its Preliminary Statement the Motion seeks to terminate the Examiner, arguing despite the Examiner being appointed as a resolution of Deerfield's Trustee Motion, that somehow because the Court appointed the Examiner, the Examiner should not be terminated. See Objection, at ¶ 9. The appointment of the Examiner was reached primarily as a compromise between Deerfield and the Debtor, in place of appointing a chapter 11 trustee pursuant to Deerfield's Trustee Motion. In fact, on May 22, 2025, Deerfield filed a Motion for an Order Staying and/or Suspending the Examiner ("Deerfield's Examiner Termination Motion"). ECF 274. Deerfield filed Deerfield's Examiner Termination Motion because when the parties agreed on the Examiner Order [ECF 99], the Debtor feared that appointment of a chapter 11 trustee would so drain the estate it would jeopardize the Debtor's chances at reorganization.

Thus, the parties agreed on the terms of the Examiner Order, which was limited in scope. It was limited to curtail excessive fees. Unfortunately, the opposite came true. The Examiner filed a budget estimating total fees in the amount of $1,416,195 and his attorneys' fees in the amount of $350,005. See Deerfield's Examiner Termination Motion, at ¶ 8. With the Examiner accruing such substantial fees, termination of the Examiner is in Prestige's best interest as more estate funds will be preserved for its Claims. Moreover, the Agreement diminishes the necessity of the Examiner's services.

Regarding Prestige's references to the fifteen (15) non-dischargeability complaints, the Debtor vehemently disputes these complaints, preliminary finds them erroneous, and will be filing answers or motions to dismiss. See Objection, at ¶ 10. Moreover, approximately seven (7) of the

7

fifteen (15) non-dischargeability complaints were filed by Prestige Fund managers or entities of said managers, therefore the number is bloated to Prestige's benefit and not as significant as Prestige makes it out to seem. Again, utilized to sensationalize Prestige's Claims.

Prestige on the one hand states "further investigation is warranted before any payments are made to creditors" yet on the other files frivolous Claims against the Debtor's estate. Id., ¶ 11. Prestige filed the Claims against the Debtor in the aggregate amount of $503,290,225.46, when – at most – Prestige only has a claim against the Debtor personally for $2,050,500; pursuant to an Order against Paramount, holding Paramount in civil contempt for $2,050,500.00, jointly and severally, against Paramount and the Debtor in the matter entitled <u>Prestige Funds A, LLC, et al. v. Paramount Management Group, LLC,</u> pending in the Court of Common Pleas of Lancaster County Pennsylvania's Civil Division, bearing docket number CI-24-06012 (the "PA Action"). Prestige conflates a $138,156,118.38 judgment received against Paramount in the PA Action as the basis for filings its Claims in the Debtor's personal bankruptcy case, and somehow arrives at the egregiously overblown aggregate amount of $503,290,225.46. On May 30, 2025, the Debtor filed a Motion to Expunge Claims Filed by Prestige Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 [ECF 288], and eagerly awaits Prestige's response to understand how Prestige substantiated such an overblown total claim amount against the Debtor in his personal bankruptcy case.

### II.    **Debtor Disputes Prestige's Background in the Objection**

Prestige adopts and incorporates by reference paragraphs four through seven of Chicago Atlantic Admin, LLC's Objection to Motion for an Order Approving Agreement Between the Debtor, Charlene R. Heller, and Orrstown bank Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Chicago Atlantic Objection"). <u>See</u> Objection, at ¶ 14. To address Prestige on its adoption of the Chicago Atlantic Objection and the pin-cites referenced, Chicago Atlantic

8

Objection states the Debtor's "Schedules also claim a grossly inflated and unreliable amount relative to the Debtor's businesses." See Chicago Atlantic Objection, at ¶ 7. Regarding HCG, the Debtor's Amended Schedule A and F (the "Schedule") [ECF 122] reflects a fair market value ("FMV") of $160,000,000 and a book value of $35,000,000. ECF 122. The Debtor included a disclosure regarding HCG's valuations:

> this has been downgraded from December 31, 2023 given impairment that occurred in the first six months of 2024. This reflects two different methodologies of valuation. First is "FMV valuation methodology" which reflects what the entities/assets would sell for in the open market, not the actual book value of assets. The "Book valuation methodology" reflects the actual equity on each company's balance sheet. Many of the companies don't have a lot of tangible assets on the balance sheet rather the valuation lies in IP, contracted revenue, multiples of EBITDA, etc. We have not done a valuation recently, however it would be less than defined below.

Id. Thus, given the HCG impairment that occurred during the first six (6) months of 2024 (June 30th, 2024), and as of the February 10, 2025 petition date (the "Petition Date") [ECF 1], the value of HCG was significantly less as of the Petition Date. The Debtor did not declare HCG had a value of $160,000,000, but rather disclosed it on his Schedule for full transparency, with the disclaimer that the value was significantly less as a result of the impairment created by Prestige and other lawsuits and judgements that occurred since June 30, 2024.

### III. The Agreement is Fair and Equitable With the Martin Factors Favoring Approval

Prestige argues in its Objection that the Agreement is not fair and equitable and non-participating creditors are unduly prejudiced. See Objection, at ¶¶ 21-26. Moreover, Prestige argues the factors set forth in In re Martin, 91 F.3d 389, 393 (3d Cir.1996) (the "Martin Factor(s)") do not weigh in favor of approval of the Agreement. Id., at ¶¶ 26- 29. Regarding Prestige's assertion that the Agreement provides benefits to the Debtor's wife, daughter, and son, does not mean Deerfield has claims against them, as they are non-debtors and rather were being pursued by

9

Deerfield in an effort to collect against the Debtor. Id., at ⁋ 32. The debt owed to Deerfield is by the Debtor not his wife, daughter, or son. The Agreement does not provide a benefit to the Debtor's family insofar as it relates to relinquishing a claim against them, as Deerfield does not have a claim against them, but rather prevents further harassment in the form of collection phone calls, possible discovery requests, etc. Regarding Prestige's assertion that Paramount paid for the Beach House, this is inaccurate as although it was paid by a Paramount account, it was a distribution to the owners of HCG and to Randall Leaman as evidenced on tax returns. Id., at ⁋ 33. Prestige's comments on the additional $300,000 being disbursed from an undisclosed source, this is because not even the Debtor is sure at this point who will fund this amount, although it will be provided by the Debtor's family (not immediate). Id., at ⁋ 34. The funding of the $300,000 was necessary to come to an Agreement with Deerfield.

In the Agreement, Deerfield releasing forty-nine percent (49%) of the Debtor's remaining interest in HIH is beyond significant as the Debtor "*can use*[it] *to fund a Plan*." See Motion, at 25 (emphasis added). The Debtor's ability to fund a plan provides the greatest benefit to creditors possible, including Prestige. Deerfield's release of forty-nine (49%) of the Debtor's remaining interest in HIH is a material and substantial benefit that directly advances the paramount interests of creditors by enhancing the estate's ability to fund a Plan. Martin, 91 F.3d at 393. The Agreement enables avoidance of litigation risks, collection difficulties, and unnecessary administrative expense(s), and ensures a prompt, concrete benefit for the estate—all of which strongly support approval under the Martin Factors. Id. Ceasing litigation with Deerfield leads to ceasing substantial estate bearing costs from accruing and enables the Debtor to fund a Plan, the Martin Factors weigh in favor of such a beneficial result. Id.

### IV. The Agreement is not an Impermissible *Sub Rosa* Plan

Prestige argues in its Objection that the Agreement is an impermissible *sub rosa* plan. See Objection, at ¶¶ 36-39. Prestige argues significant estate assets, including the Beach House proceeds are distributed to Deerfield thereby prioritizing it over other creditors. Id. at ¶ 39. Prestige further argues this circumvents the plan confirmation process and deprive parties of Section 1125 and 1129 protections. Id. What Prestige fails to account for is without approval of the Agreement, there will be no Plan, nor then the need for Sections 1125 and 1129 protections for creditors. The Agreement is fair and equitable and is a necessity to fund the Debtor's plan. Therefore, because the Agreement is not a substitute for, but a prerequisite to, the Plan, it cannot be considered a *sub rosa* plan. The ultimate treatment of creditors and distribution of assets will occur only through a confirmed Plan, which is enabled by the Agreement.

Therefore, with Prestige's Objection having been sufficiently addressed, the Debtor submits the Motion and underlying Agreement should be approved by the Court.

Dated: June 3, 2025

**McMANIMON, SCOTLAND & BAUMANN, LLC**
*Counsel for Daryl Fred Heller, the Chapter 11 Debtor and Debtor-in-Possession*

By: */s/ Sari B. Placona*
      Sari B. Placona