# EXHIBIT A

4839-4739-3596, v. 1

Lancaster County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: 215-568-2000 | Fax: 215-568-0140
*Attorneys for Plaintiffs*

**IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PA**
**CIVIL ACTION-LAW**

|  |  |
|---|---|
| PRESTIGE FUND A, LLC; | : |
| PRESTIGE FUND A II, LLC; | : No. 25-00491 |
| PRESTIGE FUND A IV, LLC; | : |
| PRESTIGE FUND A V, LLC; | : |
| PRESTIGE FUND A VI, LLC; | : |
| PRESTIGE FUND A VII, LLC; | : |
| PRESTIGE FUND A IX, LLC; | : |
| PRESTIGE FUND B, LLC; | : |
| PRESTIGE FUND B II, LLC; | : |
| PRESTIGE FUND B IV, LLC; | : |
| PRESTIGE FUND B V, LLC; | : |
| PRESTIGE FUND B VI, LLC; | : |
| PRESTIGE FUND B VII, LLC; | : |
| PRESTIGE FUND B BTM I, LLC; | : |
| PRESTIGE FUND D, LLC; | : |
| PRESTIGE FUND D III, LLC; | : |
| PRESTIGE FUND D IV, LLC; | : |
| PRESTIGE FUND D V, LLC; | : |
| PRESTIGE FUND D VI, LLC; | : |
| PRESTIGE FUND D BTM I, LLC; | : |
| WF VELOCITY I, LLC; | : |
| WF VELOCITY FUND IV, LLC; | : |
| WF VELOCITY FUND V, LLC; | : |
| WF VELOCITY FUND VI, LLC; and | : |
| WF VELOCITY FUND VII, LLC, | : |
| Plaintiffs, | : |
| v. | : |
|  | : |
| DARYL HELLER and HELLER CAPITAL | : |
| GROUP, LLC | : |
| Defendants. | : |

County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

## **COMPLAINT**

Plaintiffs Prestige Fund A, LLC; Prestige Fund A II, LLC; Prestige Fund A IV, LLC; Prestige Fund A V, LLC; Prestige Fund A VI, LLC; Prestige Fund A VII, LLC; Prestige Fund A IX, LLC; Prestige Fund B, LLC; Prestige Fund B II, LLC; Prestige Fund B IV, LLC; Prestige Fund B V, LLC; Prestige Fund B VI, LLC; Prestige Fund B VII, LLC; Prestige Fund B BTM I, LLC; Prestige Fund D, LLC; Prestige Fund D III, LLC; Prestige Fund D IV, LLC; Prestige Fund D V, LLC; Prestige Fund D VI, LLC; Prestige Fund D BTM I, LLC; WF Velocity I, LLC; WF Velocity Fund IV, LLC; WF Velocity Fund V, LLC; WF Velocity Fund VI, LLC; and WF Velocity Fund VII, LLC (collectively, **the Funds**) for their Complaint against Defendants Daryl Heller and Heller Capital Group, LLC allege as follows:

### **PRELIMINARY STATEMENT**

1.     Daryl Heller, the CEO of Heller Capital, instituted a widescale fraudulent scheme for the sale and operation of ATM units owned by the Funds.

2.     The Funds are separate LLCs composed of approximately 2700 investors who invested hundreds of millions in Heller's scheme for the purchase and operation of well-over 30,000 ATMs.

3.     Heller made countless fraudulent representations to the Funds and their investors regarding the ATMs he purchased, the operation of those ATMs, the viability of the Funds' investments, and the profits being earned.

4.     Because of and in reliance on Heller's fraudulent representations about the business scheme, the Funds entered into ATM Management Services Agreements (MSAs) with Paramount Management Group, LLC from 2020 through

Lancaster County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

2023, under which Paramount initially received all revenues generated from the

ATMs to cover operational costs and then certain monthly revenues were remitted

to the Funds.

5.      Paramount ceased making its required monthly payments to the

Funds in April 2024, so the Funds brought suit against Paramount for breach of the

MSAs a few months later. *See Prestige Fund A, LLC, et al. v. Paramount*

*Management Group*, LLC, No. CI-24-06012 (C.P. Lancaster) (Paramount Action).

6.      The Paramount Action ultimately resulted in a November 21, 2024

Consent Judgment against Paramount for $138,156,118.38, which also required

Paramount to provide an inventory and rights and title to the ATMs the Funds

owned.

7.      When Paramount did not comply with that Consent Judgment,

contempt proceedings finally revealed Heller's fraud.

8.      As the Funds learned through the Paramount Action, the ATMs Heller

claimed to have purchased for the Funds either (1) never existed, (2) were

purchased but stayed in a warehouse, (3) were sold to more than one entity, and/or

(4) were not purchased outright.

9.      Despite leaving the Funds with worthless investments and far less

ATM assets than promised, Heller was not done defrauding the Funds. In the weeks

after the Consent Judgment, Heller transferred money from Paramount to Heller

Capital with the intent to defraud the Funds of the money they are owed under the

Consent Judgment.

County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

10.    The Funds now seek redress for Heller's years of fraudulent scheming and stolen investments and Heller's most recent attempts to defraud the Funds by transferring money to which they are entitled.

## PARTIES

11.    Plaintiff Prestige Fund A, LLC is a limited liability company organized under the laws of Pennsylvania.

12.    Plaintiff Prestige Fund A II, LLC is a limited liability company organized under the laws of Pennsylvania.

13.    Plaintiff Prestige Fund A IV, LLC is a limited liability company organized under the laws of Delaware.

14.    Plaintiff Prestige Fund A V, LLC is a limited liability company organized under the laws of Delaware.

15.    Plaintiff Prestige Fund A VI, LLC is a limited liability company organized under the laws of Delaware.

16.    Plaintiff Prestige Fund A VII, LLC is a limited liability company organized under the laws of Delaware.

17.    Plaintiff Prestige Fund A IX, LLC is a limited liability company organized under the laws of Delaware.

18.    Plaintiff Prestige Fund B, LLC is a limited liability company organized under the laws of Delaware.

19.    Plaintiff Prestige Fund B II, LLC is a limited liability company organized under the laws of Delaware.

County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

20.     Plaintiff Prestige Fund B IV, LLC is a limited liability company organized under the laws of Delaware.

21.     Plaintiff Prestige Fund B V, LLC is a limited liability company organized under the laws of Delaware.

22.     Plaintiff Prestige Fund B VI, LLC is a limited liability company organized under the laws of Delaware.

23.     Plaintiff Prestige Fund B VII, LLC is a limited liability company organized under the laws of Delaware.

24.     Plaintiff Prestige Fund B BTM I, LLC is a limited liability company organized under the laws of Delaware.

25.     Plaintiff Prestige Fund D, LLC is a limited liability company organized under the laws of Delaware.

26.     Plaintiff Prestige Fund D III, LLC is a limited liability company organized under the laws of Delaware.

27.     Plaintiff Prestige Fund D IV, LLC is a limited liability company organized under the laws of Delaware.

28.     Plaintiff Prestige Fund D V, LLC is a limited liability company organized under the laws of Delaware.

29.     Plaintiff Prestige Fund D VI, LLC is a limited liability company organized under the laws of Delaware.

30.     Plaintiff Prestige Fund D BTM I, LLC is a limited liability company organized under the laws of Delaware.

Lancaster County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

31.     Plaintiff WF Velocity I, LLC is a limited liability company organized under the laws of Delaware.

32.     Plaintiff WF Velocity Fund IV, LLC is a limited liability company organized under the laws of Delaware.

33.     Plaintiff WF Velocity Fund V, LLC is a limited liability company organized under the laws of Delaware.

34.     Plaintiff WF Velocity Fund VI, LLC is a limited liability company organized under the laws of Delaware.

35.     Plaintiff WF Velocity Fund VII, LLC is a limited liability company organized under the laws of Delaware.

36.     Defendant Daryl Heller is an adult individual and businessman who resides and conducts business in Lancaster County.

37.     Defendant Heller Capital Group, LLC is a limited liability company, with an office located at 415 North Prince Street, Suite 202, Lancaster, PA 17603.

38.     Heller is the CEO of Heller Capital.

39.     Upon information and belief, Heller Capital is the sole member of Paramount.

## JURISDICTION AND VENUE

40.     This Court has original jurisdiction to hear this action under 42 Pa.C.S. § 931.

41.     Under Pa.R.Civ.P. 2179, venue is proper in this Court because (1) Heller Capital's office is in Lancaster County; (2) Heller Capital regularly conducts business in Lancaster County; (3) the causes of action arose in Lancaster

Lancaster County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

County; and (4) a transaction or occurrence took place in Lancaster County out of

which the causes of action arose.

## FACTS

### A. Heller's business pitch

42. Heller began his business in the ATM marketplace over a decade ago.

43. Later, around 2020, Heller began pitching ATM investments to the

Funds' investors.

44. As set forth in his promotional materials for the investment, Heller

represented himself as an "entrepreneur, founding more than twelve companies

within the telecom, technology, agriculture, real estate and energy sectors."

45. He further held himself out as having been in the "ATM space" since

February 2011 and having a background and strategy to generate revenue through

"monetization of ATMs with advertising revenue streams into the future."

46. Heller described the "ATM model" as such:

> Our Core strategy is to participate in a mature and stable ATM space
> that has historical strong operating margins. This is done by accessing
> attractive real estate locations for ATMs that are strategically
> positioned for capitalizing next generation revenue opportunity,
> augmenting current and healthy surcharge operating margins through
> an enhanced monetization strategy.

47. Heller further represented that, under this model, each Fund would

own a portfolio of ATM assets and the management company, Paramount, would

"source lucrative contracts with location owners" to place the ATMs and operate and

service the ATMs.

County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

48.    In turn, the portfolio of ATMs placed by Paramount would be aggregated to "normalize the return for investors," and keep "monthly payment consistent."

49.    As Heller further represented to the Funds' investors, the ATMs would be placed at "small chain convenience stores and retail stores, bodega and sundry shops (deli/grocery stores in metro markets), malls and travel plazas."

50.    In other words, Heller represented the business plan as follows: the Funds would own ATMs purchased with their investment money, the management company (Paramount) would place those ATMs and service them, the ATMs would generate revenue when used, and the Funds would receive a monthly return on the investment from the portfolio of ATMs.

51.    Heller represented the investment would generate monthly returns over the life of the investment.

52.    Heller made further representations about the viability of the investment in Q&A sections of the investment summary promotional materials.

53.    Heller represented that his management company, Paramount, committed to each investor the projected return each month based on a blended performance of the entire fund and, "in the rare occasion that the fund performance is lagging, management will share their portion of the revenue to bring up to the proforma amount."

Filed by Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

54.     In response to the question "Have you been hitting your projections,"
Heller stated in promotional materials "[w]e have paid distributions in full and on
time in all funds since we got involved in the business back in 2012."

55.     In reliance on Heller's representations about the ATM investments,
the Funds entered into MSAs with Paramount.

**B.      The MSAs and breach of the MSAs**

56.     Each of the Funds entered into an MSA with Paramount between 2020
and 2023.

57.     Under each of the MSAs, the Funds purchased ATMs.

58.     The investors in the Funds, which total over 2700, invested hundreds
of millions to purchase ATMs from Paramount under the MSAs.

59.     Bills of sale covering years 2017-2023 provided by Heller, through
Paramount, to the Funds showed the purchase of approximately 36,000 ATMs on
the Funds' behalf; yet, many of the bills of sale contained so-called placeholder
numbers, which could not be tied to any particular ATM (i.e., the placeholder
number was not the actual serial number of any ATM).

60.     Moreover, upon information and belief, the bills of sale provided by
Heller for purchases in 2023 did not reflect sufficient ATMs purchased based on the
amount invested by the Funds; hence, the bills of sale underreported the ATMs that
should have been purchased with the Funds' investments.

61.     Furthermore, Heller never supplied bills of sale for ATMs purchased in
2024, which should have shown an additional approximately 700 ATMs.

Filed By Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

62.     In total, from 2017-2024, Heller, through Paramount, should have purchased in excess of 38,000 ATMs.

63.     Heller never purchased sufficient ATMs to cover the investments made by the Funds; his failure to do so was willful and done with intent to defraud the Funds.

64.     Following purchase of the ATMs, the ATMs belonged to the respective Funds or their members.

65.     Under the MSAs, Heller, through Paramount, agreed to provide management services for the Funds' ATMs including, among other things, placing the ATMs at retail locations, entering into location contracts, and operating and maintaining the ATMs for the benefit of the Funds.

66.     Paramount and the individual Funds agreed that Paramount would remit monthly a sum to the Funds—called the Monthly Revenue Remittance—and Paramount would keep, as a fee, certain revenues generated from the operation of the ATMs.

67.     While Paramount was timely issuing payment to the Funds under the MSAs, Heller provided updates on the Funds' investment.

68.     During a presentation in March 2023, for example, Heller again represented the viability of the ATMs in the Funds' portfolios and projected investments.

Lackawanna County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

69.     Further, in February 2024, Heller represented that 34,000 ATMs belonging to the Funds were active and online, generating gross revenue in excess of $43 million.

70.     That representation, at the time it was made by Heller, was not true and he knew it not to be true.

71.     In Apil 2024, Heller, through Paramount, stopped issuing the Monthly Revenue Remittance to the Funds and never again resumed those payments.

72.     Upon information and belief, Heller at some point started using new investments to pay prior monthly obligations.

## C.     Paramount Action and consent judgment

73.     After repeated unanswered demands on Heller and Paramount for the unpaid Monthly Revenue Remittance under the MSAs, the Funds filed the Paramount Action for breach of contract and injunctive relief.

74.     The Funds immediately sought a preliminary injunction, which was denied based on Heller's testimony about the viability of the Funds' investments.

75.     The Funds and Paramount began negotiations to settle the dispute.

76.     The parties negotiated a potential resolution of the Paramount Action in November 2024, under which Heller valued the Funds' ATM network at no less than $450,000,000.

77.     On November 21, 2024, the Court entered a Consent Judgment in the Funds' favor in the amount of $138,156.118.38.

78.     The Consent Judgment further ordered that, within 2 days, Paramount shall (1) supply to the Funds a complete inventory of all ATM Units

Filed and Attested by Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

the greatest number of ATMs the Funds ever owned was a mere 8000 ATMs,
despite Heller accepting sums sufficient to purchase in excess of 38,000 ATMs and
despite Heller representing that no less than 34,000 ATMs were online and active
as late as February 2024.

86.     The balance of the ATMs under management by Paramount showed
yet more intentional misrepresentations by Heller to the Funds. Of the 20,000
ATMs under management at the height of Paramount's management, some 12,000
ATMs were so-called affiliated ATMs, meaning Heller had not purchased the ATMs
outright, as he said he would under the MSAs, but instead he purchased some
rights in some ATMs, but not the actual right to own the device and fully control its
use and profits.

87.     Essentially, Heller, upon information and belief, purchased partial
rights in thousands of ATMs solely so he could pad the number of ATMs under
management by Paramount, doing so to further his fraudulent scheme to induce
Fund investments.

88.     Because the Funds did not own all of the ATMs Paramount managed,
Heller's representation that the Funds owned over 30,000 ATMs was never true.

89.     Moreover, as Paramount eventually turned over information for rights
and title to the Funds' ATMs, the Funds learned that Heller orchestrated the
purchase of ATMs that he never even intended to place in locations for operation.

Filed by Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

90.     For example, in 2020 through 2023, Heller entered into sales

agreements with TriData U.S., Inc. for the purchase of used ATM units for the

Funds.

91.     Upon present information and belief, Heller purchased in excess of

5000 ATMs from Tri-Data using Fund money.

92.     For some of purchase agreements with TriData, Heller explicitly

negotiated for over a year of storage for the ATM units.

93.     Nearly 3000 of the TriData-purchased ATMs never left the warehouse.

94.     Heller purchased them knowing he would never place them into

service and he purchased them solely so he could, and later did, represent to the

Funds that he was complying with his obligations under the investment scheme.

95.     In sum, Heller purchased in excess of 5,000 ATMs from TriData and no

less than approximately 3000 of those ATMs remain in warehouses, all at Heller's

request, and all to further his fraudulent scheme.

96.     Instead of ensuring that the ATMs were deployed to a location to begin

operation, as Heller represented to the Funds he would, Heller let those TriData-

purchased ATMs sit valueless in storage.

97.     Upon information and belief, Heller also did not purchase all of the

ATMs he represented he would.

98.     Upon information and belief, Heller also purchased ATM units in

which more than one investor group has title or interest.

York County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

99.     For example, Heller represented to ATM investors (ones not participants in the Funds) in Michigan that he purchased 250 ATMs under an MSA, but more than half of those ATM serial numbers overlapped with serial numbers of ATMs Heller allegedly purchased for the Funds, and some of those overlaps span across multiple Funds.

100.    Further, Heller issued multiple bills of sale to individual Funds that reflected serial numbers already on bills of sale to other Funds, meaning he was double-selling ATM units over and over.

101.    Lastly, the Funds discovered that Heller left the Funds' remaining network in shambles.

102.    It was saddled with unpaid debts, totaling, upon information and belief, around $7 million.

103.    Also, the Funds learned that some of the ATMs had been pledged as collateral by Heller for loans that he subsequently defaulted on.

104.    Heller had not paid many vendors and locations for many months, resulting in thousands of ATMs being offline, replaced, and unavailable for the Funds to operate.

105.    Large portions of the network were subject to disputed ownership claims because Heller had not paid the persons or entities from whom various portfolios were purchased by Heller.

106.    In sum, Heller intentionally caused the Funds' remaining assets to be, effectively, valueless.

Filed by Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

## E.    Heller conveyances to Heller Capital

107.    Notably, after the Funds secured their Consent Judgment against Paramount on November 21, 2024, Heller authorized various transfers of funds from Paramount's accounts to Heller Capital.

108.    In the month after the Consent Judgment was entered, Paramount received $1,320,252.82, but disbursed over $2,000,000, including significant payments to Heller Capital.

109.    Indeed, Paramount acknowledged that it transferred $344,867.62 to Heller Capital in the month after the Consent Judgment.

110.    As Paramount represented in the Paramount Action, it laid off its staff on December 13, 2024, leaving it without any employees.

111.    Therefore, any of Paramount's financial transactions after that date could only be authorized by Heller, the CEO of Heller Capital, which is the sole member of Paramount.

112.    Heller made these transfers after the Funds' Consent Judgment against Paramount. *See* 12 Pa.C.S. § 5104(a).

113.    Upon information and belief, Heller made these transfers with the intent to hinder, delay, or defraud the Funds because (1) Heller retained possession or control of those funds after the transfer; (2) before the transfer, Heller had been sued or threatened with suit by the Funds, (3) the transfers constituted a substantial amount of Heller's assets; (4) the transfers occurred shortly after a substantial debt was incurred through the Consent Judgment. *See* 12 Pa.C.S. § 5104(b).

16

114.    Upon information and belief, Heller made additional voidable transfers to Heller Capital.

## COUNT I—FRAUD IN THE INDUCEMENT
### Funds v. Daryl Heller

115.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

116.    Fraud in the inducement exists where there is (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury was proximately caused by the reliance. *Seguro Medico, LLC v. Humphreys*, 313 A.3d 298, 312 (Pa. Cmwlth. 2024).

117.    Heller made representations that he would and did purchase ATMs that the Funds owned outright.

118.    Heller further represented that the purchased ATMs would be deployed by Paramount to retail locations and begin to generate fees that would ultimately result in a Monthly Revenue Remittance to the Funds and a profit on the investment.

119.    Heller also represented that the Funds owned in excess of 30,000 ATMs.

120.    These representations were material to the Funds, who invested and maintained their investment based on Heller's representations.

Lancaster County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

121.    But these representations were false because Heller either (1) did not purchase all of the ATMs he represented he would, (2) purchased ATMs that were never deployed to locations, (3) purchased ATM units in which more than one entity has title or interest, and/or (4) were not purchased outright.

122.    Moreover, at the time that Heller made the representations, he knew they were false.

123.    The Funds reasonably relied on those representations from Heller who, as the CEO of Heller Capital, which is the sole member of Paramount, claimed industry knowledge and successful experience in the ATM market.

124.    As a direct and proximate result of Heller's representations, the Funds suffered substantial damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor against Defendant Daryl Heller in an amount in excess of $50,000, plus interest, costs and expenses, and any other relief as the Court deems just and proper.

### COUNT II – FRAUDULENT MISREPRESENTATION
### Funds v. Daryl Heller

125.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

126.    Similar to fraud in the inducement, fraudulent misrepresentation exists where there is (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of the falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it;

Copy Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

(5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance. *Weston v. Northampton Personal Care, Inc.*, 62 A.3d 947, 960 (Pa. Super. 2013).

127.    Heller made representations that he would and did purchase ATMs that the Funds owned outright.

128.    Heller further represented that the purchased ATMs would be deployed by Paramount to retail locations and begin to generate fees that would ultimately result in a Monthly Revenue Remittance to the Funds and a profit on the investment.

129.    Heller also represented that the Funds owned in excess of 30,000 ATMs.

130.    These representations were material to the Funds, who invested and maintained that investment based on Heller's representation.

131.    But these representations were false because Heller either (1) did not purchase all of the ATMs he represented he would, (2) purchased ATMs that were never deployed to locations, (3) purchased ATM units in which more than one entity has title or interest, and/or (4) were not purchased outright.

132.    Moreover, at the time that Heller made the representations, he knew they were false.

133.    The Funds reasonably relied on those representations from Heller who, as the CEO of Heller Capital, which is the sole member of Paramount, claimed industry knowledge and successful experience in the ATM market.

Lebanon County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

134.    As a direct and proximate result of Heller's representations, the Funds suffered substantial damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor against Defendant Daryl Heller in an amount in excess of $50,000, plus interest, costs and expenses, and any other relief as the Court deems just and proper.

## COUNT III—VOIDABLE TRANSACTIONS
### Funds v. Daryl Heller and Heller Capital

135.    The foregoing paragraphs are incorporated by reference as if set forth in full herein.

136.    The Funds have a Consent Judgment in their favor against Paramount in the Paramount Action, entered on November 21, 2024.

137.    As such, the Funds are a creditor under the Pennsylvania Uniform Voidable Transactions Act. 12 Pa.C.S. § 5101.

138.    At the time the Consent Judgment was entered, Heller was the CEO of Heller Capital, which is the sole member of Paramount.

139.    Accordingly, Heller is a debtor under the Pennsylvania Uniform Voidable Transactions Act. 12 Pa.C.S. § 5101.

140.    Also, at the time the Consent Judgment was entered, Heller was the CEO of Heller Capital.

141.    Since the date of the Consent Judgment, Heller transferred at least $344,867.62 from Paramount to Heller Capital.

Chester County Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

142.   Heller made these transfers with the intent to hinder, delay, or defraud the Funds because (1) Heller retained possession or control of those funds after the transfer; (2) before the transfer, Heller had been sued or threatened with suit by the Funds, (3) the transfers constituted a substantial amount of Heller's assets; (4) the transfers occurred shortly after a substantial debt was incurred through the Consent Judgment. *See* 12 Pa.C.S. § 5104(b).

143.   Upon information and belief, Heller made additional fraudulent transfers to Heller Capital.

144.   Heller's transfers of Paramount's funds to Heller Capital are fraudulent conveyances under the Pennsylvania Uniform Voidable Transactions Act. *See* 12 Pa.C.S. §§ 5104, 5105.

WHEREFORE, Plaintiffs respectfully request that this Court (1) void the transfers to satisfy the Funds' claims, 12 Pa.C.S. § 5104(a)(1); (2) issue an injunction against further disposition by Heller and Heller Capital of the transferred assets, 12 Pa.C.S. § 5104(a)(1); and (3) issue such other relief as the Court deems just and proper.

Case 25-11354-JNP   Doc 815-1   Filed 06/23/25   Entered 06/23/25 16:41:00   Exhibits
Page 22 of 23

Respectfully submitted,

Dated: January 24, 2025

_____

Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: 215-568-2000 | Fax: 215-568-0140
Eml: mhaverstick@kleinbard.com
jvoss@kleinbard.com
szimmer@kleinbard.com

*Attorneys for Plaintiffs*

Received and Filed by Prothonotary E-Filed - 24 Jan 2025 11:25:30 AM
Case Number: CI-25-00491

## VERIFICATION

I, Jerry D. Hostetter, hereby state that I am President of Prestige Investment
Group, LLC, the sole member of Prestige Funds Management, LLC, President of
Prestige Funds Management II, LLC, President of Prestige Funds Management III, LLC,
and President of Prestige Investment Group, LLC, the Class A Designee Manager of
WF Velocity Funds Management, LLC, that I am authorized to make this verification on
behalf of Plaintiffs, and that the facts set forth in the foregoing Complaint are true and
correct to the best of my knowledge, information, and belief. I understand that the
statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to
unsworn falsification to authorities.

Dated: Jan 23, 2025