| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| **MᴄMᴀɴɪᴍᴏɴ, Sᴄᴏᴛʟᴀɴᴅ & Bᴀᴜᴍᴀɴɴ, LLC** <br> 75 Livingston Avenue, Second Floor <br> Roseland, NJ 07068 <br> (973) 622-1800 <br> Anthony Sodono III (asodono@msbnj.com) <br> Sari B. Placona (splacona@msbnj.com) <br> *Counsel to Daryl Fred Heller* <br> *Chapter 11 Debtor and Debtor-in-Possession* | |
| In re: <br><br> DARYL FRED HELLER, <br><br>                      Debtor. | Case No. 25-11354 (JNP) <br><br> Chapter 11 |

**DEBTOR'S DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DESCRIBING DEBTOR'S CHAPTER 11 PLAN**

      PLEASE READ THIS DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION. THE DEBTOR BELIEVES THIS PLAN IS IN THE BEST INTEREST OF THE CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTOR URGES THAT THE VOTER ACCEPT THE PLAN.

**McMANIMON, SCOTLAND,**
**& BAUMANN, LLC**
*Counsel to Debtor, Daryl Fred Heller*


By: ___*/s/ Sari B. Placona*___
     SARI B. PLACONA

**DARYL FRED HELLER**
*Chapter 11 Debtor and Debtor-in-Possession*

By: ___*/s/* Daryl Fred Heller___
     DARYL FRED HELLER

Dated: August 1, 2025

## TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION
  A. Purpose of This Document ..................................................................... 1
  B. Confirmation Procedures ....................................................................... 3
    1. Time and Place of the Confirmation Hearing ..................................... 3
    2. Deadline for Voting for/or Against the Plan ...................................... 4
    3. Deadline for Objecting to the Confirmation of the Plan ..................... 4
    4. Identity of Person to Contact for More Information Regarding the Plan ............ 4
  C. Disclaimer .......................................................................................... 4
II.
BACKGROUND
  A. Background of Debtor............................................................................ 5
  B. Circumstances Leading to Bankruptcy .................................................... 5
III.
THE DEBTOR'S BANKRUPTCY
  A. The Debtor's Chapter 11 Filing............................................................... 6
  B. Significant Events During the Bankruptcy ............................................... 7
    1. Bankruptcy Proceedings ................................................................... 7
    2. Procedures Implemented to Resolve Financial Problems ..................... 9
    3. Current and Historical Conditions ..................................................... 9
IV. SUMMARY OF THE PLAN OF REORGANIZATION
  A. What Creditors Will Receive Under the Proposed Plan ........................... 10
  B. Unclassified Claims ............................................................................ 10
    1. Administrative Expenses and Fees .................................................. 10
    2. Fee Claims........................................................................................ 10
    3. Priority Tax Claims ......................................................................... 12
  C. Classified Claims and Interests ............................................................ 13
    1. Classes of Secured Claims .............................................................. 13
    2. Classes of Priority Unsecured Claims .............................................. 15
    3. Class of General Unsecured Claims ................................................. 15
    4. Class of Interests ............................................................................ 16
    1. Funding for the Plan ....................................................................... 16
  E. Other Provisions of the Plan ................................................................ 21
    1. Executory Contracts and Unexpired Leases ..................................... 21
    2. Changes in Rates Subject to Regulatory Commission Approval........... 21
    3. Retention of Jurisdiction ................................................................. 22
    4. Effective Date................................................................................. 23
    5. Modification.................................................................................... 23
  F. Tax Consequences of Plan ................................................................... 23
  G. Risk Factors...................................................................................... 24
V.
CONFIRMATION REQUIREMENTS AND PROCEDURES
  A. Who May Vote or Object ..................................................................... 25
    1. Who May Object to Confirmation of the Plan ................................... 25
    2. Who May Vote to Accept/Reject the Plan ........................................ 25

        3. Who Is Not Entitled to Vote.................................................................. 26

        4. Who Can Vote in More Than One Class............................................. 26

        5. Votes Necessary to Confirm the Plan................................................ 26

        6. Votes Necessary for a Class to Accept the Plan................................ 26

        7. Treatment of Nonaccepting Classes .................................................. 27

        8. Request for Confirmation Despite Nonacceptance by Impaired Class(es) ......... 27

    B.  Liquidation Analysis............................................................................ 27

    C.  Feasibility............................................................................................ 29

VI.

EFFECT OF CONFIRMATION OF PLAN

    A.  Discharge.............................................................................................. 30

    B.  Release of Claims ................................................................................. 30

        1. Release .............................................................................................. 30

        2. Settlement of Claims and Controversies; General Injunction ........... 32

    C.  Revesting of Property in the Debtor ..................................................... 32

    D.  Modification of Plan ............................................................................. 32

    E.  Post-Confirmation Conversion/Dismissal............................................. 33

    F.  Closing of Case ..................................................................................... 33

4921-8944-3673, v. 1

# I.

## INTRODUCTION

Daryl Fred Heller (the "Debtor" or "Proponent") is the Debtor and Debtor-in-Possession in the instant chapter 11 bankruptcy case.  On February 10, 2025, the Debtor commenced his bankruptcy case by filing a voluntary chapter 11 petition under the United States Bankruptcy Code (the "Code"), 11 U.S.C. § 101, et seq. Chapter 11 of the Code allows the Debtor to propose a plan of reorganization.

The plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  THE DOCUMENT YOU ARE READING IS THE DEBTOR'S DISCLOSURE STATEMENT ("Disclosure Statement") FOR THE PLAN (the "Plan") WHICH IS ANNEXED AS **EXHIBIT A**. This is a plan to reorganize the Debtor's affairs.

### A.    Purpose of This Document

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

> (1)    WHO CAN VOTE OR OBJECT,
>
> (2)    THE PROPOSED TREATMENT OF YOUR CLAIM (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION,
>
> (3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)     **WHAT THE COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM THE PLAN,**

(5)     **THE EFFECT OF CONFIRMATION, AND**

(6)     **THE FEASIBILITY OF THE PLAN.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.  Code Section 1125 requires a Disclosure Statement to contain "adequate information" concerning the Plan. The term "adequate information" is defined in Code Section 1125(a) as "information of a kind, and in sufficient detail," about the Debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the Debtor to make an informed judgment about accepting or rejecting the Plan.  The Bankruptcy Court ("Court") has determined that the information contained in this Disclosure Statement is adequate, and it has approved this document in accordance with Code Section 1125.

This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor or who has filed a proof of claim against the Debtor as of the date of approval of this Disclosure Statement.  Under the Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to or concurrently with such solicitation.

B.      **Confirmation Procedures**

Persons Potentially Eligible to Vote on the Plan

In determining acceptance of the Plan, votes will only be counted if submitted by a creditor whose claim is duly scheduled by the Debtor as undisputed, non-contingent and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Court a proof of claim that has not been disallowed or suspended prior to computation of the votes on the Plan.  The Ballot Form you received does not constitute a proof of claim.  If you are uncertain whether your claim has been correctly scheduled, you should check the Debtor's Schedules, which are on file at the office of the Clerk of the Bankruptcy Court located at the United States Bankruptcy Court, District of New Jersey – Camden Vicinage, Mitchell H. Cohen U.S. Courthouse, 401 Market Street, 2nd Floor, Camden, New Jersey 08101. The Clerk of the Bankruptcy Court will not provide this information by telephone.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

1.      **Time and Place of the Confirmation Hearing**

The hearing at which the Court will determine whether to confirm the Plan will take place on **August ___, 2025, at _____ a.m.**, before the Honorable Jerrold N. Poslusny, Jr., United States Bankruptcy Judge, at the United States Bankruptcy Court, Mitchell H. Cohen U.S. Courthouse, 400 Cooper Street, 4th Floor, Courtroom 4C, Camden, New Jersey 08101.

Case 25-11354-JNP   Doc 434   Filed 08/01/25   Entered 08/01/25 20:55:14   Desc Main
Document     Page 8 of 38


### 2. Deadline for Voting for/or Against the Plan

If you are entitled to vote, it is in your best interest to timely vote on the enclosed ballot and return the ballot in the enclosed envelope to Anthony Sodono, III, Esq., and Sari B. Placona, Esq., at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Second Floor, Roseland, New Jersey 07068, on or before **August__, 2025**.

Your ballot must be received by **August ___, 2025,** or it will not be counted.

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon Anthony Sodono, III, Esq., and Sari B. Placona, Esq., at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Second Floor, Roseland, New Jersey 07068, by **August __, 2025**.

### 4. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact the Debtor's counsel, Anthony Sodono, III, Esq. (asodono@msbnj.com), or Sari B. Placona, Esq. (splacona@msbnj.com), at McManimon, Scotland, & Baumann, LLC, 75 Livingston Avenue, Second Floor, Roseland, New Jersey 07068, or by telephone (973) 622-1800.

### C. Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's books and records and the Debtor's knowledge and opinion. If based on the Debtor's knowledge or opinion, it will be specified. The information contained in this Disclosure Statement is provided by the Debtor and his professionals. The Debtor represents that everything stated in the Disclosure Statement is true to his best knowledge, information, and belief.

4

**PLEASE NOTE THAT THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A RULING ON THE MERITS, FEASIBILITY, OR DESIRABILITY OF THE PLAN.**

## II.

## BACKGROUND

**A.    Background of Debtor**

The Debtor is an individual who continues to operate as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Code.  Edward A. Phillips, CPA was appointed as the examiner (the "Examiner"), pursuant to the Order Directing the Appointment of an Examiner ("Examiner Order"). ECF 99.

**B.    Circumstances Leading to Bankruptcy**

Due to the below state court actions that were pending against the Debtor, he could not afford to litigate all of the actions and his ordinary course bills. Specifically, the Debtor filed for bankruptcy to stave off creditor Deerfield Capital, LLC's ("Deerfield") collection action(s) in order to protect his assets for the benefit of all creditors. Below is a chart of the pre-bankruptcy state court litigation involving the Debtor:

| No. | Case Name | Docket No. | State Court |
|---|---|---|---|
| 1 | **Deerfield Capital, LLC v Accordo, L.P., et al.,** | **Case No. 25-00610** | Pennsylvania |
| 2 | **Deerfield Capital, LLC v Daryl Heller, et al.** | **Docket No. CPM-C-000004-25** | New Jersey |
| 3 | **First National Bank of P.A. v. Heller Capital Group, LLC** | **Case No. 24-08833, (P.A. C.P Dec. 9, 2024)** | Pennsylvania |
| 4 | **First National Bank of P.A. v. Heller, Daryl F.** | **Case No. CI-24-06460 (P.A. C.P. Sept. 10, 2024)** | Pennsylvania |
| 5 | **Orrstown Bank v. Heller Capital Group, LLC** | **Case No. 24-08609 (P.A. C.P Dec. 3, 2024)** | Pennsylvania |
| 6 | **Orrstown Bank v. Heller Capital Group, LLC** | **Case No. CI- 24-08609 (Pa. C.P. Aug. 22, 2024)** | Pennsylvania |

| 7 | **Orrstown Bank v. Heller, Daryl F., et al.** | **Case No. CI-24-06081 (P.A. C.P. Aug. 22, 2024)** | Pennsylvania |
|---|---|---|---|
| 8 | **Orrstown Bank v. Heller, Daryl F.** | **Case No. CI-25-00331 (P.A. C.P. Jan. 16, 2025)** | Pennsylvania |
| 9 | **Traditions Bank v. Heller Capital Group, LLC** | **Case No. 2024-SU-002682 (P.A. C.P. Sept.12, 2024)** | Pennsylvania |
| 10 | **Orrstown Bank v. Heller Capital Group, LLC** | **Case No. CI- 24-08609 (Pa. C.P. Aug. 22, 2024)** | Pennsylvania |
| 11 | **Austin Business Finance, LLC v. Heller Capital Group, LLC** | **Case No. 24-1799-C480 (Tex. Cir. Ct. Aug. 20, 2024)** | Texas |
| 12 | **Prestige Fund A, LLC v. Paramount Mgmt. Grp., LLC** | **Case No. CI-24-06012 (Pa. C.P. Aug. 23, 2024)** | Pennsylvania |
| 13 | **Prestige Fund A, LLC et al v. Daryl F. Heller and Heller Capital** | **Case No. CI-25-00491 (Pa. C.P. January 27, 2025)** | Pennsylvania |
| 14 | **Jerry D. Hostetter, individually and derivatively on behalf of Prestige Investment Group, LLC v. Daryl F. Heller and Heller Capital Group, LLC** | **Case No. CI-25-00484 (Pa.C.P. January 24, 2025)** | Pennsylvania |
| 15 | **The Estate of Richard Welkowitz et al v. Heller Capital Group, LLC, Accordo LP, Daryl Heller and Paramount Management Group, LLC** | **Case No. CI-24¬05802 (Pa.C.P. 2024)** | Pennsylvania |
| 16 | **Univest Bank and Trust Co. v. Daryl F. Heller** | **Case No. CI-24-07680 (Pa.C.P. October 21, 2024)** | Pennsylvania |

## III.

## THE DEBTOR'S BANKRUPTCY

**A.    The Debtor's Chapter 11 Filing.**

The Debtor filed his voluntary Chapter 11 petition on February 10, 2025 (the "Petition Date").  The Debtor intends to continue working and operating businesses in which he holds ownership interests.

**B.      Significant Events During the Bankruptcy**

**1.      Bankruptcy Proceedings**

The following is a list of significant events which have occurred during this case:

On the Petition Date, the Debtor filed for protection under Chapter 11 of the Code.  [ECF 1].

On February 11, 2025, Deerfield filed a Motion for Relief From the Automatic Stay to Continue the State Court Proceedings Against the Debtor in Pennsylvania and New Jersey, Prohibit use of Cash Collateral, Transfer Venue and Expedited Discovery (the "Deerfield Stay Motion"). [ECF 9].

On February 18, 2025, Deerfield filed a Motion to Appoint a Chapter 11 Trustee ("Deerfield Trustee Motion"). [ECF 30]. The issue of appointment of a Chapter 11 trustee pursuant to the Deerfield Trustee Motion was mooted by the appointment of the Examiner pursuant to the Examiner Order. [ECF 99]. On March 18, 2025, the Court entered an Order Approving the Appointment of a Chapter 11 Examiner selected by Office of the United States Trustee. [ECF 131].

On February 20, 2025, the Debtor filed a Motion for an Order Authorizing to Continue to Use Existing Bank Accounts Pursuant to 11 U.S.C. §§ 105(a) and 363(e). [ECF 40]. On March 7, 2025, the Court entered an Order Authorizing Debtor to Continue Using Existing Bank Accounts. [ECF 100].

On February 20, 2025, the Debtor filed a Motion for an Interim Order and Final Order (i) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to have Adequate Assurances of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional Assurances Pursuant to 11 U.S.C. §§ 105(a) and 366. [ECF 41]. On March 7, 2025, the Court entered an Interim Order (i) Prohibiting Utility Companies from

7

Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to have Adequate

Assurances of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional

Assurances Pursuant to 11 U.S.C. §§ 105(a) and 366. [ECF 97].

On February 24, 2025, the Debtor filed his petition, schedules, and Statement of Financial

Affairs. [ECF 59]. On March 17, 2025, the Debtor filed an Amended Schedule A and F. ECF 122.

On February 26, 2025, the Debtor filed a Motion Authorizing the Debtor to Sell Real

Property Located at 7605 Pleasure Avenue, Sea Isle City, New Jersey Free and Clear of All Liens,

Claims, and Encumbrances Pursuant to 11 U.S.C. § 363(b), (f), and (m); and Granting Related

Relief (the "Sale Motion"). [ECF 73]. After objections and modifications to the Sale Motion, on

April 3, 2025, the Sale Motion was approved, creating estate funds for the benefit of creditors for

the Debtor's Plan. [ECF 169].

On March 21, 2025, the Debtor filed an Application for Retention of Professionals, seeking

to hire the law firm of McCarter & English as criminal council to the Debtor (the "Criminal

Counsel Retention App."). [ECF 139]. After objections and a hearing on April 22, 2025 [ECF 193]

having occurred regarding the Criminal Counsel Retention App., the hearing was adjourned to

June 2, 2025 [ECF 261], and then finally rescheduled to June 10, 2025 [ECF 296]. On June 10,

2025, the Court entered an oral decision approving the Criminal Counsel Retention App.

On March 21, 2025, the Court entered an Order Authorizing the Retention of McManimon,

Scotland & Baumann, LLC, as Attorneys for the Debtor. [ECF 138].

On April 30, 2025, the Debtor filed a Motion for an Order Approving the Agreement

Between the Debtor, Charlene R Heller, and Orrstown Bank Pursuant to 9019 of the Federal Rules

of Bankruptcy Procedure (the "Orrstown 9019 Motion"). [ECF 213]. On May 20, 2025, the Debtor

filed a Motion for an Order Approving the Agreement Amongst the Debtor, Heller Capital Group,

8

LLC, Heller Investment Holdings, LLC, and Deerfield Capital, LLC Pursuant to 9019 of the Fed. R. Bankr. P. (the "Deerfield 9019 Motion"). [ECF 258]. The Court entered an Order Shortening Time and Scheduling Hearing to Consider Proposed Settlements, thereby setting August 6, 2025, for an evidentiary hearing on the Orrstown 9019 Motion and Deerfield 9019 Motion. [ECF 374].

On May 21, 2025, Prestige Funds ("Prestige") fileed a Motion for the Appointment of Chapter 11 Trustee and to Modify Examiner's Order (the "Prestige Trustee Motion"). [ECF 265]. On June 30, 2025, Prestige withdrew, in part, the Prestige Trustee Motion. [ECF 367].

On May 30, 2025, the Debtor filed a Motion Expunging Claim Nos. 13 through 32 Filed by Prestige Fund A II, LLC et al. pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (the "Motion Object Prestige Claims"). [ECF 288]. On June 10, 2025, the Court entered an oral decision refraining from ruling on the Motion Object Prestige Claims, which issues will be settled in the adversary proceeding captioned as *Prestige Fund A, LLC et al. v. Daryl Heller and Heller Capital Group, LLC*, Adv. Pro. 25-01128 (the "Prestige Complaint").

### 2.     Procedures Implemented to Resolve Financial Problems

To address the issues that led to the bankruptcy filing, the Debtor has taken several actions, including litigating creditor-related matters within the bankruptcy case, with the goal of reorganizing the estate and facilitating payments to creditors under the Plan

### 3.     Current and Historical Conditions

The Debtor will be current on all post-petition obligations as of the confirmation date.

## IV.

## SUMMARY OF THE PLAN OF REORGANIZATION

A.    **What Creditors Will Receive Under the Proposed Plan**

The Plan classifies claims in various classes.  The Plan states whether each class of claims is impaired or unimpaired.  The Plan provides the treatment each class will receive.  A copy of the Plan is annexed as **Exhibit A**.

B.    **Unclassified Claims**

Certain types of claims are not placed into voting classes. They are not considered impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Code.  As such, the Debtor has not placed the following claims in a class.

1.    **Administrative Expenses and Fees**

Administrative Expenses are claims for costs or expenses of administering the Debtor's Chapter 11 Case which are allowed under Code section 503(b). Fees payable to the Clerk of the Court and the Office of the United States Trustee were also incurred during the Chapter 11 Case. The Code requires that all administrative expenses be paid on the Effective Date of the Plan unless a particular claimant agrees to different treatment.

Except if any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim will receive cash on the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

2.    **Fee Claims**

The following chart lists the Debtor's unpaid fees and expenses ("Compensation") and an estimate of future professional fees and other administrative claims and fees due under the Plan (referred to as the "Fee Claims"):

| NAME | AMOUNT ESTIMATED | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| McManimon, Scotland & Baumann, LLC | $250,000, through July 2025 | Payment in full on Effective Date, or through other agreement. Fees continue to accrue. | Administrative |
| McCarter & English, LLP ("Criminal Counsel") | $TBD | Payment in full on Effective Date, or through other agreement. | Administrative |
| The DMC Group CPAs & Advisors ("Accountant") | $TBD | Payment in full on Effective Date, or through other agreement. | Administrative |
| Office of U.S. Trustee Fees | $TBD | Payment in full on Effective Date, or through other agreement. | Administrative |
| Examiner and Getzler Henrich & Associates LLC | $133,842.50[1] | Payment in full on Effective Date, or through other agreement. | Administrative |
| Reed Smith LLP, counsel to Examiner | $177,106.35[2] | Payment in full on Effective Date, or through other agreement. | Administrative |
| **APPROXIMATE TOTAL** | **$_____** **(estimated)** | | |

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is sixty (60) days after the Effective Date, and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or (b) upon such other

---

[1] The Examiner and his financial advisor, Getzler Henrich & Associates LLC, filed fee applications, with fees continuing to accrue on a monthly basis. ECF 399, 400.
[2] The Examiner's counsel, Reed Smith LLP, filed a fee application, with fees continuing to accrue on a monthly basis. ECF 401.

terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the

Debtor.  The Debtor is authorized to pay compensation for services rendered or reimbursement of

expenses incurred after the Confirmation Date in the ordinary course and without the need for

Bankruptcy Court approval.

As indicated above, the Debtor will need to satisfy approximately $_____ in administrative

claims.  Fees continue to accrue up to confirmation of the Plan.  As noted, after confirmation, the

Debtor is authorized to pay professionals without further order of the court. The administrative

creditors shall be paid on the effective date of the Plan or will agree to be paid overtime depending

on the Debtor's cash flow.

### 3.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by

Code Section 507(a)(8).  If such claims have not been previously satisfied, each Holder of an

Allowed Priority Tax Claim, if any, shall receive in full satisfaction of such Allowed Priority Tax

Claim: (a) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim within

seven (7) business days after such Allowed Priority Tax Claim becomes an Allowed Claim, or as

soon thereafter as is practicable; or (b) cash in an amount agreed to by the Debtor and such Holder;

provided, however, that any claim or demand for payment of a penalty (other than a penalty of the

type specified in Section 507(a)(8)(G) of the Code) shall be disallowed pursuant to this Plan and

the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect such penalty

from the Debtor or the Estate.

On March 19, 2025, the Department of Treasury – Internal Revenue Service ("IRS") filed

Claim 9 (the "IRS Claim") in the amount of $18,926,096.76.  The basis for the IRS Claim is taxes

owed. The IRS Claim (i) designates $6,028,805.26 as secured, and (ii) designates $12,897,291.50

as a priority unsecured claim. The Debtor is in the process of filing tax returns for tax years 2023

and 2024, which the Debtor believes will substantially reduce, offset, or eliminate the priority unsecured portion of the IRS Claim. The Debtor anticipates the priority unsecured portion of the IRS Claim will be reduced to approximately $1,000,000, at most, or be eliminated entirely. Pursuant to Section 507 of the Bankruptcy Code, the Debtor will pay the IRS Claim, including interest, over the course of sixty (60) months, at approximately $17,000 a month should the unsecured priority portion be reduced to approximately $1,000,000. As for the secured potion of the IRS Claim, the IRS is subordinate to other secured creditors who hold a senior security interest in the Debtor's assets which may encumber any equity in such assets, thus the secured portion of the IRS Claim will be treated as unsecured. The Debtor reserves his right to file a motion to reduce and/or reclassify the IRS Claim.

### C.    Classified Claims and Interests[3]

#### 1.    Classes of Secured Claims[4]

Secured claims are claims secured by liens on property of the estate.  If the secured claims are supported by assets with value, such creditors shall be paid as secured.  Otherwise, such creditors shall be treated as unsecured claim, in whole or part.

---

[3] The Debtor retains and reserves all of his rights to object to certain claims or reclassify treatment.

[4] Proof of Claim 3 by Prosperum Capital Partners LLC, Proof of Claim 8 by CFG Merchant Solutions, LLC, Proof of Claim 47 filed by Univest Bank and Trust Co., Proof of Claim 87 filed by Bryan Zeamer and Heather Seamer, and Proof of Claim 88 filed by Randy Weaver, will all be treated as unsecured claims despite said claims filed as alleged secured claims, because the Debtor disputes the validity, extent, and priority of the asserted security interests, and no competent evidence has been provided to establish a perfected lien or enforceable security agreement under applicable law, and therefore such claims do not meet the requirements for secured status under 11 U.S.C. § 506. The Debtor reserves his right to object to such claims.

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | AMOUNT OWED | TREATMENT |
|---|---|---|---|---|---|
| 1 | IRS | N | N | $6,028,805.26 | This amount will be reduced to approximately $1,000,000, or less, once when the Debtor files taxes for tax years 2023 and 2024. The Debtor will pay approximately $17,000 and including interest a month. |
| 2 | Orrstown[5] | N | Y | $6,700,566.25 | Orrstown filed Claims Nos. 48, 49, 50, 51, 52, 53, and 62 ("Orrstown's Claims") in the Debtor's case. Orrstown Claims are addressed in the Orrstown 9019 Motion. ECF 213 |

---

[5] Orrstown Bank is secured only up to the value of the Marital Property.

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | AMOUNT OWED | TREATMENT |
|---|---|---|---|---|---|
| 3 | Needham Bank[6] | N | Y | $12,100,000.00 | This amount will be fully satisfied by the liquidation of Glorious, which is an entity under HIH, who was the largest shareholder in GCC Investment Holdings and GCC MSO before membership interests were seized, which the Debtor expects to recover. |

## 2.    Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  A class of unsecured priority claim holders, however, may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

## 3.    Class of General Unsecured Claims

General unsecured claims are uncollateralized claims not entitled to priority under Code Section 507(a).  The following chart identifies this Plan's treatment of the class containing all of Debtor's general unsecured claims:

---

[6] Needham Bank is secured only up to the value of the Marital Property.

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 5 | General Unsecured Claims[7] Total amount of filed claims = (approximately $88,226,552.83) (this amount is still being determined that claims are subject to objection and reclassification.) The Debtor will contribute one hundred percent (100%) of HCG cash flow and liquidation of assets, less Althea Management, LLC ("Althea"), Administrative Claims, and third party outsource fees over two (2) years. The Debtor will contribute one-hundred percent (100%) of HIH cash flow and liquidation of assets less Althea, Administrative Claims and third party outsource fees over ten (10) years. | Y | Y | Debtor will fund a "pot" plan of one hundred percent (100%) of HCG cash flow and liquidation of assets (post Althea, administrative claims and third-party outsource fees) over two (2) years and one-hundred percent (100%) of HIH cash flow and liquidation of assets (post Althea, admin and third party outsource fees) over ten (10) years based on pro rata amount of a creditor. The Debtor intends on liquidating HIH in whole or part, and if Debtor retains any part of HIH the Debtor will pay the value of the retained portion of HIH to creditors over ten (10) years. |

### 4.    Class of Interests

The Debtor will be retaining his fifty-percent (50%) ownership interest in 909 Greenside Drive, Lititz, Pennsylvania 17543 (the "Martial Property"). The Debtor will either retain his portion of the Martial Property, or purchase his equity interest in the Martial Property, with the amount paid to creditors. Further explanation of the Martial Property is contained in in Section (D)(1) below.

### D.    Means of Effectuating the Plan

### 1.    Funding for the Plan

---

[7] The approximate unsecured debt is less (i) Prestige's Claim Nos. 13 through 32, totaling $503,290,225.46, which is being addressed in Prestige's Complaint [Adv. Pro. 25-01128], and (ii) Glorious's Claim No. 57, totaling $60,043,172.00, which will be addressed in the forthcoming expungement motion, among other claims the Debtor designates.

The Debtor's Plan will be funded by a combination of income from the Debtor's entities and primarily from the sale of assets owned or wholly owned by entities. The Debtor is employed by Althea, which assesses monthly management fees for the daily management of Heller Capital Group, LLC's ("HCG") and Heller Investment Holdings, LLC's ("HIH") assets. The Debtor has a ninety-nine percent (99%) member-interest in Althea, and the remaining one percent (1%) is owned by Althea Group, LLC ("Althea Group"). The Debtor owns one-hundred percent (100%) member-interest of Althea Group. Althea Group is the manager of Althea. The Debtor is the managing member of Althea Group. Althea has no assets, and its sole source of income derives from management services it provides to entities and is structured to be a zero-profit entity only assessing management fees to offset its payroll, and other nominal operating expenses such as insurances. The Debtor works from a home-office to minimize expenses.

The Debtor owns a ninety-nine- and one-half percent (99.5%) member-interest in HCG and an eighty-five percent (85%) member-interest in HIH. The Debtor's gross income from Althea is bifurcated approximately as follows and may shift over time as workload increases/decreases inside entities: (i) salary of $40,000 of which 25,000 is targeted to come from HIH and $15,000 is targeted to come from HCG,[8] and (ii) and the Schedule K-1 income for entities owned by HCG and HIH will not be known until the end of 2025. The Debtor is not expecting significant Scheduled K-1 income for 2025. Rather, losses are likely based on impairment to HCG and HIH, which will pass through to Debtor and help offset his 2022 federal tax liability.  Additionally, Debtor is in process of filing his 2023 and 2024 tax returns which will generate losses and further offset his federal tax liability.

---

[8] The Debtor has been taking less monthly income given various cash-flow issues pertaining to Althea, HCG, and HIH.

The Debtor's salary is utilized to pay his ordinary course expenses, such as mortgage, living expense, taxes, etc. HCG has a significantly reduced fair market value of approximately $15,000,000 to $25,000,000, as its assets have been devalued, undermined, and impaired from (i) the legal actions by Prestige and other creditors which directly resulted in losses of customers, revenue, vendors and business partners, (ii) Debtor's bankruptcy filing, (iii) creditors seizing and liquidating assets,[9] and (iv) the unlawful seizing of assets by Jerry Hostetter[10] from Prestige for personal benefit has created further impairment.

HIH has a significantly reduced fair market value of approximately $15,000,000 to $25,000,000, as its assets have been devalued, undermined, and impaired from (i) the legal actions by Prestige and other creditors which directly resulted in losses of customers, revenue, vendors and business partners, (ii) Debtor's bankruptcy filing, and (iii) GCC Investment Holdings unlawfully seizing of membership interests.[11] As a disclaimer, valuation of HCG and HIH is estimated and valuations could be substantially higher if creditors allow for strategic selling of assets and allow certain assets/entities to reach maximum valuation by completing its life cycle to achieve critical mass; conversely estimated valuations could be substantially lower if liquated in a 'fire sale.'

---

[9] As an example of a creditor seizing and liquidating HCG assets is Chicago Atlantic Admin, LLC ("Chicago") seizure of HCG's valuable asset, Premier Technology Group ("PTG"), which Chicago liquidated for below market value on or about February 14, 2024, which the Debtor believes was sold for approximately $16,000,000. Chicago has refused after multiple attempts to provide the final account. PTG should have sold for substantially higher, likely closer to $25,000,000. Chicago also sold the entity 'AVAIL' and has not disclosed the amount, as well as assets of 'ICS' which have not been disclosed.

[10] On or about May 2025, Jerry Hostetter unlawfully confiscated the "Cornwall and Alden" assets from Prestige, placing ownership interest in his personal name, which has a book value of approximately $500,000 and should have went to creditors. Jerry Hostetter was the Debtor's partner at Prestige, who owned forty percent (40%) of Prestige with HCG owning the remaining sixty percent (60%).

[11] As an example of seizure of HIH assets, on or about February 2025, GCC Investment Holdings appropriated (membership interests) from HIH, which had a fair market value of approximately $40,000,000 for HIH equity, based on the Chief Financial Officer's analysis from a July 2024 'soft' appraisal of enterprise valuation, which should have gone to creditors.

The Debtor also has a fifty percent (50%) member interest in DHTC, and a one-hundred percent (100%) member-interest in the following entities: I Employee Services, LLC, Raw Ventures, LLC, and Cash Ventures IV, LLC, all of which will be liquidated and the proceeds distributed to creditors.

The Debtor's proposed funding of the Plan is through Debtor owned entities cash flows and/or liquidation of entities in which the Debtor wholly or partially owns through entity interests. The Debtor proposes a rapid liquidation of all HCG entities to occur in approximately eighteen (18) to twenty-four (24) months, or sooner, which will occur through various liquidation events and will result in a final dissolution of HCG. All proceeds from HCG liquidation events will be paid into the Plan to fund creditors and pay the Althea management fee, third party outsource accounting/finance/IT fees and legal administrative and related fees. Accordingly, all of cash flow and liquidation events will benefit creditors, other than the above expenses.

The Debtor has already removed all employees and operating expenses of HCG to streamline expenses to maximize the benefit for creditors. The Debtor proposes a to-be-determined company as liquidating entity for HCG over the next eighteen (18) to twenty-four (24) months. Debtor reserve all of his rights to designate an entity/asset that should not be liquidated pursuant to the eighteen (18) to twenty-four (24) month period if holding such asset(s) beyond that amount of time is for the benefit of creditors.

For HIH, the Debtor proposes that HIH continue to hold assets to generate cash flow. Such cash flow after payment for management fees, third-party accounting/finance/IT fees, and legal and similar administrative fees, will be paid to the Plan for the benefit of creditors. The cash flow will be added to funds resulting from liquidation of assets. The HIH proposal allows for maximizing values and divesting assets over a period of ten (10) years or less, This will allow

19

assets to be liquidated, at strategic times when assets hit maturity and scale which will maximize value for creditors. As a result, this strategic liquidation should increase the HIH asset value to approximately $35,000,000-$50,000,000. The proposed HCG cash flow projection and liquidation analysis will be provided and annexed to the Plan as **Exhibit A.** The proposed HIH cash flow projection and liquidation analysis will be provided and annexed to the Plan as **Exhibit B.** The Debtor is in the process of gathering projected financial data and a more acute liquidation analysis for HCG and HIH.

Upon an order confirming the Plan, any and all creditors are enjoined from taking any and all action against the Debtor and his assets and entities, including but not limited to, stock, membership interests, partnership interests, equity holdings, intellectual property, contractual rights, real and personal property, bank accounts, receivables, and any other tangible or intangible assets, whether held directly or indirectly, so as to protect the integrity of the Plan and fund payments to creditors.

The Debtor and his spouse own the marital property by tenants by the entirety located at 909 Greenside Drive, Lititz, Pennsylvania 17543 (the "Martial Property"). The Debtor's spouse retains a fifty-percent (50%) ownership in the Martial Property as tenants by the entirety. The Martial Property has an approximate fair market value of $2,800,000 to $3,000,000, which is subject to a mortgage of approximately $1,500,000. The Debtor will either retain his portion of the Martial Property through a future sale of property, or purchase his equity interest in the Martial Property, with his "equity" amount paid to creditors paid over ten (10) years.[12]

---

[12] For example, if the home sells for $3,000,000, after deducting 10% costs of sale, mortgage, homestead exemption and the Debtor's spouse half interest, there will be "equity" of approximately $550,000.   If the Debtor sells the home, the creditors will receive the benefit of such funds.   If the Debtor retains the home, the Debtor will provide for payment of $550,000 in his Plan.

The Debtor also had an ownership interest in real property located at 7605 Pleasure Avenue, Sea Isle City, New Jersey 08423 (the "Beach House"). The Beach House was sold by way of Order of the Bankruptcy Court dated April 3, 2024 (the "Sale Order"). ECF 167. The net proceeds of the Beach House pursuant to the Sale Order was in the approximate amount of $1,563,231.69, which was placed in escrow with the Debtor's law firm, which allowed the sale to occur while preserving the claims of objecting parties to the net proceeds.

Pursuant to the Motion for an Order Approving the Agreement Between the Debtor, Charlene R. Heller, and Orrstown Bank Pursuant to 9019 of the Federal Rules of Bankruptcy Procedure [ECF 213] (the "Orrstown 9019 Motion"), the Debtor's spouse is entitled to thirty-to-fifty percent (30%-50%) of the net proceeds of the Beach House or a minimum of the $250,000 settlement amount with Orrstown Bank.

### E.     Other Provisions of the Plan

#### 1.      Executory Contracts and Unexpired Leases

The Plan provides that all Executory Contracts and Unexpired Leases shall be assumed, unless expressly rejected. The confirmation order shall constitute an order approving such rejection(s), if any, as of the Effective Date. Upon information and belief, the Debtor does not have any executory contract(s) or unexpired lease(s) to assume or reject.

All proofs of claim with respect to claims arising from said rejection must be filed with the Court within the earlier of (i) the date set forth for filing claims in any order of the Court approving such rejection, or (ii) thirty (30) days after the confirmation date. Any such claims, proofs of which are not filed timely, will be barred forever from payment of such claims.

#### 2.      Changes in Rates Subject to Regulatory Commission Approval

The Debtor is not subject to governmental regulatory commission approval of his rates.

### 3.    Retention of Jurisdiction

The Court shall retain jurisdiction of this case pursuant to the provisions of Chapter 11 of

the Code, pending the final allowances or disallowances of all Claims effected by the Plan, and

with respect to the following matters:

(a)    To enable the Debtor to consummate the Plan and to resolve any disputes arising therefrom;

(b)    to adjudicate all controversies concerning the classification, estimation, or allowance of any Claim herein;

(c)    to make such orders as are necessary or appropriate to implement the provisions of the Plan;

(d)    to determine the classification, estimation, and priority of all claims against the Debtor and to re-examine any Claims which may have been allowed;

(e)    to determine applications for the rejection or assumption of executory contracts or unexpired leases pursuant to the provisions of the Plan which are not determined prior to the Confirmation date and to determine allowance of Claims for damages with respect to rejection of any such executory contracts or unexpired leases within such time as the Court may direct;

(f)    to oversee and issue further appropriate orders respecting disbursement of amounts deposited as may be required by the Plan;

(g)    to conduct hearings on valuation, as necessary, and to determine whether any party in interest is entitled to recover against any Person any Claim, whether arising under Section 506(c) of the Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(h)    to hear and determine all applications for compensation and other Administrative Expenses;

(i)    to hear and determine any and all adversary proceedings or contested matters;

(j)    to determine all causes of action which may exist in favor of the Debtor;

(k)    to determine any modification of the Plan after confirmation pursuant to Section 1127 of the Code;

(l)    to enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtor under the Plan;

(m)    to enter a final decree pursuant to Rule 3022 of the Bankruptcy Rules;

(n)    to hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan;

(o)    to hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of Court in the Chapter 11 Case entered on or before the Confirmation Date;

(p)    to hear and determine any and all controversies and disputes arising under, or in connection with, the Plan;

(q)    to hear and determine any and all objections to payments under the Plan;

(r)    to liquidate damages in connection with any disputed, contingent, or unliquidated Claims;

(s)    to adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(t)    to adjudicate all causes of action to recover all assets and properties of the Debtor wherever located;

(u)    to enter any order, including injunctions necessary to enforce the title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms. and conditions on such title rights and powers as the Court may deem necessary or appropriate; and

(v)    to make such orders as are necessary or appropriate to carry out the provisions of the Plan including. but not limited to, orders interpreting or enforcing the provisions thereof.

### 4.    Effective Date

**The Plan will become effective on the Effective Date which shall be the first day of the month following the date which is thirty (30) days after the date on which the order of confirmation becomes final.**

### 5.    Modification

The Debtor may alter, amend, or modify the Plan at any time prior to the confirmation date and thereafter as provided in Section 1127(b) of the Code.

### F.    Tax Consequences of Plan

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS,

ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers to possible tax issues this Plan may present to Debtor. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Internal Revenue Service and New Jersey State tax code, rules, regulations, and statutes embody many complicated rules that make it difficult to state completely and accurately all the tax implications of any action.

The Debtor does not believe the Plan will have any impact on the Debtor's tax liability.

**G.     Risk Factors**

The following discussion is intended to be a non-exclusive summary of certain risks attendant upon the consummation of the Plan.  You are encouraged to supplement this summary with your own analysis and evaluation of the Plan and Disclosure Statement, in their entirety, and in consultation with your own advisors.  Based on the analysis of the risks summarized below, the Debtor believe the Plan is viable and will meet all requirements of confirmation.

There are no known risks at this time other than the normal risks associated with operating and managing multiple rental properties.

## V.

## CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The Debtor

CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

### A.      Who May Vote or Object

#### 1.      Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan; but as explained below, not everyone is entitled to vote to accept or reject the Plan.

#### 2.      Who May Vote to Accept/Reject the Plan

A creditor has a right to vote for or against the Plan if that creditor has a claim that is both (1) allowed or allowed for voting purposes, and (2) classified in an impaired class.

#### a. What Is an Allowed Claim

As noted above, a creditor must have an allowed claim to have the right to vote.  Generally, any proof of claim will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim is filed, the creditor holding the claim cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM WAS APRIL 21, 2025.

A creditor may have an allowed claim even if a proof of claim was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.

#### b. What Is an Impaired Claim

As noted above, a party holding an allowed claim has the right to vote if it is in a class that is impaired under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100 percent of their claims plus interest.

### 3.    Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote: (1) Claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan.  Except as otherwise provided, claims entitled to priority pursuant to Code Section 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes, and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section (IV.A.7).

### 6.    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the allowed claims that actually voted, voted in favor of the Plan.

## 7.       Treatment of Nonaccepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of the Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on nonaccepting classes of claims if it meets all consensual requirements except the voting requirements of section 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. §1129(b) and applicable case law.

## 8.       Request for Confirmation Despite Nonacceptance by Impaired Class(es)

The party proposing this Plan asks the Court to confirm this Plan by cramdown on impaired classes if any of these classes does not vote to accept the Plan.

## B.       Liquidation Analysis

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis.  Under the Best Interest Test, if a claimant is in an impaired class and that claimant does not vote to accept the Plan, then that claimant must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor's assets were liquidated under Chapter 7 of the Code.

In a Chapter 7 case, a debtor's assets are usually sold by a Chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next.  Thereafter, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claims.

In order for the Court to be able to confirm this Plan, the Court must find that all creditors who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation.

The Debtor maintains that this requirement is met here for the following reasons: Conversion of the case to Chapter 7 will substantially delay the dividend, if any, to creditors herein and result in an additional layer of administrative expenses associated with Chapter 7 Trustee's commissions, and the professional fees of the Chapter 7 Trustee which will be paid before priority unsecured and general unsecured creditors receive their pro rata share of available estate assets. As such, the Debtor believes that secured, priority unsecured, and general unsecured creditors are better off by the reorganization of estate assets and payment of the claims of creditors in accordance with its Chapter 11 Plan of Liquidation, as opposed to conversion of the case to a proceeding under Chapter 7.  In Chapter 7 liquidation, general unsecured creditors will receive no dividend.

**ASSETS**                                                    **Chapter 7 Liquidation**


**TOTAL ASSETS**
Real Property -                                        $1,300,000[13]
Personal Property -                                    $44,652,000[14]

**ADMINISTRATIVE AND PRIORITY CLAIMS**

Chapter 11 Administrative Fees                         $TBD
Priority Tax Claims                                    $6,028,805.26[15]

---

[13] The Debtor has a fifty percent (50%) ownership interest in the Marital Property located at 909 Greenside Drive, Lilitz, Pennsylvania 17543.

[14] Personal property – The Debtor's personal property is worth significantly less than this amount, as this includes as scheduled the Debtor's interest in HCG, listed with a fair market value of $160,000,000 and HIH, listed with a fair market value of $60,000,000. HCG has a book value of $35,000,000 and HIH has a book value of $28,000,000. Thus, the value of the Debtor's personal

[15] See Section B(3) for IRS Claim.

| | |
|---|---|
| **TOTAL ADMINISTRATIVE & PRIORITY CLAIMS** | **$** TBD |
| **SECURED CLAIMS (per claims filed)** | $28,617,080.47 |
| **UNSECURED CLAIMS (as scheduled)** | $651,559,950.29 |
| Estimated Allowed Unsecured Claims<br>**TOTAL ANTICIPATED UNSECURED CLAIMS** | $88,226,552.83 |
| **AMOUNT AVAILABLE FOR UNSECURED<br>CREDITORS IF ALL PROPERTY LIQUIDATED** | **$0** |

**AMOUNT PROPOSED FOR UNSECURED CREDITORS IN PLAN - $88,226,552.83**

C.     **Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Debtor or any successor to Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis.  The first aspect considers whether Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on such date.  The Debtor maintains that this aspect of feasibility is satisfied as illustrated here, based upon the value of the Debtor's assets.

The second aspect considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments.

The Debtor's plan is feasible in light of the financial records and as set forth in the monthly operating reports. The Debtor, under his Plan, has restructured his debt to the value of his assets. Moreover, he expects to generate future cash flow/ revenue from HCG and HIH, along with

liquidation events over the course of the Plan and enhancing the value and distributions from his businesses.

Accordingly, the Debtor asserts that the Plan is feasible.

## VI.

## EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge

The Plan provides that upon confirmation of the Plan, the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. §1141.  However, any liability imposed by the Plan will not be discharged.  If Confirmation of the Plan does not occur or if, after Confirmation occurs, the Proponent elects to terminate the Plan, the Plan shall be deemed null and void.  In such event, nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims against the Debtor or his estate or any other persons, or to prejudice in any manner the rights of the Debtor or his estate or any person in any further proceeding involving the Debtor or his estate.  The provisions of the Plan shall be binding upon Debtor, the Proponent, all creditors and all equity interest holders, regardless of whether such claims or equity interest holders are impaired or whether such parties accept the Plan, upon Confirmation thereof.  Moreover, any judgments docketed against the Debtor in the State of New Jersey and any county or subdivision thereof will be expunged upon confirmation of the Plan.

### B.    Release of Claims

#### 1.  Release

Except as otherwise expressly provided for in this Plan, the distributions and rights afforded in the Plan shall be complete and full satisfaction and release, effective as of the Effective Date, of all Claims against the Debtor or any of his assets or properties of any nature whatsoever. Commencing on the Effective Date, except as otherwise expressly provided for in this Plan, all

Claimants, are forever releasing, waiving, and discharging and shall be precluded forever from asserting against the Debtor of any other or further claims, obligations, suits, judgments, liens, encumbrances, damages, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business or affairs, this Chapter 11 Case, or the Plan, including but not limited to all principal and accrued and unpaid interest on the debts of the Debtor based on any act or omission, transaction or other activity or security instrument or other agreement of any kind or nature occurring, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim, whether or not Allowed; provided, however, that such release, waiver and discharge shall not apply in any respect to any acts or omission that are the result of fraud, gross negligence or willful misconduct by the Debtor from the Petition Date to the Effective Date.

On and after the Effective Date, as to every Claim, every Holder of a Claim shall be precluded from asserting against the Debtor for any further Claim based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019, confirmation of the Plan shall constitute, and all consideration distributed under this Plan shall be in exchange for and in complete satisfaction, settlement, and release of and an injunction against, all as of the Effective Date, any and all Claims, demands, allegations or causes of action, against the Debtor and its respective agents, representatives, officers, shareholders, members, employees, financial advisors, accountants, attorneys, or employees for any liability for actions taken or omitted to be taken in good faith under or in connection with the Plan or in connection with the Chapter 11 case or the operation of the Debtor during the pendency of the Chapter 11 case.

2.      **Settlement of Claims and Controversies; General Injunction**

The provisions of the Plan shall constitute a good faith compromise and settlement of claims or controversies relating to the contractual and legal rights that a Holder of a Claim may have with respect to any Claim, or any distribution to be made on account of such an Allowed Claim.

Except as otherwise provided in the Plan, the Confirmation Order will provide that all persons and entities who have held, hold, or may hold Claims against the Debtor are permanently enjoined, on and after the Confirmation Date, from (A) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or taking any act to recover such Claim outside of the claims allowance procedure discussed in the Plan and the Code and Bankruptcy Rules, (B) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Debtor on account of any such Claim, (C) creating, perfecting or enforcing any encumbrance of any kind against the Debtor or against the property or interests in property of the Debtor on account of any such Claim  (D) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or against the property or interests in property of the Debtor on account of any such Claim; (E) any creditor, current or future, are enjoined from commencing any action that affects property of the Debtor of his estate during the term of the Plan.

C.      **Revesting of Property in the Debtor**

Except as provided in the Plan, the confirmation of the Plan revests the property of the estate in the Debtor.

D.      **Modification of Plan**

The Proponent may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or revoting on the Plan if Proponent modifies the plan

before confirmation.

The Proponent may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated, and (2) the Court authorizes the proposed modification after notice and a hearing. The Proponent further reserves the right to modify the treatment of any Allowed Claims at any time after the Effective Date of the Plan upon the consent of the Creditor whose Allowed Claim treatment is being modified, so long as no other Creditors are materially adversely affected.

### E.      Post-Confirmation Conversion/Dismissal

A creditor or party in interest may bring a motion to convert or dismiss the case under Section 1112(b), after the Plan is confirmed, if there is a default in performance of the Plan or if cause exists under Section 1112(b).  If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only if relief from stay was not previously granted during this case.

Quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) continue to be payable to the Office of the United States Trustee post-confirmation until such time as the case is converted, dismissed, or closed pursuant to a final decree or order of the court.  Operating reports shall continue to be filed on a quarterly basis after confirmation until the case is converted, dismissed, or closed by order of the court.

### F.      Closing of Case

Immediately following the first payment under the Plan, such Plan shall be deemed "consummated", and the Debtor will move to close the case.  Nothing herein shall prevent the Debtor

from completing or instituting such proceedings as may be necessary for the enforcement of any

claim of the Debtor which may have existed against any third party before, or which may exist after

Confirmation which may have not been enforced or prosecuted prior to Confirmation.


**McMANIMON, SCOTLAND,**
**& BAUMANN, LLC**
*Counsel to Debtor, Daryl Fred Heller*


By:___*/s/ Sari B. Placona*_____
SARI B. PLACONA



**DARYL FRED HELLER**
*Chapter 11 Debtor and Debtor-in-Possession*

By:___*/s/* Daryl Fred Heller_____
DARYL FRED HELLER

Dated: August 1, 2025