| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| McMANIMON, SCOTLAND & BAUMANN, LLC<br>75 Livingston Avenue, Second Floor<br>Roseland, NJ 07068<br>(973) 622-1800<br>Anthony Sodono III (asodono@msbnj.com)<br>Sari B. Placona (splacona@msbnj.com)<br>*Counsel to Daryl Fred Heller*<br>*Chapter 11 Debtor and Debtor-in-Possession* | |
| In re:<br><br>DARYL FRED HELLER,<br><br>Debtor. | Case No. 25-11354 (JNP)<br><br>Chapter 11 |

## DEBTOR'S CHAPTER 11 PLAN

Daryl Fred Heller (the "Debtor"), the Debtor / Plan Proponent respectfully submits his Chapter 11 Plan pursuant to Chapter 11, Title 11 of the United States Code, in the form annexed and made a part hereof.

<div style="margin-left:40%">

**McMANIMON, SCOTLAND,**
**& BAUMANN, LLC**
*Counsel to Debtor, Daryl Fred Heller*

By:￼    /s/ Sari B. Placona
￼    SARI B. PLACONA

**DARYL FRED HELLER**
*Chapter 11 Debtor and Debtor-in-Possession*

By:￼    */s/* Daryl Fred Heller
￼    DARYL FRED HELLER

</div>

Dated: August 1, 2025

i

## TABLE OF CONTENTS

**PAGE**

I. ...................................................................................................................................... 1

INTRODUCTION ............................................................................................................... 1

II. ..................................................................................................................................... 7

CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................... 7

   A.   General Overview ................................................................................................. 7

   B.   Definitions ............................................................................................................ 7

   C.   Unclassified Claims ........................................................................................... 13

      1.   Administrative Expenses and Fees ........................................................... 13

      2.   Priority Tax Claims .................................................................................... 15

   D.   Classified Claims and Interests ......................................................................... 16

      1.   Classes of Secured Claims......................................................................... 16

      2.   Priority Non-Tax Claims ........................................................................... 17

      3.   Class of General Unsecured Claims .......................................................... 18

      4.   Class(es) of Equity Interest Holders ......................................................... 18

   E.   Acceptance or Rejection of Plan ....................................................................... 19

   F.   Means of Effectuating the Plan .......................................................................... 19

      1.   Funding for the Plan .................................................................................. 19

      2.   Post-Confirmation Management ................................................................ 23

      3.   Disbursing Agent ....................................................................................... 23

TREATMENT OF MISCELLANEOUS ITEMS ............................................................... 23

   A.   Executory Contracts and Unexpired Leases ...................................................... 23

      1.   Rejections .................................................................................................. 23

   B.   Changes in Rates Subject to Regulatory Commission Approval ....................... 24

   C.   Retention of Jurisdiction. ................................................................................... 24

   D.   Procedures for Resolving Contested Claims...................................................... 26

   E.   Notices under the Plan ....................................................................................... 26

IV. .................................................................................................................................. 26

EFFECT OF CONFIRMATION OF PLAN ....................................................................... 26

   A.   Discharge ........................................................................................................... 26

   B.   Release of Claims .............................................................................................. 27

   C.   Modification of Plan .......................................................................................... 28

   D.   Revesting of Property in the Debtor .................................................................. 28

   E.   Post-Confirmation Conversion/Dismissal......................................................... 29

   F.   Post-Confirmation Quarterly Fees ..................................................................... 29

# I.

## INTRODUCTION

Daryl Fred Heller is the Debtor and Debtor-in-Possession in this Chapter 11 bankruptcy case (the "Debtor" or "Proponent"). On February 10, 2025, the Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code ("Bankruptcy Code"), 11 U.S.C. § 101 *et seq.* This document is the Debtor's Chapter 11 Plan (the "Plan") proposed by the Debtor / Proponent. Sent to you in the same envelope as this document is the Debtor's Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan of Reorganization Proposed by the Debtor-in-Possession which has been approved by the United States Bankruptcy Court for the District of New Jersey (the "Court"), and which is provided to help you understand the Plan.

This is a reorganizing plan. In other words, the Proponent seeks to accomplish payments under the Plan by satisfying secured, priority, Administrative Expense Claims, and general unsecured claims as set forth in the Plan. The Effective Date of the proposed Plan is the first day of the month following the date which is thirty (30) days after the date on which the Confirmation Order becomes a Final Order.

The Debtor's Plan will be funded by a combination of income from the Debtor's entities and primarily from the sale of assets owned or wholly owned by entities. The Debtor is employed by Althea Management, LLC ("Althea"), which assesses monthly management fees for the daily management of Heller Capital Group, LLC's ("HCG") and Heller Investment Holdings, LLC's ("HIH") assets. The Debtor has a ninety-nine percent (99%) member-interest in Althea, and the remaining one percent (1%) is owned by Althea Group, LLC ("Althea Group"). The Debtor owns one-hundred percent (100%) member-interest of Althea Group. Althea Group is the manager of

Althea. The Debtor is the managing member of Althea Group. Althea has no assets, and its sole source of income derives from management services it provides to entities and is structured to be a zero-profit entity only assessing management fees to offset its payroll, and other nominal operating expenses such as insurances. The Debtor works from a home-office to minimize expenses.

The Debtor owns a ninety-nine- and one-half percent (99.5%) member-interest in HCG and an eighty-five percent (85%) member-interest in HIH. The Debtor's gross income from Althea is bifurcated approximately as follows and may shift over time as workload increases/decreases inside entities: (i) salary of $40,000 of which 25,000 is targeted to come from HIH and $15,000 is targeted to come from HCG,[1] and (ii) and the Schedule K-1 income for entities owned by HCG and HIH will not be known until the end of 2025. The Debtor is not expecting significant Scheduled K-1 income for 2025. Rather, losses are likely based on impairment to HCG and HIH, which will pass through to Debtor and help offset his 2022 federal tax liability. Additionally, Debtor is in process of filing his 2023 and 2024 tax returns which will generate losses and further offset his federal tax liability.

The Debtor's salary is utilized to pay his ordinary course expenses, such as mortgage, living expense, taxes, etc. HCG has a significantly reduced fair market value of approximately $15,000,000 to $25,000,000, as its assets have been devalued, undermined, and impaired from (i) the legal actions by Prestige and other creditors which directly resulted in losses of customers, revenue, vendors and business partners, (ii) Debtor's bankruptcy filing, (iii) creditors seizing and

---

[1] The Debtor has been taking less monthly income given various cash-flow issues pertaining to Althea, HCG, and HIH.

liquidating assets,[2] and (iv) the unlawful seizing of assets by Jerry Hostetter[3] from Prestige for personal benefit has created further impairment.

HIH has a significantly reduced fair market value of approximately $15,000,000 to $25,000,000, as its assets have been devalued, undermined, and impaired from (i) the legal actions by Prestige and other creditors which directly resulted in losses of customers, revenue, vendors and business partners, (ii) Debtor's bankruptcy filing, and (iii) GCC Investment Holdings unlawfully seizing of membership interests.[4] As a disclaimer, valuation of HCG and HIH is estimated and valuations could be substantially higher if creditors allow for strategic selling of assets and allow certain assets/entities to reach maximum valuation by completing its life cycle to achieve critical mass; conversely estimated valuations could be substantially lower if liquated in a 'fire sale.'

The Debtor also has a fifty percent (50%) member interest in DHTC, and a one-hundred percent (100%) member-interest in the following entities: I Employee Services, LLC, Raw Ventures, LLC, and Cash Ventures IV, LLC, all of which will be liquidated and the proceeds distributed to creditors.

The Debtor's proposed funding of the Plan is through Debtor owned entities cash flows and/or liquidation of entities in which the Debtor wholly or partially owns through entity interests.

---

[2] As an example of a creditor seizing and liquidating HCG assets is Chicago Atlantic Admin, LLC ("Chicago") seizure of HCG's valuable asset, Premier Technology Group ("PTG"), which Chicago liquidated for below market value on or about February 14, 2024, which the Debtor believes was sold for approximately $16,000,000. Chicago has refused after multiple attempts to provide the final account. PTG should have sold for substantially higher, likely closer to $25,000,000. Chicago also sold the entity 'AVAIL' and has not disclosed the amount, as well as assets of 'ICS' which have not been disclosed.

[3] On or about May 2025, Jerry Hostetter unlawfully confiscated the "Cornwall and Alden" assets from Prestige, placing ownership interest in his personal name, which has a book value of approximately $500,000 and should have went to creditors. Jerry Hostetter was the Debtor's partner at Prestige, who owned forty percent (40%) of Prestige with HCG owning the remaining sixty percent (60%).

[4] As an example of seizure of HIH assets, on or about February 2025, GCC Investment Holdings appropriated (membership interests) from HIH, which had a fair market value of approximately $40,000,000 for HIH equity, based on the Chief Financial Officer's analysis from a July 2024 'soft' appraisal of enterprise valuation, which should have gone to creditors.

The Debtor proposes a rapid liquidation of all HCG entities to occur in approximately eighteen (18) to twenty-four (24) months, or sooner, which will occur through various liquidation events and will result in a final dissolution of HCG. All proceeds from HCG liquidation events will be paid into the Plan to fund creditors and pay the Althea management fee, third party outsource accounting/finance/IT fees and legal administrative and related fees. Accordingly, all of cash flow and liquidation events will benefit creditors, other than the above expenses.

The Debtor has already removed all employees and operating expenses of HCG to streamline expenses to maximize the benefit for creditors. The Debtor proposes a to-be-determined company as liquidating entity for HCG over the next eighteen (18) to twenty-four (24) months. Debtor reserve all of his rights to designate an entity/asset that should not be liquidated pursuant to the eighteen (18) to twenty-four (24) month period if holding such asset(s) beyond that amount of time is for the benefit of creditors.

For HIH,  the Debtor proposes that HIH continue to hold assets to generate cash flow. Such cash flow after payment for management fees, third-party accounting/finance/IT fees, and legal and similar administrative fees, will be paid to the Plan for the benefit of creditors. The cash flow will be added to funds resulting from liquidation of assets. The HIH proposal allows for maximizing values and divesting assets over a period of ten (10) years or less, This will allow assets to be liquidated, at strategic times when assets hit maturity and scale which will  maximize value for creditors. As a result, this strategic liquidation should increase the HIH asset value to approximately  $35,000,000-$50,000,000. The proposed HCG cash flow projection and liquidation analysis will be provided and annexed to the Plan as **Exhibit A.** The proposed HIH cash flow projection and liquidation analysis will be provided and annexed to the Plan as **Exhibit B.** The Debtor is in the process of gathering projected financial data and a more acute liquidation analysis for HCG and HIH.

Upon an order confirming the Plan, any and all creditors are enjoined from taking any and all action against the Debtor and his assets and entities, including but not limited to, stock, membership interests, partnership interests, equity holdings, intellectual property, contractual rights, real and personal property, bank accounts, receivables, and any other tangible or intangible assets, whether held directly or indirectly, so as to protect the integrity of the Plan and fund payments to creditors.

The Debtor and his spouse own the marital property by tenants by the entirety located at 909 Greenside Drive, Lititz, Pennsylvania 17543 (the "Martial Property"). The Debtor's spouse retains a fifty-percent (50%) ownership in the Martial Property as tenants by the entirety. The Martial Property has an approximate fair market value of $2,800,000 to $3,000,000, which is subject to a mortgage of approximately $1,500,000. The Debtor will either retain his portion of the Martial Property through a future sale of property, or purchase his equity interest in the Martial Property, with his "equity" amount paid to creditors paid over ten (10) years.[5]

The Debtor also had an ownership interest in real property located at 7605 Pleasure Avenue, Sea Isle City, New Jersey 08423 (the "Beach House"). The Beach House was sold by way of Order of the Bankruptcy Court dated April 3, 2024 (the "Sale Order"). ECF 167. The net proceeds of the Beach House pursuant to the Sale Order was in the approximate amount of $1,563,231.69, which was placed in escrow with the Debtor's law firm, which allowed the sale to occur while preserving the claims of objecting parties to the net proceeds.

Pursuant to the Motion for an Order Approving the Agreement Between the Debtor, Charlene R. Heller, and Orrstown Bank Pursuant to 9019 of the Fed. R. Bankr. P. [ECF 213] (the "Orrstown 9019 Motion"), the Debtor's spouse is entitled to thirty-to-fifty percent (30%-

---

[5] For example, if the home sells for $3,000,000, after deducting 10% costs of sale, mortgage, homestead exemption and the Debtor's spouse half interest, there will be "equity" of approximately $550,000.  If the Debtor sells the home, the creditors will receive the benefit of such funds.  If the Debtor retains the home, the Debtor will provide for payment of $550,000 in his Plan.

50%) of the net proceeds of the Beach House or a minimum of the $250,000 settlement amount
with Orrstown Bank.

On May 20, 2025, the Debtor filed a Motion Expunging over $500,000,000 of erroneous
Claims for Claim Nos. 13 Through 32 Filed by Prestige Fund A II, LLC et al.[6] ("Prestige")
Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (the "Motion Object Prestige Claims").
ECF 288. On June 10, 2025, the Court entered an oral decision refraining from ruling on the
Motion Object Prestige Claims, which issues will be settled in the adversary proceeding
captioned as *Prestige Fund A, LLC et al. v. Daryl Heller and Heller Capital Group, LLC*, Adv.
Pro. 25-01128 (the "Prestige Complaint"). The Prestige Complaint remains pending before the
Court. Furthermore, the Debtor will be filing a motion to expunge the over $60,000,000
erroneous Claim No. 57 filed by GCC Investment Holdings LLC ("GCC Investment Holdings"
or "Glorious").

Also, the Debtor will be filing a motion to expunge, or reduce, certain claims from
merchant cash advance loans on revenue or receivables, namely Claim No. 3 filed by Prosperum
Capital Partners LLC ("Prosperum"), Claim No. 8 filed by CFG Merchant Solutions, LLC
("CFG"), Claim No. 64 filed by Libertas Funding LLC ("Libertas"), Claim No. 65 filed by
WebBank ("WebBank"), Claim No. 66 filed by Funders App LLC dba Fundonatic ("Funders"),
Claim No. 67 filed by Reliance Financial ("Reliance"), and others, if applicable.

The Debtor may object to the amount or validity of any Claim within sixty (60) days of
the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of

---

[6] Claim Nos. 13 through 32 were filed by related entities as follows: Prestige Fund A II, LLC (Claim No. 13); Prestige
Fund A IV, LLC (Claim No. 14); Prestige Fund A IX, LLC (Claim No. 15); Prestige Fund A V, LLC (Claim No. 16);
Prestige Fund A VI, LLC (Claim No. 17); Prestige Fund A VII, LLC (Claim No. 18); Prestige Fund A, LLC (Claim
No. 19); Prestige Fund B BTM I, LLC (Claim No. 20); Prestige Fund B II, LLC (Claim No. 21); Prestige Fund B IV,
LLC (Claim No. 22); Prestige Fund B V, LLC (Claim No. 23); Prestige Fund B VI, LLC (Claim No. 24); Prestige
Fund B VII, LLC (Claim No. 25); Prestige Fund B, LLC (Claim No. 26); Prestige Fund B BTM I, LLC (Claim No.
27); Prestige Fund D III, LLC (Claim No. 28); Prestige Fund D IV, LLC (Claim No. 29); Prestige Fund D V, LLC
(Claim No. 30); Prestige Fund D VI, LLC (Claim No. 31); and Prestige Fund D, LLC (Claim No. 32)

the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed

Claim under the Plan.  If a claim is disputed, once such claim is adjudicated by the Court, it

will be disallowed, allowed, reclassified or reduced. An Allowed Claim will be paid in

accordance with the Plan.

Upon confirmation of the Plan the Amended Consent Order Preserving Status Quo (the

"Status Quo Order") [ECF 119], is hereby dissolved against the Debtor's spouse, two (2)

children, HIH, HCG, Accordo. L.P., Brookfield, L.P., and Brigantine Group, L.P. (collectively,

the "Status Quo Parties"). Moreover, upon dissolution of the Status Quo Order, any and all

claims against the Status Quo Parties by creditors will hereby be released. The Debtor reserves

any and all rights to seek the termination of Edward A. Phillips (the "Examiner"), the court-

appointed Examiner in this case.

## II.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.     General Overview

As required by the Bankruptcy Code, the Plan classifies claims and interests in various

classes according to their right to priority of payments as provided in the Bankruptcy Code. The

Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides

the treatment each class will receive under the Plan.

### B.     Definitions

**Scope of Definitions.**  For purposes of this Plan, except as expressly otherwise provided or unless

the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings

assigned to them in this Section of the Plan.  In all references herein to any parties' persons,

entities, or corporations, the use of any particular gender or the plural or singular number is

intended to include the appropriate gender or number as the text may require.

**1.** **Administrative Expense** shall mean any cost or expense of administration of the Chapter 11 case allowable under Section 507(a) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate of the Debtor, any actual and necessary expense of the Debtor, any indebtedness or obligation incurred or assumed by the Debtor in connection with the conduct of his business or for the acquisition or lease of property or the rendition of services to the Debtor, all allowances of compensation and reimbursement of expenses, any fees or charges assessed against the estate of any Debtor under Chapter 123, Title 28, of the United States Code, and the reasonable fees and expenses incurred by the Proponent in connection with the proposal and confirmation of this Plan.

**2.** **Allowed** when used as an adjective preceding the words "Claims" or "Equity Interest," shall mean any Claim against or Equity Interests of the Debtor, proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claim or Equity Interest against such Debtor, or, if no proof of claim or Equity Interest is filed, which has been or hereafter is listed by the Debtor as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been interposed with the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Rules, or as to which any objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. Unless otherwise specified in the Plan, "Allowed Claim" and "Allowed Equity Interest" shall not, for purposes of computation of distributions under the Plan, include interest on the amount of such Claim or Equity Interest from and after the Petition Date.

**3.**    **Allowed Administrative Expense** shall mean any Administrative Expense allowed under Section 507(a)(1) of the Bankruptcy Code.

**4.**    **Allowed Unsecured Claim** shall mean an Unsecured Claim that is or has become an Allowed Claim.

**5.**    **Bankruptcy Code** shall mean the Bankruptcy Reform Act of 1978, as amended, and as codified in Title 11 of the United States Code.

**6.**    **Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Case and, to the extent of any reference made pursuant to 28 U.S.C. Section 158, the unit of such District Court constituted pursuant to 28 U.S.C. Section 151.

**7.**    **Bankruptcy Rules** shall mean the rules and forms of practice and procedure in bankruptcy, promulgated under 28 U.S.C. Section 2075 and also referred to as the Federal Rules of Bankruptcy Procedure.

**8.**    **Business Day** means and refers to any day except Saturday, Sunday, and any other day on which commercial banks in New Jersey are authorized by law to close.

**9.**    **Chapter 11 Case** shall mean a case under Chapter 11 of the Bankruptcy Code in which Daryl Fred Heller is the Debtor.

**10.**    **Claim** shall mean any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. All claims as such term is defined in section 101(5) of the Bankruptcy Code.

**11.** **Class** shall mean a grouping of substantially similar Claims or Equity Interests for common treatment thereof pursuant to the terms of this Plan.

**12.** **Code** shall mean Title 11 of the United States Code, otherwise known as the Bankruptcy Code.

**13.** **Confirmation** shall mean the entry of an Order by this Court approving the Plan in accordance with the provisions of the Bankruptcy Code.

**14.** **Confirmation Hearing** shall mean a hearing conducted before the Bankruptcy Court for the purpose of considering confirmation of the Plan.

**15.** **Confirmation Order** shall mean an Order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**16.** **Creditor** shall mean any person that has a Claim against the Debtor that arose on or before the Petition Date or a Claim against the Debtor's estate of any kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code. This includes all persons, corporations, partnerships, or business entities holding claims against the Debtor.

**17.** **Debt** means, refers to and shall have the same meaning ascribed to it in Section 101(12) of the Code.

**19.** **Debtor** shall mean Daryl Fred Heller.

**20.** **Disbursing Agent** shall mean the Reorganized Debtor or any party appointed by and subject to Court approval, which shall effectuate this Plan and hold and distribute consideration to be distributed to holders of Allowed Claims and Allowed Equity Interests pursuant to the provisions of the Plan and Confirmation Order.

**21.** **Disclosure Statement** means and refers to the Debtor's Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Chapter 11 Plan of Reorganization

Proposed by the Debtor-in-Possession filed by the Debtor as required pursuant to Section 1125 <u>et seq</u>. of the Bankruptcy Code.

<u>22.</u>    **<u>Effective Date</u>** shall mean the day on which the Confirmation Order becomes a Final Order.

<u>23.</u>    **<u>Equity Interest Holder</u>** shall mean the holder of an equity interest in the Debtor.

<u>24.</u>    **<u>Equity Interest</u>** shall mean any interest in the Debtor represented by stock, warrants, options, or other rights to purchase any shares of stock in the Debtor.

<u>25.</u>    **<u>Final Order</u>** shall mean an order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court which, not having been reversed, modified, or amended, and not being stayed, and the time to appeal from which or to seek review or rehearing of which having expired, has become final and is in full force and effect.

<u>26.</u>    **<u>Impaired</u>** when used as an adjective preceding the words "Class of Claims" or "Class of Equity Interest", shall mean that the Plan alters the legal, equitable, or contractual rights of the member of that class.

<u>27.</u>    **<u>Person</u>** shall mean an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, or a government or any political subdivision thereof or other entity.

<u>27.</u>    **<u>Petition Date</u>** shall mean February 10, 2025, the date on which the Debtor filed this petition for relief commencing the Chapter 11 Case.

<u>28.</u>    **<u>Plan</u>** shall mean the Debtor's Chapter 11 Plan filed in these Proceedings, together with any additional modifications and amendments.

**29.**    **Priority Non-Tax Claim** shall mean a Claim entitled to priority under sections 507(a)(2),(3), (4), (5), (6) or (7) of the Bankruptcy Code, but only to the extent it is entitled to priority in payment under any such subsection.

**30.**    **Priority Tax Creditor** shall mean a Creditor holding a priority tax claim.

**31.**    **Priority Tax Claim** shall mean any Claim entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

**32.**    **Proceedings** shall mean the Chapter 11 Case of the Debtor.

**33.**    **Professional Persons** means and refers to all attorneys, accountants, appraisers, consultants, and other professionals retained or to be compensated pursuant to an Order of the Court entered under Sections 327, 328, 330, or 503(b) of the Bankruptcy Code.

**34.**    **Professional Claim** means and refers to a claim by any and all professionals as provided for in Sections 327, 328, 330 and 503(b) of the Bankruptcy Code.

**35.**    **Proponent** means Daryl Fred Heller.

**36.**    **Reorganized Debtor** means the Debtor after confirmation of the Plan.

**37.**    **Secured Claim** means and refers to a Claim which is secured by a valid mortgage, lien, security interest, or other interest in property in which the Debtor has an interest which has been perfected properly as required by applicable law, but only to the extent of the value of the Debtor's interest in such property, determined in accordance with Section 506(a) of the Bankruptcy Code.

**38.**    **Unsecured Claim** shall mean any Claim against the Debtor which arose or which is deemed by the Bankruptcy Code to have arisen prior to the Petition Date for such Debtor, and which is not (i) a secured claim pursuant to Section 506 of the Bankruptcy Code, as modified by section 1111(b) of the Bankruptcy Code, or (ii) a Claim entitled to priority under sections

503 or 507 of the Bankruptcy Code or (iii) has not been perfected in accordance with

applicable law or (iv) is deemed to be a wholly unsecured secured claims, i.e., a secured

claim that lacks any equity in its collateral and therefore, has no value. "Unsecured Claim"

shall include all Claims against the Debtor that are not expressly otherwise dealt with in the

Plan.

**39.**    **Other Definitions** a term used and not defined herein but that is defined in the Bankruptcy

Code shall have the meaning set forth therein. The words "herein," "hereof," "hereto,"

"hereunder," and others of similar import refer to the Plan as a whole and not to any

particular section, subsection, or clause contained in the Plan.  Moreover, some terms

defined herein are defined in the section in which they are used.

**C.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified.

They are not considered impaired, and they do not vote on the Plan because they are automatically

entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has

not placed the following claims in a class. The treatment of these claims is provided below.

**1.  Administrative Expenses and Fees**

| NAME | AMOUNT ESTIMATED | TREATMENT | TYPE OF CLAIM |
|---|---|---|---|
| McManimon, Scotland & Baumann, LLC | $250,000, through July 2025 | Payment in full on Effective Date, or through other agreement. Fees continue to accrue. | Administrative |
| McCarter & English, LLP ("Criminal Counsel") | $TBD | Payment in full on Effective Date, or through other agreement. | Administrative |
| The DMC Group CPAs & Advisors ("Accountant") | $TBD | Payment in full on Effective Date, or through other agreement. | Administrative |
| Office of U.S. Trustee Fees | $TBD | Payment in full on Effective Date, or through other agreement. | Administrative |

| Examiner and Getzler Henrich & Associates LLC | $133,842.50[7] | Payment in full on Effective Date, or through other agreement. | Administrative |
| Reed Smith LLP, counsel to Examiner | $177,106.35[8] | Payment in full on Effective Date, or through other agreement. | Administrative |
| **APPROXIMATE TOTAL** | **$_____** **(estimated)** | | |

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code Section 503(b). Fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee were also incurred during the Chapter 11 Case. The Code requires that all administrative expenses be paid on the Effective Date of the Plan unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's unpaid administrative fees and expenses ("Compensation"), an estimate of future professional fees and other administrative claims and fees and their treatment the Plan:

**Court Approval of Professional Compensation and Expenses Required:**

The Court must approve all professional compensation and expenses. Each professional person requesting compensation in the case pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code shall file an application for allowance of final compensation and reimbursement of expenses not later than sixty (60) days after the Effective Date. Nothing herein shall prohibit each professional person from requesting interim compensation during the course of this case pending Confirmation of this Plan. No motion or application is required to fix fees

---

[7] The Examiner and his financial advisor, Getzler Henrich & Associates LLC, filed fee applications, with fees continuing to accrue on a monthly basis. ECF 399, 400.
[8] The Examiner's counsel, Reed Smith LLP, filed a fee application, with fees continuing to accrue on a monthly basis. ECF 401.

payable to the Clerk's Office or the Office of the United States Trustee, as those fees are determined by statute.

### 2. Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires, and thus this Plan provides, that each holder of such a 507(a)(8) priority tax claim receives the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax.

Priority tax claims shall be satisfied in accordance with the requirements of Section 507(a)(8).

On March 19, 2025, the Department of Treasury – Internal Revenue Service ("IRS") filed Claim 9 (the "IRS Claim") in the amount of $18,926,096.76.  The basis for the IRS Claim is taxes owed. The IRS Claim (i) designates $6,028,805.26 as secured, and (ii) designates $12,897,291.50 as a priority unsecured claim. The Debtor is in the process of filing tax returns for tax years 2023 and 2024, which the Debtor believes will substantially reduce, offset, or eliminate the priority unsecured portion of the IRS Claim. The Debtor anticipates the priority unsecured portion of the IRS Claim will be reduced to approximately $1,000,000, at most, or be eliminated entirely. Pursuant to Section 507 of the Bankruptcy Code, the Debtor will pay the IRS Claim, including interest, over the course of sixty (60) months, at approximately $17,000 a month should the unsecured priority portion be reduced to approximately $1,000,000. As for the secured potion of the IRS Claim, the IRS is subordinate to other secured creditors who hold a senior security interest in the Debtor's assets which may encumber any equity in such assets, thus the secured portion of the IRS Claim will be treated as unsecured. The Debtor reserves his right to file a motion to reduce and/or reclassify the IRS Claim.

**D.     Classified Claims and Interests[9]**

**1.  Classes of Secured Claims[10]**

Secured claims are claims secured by liens on property of the estate.  If there are assets available, the below creditors will be paid upon the priority they should receive, otherwise they will be treated as an unsecured claim.  The following represent all classes containing Debtor's secured pre-petition claims and their treatment under this Plan:

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | AMOUNT OWED | TREATMENT |
|-------|-------------|----------------|----------------|-------------|-----------|
| 1 | IRS | N | N | $6,028,805.26 | This amount will be reduced to approximately $1,000,000, or less, once when the Debtor files taxes for tax years 2023 and 2024. The Debtor will pay approximately $17,000 and including interest a month. |

---

[9] The Debtor retains and reserves all of his rights to object to certain claims or reclassify treatment.

[10] Proof of Claim 3 by Prosperum Capital Partners LLC, Proof of Claim 8 by CFG Merchant Solutions, LLC, Proof of Claim 47 filed by Univest Bank and Trust Co., Proof of Claim 87 filed by Bryan Zeamer and Heather Seamer, and Proof of Claim 88 filed by Randy Weaver, will all be treated as unsecured claims despite said claims filed as alleged secured claims, because the Debtor disputes the validity, extent, and priority of the asserted security interests, and no competent evidence has been provided to establish a perfected lien or enforceable security agreement under applicable law, and therefore such claims do not meet the requirements for secured status under 11 U.S.C. § 506. The Debtor reserves his right to object to such claims.

| CLASS | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | AMOUNT OWED | TREATMENT |
|---|---|---|---|---|---|
| 2 | Orrstown Bank[11] | N | Y | $6,700,566.25 | Orrstown filed Claims Nos. 48, 49, 50, 51, 52, 53, and 62 ("Orrstown's Claims") in the Debtor's case. Orrstown Claims are addressed in the Orrstown 9019 Motion. ECF 213 |
| 3 | Needham Bank[12] | N | Y | $12,100,000.00 | This amount will be fully satisfied by the liquidation of Glorious, which is an entity under HIH, who was the largest shareholder in GCC Investment Holdings and GCC MSO before membership interests were seized, which the Debtor expects to recover. |

## 2. Priority Non-Tax Claims

Certain priority non-tax claims that are referred to in Code Sections 507(a)(3), (4), (5), (6),

and (7) are entitled to priority treatment. These claims are to be treated as follows: Not applicable.

---

[11] Orrstown Bank is secured only up to the value of the Marital Property.
[12] Needham Bank is secured only up to the value of the Marital Property.

3.      **Class of General Unsecured Claims**

General unsecured claims are unsecured claims not entitled to priority under Code Section

507(a). These claims are to be treated as follows:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 4 | General Unsecured Claims[13] Total amount of filed claims = (approximately $88,226,552.83) (this amount is still being determined that claims are subject to objection and reclassification.) The Debtor will contribute one hundred percent (100%) of HCG cash flow and liquidation of assets, less Althea, Administrative Claims, and third party outsource fees over two (2) years. The Debtor will contribute one-hundred percent (100%) of HIH cash flow and liquidation of assets less Althea, Administrative Claims and third party outsource fees over ten (10) years. | Y | Y | Debtor will fund a "pot" plan of one hundred percent (100%) of HCG cash flow and liquidation of assets (post Althea, administrative claims and third-party outsource fees) over two (2) years and one-hundred percent (100%) of HIH cash flow and liquidation of assets (post Althea, admin and third party outsource fees) over ten (10) years based on pro rata amount of a creditor. The Debtor intends on liquidating HIH in whole or part, and if Debtor retains any part of HIH the Debtor will pay the value of the retained portion of HIH to creditors over ten (10) years. |

4.   **Class(es) of Equity Interest Holders**

The Debtor will be retaining his fifty-percent (50%) ownership interest in the Martial

Property. The Debtor will either retain his portion of the Martial Property, or purchase his equity

interest in the Martial Property, with the amount paid to creditors.

Means of Effectuating the Plan

---

[13] The approximate unsecured debt is less (i) Prestige's Claim Nos. 13 through 32, totaling $503,290,225.46, which is being addressed in Prestige's Complaint [Adv. Pro. 25-01128], and (ii) Glorious's Claim No. 57, totaling $60,043,172.00, which will be addressed in the forthcoming expungement motion, among other claims the Debtor designates.

**E.      Acceptance or Rejection of Plan**

Each impaired class of Creditors with claims against the Debtor's estate shall be entitled to vote separately to accept or reject the Plan.  A class of Creditors shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in the aggregate dollar amount and more than one-half (1/2) in number of holders of the allowed Claims of such class that have accepted or rejected the Plan.  In the event that any impaired class of Creditors or Interest holders shall fail to accept the Plan in accordance with Section 1129(a) of the Bankruptcy Code, the Proponent reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

**F.      Means of Effectuating the Plan**

**1.   Funding for the Plan**

The Debtor's Plan will be funded by a combination of income from the Debtor's entities and primarily from the sale of assets owned or wholly owned by entities. The Debtor is employed by Althea, which assesses monthly management fees for the daily management of HCG and HIH assets. The Debtor has a ninety-nine percent (99%) member-interest in Althea, and the remaining one percent (1%) is owned by Althea Group. The Debtor owns one-hundred percent (100%) member-interest of Althea Group. Althea Group is the manager of Althea. The Debtor is the managing member of Althea Group. Althea has no assets, and its sole source of income derives from management services it provides to entities and is structured to be a zero-profit entity only assessing management fees to offset its payroll, and other nominal operating expenses such as insurances. The Debtor works from a home-office to minimize expenses.

The Debtor owns a ninety-nine- and one-half percent (99.5%) member-interest in HCG and an eighty-five percent (85%) member-interest in HIH. The Debtor's gross income from Althea is bifurcated approximately as follows and may shift over time as workload

increases/decreases inside entities: (i) salary of $40,000 of which 25,000 is targeted to come from HIH and $15,000 is targeted to come from HCG, and (ii) and the Schedule K-1 income for entities owned by HCG and HIH will not be known until the end of 2025. The Debtor is not expecting significant Scheduled K-1 income for 2025. Rather, losses are likely based on impairment to HCG and HIH, which will pass through to Debtor and help offset his 2022 federal tax liability. Additionally, Debtor is in process of filing his 2023 and 2024 tax returns which will generate losses and further offset his federal tax liability.

The Debtor's salary is utilized to pay his ordinary course expenses, such as mortgage, living expense, taxes, etc. HCG has a significantly reduced fair market value of approximately $15,000,000 to $25,000,000, as its assets have been devalued, undermined, and impaired from (i) the legal actions by Prestige and other creditors which directly resulted in losses of customers, revenue, vendors and business partners, (ii) Debtor's bankruptcy filing, (iii) creditors seizing and liquidating assets, and (iv) the unlawful seizing of assets by Jerry Hostetter from Prestige for personal benefit has created further impairment.

HIH has a significantly reduced fair market value of approximately $15,000,000 to $25,000,000, as its assets have been devalued, undermined, and impaired from (i) the legal actions by Prestige and other creditors which directly resulted in losses of customers, revenue, vendors and business partners, (ii) Debtor's bankruptcy filing, and (iii) GCC Investment Holdings unlawfully seizing of membership interests. As a disclaimer, valuation of HCG and HIH is estimated and valuations could be substantially higher if creditors allow for strategic selling of assets and allow certain assets/entities to reach maximum valuation by completing its life cycle to achieve critical mass; conversely estimated valuations could be substantially lower if liquated in a 'fire sale.'

The Debtor also has a fifty percent (50%) member interest in DHTC, and a one-hundred percent (100%) member-interest in the following entities: I Employee Services, LLC, Raw Ventures, LLC, and Cash Ventures IV, LLC, all of which will be liquidated and the proceeds distributed to creditors.

The Debtor's proposed funding of the Plan is through Debtor owned entities cash flows and/or liquidation of entities in which the Debtor wholly or partially owns through entity interests. The Debtor proposes a rapid liquidation of all HCG entities to occur in approximately eighteen (18) to twenty-four (24) months, or sooner, which will occur through various liquidation events and will result in a final dissolution of HCG. All proceeds from HCG liquidation events will be paid into the Plan to fund creditors and pay the Althea management fee, third party outsource accounting/finance/IT fees and legal administrative and related fees. Accordingly, all of cash flow and liquidation events will benefit creditors, other than the above expenses.

The Debtor has already removed all employees and operating expenses of HCG to streamline expenses to maximize the benefit for creditors. The Debtor proposes a to-be-determined company as liquidating entity for HCG over the next eighteen (18) to twenty-four (24) months. Debtor reserve all of his rights to designate an entity/asset that should not be liquidated pursuant to the eighteen (18) to twenty-four (24) month period if holding such asset(s) beyond that amount of time is for the benefit of creditors.

For HIH, the Debtor proposes that HIH continue to hold assets to generate cash flow. Such cash flow after payment for management fees, third-party accounting/finance/IT fees, and legal and similar administrative fees, will be paid to the Plan for the benefit of creditors. The cash flow will be added to funds resulting from liquidation of assets. The HIH proposal allows for maximizing values and divesting assets over a period of ten (10) years or less, This will allow assets to be liquidated, at strategic times when assets hit maturity and scale which will  maximize

value for creditors. As a result, this strategic liquidation should increase the HIH asset value to approximately $35,000,000-$50,000,000. The proposed HCG cash flow projection and liquidation analysis will be provided and annexed to the Plan as Exhibit A. The proposed HIH cash flow projection and liquidation analysis will be provided and annexed to the Plan as Exhibit B. The Debtor is in the process of gathering projected financial data and a more acute  liquidation analysis for HCG and HIH.

Upon an order confirming the Plan, any and all creditors are enjoined from taking any and all action against the Debtor and his assets and entities, including but not limited to, stock, membership interests, partnership interests, equity holdings, intellectual property, contractual rights, real and personal property, bank accounts, receivables, and any other tangible or intangible assets, whether held directly or indirectly, so as to protect the integrity of the Plan and fund payments to creditors.

The Debtor and his spouse own the Marital Property by tenants by the entirety. The Debtor's spouse retains a fifty-percent (50%) ownership in the Martial Property as tenants by the entirety. The Martial Property has an approximate fair market value of $2,800,000 to $3,000,000, which is subject to a mortgage of approximately $1,500,000. The Debtor will either retain his portion of the Martial Property through a future sale of property, or purchase his equity interest in the Martial Property, with his "equity" amount paid to creditors paid over ten (10) years.

The Debtor also had an ownership interest in the Beach House. The Beach House was sold by way of the Sale Order. ECF 167. The net proceeds of the Beach House pursuant to the Sale Order was in the approximate amount of $1,563,231.69, which was placed in escrow with the Debtor's law firm, which allowed the sale to occur while preserving the claims of objecting parties to the net proceeds.

Pursuant to the Orrstown 9019 Motion, the Debtor's spouse is entitled to thirty-to-fifty percent (30%-50%) of the net proceeds of the Beach House or a minimum of the $250,000 settlement amount with Orrstown Bank.

### 2. Post-Confirmation Management

The Debtor will continue to manage HIH and HCG through Althea.

### 3. Disbursing Agent

The Reorganized Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond and shall receive no remuneration for distribution services rendered and expenses incurred pursuant to the Plan.

## TREATMENT OF MISCELLANEOUS ITEMS

### A. Executory Contracts and Unexpired Leases

### 1. Rejections

The Plan provides that all Executory Contracts and Unexpired Leases shall be assumed, unless expressly rejected. The Order confirming the Plan shall constitute an Order approving the rejection of any and all the leases or contracts, if any, except as set forth in paragraph III(A)(1) above. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Disclosure Statement for the specific date.

Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**THE BAR DATE FOR FILING A PROOF OF CLAIM WAS APRIL 21, 2025.**

Any claim based on the rejection of an executory contract or unexpired lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

**B.      Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approval of their rates.

**C.      Retention of Jurisdiction.**

The Court shall retain jurisdiction of this case pursuant to the provisions of Chapter 11 of

the Bankruptcy Code, pending the final allowance or disallowance of all Claims affected by the

Plan, and to make such orders as are necessary or appropriate to carry out the provisions of this

Plan and with respect to the following matters:

(a)      To enable the Plan Proponent to consummate the Plan and to resolve any disputes arising therefrom;

(b)      To adjudicate all controversies concerning the classification, estimation or allowance of any Claim herein;

(c)      To make such Orders as are necessary or appropriate to implement the provisions of this Plan;

(d)      To determine the classification, estimation and priority of all claims against the Debtor and to re-examine any Claims which may have been allowed;

(e)      To determine applications for the rejection or assumption of executory contracts or unexpired leases pursuant to the provisions of this Plan which are not determined prior to the Confirmation date and to determine allowance of Claims for damages with respect to rejection of any such executory contracts or unexpired leases within such time as the Court may direct;

(f)      To oversee and issue further appropriate orders respecting disbursement of amounts deposited as may be required by this Plan;

(g)      To conduct hearings on valuation, as necessary, and to determine whether any party in interest is entitled to recover against any Person any Claim, whether arising under Section 506(c) of the Bankruptcy Code, or arising out of a voidable preference, a fraudulent transfer, or otherwise;

(h)      To hear and determine all applications for compensation and other Administrative Expenses;

(i)      To hear and determine any and all pending adversary proceedings or contested matters;

(j)     To determine all causes of action which may exist in favor of the Debtor;

(k)     To determine any modification of the Plan after confirmation pursuant to Section 1127 of the Code;

(l)     To enter any order, including injunctions, necessary to establish and enforce the rights and powers of the Debtor under the Plan;

(m)     To enter a final decree pursuant to Rule 3022 of the Bankruptcy Rules;

(n)     To hear and determine all controversies, suits and disputes, if any, as may arise in connection with the interpretation or enforcement of the Plan;

(o)     To hear and determine all controversies, suits and disputes, if any, as may arise with regard to orders of Bankruptcy Court in the Chapter 11 Case entered on or before the Confirmation Date;

(p)     To hear and determine any and all controversies and disputes arising under, or in connection with, the Plan;

(q)     To hear and determine any and all objections to payments under the Plan;

(r)     To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

(s)     To adjudicate all Claims to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(t)     To adjudicate all causes of action to recover all assets and properties of the Debtor wherever located;

(u)     To enter any order, including injunctions necessary to enforce the title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions on such title rights and powers as the Bankruptcy Court may deem necessary or appropriate; and

(v)     To make such orders as are necessary or appropriate to carry out the provisions of the Plan, including but not limited to orders interpreting or enforcing the provisions thereof.

In addition, the Court shall retain jurisdiction to implement the provisions of the Plan in the manner as provided under Section 1142, sub-paragraphs (a) and (b) of the Bankruptcy Code. If the Court abstains from exercising, or declines to exercise jurisdiction, or is otherwise without jurisdiction over any matter set forth in this Section, or if the Debtor or the reorganized Debtor

elect to bring an action or proceeding in any other forum, then this Section shall have no effect

upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court, public

authority or commission having competent jurisdiction over such matters.

**D.    Procedures for Resolving Contested Claims.**

Objections to Claims and interests, except for those Claims more specifically deemed

Allowed in the Plan, may be filed by the reorganized Debtor or any party in interest up to and

including sixty (60) days following the entry of the Confirmation Order. With respect to disputed

Claims or interests, the Disbursing Agent will hold in a separate interest-bearing reserve account

such funds as would be necessary in order to make the required distribution on the Claim or

interest, as listed either in the Debtor's schedules or the filed proof(s) of claim.

**E.    Notices under the Plan**

All notices, requests or demands with respect to this Plan shall be in writing and shall

be deemed to have been received within five (5) days of the date of mailing, provided they are

sent by registered mail or certified mail, postage prepaid, return receipt requested, and if sent to

the Proponent, addressed to:

> Anthony Sodono, III, Esq., and Sari B. Placona, Esq.
> c/o McManimon, Scotland & Baumann, LLC
> 75 Livingston Avenue, Second Floor
> Roseland, New Jersey 07068

**IV.**

**EFFECT OF CONFIRMATION OF PLAN**

**A.    Discharge**

This Plan provides that upon confirmation of the Plan, Debtor shall be discharged of

liability for payment of debts incurred before Confirmation, to the extent specified in 11 U.S.C. §

1141. However, any liability imposed by the Plan will <u>not</u> be discharged.  If Confirmation of this

Plan does not occur, the Plan shall be deemed null and void.  In such event, nothing contained in

this Plan shall be deemed to constitute a waiver or release of any claims against the Debtor or his

estate or any other persons, or to prejudice in any manner the rights of the Debtor or his estate or

any person in any further proceeding involving the Debtor or his estate.  The provisions of this Plan

shall be binding upon Debtor, all Creditors and all Equity Interest Holders, regardless of whether

such Claims or Equity Interest Holders are impaired or whether such parties accept this Plan, upon

Confirmation thereof.  Moreover, any judgments docketed against the Debtor or his real properties

in the State of New Jersey and any county or subdivision thereof will be expunged upon the

Effective Date of the Plan.

**B.    Release of Claims**

Except as otherwise expressly provided for in this Plan, the distributions and rights

afforded in the Plan shall be complete and full satisfaction and release, effective as of the Effective

Date, of all Claims against the Debtor or any of his assets or properties of any nature whatsoever.

Commencing on the Effective Date, except as otherwise expressly provided for in this Plan, all

Claimants, are forever releasing, waiving, and discharging and shall be precluded forever from

asserting against the Debtor and his respective agents, employees, principals, members, officers,

shareholders, representatives, financial advisors, accountants, attorneys, or employees and his

respective assets and properties any other or further claims, obligations, suits, judgments, liens,

encumbrances, damages, debts, rights, causes of action, and liabilities whatsoever arising on or

prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's businesses

or affairs, the Chapter 11 Case, or the Plan, including, but not limited to, all principal and accrued

and unpaid interest on the debts of the Debtor based on any act or omission, transaction or other

activity or security instrument or other agreement of any kind or nature occurring, arising or

existing prior to the Effective Date, that was or could have been the subject of any Claim, whether

or not Allowed; provided, however, that such release, waiver and discharge shall not apply in any

27

respect to any acts or omission that are the result of fraud, gross negligence or willful misconduct by the Debtor from the Petition Date to the Effective Date.

On and after the Effective Date, as to every Claim, every Holder of a Claim shall be precluded from asserting against the Debtor and his respective agents, employees, principals, officers, members, shareholders, representatives, financial advisors, accountants, attorneys or employees and its respective assets and/or properties any further Claim based on any document, instrument, act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019, confirmation of the Plan shall constitute, and all consideration distributed under this Plan shall be in exchange for and in complete satisfaction, settlement, and release of and an injunction against, all as of the Effective Date, any and all Claims, demands, allegations or causes of action, against the Debtor and their respective agents, representatives, officers, shareholders, members, employees, financial advisors, accountants, attorneys, or employees for any liability for actions taken or omitted to be taken in good faith under or in connection with the Plan or in connection with the Chapter 11 case or the operation of the Debtor during the pendency of the Chapter 11 case.

## C.    Modification of Plan

The Proponent of the Plan may modify the Plan at any time before Confirmation.  However, the Court may require a new disclosure statement or revoting on the Plan if Proponent modifies the Plan before Confirmation.

The Proponent may also seek to modify the Plan at any time after Confirmation so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modification after notice and a hearing.

## D.    Revesting of Property in the Debtor

Except as provided in Section IV.E. hereinafter, and except as provided elsewhere in the Plan, the Confirmation revests all of the property of the estate in the Debtor.

**E.      Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under 11 U.S.C. § 1112(b), after the Plan is confirmed, if there is a default in performing under the Plan. If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case.

**F.      Post-Confirmation Quarterly Fees**

Quarterly fees pursuant to 28 U.S.C. Section 1930 (a)(6) continue to be payable to the office of the United States trustee post-confirmation until such time as the case is converted dismissed or closed pursuant to a final decree.

**McMANIMON, SCOTLAND,**
**& BAUMANN, LLC**
*Counsel to Debtor, Daryl Fred Heller*

By:___*/s/ Sari B. Placona*_____
        SARI B. PLACONA

**DARYL FRED HELLER**
*Chapter 11 Debtor and Debtor-in-Possession*

By:___*/s/* Daryl Fred Heller_____
        DARYL FRED HELLER

Dated: August 1, 2025

**EXHIBIT A**

[HCG  Projected Cash Flow and Asset Liquidation Analysis]

To be Provided

**EXHIBIT B**

[HIH  Projected Cash Flow and Asset Liquidation Analysis]

To be Provided