| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Reed Smith LLP<br>Kurt F. Gwynne, Esq.<br>506 Carnegie Center, Suite 300<br>Princeton, NJ 08540<br>Telephone:  (609) 987-0050<br>Facsimile:  (609) 951-0824<br>Email:  kgwynne@reedsmith.com<br><br>*Counsel for Edward A. Phillips, as Examiner* | |
| In re*:*<br><br>DARYL FRED HELLER,<br><br>                    Debtor. | Case No. 25-11354 (JNP)<br><br>Judge Jerrold N. Poslusny Jr.<br><br>Chapter 11 |

**NOTICE OF (I) FILING OF SECOND INTERIM REPORT OF EXAMINER, EDWARD A. PHILLPS AND (II) STATEMENT OF GENERAL LEGAL PRINCIPLES REGARDING ALLEGED PONZI SCHEMES**

PLEASE TAKE NOTICE that Edward A. Phillips, the court-appointed examiner in this chapter 11 case, by and through his undersigned counsel, hereby files the *Second Interim Report of Examiner, Edward A. Phillps* (the "Second Interim Report"), which is attached as **Exhibit 1**.

The Examiner is a Certified Public Accountant (CPA) who is Certified in Financial Forensics (CFF) and is a Certified Fraud Examiner (CFE), Certified Turnaround Professional (CTP), and a Certified Insolvency & Restructuring Advisor (CIRA).  The Examiner is not an attorney.  Accordingly, as counsel to the Examiner, I set forth below a brief overview of case law regarding "Ponzi" schemes.  The ultimate determination of whether Paramount Management Group, LLC operated as a "Ponzi" scheme is an issue for the Court.

**Brief Overview of Case Law Regarding Alleged Ponzi Schemes**

A "'Ponzi scheme' gets its name from Charles Ponzi, who was infamous in the early part of the 20th Century for devising a scam operation that paid returns to investors not from the profits earned on investments but from monies paid by later investors." *Marion v. TDI, Inc.*, 591 F.3d 137, 142 n.5 (3d Cir. 2010); *see also Bald Eagle Area Sch. Dist. v. Keystone Fin.*, 189 F.3d 321, 323 n.1 (3d Cir. 1999) (discussing *Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924)). Ponzi was "a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due." *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 181 n.5 (3d Cir. 2000) (quoting *United States v. Masten*, 170 F.3d 790, 797 n.9 (7th Cir. 1999)) (citations omitted); *SEC v. Infinity Group Co.*, 212 F.3d 180, 185 (3d Cir. 2000) ("In the time-dishonored tradition of Charles Ponzi, TIGC substituted new investors' money for real investment return on old investors' funds.").[1]

Today, the term "'Ponzi' scheme" is a term commonly used to refer to "an investment scheme which is not really supported by any underlying business venture. The investors are paid profits from the principal sums paid in by newly attracted investors. Usually those who invest in the scheme are promised large returns on their principal investments. The initial investors are indeed paid the sizable promised returns." *Bald Eagle,* 189 F.3d at 323 n.1 (quoting Mark A. McDermott, Ponzi Schemes and the Law of Fraudulent and Preferential Transfers, 72 AM. BANKR. L. J. 157, 158 (1998)). "This attracts additional investors. More and more investors need to be

---

[1] BLACK'S LAW DICTIONARY defines a "Ponzi scheme," in part, as a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, us[ually] without any operation or revenue-producing activity other than the continual raising of new funds." BLACK'S LAW DICTIONARY 1404 (12th ed. 2024).

attracted into the scheme so that the growing number of investors on top can get paid." *Id.* "The person who runs this scheme typically uses some of the money invested for personal use." *Id.* "Usually, this pyramid collapses and most investors not only do not get paid their profits, but also lose their principal investments." *Id*. Indeed, "[a] Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry." *Perkins v. Parise (In re Global Trading Invs. LLC)*, 2006 Bankr. LEXIS 2898, *17-18 (Bankr. D. N.J. Oct. 25, 2006).

Notably, the existence of a legitimate business does not negate a finding of a Ponzi scheme. *See Pergament v. Torac Realty, LLC (In re Diamond Fin. Co.*), 658 B.R. 748, 768-70 (Bankr. E.D.N.Y. 2024) ("Several courts have found that a Ponzi scheme existed notwithstanding claims that the existence of a legitimate business negated any finding of a Ponzi scheme.") (discussing cases); *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1272 (D. Utah 2015), *aff'd*, 632 Fed. Appx. 937 (10th Cir. 2015) (unpublished) (finding that defendant's argument that there was no Ponzi scheme because it operated a "real business" "misse[d] the point" because "Ponzi schemes sometimes use legitimate operations to attract investors, but the existence of that legitimate business does not preclude a finding that the company operated a Ponzi scheme"); *Diamond Fin. Co.*, 658 B.R. 748, 769 (Bankr. E.D.N.Y. 2024) (quoting *Miller*). The fact that "a business may not start as a Ponzi scheme does not mean it cannot become a Ponzi scheme." *Diamond Fin. Co.*, 658 B.R. at 770. [2].

---

[2] "Sale-leaseback" models have been found to operate as Ponzi schemes when subsequent investors' funds have been used to pay earlier investors. *See Hays v. Adam,* 512 F. Supp. 2d 1330, 1332-1333 (N.D. Ga. 2007) ("From 2001 through 2004, Mobile Billboards of America, Inc. ('MBA') used a network of sales agents to sell more than $ 60 million in mobile billboard investments to investors as part of what was ultimately discovered to be massive Ponzi scheme. The scheme worked as follows: Purchasers paid MBA $ 10,000 to $ 20,000 apiece to purchase mobile billboard frames that were to be mounted on the sides of large trucks. Simultaneously with the purchase of the billboard, and even though their purchase agreements technically provided them with several options as to what to do with the billboards, all of the purchasers leased the billboards back to Outdoor Media Industries ('Outdoor Media') for a seven-year term. Outdoor Media was a shell company affiliated with MBA and owned and operated by MBA's principals. Investors were told that Outdoor Media would arrange for placement of the billboard on a truck for advertising and make monthly lease payments to the investor, resulting in a fixed return of approximately 13.49% per

The United States Bankruptcy Court for the District of New Jersey has held that, to prove that a debtor engaged in a Ponzi scheme, a party "must establish that: (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operation of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors." *In re NJ Affordable Homes Corp.*, 2013 Bankr. LEXIS 4798, *72-73 (Bankr. D. N.J. Nov. 8, 2013) (quoting *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 629-30 (Bankr. S.D. Ohio 2006)) (internal citations omitted); *see Forman v. Salzano (In re NorVergence, Inc.)*, 405 B.R. 709, 730 (Bankr. D. N.J. 2009); *see also Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC)*, 2011 Bankr. LEXIS 2394, *13 (Bankr. M.D. Fla. June 11, 2011) (considering same four factors). However, there is no rigidly defined concept of a Ponzi scheme. *See Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 730 (Bankr. D. N.J. 2009) ("Case law has revealed that a clever twist on the Ponzi concept will not remove a fraudulent scheme from the definition of Ponzi.").[3]

---

year."); *Navarro v. Thornton*, 316 S.W.3d 715, 717 (Tex. Ct. App. 2010) ("In 2005, Charles Edwards was convicted in a federal court in Georgia of 83 counts of wire fraud, money laundering, and conspiracy relating to his running of a Ponzi scheme that resulted in significant losses to many investors. Edwards was the sole shareholder of ETS Payphones, Inc. ('ETS'). ETS's business model was based on a program for the sale and lease-back of customer-owned, coin-operated telephones ('Payphones')."); *see generally* Complaint, *Securities and Exchange Commission v. Nationwide Automated Systems, Inc. et al.*, Civil Action No. 14-Civ-07249 (SJO) (FFMx), at ¶ 3 (C.D. Cal., filed September 17, 2014) ("This matter concerns a large ongoing Ponzi scheme. Defendants' scheme was to sell—in an unregistered securities offering—investment opportunities in automated teller machines ('ATMs') through purported 'sale and leaseback' transactions."); "*Operators of Ponzi involving Non-Existent ATMs that Cost Victims Over $135 Million in Losses Sentenced to up to Decade in Prison*," https://www.justice.gov/usao-cdca/pr/operators-ponzi-involving-non-existent-atms-cost-victims-over-135-million-losses (Nov. 16, 2015).

[3] *Kapila v. IRS (In re ATM Fin. Servs., LLC)*, 446 B.R. 564, 565-66 (Bankr. M.D. Fla. 2011) ("The debtor, ATM Financial Services, LLC, fraudulently induced investors to contribute monies to fund ATM's fantasy business of managing and servicing thousands of automated teller machines allegedly placed in retail locations around the country. ATM, in reality, owned only a few machines and sold and re-sold the same machines over and over to new investors using new monies to pay returns to older investors.").

In the context of determining whether the Ponzi presumption applied to allegedly avoidable transfers, the United States Bankruptcy Court for the Middle District of Florida considered whether a debtor operated its ATM investment operations as a "Ponzi" scheme in *Kapila*, 2011 Bankr. LEXIS 2394. In that case, the "[p]urchasers typically bought ATMs from the debtor or from separate companies owned by Netschi—36 Main Street, LLC, Second Main Street, LLC, and ATM Capital, Inc. (the 'Netschi Companies'). Purchasers then would sign an equipment management agreement with the debtor to service the ATMs." *Id.* at *3-4. "The debtor promised to remit a percentage of the withdrawal fees collected from the ATMs to the owner. These agreements, however, were a fiction. Because the ATMs largely never existed, the debtor never truly earned withdrawal fees. Rather, the debtor paid the fictitious withdrawal fees using cash invested by new purchasers." *Id.* at *4.

In *Kapila*, the trustee-plaintiff submitted an affidavit providing that, "in the four-year period from February 12, 2004, to February 12, 2008 (the petition date), the debtor received only $3.7 million in withdrawal fees from the legitimate operation and servicing of ATMs, yet paid ATM owners $32.8 million in purported fees." *Id.* at *5 (footnote omitted). The trustee asserted that "the debtor falsified monthly earnings reports to owners, claiming their machines earned $200-500 per month in fees," but "[e]ven assuming every machine earned $500 per month every month, the debtor would have had to service more than 1,350 machines per month over the four-year period in order to account for the debtor's net payouts of $32.8 million. Yet, only approximately 424 ATMs actually were maintained by the debtor." *Id.* at *4-5.

"Because the debtor actually serviced far fewer ATMs than the number of ATMs it claimed to service, the debtor plainly could not keep up the charade of remitting fees to ATM owners with actual withdrawal fees alone. Thus, to perpetuate the scheme the debtor used 'new money' from

new ATM purchasers." *Id.* at *5. "Based on the trustee's review of the debtor's bank statements, the debtor used (1) $2.3 million from new 'sales' of ATM machines made by the debtor, which ATMs the trustee has been unable to verify actually existed or were actually delivered, (2) $36.2 million the debtor received from the Netschi Companies, which undoubtedly was money derived from ATM "sales," (3) $4.1 million from other entities controlled by the debtor's principal, Vance Moore, and (4) $2.2 million in cash from unidentifiable sources." *Id.* at *5-6. "Eventually, of course, the debtor fell behind in payments to owners, who started asking questions, and the scheme unraveled." *Id.* at *6.

Based on the foregoing, the Court concluded that "[a]ll of the hallmarks of a classic Ponzi scheme" were present. *Id.* at *14-15. The Court reasoned that the debtor and the Netschi Companies "conned people into making a purchase they believed would generate a future income stream based on the perpetrators' misrepresentations about the amount of withdrawal fees each ATM could earn" and that "[t]he ATM purchasers were therefore no different from investors hoping to make above market returns based on phony investments, and the monies they transferred to the debtor and the Netschi Companies were functionally equivalent to investments." *Id.* at *15. Moreover, "[t]he debtor also conducted very little legitimate business in comparison with the number of non-existent ATMs sold to investors. As such, the debtor created completely false and artificially high earnings statements." *Id.* As "the debtor serviced very few actual ATMs, the debtor's legitimate operations produced no profit or earnings." *Id.* "The debtor obtained merely $6 million from servicing revenue and new 'sales' of ATM machines, yet paid out approximately $36.1 million in fictional withdrawal fees to ATM owners." *Id.* The Court further concluded that "the debtor necessarily made nearly all of the payouts to initial ATM 'owners' with money fraudulently obtained, at least in majority, from other later ATM purchasers." *Id.* at *16.

The Court had "no doubt, based on the admissions and pleadings filed in the criminal prosecution of Netschi and Moore and the trustee's affidavit, that the only possible source of the approximately $36.2 million the Netschi Companies transferred to the debtor was from fraudulent ATM sales" and that the "inescapable conclusion based on the facts presented by the trustee is therefore that the debtor necessarily relied almost exclusively on new sales — whether made by the debtor or the Netschi Companies — to make payments to ATM owners who thought they were receiving withdrawal fees." *Id.*

The defendant in the *Kapila* avoidance action did not provide "*any* factual material to rebut the evidence that the debtor operated as a Ponzi scheme." 2011 Bankr. LEXIS 2394, at *16.

Date: August 13, 2025

Respectfully submitted,

By: */s/ Kurt F. Gwynne*
Kurt F. Gwynne, Esquire
REED SMITH LLP
506 Carnegie Center, Suite 300
Princeton, NJ 08540
Telephone: (609) 987-0050
Facsimile: (609) 951-0824
Email: kgwynne@reedsmith.com

*Counsel for Edward A. Phillips, as Examiner*