# Exhibit 1

US_ACTIVE-207936664.1-GACOLSON 08/13/2025 8:44 PM

| UNITED STATES BANKRUPTCY COURT |
|---|
| **DISTRICT OF NEW JERSEY** |
| Reed Smith LLP<br>Kurt F. Gwynne, Esq.<br>506 Carnegie Center, Suite 300<br>Princeton, NJ 08540<br>Telephone: (609) 987-0050<br>Facsimile: (609) 951-0824<br>Email: kgwynne@reedsmith.com<br><br>*Counsel for Examiner*<br><br> |

| In re: | Case No. 25-11354 (JNP) |
|---|---|
| DARYL FRED HELLER, | Judge Jerrold N. Poslusny Jr. |
| Debtor. | Chapter 11 |

## SECOND INTERIM REPORT OF EXAMINER, EDWARD A. PHILLIPS

## (REGARDING *PONZI* ALLEGATION)

August 13, 2025

Edward A. Phillips, CPA, CFF, CFE, CIRA, CTP
Email: ephillips@getzlerhenrich.com

## TABLE OF CONTENTS

<u>Page</u>

I.      BACKGROUND ................................................................ 1

  A.   The Examiner ................................................................ 1

  B.   The Chapter 11 Case ................................................................ 1

  C.   Appointment of the Examiner and the Scope of His Examination ............................. 1

II.     THE EXAMINER'S SECOND INTERIM REPORT .................................... 3

  A.   Subject of Interim Report ................................................................ 3

  B.   Methodology, Analysis and Documents Relied On ............................................ 4

  C.   Analysis and Findings ................................................................ 6

    1.   PMG ................................................................ 6

    2.   The Funds ................................................................ 7

      a.   Limited Liability Company Fund Managers ........................................... 7

      b.   Examples of Securities Issued by the Funds (Interests, Units or ATM Units) and the
Intended Use of Investors' Funds ................................................................ 9

    3.   Management and Control of the Funds ................................................ 13

      a.   PFB IV ................................................................ 13

      b.   PFA IV ................................................................ 14

      c.   PFA II ................................................................ 16

    4.   ATM Revenue Share: The Returns to Investors and Compensation to PMG under the
Management Services Agreement Between the Funds and PMG ............................... 18

    5.   PMG's Bank Accounts Generally ................................................... 19

    6.   PMG's Cash Activity ................................................................ 21

      a.   Insufficiency of Net Cash and Gross Receipts from ATM Operations ................... 21

      b.   Insufficiency of Gross Profit from ATM Operations .................................. 23

      c.   Insufficiency of All Receipts (Excluding Investor Funds) During the Review Period
24

      d.   Use of Subsequent Investor Funds to Pay Returns to Earlier Investors ................. 26

    7.   PMG Lacked the Revenue-Generating ATM Count Necessary to Pay Investor Returns
During the Review Period ................................................................ 29

**D.**      The Debtor's Position Regarding the (i) Reasons PMG Collapsed and (ii) Use of ATM Sale Proceeds (Investor Funds)..................................................................................................... 36

**E.**      The Reason PMG Collapsed ....................................................................................... 38

**F.**      Conclusions ................................................................................................................. 39

I.      **BACKGROUND**

A.      **The Examiner**

Edward A. Phillips (the "Examiner" or "I") is a Certified Public Accountant (CPA) who is Certified in Financial Forensics (CFF) and is a Certified Fraud Examiner (CFE), Certified Turnaround Professional (CTP), and Certified Insolvency & Restructuring Advisor (CIRA). The Examiner is a past President of the Philadelphia/Wilmington Chapter of the Turnaround Management Association and previously served on the executive committee of TMA Global. He is also a member of the Association of Certified Fraud Examiners, the Association of Insolvency & Restructuring Advisors, the American Bankruptcy Institute, and the American Institute of Certified Public Accountants.

B.      **The Chapter 11 Case**

1.      On February 10, 2025, Daryl Fred Heller (the "Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      The Debtor continues to manage his affairs as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[1]

C.      **Appointment of the Examiner and the Scope of His Examination**

3.      On February 18, 2025, Deerfield Capital, LLC ("Deerfield") filed the *Motion for Appointment of Chapter 11 Trustee* [Docket No. 30] (the "Trustee Motion") in which Deerfield sought an order appointing a Chapter 11 Trustee. Several creditors filed statements in support of

---

[1] On January 21, 2025, Silverview Credit Partners LP ("Silverview") filed involuntary petitions against Blackford ATM Ventures, LLC ("Blackford") and certain of its affiliates (together with Blackford, the "Blackford Entities") under Chapter 7 of the Bankruptcy Code. *Blackford ATM Ventures Fund D, LLC*, Case No. 25-10105 (MFW) (Bankr. D. Del. Jan 21, 2025). In the *Addendum in Support of Involuntary Petition*, the petitioners allege that the Debtor controls Blackford and is the guarantor to certain obligations the Blackford Entities owed to Silverview, namely a tranche term loan of $18,000,000.00 and a second tranche term loan of $7,000,000.00, totaling $25,000,000.00.

the Trustee Motion (collectively, the "Statements of Support"). *See Silverview Credit Partners LP's Statement in Support of Deerfield Capital, LLC's Motion for the Appointment of Chapter 11 Trustee,* filed February 25, 2025 [Docket No. 63]; *Response of Orrstown Bank in Support of Motion to Appoint Chapter 11 Trustee*, filed February 26, 2025 [Docket No. 66]; *Receiver's Statement in Support of Deerfield Capital, LLC's Motion for the Appointment of Chapter 11 Trustee¸* filed February 27, 2025 [Docket No. 80]; *Prestige's Statement in Support of Deerfield Capital, LLC's Motion for Appointment of Chapter 11 Trustee*, filed February 28, 2025 [Docket No. 85].

4.      On March 6, 2025, the Court entered the *Consent Order Preserving Status Quo* [Docket No. 96] in which Deerfield, the Debtor, the Heller Entities (as defined therein) and the Heller Individuals (as defined therein) agreed to entry of a consent order requiring them, the Debtor, and others to cooperate with an examiner to be appointed by the Court.

5.      On March 7, 2025, with the agreement of the Debtor and other parties in interest, the Court entered the *Order Directing the Appointment of an Examiner* [Docket No. 99] (the "Examiner Order") pursuant to section 1104(c) of the Bankruptcy Code. Pursuant to the Examiner Order, the Examiner, among other things, shall investigate the following matters (collectively the "Investigation"):

- "investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, in the management of the affairs of the Debtor or in any entity or entities owned or controlled by the Debtor, either directly or indirectly, or through any intermediate entity including but not limited to Heller Capital Group, LLC, Heller Investment Holdings, LLC, Accordo Limited Partnership, Brookfield LP, Brigantine Group, L.P., DHRC, LLC, I Employee Services, LLC, and RAW Ventures, LLC, Golden Gate Investment Company, LLC, or Paramount Management Group, LLC, (collectively "Debtor Entities"),"

- "investigate any and all transfers by the Debtor and any Debtor Entities including, but not limited to, all transfers or allegations referenced in the Removed Litigation,"

- "investigate the accuracy and completeness of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, including, but not limited to, the stated value of assets included therein," and

- "otherwise perform the duties of an examiner set forth in section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code."

*Examiner Order,* ¶ 3.

6.      On March 18, 2025, the Court entered the *Order Approving the Appointment of a Chapter 11 Examiner by United States Trustee* [Docket No. 131] which approved the appointment of Edward A. Phillips as Examiner in this Chapter 11 Case.

7.      Pursuant to the Examiner Order, the Examiner engaged a financial advisor and counsel. On April 10, 2025, the Court entered the *Order Authorizing Retention of Getzler Henrich & Associates LLC as Financial Advisor to the Examiner, Effective as of March 28, 2025* [Docket No. 177], authorizing the retention of Getzler Henrich & Associates LLC ("Getzler Henrich") as the Examiner's financial advisor. Additionally, on May 14, 2025, the Court entered the *Order Authorizing Retention of Reed Smith LLP, as Proposed Counsel to the Examiner, Effective as of March 18, 2025* [Docket No. 235] authorizing the retention of Reed Smith LLP ("Reed Smith") as the Examiner's counsel.

## II.      THE EXAMINER'S SECOND INTERIM REPORT

### A.      Subject of Interim Report

8.      In an opinion dated January 10, 2025, in *Prestige Fund A, LLC et al. v. Paramount Management Group, LLC*, Case No. CI-24-06012 in the Lancaster County (Pennsylvania) Court of Common Pleas (the "Lancaster County Action"), the Court stated as follows with respect to Paramount Management Group, LLC ("PMG"): "What started off as an investment returning income to the Funds appears to have transformed into at best a significant under-capitalized

3

expansion of ATM buying or at worst a Ponzi scheme." *Order, Lancaster County Action,* *15 (dated Jan. 10, 2024). Deerfield Capital, LLC has alleged that the Debtor engaged in a "ponzi scheme and/or fraud." *See Deerfield Capital, LLC v. Daryl Fred Heller (In re Daryl Fred Heller)*, Adv. No. 25-01211-JNP, (Bankr. D. N.J. May 16, 2025) [Docket No. 1] ("The Debtor falsified personal statements and other documents to help perpetrate his ponzi scheme and/or fraud.").[2]

9.    This Second Interim Report focuses on the allegation that the Debtor operated a Ponzi scheme. *See* Examiner Order, ¶ 3 (charging Examiner with investigating "any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, in the management of the affairs of the Debtor . . . or Paramount Management Group, LLC").

**B.    Methodology, Analysis and Documents Relied On**

10.    As part of my investigation, my financial advisor (Getzler Henrich) and I primarily reviewed and/or relied on the following documents: (a) monthly bank account statements for the months of January 2021 through March 2025 (the "Review Period") in the name of PMG for accounts at First National Bank ("FNB") ending in the following numbers: 3440, 0823, and 6556, (b) monthly bank account statements from January 2021 through December 2024 in the name of PMG for accounts at FNB ending in the following numbers: 6390 and 8413, (c) certain monthly bank account statements for the Review Period in the name of certain investment funds (the "Funds")[3] at FNB ending in the following numbers: 2647, 2654, 2985, 3009, 3697, 3705, 3713,

---

[2] An employee of Heller Capital Group ("HCG") resigned due to "growing suspicions" that he had "been involved in a Ponzi scheme, and [did] not desire to continue being paid money by it." *See* March 23, 2025 email from Dakota Enck to Melissa Greg of Luma Financial Group (a back-office service provider), subject "Resignation" (Exhibit A).

[3] The "Funds" means Prestige Fund A, LLC; Prestige Fund A II, LLC; Prestige Fund A IV, LLC; Prestige Fund A V, LLC; Prestige Fund A VI, LLC; Prestige Fund A VII, LLC; Prestige Fund A IX, LLC; Prestige Fund B, LLC; Prestige Fund B II, LLC; Prestige Fund B IV, LLC; Prestige Fund B V, LLC; Prestige Fund B VI, LLC; Prestige Fund B VII, LLC; Prestige Fund B BTM I, LLC; Prestige Fund D, LLC; Prestige Fund D III, LLC; Prestige Fund D IV, LLC; Prestige Fund D V, LLC; Prestige Fund D VI, LLC; Prestige Fund

3739, 4548, 6465, 6523, 6622, 6663, 7158, 7182, 8686, 8746, 8753, 9345, 9485, and 9600, (d) monthly bank statements for the Review Period in the name of HCG at FNB ending in the following account numbers: 3140 and 8837, (e) monthly bank statements from January 2021 through December 2024 in the name of Prestige Investment Group, LLC ("PIG") at FNB ending in the following numbers: 2047 and 2484, and (f) monthly gross profit reports (the "Gross Profit Reports") issued during the Review Period for December 2021 through September 2024. The foregoing monthly bank statements aggregated 96,216 individual bank transactions, which were processed and reviewed for this analysis.

11.     Additionally, the Examiner reviewed many emails and text messages between (among others) the Debtor and Randall Leaman ("Leaman"), the Chief Executive Officer of PMG, the transcript of the August 26, 2024, testimony of the Debtor in the Lancaster County Action (the "8/26/24 Hrg. Tr."), and the Debtor's tax returns for 2021 and 2022.[4] A non-exhaustive list of documents the Examiner reviewed and considered in preparation of this Second Interim Report (the "Reviewed Documents") is attached as Exhibit B.

12.     The Examiner (individually or with his retained professionals) interviewed Jerry Hostetter ("Hostetter"), the former President of PIG, on (without limitation) June 18, July 2, August 6 and 11, 2025. The Examiner's financial advisors, Getzler Henrich, interviewed Matt Eby

---

D BTM I, LLC; WF Velocity I, LLC; WF Velocity Fund IV, LLC; WF Velocity Fund V, LLC; WF Velocity Fund VI, LLC; and WF Velocity Fund VII, LLC. Four of the Funds with "BTM" in their names invested in Bitcoin Teller Machines. In a written response to certain questions that I posed to the Debtor, he indicated that "[s]ome automated teller machines ("ATMs") "only did cash services, other ATMs could do cash and cryptocurrency services and BTM either did crypto only or in some cases (when they had a recycler and many did) they could do cash and cryptocurrency." Preamble of Response to Examiner's Questions. As my report includes all of PMG's receipts from the operation of both ATMs and BTMs and all transfers between PMG and the Funds without distinction between ATMs and BTMs, I use the term ATM herein for ease of reference.

[4] I also reviewed PMG's tax returns for 2021 and 2022, primarily to determine if the "revenue" was directionally the same as the receipts that came into the FNB Accounts (as defined *infra*).

("Eby"), the former Director of Finance of PIG on June 24, 2025, and July 11, 2025. The Examiner also (i) interviewed the Debtor on July 28, 2025 and August 12, 2025, and (ii) made multiple information requests of the Debtor (through his counsel) during the investigation and considered his responses thereto, including certain written responses received from Debtor's counsel on Monday, August 4, 2025 (each, a "Response to Question #___") (Exhibit C).

13.    The main focus of my investigation was on the raw data set forth in account statements because based on my years of experience, I consider them to be (i) the most accurate data source to analyze the transactions by and between PMG, on the one hand, and investors in the Funds (the "Investors") and other third parties, on the other hand, and (ii) less susceptible to factual or judgment errors (or manipulation) than other documents prepared by PMG, its affiliates or creditors, or other third parties.

### C.    Analysis and Findings

#### 1.    PMG

14.    The Debtor describes PMG as "an IAD with a sponsor bank." Response to Question #21(a) (Exhibit C). An IAD is an "Independent ATM Deployer." According to ATMDepot.com, an IAD "works with an independent sales organization (ISO) that provides processing. This is how an independent ATM machine is able to communicate with users' financial institutions to provide account information and approve or deny withdrawal requests. It is an IAD's job to purchase ATM equipment, place it in a location that provides customers with convenient access to their accounts, and maintain the machine to keep it functional." Amber Ivan, *Becoming an Independent ATM Deployer: FAQs*, https://atmdepot.com/articles/independent-atm-deployer-faqs/ (last visited on Aug. 7, 2025). As discussed further below, PMG served as the IAD for the Funds.

15.     PMG was owned by HCG (83%), Leaman (12%), and Dennis Ream (5%). *See* Master Assignments Investor Spreadsheet / All Active Investors ("<u>Master Assignments</u>") (Exhibit D). HCG was owned by the Debtor (99.5%) and RD Capital, LLC (0.5%). *See* Master Assignments (Exhibit D). Therefore, the Debtor controlled PMG. *See* Master Assignments (Exhibit D).

16.     As discussed further below, PMG purchased, deployed, and operated ATMs for the Funds, including collecting surcharge, interchange, dynamic currency conversion, advertising and other revenue from ATM Service Providers or other entities, and paying Investors' returns to the Funds' bank accounts or to PIG (a limited liability company manager of a Manager[5] of certain Funds), and the fees of the Funds' respective limited liability company Managers.

17.     Pursuant to the terms of the "ATM Management Services Agreements" (each, an "<u>MSA</u>"), PMG was responsible for providing a turnkey, fully-managed program for the ATMs, including acquisition, deployment, operations, maintenance, replacement, insurance, liability, and general management (including cash replenishment logistics and operational compliance).

### 2.     The Funds

18.     The structure of the investment opportunity in the Funds varied as to form, but all were designed to provide Investors with an opportunity to invest in ATMs and the revenue derived from them. Each of the Funds issued a private placement memorandum ("<u>PPM</u>") or private offering memorandum ("<u>POM</u>") to prospective Investors.

19.     The Debtor described the Funds as "a financing model to grow the business and do acquisitions." Response to Question #21(a) (Exhibit C).

### a.     Limited Liability Company Fund Managers

---

[5] Capitalized terms not defined in this Second Interim Report have the meanings provided in the applicable PPM, POM, Venture Agreement, or MSA (as those terms are defined herein), unless the context otherwise requires.

20.    Each of the Funds was managed by one or more of the following entities: Prestige

Funds Management, LLC ("PFM"); Prestige Funds Management II, LLC ("PFM II"); Prestige

Funds Management III, LLC ("PFM III"); and WF Velocity Funds Management, LLC ("WFV

Management"). Pursuant to an MSA, each Fund also had a contractual relationship with PMG for

"turnkey" services relating to the placement and operation of ATMs.

21.    PFM was owned 100% by PIG. PIG was owned by the Debtor (60%) and Jerry

Hostetter (40%). *See* Master Assignments (Exhibit D). PIG (the sole owner) had voting control of

PFM. *See* Limited Liability Company Agreement of PFM, effective as of July 1, 2019, §§ 7.1-7.2.

22.    PFM II was owned by PIG (51%), Real Asset Investor, LLC ("RAI") (44%), and

William K. Poole ("Poole") (5%). *See* Master Assignments (Exhibit D). PIG had voting control of

PFM II. *See* Limited Liability Company Agreement of PFM II, dated as of January 1, 2020, § 6.1.

In or around March 2023, RAI assigned its membership interest in PFM II to David Zook ("Zook")

(the Chief Executive Officer of RAI).

23.    PFM III was owned by PIG (51% of Class A interests and 35% of Class B interests)

and RAI (49% of Class A interests and 65% of Class B interests). PIG had voting control of PFM

III. *See* Limited Liability Company Agreement of PFM III, dated as of January 14, 2020, § 6.1.

In or around March 2023, RAI assigned its membership interest in PFM III to Zook.

24.    WFV Management was owned by PIG (51% Class A interests) and Celerity

Ventures, LLC ("Celerity") (49% Class B interests). PIG had voting control of WFV Management.

*See* Limited Liability Company Operating Agreement of WFV Management, effective November

1, 2020, § 7.1(b). In or around July 2023, Celerity may have assigned one-half (50%) of its

membership interest to WF Holdings LLC.

> **b.    Examples of Securities Issued by the Funds (Interests, Units or ATM Units) and the Intended Use of Investors' Funds**

25.    Some Funds issued to each Investor an "Interest" in the applicable Fund. One such Fund is Prestige Fund B IV, LLC ("PFB IV").[6] With respect to those Funds, the Interest in a Fund was a "restricted security" for purposes of the Securities Act of 1933 (as amended, the "Act") with limited transferability under the Fund's operating agreement. *See* PFB IV's PPM dated March 23, 2021 ("PFB IV PPM") (Exhibit E), p. 8.[7]

26.    The PFB IV PPM provided that the "Fund will utilize Investor funds to purchase, operate, and maintain automatic teller machines ('ATMs')." *See, e.g.*, PFB IV PPM (Exhibit E), p. 2. The Funds "intend[ed] to utilize the entirety of an Investor's capital to purchase, in the Fund's name, as many ATMs as is [sic] it can." PFB IV PPM (Exhibit E), p. 2, 21.[8] "As a matter of practice, the Fund will not issue an Interest to an Investor if, before doing so, it has knowledge that

---

[6] To avoid burdening the Court and parties in interest with too much paper, I have attached the PFB IV PPM as a representative example, but not the other relevant PPMs or POMs. The PPMs/POMs were attached as Exhibits to the *Complaint* (filed on August 23, 2024 @ 12:02 p.m. (Eastern)) in the Lancaster County Action. In its *Answer to Complaint with New Matter and Counterclaim* (filed on August 26, 2024 @ 10:25:27 (Eastern)) in the Lancaster County Action (the "Answer"), PMG admitted that the copies of the PPMs/POMs attached to the Complaint (including unexecuted copies) were true and correct copies. *See* Answer, ¶¶ 33-63. WF Velocity Fund VII, LLC ("WFV VII") is another example of a Fund that issued limited liability company "Interests." *See* WFV PPM dated February 22, 2024.

[7] Only "accredited investors," as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, were eligible to purchase "Interests" in the Funds. PFB IV PPM (Exhibit E), p. 2. Neither the Funds nor their Managers are registered. PFB IV PPM (Exhibit E), pp. 7, 12.

[8] Other provisions of the PPMs suggest that the Manager has discretion in the use of Investors' funds. The "Manager has sole and broad discretion in the use of proceeds from Investors. . . ." PFB IV PPM (Exhibit E), p. 7; *see also id.*, p. 8 ("The Fund *intends to use* the entirely of an Investor's capital contribution to purchase and operate ATMs." (emphasis added)); *see also id.*, p. 20 ("The Manager *intends* for the Fund to utilize the entirety of an Investor's proceeds to identify, acquire, manage, operate, and maintain new or used ATMs.") (emphasis added); *see also id.*, p. 10 ("Forward-looking statements are not guarantees. . . . Forward-looking statements are typically identified by the use of terms such as . . . 'will' . . . [or] 'intend' . . . .").

it or a third-party service provider would be unable to source ATMs on the Fund's behalf using the Investor's monies." PFB IV PPM (Exhibit E), p. 22.

27.     The PFB IV PPM provides that the "Manager intends to make monthly distributions of capital derived from operation of the Fund's ATMs." PFB IV PPM, pp. 8, 21 ("Distributions will be made through profits of the Fund derived through the Fund's ownership and operation of ATMs."). The Operating Agreement that is attached to the PFB IV PPM provides that the Manager intends to make distributions of capital on a monthly basis, as follows: From each distribution an Investor will be entitled to receive up to $1,254.50 for every $52,000 of capital they have contributed to the Fund, and then each Preferred Investor will be entitled to receive up to $1,307.19 for every $52,000 of capital they have contributed to the Fund, and any remaining cash will be distributed to the Manager. PFB IV LLC Operating Agreement, § 6.1(b)(i)-(iii). The Fund "will allocate profits and losses as if the Fund were to liquidate, dissolve, and wind-up to achieve an allocation of profits and losses (and thereby capital account balances) consistent with the intended force distributions." PFB IV PPM, p. 26.[9] The Manager anticipated that the investment will be for a period of 84 months. PFB IV PPM, pp. 8, 21, 26.[10]

28.     Other Funds did not issue "Interests." Instead, they issued "Units" in a commercial relationship. For example, Prestige Fund A IV, LLC ("PFA IV") and its Investors "enter[ed] into a commercial relationship whereby [the Fund] will purchase [ATMs] on behalf of [Investors] contributing capital to facilitate such purchase and operation." PFA IV PPM dated August 12,

---

[9] In addition to distributions, Investors also receive the benefit of depreciation. "The Fund also intends to utilize bonus depreciation to achieve tax-favorable treatment of its results of operations. The Fund intends to deduct one hundred percent (100%) of the cost of ATMs acquired prior to December 31 of each taxable year[.]" PFB IV PPM (Exhibit E), p. 22.

[10] For each $52,000 contributed to the Fund by an Investor originated by Growth Capital Services, Inc. ("GCS"), the Fund shall pay GCS a monthly fee of $45.00 for the term of the Fund. PFB IV PPM (Exhibit E), p. 20.

2022 (the "<u>PFA IV PPM</u>"), p. 1.[11] "The nature of this investment opportunity is of a commercial nature only. An Investor will not become a limited liability company member of, or otherwise, obtain any ownership interest or capital interest in Prestige Fund A IV or any affiliate[.]" PFA IV, PPM, p. 2. The "Units" that PFA IV issued were described as "a proxy for value in the commercial relationship between [PFA IV] and an Investor created by the Venture Agreement." PFA IV PPM, p. 7.[12]

29.    PFA IV "intend[ed] to use the entirety of an Investor's capital for purposes of purchasing the maximum number of ATMs possible with respect to an Investor's investment." PFA IV PPM, p. 7; *see also* PFA IV PPM, p. 23 (PFA IV "shall use an Investor's capital solely to purchase ATMs."); PFA IV Venture Agreement, Recital B (PFA IV "shall solely utilize Investor's contribution of capital to purchase, in Venturer's name, the maximum number of ATMs that Investor's contribution will permit and operate the same on Investor's behalf.").

30.    Pursuant to the Venture Agreement between PFA IV and its Investors, "an Investor shall receive approximately one thousand two hundred twenty-eight dollars and eight cents ($1,228.08) per month for eighty-four (84) months for each fifty-two thousand dollars ($52,000.00) investment." PFA IV PPM, pp. 7, 16. Consulting Investors "shall receive approximately one thousand two hundred seventy-three dollars and eight cents ($1,273.08) per month for eighty-four (84) months for each fifty-two thousand dollars ($52,000.00) investment." PFA IV PPM, pp. 7, 16.

---

[11] WF Velocity Fund I, LLC ("<u>WFV I</u>") is another example of a Fund that issued "Units" as a proxy for the value of a commercial relationship. *See* WFV I PPM dated October 12, 2020.

[12] The "offer to enter into a commercial relationship" with such Funds was "undertaken pursuant to Rule 506(b)," and most Investors were "required to represent and warrant that the Investor is an accredited investor" PFA IV PPM, pp. 7, 16 (providing that up to 35 non-accredited investors could invest in PFA IV).

31.    Other Funds did not issue restricted "Interests" or "Units" in a commercial relationship. Instead, they issued "ATM Units." For example, Prestige Fund A II, LLC ("PFA II") issued "ATM Units," which represented an investment in managed ATMs. PFA II POM dated October 5, 2020 (the "PFA II POM"), pp. 7-8.[13]

32.    The PFA II POM provides that PFA II "intends to use the proceeds from this Offering to acquire ATMs." PFA II POM, p. 13. "Upon receipt of full payment from the investor . . . and identification by [PFA II] of the ATM Units associated therewith, [PFA II] will deliver or cause to be delivered to the investor a bill of sale evidencing the sale to investor of all rights, title and interest of [PFA II] in and to the ATM Units." PFA II POM, p. 7. "Depending on specifications for each portfolio, ATMs will generally cost either $14,857, or [$]17,333." PFA II POM, p. 8.[14]

33.    Investors in PFA II were to receive a fixed rate of return agreed on between the Management Company and [PFA II] based on the Management Company's expectations of surcharge revenue earned over a fixed period (typically, 84 months) based on the "historical return of a monthly pool of ATMs" that "includes a margin buffer protection for any downside experience by the Management Company. Revenue is generated from surcharges paid by the consumer (typically, $3.00, but varies per market and demographic), with portions of surcharge going to the location owner, the investor who owns the ATM, and the Management Company, along with [PFM II], as manager of [PFA II]." PFA II POM, p. 7.

34.    During the 84-month term of PFA II, the Venture Agreement provided for revenue sharing as follows: (i) PFA II, "through its Management Company, will pay to Investor $2,184.48 monthly (which is based on historical performance of a pool of ATMs in the small-mid retail

---

[13] ATM Units were to be issued only to accredited investors. PFA II POM, p. 14.

[14] PFA II also stated in its POM that "the Purchase Price will be available to PFA II for its immediate, unrestricted use upon its receipt of the same." PFA II POM, p. 2.

portfolio in which the ATM Units are a part) for every investment unit of $104,000 paid to PFA by Investor[.]" PFA II ATM Venture Agreement (which is attached to the PFA II POM), § 6(a). "In consideration of the duties and obligations performed by PFA under this Agreement, PFA and Management Company shall have the right to retain all other amounts generated in connection with the operation of the ATM Units" (except that an Investor may receive 12% of advertising net revenues on its ATM Units). PFA II ATM Venture Agreement, § 6(a)-(b).

### 3.    Management and Control of the Funds

#### a.    PFB IV

35.    PFB IV was "exclusively responsible for the installation, operation, and maintenance of the new or used ATMs purchased with an Investor's capital." PFB IV PPM, p. 21. PFM was the Manager of PFB IV. PFB IV PPM, p. 2. However, PFB IV "intend[ed] to utilize the services of one (1) or more third-parties to handle such installation, operation, and maintenance." PFB IV PPM, p. 21.

36.    One such intended party was PMG, an affiliate of the Manager. PFB IV PPM, p. 21. PFB IV "intend[ed] for such service providers to bear responsibility for installing, operating, maintenance, insurance, governmental authorizations, and other general costs." PFB IV PPM, p. 21.

37.    Pursuant to an MSA, it was "anticipated that [PMG] shall be entitled to retain all revenues of an ATM less (i) a portion of advertising-derived revenues and (ii) any amounts above those paid to the Fund (if any)." PFB IV PPM, p. 25. Based on an indirect equity interest, the Debtor has "a pecuniary interest in revenues of [PMG] derived from its management and operation of the Fund's ATMs." PFB IV PPM, p. 25. "Daryl has absolute control of [PMG]." PFB IV PPM, p. 25.

13

38.     By way of illustration, the limited liability company managers, executive officers, and controlling persons of the Manager for PFB IV, include the following:

| Name | Title(s) |
|---|---|
| Heller | Limited liability company manager of HCG (a limited liability company manager of PIG, a limited liability company manager of the Manager, PFM), and Chief Executive Officer of HCG and PIG |
| Hostetter | Limited liability company manager of PIG (a limited liability company of the Manager) and President of PIG |
| William Powers ("<u>Powers</u>") | "Significant employee" of PIG (a limited liability company manager of the Manager) and a fund manager of PIG |

PFB IV PPM, p. 22.

39.     In other words, the Debtor was the CEO and manager of HCG,[15] which was the manager of PIG (for which Heller also was the CEO), which was the manager of PFM (the Manager of PFB IV).

40.     The Debtor had a 60% ownership interest (by and through HCG) in PFM (the Manager of PFB IV), and Hostetter had a 40% ownership interest (by and through PIG) in PFM (the Manager of PFB IV). PFB IV PPM, pp. 22-23.[16]

41.     Accordingly, the Debtor had control of PMG, PIG, and PFM.

**b.     PFA IV**

42.     PFA IV is "solely and exclusively responsible for the installation, operation, and maintenance of the ATMs purchased with an Investor's capital." PFA IV PPM, p. 17. However,

---

[15] As indicated above, the Debtor also was the 99.5% equity owner of HCG.

[16] The Fund "represent[ed] that [the PFB IV PPM] and any other documents or information made available by the Manager do not contain any untrue statements of a material fact nor omit any material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading." PFB IV PPM (Exhibit E), p. 12.

the Fund "intend[ed] to utilize the services of an affiliate—[PMG]—or of third-party service providers to handle the installation, operation, and maintenance of ATMs." PFA IV PPM, p. 17.

43.    The members of PFA IV were PFM and PFM III (together, the "<u>Management</u>"). PFA IV PPM, pp. 17-18. The limited liability company managers of Management were PIG and RAI (and Zook, as assignee of RAI). PFA IV PPM, p. 18.

44.    The limited liability company managers of PIG are HCG and Hostetter. PFA IV PPM, p. 18. The limited liability company manager of RAI is Zook. PFA IV PPM, p. 18. The management of such entities and the related individuals are as follows:

| Name | Title(s) or Affiliation(s) |
|---|---|
| Heller | Limited liability company manager of HCG (a limited liability company manager of PIG, a limited liability company manager of Management) and Chief Executive Officer of HCG and PIG |
| Hostetter | Limited liability company manager of PIG (a limited liability company manager of Management) and President of PIG |
| Zook | Limited liability company manager of RAI (a limited liability company manager of Management), prior to assignment of its interest to Zook, and Chief Executive Officer of RAI |
| Powers | "Significant employee" of PIG (a limited liability company manager of Management) and a fund manager of PIG |
| Eby | Director of Finance at PIG |

PFA IV PPM, pp. 18-19.

45.    In other words, the Debtor was the CEO and manager (and 99.5% equity owner) of HCG, which was the manager of PIG (for which the Debtor also was the CEO), which was a manager of PFM (a Manager of PFA IV).

46.    PFA IV "is beneficially owned by its limited liability company managers [PFM and PFM III] and its affiliates." PFA IV PPM, p. 19. Heller had a 45.3% ownership interest (by and

15

through HCG), Hostetter had a 30.2% ownership interest (by and through PIG), and Zook had a 24.5% ownership interest (by and through RAI, and then directly as RAI's assignee), in the Management. PFA IV PPM, p. 20.

47.    "Daryl Heller, beneficially through Heller Capital Management, LLC [sic], has an equity ownership interest in [PMG]. Pursuant to the written agreement intended to be entered into between [PFA IV] and [PMG] with respect to any Investor's ATMs (the 'Management Agreement'), it is anticipated that [PMG] shall be entitled to retain all revenues of an ATM less (i) a portion of advertising-derived revenues and (ii) pre-defined monthly payments, each of which are payable by [PMG] to [PFA IV]." PFA IV PPM, p. 20. "Accordingly, for any Investor whose ATMs are managed in whole or in part by [PMG], Daryl Heller shall have a pecuniary interest in the revenues of [PMG]." PFA IV PPM, p. 20. The Debtor, Hostetter, and Zook "shall each share in the proceeds which the Managers will recognize through their derivative membership interests in [PFA IV]." PFA IV PPM, p. 8.[17]

48.    Accordingly, the Debtor had control of PMG, PIG, PFM, and PFM II.

### c.    PFA II

49.    PFA II "is in the business of managing" ATMs "primarily through an ATM management company that locates, operates and maintains the ATMs, subject to [PFA II's] oversight." PFA II POM, p. 3. PFM II is the sole member and manager of PFA II. PFA II POM, p. 3. PFM II was "owned and managed by" PIG, RAI (and then, post-assignment, Zook), and

---

[17] The Fund "represent[ed] that [the PFA IV PPM] and any other documents and information made available by [PFA IV] do not contain any untrue statements of a material fact nor omit any material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading." PFA IV PPM, p. 10.

Poole. PFA II POM, p. 3.[18] PFA II's officers are Heller (CEO), Hostetter (President), Zook (Executive Vice President), and Poole (Vice President). PFA II POM, p. 3.

50.    PFA II "manages the ATMs through ATM Management/Placement Agreements with ATM Management Companies ('Management Companies') that allow it to place ATMs with fixed rates of return based on pooled transactions and surcharges from a large pool of ATMs, subject to [PFA II's] approval at various stages of the purchase and placement of the ATMs." PFA II POM, p. 7.

51.    PFA II "engaged or contemplate[d] engaging two Management Companies, one of which [was PMG] . . ., [which was] owned in common with the manager [PFM II] by virtue of Daryl Heller being the common controlling member of both [PMG] and [PIG]." PFA II POM, p. 15. PMG was intended to be "the predominant Management Company used by [PFA II] to manage and place ATMs." PFA POM, p. 7. PMG "is owned in common with the manager, [PFM II] by virtue of Daryl Heller being the common controlling member of both [PMG] and [PIG]." PFA POM, p. 15.

52.    PIG has a 51% ownership interest in PFM II. *See* Master Assignments (Exhibit D).

53.    PIG also owned 51% of Class A interests and 35% of Class B interests of PFM III. *See* Limited Liability Company Agreement of PFM III, dated as of January 14, 2020, § 6.1.

54.    Accordingly, the Debtor had control of PMG, PIG, PFM II, and PFM III.

---

[18] As indicated above, PIG is owned by HCG and Hostetter. HCG "is controlled by Daryl F. Heller" (who is its CEO and 99.5% equity holder). PFA II POM, p. 3. RAI is owned and managed by Zook. PFA II POM, p. 3.

**4.    ATM Revenue Share: The Returns to Investors and Compensation to PMG under the Management Services Agreement Between the Funds and PMG**

55.    With respect to ATMs managed for PFB IV, all revenues were divided such that PFB IV received up to $1,357.92 for each $52,000 of funds it advanced for the purchase of the ATMs. PMG, as the Management Company, received any remaining revenue thereafter. *See* MSA, effective as of December 1, 2020, by and between PFB IV and PMG (the "<u>PFB IV MSA</u>") (Exhibit F), § 6, p. 4.[19]

56.    With respect to ATMs managed for PFA IV, all revenues were divided such that Investors in PFA IV received a minimum of $1,228.08 per $52,000 advanced, with any excess to be allocated per a schedule agreed to by the parties. PMG, as the Management Company, received the remainder, if any, after PFA IV's distribution. This calculation was based on an assumed average of 476 transactions per ATM Unit per month, yielding approximately $0.93 per transaction. *See* MSA, effective as of October 7, 2021, by and between PFA IV and PMG ("<u>PFA IV MSA</u>"), § 6, pp. 4-5.

57.    With respect to ATMs managed for PFA II, the Management Company was entitled to retain all revenues less operational expenses generated by ATMs except for between $2,574.30 and $2,741,01 (depending on the applicable "portfolio") in "fixed" monthly payments, as increased or decreased by the percentage by which net revenues exceed the Management Company's expected net revenue in the applicable month (as adjusted), but in no event may the adjusted monthly payment be less than a minimum monthly payment between $2,125.00 and $2,245.32 (depending on the "portfolio"). *See* MSA, dated as of January 15, 2020, by and between PFA II and PMG (the "<u>PFA II MSA</u>"), § 6, p. 5 and Schedule A.

---

[19] To avoid burdening the Court and parties in interest with too much paper, I have attached the PFA II MSA as a representative example, but not the other relevant MSAs.

58.     With respect to ATMs managed for WFV VII, all revenues were divided such that Investors in WFV VII received a minimum of $1,084.00 per $52,000 advanced, with any excess to be allocated per Schedule A. WFV VII's "expected monthly payment" was $1,351.04. The Management Company received the remainder, if any, after WFV VII's distribution. *See* MSA, dated as of February 1, 2024, by and between WFV VII and PMG (the "WFV VII MSA"), § 6, pp. 4-5.

59.     In each case, the respective Fund was entitled to up to a twelve percent (12%) share of any advertising revenue. *See* PFB IV MSA (Exhibit F), § 7, p. 5; PFA IV MSA, § 7, p. 5; PFA II MSA, § 7, p. 5; and WFV VII MSA, § 7, p. 5.

60.     At the end of the Investment Term, if renewal terms had not been agreed upon, the Fund had the option to either relinquish all rights to an ATM to the Management Company or, with at least 90 days' notice, elect to sell or take possession of the ATM. If the Fund elected to take possession, the Management Company was required to provide sale terms for consideration; if the Fund declined those terms, it had the right to take possession of the ATM. In such cases, the Management Company was obligated to deliver the ATM to the Fund, and the Fund was responsible for their removal at its own cost.[20] PFA II MSA § 5(b), pp. 3-4. The variable margin and, consequently, portfolio results were communicated to Investors through periodic "variance reports."

### 5.     PMG's Bank Accounts Generally

61.     PMG maintained the following five (5) bank accounts with FNB (the "FNB Accounts"):

---

[20] The PFB IV MSA, PFA IV MSA, and WFV VII MSA contained similar termination terms. *See* PFB IV MSA (Exhibit F), § 5(b), pp. 3-4; PFA IV MSA, § 5(b), pp. 3-4; and WFV VII MSA, § 5(b), pp. 3-4.

| Last Four Digits of Account Number | Observed Use During the Review Period |
|---|---|
| 8413 | "Restricted Account" into which the Funds deposited the Investors' monies<br><br>Also used to make payments (*i.e.,* return on investments) to the Funds in 2021 and 2022 |
| 3440 | Operating account<br><br>Also used to make payments (*i.e.,* return on investments) to the Funds in 2023 and 2024 |
| 6556 | Operating account |
| 0823 | Operating account |
| 6390 | Operating account |

62.    Together with my retained professionals, I reviewed account statements for (among other accounts) all five (5) of the FNB Accounts.

63.    Of those five (5) FNB Accounts, I observed that (i) the "restricted account" #8413 ("Restricted Account #8413")[21] was the only account in which Investors' funds were received by PMG, and (ii) Restricted Account #8413 and operating account #3440 were the only accounts from which returns were paid to the Funds (or PIG) on account of Investors' returns.[22]

---

[21] I have not seen any document stating what, if anything, was "restricted" with respect to Restricted Account #8413.

[22] The Debtor has suggested that I should consider other accounts besides the five (5) FNB Accounts, such as bank accounts in the name of ShareNet, LLC, a wholly-owned subsidiary of PMG, and other entities in which PMG has no ownership interest but are under common control with PMG (i.e., ultimately controlled by the Debtor), such as PowerQwest Financial LLC ("PowerQwest") and First Regents Holdings, LLC ("First Regents"). I disagree for at least two reasons. First, as discussed *infra,* to the extent any funds from those entities were used to pay the Investors, those funds *already* would be included in my analysis of the FNB Accounts. Secondly, to the extent (if any) that a subsidiary or affiliate had other funds *available* to pay the Investors but did not use those funds to pay the Investors, they are not relevant to whether PMG actually used subsequent Investors' funds to pay earlier Investors during the Review Period. Therefore, except to

64.     Charts summarizing all receipts and disbursements from operating account #3440 and Restricted Account #8413—the two most active accounts—are attached, respectively, as Exhibits G ("<u>Summary of Operating Acct. #3440 Receipts & Disbursements</u>") and H ("<u>Summary of Restricted Acct. #8413 Receipts & Disbursements</u>").

65.     All payments to the Funds on account of Investors' returns in 2021 and 2022 originated from Restricted Account #8413.[23]

66.     Although the operating account ending in #3440 was also used for general operating purposes, all payments to the Funds on account of Investors' returns in 2023 and 2024 originated from operating account #3440.[24]

67.     The operating accounts ending in #6556, #0823, and #6390 were used for general operating purposes, including the receipt of payments from independent sales organizations, processors, operators or other ATM industry participants (together, the "<u>ATM Service Providers</u>").

**6.     PMG's Cash Activity**

**a.     Insufficiency of Net Cash and Gross Receipts from ATM Operations**

68.     The following table depicts total monthly payments (from Restricted Account #8413 and operating account #3440) to the Funds (or PIG) on account of Investors' returns during

---

the extent that they were actually used to pay the Investors through PMG (in which cases they are already included in my analysis), any available funds of PMG's subsidiary or affiliates are not relevant to whether PMG used subsequent Investors' funds to pay returns to earlier Investors in the Funds.

[23] In 2021 and 2022, a total of $396,437,913 flowed into Restricted Account #8413. Of this amount, $381,024,826 was from the Funds. In that same two-year period (2021-2022), $175,577,039 was disbursed from Restricted Account #8413 back to the Funds.

[24] In 2023 and 2024, a total of $508,906,231 flowed into operating account #3440. None of that amount originated (at least not directly) from the Funds. In that same two-year period (2023-2024), $231,747,077 was disbursed from operating account #3440 to the Funds.

the     Review     Period     in     the     aggregate     amount     of     $407,324,116:[25]

| Total Amounts Paid to Investors by PMG | | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
| Prestige Funds | $ (59,834,997.08) | $ (102,880,878.46) | $ (169,071,239.09) | $ (47,010,819.44) | $ - | $ (378,797,934.07) |
| WF Velocity Funds | $ (4,179,138.32) | $ (8,682,025.30) | $ (12,206,167.17) | $ (3,458,851.22) | $ - | $ (28,526,182.01) |
| PRESTIGE AND WFV FUND DISBURSEMENTS | $ (64,014,135.40) | $ (111,562,903.76) | $ (181,277,406.26) | $ (50,469,670.66) | $ - | $ (407,324,116.08) |

69.    PMG's primary sources of receipts (*excluding* Investor funds) during the Review Period consisted of fees generated by its ATM operations. The account statements for all FNB Accounts reflect that PMG received a total of $161,663,196 in payments from ATM operations during the Review Period.[26]

70.    After accounting for documented operating expenses of $123,501,130 reflected in the FNB Accounts, which included payroll, ATM maintenance, rent, logistics, and other ordinary business expenditures, PMG was left with $38,162,066 in *net* operating cash for the entire Review Period:

| Paramount Management Operating Cash Summary | | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
| ATM Service Provider Receipts | $ 35,556,551 | $ 34,371,286 | $ 48,464,911 | $ 43,259,911 | $ 10,536 | $ 161,663,196 |
| Operating Expenses | $ (29,425,925) | $ (35,473,507) | $ (40,008,606) | $ (18,592,793) | $ (298) | $ (123,501,130) |
| NET OPERATING CASH | $ 6,130,626 | $ (1,102,221) | $ 8,456,305 | $ 24,667,118 | $ 10,238 | $ 38,162,066 |

71.    This aggregate $38,162,066 in net operating cash was insufficient to pay the aggregate $407,324,116 in distributions PMG paid to Investors during the Review Period, thereby highlighting an inherent operational imbalance that could not have supported contractual commitments without reliance on other sources of capital.

72.    Ignoring PMG's documented operating expenses, its $161,663,196 in *gross* receipts from ATM operations was insufficient to pay the $407,324,116 in returns to Investors

---

[25] A list of the monthly returns paid to Investors during the Review Period is set forth in attached Exhibit I.

[26] A list of the receipts generated from PMG's ATM operations is set forth in attached Exhibit J.

during the Review Period. *See* Excerpts of Transcript of April 17, 2025 Deposition of Randall Leaman in the Lancaster County Action ("<u>Leaman Depo. Excerpts</u>") (Exhibit K), at 108:16-20 (Q: "Well, let's try it this way, is the operating revenue of the company sufficient to pay the PE payments without new ATM sales?" A: "No.").

### b.    Insufficiency of Gross Profit from ATM Operations

73.    PMG's *gross* profit from its deployed ATMs also was insufficient to pay the returns paid to Investors during the Review Period.

74.    In 2024, the gross profit from ATM operations was $12,175,360, which was insufficient to pay the $50,469,671 in Investor returns paid in 2024. *See* Sept. 2024 PMG Gross Profit Report ("GP Summary" tab) (Exhibit L); *see also* Summary of Operating Acct. #3440 Receipts & Disbursements (Exhibit G).[27]

75.    In 2023, the gross profit from ATM operations was $16,999,781, which was insufficient to pay the $181,277,406 in Investor returns paid in 2023. *See* Gross Profit Report December '23 -Final.xlsx ("GP Summary" tab) (the "<u>2023 PMG Gross Profit Report</u>") (Exhibit M); *see also* Summary of Operating Acct. #3440 Receipts & Disbursements (Exhibit G).[28]

76.    In 2022, the total gross profit from ATM operations was $15,691,555, which was insufficient to pay the $111,562,904 in Investor returns paid in 2022. *See* Gross Profit Report

---

[27] PMG's gross profit reported on the "Overview" tab of the Sept. 2024 PMG Gross Profit Report (Exhibit L) is $12,174,338 (a lower value than what is reported in the "GP Summary" tab). *See* Sept. 2024 PMG Gross Profit Report ("Overview" tab) (Exhibit L). For purposes of this Second Interim Report, the Examiner used the higher gross profit reported in the "GP Summary" tab.

[28] PMG's gross profit reported on the "Overview" tab of the 2023 PMG Gross Profit Report (Exhibit M) is $16,791,682 (a lower value than what is reported in the "GP Summary" tab). *See* 2023 PMG Gross Profit Report ("Overview" tab) (Exhibit M). For purposes of this Second Interim Report, the Examiner used the higher gross profit reported in the "GP Summary" tab.

December '22 -Final.xlsx ("GP Summary" tab) (the "2022 PMG Gross Profit Report") (Exhibit

N); *see also* Summary of Restricted Acct. #8413 Receipts and Distributions (Exhibit H).[29]

77.    In 2021, the total gross profit from ATM operations was $17,146,668, which was

insufficient to pay the $64,014,135 in Investor returns paid in 2021. *See* Gross Profit Report

December '21 - Final.xlsx ("2021 ATM Gross Profit Report") (Exhibit O); *see also* Summary of

Restricted Acct. #8413 Receipts and Distributions (Exhibit H).

78.    PMG's total Gross Profit from January 2021 through September 2024 was

$62,013,364. That amount was insufficient to pay the $407,324,116 in returns paid to the Investors

during the Review Period.

### c.    Insufficiency of All Receipts (Excluding Investor Funds) During the Review Period

79.    Although PMG received approximately $161.6 million in aggregate *gross receipts*

in all five (5) of the FNB Accounts from ATM operations during the Review Period, those receipts

were insufficient to pay the $407.3 million in aggregate investment returns paid to Investors during

the Review Period. *See* Summary of Operating Acct. #3440 Receipts & Disbursements (Exhibit

G) and Summary of Restricted Acct. #8413 Receipts and Distributions (Exhibit H). The $407.3

million in aggregate payments to Investors exceeded the $161.6 million *gross receipts* from ATM

operations by more than $245.7 million during the Review Period.

---

[29] PMG's gross profit reported on the "Overview" tab of the 2022 PMG Gross Profit Report (Exhibit N) is
$14,854,641 (a lower value than what is reported in the "GP Summary" tab). *See* 2022 PMG Gross Profit
Report ("Overview" tab) (Exhibit N). For purposes of this Second Interim Report, the Examiner used the
higher gross profit reported in the "GP Summary" tab.

80.    Even adding other sources of capital[30] (other than Investors' funds)[31] deposited into

all of the FNB Accounts, which total $171.9 million and include gross receipts from (i) other funds

($31.9 million), (ii) other Debtor-related entities ($69.9 million), (iii) third-party lenders ($23.9

million), and (iv) all other receipts ($46.2 million), PMG lacked sufficient funds to pay the $407.3

million in returns paid to Investors during the Review Period ($161.6 million + $171.9 million =

$333.5 million). Even ignoring all operating and other expenses, PMG's total receipts were $73.8

---

[30] As discussed above, PMG's FNB operating account #3440 was used for routine operational expenses, Investor distributions (in 2023 and 2024), and receipt of ATM-related revenues. During the Review Period, operating account #3440 also received significant inflows from lenders, including $23,822,570 from entities such as Libertas, Reliance Financial LLC, and LendSpark Corporation. Additionally, substantial sums totaling $46,613,726 were deposited into operating account #3440 from entities associated with the Debtor, such as HCG and PowerCoin LLC. PMG's operating account #3440 also received $16,143,955 from funds associated with the Debtor such as Cash Ventures, Symbios ATM Ventures, and Horizon ATM Fund. The operating account #3440 also received $32,906,592 in receipts from other sources including tax refunds, FR Holdings, returned funds, and unidentified transfers. During the Review Period, Restricted Account #8413 received deposits in the amount of (i) $15,710,000 in total from other funds associated with the Debtor, such as Blackford ATM Ventures, Cash Ventures, Symbios ATM Ventures, Horizon ATM Fund, and Raw Ventures, (ii) $23,265,969 from entities associated with the Debtor, such as HCG, Heller Investment Holdings, and PowerCoin LLC, (iii) $129,039 in receipts from lender Libertas Funding LLC ("Libertas"), and (iv) $12,018,557 in other miscellaneous receipts, of which $7,492,887 are from unidentified sources as Restricted Account #8413's statements did not provide sufficient detail regarding the source of the payments. Notably, I do not know whether the $15,710,000 from other funds were derived from investor capital from those funds or whether they were receipts from the Funds' operations. The Debtor asserts that those receipts were operational. *See* Response to Question #21 (Exhibit C). For purposes of my analysis, they were not considered to be Investors' funds as they did not originate from the Funds' accounts. PMG also received $3,609 in Other Receipts to its operating account #6390, $175,101 in Other Receipts to its operating account #6556, and $1,078,217 in Other Receipts to its operating account #0823. The unidentified receipts are inconsequential to my analysis and findings in this Second Interim Report.

[31] During the Review Period, a total of $587,562,603 from the Investors (through the Funds' bank accounts) was deposited in Restricted Account #8413. *See* Summary of Restricted Acct. #8413 Receipts and Distributions (Exhibit H).

million short of the amounts paid to Investors during the Review Period ($407.3 million - $333.5
million = $73.8 million).[32]

| Paramount Management Cashflow Summary | | | | | | |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
| Gross Receipts | $ 210,937,241 | $ 274,375,621 | $ 313,869,198 | $ 121,892,875 | 18,200 | $ 921,093,134 |
| Prestige Funds and WF Velocity Funds Receipts | $ 159,131,896 | $ 221,892,930 | $ 190,592,000 | $ 15,945,777 | $ - | $ 587,562,603 |
| Gross Receipts Less Prestige Funds and WF Velocity Funds | $ 51,805,345 | $ 52,482,691 | $ 123,277,198 | $ 105,947,098 | 18,200 | $ 333,530,532 |
| Disbursements to Prestige Funds and WF Velocity Funds | $ (64,014,135) | $ (111,562,904) | $ (181,277,406) | $ (50,469,671) | $ - | $ (407,324,116) |
| NET OVERAGE (DEFICIENCY) | $ (12,208,791) | $ (59,080,213) | $ (58,000,208) | $ 55,477,428 | 18,200 | $ (73,793,584) |

**d.    Use of Subsequent Investor Funds to Pay Returns to Earlier Investors**

81.    With no other available funds to pay returns to earlier Investors, PMG necessarily
used funds from subsequent Investors to pay returns owed to earlier Investors. PMG's obligations
to the Funds on account of Investor returns exceeded PMG's receipts (excluding Investor funds),
resulting in substantial cashflow deficits in each year from 2021 through 2023, as illustrated in the
cashflow summary figure below.

82.    If non-Investor cash receipts in all five (5) of PMG's accounts at FNB (ending in
#3440, #8413, #0823, #6390, and #6556) represented earnings (which they did not), PMG
experienced annual shortfalls during most of the Review Period. From January 2021, through
December 2023, the deficiency amounted to $129,289,212,[33] as reflected in the columns for 2021
through 2023 in the following chart:

---

[32] The Debtor states that I should include the revenue of all of PMG's affiliates (*i.e.,* entities under common
control with PMG) when determining the sufficiency of available capital to pay returns to the Investors.
To the extent that PMG's affiliates used any such available revenue to pay returns to Investors during the
Review Period, that already would be reflected in my analysis of receipts deposited into Restricted Account
#8413 or operating account #3440—the only two accounts from which PMG paid returns to the Funds.
To the extent that any such available revenue was not used to pay returns to Investors, I do not believe that
it has any bearing on whether PMG actually used subsequent Investors' funds to pay earlier Investors.

[33] The $12,208,791 cash deficit in 2021, plus the $59,080,213 cash deficit in 2022, plus the $58,000,208
cash deficit in 2023, totals $129,289,212.

| Paramount Management Cashflow Summary | | | | | |
|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | | Total |
| Gross Receipts | $ 210,937,241 | $ 274,375,621 | $ 313,869,198 | $ | 799,182,060 |
| Prestige Funds and WF Velocity Funds Receipts | $ 159,131,896 | $ 221,892,930 | $ 190,592,000 | $ | 571,616,826 |
| Gross Receipts Less Prestige Funds and WF Velocity Funds | $ 51,805,345 | $ 52,482,691 | $ 123,277,198 | $ | 227,565,234 |
| Disbursements to Prestige Funds and WF Velocity Funds | $ (64,014,135) | $ (111,562,904) | $ (181,277,406) | $ | (356,854,445) |
| NET OVERAGE (DEFICIENCY) | $ (12,208,791) | $ (59,080,213) | $ (58,000,208) | $ | (129,289,212) |

83.    It was not until 2024, when Investor payments ceased in April while operational receipts from PMG's ATM operations continued, that the shortfall was reduced to approximately $73.79 million.[34] The $129,289,212 shortfall would have substantially increased if PMG continued to pay the obligations due to Investors in 2024 because the ATM count had significantly decreased (due to ATM sales by PMG and creditors' exercise of remedies or self-help).

84.    The following example demonstrates PMG's intended use of Investors' funds to pay other Investors. Between November 27, 2023 and November 29, 2023, a series of incoming wire transfers from four (4) Funds[35] totaling $3,952,000 was credited to Restricted Account #8413. On November 29, 2023, PMG transferred $3,037,764 from Restricted Account #8413 to its operating account #3440, explicitly labeled as "For Investor Wires." On the same date, PMG initiated 23 outgoing wires totaling $3,039,964 from the operating account into various Funds' accounts. The express labeling of the transfer to the operating account as "For Investor Wires" demonstrates that incoming Investor funds intended for the ATM purchase and deployment of ATMs were redirected from Restricted Account #8413 to pay returns owed to existing Investors:

---

[34] Reducing the $129,289,212 deficit for 2021 through 2023 by the $55,477,428 "surplus" in 2024 and the $18,200 "surplus" in 2025 results in an aggregate deficit of $73,793,584.

[35] Prestige Fund B VI, Prestige Fund A VII, Prestige Fund D VI, and Prestige Fund B VI.

| Date | Description | Amount | Balance | Entity | Type |
|---|---|---|---|---|---|
| 11/27/2023 | IN COMING WIRE 70991039 PRESTIGE FUND B VI LLC | 260,000.00 | 795,607.00 | Paramount Management - 8413 | CR |
| 11/27/2023 | IN COMING WIRE 70991052 PRESTIGE FUND A VII LLC | 312,000.00 | 1,107,607.00 | Paramount Management - 8413 | CR |
| 11/27/2023 | IN COMING WIRE 70991081 PRESTIGE FUND D VI LLC | 1,040,000.00 | 2,147,607.00 | Paramount Management - 8413 | CR |
| 11/28/2023 | IN COMING WIRE 71014687 PRESTIGE FUND D VI LLC | 1,612,000.00 | 3,296,956.70 | Paramount Management - 8413 | CR |
| 11/29/2023 | IN COMING WIRE 71048566 PRESTIGE FUND D VI LLC | 312,000.00 | 3,608,934.70 | Paramount Management - 8413 | CR |
| 11/29/2023 | IN COMING WIRE 71038493 PRESTIGE FUND B VI LLC | 416,000.00 | 4,024,934.70 | Paramount Management - 8413 | CR |
| | Total Transferred from Prestige Funds to PMG Account #8413 | 3,952,000.00 | | | |
| | | | | | |
| 11/29/2023 | 8413-3440 FOR INVESTOR WIRES | (3,037,764.48) | 4,970.22 | Paramount Management - 8413 | DR |
| | Total Transferred from PMG Account #8413 to PMG Account #3440 | (3,037,764.48) | | | |
| | | | | | |
| 11/29/2023 | 8413-3440 - FOR INVESTOR WIRES | 3,037,764.48 | 3,778,116.11 | Paramount Management - 3440 | CR |
| | Total Transferred from PMG Account #8413 to PMG Account #3440 | 3,037,764.48 | | | |
| | | | | | |
| | | | | | |
| 11/29/2023 | OUTGOING WIRE 768487 PRESTIGE FUND B, LLC | (2,200.00) | 3,775,916.11 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768698 PRESTIGE FUND B BII MI, LLC MARGIN PAYMENT | (2,370.00) | 3,773,546.11 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768699 PRESTIGE FUND B BII MI, LLC MARGIN PAYMENT | (4,140.00) | 3,769,406.11 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768676 PRESTIGE FUND A IV, LLC MARGIN PAYMENT | (8,848.72) | 3,760,557.39 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768682 PRESTIGE FUND B II, LLC MARGIN PAYMENT | (10,950.24) | 3,749,607.15 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768683 PRESTIGE FUND B IV, LLC MARGIN PAYMENT | (13,959.96) | 3,735,647.19 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768674 WF VELOCITY I, LLC MARGIN PAYMENT | (20,008.84) | 3,715,638.35 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768685 PRESTIGE FUND B VI, LLC MARGIN PAYMENT | (20,401.43) | 3,695,236.92 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768689 WF VELOCITY FUND VI, LLC MARGIN PAYMENT | (25,575.75) | 3,669,661.17 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768686 PRESTIGE FUND B, LLC MARGIN PAYMENT | (27,357.14) | 3,642,304.03 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768700 PRESTIGE FUND D III, LLC MARGIN PAYMENT | (29,006.27) | 3,613,297.76 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768673 PRESTIGE INVESTMENT GROUP, LLC MARGIN PAYMENT | (32,787.22) | 3,580,510.54 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768684 PRESTIGE FUND B V, LLC MARGIN PAYMENT | (47,059.71) | 3,533,450.83 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768687 WF VELOCITY FUND IV, LLC MARGIN PAYMENT | (72,819.88) | 3,460,630.95 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768688 WF VELOCITY FUND V, LLC MARGIN PAYMENT | (87,941.11) | 3,372,689.84 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768679 PRESTIGE FUND A VII, LLC MARGIN PAYMENT | (152,435.03) | 3,220,254.81 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768677 PRESTIGE FUND A V, LLC MARGIN PAYMENT | (230,716.56) | 2,989,538.25 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768703 PRESTIGE FUND D VI, LLC MARGIN PAYMENT | (265,220.63) | 2,724,317.62 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768678 PRESTIGE FUND A VI, LLC MARGIN PAYMENT | (281,438.31) | 2,442,879.31 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768704 PRESTIGE FUND D, LLC MARGIN PAYMENT | (305,580.46) | 2,137,298.85 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768701 PRESTIGE FUND D IV, LLC MARGIN PAYMENT | (329,158.23) | 1,808,140.62 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768675 PRESTIGE FUND A II, LLC MARGIN PAYMENT | (380,785.81) | 1,427,354.81 | Paramount Management - 3440 | DR |
| 11/29/2023 | OUTGOING WIRE 768702 PRESTIGE FUND D V, LLC MARGIN PAYMENT | (689,203.18) | 738,151.63 | Paramount Management - 3440 | DR |
| | Total Transferred from PMG Account #3440 to Prestige Funds and WF Velocity Funds | 3,039,964.48 | | | |

85.     Another example shows PMG's use of Investor funds in Restricted Account #8413 to fund distributions to *other* unrelated investment funds, in this case Blackford ATM Ventures, Cash Ventures, Symbios ATM Ventures, and Raw Ventures (together, the "Other Funds"). On December 29, 2023, $5,096,000 in wires from certain Funds[36] were deposited in Restricted Account #8413. That same day, PMG transferred $5,047,054 from Restricted Account #8413 to operating account #3440, a figure that is roughly equivalent to the incoming Investor wires. This transfer to operating account #3440 was labeled "For Blackford and CV Payments." From there, I observed a set of outbound payments to the Other Funds totaling $5,047,054, an exact match to the value transferred from Restricted Account #8413 containing Investor funds:

---

[36] Prestige Fund A VII, LLC; Prestige Fund B VI, LLC; and Prestige Fund D VI, LLC.

| Date | Description | Amount | Balance | Entity | Type |
|---|---|---|---|---|---|
| 12/29/2023 | INCOMING WIRE 71924249 PRESTIGE FUND A VII LLC | 104,000.00 | 7,867,984.65 | Paramount Management - 8413 | CR |
| 12/29/2023 | INCOMING WIRE 719 19792 PRESTIGE FUND A IV LLC | 260,000.00 | 8,283,984.65 | Paramount Management - 8413 | CR |
| 12/29/2023 | INCOMING WIRE 71922503 PRESTIGE FUND B VI LLC | 312,000.00 | 8,595,984.65 | Paramount Management - 8413 | CR |
| 12/29/2023 | INCOMING WIRE 71922525 PRESTIGE FUND B VII LLC | 416,000.00 | 9,011,984.65 | Paramount Management - 8413 | CR |
| 12/29/2023 | INCOMING WIRE 71924266 PRESTIGE FUND D VI LLC | 4,004,000.00 | 15,984.65 | Paramount Management - 8413 | CR |
| | Total Transferred from Prestige Funds to PMG Account #8413 | 5,096,000.00 | | | |
| | | | | | |
| 12/29/2023 | 8413-3440 FOR BLACKFORD AND CV PAYMENTS | (5,047,054.20) | 7,711,235.69 | Paramount Management - 8413 | DR |
| | Total Transferred from PMG Account #8413 to PMG Account #3440 | (5,047,054.20) | | | |
| | | | | | |
| 12/29/2023 | 8413-3440 - FOR BLACKFORD AND CV PAYMENTS | 5,047,054.20 | 8,313,172.24 | Paramount Management - 3440 | CR |
| | Total Transferred from PMG Account #8413 to PMG Account #3440 | 5,047,054.20 | | | |
| | | | | | |
| 12/29/2023 | OUTGOING WIRE 784171 CASH VENTURES III, LLC | (98,820.00) | 8,214,945.27 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784173 CASH VENTURES V, LLC | (98,820.00) | 8,116,125.27 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784160 BLACKFORD ATM VENTURES, FUND D | (175,900.00) | 7,940,225.27 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784169 CASH VENTURES II, LLC | (197,640.00) | 7,544,960.27 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784161 BLACKFORD ATM VENTURES, FUND M | (205,012.80) | 7,339,947.47 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784162 BLACKFORD ATM VENTURES, FUND MII | (271,350.00) | 7,068,597.47 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784165 BLACKFORD ATM VENTURES, FUND MV | (533,592.00) | 6,535,005.47 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784164 BLACKFORD ATM VENTURES, FUND MIV | (562,700.00) | 5,972,305.47 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784156 BLACKFORD ATM VENTURES, FUND BAV | (929,725.00) | 5,042,580.47 | Paramount Management - 3440 | DR |
| 12/29/2023 | OUTGOING WIRE 784167 BLACKFORD HOLDINGS | (1,973,494.40) | 3,069,086.07 | Paramount Management - 3440 | DR |
| | Total Transferred from PMG Account #3440 to Blackford ATM Ventures and Cash Ventures | 5,047,054.20 | | | |

### 7.   PMG Lacked the Revenue-Generating ATM Count Necessary to Pay Investor Returns During the Review Period

86.    It is instructive to determine the approximate ATM count necessary to generate sufficient operating receipts to pay returns to the Investors during the Review Period. In other words, absent significant other available capital that was used to pay Investors' returns, PMG would need a certain number of revenue-generating ATMs in order to pay the Investors' returns from ATM operating receipts instead of new Investors' funds. As set forth below, the ATM count necessary to pay those returns exceeds PMG's ATM count during the Review Period by a wide margin. That reinforces my conclusion that PMG used subsequent Investors' funds to pay returns to earlier Investors.

87.    The PFA II POM provides that the purchase price for ATMs sold to the Fund was $14,857 or $17,333.[37] Using $17,333 as the estimated sale price of each individual ATM machine

---

[37] "Depending on specifications for each portfolio, ATMs will generally cost either $14,857, or [$]17,333." PFA II POM, p. 8; see April 23, 2024 email from Daryl Heller to Randall Leaman and Dennis Ream, subject "Model Overview and Deleverage – CONFIDENTIAL AND NOT FOR DISTRIBUTION" (the "April 2024 Overview Email") (Exhibit P) (PMG "[s]ells ATMs from organic or mostly acquisition growth to the Prestige for $17k-21k with a cost basis ranging from $2k to $8k."). In some instances, PMG may have

(including the cost of the machine itself, plus certain costs related to location installation and fees), PMG should have been able to purchase roughly 33,898 ATMs with the $587,562,603 received from the Funds during the Review Period.

88.    At the August 26 Hearing in the Lancaster County Action, the Debtor testified that the "totality" of ATMs managed by PMG is "probably somewhere . . . between 25- and 30,000." Tr. of 8/26/24 Hrg. at 47:3-11. PMG's Gross Profit Report for September 2024 listed the monthly ATM count (by terminal identification number) for August 2024 at only 16,895. *See* PMG Gross Profit Report Sep '24- Final.xlsx (the "Sept. 2024 PMG Gross Profit Report") (TID Count Summary tab) (Exhibit L).[38]

89.    PMG's Gross Profit Reports provided an ATM count, by terminal identification number, of 6,546 as of December 2021; 8,245 as of December 2022; 16,639 as of December 2023; and 16,673 as of September 2024. (*See* Exhibits L, M, N & O). From January 2021 through

---

purchased used ATMs at lower cost. PFB IV PPM, (Exhibit E), p. 20. Hostetter and Eby also indicated during interviews that the Funds' average purchase price for an ATM was approximately $17,000.

[38] It is unclear whether the ATM count in PMG's monthly Gross Profit Reports only reflects online, revenue-generating ATMs (whether owned and operated by the Funds, PMG, an affiliate, or a third-party for which PMG managed the ATMs) or whether it includes PMG's total universe of ATMs (whether online and revenue generating or not). PMG's Chief Executive Officer, Leaman, testified that the Gross Profit Reports included every ATM within PMG's "universe of ATMs," not just the number of "active" ATMs. *See* Leaman Depo. Excerpts (Exhibit K) at 54:5-25. During an interview on August 12, 2025, the Debtor stated that the Gross Profit Reports do *not* include some or all of the ATMs owned by PMG's affiliates (*i.e.,* separate entities under common control with PMG). As indicated earlier in this Second Interim Report, the focus of my investigation is on whether PMG used subsequent Investors' funds to pay earlier Investors. Accordingly, I did not focus on ATMs owned by PMG's affiliates. As previously stated, to the extent that revenue generated by ATMs of PMG's affiliates was used to pay returns to Investors, that would be reflected in my analysis of receipts deposited into Restricted Account #8413 or operating account #3440—the only two accounts from which PMG paid returns to the Funds. In any event, the Gross Profit Reports *do include* ATMs owned or managed by PMG's affiliates First Regents and PowerQwest.

September 2024, the highest single monthly ATM count reflected in the Gross Profit Reports was 17,179 in July 2023. (*See* Exhibits L, M, N & O).[39]

90.    Periodic "variance reports" provided (among other things) the number of ATMs for each month. The PMG December 2023 variance report (the "Dec. 2023 Variance Report") reported a total of 31,678 ATMs. *See* Dec. 2023 Variance Report (Exhibit Q). This represents either (i) a conflict with the 16,639 reported in PMG's 2023 ATM Gross Profit Report (Exhibit M), (ii) an indication that many of the ATMs purchased by PMG termed out or were otherwise offline and warehoused, (iii) that the ATMs listed in the Dec. 2023 Variance Report include ATMs *other than* those owned or managed by PMG, or (iv) some combination of the foregoing.[40]

91.    Leaman, then the Chief Executive Officer of PMG, expressed concern with how Investors may react to the ATM count if the Debtor agreed to "turn over" PMG to the Investors. On November 23, 2024, in a text message thread between Leaman and the Debtor (the "Heller/Leaman Text Messages") (Exhibit R), Leaman said that he was "just completely freaked

---

[39] The useful life of an ATM is generally at least seven (7) years, which is consistent with the seven (7) year or eighty-four (84) month term of the Funds. *How to Properly Dispose of and Service Decommissioned ATMs*, ATM Advantage, https://www.atmadvantage.com/proper-atm-disposal-and-services/#:~:text=The%20Lifespan%20of%20an%20ATM,functionality%20of%20your%20financial%20services. (Sept. 3, 2024) ("The average lifespan of an ATM is typically between seven to ten years. However, this lifespan isn't usually due to physical wear and tear but rather the result of technological advancements and new regulations.") (last visited August 8, 2025); *see Frequently Asked Questions About Buying an ATM*, Best Products Sales & Service, Inc., https://bpsands.com/frequently-asked-questions-about-buying-an-atm/?srsltid=AfmBOopiGoL0iFDBaijAcN2OMQVJUi69Fobn0rMtLjZZsbcUNMTYw74N ("What is the lifespan of an ATM? On average – the useful lifespan is approx. 7 years. The industry has been averaging about one major upgrade every 5 years or so.") (last visited August 8, 2025). The Debtor generally agreed with that approximate useful life for an ATM. *See* Response to Question #13 (Exhibit C) ("A kiosk may only operate for a minimum 6-7 years in some cases where the usage is very high however in most cases Paramount/Affiliates had Kiosks operating for 10-15 years and sometimes 15+."). Accordingly, I would expect most ATMs purchased during the Review Period to be online and revenue generating before PMG's collapse.

[40] During an interview on August 12, 2025, the Debtor stated that the ATM count in the variance reports includes ATMs not owned or managed by PMG.

out that when they [*i.e.,* Investors] get in and realize that there's not 25,000 locations there and they're not generating the margins that they need that they are going to trip and we're gonna be all in lawsuits and alleging fraud." *See* Heller/Leaman Text Messages, Nov. 23, 2024, 12:06:20 p.m. (Eastern) (Exhibit R).

92.     Eleven days later, on December 4, 2024, Leaman sent another text to the Debtor saying that he was "worried about the number of ATMs and the investor expectation of performance if we turn these over to them. We don't have 28,000 units which I saw on the serial number list. Is all hell going to break loose?" *See* Heller/Leaman Text Messages, Dec. 4, 2024, 10:40:22 a.m. (Eastern), p. 1760 of 1778 (Exhibit R). Leaman continued that PMG was at "almost 17,000 active terminals in August before selling Cypress and Phonco" ATM portfolios. *See* Heller/Leaman Text Messages, Dec. 4, 2024, 10:54:05 a.m. (Eastern), p. 1760 of 1778 (Exhibit R). Leaman concluded that "my guess is that we are at less than 10,000 after that and down much more after the CashConnect fiasco." *See* Heller/Leaman Text Messages, Dec. 4, 2024, 10:54:46 a.m. (Eastern), p. 1760 of 1778 (Exhibit R).

93.     The Debtor responded that "[t]his included all [bills of sale] and many of this termed out already" and that he was "managing against that concern." *See* Heller/Leaman Text Messages, Dec. 4, 2024, 10:54:54 a.m. (Eastern), 10:55:52 a.m. (Eastern) pp. 1760-61 of 1778 (Exhibit R).

94.     Leaman responded shortly thereafter that he was "seriously tripping here" and that "[t]his is appearing to be fraudulent to me. Please tell me why my perception is incorrect." *See* Heller/Leaman Text Messages, Dec. 4, 2024, 11:05:12 a.m. (Eastern), 11:12:55 a.m. (Eastern), p. 1761 of 1778 (Exhibit R).

95.     The Debtor answered that it was "not fraudulent" and "[w]e needed to assign ATMs which we did, not have all operating [sic]. Never a requirement." *See* Heller/Leaman Text Messages, Dec. 4, 2024, 11:14:02 a.m. (Eastern), p. 1761 of 1778 (Exhibit R); *see also* Heller/Leaman Text Messages Dec. 4, 2024, 1:20:51 p.m. (Eastern), p. 1763 of 1778 (Exhibit R) ("[T]he ATMs do not have to be operational. We have them in warehouses…").

96.     In a written submission that the Debtor sent to the Examiner,[41] he similarly asserted that "PPM does not reference anywhere a requirement for Kiosks [ATMs/BTMs] to be operational" and that ATMs "did not all need to be operational in the field" (alteration added).[42]

---

[41] Counsel for the Debtor asked that such document not be shared with any other party until it becomes part of a "more public filing." Accordingly, that document is not made an exhibit hereto.

[42] The PPMs/POMs contemplate the installation and operation of the ATMs. *See* PFA IV PPM, § 7, p. 17 ("Prestige Fund A IV intends to utilize the services of an affiliate—Paramount Management Group, LLC, a Pennsylvania, member-managed limited liability company []—or of third-party service providers to handle the installation, operation, and maintenance of ATMs. Prestige Fund A IV intends for such service providers to bear responsibility for installing, operating, maintenance, insurance, governmental authorizations, and other general costs, and does anticipate that an Investor would bear any responsibility for the same."). Although the MSAs between PMG and the Funds provide for PMG to warehouse an ATM until a Location Agreement has been secured and staging of the ATM is complete, the MSAs provide for the installation and operation of the ATMs to be completed with a target date of 75 days. *See* PFA IV MSA, § 3(a), p. 2 (regarding warehousing); § 2(b), p. 1 (PMG "will secure Location Agreements to *install and operate* each of the ATM Units, and deploy such ATM Units to such locations, with a target timeline of seventy-five (75) days from the date of purchase of the ATM Units from PFA IV (the 'Deployment Date')") (emphasis added); PFA IV MSA, § 2(d), p. 2 ("'deploy' or 'deployment' of an ATM Unit shall be the date that the ATM Unit is operational and on-line for transaction at the applicable location."). In the event of substantial delay, PMG had the option of returning the relevant funds with ten percent (10%) interest to the relevant Fund, at which time PMG would have no further obligation with respect to the ATM Unit. *See* PFA IV MSA, § 2(c) , pp. 1-2; *see also* PFB IV MSA (Exhibit F), §§ 2(b)-(d), 3(a), pp. 1-2; PFA II MSA, §§ 2(b)-(d), 3(a), pp. 1-2; WFV VII MSA, §§ 2(b)-(d), 3(a), pp. 1-2; *see also, e.g.,* PFB IV Subscription Agreement (attached to the PFB IV PPM), § 3(c) ("If the Fund, in the Manager's sole and reasonable discretion, is unable to utilize the Purchase Price for the Fund's intended investment purposes within four (4) months of the Effective Date, then the Fund shall rescind the Agreement. In such event, the Fund shall return the Purchase Price to Subscriber within ten (10) days without interest.").

97.    A few hours later, Leaman texted the following ATM count chart to the Debtor:

| ATM Counts 12/4/24 | Acquired | Aug 24 Active | Dec 24 Active | | |
|---|---|---|---|---|---|
| Cypress | 6,744 | 6,792 | - | | |
| Phonco | 1,478 | 1,375 | - | | |
| All Other | 12,041 | 8,728 | 8,728 | | |
| PMG Warehouses | 2,688 | 1,223 | 1,223 | 1,465 | Disposed summer of 2024 |
| Tridata | 1,500 | 1,500 | 1,500 | | |
| Total | 24,451 | 19,618 | 11,451 | 1,465 | 12,916 |

*See* Heller/Leaman Text Messages, Dec. 4, 2024, 3:12:31 p.m. (Eastern), p. 1768 of 1778 (Exhibit

R). Leaman's chart appears to be consistent with the August 2024 ATM count in PMG's Gross

Profit reports. Subtracting the warehoused PMG and Tridata ATMs (which total 2,773) from the

19,618 in Leaman's chart leaves 16,895 ATMs in August 2024, the same ATM count set forth in

the Sept. 2024 PMG Gross Profit Report (Exhibit L) for the month of August. Leaman's chart

indicates that only 8,728 of those 16,895 ATMs remained as of December 2024 (after the PMG

business had collapsed).

98.    This Second Interim Report is not intended to resolve whether there is any

misrepresentation in the varying ATM counts prior to PMG's collapse. The ATM count is

discussed in this Second Interim Report because the online, operational ATM count during the

Review Period is important for purposes of this Second Interim Report for two reasons: (i) it *is* an

important indicator of whether PMG had the revenue-generating ATMs required to generate the

receipts necessary to pay the returns to the Investors during the Review Period, and (ii) Investors

were advised that the Funds "intended" to use all "100%" or the "entirety" of the Investors' funds

to purchase ATMs.

99.     According to its monthly Gross Profit Reports, PMG earned the annual gross profit set forth in Column B below during the period from January 2021 through September 2024. During the relevant year, PMG had the average monthly revenue-generating ATM count set forth below in Column C. With those figures, one can determine the annual gross profit per revenue-generating machine set forth in Column D by dividing gross profit (Column B) by the average monthly ATM count (Column C). The annual returns paid to Investors is set forth in Column E. Dividing the annual returns (Column E) by the gross profit per revenue-generating ATM (Column D) results in the number of revenue-generating ATMs needed to pay the Investors during that year (Column F):

| A | B | C | D<br>(B divided by C) | E | F<br>(E divided by D) |
|---|---|---|---|---|---|
| Year | Gross Profit[43] | Average Monthly Revenue-Generating ATM Count | Gross Profit per Revenue-Generating ATM | Amounts Paid to Investors | Number of ATMs Needed to Pay Investors |
| 2021 | $17,146,668 | 7,364.75 | $2,328.21 | $64,014,135.40 | 27,495 |
| 2022 | $15,691,555 | 7,457.42 | $2,104.15 | $111,562,903.76 | 53,020 |
| 2023 | $16,999,781 | 14,614.92 | $1,163.17 | $181,277,406.26 | 155,848 |
| 2024* | $12,175,360 | 16,687.00 | $729.63 | $50,469,670.66 | 69,172 |

*In 2024, columns B, C and D are based on information available through September 2024 from the 2024 PMG Gross Profit Report.

---

[43] The annual gross profit amounts are set forth in the following documents attached to emails sent by Tracy Spaulding at PMG: (i) 2021 PMG Gross Profit Report (2021 GP Summary tab) (1/27/22 Email); (ii) 2022 Gross Profit Report (2022 PMG GP Summary tab) (1/25/23 Email); (iii) 2023 PMG Gross Profit Report (2023 GP Summary tab) (1/29/24 Email); and (iv) Sept. PMG 2024 Gross Profit Report (2024 GP Summary tab) (10/29/24 Email). The average monthly ATM count was determined by adding the monthly ATM counts in such reports and then dividing by (a) twelve (12) for each of 2021, 2022 and 2023, and (b) nine (9) for 2024 as the data only extends through September 2024. The amounts paid to Investors from January 2021 through September 2024 (as set forth in Column E) were determined by our review of Restricted Account #8413, operating account #3440 (outgoing), and the Funds' (and PIG's) bank accounts (incoming).

100.    As the foregoing chart indicates, based on the gross profits from ATM operations, PMG needed many more ATMs (and profits) than it had during the Review Period to pay the returns to the Funds that were paid during the Review Period.

**D.    The Debtor's Position Regarding the (i) Reasons PMG Collapsed and (ii) Use of ATM Sale Proceeds (Investor Funds)**

101.    In an April 23, 2024, email from the Debtor to Leaman and Dennis Ream, the Debtor described his view of PMG's business model and why it "does NOT behave as a Ponzi." *See* April 2024 Overview Email (Exhibit P).

102.    The Debtor states that the PMG "model" is analogous to a "REIT sales leaseback" (though structured differently for tax depreciation) in which PMG "sells ATMs under this model and makes payment for a [sic] X years (allows for deprecation to be taken by the Fund by ATMs) and then Paramount take over ATM/devices (buys back for pennies) and operates it for another 6-10 years with no payment given the long usable life of an ATM." *See* April 2024 Overview Email (Exhibit P); *see* Response to Question #6(b) (Exhibit C) ("this was a sales/leaseback concept analog (structured a bit different for tax purposes), and the sale of the Kiosk was highly profitable and facilitated a couple years of Fund/Investor payments").

103.    The Debtor states that the profit on the sale of the ATMs to the Funds provides an average profit of $14,000, which "covers 32 months+/- just from the profit of selling ATM sale" as the payment to the "Fund/investor" is "about $435/month/ATM (not including the Fund margin) which equates to 32 months of covering the monthly payment just from ATM sale margin." *See* April 2024 Overview Email (Exhibit P); *see* Response to Question #6(b) (Exhibit C) ("the sale of the Kiosk was highly profitable and facilitated a couple years of Fund/Investor payments").[44]

---

[44] Some of the PPMs provide that the Manager intended to pay Investors from the operation of the ATMs, rather than the proceeds of their own investments. *See, e.g.,* PFB IV PPM, p. 8 ("The Manager intends to make monthly distributions of capital derived from the operation of the Fund's ATMs."); p. 21

104.    The Debtor states that the "[r]eason[s]" PMG is a "bona fide business model," include that it is (i) "an ATM hardware sales and operations business model (hardware sales/distribution is a legit business model)" and (ii) a "[t]angible model of buying/selling ATMs that becomes highly profitable when ripcord is pulled at 36 months." *See* April 2024 Overview Email (Exhibit P).

105.    The Debtor then states that the "[r]easons" the business model "does NOT behave as Ponzi" include that it is "a sales leaseback model with a defined end date to payment (ponzi never end and are perpetual, this terminates and ends on its own)" and "[i]t's a business model of selling hardware AND participating in revenue generated from the ATM placement." *See* April 2024 Overview Email (Exhibit P). The Debtor also asserts that PMG "can pull that ripcord and buy any ATM out for one cent at 36 month maturity (and a few at 24 month)." *See* April 2024 Overview Email (Exhibit P).

106.    I am a financial advisor, not an attorney, so I will not address the Debtor's assertions that are legal in nature.

107.    I will address certain factual assertions by the Debtor.

108.    The Debtor asserts that I should consider the "hardware profit center (derived from the sales of kiosks [ATMs] to prestige [the Funds]) which is hundreds of millions." *See* Response to Question #20 (Exhibit C). In response to the question "Were there any other sources of operating receipts for PMG?," the Debtor responded in part that the "Examiner is not looking at the hardware profit center (derived from the sales of kiosks to prestige) which is hundreds of millions." *See* Response to Question #20(c)(vi) (Exhibit C).

---

("Distributions will be made through profits of the Fund derived through the Fund's ownership and operation of ATMs.").

109.    In another written submission to the Examiner, the Debtor states that "Paramount/Affiliates did not pay existing [I]nvestors from funds received from new [I]nvestors, rather it was the strong profit generated from kiosk hardware sales and revenue from Paramount and affiliates managing and operating kiosks" (alteration added).[45] The "hardware profit center" and the "sale of kiosks" _is_ the sale to the Investors and/or the Funds. The proceeds of those sales _are_ Investor Funds. Therefore, the Debtor's assertion that PMG had the right to utilize such funds and his admission that the "strong profit generated from kiosk hardware sales" was used to pay the Funds' investment returns confirms my findings that (i) PMG (under the Debtor's control) used subsequent Investors' funds to pay earlier Investors, and (ii) the Debtor utilized Investors' funds contrary to the "intended" use of those funds under (without limitation) the PPMs, POMs, and MSAs.[46]

### E.    The Reason PMG Collapsed

110.    In a written submission, the Debtor asserted that the failure of PMG's business resulted from numerous challenges primarily from 2023 through early 2024, including rising interest rates, customer attrition, reduced ATM usage, regulatory changes, and poor acquisition performance.

111.    However, I found cash flow deficits existing at least as far back as 2021. I believe that PMG collapsed because (at least during the Review Period) PMG lacked sufficient revenue (let alone profit) to pay returns to the Investors. As PMG was using subsequent Investors' funds to pay earlier Investors, one would expect that PMG would fail when new Investor funds dried up.

---

[45] The Debtor often uses the term "kiosk" to refer to an ATM or BTM.

[46] Leaman testified that the Funds were paid "based on the operations of [PMG] and on the operation, _from the cash raised by the Funds",_ although he asserted that Investors were paid based on "existing money too" that was "already raised" rather than "new money." _See_ Leaman Depo. Excerpts (Exhibit K) at 137:11-138:2 (emphasis added).

That is what happened to PMG (although other challenges referenced by the Debtor may have exacerbated or hastened its failure by, among other things, impairing PMG's ability to raise additional investments). PMG was not able to survive without new Investors' funds.

F.   **Conclusions**

112.   My examination of PMG's account statements and other documents and its financial operations during the Review Period indicates as follows:

    i.    By and through his contractual rights and/or equity interests, the Debtor had control of PMG, PIG, PFM, PFM II, PFM III, and WFV Management.

    ii.    PMG did have meaningful ATM business operations during most of the Review Period.

    iii.    PMG's earnings from ATM operations (excluding Investors' funds) were insufficient to pay returns to Investors during the Review Period.

    a.    PMG's earnings from its ATM operations (excluding Investors' funds) during the Review Period totaled approximately $38 million during the Review Period. Those earnings were insufficient to pay the $407.3 million in returns paid to Investors during the Review Period.

    iv.    PMG's gross receipts (excluding Investors' funds) were insufficient to pay the returns to Investors that were paid during the Review Period.

    a.    PMG's gross receipts for ATM operations (other than Investors' funds) totaled approximately $161.6 million during the Review Period. Those gross receipts were insufficient to pay the $407.3 million in returns paid to Investors during the Review Period.

    v.    Even considering all of PMG's additional receipts (other than Investors' funds) during the Review Period, PMG still lacked sufficient funds to pay the $407.3 million in returns paid to Investors during the Review Period.

a. Even adding all other sources of capital (other than Investors' funds) deposited into all of the FNB Accounts, which total $171.9 million and include gross receipts from (i) other funds ($31.9 million), (ii) other Debtor-related entities ($69.9 million), (iii) third-party lenders ($23.9 million), and (iv) all other receipts ($46.2 million), PMG still lacked sufficient funds to pay the $407.3 million in returns paid to Investors during the Review Period ($161.6 million + $171.9 million = $333.5 million). Even ignoring all operating and other expenses, PMG's total gross receipts were still $73.8 million short of the amount paid to Investors during the Review Period ($407.3 million - $333.5 million = $73.8 million).

vi. Putting aside any alleged discrepancies in the ATM count during the Review Period and whether ATMs were required to be installed and operational under the relevant disclosures and agreements, PMG lacked the number of revenue-generating ATMs necessary to generate the $407.3 million paid to the Investors during the Review Period.

a. From January 2021 through September 2024, the highest single monthly ATM count reflected in the Gross Profit Reports was 17,179 in July 2023. Based on the annual gross profit information contained in PMG's Gross Profit Reports and the $407.3 million paid to Investors during the Review Period, on a monthly basis, PMG would have needed more than 17,179 revenue-generating ATMs to generate the receipts (and earnings necessary) to pay the $407.3 million paid to Investors during the Review Period. This further evidences that PMG used subsequent Investors' funds to pay returns to earlier Investors.

EXAMINER:

Date: August 13, 2025                By: _Edward A. Phillips_
                                        Edward A. Phillips, CPA, CFF, CFE, CIRA, CTP
                                        Examiner