# Exhibit E

# NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement (this "**Agreement**") is entered into by and between Prestige Fund B IV, LLC, a limited liability company duly formed under the laws of the State of Delaware ("**Disclosing Party**"), and the undersigned counterparty hereto ("**Recipient**"), as of the earlier date of their respective signatures hereto (the "**Effective Date**"). Each of Disclosing Party and Recipient may hereinafter be individually referred to as a "**Party**," as appropriate, or collectively referred to as the "**Parties**."

## RECITALS

A.      In order to allow the Parties to explore matters related to conducting business together wherein the Recipient may purchase certain equity securities of the Disclosing Party, and the Disclosing Party will furnish to the Recipient certain information that is either non-public, confidential or proprietary in nature (the "**Confidential Information**"), solely for the purposes of exploring such matters related to the Recipient's purchase of certain equity securities (the "**Permitted Use**").

B.      The Disclosing Party is permitted to disclose to the Recipient on a confidential basis, the Confidential Information so long as the Recipient understands, acknowledges and agrees to be bound by this Agreement.

NOW, THEREFORE, the Parties represent, warrant, covenant, and agree as follows:

## AGREEMENT

1.      <u>Definitions</u>. As used in this Agreement, the following terms have the following meanings:

"**Affiliate(s)**" means, with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person. The term "Affiliate" of a Person shall be deemed to include any director, executive officer, limited liability company manager, general partner, or holder, directly or indirectly, of five percent (5%) or more of the voting equity securities of such Person.

"**Agreement**" has the meaning set forth in the introductory paragraph herein.

"**Confidential Information**" has the meaning specified in <u>Section 2(a)</u>.

"**Disclosing Party**" has the meaning set forth in the introductory paragraph herein, and shall be broadly construed to include the Disclosing Party's Affiliates.

"**Dispute**" has the meaning specified in <u>Section 6(g)</u>.

"**Effective Date**" has the meaning set forth in the introductory paragraph herein

"**Party**," and "**Parties**," have the respective meanings set forth in the introductory paragraph herein.

"**Permitted Persons**" means partners, employees, officers, directors, affiliates, agents, advisors or other representatives of the Recipient who (i) need to know such Confidential Information for the purpose of participating in the consideration, evaluation and performance of the Permitted Use and (ii) are obligated to the Recipient and the Disclosing Party to maintain the Confidential Information under confidentiality terms and conditions at least as stringent as those provided for herein.

"**Permitted Use**" has the meaning specified in <u>Recital A</u>.

"**Person**" means any individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, governmental authority, or other entity or organization.

"**Recipient**" has the meaning set forth in the introductory paragraph herein, and shall be broadly construed to include the Recipient's Affiliates.

2.    <u>Confidential Information; Exclusions</u>.

(a)    <u>Confidential Information</u>. As used in this Agreement, "**Confidential Information**" means any and all technical and non-technical information provided by the Disclosing Party (whether with respect to itself, its Affiliates, or to any other Person) to the Recipient, which may include without limitation information regarding: (i) patent and patent applications; (ii) trade secrets; (iii) proprietary and confidential information, technology, data, results, strategies, ideas, techniques, sketches, drawings, works of authorship, models, inventions, know-how, processes, improvements, discoveries, developments, apparatuses, equipment, algorithms, software programs, software source documents, and formulae related to the current, future, and proposed products and services of the Disclosing Party, including without limitation the Disclosing Party's information concerning research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, customer lists, investors, employees, business and contractual relationships, business forecasts, projections, sales and merchandising, marketing plans, and information the Disclosing Party provides regarding third parties; and (iv) all other information that the Recipient knew, or reasonably should have known, was the Confidential Information of the Disclosing Party.

(b)    <u>Exclusions</u>. The Recipient will not have any obligations under this Agreement with respect to a specific portion of Confidential Information if the Recipient can demonstrate with competent evidence that such Confidential Information:

(i)    was generally available to the public at the time it was disclosed to the Recipient;

(ii)    becomes generally available to the public after disclosure to the Recipient, through no fault of the Recipient;

(iii)    was in the possession or the possession of the Recipient or any Permitted Person at the time the information was received hereunder, provided that the source of the information was not known by the Recipient or any Permitted Person to be bound to an obligation of confidentiality to the Disclosing Party with respect to such information and such obligation prohibited such disclosure;

(iv)    was communicated to Recipient or any Permitted Person from a third party, provided that the source of the information was not known by the Recipient or any Permitted Person to be bound to an obligation of confidentiality to the Disclosing Party with respect to such information and such obligation prohibited such disclosure; or

(v)    was developed independently by the Recipient or any Permitted Person without use, directly or indirectly, of any Confidential Information.

(c)    <u>Permitted Disclosure</u>. Notwithstanding <u>Section 3</u>, The Recipient may disclose certain Confidential Information, without violating the obligations of this Agreement, to the extent such disclosure

is required by law, rule, regulation, subpoena or a valid order of a court or other governmental body having jurisdiction; provided, however, that the Recipient provides the Disclosing Party with reasonable prior written notice of such disclosure and makes a reasonable effort to obtain, or to assist the Disclosing Party in obtaining, a protective order preventing or limiting the disclosure or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation required, or for which the order was issued.

(d)     Property of Disclosing Party. Confidential Information is and shall remain the sole property of Disclosing Party. Recipient recognizes and agrees that nothing contained in this Agreement will be construed as granting any property rights, by license or otherwise, to any Confidential Information disclosed under this Agreement, or to any invention or any patent, copyright, trademark, or other intellectual property right that has issued or that may issue, based on such Confidential Information. Recipient will not make, have made, use or sell for any purpose any product or other item using, incorporating or derived from any Confidential Information. Neither this Agreement nor the disclosure of any Confidential Information hereunder shall be construed as granting to the Recipient any license, right, interest or ownership in the Disclosing Party's Confidential Information.  Nothing in this Agreement creates or shall be deemed to create any employment, joint venture, or agency between the Parties.

(e)     No Warranties. THE COMPANY IS PROVIDING CONFIDENTIAL INFORMATION ON AN "AS IS" BASIS FOR USE BY RECIPIENT AT ITS OWN RISK. THE COMPANY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED OR STATUTORY, AS TO THE ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION OR ANY ERRORS THEREIN OR OMISSION THEREFROM, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

3.     Handling of Confidential Information.

(a)     Standard of Care. Subject to Section 2(b), The Recipient agrees that at all times and notwithstanding any termination or expiration of this Agreement, it will hold in strict confidence and not disclose to any third-party any Confidential Information, except as approved in writing by the Disclosing Party, or to Permitted Persons, and will use the Confidential Information for no purpose other than the Permitted Use. The Recipient will also protect such Confidential Information with at least the same degree of care that the Recipient uses to protect its own confidential information, but in no case, less than reasonable care. The Recipient will limit access to the Confidential Information to only Permitted Persons and the Recipient will (1) communicate the confidential and proprietary nature of the Confidential Information to Permitted Persons, and (2) be responsible for any unauthorized use or disclosure of Confidential Information by the Permitted Persons and by any and all other persons to whom it discloses the Confidential Information.

(b)     No Circumvention. During the twelve (12) month period from the date on which this Agreement is executed, the Recipient will not, without the prior written consent of the Disclosing Party: (1) engage in any discussions with any customers or suppliers of the Disclosing Party, which are disclosed pursuant to this Agreement regarding the Disclosing Party or its business; (2) solicit or offer to employ or consult or compensate any employee, advisor or consultant of the Disclosing Party or its Affiliates; or (3) solicit any customers of the other Party and/or its Affiliates.

(c)     No Exportation. Recipient will not export, directly or indirectly, any U.S. technical data acquired pursuant to this Agreement, or any products utilizing such data, in violation of U.S. export laws or regulations.

(d)     No Reproduction. Confidential Information will not be reproduced in any form except as

required to accomplish the intent of this Agreement. Any reproduction of any Confidential Information will remain the property of the Disclosing Party and will contain any and all confidential or proprietary notices or legends that appear on the original, unless otherwise authorized in writing by the Disclosing Party.

(e)    <u>No Reverse Engineering</u>. The Recipient agrees that the software programs of the Disclosing Party contain valuable confidential information and agrees that it will not modify, reverse engineer, decompile, create other works from, or disassemble any software programs contained in the Confidential Information without the prior written consent of the Disclosing Party.

(f)    <u>Notice of Loss</u>. The Recipient will immediately notify the Disclosing Party in the event of any loss or unauthorized disclosure of any Confidential Information.

(g)    <u>Return</u>. Upon the termination or expiration of this Agreement, or upon written request of the Disclosing Party, the Recipient will promptly return to the Disclosing Party all documents and other tangible materials representing any Confidential Information and all copies thereof.

4.    <u>Term; Termination</u>. This Agreement shall be effective as of the Effective Date and remain in full force and effect for a period of three (3) years therefrom; *provided*, *however*, that the obligations under this Agreement will continue to apply to a Recipient with respect to the Confidential Information and will survive termination of this Agreement and will be binding upon Recipient and Recipient's heirs, successors, agents, and affiliates.

5.    <u>Injunctive Relief</u>. The Recipient acknowledges that the Disclosing Party cannot be properly compensated for unauthorized disclosure or misuse of the Confidential Information and accordingly the Recipient agrees that if any Confidential Information is disclosed without authorization or used in contravention of any provision of this Agreement, then the Disclosing Party will have, in addition to any other remedies available to it, the right to injunctive relief (including interlocutory injunctive relief) enjoining such action and the Recipient agrees that other remedies are inadequate to fully protect the Disclosing Party's rights.

6.    <u>Miscellaneous</u>.

(a)    <u>Advice of Counsel</u>. The Parties acknowledge that each has either been represented by legal counsel of its choice in the negotiation, drafting, and execution of this Agreement, or has consciously chosen to waive its right to counsel. The Parties acknowledge and agree that by executing this Agreement, they have read this Agreement in its entirety and fully understand this Agreement.

(b)    <u>Amendment</u>. This Agreement may only be amended by an instrument in writing signed by the Parties, which shall be attached to this Agreement as an addendum hereto.

(c)    <u>Assignment</u>. Neither this Agreement nor the rights, interests, or obligations hereunder shall be assigned by the Recipient (whether by operation of law or otherwise) without the prior written consent of the Disclosing Party. Except as otherwise expressly provided in this Agreement, this Agreement shall be binding upon and inure solely to the benefit of the Parties, and their permitted successors and assigns, and nothing herein is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

(d)    <u>Counterparts; Electronic Signature</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. The Parties may execute this Agreement in any number of duplicate originals, including by facsimile, electronic mail, or other electronic means, and the respective signatures of the Parties need not appear on the same counterpart. The delivery of a counterpart signature page by facsimile,

electronic mail, or other electronic means shall constitute execution and delivery of this Agreement by the delivering Party to the other Party.

(e)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, and this Agreement supersedes any and all prior agreements between them, whether oral or written, relating to the subject matter hereof; *provided, however*, that the foregoing shall in no way affect any right to indemnification that Indemnitee may have pursuant to the Governing Document(s), applicable law, or otherwise, in addition to this Agreement.

(f)    <u>Further Assurances</u>. The Parties agree and covenant that at any time and from time to time each shall promptly execute and deliver to the other Party such further instruments and take such further action as one Party may reasonably require of the other in order to carry out the full intent and purpose of this Agreement.

(g)    <u>Governing Law; Venue</u>. This Agreement shall be deemed to have been made and delivered in the State of Delaware, and construed in accordance with the laws of that state without regard to principles of conflicts of law. Any controversy, dispute, or claim arising from or relating to this Agreement, including, not limited to, the breach, enforcement, interpretation, or termination of this Agreement (each, a "**Dispute**"), shall be brought in the state or federal courts located in Wilmington, Delaware, and the Parties each irrevocably waive (to the fullest extent permitted by applicable law) any objection they each may now or hereafter have to the laying of the venue of any dispute in any such court or that a Dispute brought in any such court has been brought in an inconvenient forum. Further, without limiting the foregoing, the Parties agree that service of process by one Party on the other in the manners provided in <u>Section 6(i)</u> shall be deemed effective service of process; *provided, however*, that service of process performed by way of email must be accompanied by a courtesy copy of service of process by way of certified mail, return receipt requested.

(h)    <u>Notices</u>. Any notices and other communications required or permitted to be given under this Agreement shall be made in writing and shall be deemed to have been duly given (i) when received by the receiving Party if transmitted by United States registered or certified mail, return receipt requested, to the receiving Party's address set forth on the signature page hereto, (ii) two (2) business days from the date transmitted to a receiving Party if transmitted by overnight or express mail, (iii) one (1) calendar day from the date transmitted to the receiving Party if sent by email at the receiving Party's email address set forth on the signature page hereto, or (iv) the date transmitted to the receiving Party if delivered in person to the receiving Party at the receiving Party's address set forth on the signature page hereto.

(i)    <u>Severability</u>. If any part of this Agreement shall be declared or held invalid for any reason, such invalidity shall not affect the validity of the remainder which shall continue in force and effect and be construed as if this Agreement had been executed without the invalid portion and it is hereby declared the intention of the parties hereto that this Agreement would have been executed without reference to any portion which may, for any reason, be hereafter declared or held invalid.

(j)    <u>Specific Enforcement</u>. Each Party acknowledges that the breach of this Agreement would cause irreparable damage to other Party, and that money damages or other legal remedies would not be an adequate remedy for any such damages. Therefore, the obligations of the Parties under this Agreement shall be enforceable by a decree of specific performance and appropriate injunctive relief may be applied for and granted in connection therewith without the requirement of posting bond or other security. All remedies hereunder, including those remedies this <u>Section 6(j)</u>contemplates, shall be cumulative and not exclusive and shall be in addition to any other remedies that a Party may have under this Agreement or otherwise. No exercise of any right or remedy by a Party shall be construed as an election of remedies by that Party.

(k)    <u>Waiver</u>. Compliance with any provision of this Agreement may be waived only if such

waiver is approved in writing by the Party entitled to the benefit thereof. The failure of a Party to terminate or enforce any provisions of this Agreement upon the occurrence of any event of a breach of this Agreement by the other Party will not be construed as a waiver or relinquishment of rights of the non-breaching Party, and this Agreement shall remain of full force and effect.

The undersigned have duly executed this Non-Disclosure Agreement as of the earlier date of their respective signatures below.[1]

**Disclosing Party:**

| | | |
|---|---|---|
| _____ signature | dheller@hellercg.com _____ email | |
| Prestige Fund B IV, LLC _____ name | 415 N. Prince St. Suite 200 _____ address | |
| Daryl Heller _____ signatory | Lancaster, PA 17603 _____ | |
| Limited Liability Company Manager* _____ title | _____ date | |

*A limited liability company manager of Prestige Investment Group, LLC, a limited liability company manager of Prestige Funds Management, LLC, and a limited liability manager of Disclosing Party.

**Recipient:**

| | | |
|---|---|---|
| _____ name | _____ email | |
| _____ signature | _____ address | |
| _____ signatory | _____ | |
| _____ title | _____ date | |

---

[1] If signing on behalf of a legal entity, (i) identify the name of the legal entity for "**name**," (ii) identify the name of the natural person signing on behalf of the legal entity for "**signatory**,"  and (iii) identify the title that natural person holds with respect to the legal entity for "**title**." If signing on behalf of yourself as a natural person, then please disregard "**signatory**" and "**title**." Please provide all information requested.

COPY NO: _____
PRESENTED TO: _____

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
OF
PRESTIGE FUND B IV, LLC



Dated: March 23, 2021

Prestige Fund B IV, LLC is offering for sale up to an unlimited number of limited liability company membership interests and is accepting up to $100,000.000.00, with a minimum capital contribution of $52,000.00 per investor and a requirement that capital contributions be made in multiples of $52,000.00. The offering shall terminate within eighteen (18) months from the first date on which the offering commences. Prestige Fund B IV, LLC is undertaking such offer and sale on a "best efforts" basis, meaning the company is not required to sell any predetermined amount of securities before it may use proceeds of its sale of securities. No assurance can be given that all or any portion of the securities offered hereby will be sold.

---

The investment opportunity contemplated herein involves a high degree of risk.
Please refer to "**Risk Factors**" on page 10 herein.

---

NEITHER THE SECURITIES AND EXCHANGE COMMISSION ("**SEC**") NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES REFERENCED HEREIN OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS PRIVATE PLACEMENT MEMORANDUM OF PRESTIGE FUND B IV, LLC (THIS "**MEMORANDUM**"). ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND ARE BEING OFFERED PURSUANT TO EXEMPTION FROM REGISTRATION THEREUNDER, SPECIFICALLY RULE 506(C) OF REGULATION D PROMULGATED UNDER THE ACT ("**RULE 506(C)**").

THIS MEMORANDUM HAS BEEN PREPARED ON A CONFIDENTIAL BASIS SOLELY FOR THE BENEFIT OF "ACCREDITED INVESTORS," AS THAT TERM IS DEFINED AND SET FORTH UNDER RULE 501 OF REGULATION D, AS SUCH TERMS ARE USED IN THE CONTEXT OF RULE 506(C), EACH AS PROMULGATED UNDER THE ACT. THERE IS NO PUBLIC MARKET FOR ANY SECURITIES OF THE COMPANY, AND IT IS NOT EXPECTED THAT THERE WILL BE A MARKET FOR ANY SECURITIES OF THE COMPANY IN THE FORESEEABLE FUTURE, INCLUDING THE OFFERED SECURITIES.

YOUR PARTICIPATION IN THIS OFFER OF SECURITIES ENTAILS A HIGH DEGREE OF RISK. THE OFFERING IS SPECULATIVE AND SUITABLE ONLY FOR INVESTORS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES AND NO NEED FOR LIQUIDITY IN AN INVESTMENT IN THE COMPANY. FURTHER, PARTICIPATION IN THIS OFFER OF SECURITIES SHOULD ONLY BE UNDERTAKEN BY INVESTORS WHO UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE TAX CONSEQUENCES AND OTHER RISK FACTORS ASSOCIATED THEREWITH, AND WHO CAN BEAR THE SUBSTANTIAL ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD. SEE "**RISK FACTORS**" HEREIN.

THE SECURITIES REFERENCED HEREIN ARE OFFERED, AND SHALL BE SOLD, SUBJECT TO THE PROVISIONS OF THIS MEMORANDUM, AND A SUBSCRIPTION AGREEMENT CONTAINING CERTAIN REPRESENTATIONS, WARRANTIES, TERMS, AND CONDITIONS OF AN INVESTOR. ANY INVESTMENT IN THE SECURITIES REFERENCED HEREIN SHOULD BE MADE ONLY AFTER A COMPLETE AND THOROUGH REVIEW OF THE PROVISIONS OF THIS MEMORANDUM, SUCH SUBSCRIPTION AGREEMENT, AND SUCH OPERATING AGREEMENT.

THIS CONFIDENTIAL MEMORANDUM MAY NOT BE SHOWN OR GIVEN TO ANY PERSON OTHER THAN THE PERSON WHOSE NAME APPEARS ABOVE, WHO AGREES TO RETURN IT AND ANY OTHER DOCUMENTS MADE AVAILABLE BY THE COMPANY, AND MAY NOT BE PRINTED OR REPRODUCED IN ANY MANNER WHATSOEVER. FAILURE TO COMPLY WITH THIS DIRECTIVE CAN RESULT IN A VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, AND/OR THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THESE MATERIALS, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF THE CONTENTS BY AN OFFEREE IS UNAUTHORIZED. PLEASE SEE SECTION ENTITLED "FURTHER INFORMATION."

Prestige Fund B IV, LLC, a Delaware limited liability company (the "**Fund**," "PFB," "we," "us," "our" or "Company"), is presently undertaking and offer to issue limited liability company membership interests to unaffiliated third-parties who are accredited investors ("**Investor(s)**"). Investors will be required to make capital contributions to the Fund in multiples of $52,000.00 (the "**Minimum Contribution**"). The Fund will utilize Investor funds to purchase, operate, and maintain automatic teller machines ("**ATM(s)**"). The Fund will utilize third-party service providers to handle such purchase, operation, and maintenance of new or used ATMs. The Fund is accepting up to $100,000,000.00 of capital contributions. The offering shall terminate within eighteen (18) months from the first date on which the offering commences.

Investors are being offered the opportunity to acquire a limited liability company membership interest of the Fund ("**Interest(s)**"), as that term is defined within that Limited Liability Company Operating Agreement of PFB included herewith (the "**Operating Agreement**"). Interests represent a passive investment in the Fund and shall not entitle an Investor to management rights or any operational interests in the Fund, which shall be managed by Prestige Funds Management, LLC (the "**Manager**"). The acquisition of an Interest shall be made by and through that Subscription Agreement included herewith (the "**Subscription Agreement**").

This Memorandum is proprietary and confidential and is for an intended recipient's use in

considering the acquisition of an Interest alone. Neither this Memorandum nor any other documentation made available by the Fund or any affiliate of the Fund may be reproduced, duplicated, or transmitted in whole or in part. An Investor should review this Memorandum, the Operating Agreement, and the Contribution Agreement with their independent legal counsel, financial and tax advisers, and other advisers in considering whether to acquire an Interest. Other than the information made available in this Memorandum, the Fund and its affiliates will not offer an Investor any legal, financial, tax, or otherwise advice concerning the Investor's acquisition of an Interest. An Investor not wishing to acquire an Interest must return to the Fund this Memorandum and any other documentation made available by the Fund or any affiliate of the Fund in their entirety.

## TABLE OF CONTENTS

1.    Summary ................................................................................................................... 7

2.    Risk Factors ........................................................................................................... 10

    A.    Cautionary Note Regarding Forward-Looking Statements .................................. 10

    B.    Risks Related to the Offer and Issuance of Interests ........................................... 11

        i.    The Fund is newly formed with limited operating history. Investors will not have the benefit of reviewing its past performance. ................................................................ 11

        ii.    No market studies have been or will be performed regarding the offer and issuance of Interests. 11

        iii.    The Manager will have broad discretion in the use of proceeds raised by the offer and issuance of Interests to identify, acquire, manage, operate and maintain new or used ATMs. 11

        iv.    An Investor acquiring an Interest will have little to no control over the Fund's operations. 11

        v.    The Fund's future issuance of additional equity securities in connection with financings, investments, or otherwise may dilute an Investor's holding in Interests ..................... 11

        vi.    There will be no public market for the equity securities of the Fund. Interests will be illiquid. 12

        vii.    The offer and issuance of Interests is subject to risks arising under federal and state securities laws ......................................................................................................... 12

        viii.    The Fund may become subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). ....................................................................................... 12

        ix.    Investors will no right to withdraw capital from the Fund. ..................................... 13

        x.    The offer and issuance of Interests is being undertaken on a "best efforts" basis. .... 13

        xi.    The Fund is not registered, and the Manager does not intend for the Fund to register, an investment company ................................................................................... 13

        xii.    Neither the Manager nor any affiliate of the Manager is registered as an investment adviser. .......................................................................................................... 13

        xiii.    An instance of incompliance by the Fund's engaged broker could adversely affect the Fund. .......................................................................................................................... 14

        xiv.    The Fund shall return an Investor's proceeds if the Manager determines, in its sole and reasonable discretion, that it is unable to utilize the Investor's funds. ........................... 14

        xv.    The offer and sale of Interests is subject to an arbitrary offering price. ................. 14

        xvi.    We will not be required to publicly report. Therefore, our investors will receive less information than they might expect to receive from public companies. .................................. 14

    C.    Risks related to the Fund's Intended Business and the Management Company's Operations ........................................................................................................................ 14

        i.    Acquisitions, investments, or significant commercial arrangements could result in operating losses. ............................................................................................................. 14

ii.    The Fund's results of operations may vary from quarter-to-quarter and year-to-year. The Fund's results of operations in a certain financial period may not be indicative of, or comparable to, future results of operations in subsequent financial periods. ............................... 15

iii.    Data loss or security breaches could harm the Fund's business, reputation, brand, and results of operations. ........................................................................................................... 15

iv.    The Fund competes against traditional and novel solutions to financial services and the services it offers. The Fund may also face competition from new competitors. ............... 16

v.    The proliferation of payment options and increasingly frictionless methods of payment other than cash, including credit cards, stored-value debit cards, contactless, and mobile payments options could result in a reduced need for cash in the marketplace and a resulting decline in the usage of our ATMs. .................................................................................. 16

vi.    Factors adversely affecting the financial markets and global economy could impact the Fund's results of operations. ................................................................................ 16

vii.    The Fund is heavily reliant upon the experience and expertise of the Manager and other key employees, consultants, and other agents. The failure to retain or motivate any of such persons could adversely affect the Fund. ......................................................... 17

viii.    The Fund's business is subject to a wide range of laws and regulations. The Fund's failure to comply with regulatory, legislative or self-regulatory/standard developments could adversely affect the Fund's results of operations. ................................................................. 17

ix.    The passage of legislation banning or limiting the fees we receive for transactions conducted on our ATMs would severely impact our revenues and our operations. ..................... 17

x.    The Fund's accounted or reported results of operations may be adversely affected by changes in accounting principles generally accepted in the United States. .............................. 17

xi.    The failure of any bank in which the Fund deposits its funds could reduce the amount of cash the Fund has available for operation .................................................................... 17

xii.    The Fund is required to indemnify the Manager and other agents for good faith actions taken on the Fund's behalf ............................................................................................... 18

xiii.    ATMs held by the Fund may be repurchased by a third-party management company servicing them for the Fund ............................................................................................. 18

xiv.    We will need to attract additional capital to scale our business but have no assurance that we can do so successfully ................................................................................... 18

xv.    The occurrence of any of the risk factors herein could cause the Management Company to become unprofitable, then our Fund may be unable to make distributions ............... 18

D.    Tax-Related Risks ................................................................................................. 18

i.    Interests may not be suitable for acquisition by Benefit Plans. .................................. 18

ii.    The Manager does not intend for the Fund's profits to be taxed at the entity level. Changes to existing tax laws and could adversely affect Investors holding Interests ................... 19

iii.    A change in the tax treatment of the Fund could affect its ability to use net operating losses to offset future taxable income. ........................................................................ 19

iv.    The Manager cannot guarantee that the Fund or an Investor will never be subject to an adverse tax consequence. ................................................................................................ 19

v.    Investors holding Interests may be subject to phantom income. ............................... 19

3.     Use of Proceeds ............................................................................................................... 20

4.     Determination of Offering Price ....................................................................................... 20

5.     Dilution ............................................................................................................................ 20

6.     Plan of Distribution.......................................................................................................... 20

7.     Description of the Fund's Securities ................................................................................ 21

8.     Description of Business .................................................................................................... 21

9.     Legal Proceedings............................................................................................................ 22

10.    limited liability company managers, Executive Officers, Promoters, and Control Persons .......... 22

      A.     Biographical Information ................................................................................... 22

             i.   Daryl Heller .......................................................................................... 22

             ii.   Jerry Hostetter........................................................................................ 23

             iii.   William Powers ..................................................................................... 23

      B.     Family Relationships and Involvement in Certain Legal Proceedings ............... 23

11.    Security Ownership of Beneficial Owners and Management .................................................... 24

      A.     Beneficial Ownership of the Fund and the Manager........................................... 24

      B.     Changes in Control............................................................................................. 24

12.    Transactions with Related Persons, Promoters, and Certain Control Persons ............................ 24

      A.     Daryl Heller's Interest in Paramount .................................................................. 25

      B.     Indemnification of the Manager and other Agents ............................................. 25

13.    Disclosure of Commission Position on Indemnification for Securities Act Liabilities ................. 25

14.    Narrative Summary of the Operating Agreement ................................................................... 25

15.    Subscription Procedures........................................................................................................ 27

16.    Further Information................................................................................................................ 29

1. <u>**SUMMARY**</u>

The following summary is qualified in its entirety by reference to the more detailed information included elsewhere in this Memorandum. Capitalized terms used in the following summary but not previously defined within this Memorandum have those meanings given to them in the following, full text of this Memorandum beginning on page 10 herein.

*Risk Factors*        Acquiring an Interest involves a high degree of risk. If the Fund is unable to manage these risks, the Fund may not meet its business objectives, and an Investor may lose some or all of the value of their investment in the Fund. The following is a summary of the material risks that the Manager believes are most relevant to an investment in the Fund. However, this summary does not replace a complete review of "*Risk Factors*" herein:

- The Fund is a newly formed legal entity with limited operating history, so Investors will not have the benefit of reviewing its prior performance.

- The Manager has sole and broad discretion in the use of proceeds from Investors to identify, acquire, manage, operate and maintain new or used ATMs, and Investors holding Interests will have little to no control over the Fund's ATM operations.

- There is and will not be a public market for Interests.

- Investors will have no right to withdraw capital from the Fund.

- The offer and issuance of Interests is being undertaken on a "best efforts" basis. The Fund may be undercapitalized to achieve its intended business objectives.

- The Fund is not registered, and the Manager does not intend for the Fund to Register, as an investment company. Investors holding membership interests will not be afforded protections under the Investment Company Act of 1940.

- Neither the Manager nor its affiliates are registered as investment advisers, and to the Fund's knowledge no such persons intend to register, as investment advisers. Investors holding Interests will not be afforded protections under the Investment Advisers Act of 1940.

- The Fund's results of operations may vary among separate financial periods, and its results of operations in any financial period may not be indicative of its future performance.

- The Fund operates in a fragmented market, and competes with existing and novel businesses within the greater financial services industries. No guarantee can be made that the Fund will profitably compete with such business.

- Factors adversely affecting the financial markets and global economy, which are outside of the Fund and the Manager's control, could adversely affect the Fund's results of operations.

- The Fund is required to indemnify certain of its agents for actions taken on the Fund's behalf. Costs incurred by the Fund in satisfying such

indemnification obligations could adversely affect its results of operations.

- The Fund is presently taxed as a "partnership" for federal income tax purposes. Investors holding Interest may experience phantom income as a result. Separately, an Investor holding an Interest shall be solely responsible for accounting and reporting their personal tax obligations arising from and relating to their holding of an Interest.

**Use of Proceeds**

The Fund intends to use the entirety of an Investor's capital contribution to purchase and operate ATMs.

**Plan of Distribution**

The offer and issuance of Interests is not being underwritten. The Fund intends to sell Interests by and through the Manager and its own limited liability company managers and controlling persons. The offer and issuance of Interests is being undertaken on a "best efforts" basis.

The Fund has engaged at least one broker, to serve as a broker in the offer and issuance of Interests hereby. We reserve the right to engage additional brokers and replace any broker at any time, in our sole discretion. For example, the Fund shall pay the broker a monthly fee of up to $45.00 for the term of the Fund (approximately seven (7) years), for each $52,000.00 contributed to the Fund by an Investor originated by a particular broker,

**Description of the Fund's Securities**

The Fund is authorized to issue an unlimited number of Interests. An Investor holding an Interest will not be entitled to dividends from the Fund, other than distributions customarily made by a limited liability company to its limited liability company members. The Manager intends to make monthly distributions of capital derived from the operation of the Fund's ATMs.

The Manager intends to make distributions of capital on a monthly basis on the 25th of each month.  At the sole discretion of the Board of Managers, after taking into account the Company's financial position and any contractual provisions imposed on the ability of the Company to make such distributions, and, if made, will be made as follows: (i) to the Members in proportion to their relative ownership of the issued and outstanding Membership Interests, the amount of one thousand ninety-two dollars ($1,092.00) per month for eighty-four months for each fifty-two thousand dollars ($52,000.00) of Capital Contributions made by a Member, amounting to twenty-five and two-tenths percent (25.2%) as of the date of a distribution ("Preferred Return"); and (ii) if any advertising revenue associated with ATMs ("Advertising Revenue"), is received by the Company, Members, in proportion to their relative ownership of the issued and outstanding Membership Interests, contemporaneously shall receive twelve percent (12%) of the Advertising Revenue; and then (iii) to the Managers. Interests will be "restricted securities" for purposes of the Act and shall be further limited in transferability by the Operating Agreement, which provides for a customary right of first refusal in favor of the Company and other Members.

**Limited Liability Company Managers, Executive Officers,**

Presently, the Manager is the one (1) limited liability company manager of the Fund. Please refer to section entitled "Security Ownership of Beneficial Owners and Management" to learn more about the control

| ***Promoters, and Control Persons*** | persons of the Manager. |
| --- | --- |
| ***Transactions with Related Persons, Promoters, and Certain Control Persons*** | Transactions occurring among the Fund, the Manager, and their respective affiliates include: |

- An affiliate of the Manager has a beneficial pecuniary interest in a potential third-party operator of the Fund's ATMs. This beneficial pecuniary interest means the affiliate may derive significant income from the operations of the Fund's ATMs.

**[*The full text of this Memorandum follows.*]**

2.    RISK FACTORS

The acquisition of an Interest involves a high degree of risk. An Investor should carefully consider the risks described below in addition to other information set forth in this Memorandum and other documentation and information made available by the Fund before deciding to acquire an Interest. The risks and uncertainties described below are not exhaustive. Additional risks and uncertainties not presently known or that the Manager currently deems immaterial may also impair the Fund's results of operations. An Investor may lose some or all of the value of their investment in the Fund.

A.    **Cautionary Note Regarding Forward-Looking Statements**

Statements included in this Memorandum and other documentation and information made available by the Manager that are not historical facts (including, but not limited to, any statements concerning investment objectives, other plans, and objectives of the Fund for future operations or economic performance, or assumptions or forecasts related thereto) are forward-looking statements. These statements are only predictions. Forward-looking statements are not guarantees. Actual events or the Fund's results of operation could differ materially from those expressed or implied in forward-looking statements. Forward-looking statements are typically identified by the use of terms such as "may," "will," "should," "expect," "could," "intend," "plan," "anticipate," "estimate," "believe," "continue," "predict," "potential," or the negative of such terms and other comparable terminology.

Forward-looking statements included in this Memorandum and other documentation and information made available by the Manager are expectations, plans, estimates, assumptions, and beliefs, which involve numerous risks and uncertainties. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions, and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the Fund's control. Although the Manager believes that the expectations reflected in forward-looking statements are based on reasonable assumptions, actual results and performance could differ materially from those set forth in such forward-looking statements. There can be no assurance that (i) the Manager has correctly measured or identified all of the factors affecting the Fund's business, or the extent or likelihood of their impact, (ii) any information with respect to these factors on which the Manager's analysis is based is complete or accurate, (iii) the Manager's analysis is correct, or (iv) the Manager's strategy for the Fund, which is based in part on its analysis, will be successful.

Investors are cautioned not to place undue reliance on any forward-looking statements. All forward-looking statements are made as of the date of this Memorandum, and the risk that actual results will differ materially from the expectations expressed in this Memorandum and other documentation and information made available by the Manager will increase with the passage of time. Except as otherwise required by the federal securities laws, the Fund undertakes no obligation to update or revise any forward-looking statements after the date of this Memorandum, whether as a result of new information, future events, changed circumstances, or any other reason. In light of the significant uncertainties inherent in forward-looking statements included in this Memorandum and other documentation and information made available by the Manager, the inclusion of forward-looking statements should not be regarded as a representation by the Fund, the Manager, or any other person that the objectives and plans set forth in this Memorandum and other documentation and information made available by the Manager will be achieved.

### B.    Risks Related to the Offer and Issuance of Interests

**i.    The Fund is newly formed with limited operating history. Investors will not have the benefit of reviewing its past performance.**

The Fund is newly formed and has limited operating history. As of March 23, 2021, the Fund has raised $3,328,000 from 16 investors. An Investor will not be able to review the Fund's prior performance to determine the likelihood of it achieving its business objectives. An Investor should consider an investment in Interests in light of the risks, uncertainties, and difficulties frequently encountered by other newly formed companies. An Investor should not rely upon the past performance of the Manager or its affiliates as indicative of the Fund's potential future performance

**ii.    No market studies have been or will be performed regarding the offer and issuance of Interests.**

No studies have been or will have been performed regarding the offer and issuance of Interests by the Fund. The Manager has been independently responsible for determining all aspects of such offer and issuance. The Fund may be unable to sell a sufficient number of Interests to permit it to successfully operate. Even where the Fund sells all the Interests offered, the Fund may nonetheless never become profitable.

**iii.    The Manager will have broad discretion in the use of proceeds raised by the offer and issuance of Interests to identify, acquire, manage, operate and maintain new or used ATMs.**

The Manager will have broad discretion over the specific use of the net proceeds the Fund raises through the offer and issuance of Interests to identify, acquire, manage, operate and maintain new or used ATMs. Except as described herein, the Manager cannot specify with certainty its plans for the use of the net proceeds raised by the Fund through the offer and issuance of Interests. Investors who acquire Interests will be reliant upon the judgment of the Manager with respect to the use of proceeds. If the Manager does not effectively use the proceeds that the Fund raises through the offer and issuance of Interests, then the Fund's business, results of operations, and financial condition could be adversely affected.

**iv.    An Investor acquiring an Interest will have little to no control over the Fund's operations.**

An Investor will have minimal to no control over the operations of the Fund, and must rely exclusively the Manager to operate the Fund's business. The Manager will have wide authority to make decisions regarding the Fund and its day-to-day operations, and may take actions with which an Investor disagrees. The Manager is under no obligation to make its' decisions in accordance with the wishes of investors.  Investors will have limited rights to object to the actions of the Fund's Manager.

**v.    The Fund's future issuance of additional equity securities in connection with financings, investments, or otherwise may dilute an Investor's holding in Interests.**

The Manager may cause the Fund to issue additional equity securities (or securities convertible into, or redeemable for, additional equity securities) in the future that will result in dilution to Investors holding Interests. This may occur through grant equity awards to limited liability company managers, executive officers, employees, and consultants of the Fund, raising capital through equity financings in the future, acquiring or making investments in complementary companies, products, or technologies, as part of a debt financing transaction, or otherwise. Any such issuances of additional equity securities by the Fund may cause Investors holding Interests to experience a dilution with respect to such holding.

**vi.     There will be no public market for the equity securities of the Fund. Interests will be illiquid.**

There will be no public market for the equity securities of the Fund. Further, because Interests are being offered and sold in accordance with exemptions from the registration or qualification requirements of federal and state securities laws, the resale or transfer of Interests will be highly restricted. An Investor desiring to resell or transfer Interests will have to fully comply with and pay all of the costs associated with such resale or transfer. An Investor must be prepared to indefinitely hold Interests.

If the Fund undertakes a public offering in the future, the price at which its equity securities are initially offered to the public or subsequently trade may be lower than the capital contribution for which they were acquired by an Investor. We do not have any plans at the present time to undertake a public offering in the future.  However, such prices for the Fund's equity securities will be influenced by a number of factors outside of the Manager and the Fund's control, including but not limited to:

- the subsequent issuance of equity securities by the Fund;
- changes in interest rates;
- competitive developments, including announcements by the Fund or competitors of new products or services or significant contracts, acquisitions, strategic partnerships, joint ventures, or capital commitments;
- variations in the Fund's results of operations;
- the depth and liquidity of the market for the equity securities of the Fund, and comparable securities generally; and
- the markets' perceptions of the Fund.

**vii.     The offer and issuance of Interests is subject to risks arising under federal and state securities laws.**

The offer and issuance of Interests is being undertaken pursuant to the exemption from registration provided under Rule 506(c). As part of the offer and issuance of Interests, the Fund is representing that this Memorandum and any other documents and information made available by the Manager do not contain any untrue statements of a material fact nor omit any material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. However, if this representation is inaccurate with respect to a material fact or if the offer and issuance of Interests fails to qualify for an exemption from registration or qualification under federal or state securities laws, then an Investor may have the right under federal or state securities laws to rescind their contribution and receive their contribution back in full, plus interest (less income received upon the tender of the interest acquired by them). If an Investor were to successfully seek rescission, the Fund could face severe financial demands that could adversely affect either, or non-rescinding Investors.

**viii.     The Fund may become subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA").**

The Department of Labor ("**DOL**") has published regulations describing when the underlying assets of an entity, such as the Fund, which has taken on investment by certain employee benefit plans subject to ERISA and other benefit plans subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "**Code**," and such plans, "**Benefit Plan Investors**"), constitute "plan assets" for purposes of ERISA and Section 4975 of the Code. Where a Benefit Plan Investor acquires an equity interest in an entity that is neither (i) a "publicly offered security," nor (ii) a security issued by an investment company registered under the Investment Company Act of 1940, as amended (the "**Company Act**"), then the plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity,

unless it is established that the entity is an "operating company" or the equity participation in the entity by Benefit Plan Investors is not "significant." Equity participation in an entity by Benefit Plan Investors is considered "significant" if, immediately after any acquisition or redemption of an equity interest, twenty-five percent (25%) or more of the value of any class of equity interests in the entity is held by such Benefit Plan Investors. If Interests were considered "plan assets," then the Fund would be a "fiduciary" for purposes of ERISA with respect to an Investor holding Interests. Moreover, the Manager or the Fund could become subject to ERISA and Section 4975 of the Code. That may limit the Fund's ability to direct the Fund's operations, and thereby its ability to achieve its investment objectives. This may adversely affect the Fund's results of operations.

**ix.    Investors will no right to withdraw capital from the Fund.**

Investors holding membership interests will have no right to withdraw capital from the Fund, irrespective of the balance of their respective capital accounts at any point in time. An Investor will be fully exposed to the risk of the Fund's performance.

**x.    The offer and issuance of Interests is being undertaken on a "best efforts" basis.**

The offer and issuance of Interests is being undertaken on a "best efforts" basis. This means that the Fund is not required to raise any requisite amount of funds before proceeds may be used for the business purposes contemplated herein. If the Fund is unable to sell a sufficient number of Interests, the Fund may be unable to achieve its intended business objectives.

**xi.    The Fund is not registered, and the Manager does not intend for the Fund to register, an investment company.**

To the Manager's knowledge, the intended business of the Fund—the purchase, operation, and maintenance of ATMs—does not subject the Fund to the Investment Company Act of 1940, as amended (the "**Company Act**"). Specifically, to the Manager's knowledge, the intended business of the Fund would not implicate the definition of "investment company" under Section 3(a) of the Company Act, and/or would qualify for the exemption from such definition recognized in Section 3(b)(1) of the Company Act. Further, to the extent the Fund's intended business would implicate the definition of "investment company," the Fund intends to qualify for the exemption from such definition applicable to a "private fund" under Section 3(c)(1) of the Company Act. Accordingly, the Fund is not registered, and the Manager does not intend for the Fund to register, as an investment company, and investors will not be afforded any protections otherwise available under the Company Act.

However, the Fund cannot guaranty that neither the SEC nor any state securities regulator will agree with its determination that the Fund's intended business does not implicate the Company Act, or that it would in fact qualify as a Section 3(c)(1) private fund. If the Fund were required to register as and comply with the obligations applicable to an investment company, such registration and compliance could adversely affect the Fund's business operations and limit its ability to successfully manage and operate ATMs.

**xii.    Neither the Manager nor any affiliate of the Manager is registered as an investment adviser.**

To the Manager's knowledge, the intended business of the Fund does not subject either the Manager or any affiliate of the Manager to the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), or equivalent state laws. Specifically, to the Manager's knowledge, the intended business of the Fund would not implicate the definition of "investment adviser" under Section 202(a)(11) of the Advisers Act. Accordingly, the Manager is not registered, and does not intend to register, as an investment adviser, and

to the Fund's knowledge, no affiliate of the Manager is registered, and none intend to register, as investment an adviser. Investors will not be afforded any protections otherwise available under the Advisers Act.

However, the Fund cannot guarantee that either the SEC or any state securities regulator will agree with the determination of the Manager and its affiliates that the Fund's intended business does not subject them to the Advisers Act. If the Manager was or any of its affiliates were required to register and comply with the obligations applicable to investment advisers, such registration and compliance could adversely affect the Fund's business operations and limit its ability to successfully manage and operate ATMs.

**xiii.    An instance of incompliance by the Fund's engaged broker could adversely affect the Fund.**

The Fund has engaged at least one broker, to serve as a broker in the offer and issuance of Interests hereby. We reserve the right to engage additional brokers and replace any broker at any time, in our sole discretion.  For example, the Fund shall pay the broker a monthly fee of up to $45.00 for the term of the Fund (approximately seven (7) years), for each $52,000.00 contributed to the Fund by an Investor originated by a particular broker.  Our broker or brokers we work with will be subject to a range of obligations arising from their status as a registered broker and service to the fund in the offer and issuance of Interests hereby. If our broker or brokers were to be incompliant with its obligations as a registered broker, the Fund could be adversely affected.

**xiv.    The Fund shall return an Investor's proceeds if the Manager determines, in its sole and reasonable discretion, that it is unable to utilize the Investor's funds.**

If the Fund, in the Manager's sole and reasonable discretion, is unable to utilize an Investor's funds for the Fund's intended investment purposes within four (4) months of accepting an Investor's funds, then the Fund shall rescind an Investor's investment. In such event, the Fund shall return to an Investor their contributed capital within ten (10) days without interest.

**xv.    The offer and sale of Interests is subject to an arbitrary offering price.**

The offering price of the Interests has been determined through the Manager's control persons' experience with similar investment opportunities, its consultation with outside consultants, and the anticipated expenses to be incurred by the Company. The offering price of the Interests is not indicative of the Company's value, or the present or future value its assets. No assurance will be or could be given that Interests, if resellable or transferable, could be resold or transferred for the price at which they will be offered to Investors (or for any amount).

**xvi.    We will not be required to publicly report. Therefore, our investors will receive less information than they might expect to receive from public companies.**

We will be not be required to publicly report.  Therefore, our investors will receive less information than they might expect to receive from public companies. The Fund is not a "reporting company" for purposes of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). Accordingly, the Fund does not and will not file with the SEC (or with any state securities commission) any audited or unaudited financial statements or other information required of a reporting company under the Exchange Act.

**C.    Risks related to the Fund's Intended Business and the Management Company's Operations**

**i.    Acquisitions, investments, or significant commercial arrangements could result in operating losses.**

In the normal course of business, the Fund may enter into other significant commercial arrangements with one (1) or more third-parties. Accordingly, the Fund's success will depend, in part, on the success of such commercial arrangements, which may not materialize for reasons outside of the Fund's control. Such reasons may include, but will not be limited to:

- failing to achieve anticipated benefits, revenue, earnings, or cash flows from a commercial arrangement.

- expected and unexpected risks with pursuing a commercial arrangement, including regulatory exposure, unfavorable accounting treatment, increases in tax liabilities, a loss of anticipated tax benefits, or costs incurred in obtaining governmental approvals necessary to effectuate an investment; and

- having to indemnify commercial counterparties.

Moreover, the Fund will heavily rely on the representations and warranties made, and the indemnity obligations undertaken, by its commercial counterparties. If the representations and warranties made by a commercial counterparty are inaccurate or are breached, or if the Fund is unable to fully exercise any indemnification rights it may have, the Fund may incur additional, uncovered liabilities. The Fund may be required to incur costs to enforce its contractual rights through litigation.

**ii.      The Fund's results of operations may vary from quarter-to-quarter and year-to-year. The Fund's results of operations in a certain financial period may not be indicative of, or comparable to, future results of operations in subsequent financial periods.**

The Manager expects that the Fund's results of operations will vary from quarter-to-quarter and year-to-year, and that the results the Fund achieves in a financial period may not be indicative of, or comparable to, the results of operations the Fund will achieve in a subsequent period. Accordingly, period-to-period comparisons of the Fund's results of operations may never be meaningful, and an Investor cannot rely upon them as an indication of future performance.

**iii.      Data loss or security breaches could harm the Fund's business, reputation, brand, and results of operations.**

Security breaches, computer malware, and computer hacking attacks have become more prevalent across industries and may occur on the Fund's systems or those of its third-party service providers. Despite the implementation of security measures, the Fund's internal computer systems and those of its third-party service providers and partners are vulnerable to damage from computer viruses, hacking, and other means of unauthorized access, denial of service and other attacks, natural disasters, terrorism, war, and telecommunication and electrical failures. Attacks upon information technology systems are increasing in their frequency, levels of persistence, sophistication, and intensity, and are being conducted by sophisticated and organized groups and individuals with a wide range of motives and expertise. In addition to unauthorized access to or acquisition of personal data, confidential information, intellectual property, or other sensitive information, such attacks could include the deployment of harmful malware and ransomware, and may use a variety of methods, including denial-of-service attacks, social engineering, and other means, to attain such unauthorized access or acquisition, or otherwise affect service reliability and threaten the confidentiality, integrity, and availability of information. Furthermore, the prevalent use of mobile devices increases the risk of data security incidents. Additionally, misplaced, stolen, or compromised mobile devices could lead to unauthorized access to the device and data stored on or accessible through such device. The Fund may experience breaches of its security measures, and their systems may be at risk for future breaches as a result of third-party action or employee, service provider, partner, or contractor error or malfeasance.

If an actual or perceived breach of security occurs, the market perception of the effectiveness of the Fund's security measures could be harmed. The Fund could lose third-party relationships, face lawsuits, regulatory investigations, or other legal or regulatory proceedings, or lose appealability to potential commercial counterparties. The Fund could suffer financial exposure due to such events or in connection with regulatory fines, remediation efforts, investigation costs, changes, or augmentation of their security measures.

> **iv.    The Fund competes against traditional and novel solutions to financial services and the services it offers. The Fund may also face competition from new competitors.**

The Fund operates in a fragmented market. The Fund competes with a variety of competitors in the greater financial services industry, including traditional financial services such as brick-and-mortar banks, credit cards, and related payment process-based business, and the like. The Fund may also compete with novel entrants into the financial services industry generally. Our competitors could prevent us from obtaining or maintaining desirable locations for our ATMs, cause us to reduce the revenue generated by transactions at our ATMs, or cause us to pay higher merchant fees, thereby reducing our profits. If the Fund is unable to compete with existing or future competitors, the Fund may not be presented with the most valuable investment opportunities available. Some current and potential competitors have significantly more financial, technical, marketing, and other resources available to them, are able to devote greater resources to the development, promotion, sale, and support of services, have more extensive client bases and broader client relationships, and have longer operating histories and greater name recognition. The Fund may also compete with potential entrants into the market that currently do not offer its services, but could potentially leverage their networks in the market in which the Fund operates.

> **v.    The proliferation of payment options and increasingly frictionless methods of payment other than cash, including credit cards, stored-value debit cards, contactless, and mobile payments options could result in a reduced need for cash in the marketplace and a resulting decline in the usage of our ATMs.**

Additionally, some merchants offer free cash back at the point-of-sale ("POS") for customers that utilize debit cards for their purchases, thus providing an additional incentive for consumers to use these cards. Increasingly, frictionless payment options, like contactless, are also being used by consumers.  New payment technology, such as Venmo, Zelle, Square Cash, Facebook Messenger Payments and virtual currencies such as Bitcoin, or other new payment method preferences by consumers could reduce the general population's need or demand for cash and negatively impact our transaction volumes in the future. The proliferation of payment options and changes in consumer preferences and usage behavior could reduce the need for cash and have a material adverse impact on our operations and cash flows. We depend on ATM and financial services transaction fees for substantially all of our revenues, and our revenues would, and profits could, be reduced by a decline in the usage of our ATMs or a decline in the number of ATMs that we operate, whether as a result of changes in consumer spending preferences, global economic conditions or otherwise.

> **vi.    Factors adversely affecting the financial markets and global economy could impact the Fund's results of operations.**

Adverse trends in the economy or the financial markets could adversely affect the Fund's results of operations. During periods of financial market volatility or market slowdown, financial markets have become systemically illiquid, the United States Dollar has become devalued, and general economic activity has slowed down. During such times, investors have historically reduced their discretionary investment activity. The impact that a precedented or unprecedented economic slowdown may have on the Fund's operations cannot be reliably predicted. Similarly, the circumstances under which the economy or financial

market may adversely trend cannot be reliably predicted, but are generally outside of the Fund's control. Such circumstances may include, but will not be limited to, war, acts of terrorism, systemic issues occurring within the financial markets, and pandemic.

      **vii.**    **The Fund is heavily reliant upon the experience and expertise of the Manager and other key employees, consultants, and other agents. The failure to retain or motivate any of such persons could adversely affect the Fund.**

The Fund's success depends on the continued service of the Manager and its other key employees, control persons, consultants, and other agents. The loss of any such persons may delay or prevent the achievement of the Fund's business objectives. The Fund may not be able to hire new employees quickly enough to meet its demands.

      **viii.**    **The Fund's business is subject to a wide range of laws and regulations. The Fund's failure to comply with regulatory, legislative or self-regulatory/standard developments could adversely affect the Fund's results of operations.**

The Fund's business is subject to a wide range of federal, state, and municipal laws and regulations that involve matters central to its business. These include, but are not limited to, laws and regulations concerning the electronic transfer of funds and movement of monies generally and the operation of an ATM specifically. In the U.S., the rules and regulations to which we may be subject include those promulgated under the authority of the Federal Trade Commission, the Electronic Communications Privacy Act, Computer Fraud and Abuse Act, the Gramm Leach Bliley Act and state cybersecurity, privacy, and breach notification laws, as well as regulator enforcement positions and expectations. The interpretation of these laws and regulations by judges, regulatory bodies, and enforcement agencies is changing, often quickly and with little notice. The enforcement of current laws and regulations, or changes in laws and regulations, could impose more stringent operational requirements on the Fund, or could otherwise adversely affect its results of operations.

      **ix.**    **The passage of legislation banning or limiting the fees we receive for transactions conducted on our ATMs would severely impact our revenues and our operations.**

We rely on transaction-based revenues in each of our markets and any regulatory fee limits that could be imposed on our transactions may have an adverse impact on our revenues and profits. If legislation were to be enacted in the future in any of our markets, and the amount we were able to charge consumers to use our ATMs was reduced, our revenues and related profitability would be negatively impacted. Furthermore, if such limits were set at levels that are below our current or future costs to operate our ATMs, it would have a material adverse impact on our ability to continue to operate under our current business model and adversely impact our revenues and cash flows.

      **x.**    **The Fund's accounted or reported results of operations may be adversely affected by changes in accounting principles generally accepted in the United States.**

Generally accepted accounting principles in the United States are subject to interpretation by the Financial Accounting Standards Board ("**FASB**"), the SEC, and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a material effect on the Fund's accounted or reported results of operations, and may even affect the accounting or reporting of transactions completed before the announcement or effectiveness of a change.

      **xi.**    **The failure of any bank in which the Fund deposits its funds could reduce the amount of cash the Fund has available for operation.**

the Manager intends to deposit the cash and cash equivalents of the Fund in bank accounts insured by the Federal Insurance Deposit Corporation ("**FDIC**"). FDIC generally only insures limited amounts per depositor per insured bank. Currently, FDIC is insuring up to two hundred fifty thousand dollars ($250,000.00) per depositor per insured bank for interest-bearing accounts. If the Fund's deposits exceed these federally insured levels or if any of the banking institutions holding its cash fails, the Fund may lose such deposits over the federally insured levels. The loss of such deposits could reduce the amount of cash the Fund has available to utilize in operations.

**xii.    The Fund is required to indemnify the Manager and other agents for good faith actions taken on the Fund's behalf.**

Applicable law and the Fund's governing documents, including but not limited to, its certificate of formation, limited liability company operating agreement, and otherwise, may require the Fund to indemnify the Manager and other agents of the Fund. If such a right to indemnification is exercised, the Fund may be obligated to incur substantial costs in defending or reimbursing the legal costs of the Manager and other agents.

**xiii.    ATMs held by the Fund may be repurchased by a third-party management company servicing them for the Fund.**

Customarily, the terms by which a third-party management company acquires, operates, and maintains ATMs on behalf of the Fund will provide the management company with, effectively, a put option on the ATMs. This put option provides the management company with a right to repurchase ATMs from the Fund at predetermined rates, which vary based upon how long the ATMs have been owned by the Fund. An exercise of this put option by a management company may cause the Fund to realize less of a return on its investments in any ATMs repurchased that it otherwise would.

**xiv.    We will need to attract additional capital to scale our business but have no assurance that we can do so successfully.**

We will be incurring significant costs as we continue to develop our business.  We will need to raise additional capital to pay operating expenses until we are able to generate sufficient revenues.  Our ability to raise additional equity or debt capital will depend not only on progress made developing our business, but also will depend on access to capital and conditions in the capital markets.  There is no assurance that we will be able to raise capital at times and in amounts needed to finance the continued development of our business.  Even if capital is available, it may not be available on terms that we or our investors would consider favorable.

**xv.    The occurrence of any of the risk factors herein could cause the Management Company to become unprofitable, then our Fund may be unable to make distributions.**

The Fund's operations and success are dependent upon the success of our Management Company. In the event that any of the risk factors herein occurs, including those that are unknown or unforeseeable, then our Fund may be unable to make distributions to Members.

**D.    Tax-Related Risks**

**i.    Interests may not be suitable for acquisition by Benefit Plans.**

Benefit Plans considering the acquisition of an Interest should consider the limited liquidity of Interests as it relates to applicable minimum distribution requirements of the Code and the requirements of ERISA. If Interests are held in a benefit plan at the time mandatory distributions are required of the IRA or

benefit plan, a cash distribution may be difficult or impossible. Separately, an investment in Interests may subject a benefit plan to liability for unrelated business taxable income.

### ii. The Manager does not intend for the Fund's profits to be taxed at the entity level. Changes to existing tax laws and could adversely affect Investors holding Interests.

the Manager does not intend for the Fund to elect classification or taxation as a "C-corporation" for federal income tax purposes. As such, the Fund will be classified and taxed as a "partnership" for federal income tax purposes. For federal income tax purposes, the terms "partner(s)" and "member(s)" (of a limited liability company) are synonymous. Subchapter K of the Internal Revenue Code of 1986, as amended (the "**Code**") provides that current-year income or loss of a partnership will be taxed at the partner level, rather than the partnership level. Accordingly, Investors holding Interests will report their allocated share of the Fund's current-year operations directly on their individual federal income tax return. Subchapter K of the Code is complex, and an Investor considering the acquisition of an Interest should consult with their legal and financial advisers regarding the impact of holding Interests.

However, changes to existing laws and regulations relating to taxation are likely to occur, and may adversely affect the taxation of an Investor holding Interests. Alternatively, it may become more advantageous for the Fund to elect to be classified or taxed as a "C-corporation" for federal income tax purposes, and such election could adversely affect how an Investor receives distributions of capital from the Fund. Except as may otherwise be provided by applicable law, the Manager will have sole and absolute discretion to determine how the Fund elects to be classified and taxed for federal income tax purposes

### iii. A change in the tax treatment of the Fund could affect its ability to use net operating losses to offset future taxable income.

In the event the Fund elects to be treated as a "C-corporation" for federal income tax purposes, then net operating losses ("**NOLs**") of the Fund, if any, may not be available to offset taxable income of its limited liability company members in the future. In general, under Section 382 of the Code, an entity taxed as a "C-corporation" that undergoes an "ownership change" is subject to limitations on its ability to utilize its pre-change NOLs to offset future taxable income. If the Fund undergoes an ownership change in connection with or after the offer and issuance of its equity securities in the future, its ability to utilize NOLs could be limited by Section 382 of the Code. There is also a risk that due to regulatory changes, such as suspensions on the use of NOLs or other unforeseen circumstances, the Fund's existing NOLs could expire or otherwise be unavailable to offset future income tax liabilities, including for state tax purposes. For these reasons, the Fund may not be able to utilize some portion of its NOLs, even if it achieves profitability during any given period.

### iv. The Manager cannot guarantee that the Fund or an Investor will never be subject to an adverse tax consequence.

The Manager cannot guarantee that the Internal Revenue Service or local, state, or foreign tax authorities will accept the tax positions taken by the Fund or an Investor holding Interests. If any tax authority successfully contests a tax position taken by the Fund, it or Investors holding Interests may be liable for tax, interest, additions to tax, or penalties, and may need to file or amend prior tax returns to reflect such contested positions. The Manager will not be liable to the Fund or an Investor in such circumstances. Separately, the Manager intends to base the Fund's business strategies on economic, not tax, considerations, which could result in adverse tax consequences to Investors holding Interests.

### v. Investors holding Interests may be subject to phantom income.

For as long as the Fund is taxed as a "partnership" for federal income tax purposes, Investors

holding Interests will be subject to tax each year on their allocable shares of the Fund's income or gains, if any, regardless of whether the Fund has distributed cash or property to such Investors. This is commonly referred to as "phantom income." The tax liability due in respect of such phantom income could be substantial. If the Fund fails to distribute cash or property to such Investors in an amount sufficient to cover their respective tax liabilities, then such Investors would need to find sources of funding to discharge the tax liability due.

## 3.  USE OF PROCEEDS

The Manager intends for the Fund to utilize the entirety of an Investor's proceeds to identify, acquire, manage, operate, and maintain new or used ATMs. The Manager estimates that the Minimum Contribution can be used acquire three (3) to four (4) ATMs, however, the Manager cannot guarantee the exact number of ATMs that will be acquired.   Additionally, notwithstanding the foregoing summary, the offer and issuance of Interests is being undertaken on a "best efforts" basis. This means that the Company is not required to raise any requisite amount of funds before proceeds may be used for the purposes contemplated herein. See "**Risk Factors**" herein.

In the event the Company does not raise the total amount of $100,000,000 through the offer and sale of Interests, the Manager intends to prioritize its use of proceeds using its best judgment. Again, the Manager cannot guarantee that the Company will utilize proceeds in precisely the manner identified above, and cannot guarantee that the Company will be able to achieve its business objectives.

## 4.  DETERMINATION OF OFFERING PRICE

The offer and issuance of Interests is not being underwritten. The Minimum Contribution has been arbitrarily determined by the Manager, and may not reflect the perceived or actual market value of Interests, the book value of Interests, or the value of Interests as measured by other established means of valuation. See "**Risk Factors**" herein.

## 5.  DILUTION

As of March 23, 2021, the Fund has raised $3,328,000 from 16 investors. See "**Description of the Fund's Securities**" herein. Accordingly, there shall be no disparity between the offering price of Interests hereby and the effective cash cost of those interests to the Manager of its affiliates. As the Fund is not limiting the contribution that may be made for an Interest by any Investor, the Fund cannot know what ownership interest an Investor's capital contribution to the Fund will represent in advance of the closing of the offer and issuance of Interests hereby. That said, the Fund anticipates that an Investor acquiring an Interest may experience a dilution of their investment in the event of subsequent contributions of capital and acquisitions of Interests by other Investors until the offer and issuance of Interests is closed.

## 6.  PLAN OF DISTRIBUTION

The offer and issuance of Interests is not being underwritten. The Manager intends to sell Interests by and through the Manager and its own limited liability company managers and controlling persons. The offer and issuance of Interests is being undertaken on a "best efforts" basis. This means that the Fund is not required to raise any requisite amount of funds before proceeds may be used for the business purposes contemplated herein. If the Fund is unable to sell a sufficient number of Interests, the Fund may be unable to achieve its intended business objectives. See "**Risk Factors**" herein.

The Fund has engaged at least one broker, to serve as a broker in the offer and issuance of Interests hereby. We reserve the right to engage additional brokers and replace any broker at any time, in our sole discretion.  For example, the Fund shall pay the broker a monthly fee of up to $45.00 for the term of the

Fund (approximately seven (7) years), for each $52,000.00 contributed to the Fund by an Investor originated by a particular broker.  A failure by any broker engaged by the Fund to comply with its obligations as a registered broker may adversely affect the Fund. See "**Risk Factors**" herein.

## 7.    DESCRIPTION OF THE FUND'S SECURITIES

The Fund is authorized to issue an unlimited number of Interests. An Investor holding an Interest will not be entitled to dividends from the Fund, other than distributions customarily made to limited liability company members by a limited liability company. Distributions will be made through profits of the Fund derived through the Fund's ownership and operation of ATMs. The Manager intends to make distributions of capital on a monthly basis. At the sole discretion of the Board of Managers, after taking into account the Company's financial position and any contractual provisions imposed on the ability of the Company to make such distributions, and, if made, will be made as follows:  (i) to  the Members in proportion to their relative ownership of the issued and outstanding Membership Interests, the amount of one thousand ninety-two dollars ($1,092.00) per month for eighty-four months for each fifty-two thousand dollars ($52,000.00) of Capital Contributions made by a Member, amounting to twenty-five and two-tenths percent (25.2%) as of the date of a distribution ("Preferred Return"); and (ii) if any advertising revenue associated with ATMs ("Advertising Revenue"), is received by the Company, Members, in proportion to their relative ownership of the issued and outstanding Membership Interests, contemporaneously shall receive twelve percent (12%) of the Advertising Revenue; and (iii) to the Managers.

Interests will not be redeemable nor entitle an Investor to any right to transfer their interest therein in whole or in part. As Interests are being offered and issued in accordance with Rule 506(c), they shall be "restricted securities," as defined under Rule 144 promulgated under the Act. Accordingly, an Interest shall be illiquid unless an exemption from registration under the Act is applicable to a sale or transfer of the Interest. Further, to the extent a sale or transfer of an Interest shall be permissible under applicable law, such sale or transfer shall be subject to a customary right of first refusal in favor of the Fund and other Investors holding Interest. See "***Narrative Description of the Operating Agreement***" herein.

## 8.    DESCRIPTION OF BUSINESS

The Fund is a manager-managed, Delaware limited liability company formed in 2020. As a newly formed legal entity, the Fund has not undergone any bankruptcy, receivership, or similar proceedings. Similarly, the Fund has not undergone any material reclassification, merger, consolidation, or purchase or sale of a significant amount of its assets outside of the ordinary course of business. The same is true with respect to the Manager, which is also a newly formed legal entity.

The Fund intends to utilize the entirety of an Investor's capital to purchase, in the Fund's name, as many ATMs as is it can. The Fund shall be solely and exclusively responsible for the installation, operation, and maintenance of the new or used ATMs purchased with an Investor's capital. Where used ATMs are acquired, the Fund may subsequently upgrade them to new ATMs.

The Fund intends to utilize the services of one (1) or more third-parties to handle such installation, operation, and maintenance. One such intended third-party is an affiliate of the Manager, Paramount Management Group, LLC, a Pennsylvania, member-managed limited liability company ("**Paramount**"). The Fund intends for such service providers to bear responsibility for installing, operating, maintenance, insurance, governmental authorizations, and other general costs. In the event Paramount fails to make payment of any sum pursuant to the ATM Management Services Fees provision of a certain ATM Management Services Agreement within twenty (20) days after the Fund provides Paramount with written notice of such failure, the Fund will have the right, upon written notice to Paramount, to immediately terminate its Agreement with Paramount and take over possession of the ATMs. If the Fund exercises such right, Paramount will promptly assign and transfer to the Fund all of its right, title and interest to the ATMs,

the Location Agreements, Permits, ATM passwords and combinations, and all vendor and other contracts or agreements relating to the ATMs (excluding the communication modems installed in any ATMs). The Fund will cooperate with Paramount in regard to any such transfer (including executing such assignments or other agreements as may be reasonably necessary to effect the foregoing) to ensure the assignment and transfer of control of the foregoing takes place in a timely and organized manner. An Investor may review the ATM Management Services Agreement upon request. The Fund intends to acquire its ATMs from such third-party service providers. As of the date of this Memorandum, the Fund does not anticipate that it or such third-party service providers will be unable to obtain ATMs on the Fund's behalf. As a matter of practice, the Fund will not issue an Interest to an Investor if, before doing so, it has knowledge that it or a third-party service provider would be unable to source ATMs on the Fund's behalf using the Investor's monies.

The Fund also intends to utilize bonus depreciation to achieve tax-favorable treatment of its results of operations. The Fund intends to deduct one hundred percent (100%) of the cost of ATMs acquired prior to December 31 of each taxable year to the extent the deduction remains legally permissible. If the maximum amount of bonus depreciation permissible falls below one hundred percent (100%) for any given tax year, then the Fund intends to take the maximum amount of bonus depreciation available.

The Fund is not a "reporting company" for purposes of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). Accordingly, the Fund does not and will not file with the SEC (or with any state securities commission) any audited or unaudited financial statements or other information required of a reporting company under the Exchange Act.

## 9. LEGAL PROCEEDINGS

To the Manager's knowledge, neither the Fund nor the Manager are subject to any material legal proceedings. However, from time to time, either may be subject to ordinary, routine litigation incidental to the Fund's intended business. See "**Risk Factors**" herein.

## 10. LIMITED LIABILITY COMPANY MANAGERS, EXECUTIVE OFFICERS, PROMOTERS, AND CONTROL PERSONS

As of the date of this Memorandum, the Manager is the one (1) limited liability company manager of the Fund. In turn, the limited liability company managers, executive officers, and controlling persons of the Manager, and other promoters of the offer and issuance of Interests hereby, include:

| Name | Title(s) | Age |
|------|----------|-----|
| Daryl Heller | Limited liability company manager of Heller Capital Group, LLC (a limited liability company manager of PIG, a limited liability company manager of the Manager) | 50 |
| Jerry Hostetter | Limited liability company manager of PIG (a limited liability company manager of the Manager) | 59 |
| William Powers | Significant employee of PIG (a limited liability company manager of the Manager) | 28 |

### A. Biographical Information

#### i. Daryl Heller

Daryl Heller currently serves as the chief executive officer of PIG (a limited liability company manager of PIG, a limited liability company of the Manager). Daryl was appointed to serve as chief executive officers of PIG by its limited liability managers in accordance with the company's operating agreement. Daryl is serving in this role for an indefinite term until the earlier of his resignation, incapacity or death, or removal in accordance with the terms of the company's operating agreement.

From January 2013 to present, Daryl has served as the chief executive officer of Heller Capital Group, LLC. Daryl's duties in this role include strategic planning and development and mergers and acquisitions leadership. Daryl also serves as the chairman of the board for the Horizon Initiative.

### ii.    Jerry Hostetter

Jerry Hostetter currently serves as the president of PIG. Jerry was appointed to serve as the president of PIG by its limited liability managers in accordance with the company's operating agreement. Jerry is serving in this role for an indefinite term until the earlier of his resignation, incapacity or death, or removal in accordance with the terms of the operating agreement.

Previously, from 1990 through 2004, Jerry served as the chief executive officer of Hostetter Management Company. Jerry's duties in this role included strategic vision leadership and management. Jerry currently serves on the board of S&T Bank, and was a board member at Ephrata Community Hospital for six (6) years.

### iii.    William Powers

Will Powers is presently employed as a fund manager of PIG. Previously, from November 2016 through August 2017, Will worked as a technical sales representative for The Yorkaire Group, Inc. Will's duties in this role included database management, performance analysis, and sales. Prior to this role, Will worked as an operations analyst for Bass Mechanical, Inc. from September 2014 through November 2015. Will's duties in this role included operational and administrative efficiency improvements and job-cost analysis.

### B.    <u>Family Relationships and Involvement in Certain Legal Proceedings</u>

There are no family relationships among the control persons of the Manager or the Fund, any of the individuals listed above, or any of their respective officers or directors.

Accordingly, none of these individuals has:

- been convicted in a criminal proceeding or been subject to a pending criminal proceeding (excluding traffic violations and other minor offenses);

- had any bankruptcy petition filed by or against the business or property of the person, or of any partnership, corporation or business association of which he was a general partner or executive officer, either at the time of the bankruptcy filing or within two years prior to that time;

- been subject to any order, judgment, or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction or federal or state authority, permanently or temporarily enjoining, baring, suspending or otherwise limiting, his involvement in any type or business, securities, futures, commodities, investment, banking, savings and loan, or insurance activities, or to be associated with persons engaged in any such activity;

- been found by a court of competent jurisdiction in a civil action or by the Securities and

Exchange Commission or the Commodity Futures Trading Commission to have violated a federal or state securities or commodities law, and the judgment has not been reversed, suspended, or vacated;

- been the subject of, or a party to, any federal or state judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated (not including any settlement of a civil proceeding among private litigants), relating to an alleged violation of any federal or state securities or commodities law or regulation, any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or temporary or permanent cease-and-desist order, or removal or prohibition order, or any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; or

- been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

## 11. SECURITY OWNERSHIP OF BENEFICIAL OWNERS AND MANAGEMENT

### A. Beneficial Ownership of the Fund and the Manager

As of the date of this Memorandum, there are no limited liability company members of the Fund. The only limited liability company members of the Fund will be Investors acquiring Interests hereby. The Manager does not have a beneficial ownership interest in the Fund. However, the Manager will derive income through the operation of ATMs purchased by the Fund with Investors' proceeds.

The Manager is beneficially owned as follows:

| Beneficial Owner | Nature of Ownership Interest | Degree of Ownership Interest |
|---|---|---|
| Daryl Heller, by and through Heller Capital Group, LLC (a limited liability company member of PIG, a limited liability company member of the Manager) | Limited liability company membership interest | 60% |
| Jerry Hostetter, by and through PIG (a limited liability company member of the Manager) | Limited liability company membership interest | 40% |

### B. Changes in Control

To the Manager's knowledge, there are no circumstances under which either the Fund or the Manager would experience a change in control.

## 12. TRANSACTIONS WITH RELATED PERSONS, PROMOTERS, AND CERTAIN CONTROL PERSONS

Material transactions occurring among the Fund, the Manager, the promoters of the offer to and

issuance of Interests hereby, and the Fund's other controlling persons include the following items:

### A.    Daryl Heller's Interest in Paramount

Daryl Heller, beneficially through Heller Capital Management, LLC, has an equity ownership interest in Paramount. Pursuant to the written agreement intended to be entered into between the Fund and Paramount with respect to the Fund's ATMs (the "**ATM Management Services Agreement**"), it is anticipated that Paramount shall be entitled to retain all revenues of an ATM less (i) a portion of advertising-derived revenues and (ii) any amounts above those paid to the Fund (if any). See "**Narrative Summary of the Operating Agreement**" herein. As of the date of this Memorandum, the Fund understands that Daryl Heller's beneficial interest in Paramount will be present for the duration of the Fund. Accordingly, Daryl Heller shall have a pecuniary interest in the revenues of Paramount derived from its management and operation of the Fund's ATMs. Daryl has absolute control of Paramount.

### B.    Indemnification of the Manager and other Agents

The Manager (including its own limited liability company managers, executive officers, consultants, and other agents) and certain of the Fund's other agents will be entitled to indemnification by the Fund. Such rights to indemnification will derive from a combination of the law of the Fund's domicile, the Operating Agreement, and other written instruments that the Fund may enter into with its consultants or other agents. In the event that the Fund is required to indemnify any agent for actions taken on the Fund's behalf, the Fund's results of operations may be adversely affected. See "**Risk Factors**" herein.

### 13.    DISCLOSURE OF COMMISSION POSITION ON INDEMNIFICATION FOR SECURITIES ACT LIABILITIES

Insofar as indemnification for liabilities arising under the Act may be permitted to limited liability company managers, executive officers, or persons controlling the Fund, the Fund has been informed that in the opinion of the SEC such indemnification is against public policy as expressed in the Act and is therefore unenforceable.

### 14.    NARRATIVE SUMMARY OF THE OPERATING AGREEMENT

The following summary of the Operating Agreement is qualified in its entirety by reference to the written terms of the Operating Agreement, and cannot replace a complete review of the Operating Agreement. Any section references herein refer to the corresponding sections in the Operating Agreement. As with this Memorandum generally, Investor must consult their independent legal counsel, financial and tax advisers, and other representatives to evaluate the terms of the Operating Agreement.

| | |
|---|---|
| *Capitalization* | For a discussion of the Fund's capitalization and potential future capitalization, please refer to Sections 3.2 and 3.3. The Fund is authorized to issue an unlimited number of Interests; and is accepting up to one hundred million dollars ($100,000,000.00) of Capital Contributions. |
| *Investor Outside Business Activities* | For a discussion on potential limitations in an Investor's outside business activities that compete with the Fund, please refer to Section 3.8. Each Investor may have business interests and engage in business activities extrinsic to the Fund. However, if such interests or activities compete with the Fund's business, then an Investor must (a) maintain the confidentiality of the Fund's proprietary information, (b) refrain from disparaging the Fund or its constituents, and (c) not solicit the |

Fund's constituents or third-party service providers.

**Capital Contributions**

For a discussion of an Investor's limited obligation to make capital contributions to the Fund, please generally refer to Article IV. An Investor will be required to make a capital contribution to the Fund in exchange for their receipt of an Interest, which shall be no less than the Minimum Contribution and shall not be in an amount other than a multiple of $52,000.00. An Investor will have no further obligation to contribute capital to the Fund outside of this initial capital contribution. Capital contributions shall not accrue interest, and Investors will generally be unable to withdraw any portion of their capital contribution or capital account balance at any time. However, Investors may be required to totally or partially withdraw their capital account balance and to withdraw as a limited liability company member of the Fund at any time, in the sole and absolute discretion of the Manager, for failure to comply with any Representations and Warranties pursuant to Section 4 of a certain Subscription Agreement.

**Allocations; Distributions**

For a discussion of how the profits and losses of the Fund shall be allocated among Investors, and how distributions shall be made to Investors, please generally refer to Article V and Article VI. Generally, the Fund intends for any allocation of profits and losses to comply with Section 704(b) of the Code. To that end, the Fund will allocate profits and losses as if the Fund were to liquidate, dissolve, and wind-up to achieve an allocation of profits and losses (and thereby capital account balances) consistent with the intended forced distributions. At the sole discretion of the Board of Managers, after taking into account the Company's financial position and any contractual provisions imposed on the ability of the Company to make such distributions, and, if made, will be made as follows:  (i) to  the Members in proportion to their relative ownership of the issued and outstanding Membership Interests, the amount of one thousand ninety-two dollars ($1,092.00) per month for eighty-four months for each fifty-two thousand dollars ($52,000.00) of Capital Contributions made by a Member, amounting to twenty-five and two-tenths percent (25.2%) as of the date of a distribution ("Preferred Return"); and (ii) if any advertising revenue associated with ATMs ("Advertising Revenue"), is received by the Company, Members, in proportion to their relative ownership of the issued and outstanding Membership Interests, contemporaneously shall receive twelve percent (12%) of the Advertising Revenue; and then (iii) to the Managers.

**Management; Executive Officers**

For a discussion of the Fund's management, please refer to Sections 7.1 and 7.2, and generally refer to Article VII. Investors shall have no rights in the management of the Fund except as may be required by applicable law. The Manager shall be the one (1) limited liability company manager of the Fund, and the Fund shall be limited to one (1) limited liability company manager in perpetuity. Any limited liability company manager succeeding the Manager shall be a natural person or legal entity appointed by the Manager in its sole and absolute discretion. The Manager and its affiliates may have business interests and engage in

business activities extrinsic to the Fund, even those which compete with the Fund.

*Transfer of Membership Interests*

For a discussion on the limitations on the transfer of Interests, please generally refer to Article XI. Generally, any transfer of an Interest (unless to an immediate family member, a trust of an Investor, or an entity owned and controlled by an Investor) shall be subject a combination of a right of first refusal in favor of the Fund itself and other Investors holding Interests.

*Indemnification*

For a discussion of the Fund's obligation to indemnify and defend certain principals and third-parties, please generally refer to Article XV. The Fund is required to indemnify the Manager, and may be required to indemnify any employee or other agent of the Fund, or other Covered Persons, except (a) for any act taken by such Covered Person purporting to bind the Company that has not been authorized pursuant to the Operating Agreement or (b) to the extent that the liability of such Covered Person arises from willful misconduct or gross negligence. These obligations are separate and apart from any other duty to indemnify that the Fund might owe under any third-party under applicable law or pursuant to written instrument.

*Dissolution*

For a discussion of how the affairs of the Fund shall be wound up and how the Fund shall be cancelled or dissolved, as applicable, please generally refer to Article XVI. The Fund shall be wound up upon (i) the affirmative vote of Manager, (ii) an event triggering dissolution under applicable law, or (iii) a decree of judicial dissolution. The person(s) in charge of the Fund's winding up shall first pay off any creditors of the Fund, and thereafter distribute any remaining assets among the Manager and Investors as described herein. Investors shall have no rights of recourse against the Fund if paying off its creditors results in limited or no assets being available to distribute to Investors.

*Dispute Resolution*

For a discussion of how a dispute among Investors and/or the Fund shall be handled, please refer to Section 17.8. Any dispute among Investors and/or the Fund shall be subject to litigation within the state and federal courts located in Wilmington, Delaware. No dispute involving the Fund shall be arbitrated in a manner utilizing class action or equivalent procedures. The parties to litigation shall bear their own costs and expenses of the same.

*Spousal Addendum*

An Investor acquiring an Interest as a natural person (rather than through a legal entity) shall be required to have their spouse or spousal equivalent execute the spousal addendum thereto (Schedule 3.3(b)(ii) to the Operating Agreement) if applicable. In doing so, the spouse or spousal equivalent's community interest in any equity securities of the Fund held by the Investor shall be subject to the terms and conditions of the Operating Agreement.

**15.    SUBSCRIPTION PROCEDURES**

In order to subscribe for Interests in this offering, a prospective investor must execute the

Subscription Agreement included herewith by:

1.      Identifying the amount they wish to invest in the Fund in Section 2(a) therein (found on page 3 of the Subscription Agreement);

2.      Executing the Subscription Agreement on page 10 therein, providing all information requested in the signature block provided; and

3.      Completing the Accreditation Disclosure Form included as Exhibit A to the Subscription Agreement.

a.      The Investor must check the box applicable to their ground(s) for qualifying as an accredited investor, and thereafter execute the Accreditation Disclosure Form on the top portion of page 3 therein. Please note:

b.      If the Investor has an applicable professional representative whom is representing and warranting that the Investor is an accredited investor, then that professional representative must complete and execute the applicable, bottom portion of page 3 of the Accreditation Disclosure Form.

c.      If the Investor is using a third-party service provider to verify that the Investor is an accredited investor, then the Investor must provide the Fund with such documentation made available from the third-party service provider that verifies the Investor is, in fact, an accredited investor.

d.      If the Investor neither has an applicable professional representative whom is representing and warranting that the Investor, nor is using a third-party service provider to verify that the Investor is an accredited investor, then the Investor must provide the Fund with such documentation and information as the Fund requests to determine that the Investor is, in fact, an accredited investor. Such documentation and information may include tax returns, pay stubs, verification of banking and investment account balances, and the like.

Thereafter, if the Fund accepts the Investor's request to acquire an Interest, the Investor must:

1.      Make a contribution of capital to the Fund, preferably by electronic transfer using the wire instructions below, or a check, in the amount identified by the Investor in Section 2(a) of the Subscription Agreement (which in no event shall be less than the Minimum Contribution);

| | |
|---|---|
| Account Name: | Prestige Fund B IV, LLC |
| Bank Name: | First National Bank |
| Bank Address: | 4140 East State Street, Hermitage, PA 16148 |
| Routing Number: | 043318092 |
| Account Number: | 96412647 |
| Customer Address: | 415 N. Prince Street, Suite 200, Lancaster, PA 17603 |

2.      Execute the Operating Agreement included herewith on page 52 therein; and

3.      If the Investor (i) is acquiring an Interest as a natural person (rather than through a legal entity) and (ii) is married or is the legally equivalent of married, then the Investor must have their spouse or spousal-equivalent execute the spousal addendum to the Operating Agreement.

Subscriptions from suitable prospective investors will be accepted in our sole discretion after receipt of all subscription documents, properly and completely executed, with the appropriate payment. All subscription payments must be in United States Dollars. Any subscription which is not accompanied by

payment and properly executed accompanying documents will be rejected.  If a potential investor elects not to make a subscription or his entire subscription is rejected, the potential investor, by accepting delivery of this memorandum, agrees to destroy it, along with any documents or other information supplied in connection with it, upon our request.  The funds received by us from any investor whose subscription to purchase securities is rejected by us will be returned to such investor, without deduction from or interest on the funds, but no sooner than those funds have cleared the banking system in the normal course of business.

16.    <u>FURTHER INFORMATION</u>

The statements contained in this memorandum constitute only a brief summary of certain provisions of the documents referred to and the transactions contemplated.  The statements contained in this document do not purport to be a complete description of every term and condition of such documents and are qualified in their entirety by reference to such documents.  As with any summary, some details and exceptions have been omitted. If any of the statements made in this document are in conflict with any of the terms of any of such documents, the terms of such documents will govern.  Reference is made to the actual documents for a complete understanding of what they contain.  Each prospective investor and his/her/its advisor are invited and encouraged to ask us questions with respect to the terms and conditions of the offering and our business and request additional information necessary to verify information in this memorandum.  We will seek to provide answers and such information to the extent possessed or obtainable without unreasonable effort or expense. Potential investors will be required to execute non-disclosure agreements as a prerequisite to reviewing documents determined by us to contain proprietary, confidential or otherwise sensitive information.  To obtain such information or to make arrangements to ask such questions of us, prospective investors should contact our CEO, whose contact information can be located in the section entitled Subscription Procedures.

SUBSCRIPTION AGREEMENT

This Subscription Agreement (this "***Agreement***") is entered into by and between Prestige Fund B IV, LLC, a limited liability company duly formed under the laws of the State of Delaware ("***Company***"), and the undersigned counterparty hereto (""), as of the date of Company's signature hereto (the "***Effective Date***"). Each of Company and Contributor may hereinafter be individually referred to as a "***Party***," as appropriate, and collectively referred to as the "***Parties***."

RECITALS

A.      As described in that Private Placement Memorandum of Prestige Fund B IV, LLC (the "***PPM***"), the Company is issuing an unlimited number of limited liability company membership interests, and accepting capital contributions therefor up to one hundred million dollars ($100,000,000.00). Specifically, the Company is offering to issue limited liability company membership interests having those rights and privileges attributed to its Membership Interests as defined and fully set forth in that Limited Liability Company Operating Agreement of Prestige Fund B IV, LLC (the "***Operating Agreement***").

B.      Subscriber wishes to receive a Membership Interest in Company in exchange for a capital contribution to Company in the amount identified by Investor in Section 2(a), which in no event shall be less than $52,000.00 or any amount other than a multiple of $52,000.00 absent the prior, written consent of Company. Subscriber's right to receive a Membership Interest is subject to the sole and absolute discretion of Company.

C.      It is the Parties' mutual intent that this Agreement shall govern Subscriber's receipt of a Membership Interest from Company, as separate and apart from Subscriber's rights and interests in, and obligations to, Company as a limited liability company member thereof. Such rights, interests, and obligations shall be addressed solely by and through the Operating Agreement.

NOW, THEREFORE, the Parties represent, warrant, and agree as follows:

AGREEMENT

1.      Definitions. Capitalized terms used herein but not defined shall have those meanings given to them in the Operating Agreement. As otherwise used in this Agreement, the following terms have the following meanings:

"***Act***" means the Securities Act of 1933, as amended, and any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time. Reference to a particular section of the Act shall include a reference to the comparable section, if any, of any such similar or successor federal statute.

"***Affiliate***" means, with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person. The term "Affiliate" of a Person shall be deemed to include any director, executive officer, limited liability company manager, general partner, or holder, directly or indirectly, of five percent (5%) or more of the voting equity securities of such Person.

"***Agreement***" has the meaning set forth in the introductory paragraph herein.

"***Commission***" means the Securities and Exchange Commission or any other federal agency at the time administering the Act or the Exchange Act.

"***Company***" has the meaning set forth in the introductory paragraph herein.

"***Company Covered Person***" means, with respect to Company as an "issuer" for purposes of Rule 506 of Regulation D promulgated under the Act, any person listed in the first paragraph of Section (d)(1) of Rule 506(d) of Regulation D promulgated under the Act.

"***Company Indemnified Party***" shall be broadly construed and shall include, without limitation, Company, Managers, its limited liability company members, and the Affiliates of each.

"***Disqualification Event***" means any "bad actor" disqualifying event described in Section (d)(1) of Rule 506(d) of Regulation D promulgated under the Act, except for a disqualification event as to which Sections (2)(ii-iv) or (3) of Rule 506 of Regulation D promulgated under the Act is applicable.

"***Dispute***" has the meaning specified in Section 7(i).

"***Effective Date***" has the meaning set forth in the introductory paragraph herein.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time. Reference to a particular section of the Exchange Act shall include a reference to the comparable section, if any, of any such similar or successor federal statute.

"***Expenses***" shall be broadly construed and shall include, without limitation, all direct and indirect costs of any type or nature whatsoever (including, without limitation, all attorneys', witness, or other professional fees and related disbursements, and other out-of-pocket costs of whatever nature), actually and reasonably incurred by a Company Indemnified Party in connection with the investigation, defense, or appeal of a Proceeding or establishing or enforcing a right to indemnification under this Agreement, applicable law, or otherwise, and amounts paid in settlement by or on behalf of a Company Indemnified Party.

"***Issuance Interest***" has the meaning specified in Section 2(b).

"***Operating Agreement***" has the meaning set forth in Recital A.

"***Party***," and "***Parties***," have the respective meanings set forth in the introductory paragraph herein.

"***Person***" means any individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, governmental authority, or other entity or organization.

"***PPM***" has the meaning set forth in Recital A.

"***Proceeding(s)***" shall be broadly construed and shall include, without limitation, any threatened, pending, or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing, or any other actual, threatened, or completed proceeding, whether brought in the right of Subscriber or otherwise and whether of a civil, criminal, administrative, or investigative nature, and whether formal or informal in any case, in which a Company Indemnified Party was, is, or will be involved as a party or otherwise by reason of Subscriber's breach of any representation, warranty, or covenant made in this Agreement.

"***Subscriber***" has the meaning set forth in the introductory paragraph herein.

"***Subscriber Covered Person***" means, with respect to Subscriber as if it were an "issuer" for

purposes of Rule 506 of Regulation D promulgated under the Act, any person listed in the first paragraph of Section (d)(1) of Rule 506(d) of Regulation D promulgated under the Act.

2.      <u>Purchase; Issuance of Membership Interest</u>.

(a)      <u>Purchase</u>. Subject to the terms and conditions of this Agreement, Subscriber agrees to pay $_____ (a minimum of $52,000.00 or an amount that is a multiple of $52,000.00) (the "***Purchase Price***"), for the purchase of securities, which the Company acknowledges receiving in cash in U.S. dollar. The Parties acknowledge and agree that Subscriber's Purchase Price shall be treated as a Capital Contribution.

(b)      <u>Issuance of Membership Interest</u>. In exchange for Subscriber's Purchase Price hereunder and subject to Subscriber's representations and warranties made herein, Company agrees to issue a Membership Interest to Subscriber (the "***Issuance Interest***").

3.      <u>Delivery</u>.

(a)      <u>Delivery by Subscriber</u>. At the Closing, Subscriber shall deliver to Company the Purchase Price, a duly completed and executed copy of the Operating Agreement, and any other instruments as Company shall reasonably request of Subscriber to facilitate the issuance of the Issuance Interest to Subscriber, and Company shall acquire the Purchase Price in cash.

(b)      <u>Delivery by Company</u>. At the Closing, Company shall (i) if Subscriber is not already a Member, admit and recognize Subscriber as a Member having a Capital Account in an amount of the Purchase Price, or (ii) if Subscriber is already a Member, credit Subscriber's Capital Account in the amount of the Purchase Price.

(c)      <u>Recission</u>. If the Fund, in the Manager's sole and reasonable discretion, is unable to utilize the Purchase Price for the Fund's intended investment purposes within four (4) months of the Effective Date, then the Fund shall rescind the Agreement. In such event, the Fund shall return the Purchase Price to Subscriber within ten (10) days without interest.

4.      <u>Representations and Warranties of Subscriber</u>. Subscriber represents and warrants to Company as follows:

(a)      <u>Accredited Investor</u>. Subscriber is an "accredited investor," as that term is defined in Rule 501 of Regulation D promulgated under the Act, and Subscriber's basis or bases for falling within that definition are accurately set forth in that Accreditation Disclosure Form attached hereto as <u>Exhibit A</u>, which is hereby incorporated herein, in full, as a representation and warranty of Subscriber by reference.

(b)      <u>Authorization; Binding Agreement</u>. Subscriber has all requisite authority to execute and deliver this Agreement to Company and to carry out and perform its obligations hereunder. All action on the part of Subscriber necessary for the authorization, execution, and performance of this Agreement and Subscriber's obligations hereunder has been taken or will be taken prior to the Effective Date. This Agreement, when executed and delivered by Subscriber to Company, shall constitute a valid and binding obligation of Subscriber enforceable in accordance with its terms.

(c)      <u>Bad Actor Disqualification</u>. No Disqualification Event is applicable to Subscriber or, to Subscriber's actual knowledge, any Subscriber Covered Person.

(d)      <u>Information</u>. Subscriber is sufficiently familiar with the business of Company to have evaluated the decision to make an investment in the Issuance Interest. Further, Subscriber has been

furnished with materials relating to Company, the offering of the Issuance Interest, and anything which it has reasonably requested. Subscriber has been afforded an opportunity to make inquiries concerning the Company, its Affiliates, the terms and conditions of the Issuance Interest, or any other matters relating to the issuance of the Issuance Interest, and has been afforded the opportunity to obtain any additional information necessary to evaluate the accuracy of the representations and warranties of Company.

(e)     <u>Investment Intent</u>. Subscriber is making an investment the Issuance Interest solely for Subscriber's own account (or in a fiduciary capacity for the account or benefit of a person or entity) for investment purposes only, and without any present intention of selling, offering to sell, or otherwise disposing of, transferring, or distributing Subscriber's interest in the Issuance Interest. Subscriber does not presently have any reason to anticipate any change in Subscriber's circumstances or any particular occasion or event which would cause Subscriber to dispose of, transfer, or distribute said interest.

(f)     <u>Investment Risk</u>. Subscriber understands that an investment in the Issuance Interest is speculative and involves high economic and other risks. Subscriber is capable of bearing the economic risks of its investment in the Issuance Interest, including a total loss of Subscriber's investment in the Issuance Interest.

(g)     <u>Personal Liquidity</u>. Subscriber has substantial means of providing for Subscriber's current needs and personal contingencies, and Subscriber has no need for liquidity in its investment in the Issuance Interest. Subscriber is financially capable of holding its investment in the Issuance Interest for an indefinite period of time.

(h)     <u>Restrictions on Transfer</u>. Subscriber understands that the Issuance Interest will be subject to the terms and conditions that apply to equity securities as set forth in, as may be applicable from time to time, the Certificate of Formation of Company and the Operating Agreement, each as may be as amended from time to time, and any other limitation or restriction on transfer created by applicable law. Further, Subscriber understands and acknowledges that the Issuance Interest is being issued to Subscriber by Company under the exemption from registration of such securities provided by Rule 506(c) of Regulation D promulgated under the Act for an offering of securities not involving a public offering. Accordingly, Subscriber agrees not to offer to make or to make any disposition of all or any portion of the Issuance Interest unless and until (i) there is then in effect a registration statement under the Act covering such offer or disposition and such offer or disposition is made in accordance with such registration statement, or (ii) Subscriber shall have notified Company of the offer or the disposition and, prior to such offer or disposition being made or undertaken, shall have furnished to Company a detailed statement of the circumstances surrounding the offer or the disposition and, if reasonably requested by the Company, an opinion of counsel, reasonably satisfactory to Company, that such disposition will not require registration under the Act or any applicable state securities laws. Subscriber understands and acknowledges that Subscriber shall have no right to require the Company to register the Issuance Interest under the Act. Subscriber understands and has fully considered, for purposes of its investment, that there are substantial restrictions on the transferability of, and there will be no public market for, the Issuance Interest at this time or in the immediate future, and, accordingly, it may not be possible for Subscriber to liquidate Subscriber's investment in the Issuance Interest in case of emergency.

5.     <u>Representations and Warranties of Company</u>. Company represents and warrants to Subscriber as follows:

(a)     <u>Authorization; Binding Agreement</u>. Company has all requisite authority to execute and deliver this Agreement to Subscriber and to carry out and perform its obligations hereunder. All action on the part of Company necessary for the authorization, execution, and performance of this Agreement and Company's obligations hereunder has been taken or will be taken prior to the Effective Date. This Agreement, when executed and delivered by Company to Subscriber, shall constitute a valid and binding

obligation of Company enforceable in accordance with its terms.

(b)    <u>Bad Actor Disqualification</u>. No Disqualification Event is applicable to Company or, to Company's actual knowledge, any Company Covered Person.

(c)    <u>Good Standing; Qualification</u>. Company is duly formed, validly existing, and in good standing under the laws of the state of its formation. Company is duly qualified and is authorized to do business, and is in good standing as a foreign entity in, all jurisdictions in which the nature of its activities makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on Company or its business.

(d)    <u>Valid Issuance of Issuance Interest</u>. The Issuance Interest, when issued and delivered to Subscriber, will be duly authorized, validly issued, fully paid, and nonassessable, and free of restrictions on transfer other than restrictions on transfer as may be set forth in this Agreement or the Operating Agreement, applicable state and federal securities laws, and liens or encumbrances created by or imposed by Subscriber. Based in part on the accuracy of the representations of Subscriber herein, and subject to filings pursuant to the Act, and applicable state securities laws, the issuance of the Issuance Interest will comply with all applicable federal and state securities laws.

6.    <u>Indemnification</u>.

(a)    <u>Duty to Indemnify</u>. The debts, liabilities and obligations of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, liabilities and obligations of the Company, for which no Subscriber shall be personally liable.  The Company shall indemnify each Company Indemnified Party to the fullest extent permitted by applicable law if a Company Indemnified Party is a party to or threatened to be made a party to or otherwise involved in any Proceeding for any and all Expenses incurred therein, including in preparation therefor; *provided, however*, that Company's duties under this <u>Section 6</u>(a) shall not extend to any Proceeding initiated or brought by a Company Indemnified Party against Company and not by way of defense, cross-claim, or counterclaim, except (A) with respect to Proceedings brought to establish or enforce a right to indemnification under this Agreement or (B) with respect to a Proceeding initiated or brought by Company for which Company Indemnified Party's participation is required by applicable law, and (ii) shall not extend to any Expenses arising from or relating to the gross negligence or willful misconduct of a Company Indemnified Party.

(b)    <u>Advancement of Expenses</u>. To the extent not prohibited by law, the Company shall advance the expenses incurred by a Company Indemnified Party in connection with any Proceeding, and such advancement shall be made within twenty (20) days after the receipt by the Company of a statement or statements requesting such advances (which shall include invoices received by a Company Indemnified Party in connection with such expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditures made that would cause a Company Indemnified Party to waive any privilege accorded by applicable law shall not be included with the invoice) and upon request of the Company, an undertaking to repay the advancement of expenses if and to the extent that it is ultimately determined by a court of competent jurisdiction in a final judgment, not subject to appeal, that a Company Indemnified Party is not entitled to be indemnified by Company. Advances shall be unsecured, interest-free, and without regard to a Company Indemnified Party's ability to repay the expenses. Advances shall include any and all expenses actually and reasonably incurred by a Company Indemnified Party pursuing an action to enforce a Company Indemnified Party's right to indemnification under this Agreement, or otherwise, and this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. A Company Indemnified Party acknowledges that the execution and delivery of this Agreement shall constitute an undertaking providing that a Company Indemnified Party shall, to the fullest extent required by law, repay the advance if and to the extent that it is ultimately determined by a court of competent jurisdiction in a final judgment, not

subject to appeal, that a Company Indemnified Party is not entitled to be indemnified by the Company. The right to advances under this <u>Section 6(b)</u> shall continue until the final disposition of any proceeding, including any appeal therein.

(c)    <u>Procedure of Indemnification.</u>

(i)    <u>Notice</u>. A Company Indemnified Party will notify the Company in writing promptly upon being served with any summons, citation, subpoena, complaint, indictment, information, or other document relating to any Proceeding or matter which may be subject to indemnification or advancement of expenses covered hereunder. The failure of a Company Indemnified Party to so notify the Company shall not relieve the Company of any obligation which it may have to a Company Indemnified Party under this Agreement or otherwise.

(ii)    <u>Request for Payment</u>. A Company Indemnified Party shall notify the Company promptly in writing upon receiving notice of any demand, judgment, or other requirement for payment that a Company Indemnified Party reasonably believes to be subject to indemnification under the terms of this Agreement, and shall request payment thereof by the Company. Indemnification payments requested by a Company Indemnified Party under <u>Section 6(a)</u> shall be made by the Company no later than sixty (60) days after receipt of the written request of a Company Indemnified Party. Claims for the advancement of expenses shall be made under the provisions of <u>Section 6(b)</u>.

(iii)    <u>Application for Enforcement</u>. In the event the Company fails to make timely payments as set forth in <u>Sections 6(b)</u> or <u>6(c)(ii)</u>, a Company Indemnified Party shall have the right to apply to any court of competent jurisdiction for the purpose of enforcing a Company Indemnified Party's right to indemnification or advancement of expenses pursuant to this Agreement. In such an enforcement hearing or proceeding, the burden of proof shall be on the Company to prove that indemnification or advancement of expenses to a Company Indemnified Party is not required under this Agreement or permitted by applicable law. Any determination by the Company that a Company Indemnified Party is not entitled to indemnification hereunder, shall not be a defense by the Company to the action nor create any presumption that a Company Indemnified Party is not entitled to indemnification or advancement of expenses hereunder.

(d)    <u>Assumption of Defense</u>. In the event the Company shall be requested by a Company Indemnified Party to pay the expenses of any Proceeding, the Company, if appropriate, shall be entitled to assume the defense of such Proceeding, or to participate to the extent permissible in such Proceeding, with counsel reasonably acceptable to a Company Indemnified Party. Upon assumption of the defense by the Company and the retention of such counsel by the Company, the Company shall not be liable to a Company Indemnified Party under this Agreement for any fees of counsel subsequently incurred by a Company Indemnified Party with respect to the same Proceeding; *provided, however*, that a Company Indemnified Party shall have the right to employ separate counsel in such Proceeding at a Company Indemnified Party's sole cost and expense. Notwithstanding the foregoing, if a Company Indemnified Party's counsel delivers a written notice to the Company stating that such counsel has reasonably concluded that there may be a conflict of interest between the Company and a Company Indemnified Party in the conduct of any such defense or the Company shall not, in fact, have employed counsel or otherwise actively pursued the defense of such Proceeding within a reasonable time, then in any such event the fees and expenses of a Company Indemnified Party's counsel to defend such Proceeding shall be subject to the indemnification and advancement of expenses provisions of this Agreement.

(e)    <u>Unauthorized Settlements</u>. The Company shall not be obligated to indemnify a Company Indemnified Party for any amounts paid in settlement of a Proceeding effected without the Company's written consent. Neither the Company nor a Company Indemnified Party shall unreasonably withhold

consent to any proposed settlement; *provided, however*, that the Company may in any event decline to consent to (or to otherwise admit or agree to any liability for indemnification hereunder in respect of) any proposed settlement if the Company is also a party in such proceeding and determines in good faith that such settlement is not in the best interests of the Company.

7.    Additional Capital Contributions.

(a)    No Member shall be required to contribute any additional capital to the Fund after the Effective Date.

(b)    Notwithstanding <u>Section 7(a)</u> above, in the event that the Manager determines (in its sole discretion) that the Fund requires additional capital after the offering termination date (outside of the Company's raising the maximum amount of offering proceeds), the Manager may cause the Fund to incur additional indebtedness, and the same may be provided by an independent third party financer, by the Manager or by any Member (in each case, an "**Optional Loan**"), and such Optional Loan shall be on terms and conditions as determined by the Manager in its sole but reasonable discretion; *provided, however*, in no event will any such Optional Loan bear interest at a rate in excess of twelve percent (12%) per annum.

(c)    The amount of any Optional Loan made by the Manager or by any Member shall be an obligation of the Fund and the principal balance of Optional Loan shall be repaid to the Manager or Member prior to any distributions of Available Cash being made to any Member, with repayments being applied first to reduce any interest accrued thereon and then to reduce principal; *provided, however*, that the Manager may elect, in its reasonable discretion, to provide for distributions of Available Cash to the Members prior to repayment of any particular Optional Loan (only if made by the Manager). Available Cash is defined as the excess of gross receipts over cash disbursements (excluding distributions to Members), without deduction for depreciation and less a reasonable allowance for cash reserves for anticipated obligations reasonably necessary for the operation of the Company.

(d)    In the event that the Fund requires additional capital and the Manager (on behalf of the Fund) is unable to (or chooses not to, in its sole discretion) obtain an Optional Loan in thirty (30) calendar days, the Manager may thereafter issue additional Issuance Interests, in which case the Manager shall provide written notice of such additional capital contribution requirement (an "**Additional Capital Requirement**") to the Members (an "**Additional Capital Notice**"). Each Member shall have the right, but not the obligation, to contribute to the Fund, on a pro rata basis (based upon such Member's Percentage Interest), such amount of additional capital, when aggregated with the proportionate amounts of each of the other Members, as is necessary to satisfy such Additional Capital Requirement (an "**Additional Contribution**"), and the Manager shall amend Exhibit A to the Operating Agreement if and as necessary to reflect any adjustments to the Percentage Interest of each Member as a result of any such Additional Contributions.

(e)    In the event that any Member elects not to make an Additional Contribution within fifteen (15) calendar days after receipt by such Member of an Additional Capital Notice (a "**Noncontributing Member**"), then each Member who elected to make an Additional Contribution (a "**Contributing Member**") shall have the right, but not the obligation, to contribute to the Fund (in addition to its initial Additional Contribution) its pro rata portion of the aggregate amount of that portion of such Additional Capital Requirement which remains unfunded within fifteen (15) calendar days after receipt by such Member of its pro rata available portion, and such additional amount shall be considered part of such

Contributing Member's Additional Contribution. The Manager shall also, in the event that the Additional Capital Requirement has not been fully funded to the Fund within thirty (30) calendar days after the Additional Capital Notice thereof by the Fund Manager, have the right to fund, or to obtain financing in the form of an Optional Loan or the issuance of additional Investor Units (from any Person not then a Member of the Fund), any deficiency between the amount of the Additional Capital Requirement and the aggregate amount of Additional Contributions proposed to be funded by Contributing Members. Additional Contributions shall be consummated no later than thirty (30) days after the date of the applicable Additional Capital Notice.

8.    <u>Miscellaneous</u>.

(a)    <u>Advice of Counsel</u>. The Parties acknowledge that each has either been represented by legal counsel of its choice in the negotiation, drafting, and execution of this Agreement, or has consciously chosen to waive its right to counsel. The Parties acknowledge and agree that by executing this Agreement, they have read this Agreement in its entirety and fully understand this Agreement.

(b)    <u>Amendment</u>. This Agreement may only be amended by an instrument in writing signed by the Parties, which shall be attached to this Agreement as an addendum hereto.

(c)    <u>Reserved</u>.

(d)    <u>Assignment</u>. Neither this Agreement nor the rights, interests, or obligations hereunder shall be assigned by a Party (whether by operation of law or otherwise) without the prior written consent of the other Party. Except as otherwise expressly provided in this Agreement, this Agreement shall be binding upon and inure solely to the benefit of the Parties, and their permitted successors and assigns, and nothing herein is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

(e)    <u>Broker's Fees</u>. Subscriber represents and warrants to Company that, except as the Parties may have previously agreed to or otherwise acknowledge, that no agent, broker, investment banker, or other Person acting on behalf of or under the authority of Subscriber is or will be directly or indirectly entitled to any broker's fee, finder's fee, or any other commission or transaction-based compensation in connection with this Agreement.

(f)    <u>Counterparts; Electronic Signature</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. The Parties may execute this Agreement in any number of duplicate originals, including by facsimile, electronic mail, or other electronic means, and the respective signatures of the Parties need not appear on the same counterpart. The delivery of a counterpart signature page by facsimile, electronic mail, or other electronic means shall constitute execution and delivery of this Agreement by the delivering Party to the other Party.

(g)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, and this Agreement supersedes any and all prior agreements between them, whether oral or written, relating to the subject matter hereof.

(h)    <u>Further Assurances</u>. The Parties agree and covenant that at any time and from time to time each shall promptly execute and deliver to the other Party such further instruments and take such further action as one Party may reasonably require of the other in order to carry out the full intent and purpose of this Agreement.

(i)      Governing Law; Venue. This Agreement shall be deemed to have been made and delivered in the State of Delaware, and construed in accordance with the laws of that state without regard to principles of conflicts of law. With respect to any controversy, dispute, or claim arising from or relating to this Agreement, including, not limited to, the breach, enforcement, interpretation, or termination of this Agreement (each, a "*Dispute*"), the Parties agree that service of process by one Party on the other in the manners provided in Section 8(k) shall be deemed effective service of process in such Dispute; *provided, however*, that service of process performed by way of email must be accompanied by a courtesy copy of service of process by way of certified mail, return receipt requested.

(j)      Interpretation. In this Agreement, unless a clear contrary intention appears: (i) pronouns in the masculine, feminine, and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and vice versa; (ii) if a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb); (iii) the term "including" shall be construed to be expansive rather than limiting in nature and to mean "including, without limitation"; (iv) the word "or" shall not be deemed exclusive; (v) references to Sections refer to Sections of this Agreement; (vi) the words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the exhibits or schedules to this Agreement (as applicable), and not to any particular subdivision unless expressly so limited; (vii) references in any Section or definition to any clause means such clause of such Section or definition; (viii) all references to dollars or "$" shall be to United States Dollars; (ix) any event contemplated by this Agreement requiring the payment of cash or cash equivalents on a day that is not a business day shall be deferred until the next business day; (x) any schedules to this Agreement are incorporated into this Agreement, in full, by reference; and (xi) Section titles and headings in this Agreement are used for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement. Any uncertainty and ambiguity of this Agreement shall not be interpreted against any one Party in favor of the other.

(k)      Notices. Any notices and other communications required or permitted to be given under this Agreement shall be made in writing and shall be deemed to have been duly given (i) when received by the receiving Party if transmitted by United States registered or certified mail, return receipt requested, to the receiving Party's address set forth on the signature page hereto, (ii) two (2) business days from the date transmitted to a receiving Party if transmitted by overnight or express mail, (iii) one (1) calendar day from the date transmitted to the receiving Party if sent by email at the receiving Party's email address set forth on the signature page hereto, or (iv) the date transmitted to the receiving Party if delivered in person to the receiving Party at the receiving Party's address set forth on the signature page hereto.

(l)      Severability. If any provision of this Agreement shall be held or made invalid or otherwise unenforceable by a court of competent jurisdiction, statute, rule, or otherwise, the remainder of this Agreement shall remain of full force and effect and not be affected thereby.

(m)      Waiver. Compliance with any provision of this Agreement may be waived only if such waiver is approved in writing by the Party entitled to the benefit thereof. The failure of a Party to terminate or enforce any provisions of this Agreement upon the occurrence of any event of a breach of this Agreement by the other Party will not be construed as a waiver or relinquishment of rights of the non-breaching Party, and this Agreement shall remain of full force and effect.

*[Signature Page Follows]*

The undersigned hereby executes this Subscription Agreement as of the date of its signature below.[1]

**Subscriber:**

| | |
|---|---|
| _____ Signature | _____ Email |
| _____ Name | _____ Address |
| _____ Signatory | _____ |
| _____ Title | _____ |
| _____ Taxpayer I.D. | _____ Date |

Company hereby accepts Subscriber's duly executed and completed copy of this Subscription Agreement, and agrees to issue a limited liability company membership interest to Subscriber as set forth herein, as of the date of its signature below.

**Company:**

| | |
|---|---|
| _____ Signature | dheller@hellercg.com Email |
| Prestige Fund B IV, LLC Name | 415 N. Prince St. Suite 200 Address |
| Daryl Heller Signatory | Lancaster, PA 17603 |
| Limited Liability Company Manager* Title | _____ Date |

*A limited liability company manager of Prestige Investment Group, LLC, a limited liability company manager of Prestige Funds Management, LLC, and a limited liability manager of Company.

Exhibit A: [Accreditation Disclosure Form]

---

[1]If you are signing on behalf of a legal entity, then please (i) identify the name of the legal entity for "**Name**," (ii) identify your name for "**Signatory**," (iii) identify the title you hold with respect to the legal entity for "**Title**," (iv) identify the legal entity's employment identification number for "**Taxpayer I.D.**," and (v) provide the contact information requested. If signing on behalf of yourself as a natural person, then please (i) disregard "**Signatory**" and "**Title**," (ii) identify your name for "**Name**," (iii) identify your social security number for "**Taxpayer I.D.**," and (iv) provide the contact information requested.

SUBSCRIPTION AGREEMENT

EXHIBIT A

---

*[The Accreditation Disclosure Form follows here.]*

ACCREDITATION DISCLOSURE FORM

The undersigned represents and warrants that the undersigned is an "accredited investor," as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, based on the following (*please check all that apply*):

| If signing this form as an individual: |
|---|

☐  The undersigned's income[1] during each of the last two (2) years exceeded two hundred thousand dollars ($200,000.00) or, if the undersigned is married, the joint income of the undersigned and their spouse during each of the last two (2) years exceed three hundred thousand dollars ($300,000.00), and the undersigned reasonably expects their income from all sources during this year, will exceed two hundred thousand dollars ($200,000.00) or, if the undersigned is married, the joint income of the undersigned and their spouse from all sources during this year will exceed three hundred thousand dollars ($300,000.00);

☐  The undersigned's net worth,[2] including the net worth of the undersigned's spouse, is in excess of one million dollars ($1,000,000.00) excluding the value of the undersigned's primary residence;

☐  The undersigned is a director, limited liability company manager, general partner, or executive officer of the issuer of the securities being purchased, or is a director, limited liability company manager, general partner, or executive officer of a general partner of the issuer of the securities being purchased;

☐  The undersigned possesses certain professional certifications, designations or credentials or other credentials issued by an accredited educational institution, which the Commission may designate from time to time by order, such as designated in good standing of the Licensed General Securities Representative (Series 7), Licensed Investment Adviser Representative (Series 65), or Licensed Private Securities Offerings Representative (Series 82);

☐  The undersigned is a "knowledgeable employee" as defined in Rule 3c-5(a)(4) under the Investment Company Act, of the issuer of the securities being offered where the issuer is a private fund (excluded from the definition of investment company in Section 3(c)(1) or 3(c)(7));

☐  The undersigned is a "spousal equivalent," so that spousal equivalents may pool their finances for the purpose of qualifying as accredited investors;

☐  The undersigned's professional representative has determined that the undersigned is an accredited investor, and such professional representative has (in addition to the undersigned) duly completed and executed this Accreditation Disclosure Form below; or

☐  The undersigned is unable to make any of the representations set forth above. If the undersigned nonetheless represents that Purchaser is an accredited investor, the undersigned's basis or bases for that representation is or are (*please explain; an empty field shall be presumed as a representation that the undersigned is not an accredited investor*):

---

[1] "***Income***" means adjusted gross income, as reported for federal income tax purposes, increased by the following amounts: (i) the amount of any tax exempt interest income received; (ii) the amount of losses claimed as a limited partner in a limited partnership; (iii) any deduction claimed for depletion; (iv) amounts contributed to an individual retirement account or Keogh retirement plan; (v) alimony paid; and (vi) any amounts by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Internal Revenue Code of 1986, as amended.
[2] "***Net worth***" means the excess of total assets, excluding a primary residence, at fair market value over total liabilities, including a mortgage or any other liability secured by your primary residence only if and to the extent that it exceeds the value of a primary residence. Net worth should include the value of any other shares of stock or options held by the undersigned and the undersigned's spouse and any personal property owned by you or your spouse (e.g. furniture, jewelry, other valuables, etc.).

**If signing this form on behalf of a legal entity:**

☐    The undersigned is a trust with total assets in excess of five million dollars ($5,000,000.00) whose purchase is directed by a person with such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the prospective investment in the issuer of the securities being purchased;

☐    The undersigned is: (i) a bank, insurance company, investment company registered under the Investment Company Act of 1940, as amended; (ii) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; (iii) a business development company (as that term is defined under the Investment Company Act of 1940, as amended); (iv) a Small Business Investment Company licensed by the Small Business Administration; (v) a plan with total assets in excess of five million dollars ($5,000,000.00) established and maintained by a state for the benefit of its employees; or (vi) a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended;

☐    The undersigned is a "family office," as defined in Rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940: with at least $5 million in assets under management, that is not formed for the specific purpose of acquiring the securities being offered, and whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that the family office is capable of evaluating the merits and risks of the prospective investment; or any such family office's "family clients," as defined in Rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940;

☐    The undersigned is an employee benefit plan and either (i) all investment decisions are made by a bank, savings and loan association, insurance company, or registered investment advisor, (ii) the undersigned has total assets in excess of five million dollars ($5,000,000.00), or (iii) if such plan is a self-directed plan, investment decisions are made solely by persons who are accredited investors;

☐    The undersigned is (i) either (a) a corporation, partnership, or business trust not formed for the purpose of acquiring the securities being purchased, or (b) an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, and (ii) has total assets in excess of five million dollars ($5,000,000.00);

☐    The undersigned is an entity in which each of its equity owners satisfies the definition of accredited investor applicable to individuals as described above. If relying upon this basis for qualifying as an accredited investor, each of the undersigned's equity owners must separately complete and duly execute a copy of this Accreditation Disclosure Form setting forth their separate basis or bases for qualifying as accredited investors as individuals;

☐    The undersigned is a limited liability company manager or general partner of the issuer of the securities being purchased, or is a limited liability company manager or general partner of a general partner of the issuer of the securities being purchased;

☐    The undersigned's professional representative has determined that the undersigned is an accredited investor, and such professional representative has (in addition to the undersigned) duly completed and executed this Accreditation Disclosure Form below; or

☐    The undersigned is unable to make any of the representations set forth above. If the undersigned nonetheless represents that the undersigned is an accredited investor, the undersigned's basis or bases for that representation is or are (*please explain; an empty field shall be presumed as a representation that the undersigned is not an accredited investor*):

**NOTE:** *If the undersigned does not have a professional representative concurrently representing and warranting that the undersigned is an accredited investor, the undersigned must provide to the issuer of the securities being purchased, together with a duly completed and executed copy of this Accreditation Disclosure Form, documentation which substantiates and evidences the representations and warranties made above. Such documentation would include bank account statements, investment account statements, tax returns, credit reports, analogous and other records prepared for corporations, partnerships, limited liability companies, and other entities, and any other information reasonably requested by the issuer of the securities being purchased to determine the undersigned's suitability as an investor.*

The undersigned hereby agrees to indemnify and hold harmless the issuer of the securities being purchased with respect to this representation and warranty (in addition to any other indemnity which the undersigned may separately owe to the issuer of the securities being purchased), and hereby executes this Accreditation Disclosure Form as of the date of its signature below.[3]

_____ Signature    _____ Signatory

_____ Name    _____ Title

_____ Date

***For the undersigned's professional representative (if applicable):***

I, _____,[4] of _____,[5]

represent the above-named individual or entity as their duly engaged and licensed (*check all that apply*):

☐    broker-dealer (my Central Registration Depository number is _____);
☐    registered investment adviser (my Central Registration Depository number is _____);
☐    attorney (I am licensed in the State of _____, and my state bar number or equivalent is _____); or
☐    certified public accountant (I am licensed in the State of _____, and my license number or equivalent is _____).

I represent and warrant to the issuer of the securities being purchased that, after taking reasonable steps to do so, I have determined that the above-named individual or entity is an accredited investor. Together with the above-named individual or entity, I agree to jointly and severally indemnify and hold harmless the issuer of the securities being purchased with respect to this representation and warranty. I hereby execute this Accreditation Disclosure form as of the date of my signature below.

_____ Signature    _____ Address

_____ Date    _____

_____ Email

---

[3] If signing on behalf of a legal entity, (i) identify the name of the legal entity for "***Name***," (ii) identify your name for "***Signatory***," and (iii) identify your title with respect to the legal entity for "***title***." If signing on behalf of yourself as a natural person, then only identify your name for "***Name***."
[4] Identify your full name here.
[5] Identify your place of employment here.

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

**This Limited Liability Company Operating Agreement (this "*Agreement*") of Prestige Fund B IV, LLC, a limited liability company duly organized under the laws of the State of Delaware (the "*Company*"), dated and effective as of December 4, 2020 (the "*Effective Date*"), is agreed to and adopted by the Members and the Company.**

## ARTICLE I
## DEFINITIONS

1.1     <u>Definitions</u>. As used in this Agreement, the following terms have the following meanings:

"*Act*" means the Delaware Limited Liability Company Act, and any successor statute, as amended.

"*Adjusted Capital Account*" means the Capital Account established and maintained for each Member, as the same is specially computed after giving effect to the following adjustments:

(i)     credit to such Member's Capital Account for any amounts which such Member is deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)     debit to such Member's Capital Account for the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of "*Adjusted Capital Account*" is intended to comply with the provisions of Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2 and shall be interpreted consistently therewith.

"*Affiliate*" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person. The term "Affiliate" of a Person shall be deemed to include any executive officer, director, or limited liability company manager of a Person, or holder, directly or indirectly, of five percent (5%) or more of the Membership Interests of a Person.

"*Agreed Value*" means, in the case of any contributions or distributions of Property, the fair market value of that Property, as the fair market value is determined by the Board of Managers using such reasonable method of valuation as it may adopt.

"*Agreement*" has the meaning specified in the introductory paragraph.

"*Allocation Year*" means (i) the period commencing on the date the Company is first classified as a partnership for U.S. federal income tax purposes and ending on December 31 of the year in which the Company has such classification, (ii) any subsequent 12-month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (i) or (ii) for which the Company is required to allocate Profit, Loss, and other items of Company income, gain, loss, or deduction for U.S. federal income tax purposes, unless the Company is required by Section 706 of the Code to use a different tax year, in which case such tax year.

"***Alternative Method***" has the meaning specified in Section 14.2(e).

"***Applicable Tax***" has the meaning specified in Section 14.5.

"***Certificate***" has the meaning specified in Section 2.1.

"***Board of Managers***" has the meaning specified in Section 7.1(a).

"***Built-In Gain***" means with respect to any Property (i) the excess of the Agreed Value of any Contributed Property over its adjusted basis for U.S. federal income tax purposes as of the time of contribution and (ii) in the case of any adjustment to the Gross Asset Value of any Property pursuant to the definition of Gross Asset Value, the Unrealized Gain with respect to that Property.

"***Built-In Loss***" means with respect to any Property (i) the excess of the adjusted basis for U.S. federal income tax purposes of any Contributed Property over its Agreed Value as of the time of contribution and (ii) in the case of any adjustment to the Gross Asset Value of any Property pursuant to the definition of Gross Asset Value, the Unrealized Loss with respect to that Property.

"***Business Day***" means any day other than a Saturday, a Sunday, or a holiday on which commercial banking institutions located in the State of Delaware are authorized or required to close.

"***Capital Account***" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(i) to each Member's Capital Account there shall be credited (a) such Member's Capital Contributions, (b) such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated to such Member pursuant to Section 5.1 or Section 5.2, and (c) the amount of any Company liabilities assumed by such Member or that are secured by any Property distributed to such Member;

(ii) to each Member's Capital Account there shall be debited (a) the amount of money and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, (b) such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated to such Member pursuant to Section 5.1 or Section 5.2, and (c) to the extent not taken into account in determining the amount of a Member's Capital Contribution under clause (i)(a) above, the amount of any liabilities of such Member assumed by the Company or that are secured by any Property contributed by such Member to the Company;

(iii) in the event a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest; and

(iv) in determining the amount of any liability for purposes of clauses (i) and (ii) above, there shall be taken into account any applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance

of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto are computed in order to comply with such Treasury Regulations, the Board of Managers may make such modification. The Board of Managers also shall (A) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), and (B) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b). The Company shall provide the Members with written notice of any such adjustments or modifications.

"***Capital Contribution***" means (i) with respect to any Member, the aggregate contributions made by or on behalf of such Member to the Company as of the date in question and (ii) in respect of any Membership Interest, the total amount of such contributions made by the applicable Member in respect of such Membership Interest, in each case net of any liabilities assumed by the Company from such Member in connection with such contribution and net of any liabilities to which assets contributed by such Member in respect thereof are subject.

"***Code***" means the Internal Revenue Code of 1986 and any successor statute, as amended.

"***Commission***" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

"***Company***" has the meaning specified in the introductory paragraph.

"***Company Level Taxes***" has the meaning specified in <u>Section 14.2(f)</u>.

"***Compensated Manager***" has the meaning specified in <u>Section 7.16</u>.

"***Confidential Information***" means any proprietary or confidential information of or relating to the Company or any of its Subsidiaries, including any business information, intellectual property, trade secrets or other information relating to the businesses, products, services, customers (whether former, current or prospective), vendors, technology, assets, or liabilities of the Company or any of its Subsidiaries, except for any information that is generally available to the public (otherwise than through a breach by the party disclosing the same of its obligations under this Agreement or a breach of its fiduciary duties to the Company).

"***Consolidated Group***" has the meaning specified in <u>Section 14.5</u>.

"***Contributed Property***" means any Property contributed by a Member to the capital of the Company with respect to a Membership Interest.

"***Controlled Entity***" means, with respect to any Person, any entity that is and continues to be "exclusively controlled" by such Person, with the term "exclusively control" meaning for purposes of this definition, the exclusive power to direct the management and policies of such entity, directly or indirectly, whether through ownership of voting securities or partnership or other ownership interests, or by contract, or otherwise.

"***Covered Audit Adjustment***" has the meaning specified in <u>Section 14.2(e)</u>.

"***Covered Person***" means each Person that is or was a Member, Manager, or if and to the extent determined by the Board of Managers, an officer or employee or agent of the Company or any of its Affiliates, or who is or was serving at the request of the Company as a member, officer, or director of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, and any other Person the Board of Managers determine to designate as a Covered Person.

"***Depreciation***" means, for each Allocation Year or other period, an amount equal to the depreciation, amortization (including pursuant to Sections 195, 197 and 709 of the Code), or other cost recovery deduction allowable with respect to a Property for such period for U.S. federal income tax purposes, except that (i) with respect to a Property whose Gross Asset Value differs from its adjusted basis for U.S. federal income tax purposes and which difference is being eliminated by use of the "remedial allocation method" as defined in Treasury Regulations Section 1.704-3(d), Depreciation for such period shall be the amount of the book basis recovered for such period under the rules prescribed in Treasury Regulations Section 1.704-3(d)(2), and (ii) with respect to any other Property whose Gross Asset Value differs from its adjusted tax basis at the beginning of such period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the U.S. federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; *provided*, *however*, that if the U.S. federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"***Designee Party***" means Prestige Funds Management, LLC.

"***Designee Manager***" has the meaning specified in Section 9.8(b)(i).

"***Dispute***" has the meaning specified in Section 17.8.

"***Drag-Along Members***" has the meaning specified in Section 11.2(d)(vi)(A).

"***Drag-Along Notice***" has the meaning specified in Section 11.2(d)(vi)(A).

"***Drag-Along Right***" has the meaning specified in Section 11.2(d)(vi)(A).

"***Dragged Members***" has the meaning specified in Section 11.2(d)(vi)(A).

"***Effective Date***" has the meaning specified in the introductory paragraph of this Agreement.

"***Election Out***" has the meaning specified in Section 14.2(f).

"***Equity Securities***" means equity securities of the Company, and includes Membership Interests of all classes of Membership Interests (including non-voting Membership Interests), whether or not now authorized, and all options, warrants, rights, subscriptions, and other securities, agreements, or commitments convertible into, or exchangeable for, or evidencing a right to receive or purchase, Membership Interests or other equity securities of the Company.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended, and any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time. Reference to a particular section of the Exchange Act

shall include a reference to the comparable section, if any, of any such similar or successor federal statute.

"*Fair Market Value*" means, for purposes of this Agreement, the fair market value with no deduction for lack of marketability or minority interest; determined in accordance with the procedures set forth in <u>Section 11.3</u>.

"*Family Group*" means, with respect to any natural Person, such Person's spouse and descendants (whether natural or adopted).

"*First Resort Indemnitors*" has the meaning specified in <u>Section 15.4(a)</u>.

"*Fully Diluted Basis*" means, with respect to any Member or other holder of Equity Securities, as of any date, the proportionate amount of a class of Membership Interests held by such Member or other holder in relation to the total number of such class of Membership Interests that are then outstanding on a Fully Diluted Basis. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Fully Diluted Percentage Interest of the transferor to the extent it relates to the transferred Membership Interest.

"*Fully Diluted Percentage Interest*" means, with respect to any Member or other holder of Equity Securities, as of any date, the proportionate amount of a class of Membership Interests held by such Member or other holder in relation to the total number of such class of Membership Interests that are then outstanding on a Fully Diluted Basis. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Fully Diluted Percentage Interest of the transferor to the extent it relates to the transferred Membership Interest.

"*GAAP*" means generally accepted accounting principles in the Membership Interests States, consistently applied throughout a specified period and, if applicable, the immediately preceding comparable period.

"*Governmental Entity*" means any U.S. federal, state, local, or foreign court, executive office, legislature, governmental agency or ministry, commission, or administrative, regulatory, or self-regulatory authority or instrumentality.

"*Gross Asset Value*" means with respect to any Property, the Property's adjusted basis for U.S. federal income tax purposes, except as follows:

(i)    the initial Gross Asset Value of any Property contributed by a Member to the Company shall be the gross fair market value of such Property as agreed to by the Board of Managers and the Member contributing such Property;

(ii)    immediately prior to the occurrence of a Revaluation Event, the Gross Asset Values of all Properties shall be adjusted to equal their respective fair market values (taking Section 7701(g) of the Code into account), as that fair market value is determined by the Board of Managers; *provided*, *however*, if any Noncompensatory Option is outstanding upon the occurrence of a Revaluation Event, Gross Asset Values shall be adjusted in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(f)(1) and 1.704-1(b)(2)(iv)(h)(2);

(iii)    the Gross Asset Value of any Property distributed to any Member shall

be adjusted to equal the gross fair market value (taking Section 7701(g) of the Code into account) of such Property on the date of distribution; and

(iv)    the Gross Asset Values of each Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Property pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and clause (vi) of the definition of "Profits" and "Losses"; *provided*, *however*, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent an adjustment pursuant to clause (i) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of a Property has been determined or adjusted pursuant to clause (i) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Property, for purposes of computing Profits and Losses.

"*Indebtedness*" of a Person means any indebtedness for borrowed money or deferred purchase price of property which may be evidenced by a note, bond, or other instrument.

"*Indemnifiable Losses*" has the meaning specified in <u>Section 15.3(a)</u>.

"*JAMS*" has the meaning specified in <u>Section 17.16</u>.

"*Last Resort Indemnitors*" has the meaning specified in <u>Section 15.4(a)</u>.

"*Law*" means a law, statute, ordinance, rule, code, or regulation enacted or promulgated, or order, directive, instruction, or other legally binding guideline or policy issued or rendered by, any Governmental Entity.

"*Legal Person*" means any partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, or other entity or organization.

"*Lien*" means a lien, mortgage, deed of trust, deed to secure debt, pledge, hypothecation, assignment, deposit arrangement, easement, preference, priority, assessment, security interest, charge, claim, adverse claim, levy, interest of other Persons, or any other encumbrance or restriction of any kind.

"*Liquidating Agents*" has the meaning specified in <u>Section 16.2</u>.

"*Liquidity Event*" means distributions by the Company outside of the ordinary course of business, including in connection with (i) a merger, consolidation, reorganization, recapitalization, or other similar transaction with the Company that would result in the Members of the Company immediately prior to such merger, consolidation, reorganization, or other similar transaction owning less than fifty percent (50%) of the equity securities or other equity interests (measured by voting power) of the surviving, resulting, or acquiring entity (or of its parent if such parent owns one hundred percent (100%) of the surviving, resulting, or acquiring entity); *provided, however,* that each Member shall receive its applicable portion of the aggregate proceeds, merger consideration, or other consideration of such transaction in accordance with this Agreement; (ii) a sale of all or substantially all of the assets of the Company or other change of control of the Company; (iii) any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary; (iv) a transaction through which the Company obtains a loan or takes on

Indebtedness to fund a distribution to its Members; (v) the return of capital distributions to the Company's Members other than pursuant to distributions specifically authorized under this Agreement; or (vi) distributions by the Company to its Members of proceeds raised by the Company or any of its Subsidiaries from an initial public offering or other securities offerings.

"***Manager***" shall mean any member of the Board of Managers.

"***Member***" means each of, and "***Members***" means collectively, the Persons executing this Agreement as of the Effective Date or hereafter admitted to the Company as a limited liability company member as provided in this Agreement, and for purposes of <u>Article XI</u> shall include all holders of Membership Interests on a Fully Diluted Basis.

"***Membership Interests***" means the ownership interests of the Members in the Company, including rights to liquidating and other distributions, allocations, and information, and the right to vote, consent or approve (but only to the extent set forth in this Agreement) *provided, however,* that for purposes of <u>Article X</u> and <u>Article XI</u>, "***Membership Interests***" shall include all warrants and options to acquire Membership Interests.

"***Net Asset Value***" of the Company means the aggregate Gross Asset Value of the Fund's Property or Properties, at the Property's or Properties' (as applicable) fair market value, less the Company's liabilities (including, but not limited to, accrued but unpaid expenses and any reserves of cash held by the Company at the Board of Manager's discretion).

"***Noncompensatory Option***" has the meaning given such term in Treasury Regulations Sections 1.721-2(f) and 1.761-3(b)(2) that is not treated as a "partnership interest" of the Company pursuant to Treasury Regulations Section 1.761-3(a).

"***Nonrecourse Deductions***" has the meaning given such term in Treasury Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for any Allocation Year equals the excess, if any, of the net increase, if any, in the amount of Partnership Minimum Gain attributable to Nonrecourse Liabilities during such Allocation Year over the aggregate amount of any distributions during such Allocation Year of proceeds of a Nonrecourse Liability that are allocable to an increase in Partnership Minimum Gain attributable to Nonrecourse Liabilities, determined in accordance with the provisions of Treasury Regulations Section 1.704-2(c).

"***Nonrecourse Liability***" has the meaning given such term in Treasury Regulations Section 1.704-2(b)(3).

"***Offered Membership Interests***" has the meaning specified in <u>Section 11.2(a)(ii)</u>.

"***Option A***" has the meaning specified in <u>Section 14.2(f)</u>.

"***Option B***" has the meaning specified in <u>Section 14.2(f)</u>.

"***Outside Managers***" means those individuals from time to time serving as Managers who are not officers or employees of the Company or one (1) or more of its Subsidiaries.

"***Partner Minimum Gain***" has the meaning given the term "partner nonrecourse debt minimum gain" set forth in Treasury Regulations Section 1.704-2(i)(2), and will be computed as provided in Treasury Regulations Section 1.704-2(i)(3).

"***Partner Nonrecourse Debt***" has the meaning given such term in Treasury Regulations

Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning given such term in Treasury Regulations Section 1.704-2(i). The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for any Allocation Year equals the excess, if any, of the net increase, if any, in the amount of Partner Minimum Gain attributable to such Partner Nonrecourse Debt during such Allocation Year over the aggregate amount of any distributions during such Allocation Year to the Member that bears the economic risk of loss for such Partner Nonrecourse Debt to the extent such distributions are from the proceeds of such Partner Nonrecourse Debt and are allocable to an increase in Partner Minimum Gain attributable to such Partner Nonrecourse Debt determined in accordance with Treasury Regulations Section 1.704-2(i).

"*Partnership Minimum Gain*" has the meaning given such term in Treasury Regulations Section 1.704-2(b)(2), and will be computed as provided in Treasury Regulations Section 1.704-2(d).

"*Partnership Representative*" has the meaning specified in Section 14.2.

"*Partnership Tax Audit Rules*" means Sections 6221 through 6241 of the Code, as amended, together with any guidance issued thereunder or successor provisions and any similar provision of state or local tax laws.

"*Percentage Interest*" means, with respect to any Member, as of any date, the proportionate amount of a class of Membership Interests held by such Member in relation to the total number of such class of Membership Interests that are then outstanding. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Percentage Interest of the transferor to the extent it relates to the transferred Membership Interest.

"*Permitted Transfer*" means any of the following Transfers by a Transferor Person of any Membership Interest(s) or other Equity Security in the Company:

      (i)     (A) a sale, assignment, conveyance, gift, or other disposition to (I) any Controlled Entity of such Transferor Person or (II) the trustee of any Permitted Trust with respect to such Transferor Person, and (B) any subsequent sale, assignment, conveyance, gift, or other disposition from such Controlled Entity or Permitted Trust to the Transferor Person that previously owned such Membership Interests or other Equity Securities;

      (ii)    a sale, assignment, conveyance, gift, or other disposition to one (1) or more members of the Transferor Person's Family Group or to any Controlled Entity of one (1) or more members of the Transferor Person's Family Group; *provided, however,* that no Transferor Person shall Transfer Membership Interests or other Equity Securities pursuant to this subsection (ii) if such Transferred Membership Interests and other Equity Securities constitute (collectively with any and all other Membership Interests and other Equity Securities previously Transferred by such Transferor Person pursuant to this subsection (ii)) (A) a Percentage Interest of more than ten percent (10%), or (B) twenty percent (20%) of the Membership Interests or other Equity Securities held by such Transferor Person immediately prior to such Transfer or Transfers;

      (iii)   a transfer to the Company or one (1) or more Members pursuant to the exercise of any of (A) the purchase options described in Section 11.2 hereof, or (B) the purchase rights under one (1) or more separate agreements of the Company with certain

employee Members, if any;

(iv)    in the case of a Transferor Person which is a corporation, limited liability company, or partnership, a distribution from such corporation, limited liability company or partnership to its shareholders, limited liability company members, or partners, as applicable; or

(v)    any *bona fide* pledge by a Member made pursuant to a *bona fide* loan transaction that creates a mere security interest; *provided, however,* that upon any default by a pledgor Member, any Transfer to the pledgee is not a Permitted Transfer and therefore shall be subject to the restrictions on Transfer set forth in <u>Article XI</u>.

"***Permitted Trust***" means, with respect to any Transferor Person that is a natural person, any trust (i) that is held exclusively for the benefit of such Transferor Person or members of such Transferor Person's Family Group, (ii) with respect to which the initial and any successor sole trustee is the Transferor Person or a member of such Transferor Person's Family Group, and (iii) with respect to which the governing trust agreement requires that no Person other than the Transferor Person or a member of such Transferor Person's Family Group shall serve as trustee prior to the termination of this Agreement (unless the Transferor Person is deceased, incapacitated or otherwise not qualified to serve).

"***Person***" means any individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, governmental authority, or other entity or organization.

"***Preferred Member***" means a Member that: (i) is a Legal Person; (ii) was formed the principal purpose of investing in securities (including Membership Interests); and (iii) is admitted as Preferred Member subject to the sole and absolute discretion of the Board of Managers.

"***Pro Rata Share***" means the ratio determined by dividing the specified Fully Diluted Percentage Interest of each Member to whom a particular provision of this Agreement is stated to apply by the aggregate of the specified Fully Diluted Percentage Interests of all Members to whom that provision is stated to apply.

"***Proceeding***" has the meaning specified in <u>Section 15.3(a)</u>.

"***Profit***" and "***Loss***" means, for each Allocation Year or other period, an amount equal to the Company's U.S. federal taxable income or loss, respectively, under Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 702(a) of the Code), with the following adjustments:

(i)    any income of the Company exempt from U.S. federal income tax and not otherwise taken into account in computing taxable income or loss will be added to such taxable income or loss;

(ii)    any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section l.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing taxable income or loss will be subtracted from such taxable income or loss;

(iii)    in the event the Gross Asset Value of any Property is adjusted pursuant to clauses (ii) or (iii) of the definition of Gross Asset Value, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the Property) or an item of loss (if the adjustment decreases the Gross Asset Value of the Property) from the disposition of such Property and shall be taken into account for purposes of computing Profits or Losses;

(iv)    gain or loss resulting from any disposition of any Property with respect to which gain or loss is recognized for U.S. federal income tax purposes will be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(v)    in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there will be taken into account Depreciation for such Allocation Year or other period;

(vi)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734 of the Code is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Membership Interests, the amount of such adjustment shall be treated either as an item of gain (if the adjustment increases the basis of the asset) or an item of loss (if the adjustment decreases the basis of the asset) from the disposition of the asset;

(vii)    any fees and other expenses incurred by the Company to promote the sale of (or to sell) a Membership Interest that can neither be deducted nor amortized under Section 709 of the Code will be treated as an item of deduction; and

(viii)    excluding any items specially allocated pursuant to Section 5.1 or Section 5.2.

The amounts of the items of income, gain, loss, or deduction available to be specially allocated pursuant to Section 5.1 and Section 5.2 shall be determined by applying rules analogous to those set forth in clauses (i) through (vii) above.

"*Prohibited Transfer*" has the meaning specified in Section 11.5(a).

"*Property*" means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"*Proposed Acquisition Transaction*" means any transaction or series of related transactions that would result in any of the following:

(i)    the sale of all or substantially all of the Membership Interests and other Equity Securities of the Company, with each Member receiving its Percentage Interest of the aggregate proceeds of such sale;

(ii)    the sale of all or substantially all of the assets of the Company; or

(iii)    a merger, consolidation, reorganization, recapitalization, or other similar transaction with the Company that would result in the Members of the Company

immediately prior to such merger, consolidation, reorganization, or other similar transaction owning less than fifty percent (50%) of the equity securities or other equity interests (measured by voting power) of the surviving, resulting or acquiring entity (or of its parent if such parent owns one hundred percent (100%) of the surviving, resulting, or acquiring entity); *provided, however,* that each Member shall receive its Percentage Interest of the aggregate proceeds, merger consideration or other consideration of such transaction.

"*Record Holder*" means the Person in whose name a Membership Interest is registered as of the close of business on a particular day.

"*Reporting Member*" has the meaning specified in Section 14.5.

"*Required Vote*" has the meaning specified in Section 9.8(a).

"*Revaluation Event*" means each of the following events: (i) the contribution of money or other property (other than a *de minimis* amount) by any Person, including an existing Member, to the capital of the Company in respect of a Membership Interest; (ii) the grant of a Membership Interest (other than a *de minimis* amount) as consideration for the provision of services to or for the benefit of the Company by any Person, including an existing Member, or by a new Member acting in a member capacity or in anticipation of becoming a member; (iii) the distribution of money or other property (other than a *de minimis* amount) by the Company to a retiring or continuing Member as consideration for a Membership Interest; (iv) the liquidation of the Company; (v) the issuance of a Noncompensatory Option; or (vi) such other times as the Board of Managers reasonably determines necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2.

"*Securities Act*" means the Securities Act of 1933, as amended, and any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time. Reference to a particular section of the Securities Act shall include a reference to the comparable section, if any, of any such similar or successor federal statute.

"*Spousal Addendum*" has the meaning specified in Section 3.3(b)(iii).

"*Subsidiary*" means any corporation, partnership, or limited liability company of which the Company from time to time owns, directly or indirectly through one (1) or more other corporations, partnerships, or limited liability companies, fifty percent (50%) or more of the outstanding capital stock or partnership or membership interests having general voting power.

"*Tag-Along Rights*" has the meaning specified in Section 11.2(d)(iii).

"*Tag-Along Membership Interests*" has the meaning specified in Section 11.2(d)(iii).

"*Taxing Authority*" means any Governmental Entity responsible for the imposition, assessment, enforcement, or collection of any tax.

"*Transfer(ed)*" means any direct or indirect change in the ownership of any Membership Interest(s) or other Equity Security in the Company, whether made voluntarily or involuntarily, by operation of law, or otherwise, including, but not limited to:

(i)    a sale, assignment, grant, conveyance, gift, or other disposition (other

than by operation of law or as otherwise described in clauses (ii) through (ix) below) to any Person, including but not limited to any terminating or non-terminating distribution from a Permitted Trust or from any other trust that is not a Permitted Trust (whether voluntarily or involuntarily or by operation of law);

(ii)    a transfer to the personal representative of the estate of a Member upon such Member's death, and any subsequent transfer from such personal representative to the heirs of the deceased Member under his or her will or by the laws of descent and distribution;

(iii)    a transfer to a judicially appointed personal representative as a result of the adjudication by a court of competent jurisdiction that the Transferor Person is mentally incompetent to manage his or her person or property and such mental incompetence has lasted or is expected to last more than six (6) months;

(iv)    a transfer to the Transferor Person's spouse or former spouse, or heirs of such spouse or former spouse, in connection with a division of their community property in the event of a divorce involving the Transferor Person and such spouse or former spouse;

(v)    a transfer to the Transferor Person's spouse or former spouse, or heirs of such spouse or former spouse, in connection with a division of their community property upon the death of the Transferor Person or such spouse;

(vi)    a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon (or assignment in lieu of such foreclosure) or execution against any Lien on such Membership Interest(s) or other Equity Security;

(vii)    the filing by the Transferor Person of a voluntary bankruptcy petition;

(viii)    the entry of a judicial order granting the relief requested by the petitioner in an involuntary bankruptcy proceeding filed against the Transferor Person; or

(ix)    any Permitted Transfer.

"***Transfer Notice***" has the meaning specified in <u>Section 11.2(a)(ii)</u>.

"***Transferor Person***" has the meaning specified in <u>Section 11.1(a)</u>.

"***Treasury Regulations***" means the regulations, including temporary regulations, promulgated under the Code by the U.S. Department of Treasury, as those regulations may be amended from time to time. Any reference herein to a specific section of the Treasury Regulations shall include any corresponding provisions of succeeding, similar, substitute, or final Treasury Regulations.

"***Unrealized Gain***" means, with respect to any Property as of the date of determination, the excess of the fair market value of that Property as of that date of determination over the Gross Asset Value of that Property as of that date of determination.

"***Unrealized Loss***" means, with respect to any Property, the excess of the Gross Asset Value of that Property as of that date of determination over the fair market value of that Property

as of that date of determination.

"**_Venue_**" has the meaning specified in <u>Section 17.8</u>.

1.2     <u>Construction</u>. In this Agreement, unless a clear contrary intention appears: (a) pronouns in the masculine, feminine and neuter genders shall be construed to include any other gender, and words in the singular form shall be construed to include the plural and _vice versa_; (b) if a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb); (c) the term "including" shall be construed to be expansive rather than limiting in nature and to mean "including, without limitation"; (d) the word "or" shall not be deemed exclusive; (e) references to Articles and Sections refer to Articles and Sections of this Agreement; (f) the words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the exhibits appended to this Agreement, and not to any particular subdivision unless expressly so limited; (g) references in any Article or Section or definition to any clause means such clause of such Article, Section or definition; (h) each schedule or exhibit to this Agreement is hereby incorporated in this Agreement and made a part of this Agreement for all purposes as if set forth in full in this Agreement; (i) all references to dollars or "$" shall be to the lawful currency of the U.S. of America; (j) references to "federal" or "Federal" means U.S. federal or U.S. Federal, respectively; (k) all accounting terms used in this Agreement and not expressly defined shall have the meanings given to them under GAAP; (l) any event contemplated by this Agreement requiring the payment of cash or cash equivalents on a day that is not a Business Day shall be deferred until the next Business Day; and (m) the Table of Contents and the Article and Section titles and headings in this Agreement are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

1.3     <u>GAAP and Consolidation</u>. For financial reporting purposes, all Company financial statements referred to in this Agreement, and all references to the assets, liabilities, revenues, income, expenses, losses, and financial position and results of operations of the Company shall be prepared, presented, and determined in accordance with GAAP and, to the extent required or permitted by GAAP, on a consolidated basis for the Company and its consolidated Subsidiaries.

# ARTICLE II
# ORGANIZATION

2.1     <u>Formation</u>. The Company was formed as a Delaware limited liability company by the filing of the Certificate of Formation (the "**_Certificate_**") with the Division of Corporations of the State of Delaware under and pursuant to the Act.

2.2     <u>Name</u>. The name of the Company is "Prestige Fund B IV, LLC". All Company business shall be conducted in that name or such other names that comply with applicable Law as the Board of Managers may select from time to time.

2.3     <u>Registered Office; Registered Agent; Principal Office in the U.S.; Other Offices</u>. The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board of Managers may designate from time to time in the manner provided by Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board of Managers may designate from time to time in the manner provided by Law. The principal office of the Company in the U.S. shall be at such place as the Board of Managers may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there as required by the Act and

shall keep the street address of such principal office on file at the registered office of the Company in the State of Delaware. The Company may have such other offices as the Board of Managers may designate from time to time.

2.4   <u>Purposes and Powers</u>. The Company is being formed to (i) engage directly in, or enter into or form any entity or any arrangement to engage indirectly in, any business activity the Board of Managers approves which a limited liability company formed under the Act lawfully may conduct and, in connection therewith, exercise all the rights and powers conferred on, and perform or comply with all obligations incurred by or imposed on, the Company in or pursuant to the agreements relating to that business activity; and (ii) do anything necessary or convenient to the conduct and promotion of the business of the Company.

The Company shall have all such powers as are necessary or appropriate to carry out the purpose of the Company, including the power to:

(a)   conduct its business, carry on its operations, and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district, or possession of the U.S. or in any foreign country;

(b)   acquire (by purchase, lease, contribution of property, or otherwise), own, hold, operate, maintain, improve, lease, sell, convey, mortgage, transfer, or dispose of any real or personal property that may be necessary, convenient, or incidental to the accomplishment of the purpose of the Company;

(c)   enter into, perform, and carry out contracts and leases (including contracts and leases with any Member, Manager, or officer of the Company or any Affiliate of any of them) necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(d)   extend, renew, terminate, modify, amend, waive, execute, acknowledge, or take any other action with respect to any contracts or leases entered into by the Company;

(e)   purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other securities or obligations of or interests in domestic or foreign corporations, associations, general or limited partnerships, trusts, or limited liability companies;

(f)   borrow money and issue evidences of indebtedness, and to secure the same by Liens on the real and personal property of the Company;

(g)   lend money for any proper purpose, invest and reinvest its funds, and to take and hold real and personal property for the payment of funds so loaned or invested;

(h)   sue and be sued, complain and defend, and participate in administrative or other proceedings, in the name of the Company or otherwise, and pay, collect, compromise, litigate, arbitrate, or otherwise adjust or settle any and all other claims or demands of or against the Company;

(i)   appoint employees and agents of the Company, and define their duties and fix their compensation;

(j)   indemnify any Person in accordance with and subject to applicable Law and to obtain any and all types of insurance;

(k)    exercise all general powers granted under the Act; and

(l)    take all such other actions and to make, execute, acknowledge, and file any and all documents or instruments related to the exercise of any of the foregoing powers or otherwise necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.5    <u>Qualification in Other Jurisdictions</u>. The Board of Managers shall cause the Company to be qualified, formed, or registered under limited liability company acts, assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business and in which the Board of Managers determines that qualification, formation, or registration is necessary or appropriate. Any officer of the Company designated by the Board of Managers shall have the authority to execute, deliver, and file such certificates and other instruments (and any amendments thereto or restatements thereof) as are necessary for the Company to be qualified, formed, or registered under limited liability company acts, assumed or fictitious name statutes, or similar Laws in any jurisdiction in which the Company transacts business.

2.6    <u>No State-Law Partnership</u>. The Company shall not be a partnership (including a general or limited partnership) or a joint venture, and no Member or Manager, by virtue of his, her, or its status as a member or manager, respectively, of the Company, shall be (or shall be deemed) a partner or joint venturer of any other Member or Manager, for any purpose other than federal and state income tax purposes, and this Agreement shall not be construed to suggest otherwise.

2.7    <u>Term</u>. The Company commenced upon the filing of the Certificate with the Division of Corporations of the State of Delaware and shall continue in existence indefinitely or until such time as this Agreement may specify.

**ARTICLE III**
**MEMBERSHIP AND MEMBERSHIP INTERESTS**

3.1    <u>Admission as Members</u>. Any Person to whom a Membership Interest is issued by the Company in accordance with the terms and conditions of this Agreement shall be admitted as a Member upon compliance with all applicable requirements of <u>Section 3.3</u>. Any Person to whom a Membership Interest is Transferred in accordance with the terms and conditions of this Agreement shall be admitted as a Member upon compliance with the applicable requirements of <u>Article X</u> and <u>Article XI</u>. Any Legal Person whom has been admitted as a Preferred Member may be reclassified as a non-Preferred Member at any time by the Board of Managers, subject to its sole and absolute discretion.

3.2    <u>Membership Interests</u>.

(a)    The Company shall have the authority to issue an unlimited number of Membership Interests; *provided, however*, that the Company shall not accept more than one hundred million dollars ($100,000,000.00) in aggregate Capital Contributions absent the prior, written consent of the Board of Managers. Membership Interests shall be of the same rights, privileges, and obligations; *provided, however*, that subject to the terms and conditions of this Agreement, the Company may also authorize and issue separate classes Membership Interests as the Board of Managers may determine from time to time.

(b)    No Membership Interest will entitle its holder to (i) any preemptive or preferential right to acquire or subscribe for any Membership Interests of any class or series, whether now or hereafter authorized, which at any time the Company may issue, offer for sale or sell, or (ii) any right to cumulate votes in any election of the Board of Managers.

LIMITED LIABILITY COMPANY OPERATING AGREEMENT
- 15 -

3.3     <u>Future Issuances of Equity Securities; Admission Procedures</u>.

(a)     Subject to <u>Section 7.3</u>, the Company may issue Equity Securities (in addition to the Membership Interests issued or authorized to be issued by <u>Section 3.2</u>) to Members or any other Persons, for any purpose, upon authorization of the Board of Managers and without the approval of the Members (other than any required approvals of the Members, as set forth in this Agreement). The Company may assume liabilities in connection with the issuance of Equity Securities if the Board of Managers so determines. The Board of Managers shall determine the consideration for, and the terms and conditions of, any future issuance of Equity Securities.

(b)     The issuance of any Equity Securities to any Person, admission of any Person as a Member upon the issuance of Membership Interests pursuant to this <u>Section 3.3</u>, or, if applicable, pursuant to any exercise or conversion into Membership Interests of any exercisable or convertible Equity Securities, shall be effective only when:

(i)     *reserved*;

(ii)     *reserved*; and

(iii)     such Person's spouse, if applicable, has executed and delivered to the Company an "Addendum for Spouses" in the form attached as <u>Exhibit 3.3(b)(iii)</u> to this Agreement (or in such other form as may be approved by the Company in its sole discretion) (the "***Spousal Addendum***").

3.4     <u>Reserved</u>.

3.5     <u>Reserved</u>.

3.6     <u>Non-Equity Securities</u>. The Company may also issue any type of non-equity security of the Company from time to time to the Members or other Persons on terms and conditions established by the Board of Managers.

3.7     <u>Nature of Interests</u>. Membership Interests, and Membership Interests thereof, are personal property. No Member, in his, her, or its capacity as such, shall have any rights in respect of, or interest in, specific property of the Company; *provided, however*, that the foregoing shall not be construed to limit or adversely affect any Member's rights to the distribution of any property of the Company to the extent made pursuant to <u>Section 16.2</u>.

3.8     <u>Outside Activities of Members; Competition</u>. Each Member may have other business interests and may engage in other activities in addition to being Members of the Company. Such other business interests and activities may be of any nature or description, and may be engaged in independently or with others; *provided, however*, that any Member who wishes to have business interests in, or engage in, any business that competes with the Company shall (a) provide prior written notice to the Board of Managers, (b) maintain the confidentiality of any non-public information about the Company or any of its business activities, (c) not disparage the Company or any of the officers, Managers, employees, or agents of the Company to any other Person, and (d) not solicit any officer, employee, independent contractor, customer, supplier, or vendor to cease doing business with the Company or otherwise interfere with the Company's business relationship with any such Person; *provided*, *further*, that the foregoing shall not limit a Member from hiring any employee or former employee of the Company who responds to a general public solicitation of prospective candidates that is not directed at employees of the Company. Neither the Company nor any other Member shall have any right, by virtue of this Agreement or the relationship created hereby, in or to such other ventures or activities of a Member or its Affiliates, or to

the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper. The Members shall have the right to take for their own account or the account of their Affiliates, or to recommend to others, any investment opportunity; *provided, however,* that such Member did not first become aware of such investment opportunity pursuant to its membership in the Company. Notwithstanding anything in this Section 3.8 to the contrary, any Member shall have the right to take for its own account or the account of its Affiliates, or to recommend to others, any investment opportunity (regardless of whether it first became aware of such investment opportunity pursuant to its membership in the Company) if such Member first obtains the unanimous written consent of the Managers. This Section 3.8 is subject to and shall not limit or nullify the terms and provisions of any employment or other agreement (including any restrictive covenants therein) between the Company and any Member that is also an officer or employee of the Company.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

4.1     Capital Contributions. Each Member shall be obligated to make a contribution of capital in an amount that, absent the prior written consent of Company, (i) is not less than $52,000.00, and (ii) is an amount other than a multiple of $52,000.00, as may be agreed upon between a Member and Company in writing.

4.2     Subsequent Capital Contributions. No Member shall be obligated to make any Capital Contributions other than as required by Section 4.1 or by any separate and subsequent subscription or other agreement executed by such Member. From time to time after the Effective Date, the Company may accept such Capital Contributions (in addition to those required by Section 4.1) as are authorized by the Board of Managers, in connection with the issuance of new Membership Interests or other Equity Securities or otherwise, in accordance with and as permitted by this Agreement.

4.3     No Return of Capital Contributions. Except as expressly provided elsewhere in this Agreement, and except as may be separately undertaken by the Company in a written agreement signed by the Company and approved by the Board of Managers as required by Section 7.3, a Member shall not be entitled to the return of any of his, her, or its Capital Contributions, or to be paid any interest, salary or draw in respect of his, her, or its Capital Contributions or Capital Account. An unpaid Capital Contribution shall not be a liability of the Company or any Member.

4.4     Capital Accounts. A separate Capital Account shall be established and maintained for each Member. Each Member shall have a single Capital Account that reflects all of a Member's Membership Interests, regardless of class or the time or manner in which acquired.

4.5     Withdraw of Capital Account.

(a)     No Voluntary Withdrawals. Except as may be required under Section 4.5(c), no Member may withdraw any portion of its Capital Account for any reason.

(b)     Involuntary Withdrawals by the Members. The Board of Managers, in its sole discretion, may require that a Member (or the holder of a Membership Interest who is not a Member) withdraw all or a portion of the Member's Capital Account and withdraw as a Member of the Company for any reason.

(c)     Hold on Total Withdrawal. Where a Member (or a holder of a Membership Interest who is not a Member) is required to withdraw all of the Member's Capital Account under Section 4.5(b), the Company may retain up to ten percent (10%) of the amount withdrawn for up to (120) days for purposes of reconciling the Company's Net Asset Value.

(d)    <u>Withdrawal Proceeds in Cash or In Kind.</u> Capital Account withdrawals shall be in cash or, in the sole discretion of the Board of Managers, in securities or other assets selected by the Board of Managers which are the Company's Property, or through a combination thereof. If any withdraw is paid in securities or other assets which are the Company's Property, the transfer of such securities or other assets shall be subject to such conditions and restrictions as the Board of Managers reasonably determines are legally required or appropriate.

## ARTICLE V
## ALLOCATIONS

5.1    <u>General Allocation Rule</u>. After giving effect to the special allocations set forth in <u>Section 5.2</u> and after adjusting for all Capital Contributions and distributions made during the Allocation Year, Profits and Losses (or to the extent necessary, individual items of profit, income, gain, loss, or deduction) shall be allocated among the Members in a manner such that the Capital Account balance of each Member, immediately after giving effect to such allocation, is, as closely as possible (proportionately), equal to (a) the amount that would be distributed to such Member if (i) the Company were dissolved, its affairs wound up, and its assets were sold for cash in amounts equal to their respective Gross Asset Values (determined, for the avoidance of doubt, without any adjustment on account of the deemed liquidation described in this sentence), (ii) all liabilities of Company were satisfied in accordance with their terms (limited, with respect to each Nonrecourse Liability, to the Gross Asset Values of the assets securing each such liability), and (iii) the resulting or remaining assets of Company were distributed to the Members in accordance with <u>Section 16.3</u>, minus (b) the sum of (i) such Member's share of Partnership Minimum Gain and such Member's Partner Minimum Gain, computed immediately prior to the hypothetical sale of the Company's assets described in clause (a), and (ii) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a member, to the Company immediately after the hypothetical sale of assets described in clause (a).

5.2    <u>Special Tax Allocations</u>. Notwithstanding <u>Section 5.1</u>, the following special allocations shall be made in the following order and priority:

(a)    <u>Minimum Gain Chargeback</u>. If there is a net decrease in Partnership Minimum Gain during any Allocation Year, each Member shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum Gain determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be so allocated to each Member pursuant thereto. The items to be allocated will be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This <u>Section 5.2(a)</u> is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)    <u>Partner Minimum Gain Chargeback</u>. If there is a net decrease in Partner Minimum Gain attributable to Partner Nonrecourse Debt during any Allocation Year, determined in accordance with Treasury Regulations Section 1.704-2(i)(3), then, except as provided in Treasury Regulations Section 1.704-2(i)(4), each Member who has a share of the Partner Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be allocated items of income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Partner Minimum Gain. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be so

allocated to each Member pursuant thereto. The items to be allocated will be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This <u>Section 5.2(b)</u> is intended to comply with the minimum gain chargeback requirement in Treasury Regulations Section 1.704-2(i) and shall be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), such Member shall be specially allocated items of income and gain (consisting of a *pro rata* portion of each item of income and gain) in an amount and in the manner sufficient to eliminate any deficit in such Member's Adjusted Capital Account as quickly as possible; *provided, however*, that an allocation pursuant to this <u>Section 5.2(c)</u> shall be made only if and to the extent that such Member would have a deficit in such Member's Adjusted Capital Account after all other allocations provided in this <u>Article V</u> have been tentatively made as if this <u>Section 5.2(c)</u> were not a part of this Agreement. This <u>Section 5.2(c)</u> is intended to be a "qualified income offset" as that term is used in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d)    <u>Stop Loss</u>. No amount of Loss shall be allocated to any Member to the extent that any such allocation would cause such Member to have a, or increase the amount of an existing, deficit in such Member's Adjusted Capital Account balance at the end of any Allocation Year. All Loss in excess of the limitation set forth in this <u>Section 5.2(d)</u> shall be allocated among such other Members, who have positive Adjusted Capital Account balances, in proportion to their Percentage Interest until each Member's Adjusted Capital Account balance is reduced to zero. Thereafter, any remaining Loss shall be allocated to the Members in proportion to their relative interests in the Company as required by Section 704(b) of the Code.

(e)    <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(f)    <u>Nonrecourse Deductions</u>. "Excess nonrecourse liabilities" (as defined by Treasury Regulations Section 1.753-3) and Nonrecourse Deductions for each Allocation Year shall be allocated among the Members in proportion to their respective Percentage Interests.

(g)    <u>Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Company property pursuant to Sections 734(b) or 743(b) of the Code is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the property) or loss (if the adjustment decreases such property) and such gain or loss will be specially allocated among the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

(h)    <u>Forfeiture Allocations</u>. If any holder forfeits all or a portion of such holder's equity interest acquired pursuant to an equity incentive plan, the Company shall make forfeiture allocations to such holder in the manner and to the extent required by Proposed Treasury Regulations Section 1.704-1(b)(4)(xii) (as such Proposed Treasury Regulations may be amended or modified, including upon the issuance of temporary or final Treasury Regulations).

(i)    <u>Noncompensatory Options</u>. If a Capital Account reallocation is required under

Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3) as a result of an exercise of a Noncompensatory Option, the Company shall make corrective allocations pursuant to Treasury Regulations Section 1.704-1(b)(4)(x).

5.3     Tax Allocations; Section 704(c).

(a)     The Company shall, except to the extent such item is subject to allocation pursuant to Section 5.3(b), allocate each item of income, gain, loss, deduction, and credit, as determined for U.S. federal income tax purposes, in the same manner as such item was allocated for purposes of maintaining the Members' Capital Accounts.

(b)     The Company, for U.S. federal income tax purposes, shall allocate items of income, gain, loss, depreciation, cost recovery, and amortization deductions attributable to any Contributed Property with a Built-In Gain or Built-In Loss pursuant to Section 704(c) of the Code using the "remedial allocation method" described in Treasury Regulations Section 1.704-3(d). Similar allocations shall be made in the event the Gross Asset Value of Company Properties subject to depreciation, cost recovery, or amortization are adjusted pursuant to the definition of "Gross Asset Value." If an existing Member acquires additional Membership Interests, such allocations shall apply only to the extent of its additional Membership Interests. No allocation under Section 704(c) of the Code shall be charged or credited to a Member's Capital Account.

5.4     Other Allocation Rules.

(a)     Profit, Loss, and any other items of income, gain, loss, or deduction shall be allocated to the Members pursuant to Section 5.1 and Section 5.2 as of the last day of each Allocation Year; provided, however, that Profit, Loss, and such other items shall also be allocated at such times as the Gross Asset Value of any Property is adjusted pursuant to the definition of Gross Asset Value. For purposes of determining Profit, Loss, or any other items allocable to any period, Profit, Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by Board of Managers using any permissible method under Section 706 of the Code and the Treasury Regulations thereunder.

(b)     Unless another method is required by the Code or if another method is permitted by the Code and is agreed to by the Board of Managers, the transferor, and transferee, Profit and Loss, and each item thereof, attributable to any Membership Interest which has been transferred shall be allocated between the transferor and transferee in proportion to the number of days each held such Membership Interest during the Allocation Year without regard to Company's operations during such days. Notwithstanding the foregoing, (i) if a transferor and transferee agree to allocate Profit and Loss based on a closing of the books, the Board of Managers shall not unreasonably withhold its consent to the use of such method, and (ii) gain or loss realized on a transfer of Property other than in the ordinary course of business shall be allocated to the Person holding such transferred Membership Interest on the date of such transfer of Property.

(c)     The Members are aware of the income tax consequences of the allocations made by this Article V and hereby agree to be bound by the provisions of this Article V in reporting their shares of Company income and loss for income tax purposes, except to the extent otherwise required by law.

(d)     To the extent permitted by Section 761(c) of the Code, the provisions of this Article V shall be applied as if this Agreement were effective as of the Effective Date.

**ARTICLE VI**

## DISTRIBUTIONS

6.1    <u>General</u>. The Company, if the Board of Managers authorizes it to do so, may make distributions to the Members at such times and in such amounts as shall be determined by the Board of Managers. Except as provided in <u>Article XVI</u> in connection with a winding up and termination of the Company, any distributions the Company may make pursuant to this <u>Article VI</u> will be at the sole discretion of the Board of Managers, after taking into account the Company's financial position and any contractual provisions imposed on the ability of the Company to make such distributions, and, if made, will be made as follows:

(a)    Subject to <u>Section 7.3(a)(iii)</u>, to the extent the Board of Managers determines in its discretion to make distributions from the Company's normal course operations at any time or from time to time (which, for the avoidance of doubt, means distributions other than in connection with a Liquidity Event or under <u>Article XVI</u>), such distributions shall be made to the Members in proportion to their relative ownership of the issued and outstanding Membership Interests; *provided, however*, that:

(i)    no distribution shall be made pursuant to <u>Section 6.1(a)</u> unless the Board of Managers reasonably determines that if the Company were to dissolve pursuant to <u>Section 16.1</u> immediately after such further distribution the Company would have a sufficient amount of assets (based on fair market value) after the payment of creditors pursuant to <u>Section 16.3(a)</u> to make the distributions required in <u>Section 6.1(b)</u>, and if such determination cannot reasonably be made, then any distributions, which must be approved by the Board of Managers subject to <u>Section 7.3(a)(iii)</u>, shall be made pursuant to <u>Section 6.1(b)</u>; and

(ii)    *reserved*.

(b)    Subject to <u>Section 7.3(a)(iii)</u>, to the extent the Board of Managers determines to make distributions of proceeds from a Liquidity Event, such distributions shall be made in the following order of priority (without duplication):

(i)    to the Members in proportion to their relative ownership of the issued and outstanding Membership Interests, up to the amount of one thousand two hundred fifty four dollars and fifty cents ($1,254.50) for each fifty-two thousand dollars ($52,000.00) of Capital Contributions made by a Member as of the date of a distribution; and then

(ii)    to the Preferred Members, in proportion to their relative ownership of the issued and outstanding Membership Interests, up to the amount of one thousand three hundred seven dollars and nineteen cents ($1,307.19) for each fifty-two thousand dollars ($52,000.00) of Capital Contributions made by a Preferred Member as of the date of a distribution; and then

(iii)    to the Designee Managers.

6.2    <u>Reserved</u>.

6.3    <u>Amounts Withheld</u>. All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution, or allocation to the Company or the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Member or any Person owning

an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this Article VI for all purposes under this Agreement. The Board of Managers is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local, or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld. Such Member shall indemnify the Company in full for the entire amount required to be withheld (and any interest, penalties and expenses associated with such payments), and to the extent distributions to such Member are not reduced, such Member, promptly upon notification of an obligation to indemnify the Company, shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall not be treated as a Capital Contribution). A Member's obligation to make payments to the Company under this Section 6.3 shall survive the termination, dissolution, liquidation, and winding up of the Company.

## ARTICLE VII
## MANAGEMENT BY BOARD OF MANAGERS

7.1    Board of Managers. Except where any action or approval on the part of the Members or any class of Members is expressly required by this Agreement or the Act:

(a)    the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a board of managers (the *"Board of Managers"*) comprised of all Persons from time to time serving as the Managers of the Company, and by the officers of the Company elected by the Board of Managers under Section 8.3; and

(b)    all decisions regarding any matter set forth in this Agreement or otherwise relating to or arising out of the business of the Company shall be made by or at the direction or under the authority of the Board of Managers.

7.2    No Member Management. Except as otherwise provided in this Agreement, and except as may be required by the Act, (i) the Members, in their capacities as such, shall not have any right, power, or authority to take part in the management, operation, or control of the business or affairs of the Company and (ii) the vote, approval, or consent of the Members shall not be required to authorize any actions by or on behalf of the Company. No Members or other Persons (other than Managers or officers of the Company acting as such) shall be agents of the Company or authorized to transact business in the name of the Company or to act for or on behalf of or to bind the Company.

7.3    Limitations on Board of Managers Authority. Notwithstanding the terms of Section 7.1 and Section 7.2:

(a)    Matters Requiring Certain Approval of the Members. The Board of Managers may not take any of the following actions without the Required Vote of the Members:

(i)    amend this Agreement or the Certificate in any way that would adversely affect the rights, preferences, or powers (including, without limitation, allocations, distributions, or voting powers) of any individual Members or group of Members relative to other Members of the Company, or that would provide additional priorities, powers, or benefits to any individual Member or group of Members relative to other Members of the Company;

(ii)    increase the compensation of a holder of Membership Interests who is

also an officer, Manager, or other member of the Company's management, regardless of the capacity in which it receives such compensation;

(iii)    authorize or make any distributions to the Members;

(iv)    sell, lease, exchange, or otherwise dispose of all or substantially all of the assets of the Company and its Subsidiaries;

(v)    merge or consolidate the Company with or into another Person;

(vi)    approve any sale of more than fifty percent (50%) of the Membership Interests and other Equity Securities of the Company;

(vii)    dissolve, liquidate, or wind up the Company; or

(viii)    enter into any arrangement or agreement to do any of the foregoing.

7.4    <u>Number of Managers</u>. The number of Managers comprising the Board of Managers shall be one (1), all of whom shall be elected by the Required Vote of the Members (subject to the designation rights provided in <u>Section 9.8(b)</u>).

7.5    <u>Qualifications</u>. A Manager need not be a natural person. A Manager need not be a Member or a resident of any particular State or other jurisdiction.

7.6    <u>Election; Term</u>. Each Manager shall serve until the earlier of his, her, or its death, resignation, or removal.

7.7    <u>Vacancies</u>. Any vacancy occurring in the Board of Managers may be filled by the affirmative vote of a majority of the remaining Managers, even if such Manager(s) constitute less than a quorum of the Managers; *provided, however*, that should there be no remaining Managers, then any vacancy occurring in the Board of Managers shall be filled by the Required Vote of the Members; *provided further*, that any vacancy in a Manager's position held by a Person designated by any Person or group of Persons pursuant to <u>Section 9.8(b)</u> may be filled only by the Person or group of Persons that designated the election of such Manager if such Person or group of Persons continues to hold the right to designate such Manager.

7.8    <u>Removal</u>. Any Manager may be removed at any time, with or without cause, by the Required Vote of the Members, except that any Manager serving at the designation of a Person or group of Persons pursuant to <u>Section 9.8(b)</u> may be removed only with the consent of that Person or group of Persons.

7.9    <u>Place of Meetings</u>. Meetings of the Board of Managers shall be held at such places, either within or without the State of Delaware, as may be specified by the Person calling the meeting. In the absence of specific designation, meetings of the Board of Managers shall be held at the principal office of the Company.

7.10    <u>Regular Meetings</u>. The Board of Managers shall not be required to meet on any predetermined, periodic basis.

7.11    <u>Special Meetings</u>. Special meetings of the Board of Managers shall be held at any time upon the written request of any Manager. Notice of any such special meeting shall be in writing and shall be given to each Manager at least two (2) Business Days before the date of the meeting; *provided,*

*however*, that a Manager may waive such requirement of notice by written consent or as provided in Section 7.12.

7.12    Attendance at and Notice of Meetings. Attendance at a meeting of the Board of Managers shall constitute a waiver of notice of the meeting, except where a Manager attends a meeting for the express and sole purpose of objecting to the transaction of any business at the meeting solely on the ground that the meeting is not lawfully called or convened. The requisite notice of a meeting may also be waived in writing. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Managers need be specified in the notice or waiver of notice of the meeting; *provided, however*, if no Designee Manager has been designated or the seat of any Designee Manager is vacant, for any reason, then prior to any regular or special meeting of the Managers, the sitting Managers shall be required to deliver to, and the Designee must have received, notice of such regular or special meeting five (5) Business Days before such meeting; *provided further*, that such notice must state the purpose of such meeting and the actions to be taken at the meeting, and only such stated actions may be taken at such meeting.

7.13    Quorum of and Action by Managers. A majority of the number of Managers comprising the Board of Managers shall constitute a quorum for the transaction of business at any meeting of the Board of Managers; *provided, however*, that if a Designee Party has designated any Designee Manager, at least one (1) Designee Manager must be included to constitute a quorum of the Board of Managers; *provided, further*, that at any time that one (1) or more vacancies exist on the Board of Managers, a majority of the actual number of Managers then serving on the Board of Managers (exclusive of such vacancy) shall constitute a quorum for the transaction of business at any meeting of the Board of Managers. For the purposes of this Section 7.13, an "attempted meeting" means a meeting duly called pursuant to this Article VII for which a quorum was not present. Each Manager shall have one (1) vote on all matters submitted to the Board of Managers or any committee thereof. Except as otherwise provided herein, the act of a majority of the Managers present at a meeting of the Board of Managers at which a quorum is present shall be the act of the Board of Managers. Any Manager appointed after the provision of notice for special meeting of the Board of Managers, but before such meeting commences, shall be entitled to vote at such meeting.

7.14    Unanimous Written Consent. Any action required or permitted to be taken at any special meeting of the Board of Managers may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Managers then serving on the Board of Managers (excluding for this purpose any vacancies then existing in the Board of Managers); *provided, however*, that if a Designee Manager's seat is vacant, a Designee Party must receive written notice of the proposed action three (3) Business Days before the action is approved and shall have an opportunity during such time to designate a Designee Manager to such vacancy prior to the taking of such action, whose approval of such action would be required for unanimity. An executed copy of any such written consent shall be inserted into the minute books of the Company.

7.15    Telephonic Meetings. The Managers may hold meetings by means of conference telephone or similar communications equipment by means of which all Managers participating in the meeting can hear each other.

7.16    Compensation; Reimbursement of Expenses. No Manager shall be entitled to receive compensation for his, her, or its services unless pursuant to a written instrument between the Company and such Manager (a "**Compensated Manager**"). Notwithstanding the foregoing, (a) all Managers shall be insured under the Directors and Officers liability insurance policy of the Company, which insurance policy of the Company shall be primary to any other insurance covering any Outside Managers, (b) the

Managers shall be entitled to prompt reimbursement of all reasonable out-of-pocket expenses incurred in the course of the performance of their duties; and (c) a Compensated Manager shall be entitled to receive compensation for his or her services in an amount that is reasonable and customary, as determined by the Board of Managers.

7.17    Committees of the Board of Managers. The Board of Managers may designate one (1) or more committees, each of which shall be comprised of one (1) or more Managers; *provided, however*, that if any Designee Manager has been appointed, each committee shall include at least one (1) Designee Manager. Any such committee, to the extent provided in the resolution establishing it, shall have and may exercise all of the authority of the Board of Managers; *provided, however*, that no committee shall have authority of the Board of Managers in reference to (i) amending this Agreement, (ii) filling any vacancies among the Board of Managers, (iii) authorizing the issuance of any Membership Interests or other Equity Securities, or (iv) taking any action that would require the approval of all of the Managers pursuant to Section 7.3(a). The Board of Managers shall have the power at any time to change the membership of, and to fill vacancies in, any committee of the Board of Managers. A majority of the number of members of any committee shall constitute a quorum for the transaction of business by the committee unless a greater number is required by a resolution adopted by the Board of Managers; *provided, however*, that, if any Designee Manager has been appointed, at least one (1) Designee Manager must be included to constitute a quorum of such committee. The act of the majority of the members of a committee present at any meeting at which a quorum is present shall be the act of the committee, unless the act of a greater number is required by a resolution adopted by the Board of Managers.

7.18    Minutes of Meetings. All decisions made and resolutions approved at a meeting of the Board of Managers (or any committee thereof) shall be recorded in the minutes of its meetings, which shall state the date, time and place of the meeting, the Managers present at the meeting, the resolutions put to a vote and the results of such voting. Written consents of the Board of Managers (and any committee thereof) and the minutes of all meetings of the Board of Managers (and any committee thereof) shall be kept at the principal office of the Company, and a copy thereof shall be provided to any Manager who so requests within ten (10) Business Days thereafter.

7.19    Outside Activities of Managers; Competition. The Outside Managers shall not be required to manage the Company as their sole and exclusive function, and they may have other business interests and may engage in other activities in addition to those relating to the Company. Such other business interests and activities may be of any nature or description, and may be engaged in independently or with others; *provided, however*, that any Outside Manager who wishes to have business interests in, or engage in, any business that competes with the Company shall (a) provide prior written notice to the Board of Managers, (b) maintain the confidentiality of any non-public information about the Company or any of its business activities, (c) not disparage the Company or any of the officers, managers, employees, or agents of the Company to any other Person, and (d) not solicit any officer, employee, independent contractor, customer, supplier, or vendor to cease doing business with the Company or otherwise interfere with the Company's business relationship with any such Person. Neither the Company nor any Member shall have any right, by virtue of this Agreement or the relationship created hereby, in or to such other ventures or activities of the Outside Managers or their Affiliates, or to the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper. The Outside Managers shall have the right to take for their own account or the account of their Affiliates, or to recommend to others, any investment opportunity; *provided, however,* that such Outside Manager did not first become aware of such investment opportunity pursuant to his, her, or its service on the Board of Managers. Notwithstanding anything in this Section 7.19 to the contrary, any Outside Manager shall have the right to take for his, her, or its own account or the account of his, her, or its Affiliates, or to recommend to others, any investment opportunity (regardless of whether he, she, or it first became aware of such investment opportunity

pursuant to his, her, or its service on the Board of Managers) if whether he, she, or it first obtains the unanimous written consent of the other Managers.

7.20    Interested Transactions.

(a)    No contract or transaction between the Company and one (1) or more of Manager or between the Company and any other Person in which one (1) or more Manager have a financial interest, shall be void or voidable solely because of a Manager's interest in the contract or transaction, solely because a Manager is present at or participates in the meeting of the Board of Managers or of a committee thereof which authorized the contract or transaction, or solely because a Manager's votes are counted for that purpose if otherwise permitted by applicable law, so long as:

(i)    the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers and the Board of Managers or a majority of the disinterested Managers, even though the disinterested Managers are less than a quorum, approve the contract or transaction; *provided, however,* that prompt written notice of such facts is given to all holders of Membership Interests within twenty (20) days of the approval of any such action;

(ii)    the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by disinterested Members holding a majority of the Percentage Interests then held by all of the disinterested Members; or

(iii)    the contract or transaction is fair to the Company as of the time it is authorized, approved, or ratified by the Board of Managers.

(b)    Disinterested or interested Managers may be counted in determining the presence of a quorum at a meeting of the Board of Managers or of a committee which authorized the contract or transaction.

7.21    Duties. The Members expressly intend, acknowledge and agree that the provisions of this Agreement, including those in this Article VII, shall govern the rights, duties, and obligations of the Managers and the Members and shall supplant entirely any fiduciary duties stated or implied by applicable Law or equity which might otherwise apply, all such fiduciary duties stated or implied by applicable Law or equity which might otherwise apply being expressly waived. Without limiting the foregoing, to the fullest extent permitted by Law, neither the Members nor the Managers shall be subject to any fiduciary duties to the Company or to any other Member (or in the case of the Managers, to any Member) or to any corporate opportunity or similar doctrines.

## ARTICLE VIII
## RESERVED

## ARTICLE IX
## MEETINGS OF MEMBERS

9.1    Place of Meetings. Meetings of Members shall be held at such places, either within or without the State of Delaware, as may be designated by the Board of Managers and stated in the notice of the meeting.

9.2     <u>Annual Meeting</u>. The Company shall not be required to hold a meeting of the Members on any predetermined, periodic basis.

9.3     <u>Special Meetings</u>. Special meetings of the Members may be called by the Board of Managers and shall be called by the Secretary upon the written request of the holders of ten percent (10%) or more of all Membership Interests then outstanding. Only business within the purpose(s) described in the notice of meeting delivered to the Members in accordance with <u>Section 9.4</u> may be conducted at a special meeting of Members.

9.4     <u>Notice of Meeting</u>. Written or printed notice of all meetings of the Members stating the place, date, and time of the meeting and the purpose(s) for which the meeting is called shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting; *provided, however*, that a Member may waive such requirement of notice by written consent or as provided in <u>Section 9.5</u>.

9.5     <u>Waiver of Notice</u>. Attendance of a Member at a meeting will constitute a waiver of notice of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. The requisite notice of a meeting may also be waived in writing. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the applicable notice of the meeting but not so included, if the objection is expressly made at the meeting.

9.6     <u>Record Dates</u>. For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, the Board of Managers may fix in advance a record date, which shall not be less than ten (10) nor more than sixty (60) days before the date of the meeting. In addition, whenever action by Members is proposed to be taken by consent in writing without a meeting of Members, the Board of Managers may fix a record date for the purpose of determining Members entitled to consent to that action, which record date shall not precede, and shall not be more than ten (10) days after, the date upon which the resolution fixing the record date is adopted by the Board of Managers. If no record date has been fixed by the Board of Managers for the purpose of determining Members entitled to consent in writing to any action, the record date for determining Members entitled to consent to that action shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.

9.7     <u>Quorum</u>. The presence, in person or represented by proxy, of the holders of at least a majority of the issued and outstanding Membership Interests held by the Members shall constitute a quorum for the purpose of considering any matter at a meeting of the Members. If a meeting of the Members cannot be organized because a quorum is not present or represented, the Members entitled to vote at the meeting, present in person, or represented by proxy, shall have the power to adjourn the meeting from time to time until a quorum is present or represented. When a meeting is adjourned to another time or place, notice need not be given of the reconvening of the adjourned meeting if the time and place at which the meeting is to be reconvened are announced at the adjourned meeting. At any adjourned meeting at which a quorum is present or represented, the Members may transact any business which might have been transacted at the original meeting.

9.8     <u>Voting</u>.

(a)     <u>General</u>. The holders of Membership Interests shall vote as a single class for all matters submitted to the Members for a vote or approval. Each Member shall be entitled to one (1) vote for each Membership Interest held by such Member. Approval of any matter on which the Members are entitled to vote shall require the affirmative vote (or written consent pursuant to

Section 9.11) of the holders of greater than one-half (one-half) of the total number of Membership Interests then outstanding (the "**Required Vote**"); *provided*, *however*, that the Members may not take action to approve or effect any action or change set forth in Section 7.3 that requires the consent or approval the Managers without such consent or approval.

(b)    Board of Managers. Each Member hereby agrees to vote all of the Membership Interests over which such Member has voting control, and to take all other necessary or desirable actions within its control (whether in their capacity as a Member, Manager, or officer of the Company, or otherwise) in order to ensure that the size of the Board of Managers shall consist of no more than one (1) Managers and to cause the election as Managers of:

(i)    one (1) Person designated by each of a Designee Party (each such person, a "**Designee Manager**"), who shall initially be Prestige Funds Management, LLC.

If any representative designated as provided herein for any reason ceases to serve as a member of the Board of Managers during his, her, or its term of office, the parties hereto shall cause the resulting vacancy to be filled by a representative designated as provided in this Section 9.8(b) by the respective Person or Persons entitled to designate such representative.

(c)    In order to secure each Member's and other holder's obligation to vote its Membership Interests (if any) and other Equity Securities of the Company in accordance with Section 9.8(b), each Member and holder of other Equity Securities hereby appoints the Board of Managers as his, her, or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her, or its Membership Interests or other Equity Securities of the Company for the election or removal of Managers that are properly designated pursuant to and in accordance with this Section 9.8(b). The Board of Managers, holding such proxy, may exercise the irrevocable proxy granted to it hereunder at any time any Member fails to timely comply with the provisions of Section 9.8(b) or threatens to fail to timely comply with the provisions of Section 9.8(b). The proxies and powers granted by each Member and holder of other Equity Securities pursuant to this Section 9.8(c) are coupled with an interest and are given to secure the performance of each Member's and holder's obligations under Section 9.8(b). Such proxies and powers shall be irrevocable and shall survive the death, incompetency, disability, bankruptcy or dissolution of such Member or holder of other Equity Securities and the subsequent holders of his, her, or its Membership Interests and other Equity Securities.

9.9    Conduct of Meetings of Members. At each meeting of the Members, a chairman chosen by those Members entitled to approve a matter brought before the meeting, present in person, or represented by proxy, shall preside and act as chairman of the meeting. A Person whom the chairman of such meeting shall appoint shall act as secretary of such meeting and keep the minutes of the meeting. The Board of Managers may adopt such rules and regulations as it determines are reasonably necessary or appropriate in connection with the organization and conduct of any meeting of the Members.

9.10    Proxies. Each Member entitled to vote at a meeting of the Members may authorize another Person or other Persons to act for him, her, or it by proxy with respect to the Membership Interests held by such Member, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient under applicable Law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the Membership Interests to which it relates or an interest in the Company generally.

9.11    <u>Written Consent</u>. Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted, including the signature of any Member whose consent is specifically required for the taking of such action, if applicable. Every written consent shall bear the date of signature of each Member that signs the consent.

9.12    <u>Telephonic Meetings</u>. Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Members participating in the meeting can hear each other, and participation in such a meeting shall constitute attendance and presence in person at that meeting.

**ARTICLE X**
**TRANSFER OF INTERESTS**

10.1    <u>Reserved</u>.

10.2    <u>Record Holders</u>. Except as otherwise required by Law, the Company shall be entitled to recognize the exclusive right of the Record Holder of a Membership Interest to receive distributions in respect of such a Membership Interest and to vote as the owner of such a Membership Interest, and shall not be bound to recognize any equitable or other claim to or interest in such a Membership Interest on the part of any other Person, whether or not the Company has notice of the Transfer.

**ARTICLE XI**
**RESTRICTIONS ON TRANSFER; REGISTRATION RIGHTS**

11.1    <u>Restrictions on Transfer of Membership Interests and other Equity Securities</u>.

(a)    <u>Restrictions on Transfer</u>. No Transfer of any Membership Interests or other Equity Securities, or any interest therein, may be made (i) if the Member engaging in such Transfer or group of Members engaging in such Transfer (the "***Transferor Person***") has failed to provide the notices under, follow the procedures of, and Transfer such Membership Interests or other Equity Securities in accordance with this <u>Article XI</u>, (ii) if the Transfer has not been specifically approved by the Board of Managers, unless such Transfer is a Permitted Transfer, or (iii) if the Transfer would or could reasonably be expected to: (A) violate the then-applicable federal or state securities Laws or the rules and regulations thereunder or the rules and regulations of any Governmental Entity having jurisdiction over such purported Transfer; (B) affect the Company's existence or qualification as a limited liability company under the Delaware Law; (C) result in a termination of the Company for purposes of Section 708 of the Code or any similar or successor provision of the Code; (D) require the Company to register as an investment company under the Investment Company Act of 1940, as amended; (E) require the Company or any of its Affiliates to register as an investment adviser under the Investment Advisers Act of 1940; (F) require the Company to become a reporting company for purposes of the Securities Exchange of 1934, as amended; or (G) result in the creation of any Lien that purports to give the party holding a security interest relating to such Lien any right as a Member or create any duty to such party on the part of the Company or any other Member other than the delivery of distributions the Company makes to Members pursuant to this Agreement, to the extent subject to such Lien. Except as expressly provided in this Agreement, unless approved by the Board of Managers, no Member may Transfer in any manner whatsoever all or any part of such Member's Membership Interests or other Equity Securities if, after giving effect to such Transfer, the Company would be

classified as other than a partnership for U.S. federal income tax purposes.

(b)    Permitted Transfers. Subject to the notice requirements set forth in Section 11.2(a)(i), the covenants and restrictions set forth in Section 11.2 shall not apply with respect to any Permitted Transfer; *provided, however*, that, (i) the restrictions contained in Section 11.2 shall continue to be applicable to the Membership Interests and other Equity Securities after any such Permitted Transfer, and (ii) the transferees of such Membership Interests or other Equity Securities shall (to the extent not already a party hereto) have agreed in writing to be bound by the provisions of this Agreement affecting the Membership Interests or other Equity Securities so transferred. Notwithstanding the foregoing, no Transferor Person shall avoid the provisions of this Agreement by making one (1) or more Permitted Transfers to one (1) or more permitted transferees and then at any time (A) disposing of, or permitting the disposition of, all or any portion of the direct or indirect equity or beneficial interest in any such permitted transferee to any Person other than a permitted transferee, (B) directly or indirectly issuing, or permitting the issuance of, any equity or beneficial interest in any such permitted transferee to any Person other than a permitted transferee, or (C) with respect to a Permitted Transfer to the trustee of a Permitted Trust, at any time replacing the trustee of such Permitted Trust if such successor trustee would cause such trust to cease to constitute a Permitted Trust.

11.2    Options to Purchase Membership Interests Proposed to be Transferred.

(a)    Notification from Transferor Person.

(i)    If a Transferor Person proposes to make, or is subject to, a Transfer that constitutes a Permitted Transfer under this Agreement, then prior to giving effect to such Transfer, such Transferor Person shall deliver a written notice to the Company and all Members, which notice shall set forth the number of Membership Interests or other Equity Securities to be Transferred, the type of Permitted Transfer proposed to be made and the other material terms and conditions of such proposed Transfer.

(ii)    If a Transferor Person proposes to make, or is subject to, a Transfer of any or all of its Membership Interests or other Equity Securities other than pursuant to a Permitted Transfer (such Membership Interests or other Equity Securities, the "***Offered Membership Interests***"), then prior to giving effect to any such Transfer, the Transferor Person shall deliver a written notice to the Company and all Members (the "***Transfer Notice***"). The Transfer Notice must set forth the number of Offered Membership Interests, the type of Transfer proposed to be made and all other material terms and conditions of the proposed Transfer including, if the Transferor Person has identified a proposed purchaser or other transferee for the Offered Membership Interests, the name of the proposed transferee, the price at which the Offered Membership Interests are to be purchased (if the proposed Transfer will be a sale), the form of consideration proposed to be paid for the Offered Membership Interests (and a reasonably detailed description of any non-cash consideration proposed to be paid for the Offered Membership Interests, which shall include all material economic terms thereof and the estimated cash value of any such non-cash consideration (it being understood, for the purposes of the rights to purchase Offered Securities by the Company or any Members hereunder, the right to purchase any Offered Membership Interests with respect to which an applicable Transfer Notice specifies non-cash consideration shall be available to any prospective purchaser hereunder for the cash value of any such non-cash consideration)), and the proposed date of such Transfer.

(b)    <u>Community Property Transfers on Termination of Marriage</u>. If the proposed Transfer is one described in clause (iv) of the definition of "***Transfer***", involving the Transfer to the Transferor Person's former spouse, or heirs of such former spouse, in connection with a division of their community property or other property upon divorce, and if such Transfer is not a Permitted Transfer, then the following rights and options shall apply:

(i)    First, the Transferor Person shall have an exclusive option, exercisable at any time during a period of twenty (20) days from the date the Transfer Notice was given, to elect to purchase all or part of the Offered Membership Interests at the accumulated Capital Account value of such Offered Membership Interests (as determined in accordance with <u>Section 11.3</u>) by delivering a written election notice to such spouse or his or her estate, as applicable, within such twenty (20)-day period. If the Transferor Person waives its option under this <u>Section 11.2(b)(i)</u> before this twenty (20)-day period has ended, such twenty (20)-day period shall be deemed to have ended on the date the Transferor Person's waiver is received by the Company and the other parties hereto (whether directly from the Transferor Person or by distribution thereafter). If the Transferor Person has not responded within such twenty (20)-day period, then the Transferor Person shall be deemed to have elected not to purchase any Offered Membership Interests.

(ii)    Second, if the Transferor Person fails to elect to purchase all of the Offered Membership Interests within such twenty (20)-day period, then the Company or its designee, for a period of fifteen (15) days after the earlier of (A) the expiration of such twenty (20)-day period, and (B) the date the Transferor Person's waiver of his, her, or its option under <u>Section 11.2(b)(i)</u> is received by the Company and the other parties hereto, may elect to purchase all or part of the remaining Offered Membership Interests at the accumulated Capital Account value of such Offered Membership Interests by delivering a written election notice to such spouse or estate within such fifteen (15)-day period. If the Company waives its option under this <u>Section 11.2(b)(ii)</u> before this fifteen (15)-day period has ended, such fifteen (15)-day period shall be deemed to have ended on the date the Company's waiver is received by the other parties hereto. If the Company has not responded within such fifteen (15)-day period, then the Company shall be deemed to have elected not to purchase any Offered Membership Interests.

(iii)    Third, if the Company fails to elect to purchase all of the remaining Offered Membership Interests within such fifteen (15)-day period, each Member other than the Transferor Person, for a period of ten (10) days after the earlier of (A) the expiration of such fifteen (15)-day period, and (B) the date the Company's waiver of its option under <u>Section 11.2(b)(ii)</u> is received by the other parties hereto, may elect to purchase the remaining Offered Membership Interests at the accumulated Capital Account value of such Offered Membership Interests in an amount up to an electing Member's Pro Rata share of the number of Offered Membership Interests, except as otherwise mutually agreed to by the electing Members. Such election may be made by delivering a written election notice to such spouse or his or her estate within such ten (10)-day period. If any Member has not responded within such ten (10)-day period, such Member shall be deemed to have elected not to purchase any Offered Membership Interests. Any remaining Offered Membership Interests not elected to be purchased by the end of such ten (10)-day period shall be reoffered by the Transferor Person for a five (5)-day period to the Members who have elected to purchase the Offered Membership Interests. Such electing Members shall have the right to purchase such additional portion of the remaining Offered Membership Interests in an amount up to an electing Member's

Pro Rata Share of the remaining Offered Membership Interests, except as otherwise mutually agreed by the electing Members.

(iv)     Subject to the foregoing and except as otherwise mutually agreed by the parties to such purchase, the closing of any purchase of such Offered Membership Interests shall be as soon as practicable but in no event later than forty-five (45) days following the determination of the accumulated Capital Account value of the Offered Membership Interests and shall take place at the principal office of the Company or by delivery of executed documents via electronic mail. At the closing, such spouse or estate shall assign and deliver the Offered Membership Interests to the purchasers, together with such documents of transfer as shall be reasonably requested by the purchasers, and the purchasers shall deliver to such spouse or estate the full consideration therefor payable in cash, by wire transfer or other immediately available funds. Any transfer or other similar taxes involved in such sale shall be paid by such spouse or estate, and such spouse or estate shall provide the purchasers with such evidence of its authority to sell hereunder and such tax lien waivers and similar instruments as the purchasers may reasonably request. In the event all such Offered Membership Interests are not purchased by the purchasers as provided herein, then such spouse or estate shall hold such remaining Offered Membership Interests subject to this Agreement in all respects.

(c)     <u>Transfers on Death, Disability or Bankruptcy</u>. If the proposed Transfer is one described in any of clauses (ii), (iii), (v), (vi), (vii) or (viii) (but not clause (iv)) of the definition of "***Transfer***," and if such Transfer is not a Permitted Transfer, then the following rights and options shall apply:

(i)     First, the Company shall have an exclusive option, exercisable at any time during a period of twenty (20) days from the date the Transfer Notice was given, to elect to purchase all or part of the Offered Membership Interests at the Fair Market Value of such Offered Membership Interests (as determined in accordance with <u>Section 11.3</u>) by delivering a written election notice to the Transferor Person or his or her personal representative or estate, as applicable, within such twenty (20)-day period. If the Company waives its option under this <u>Section 11.2(c)(i)</u> before this twenty (20)-day period has ended, such twenty (20)-day period shall be deemed to have ended on the date the Company's waiver is received by the other parties hereto. If the Company has not responded within such twenty (20)-day period, then the Company shall be deemed to have elected not to purchase any Offered Membership Interests.

(ii)     Second, in the event that the Company fails to elect to purchase all of the Offered Membership Interests within such twenty (20)-day period, each Member other than the Transferor Person, for a period of ten (10) days after the earlier of (A) the expiration of such twenty (20)-day period, and (B) the date the Company's waiver of its option under <u>Section 11.2(c)(i)</u> is received by the other parties hereto, may elect to purchase the remaining Offered Membership Interests at the Fair Market Value of such Offered Membership Interests in an amount up to an electing Member's Pro Rata Share of the number of Offered Membership Interests, except as otherwise mutually agreed by the electing Members. Such election may be made by delivering a written election notice to the Transferor Person or such personal representative or estate within such ten (10)-day period. If any Member has not responded within such ten (10)-day period, such Member shall be deemed to have elected not to purchase any Offered Membership Interests. Any remaining Offered Membership Interests not elected to be purchased by the end of such ten (10)-day period shall be reoffered by the Transferor Person for a five

(5)-day period to the Members who have elected to purchase the Offered Membership Interests. Such electing Members shall have the right to purchase such additional portion of the remaining Offered Membership Interests in an amount up to an electing Member's Pro Rata Share of the remaining Offered Membership Interests, except as otherwise mutually agreed by the electing Members.

(iii)     Subject to the foregoing and except as otherwise mutually agreed by the parties to such purchase, the closing of any purchase of such Offered Membership Interests shall be as soon as practicable but in no event greater than thirty (30) days after the determination of the Fair Market Value of such Offered Membership Interests and shall take place at the principal office of the Company. At the closing, the Transferor Person or his or her personal representative or estate, as applicable, shall assign and deliver such Offered Membership Interests to the purchasers, together with such documents of transfer as shall be reasonably requested by the purchasers, and the purchasers shall deliver to the Transferor Person or such personal representative or estate the full consideration therefor payable in cash, by wire transfer or other immediately available funds. Any transfer or other similar taxes involved in such sale shall be paid by the Transferor Person or such personal representative or estate, and the Transferor Person or such personal representative or estate shall provide the purchasers with such evidence of its authority to sell hereunder and such tax lien waivers and similar instruments as the purchasers may reasonably request. In the event all such Offered Membership Interests are not purchased by the purchasers as set forth herein, then the remaining Offered Membership Interests may then be distributed to the successors-in-interest entitled to receive the same in accordance with the terms of this Agreement; *provided, however,* that any such Offered Membership Interests so distributed shall be subject to this Agreement in all respects.

(d)     <u>Transfers on Sales of Membership Interests</u>. If the proposed Transfer is one described in *clause (i)* of the definition of "***Transfer***", including but not limited to a sale to another Member, and if such Transfer is not a Permitted Transfer, then the following rights and options shall apply:

(i)     <u>Company Right of First Refusal</u>. First, the Company shall have an exclusive option, exercisable at any time during a period of twenty (20) days from the date the Transfer Notice was given, to elect to purchase all or any portion of the Offered Membership Interests at the price (or at their Fair Market Value if such Transfer is a gift) and on the other terms as set forth in the Transfer Notice (which must be accompanied by the offer from such Person), by delivering a written election notice to the Transferor Person within such twenty (20)-day period. If the Company waives its option under this <u>Section 11.2(d)(i)</u> before this twenty (20)-day period has ended, such twenty (20)-day period shall be deemed to have ended on the date the Company's waiver is received by the other parties hereto. If the Company has not responded within such twenty (20)-day period, then the Company shall be deemed to have elected not to purchase any Offered Membership Interests.

(ii)     <u>Member Rights of First Refusal</u>. Second, in the event that the Company fails to elect to purchase all of the Offered Membership Interests within such twenty (20)-day period, each Member other than the Transferor Person, for a period of ten (10) days after the earlier of (A) the expiration of such twenty (20)-day period, and (B) the date the Company's waiver of its option under <u>Section 11.2(d)(i)</u> is received by the other parties hereto, may elect to purchase the remaining Offered Membership Interests, at the price

(or at their Fair Market Value if such Transfer is a gift) and on the other terms set forth in the Transfer Notice, in an amount up to an electing Member's Pro Rata Share of the number of Offered Membership Interests, except as otherwise mutually agreed to by the electing Members. Such election may be made by delivering a written election notice to the Transferor Person within such ten (10)-day period. If any Member has not responded within such ten (10)-day period, such Member shall be deemed to have elected not to purchase any Offered Membership Interests. Any remaining Offered Membership Interests not elected to be purchased by the end of such ten (10)-day period shall be reoffered by the Transferor Person for a five (5)-day period to the Members who have elected to purchase the Offered Membership Interests. Such electing Members shall have the right to purchase such additional portion of the remaining Offered Membership Interests in an amount up to an electing Member's Pro Rata Share of the remaining Offered Membership Interests, except as otherwise mutually agreed by the electing Members.

(iii)    Tag-Along Rights. Concurrently with subsections (i) and (ii) above, each Member, to the extent that it has not otherwise elected to purchase Offered Membership Interests pursuant to subsection (ii) above, shall have a right, exercisable during the ten (10)-day period described in subsection (ii) above (the "*Tag-Along Rights*"), to substitute Membership Interests owned by it in place of a portion of the Offered Membership Interests to be sold at the price and on the terms set forth in the Transfer Notice. The number of Membership Interests that such Member can substitute shall be determined by multiplying the number of Offered Membership Interests by the Fully Diluted Percentage Interest of such electing Member, and rounding up any fractional number of Membership Interests by one (1) Membership Interest. The notice given by each electing Member shall constitute its agreement to sell the Membership Interests specified in the notice on the terms and conditions applicable to the proposed Transfer; *provided*, *however*, that in the event that there is any material change in the terms and conditions of such proposed Transfer applicable to such electing Member after it gives such notice, then, notwithstanding anything herein to the contrary, it shall have the right to withdraw from participation in the proposed Transfer with respect to all or any portion of its Membership Interests. No exercise of the Tag-Along Rights by any Member shall limit or otherwise affect the other Members' rights to purchase Offered Membership Interests pursuant to subsection (ii) above. As used in this Section 11.2(d), "*Tag-Along Membership Interests*" shall mean and include the Membership Interests substituted by the electing Members through the exercise of their Tag-Along Rights and the remaining Membership Interests from the Offered Membership Interests after deducting the Membership Interests to be offered by the electing Members.

(iv)    Remaining Membership Interests. If and to the extent that there are any Offered Membership Interests that (A) are not being purchased by the Company or any Member pursuant to subsection (i) or (ii) above, and (B) are not being replaced in such proposed Transfer with Membership Interests substituted by the Members pursuant to subsection (iii), then the Transferor Person(s) shall have the right to complete the Transfer of such remaining Offered Membership Interests without the participation of the Members, but only on terms and conditions that are no more favorable in any material respect to the Transferor Person(s) than as stated in the Transfer Notice, as applicable (and in any event, at the same purchase price), and only if such proposed Transfer occurs on a date within ninety (90) days of the proposed date of such Transfer as set forth in the Transfer Notice. If such proposed Transfer does not occur within such ninety (90)-day period, then the Offered Membership Interests that were to be subject to such proposed

Transfer thereafter shall continue to be subject to all of the restrictions contained in this Agreement.

(v)      Closing of Transfer. The closing of any purchase of Offered Membership Interests or any sale of Co-Sale Membership Interests or Tag-Along Membership Interests by the Members shall take place at the principal office of the Company, unless otherwise agreed. At the closing, the Members participating in such Transfer shall take all necessary steps and actions to consummate the Transfer, including (A) the delivery of the purchase price to the Transferor Person(s) by any Members who have elected to purchase Offered Membership Interests and (B) the assignment and delivery by the selling Members of any Membership Interests the selling Members have elected to sell, together with such documents of transfer as shall be reasonably requested by the purchasers and the delivery by the purchasers to the selling Members of the full consideration therefor. Any transfer or other similar taxes involved in such sale shall be paid by the selling Members, and the selling Members shall provide the purchasers with such evidence of their authority to sell hereunder and such tax lien waivers and similar instruments as the purchasers may reasonably request.

(vi)      Drag-Along Right.

(A)      If (I) the Company or any Member receives any bona fide offer to enter into a Proposed Acquisition Transaction, (II) Members holding more than fifty percent (50%) of the outstanding Membership Interests of the Company desire to accept such offer (such Members, the "***Drag-Along Members***"), and (III) the Board of Managers has approved the Proposed Acquisition Transaction (unless the Proposed Acquisition Transaction does not require Board of Managers approval), then the Drag-Along Members shall have the right (the "***Drag-Along Right***"), exercisable by delivering written notice to the Company and the other Members including the material terms and conditions of the Proposed Acquisition Transaction (a "***Drag-Along Notice***"), to cause all of the other holders of Membership Interests and other Equity Securities (the "***Dragged Members***") to take such actions as may be necessary to consummate the Proposed Acquisition Transaction, including but not limited to (1) voting in favor of, or granting their prior written consent to, the Proposed Acquisition Transaction in their capacities as Members of the Company, (2) causing any Managers designated by such Members to vote in favor of, or grant their prior written consent to, the Proposed Acquisition Transaction, (3) selling or exchanging their Membership Interests and other Equity Securities to the proposed purchaser or acquirer in the Proposed Acquisition Transaction, and (4) taking any other actions that may be reasonably necessary or appropriate to consummate the Proposed Acquisition Transaction, all on the price and other terms set forth in the Drag-Along Notice. Each Dragged Member shall be obligated to Transfer all Membership Interests and Membership Interests owned by it in the Proposed Acquisition Transaction (or, in the case of a Proposed Acquisition Transaction involving a sale of less than all of the outstanding Membership Interests, such Member's Pro Rata Share of such Membership Interests being sold), for a price and on other terms and conditions not less favorable to the Dragged Members than to the Drag-Along Members.

Notwithstanding the foregoing or anything to the contrary in this Agreement, the Dragged Members shall have no obligations pursuant to this Section 11.2(d)(vi)

with regard to the Proposed Acquisition Transaction, unless (I) upon consummation of the Proposed Acquisition Transaction, all of the Membership Interests and other Equity Securities shall be converted into or entitled to receive, as applicable, a proportionate amount of the aggregate consideration to be paid by the acquiring party, with such proportions being determined in accordance with the liquidation and distribution preferences set forth in Section 6.1(b), and (II) each Dragged Member is to receive the same form of consideration, and in the same relative proportions if more than one form is to be received:

(B)     <u>Closing of Proposed Acquisition Transaction</u>. The closing of any Proposed Acquisition Transaction in which the Drag-Along Members have exercised their Drag-Along Right shall occur within ninety (90) days after the delivery of the Drag-Along Notice and shall take place at the principal office of the Company, unless otherwise agreed between the transferring Member(s) and the purchasers. At closing, if required by the terms and conditions of the Proposed Acquisition Transaction, the Members shall assign and deliver their Membership Interests and other Equity Securities to the purchasers, together with such documents of transfer as shall be reasonably requested by the purchasers, and the purchasers shall deliver to the Members the full consideration therefor.

(C)     <u>Proxy</u>. In order to secure each Member's and other holder's obligation to vote its Membership Interests and other Equity Securities of the Company in accordance with the provisions of this <u>Section 11.2(d)(vi)</u>, each Member and holder of other Equity Securities hereby appoints the Drag-Along Members as his, her, or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her, or its Membership Interests and other Equity Securities of the Company for such matters as expressly provided for in this <u>Section 11.2(d)(vi)</u>. Any of the Drag-Along Members may exercise the irrevocable proxy granted to him or her hereunder at any time any Member or other holder of Equity Securities fails to timely comply with the provisions of this <u>Section 11.2(d)(vi)</u> or threatens to fail to timely comply with such provisions. The proxies and powers granted by each Member and holder of other Equity Securities pursuant to this <u>Section 11.2(d)(vi)(C)</u> are coupled with an interest and are given to secure the performance of each Member's and holder's obligations under this Agreement. Such proxies and powers shall be irrevocable and shall survive the death, incompetency, disability, bankruptcy, or dissolution of such Member or holder of other Equity Securities and the subsequent holders of his, her, or its Membership Interests and other Equity Securities.

(e)     <u>Termination</u>. The provisions of <u>Sections 11.1</u> and <u>11.2</u> shall terminate upon the Company's initial public offering.

11.3     <u>Value Determination</u>. The Fair Market Value shall be determined with respect to a particular proposed Transfer in accordance with the following procedures:

(a)     <u>By Agreement</u>. For a period of thirty (30) days following the final exercise of any option rights to purchase Offered Membership Interests at Fair Market Value pursuant to <u>Section 11.2(c)</u> or <u>Section 11.2(d)</u>, the selling party and the purchaser (or, if there is more than one purchaser, a majority of the purchasers) of the applicable Offered Membership Interests shall first endeavor to agree on the Fair Market Value of the Offered Membership Interests.

(b)      By Appraisal. If an agreement as to the Fair Market Value of the Offered Membership Interests cannot be reached by the parties as provided in subsection (a) of this Section 11.3, then such Fair Market Value shall be determined in accordance with the procedures set forth in this subsection (b). Initially, each party (or if there is more than one purchaser, the selling party and a majority of the purchasers) shall, within ten (10) days after the expiration of the thirty (30)-day period in subsection (a) above, appoint an appraiser with experience in appraising the value of closely held businesses or agree to a single appraiser to appraise the Fair Market Value of the Offered Membership Interests. Within thirty (30) days of appointment, each appraiser, or a single appraiser if agreed upon, shall separately investigate the Fair Market Value of the Offered Membership Interests and shall submit a notice of an appraisal of that Fair Market Value to each party. If a single appraiser conducts the initial appraisal, the initial appraisal shall be controlling as to the Fair Market Value of the Offered Membership Interests. If separate appraisers for each party conduct appraisals and such initial appraisals vary as to the Fair Market Value of the Offered Membership Interests by less than twenty percent (20%) of the higher appraisal, then the average of such initial appraisals shall be controlling as to the Fair Market Value of the Offered Membership Interests. If separate appraisers for each party conduct appraisals and such initial appraisals vary as to the Fair Market Value of the Offered Membership Interests by more than twenty percent (20%) of the higher appraisal, then the appraisers, within ten (10) days of submission of the last appraisal, shall appoint a third-party appraiser experienced in the valuation of closely held businesses. In such event, the third appraiser shall, within thirty (30) days of its appointment, appraise the Fair Market Value of the Offered Membership Interests and submit notice of its appraisal to each party, and the Fair Market Value of the Offered Membership Interests as determined by the third appraiser shall be controlling. The third-party appraiser may not assign a Fair Market Value to the Offered Membership Interests greater than the greatest value claimed by either of the other appraisers or less than the smallest value claimed by either of the other appraisers. Each party to the appraisal shall bear the costs of its own respective appointed appraisers. The cost of an agreed-upon single appraiser or a third appraiser will be shared equally by the opposing parties to the dispute. The controlling decisions of the appraisers shall be final and binding on the parties thereto with no right to appeal such decisions.

11.4    Transfer Costs and Expenses. The parties to any consummated Transfer of any Membership Interest(s) or other Equity Security, and the prospective transferor of any Membership Interest(s) or other Equity Security in an unconsummated Transfer, will pay all the costs and expenses that the Company incurs in connection with that matter.

11.5    Prohibited Transfers.

(a)      Transaction Void. Any purported Transfer of Membership Interest(s) or other Equity Security that violates or is otherwise not in accordance with Section 11.1 (a "***Prohibited Transfer***") shall be null and void and of no force or effect whatsoever; *provided, however*, that, if the Company is required by Law or order of a court of competent jurisdiction to recognize any Prohibited Transfer, then the Membership Interest that is Transferred (if any) shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the Transferred Membership Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interest may have to the Company or any other Member. A transferee who acquires a Membership Interest by a Prohibited Transfer shall be subject to, and shall only have the rights set forth in, Section 11.7.

(b)      Remedies. In the case of an actual, attempted or threatened Prohibited Transfer,

(i) the parties engaging, attempting to engage, or threatening to engage in such Prohibited Transfer shall be liable to, indemnify, defend and hold harmless the Company, the other Members, and their respective Affiliates from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, incremental tax liabilities and lawyers' fees and expenses) in connection with, arising from or as a result of such Prohibited Transfer or attempted or threatened Prohibited Transfer and efforts to enforce the indemnity granted hereby, and (ii) the Company and other Members shall, to the extent permitted by applicable Law, be entitled to (A) obtain injunctive relief, (B) obtain a decree compelling specific performance, or (C) obtain any other remedy hereunder, at Law or in equity, or otherwise. The remedies of the parties under this Agreement, including the remedies contemplated by this Section 11.5(b), are cumulative and not exclusive of any other remedy hereunder, at Law or in equity, or otherwise; accordingly, no exercise of any right or remedy shall be construed as an election of remedies by any party.

11.6    Admission of Substituted Members.

(a)    General Requirements. If a transferee of any Membership Interest(s) or other Membership Interest is admitted to the Company as a substituted Member, the transferee shall have all of the rights, powers, benefits, obligations and duties provided by this Agreement with respect to such Membership Interest in the hands of the transferor.

(b)    Admission of a Substituted Member. Subject to the other provisions of this Article XI, a transferee of any Membership Interest(s) or other Membership Interest who is not a Member prior to such Transfer shall be admitted to the Company as a substituted Member only upon satisfaction of each of the following conditions:

(i)    The Membership Interest with respect to which the transferee is being admitted was acquired in accordance with Section 11.1;

(ii)    The transferee becomes a party to this Agreement as a Member and executes and delivers such documents and instruments as the Company may reasonably request as may be necessary or appropriate to confirm such transferee as a Member of the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement, including but not limited to the Spousal Addendum, executed by such transferee's spouse, if applicable; and

(iii)    The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company actually incurs in connection with the admission of the transferee as a substituted Member with respect to the Transferred Membership Interest.

(c)    Timing of Admission. In the event that the transferee of a Membership Interest from a Member is admitted as a substituted Member under this Section 11.6, such transferee shall be deemed admitted to the Company as a substituted Member immediately prior to the Transfer, and such transferee shall continue the business of the Company without dissolution.

11.7    Rights of Unadmitted Members. A Person who acquires any Membership Interest(s) or other Membership Interest by Transfer, but who is not admitted as a substituted Member pursuant to Section 11.6, shall be entitled only to allocations and distributions with respect to such Membership Interest in accordance with this Agreement, and shall have no authority to act for or bind the Company, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the

Act or this Agreement. In the event that a transferee who acquires any Membership Interest(s) or other Membership Interest by Transfer is not admitted as a substituted Member, the transferor shall not cease to be a Member of the Company and shall continue to be a Member until such time, if ever, as the transferee is admitted as a Member under this Agreement; *provided*, *however*, that such transferor shall not be entitled to allocations and distributions with respect to such Membership Interest from and after the Transfer thereof.

11.8    <u>Treatment of Transferred Membership Interests</u>. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making distributions, the Company shall recognize such Transfer no later than the end of the calendar month during which it is given notice of such Transfer; *provided, however*, that, if the Company is given notice of a Transfer at least ten (10) Business Days prior to the Transfer, then the Company shall recognize such Transfer as of the date of such Transfer; *provided, further*, that, if the Company does not receive a notice stating the date such Membership Interest was Transferred and such other information as the Board of Managers may reasonably require within thirty (30) days after the end of the fiscal year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Membership Interest(s) or other Membership Interest on the last day of such fiscal year. Neither the Company nor any Manager shall incur any liability for making distributions in accordance with the provisions of this <u>Section 11.8</u>, whether or not the Company or any Manager has knowledge of any Transfer of ownership of any Membership Interest(s) or other Membership Interest.

## ARTICLE XII
## RESERVED

## ARTICLE XIII
## BOOKS, RECORDS AND INFORMATION; FISCAL YEAR

13.1    <u>Books and Records</u>. At all times until the dissolution and termination of the Company, the Company shall maintain separate books of account which show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the business of the Company in accordance with this Agreement. The Company's books of account shall be maintained on the accrual basis in accordance with GAAP, notwithstanding that Capital Accounts shall also be maintained in accordance with <u>Section 4.4</u>. Each Member that, together with any Affiliates, owns at least ten percent (10%) of the Equity Securities of the Company on a Fully Diluted Basis shall have the right, following reasonable notice and during the Company's normal business hours, (a) to inspect the Company's and any of its Subsidiaries' offices and other facilities, (b) to inspect, audit, and make copies of, or extracts from, the Company's and its Subsidiaries' books and records, and (c) of reasonable access to the Managers and the Company's officers, senior employees, and accountants, in order to discuss and advise on the affairs, finances, and accounts of the Company and its Subsidiaries (and the Company hereby authorizes said Managers, officers, senior employees, and accountants to discuss with such Member and its representatives such affairs, finances, and accounts).

13.2    <u>Reserved</u>.

13.3    <u>Fiscal Year</u>. The fiscal year of the Company shall end on December 31.

## ARTICLE XIV
## TAX MATTERS

14.1    <u>Partnership for Tax Purposes</u>. The Members agree that it is their intention that the

Company shall be treated as a partnership for purposes of U. S. federal income tax purposes and, to the extent permitted by Law, state and local income tax purposes. Neither the Company, the Board of Managers, nor any Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or similar provisions of applicable state Law or to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3, and no provision of this Agreement shall be construed to sanction or approve such an election.

14.2    <u>Partnership Representative</u>. The "partnership representative" (within the meaning of Section 6223(a) of the Partnership Tax Audit Rules (the "***Partnership Representative***") of the Company shall be William Powers.

(a)    Any cost or expense incurred by the Partnership Representative in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

(b)    Without limiting the powers that the Partnership Representative may have, the Partnership Representative will have the authority to do any of the foregoing: (i) enter into a settlement agreement with the Internal Revenue Service (or state, local, or foreign taxing authorities, as the case may be) that binds the Company and the Members; (ii) file a petition as contemplated in Section 6234 of the Code; (c) file any request for administrative judgment contemplated in Section 6227(a) of the Code; or (d) enter into an agreement extending the period of limitations of the Company as contemplated in Section 6235 of the Code.

(c)    To the extent that a portion of the tax liabilities imposed under Sections 6225 of the Code relates to a former Member, the Manager may require a former Member to indemnify the Company for its allocable portion of such tax. Each Member acknowledges that, notwithstanding the transfer of all or any portion of its interest in the Company, it may remain liable for tax liabilities with respect to its allocable share of income and gain of the Company for the Company's taxable years (or portions thereof) prior to such transfer or redemption.

(d)    The Partnership Representative may (but shall not be required to) make the election provided by Section 6221(b) of the Partnership Tax Audit Rules to have Subchapter C of Chapter 63 of the Code not apply (the "***Election Out***").

(e)    If the Internal Revenue Service, in connection with an audit governed by the Partnership Tax Audit Rules, proposes an adjustment in the amount of any item of income, gain, loss, deduction, or credit of the Company, or any Member's distributive share thereof, and such adjustment results in an "imputed underpayment" as described in Section 6225(b) of the Partnership Tax Audit Rules (a "***Covered Audit Adjustment***"), the Partnership Representative may (but shall not be required to) elect, to the extent that such election is available under the Partnership Tax Audit Rules (taking into account whether the Partnership Representative has received any needed information on a timely basis from the Members) and the Election Out was not previously made, to apply the alternative method provided by Section 6226 of the Partnership Tax Audit Rules (the "***Alternative Method***"). To the extent that the Partnership Representative does not elect the Alternative Method with respect to a Covered Audit Adjustment, the Partnership Representative shall use commercially reasonable efforts to (i) make any modifications available under Sections 6225(c)(3), (4), (5) and (6) of the Partnership Tax Audit Rules to the extent that such modifications are available (taking into account whether the Partnership Representative has received any needed information on a timely basis from the Members) and would reduce any Company Level Taxes payable by the Company with respect to

the Covered Audit Adjustment, and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended U.S. federal income tax return, as described in Section 6225(c)(2) of the Partnership Tax Audit Rules, to the extent that such amended return and payment of any related U.S. federal income taxes would reduce any Company Level Taxes payable by the Company with respect to the Covered Audit Adjustment (after taking into account any modifications described in clause (i)). Similar procedures shall be followed in connection with any state or local income tax audit that incorporates rules similar to the Partnership Tax Audit Rules.

(f)      Notwithstanding any provision of this Agreement to the contrary, any taxes, penalties, and interest payable under the Partnership Tax Audit Rules by the Company ("*Company Level Taxes*") shall be treated as attributable to the Members of the Company, and the Partnership Representative shall cause the Company to allocate the burden of any such Company Level Taxes to those Members to whom such amounts are reasonably attributable (whether as a result of their status, actions, inactions, or otherwise), taking into account the effect of any modifications described in Section 14.2(e) that reduce the amount of Company Level Taxes. All Company Level Taxes allocated to a Member, at the option of the Board of Managers, shall (i) be promptly paid to the Company by such Member ("*Option A*") or (ii) be paid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Member pursuant to Section 6.1 and, if such distributions are not sufficient for that purpose, by reducing the proceeds of liquidation otherwise payable to such Member pursuant to Section 16.3(b) ("*Option B*"). If the Board of Managers selects Option A, the Company's payment of the Company Level Taxes allocated to the applicable Member shall be treated as a distribution to such Member and the payment by such Member to the Company shall be treated as a capital contribution for U.S. federal income tax purposes; *provided, however*, that such payments shall not affect the Capital Accounts of, any other contributions to be made by, or the distributions and allocations to be made to the applicable Members under this Agreement. If the Board of Managers selects Option B, the applicable Member shall for all purposes of this Agreement be treated as having received a distribution of the amount of its allocable share of the Company Level Taxes at the time such Company Level Taxes are paid by the Company. To the fullest extent permitted by Law, each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability for Company Level Taxes allocated to such Member.

(g)      The provisions of this Section 14.2 shall survive the termination of any Member's interest in the Company and shall remain binding on the Company and the Members for so long as necessary to resolve with the Service any and all matters regarding the U.S. federal income taxation of the Members with respect to partnership items.

14.3    Tax Returns. All matters relating to tax returns (including amended returns) filed by the Company, including tax audits and related matters and controversies, shall be determined and conducted by the Partnership Representative after consultation with and under the direction of the Board of Managers. The Partnership Representative shall prepare and file or cause to be prepared and filed at the Company's expense all tax returns (including amended returns) filed by the Company. Copies of all federal income tax returns and all other material tax returns shall be provided to each of the Members at least thirty (30) days prior to their filing. As promptly as practicable, and in any event within seventy-five (75) days after the close of each taxable year, the Company shall deliver to each Member a copy of each state and federal tax return and Schedule K-1 for each Member, together with any corresponding state schedules, and other tax reports filed by the Company.

14.4    Tax Elections. All elections for U.S. federal income tax purposes (and corresponding

elections for state, local, and foreign purposes) which are required or permitted to be made by the Company, and all material decisions with respect to the calculation of its income or loss for tax purposes, shall be made in such manner as the Partnership Representative shall determine after consultation with the Board of Managers.

14.5    Tax Consolidation. If the Company is treated as a member of a consolidated, combined, or unitary group for any tax purpose with any Member or an Affiliate thereof (other than any Subsidiary of the Company) (a "**Consolidated Group**"), such Member shall cause one of the members of such Consolidated Group other than the Company to be the reporting or parent entity for any tax return of such Consolidated Group (the "**Reporting Member**") and pay the tax liability due with respect to such Consolidated Group. The Members agree that the Company shall promptly reimburse the Reporting Member for any Applicable Tax paid by or on behalf of the Reporting Member or any other member of such Consolidated Group; *provided*, *however*, that the Members agree that (a) any such Applicable Tax shall be considered as paid on behalf of the Company for U.S. federal income tax purposes, (b) except as provided in clause (c), below, the Company shall deduct for U.S. federal income tax purposes one hundred percent (100%) of the Applicable Tax, and (c) in the event that it is determined, pursuant to a final determination as defined in Section 1313 of the Code, that all or a portion of such deduction may be properly claimed by the Reporting Member, its Affiliate, or any other member of the Consolidated Group, but not the Company, the Company shall reimburse the Reporting Member only for the after-tax cost of such payment of Applicable Tax. With respect to any tax of a Consolidated Group of which the Company is a member, the "**Applicable Tax**" shall be equal to the tax of the Consolidated Group that the Company would have paid if it had computed its tax liability for the applicable period on a separate entity basis (rather than as a member of the Consolidated Group). Except as provided in this Section 14.5 with respect to the amount of such Consolidated Group's tax that the Company is required to reimburse the Reporting Member, the Reporting Member shall indemnify and hold the Company harmless from and against any and all taxes of the Consolidated Group.

## ARTICLE XV
## LIABILITY AND INDEMNIFICATION

15.1    No Liability for Company Debts; Limited Liability.

(a)    The debts, liabilities and obligations of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, liabilities and obligations of the Company, for which no Member or Manager shall be personally liable.

(b)    Except as otherwise expressly required by Law, no Member (or any Affiliate of a Member), in its capacity as Member (or an Affiliate of a Member), shall have any liability to the Company, any other Member (or any Affiliate of a Member), or the creditors of the Company in excess of the obligation of such Member to make Capital Contributions in accordance with the provisions of this Agreement (to the extent that such Capital Contributions have not yet been made) and any other payments required to be made by such Members to the Company under the express provisions of this Agreement.

15.2    Good Faith Actions; Exculpation.

(a)    To the fullest extent permitted by applicable Law, no Covered Person shall be liable to the Company or any Member (or any Affiliate of a Member) as a result of or in connection with any actions or omissions with respect to the Company on the part of such Covered Person in his, her, or its capacity as such based on any claim of breach of fiduciary duty to the extent that such Covered Person (i) conducted himself, herself, or itself in good faith and

(ii) reasonably believed that his, her, or its conduct was in the best interests of the Company except (A) for any act taken by such Covered Person purporting to bind the Company that has not been authorized pursuant to this Agreement or (B) to the extent that the liability of such Covered Person arises from the willful misconduct or gross negligence of such Covered Person. In addition, no Covered Person shall be liable to the Company or any Member (or Affiliate of a Member) for actions taken by such Covered Person consistent with the duty of loyalty and care applicable to a member of the board of directors of a Delaware corporation.

(b)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any Manager, officer, or other Person as to matters the Covered Person reasonably believes are within the professional or expert competence of such Manager, officer, or other Person and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, Profits, Losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(c)    To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, such Covered Person acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person, to the maximum extent permitted by applicable law.

15.3    Indemnification.

(a)    Each Covered Person who was or is made a party or is threatened to be made a party or is involved in any threatened, pending, or completed action, suit or proceeding, whether formal or informal, whether of a civil, criminal, administrative, or investigative nature (hereinafter a "***Proceeding***"), by reason of the fact that such Covered Person is or was a Manager, officer, or employee of the Company or is or was serving as a manager, director, officer, employee, or agent of any other entity at the request of the Company, whether the basis of such proceeding is an alleged action or inaction in an official capacity or in any other capacity while serving in that official capacity, shall be indemnified and held harmless by the Company against all costs, charges, expenses, liabilities, and losses, including, without limitation, attorneys' fees, judgments, fines, and amounts paid or to be paid in settlement (collectively, "***Indemnifiable Losses***") reasonably incurred or suffered by the Covered Person in connection therewith if with respect to the subject matter of such Proceeding the Covered Person acted in good faith and in a manner reasonably believed by such Person to be (i) in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, such Person had no reasonable cause to believe such Person's conduct was unlawful, and (ii) within the scope of the authority conferred by this Agreement, by Law, or by the Board of Managers. Such indemnification shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the Covered Person's successors, heirs, executors, and administrators. The Board of Managers shall make the determination (or shall appoint independent legal counsel to make the determination) as to whether or not the Covered Person and his, her, or its actions have met the requirements set forth herein for indemnification; *provided, however,* that the Company shall indemnify any Covered Person who has been successful on the merits or otherwise in the defense of a Proceeding or any claim, issue, or matter therein, against any Indemnifiable Losses incurred in connection therewith.

(b)     The Company shall pay expenses actually and reasonably incurred by a Covered Person in connection with any Proceeding in advance of its final disposition; *provided*, *however*, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written undertaking, by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined that such Covered Person is not entitled to be indemnified.

(c)     If a Covered Person is entitled to payment under Section 15.3(a) and is not paid in full by the Company within thirty (30) days after a written claim has been received by the Company, such Covered Person may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim and, if successful in whole or in part, the Covered Person shall be entitled to be paid also the expense of prosecuting such claim.

(d)     To the extent that any Manager, Member, officer, or employee of the Company is by reason of such position, or position with another entity at the request of the Company, a witness in any Proceeding, such Person shall be indemnified against all costs and expenses actually and reasonably incurred by such Person in connection therewith.

(e)     The Company may purchase and maintain insurance, at its expense, to protect itself and any Manager, Member, officer, or employee of the Company against any Indemnifiable Losses, whether or not the Company would have the power to indemnify such Person against such Indemnifiable Losses.

(f)     The Company may enter into agreements with any Manager, member, officer, employee, or agent of the Company providing for indemnification to the fullest extent permissible under Delaware Law.

(g)     Each and every term and provision of this Section 15.3 is separate and distinct, so that if any term or provision of this Section 15.3 is held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the validity or enforceability of any other term or provision hereof. To the extent required, any term or provision of this Section 15.3 may be modified by a court of competent jurisdiction to preserve its validity and to provide the Covered Person with, subject to the limitations set forth in this Section 15.3 and any agreement between the Company and the Covered Person, the broadest possible indemnification consistent with the intent hereof.

(h)     Each of the rights conferred on a Covered Person by subsections (a), (b), (c), and (d) of this Section 15.3 and on employees or agents of the Company by Section 15.3(d) shall be a contractual right and any repeal or amendment of the provisions of this Section 15.3 shall not adversely affect any right hereunder of any Person existing at the time of such repeal or amendment with respect to any act or omission occurring prior to the time of such repeal or amendment, and, further, shall not apply to any proceeding, irrespective of when the Proceeding is initiated, arising from the service of such Person prior to such repeal or amendment.

(i)     The rights conferred in this Section 15.3 shall not be exclusive of any other rights that any Person may have or hereafter acquire under any statute, agreement, vote of Members, or otherwise.

(j)     No Member shall have any obligation to contribute to the capital of the Company or otherwise provide funds to enable the Company to fund its obligations under this Section 15.3.

(k)     A Covered Person shall not be denied indemnification in whole or in part under

this Section 15.3 because the Covered Person had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by this Agreement.

15.4    Company Responsibility for Indemnification Obligations.

(a)    Notwithstanding anything to the contrary in this Agreement, the Company and the Members hereby acknowledge that a Covered Person may have rights to indemnification, advancement of expenses, or insurance pursuant to written instruments of, or with, the employer or other principal of such Covered Person, a Member, or a direct or indirect Affiliate of the Covered Person or Member (collectively, the "**Last Resort Indemnitors**"). On the other hand, a Covered Person may also have rights to indemnification, advancement of expenses, or insurance provided by the Company or pursuant to written instruments with third-parties in which the Company has an interest (collectively, the "***First Resort Indemnitors***"). Notwithstanding anything to the contrary in this Agreement, as to each Covered Person's rights to indemnification and advancement of expenses pursuant to this Agreement, the Company and the Members hereby agree that as between the Company and the Members:

(i)    the First Resort Indemnitors, if any, are the indemnitors of first resort (*i.e.*, their indemnity obligations to such Covered Person are primary and any obligation of the Company to advance expenses or to provide indemnification for the Indemnifiable Losses incurred by such Covered Person are secondary), and the First Resort Indemnitors shall be obligated to indemnify such Covered Person for the full amount of all Indemnifiable Losses and expenses covered by this Article XV, to the full extent of their indemnity obligations to the Covered Person and to the extent of the First Resort Indemnitors' assets legally available to satisfy such obligations, without regard to any rights the Covered Person may have against the Company or the Last Resort Indemnitors;

(ii)    the Company is the indemnitor of second resort (*i.e.*, its indemnity and advancement of expense obligations to such Covered Person are secondary to the obligations of any First Resort Indemnitors, but precede any indemnity and advancement of expense obligations of any Last Resort Indemnitors), and the Company shall be liable for the full amount of all remaining Indemnifiable Losses and expenses covered by this Agreement after the application of Section 15.4(a)(i) to the full extent of its obligations under the other subsections of this Article XV and to the extent of the Company's assets legally available to satisfy such obligations, without regard to any rights such Covered Person may have against the Last Resort Indemnitors; and

(iii)    the Last Resort Indemnitors, if any, are the indemnitors of last resort and shall be obligated to indemnify such Covered Person for any remaining Indemnifiable Losses and expenses covered by this Article XV only after the application of Sections 15.4(a)(i) and 15.4(a)(ii).

(b)    The Company and the Members further agree that no advancement or payment by any Last Resort Indemnitors on behalf of a Covered Person with respect to any Indemnifiable Loss or expense covered by the other sections of this Article XV shall affect the foregoing and such Last Resort Indemnitors shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company. The Last Resort Indemnitors, if any, are express third-party beneficiaries of the terms of this Section 15.4.

**ARTICLE XVI**

## DISSOLUTION, LIQUIDATION AND TERMINATION

16.1    <u>Dissolution</u>. The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

(a)    the adoption by the Board of Managers and approval by the Required Vote of the Members of a resolution providing that the Company shall be dissolved as of the date specified therein;

(b)    an event of dissolution occurs under the Act; or

(c)    the entry of a decree of judicial dissolution of the Company under the Act.

The death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

Upon the dissolution of the Company, the Board of Managers shall promptly notify the Members of the dissolution.

16.2    <u>Liquidation</u>. Upon dissolution of the Company, the Company shall continue solely for the purposes of winding-up its business and affairs as soon as reasonably practicable. Promptly after the dissolution of the Company, the Board of Managers, or if there are no Managers then serving, a Person selected by a majority of the Members, shall designate one (1) or more Managers or other Persons (the "***Liquidating Agents***") to conduct the winding up of the business and affairs of the Company. Upon their designation, the Liquidating Agents shall immediately begin to wind up the affairs of the Company in accordance with the provisions of this Agreement and the Act. In winding up the business and affairs of the Company, the Liquidating Agents may take any and all actions that they determine to be in the best interests of the Members, including any actions relating to (a) causing written notice by registered or certified mail of the Company's intention to dissolve to be mailed to each known creditor of and claimant against the Company, (b) the payment, settlement or compromise of existing claims against the Company, (c) the making of reasonable provisions for payment of contingent claims against the Company, and (d) the sale or disposition of the properties and assets of the Company. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of claims against the Company so as to enable the Liquidating Agents to minimize the losses that may result from a liquidation.

16.3    <u>Application of Company Assets</u>. In winding up the business and affairs of the Company, the assets of the Company shall be paid and distributed in the following manner and priority:

(a)    first, except to the extent otherwise permitted by Law, to creditors, as their interests may appear, including Members who are creditors, in satisfaction of liabilities (other than for distributions) of the Company, whether by payment or by establishment of reserves; and

(b)    thereafter, to the Members in accordance with <u>Section 6.1(b)</u>.

16.4    <u>Deficit Capital Accounts</u>. Notwithstanding any other provision of this Agreement, and notwithstanding any custom or rule of Law to the contrary, if any Member has a deficit balance in his, her, or its Capital Account (after giving effect to all contributions, distributions and allocations for all Allocation Years, including the Allocation Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

16.5    <u>Certificate of Cancellation; Termination</u>. Upon the completion of the winding up of the business and affairs of the Company, and when all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made therefor (or, in case the property and assets of the Company are not sufficient to satisfy and discharge all of its liabilities and obligations, then when all the property and assets have been applied so far as they will go to the just and equitable payment of its liabilities and obligations) and all the remaining property and assets of the Company have been distributed to the Members in accordance with their respective rights and interests set forth in <u>Section 16.3</u>, a certificate of cancellation shall be executed on behalf of the Company by a Manager or Member designated by the Liquidating Agents, which certificate of cancellation shall comply with the requirements of the Act, and the Liquidating Agents shall cause such certificate of cancellation to be filed in the office of the Secretary of State of the State of Delaware and shall take such other actions as they may determine are necessary or appropriate to terminate the Company.

16.6    <u>Claims of the Members</u>. The Members and former Members shall look solely to the property and assets of the Company for the return of their Capital Contributions, and if the property and assets of the Company remaining after payment of or due provision for all liabilities to creditors are insufficient to return any or all Capital Contributions, the Members and former Members shall have no recourse against the Company or any Member.

16.7    <u>Waiver of Partition</u>. Each Member hereby waives until termination of the Company any and all rights that the Member may have to maintain an action for partition of the property and assets of the Company.

## ARTICLE XVII
## MISCELLANEOUS

17.1    <u>Amendment</u>. The Board of Managers may approve any of the following actions, without the approval of the Members or any other Person, subject to any contractual restrictions elsewhere, and may modify or amend any provision of this Agreement to reflect:

(a)    a change in the name of the Company;

(b)    a change in the name of the registered agent or the location of the registered office of the Company;

(c)    a change in the location of the principal office of the Company;

(d)    the making of any Capital Contribution to the Company;

(e)    the admission to or withdrawal from the Company of any Members in accordance with the provisions of this Agreement; or

(f)    a change required or contemplated by this Agreement.

Except as provided in this <u>Section 17.1</u>, any provision of this Agreement may otherwise be modified or amended only if such modification or amendment is adopted by the Board of Managers and approved by the Required Vote of the Members.

However, notwithstanding anything herein to the contrary, no amendment or modification shall be adopted that specifically modifies the rights, powers, preferences or privileges of any Member or group of Members in a manner that is materially adverse to such Member or group of Members relative to the other Members of the Company without the consent of such Member or group of Members.

17.2    Confidentiality. No Member or Manager shall use, publish, disseminate, distribute, or otherwise disclose all or any portion of the Confidential Information without the prior written approval of the Company. If a Member or Manager receives either a request to disclose any Confidential Information under the terms of a subpoena or order issued by a court or other governmental authority or advice of legal counsel that disclosure is required under applicable Law, such Person agrees that, prior to disclosing any Confidential Information, he, she, or it shall, unless prohibited by applicable Law, (a) promptly notify the Company of the existence and terms of, and the circumstances attendant to, such request or advice, (b) consult with the Company as to the advisability of taking legally available steps to resist or narrow any such request or to otherwise eliminate the need for such disclosure, and (c) if disclosure is required, disclose only such portion of the Confidential Information as is required by applicable Law to be disclosed and cooperate with the Company to obtain a protective order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information that is required to be disclosed.

17.3    Counterparts. This Agreement may be executed in multiple counterparts all of which taken together shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of an original Agreement for all purposes. Signatures of the parties hereto transmitted by facsimile or other electronic transmission shall be deemed to be original signatures for all purposes.

17.4    Entire Agreement; Advice of Counsel. This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter thereof, and this Agreement supersedes any and all prior agreements between them, whether oral or written, relating to the subject matter hereof. The parties hereto acknowledge that each has either been represented by legal counsel of their choice in the negotiation, drafting, and execution of this Agreement, or have consciously chosen to waive their right to counsel. The parties hereto acknowledge and agree that by executing this Agreement, they have read this Agreement in its entirety and fully understand it.

17.5    Further Actions. Each party hereto shall execute and deliver such further agreements, documents, deeds, certificates, and other instruments and shall take or cause to be taken such other actions as may reasonably be requested by any other party to carry out the provisions of this Agreement and consummate and make effective the transactions this Agreement contemplates.

17.6    Governing Law. This Agreement shall be deemed to have been made and delivered in the State of Delaware, and construed in accordance with the laws of that state without regard to principles of conflicts of law.

17.7    Joinder of Spouses. By executing and delivering the Spousal Addendum, the spouse of each Member who is a natural Person hereby joins in the execution of this Agreement to evidence the binding effect of this Agreement on any community property or other interest he or she may have in any Membership Interests or Equity Securities.

17.8    Jurisdiction. In the event, and only in the event, of a determination by a court of competent jurisdiction that Section 17.16 is invalid and unenforceable in whole or in part, the parties hereto (a) agree and consent that any controversy, dispute, or claim arising from or relating to this Agreement, including, not limited to, this Agreement's breach enforcement, interpretation, or termination (each, a "***Dispute***") shall be subject to the exclusive jurisdiction of the state and federal courts in

Philadelphia, Pennsylvania,, and, in each case, of the appropriate appellate courts therefrom (the "*Venue*"), and (b) irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of the venue of any Dispute in any such court or that Dispute brought in any such court has been brought in an inconvenient forum. Process in any such suit, action, or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 17.10 shall be deemed effective service of process on such party.

17.9     Notice to Members. By executing this Agreement, each party hereto acknowledges that he, she, or it has actual notice of all of the provisions of this Agreement, including the restriction on the Transfer of Membership Interests and other Equity Securities set forth in Article X and Article XI. Each party hereto agrees that this Agreement constitutes adequate notice of all such provisions, including any notice requirement under the Act and Article 8 of the Uniform Commercial Code, and each such Person hereby waives any requirement that any further notice be given thereunder.

17.10     Notices. All notices and other communications under or in connection with this Agreement shall be in writing and shall be given by delivery in person or by overnight courier, by registered or certified mail (return receipt requested and with postage prepaid thereon) or if delivered to the recipient in person, by courier, or by facsimile or e-mail  (a) in the case of notices or other communications to the Company, its principal office to the attention of the Secretary and (b) in the case of notices or other communications to a Member, its address set forth in the Company's books and records. All notices and other communications that are addressed as provided in or pursuant to this Section 17.10 shall be deemed duly and validly given (a) if delivered in person or by overnight courier, upon delivery, (b) if delivered by registered or certified mail (return receipt requested and with postage paid thereon), seventy two (72) hours after being placed in a depository of the U.S. mail, and (c) if delivered by facsimile or e-mail transmission, upon actual receipt.

17.11     Parties in Interest; Assignment. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns (it being understood and agreed that, except as expressly provided herein, nothing contained in this Agreement is intended to confer any rights, benefits, or remedies of any kind or character on any other Person under or by reason of this Agreement).

17.12     Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction, and, subject to Section 15.3(g), this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision.

17.13     Specific Enforcement. Each party hereto acknowledges that the breach of this Agreement would cause irreparable damage to the Company and the other parties hereto and that money damages or other legal remedies would not be an adequate remedy for any such damages. Therefore, the obligations of the parties under this Agreement shall be enforceable by a decree of specific performance and appropriate injunctive relief may be applied for and granted in connection therewith without the requirement of posting bond or other security. All remedies hereunder, including those remedies this Section 17.13 contemplates, shall be cumulative and not exclusive and shall be in addition to any other remedies that any party hereto may have under this Agreement, at Law or in equity, or otherwise.

17.14    Survival. The representations, warranties, covenants, and agreements of the parties hereto shall survive the execution and delivery of this Agreement.

17.15    Waiver. Compliance with any provision of this Agreement may be waived only if such waiver is approved in writing by (a) the Board of Managers and (b) each Member entitled to the benefits thereof. Except as expressly provided herein to the contrary, no failure to exercise any right, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege granted hereunder.

17.16    Waiver of Jury Trial; Arbitration. EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY, KNOWINGLY, AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY DISPUTE.

Any Dispute shall be handled by binding arbitration administered by Judicial Arbitration and Mediation Services, Inc. ("*JAMS*") in the Venue before one (1) arbitrator, who shall be a retired judge, selected by the parties to such dispute. Such arbitration shall be conducted in accordance with either (i) the JAMS Streamlined Arbitration Rules or Procedures, if the amount in controversy is less than one hundred thousand dollars ($100,000.00), or (ii) the JAMS Comprehensive Arbitration Rules & Procedures if the amount in controversy exceeds one hundred thousand dollars ($100,000.00). Each Dispute's parties shall bear their own fees and expenses in such arbitration; *provided, however*, that the arbitrator may assess the Dispute's prevailing party's or parties' fees and costs against the Dispute's non-prevailing party or parties as part of the arbitrator's award. Such arbitration shall be confidential and no party to a Dispute nor the arbitrator shall disclose the existence, contents, or results of such process without the prior written consent of the other, except where necessary or compelled by a court of law to enforce this arbitration provision or an award from such arbitration or otherwise in a legal proceeding.

The parties hereto agree that any claim brought against the Company in connection with a Dispute will be brought against the Company by the applicable party individually, and that the applicable party may not assert any such claim against Company as class member or other form of representative party in any purported class or representative proceeding. To the fullest extent of the law: (i) no arbitration shall be joined with any other; (ii) no Dispute between the Company and a Member or other party is to be arbitration on a class action or representative basis, or to utilize such procedures; (iii) a Member or other party may not bring any Dispute against the Company in a purported class action or representative capacity on behalf of the general public, other Members, or any other Persons.

Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 17.10 shall be deemed effective service of process on such party.

*<signature page follows>*

The undersigned hereby executes this Limited Liability Company Operating Agreement as of the date of its signature below.[1]

**Designee Manager:**

_____ signature

<u>Prestige Funds Management, LLC</u>____ name

<u>Daryl Heller*</u>_____ signatory

<u>Manager*</u>_____ title

_____ date

\* A limited liability company manager of Prestige Investment Group, LLC, a limited liability company manager of the Prestige Funds Management, LLC.

**Member:**

_____ signature

_____ name

_____ signatory

_____ title

_____ date

---

[1] If you are signing on behalf of a legal entity, then please (i) identify the name of the legal entity for "***name***," (ii) identify your name for "***signatory***," and (iii) identify the title you hold with respect to the legal entity for "***title***.". If signing on behalf of yourself as a natural person, then please (i) disregard "***signatory***" and "***title***," and (ii) identify your name for "***name***."

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

Exhibit 3.3(b)(iii) – The Spousal Addendum

---

[*The Spousal Addendum follows here.*]

SPOUSAL ADDENDUM

The undersigned, being the spouse of _____,
agrees to be bound by the provisions of that Limited Liability Company Operating Agreement of Prestige
Fund B IV, LLC (the "**_Agreement_**"), to which this Spousal Addendum is <u>Exhibit 3.3(b)(iii)</u> thereto, as
may be amended, to the extent applicable to the undersigned, including specifically provisions set forth
therein relating to securities of Prestige Fund B IV, LLC, a limited liability company duly formed under
the laws of the State of Delaware, being community property of the undersigned, and the undersigned's
rights and obligations relating thereto.

By signing, the undersigned acknowledges they are aware that the legal, financial, and related matters
contained in the Agreement are complex and that they are free to seek independent professional guidance
or counsel with respect to this consent. They have either sought such guidance or counsel or determined
after fully reviewing the Agreement in its entirety that they will waive such right.

_____signature

_____name

_____email

_____address

_____

_____date

**CONTACT & DIRECT DEPOSIT FORM**

**Name/Entity** _____

**Address** _____

_____

**Phone Number** _____

**Email Address** _____

**SSN/EIN** _____

**Additional point person(s) & email address(es) to be emailed monthly investor statements:**

Name: _____  Email: _____

Name: _____  Email: _____

Notes _____

**We offer the option of receipt of monthly return via direct deposit. Direct deposit will occur on the 25th of every month. If direct deposit is preferred, please provide the following information:**

Bank Name _____

Account # _____

Routing # _____

Is the account a checking or savings account?

☐   Checking

☐   Savings