**ReedSmith**
*Driving progress through partnership*

**Kurt F. Gwynne**
Direct Phone:  +1 302 778 7550
Email:  kgwynne@reedsmith.com

Reed Smith LLP
506 Carnegie Center
Suite 300
Princeton, NJ 08540-7839
+1 609 987 0050
Fax +1 609 951 0824
reedsmith.com

August 21, 2025

**VIA ECF**
Honorable Jerrold N. Poslusny, Jr.
United States Bankruptcy Court
Mitchell H. Cohen U.S. Courthouse
400 Cooper Street, 4th Floor
Camden, NJ 08101

**Re:    Daryl Fred Heller; Chapter 11; Case No. 25-11354 (JNP);**
***Debtor's Response to Notice of (I) Filing of Second Interim Report of Examiner, Edward A. Phillips and (II) Statement of General Legal Principles Regarding Alleged Ponzi Schemes [filed August 15, 2025; ECF No. 481] (the "Response")***

Dear Judge Poslusny:

As counsel to Edward A. Phillips (the "Examiner"), I write to reply to the above-referenced Response in which the Debtor alleges that there are various "fundamental flaws" in the *Examiner's Second Interim Report* [ECF No. 473-1] (the "Second Interim Report") and that the Examiner was "biased" against the Debtor.[1]  The Examiner disputes the existence of any "fundamental flaw" and "bias."  The Examiner's responses to the Debtor's main allegations are set forth below.

1.    The Examiner "fundamental[ly] misunderstand[s]" the "business model" in which the "investment by the [I]nvestors occurred into [the Funds] which has fundamentally *nothing to do with the PMG/Affiliates who simply sold an ATM to Prestige Funds*." (emphasis added).

   ***Examiner's Reply***:  The Examiner understands the business model and its operation.  PMG did not just "simply" sell an ATM.  The Debtor used the Funds (which he controlled)[2] as "a financing model to grow the business and do acquisitions."  Response to Question #21(a).  The structure of the "financing model" involved the offering to Investors (in private placements) of unregistered securities by which Investors invested in ATMs and the revenue generated by the ATMs.  Specifically, Investors were offered an opportunity to purchase ATMs or interests therein (whether in the Funds' name or in the Investors' names) and to receive a return based on the performance

---

[1] Capitalized terms not defined in this reply (the "Reply") have the meanings set forth in the Second Interim Report.

[2] PIG had either a 100% or a 51% ownership interest in each of the managers of the Funds (PFM, PFM II, PFM III, and WFV Management).  Second Interim Report ¶¶ 20-24.  HCG owned 60% of PIG, and the Debtor owned 99.5% of PIG.  Second Interim Report ¶¶ 21 & 49 n.18; Master Assignments (Exhibit D).  Thus, the Debtor controlled each of the managers of the Funds.  Second Interim Report ¶¶ 21-24, 41, 48, 51, 54 & 112.

Honorable Jerrold N. Poslusny, Jr.
August 21, 2025
Page 2



of those ATMs (as managed by PMG), and a share of potential advertising revenue. Second Interim Report ¶¶ 18-19; 25-34; and 55-59. In exchange for their Investment, the Investors received unregistered securities entitling them to annual returns of (for example, with respect to PFB IV) roughly 25%[3] in addition to the benefits of depreciation (to which they would be entitled based on ATM ownership alone). Id. ¶¶ 25-34 and 55-59. In addition to the "business model" and "financing model," the purchase price for ATMs sold to the Funds (to be held in their names or in the name of the Investors) reflects that PMG did not "simply" sell ATMs to the Funds. ATMs were sold to the Funds for between $14,857 and $26,000 each.[4] An Investor likely would not have paid PMG $14,857 to $26,000 "solely" for an ATM that could be purchased for somewhere around $2,000 to $8,000.[5] Investors were also paying for the deployment, operation, and maintenance of the ATMS. *See, e.g.,* PFB IV PPM (Exhibit E), p. 2 ("The Fund will utilize Investor funds to purchase, operate, and maintain automatic teller machines ('ATM(s)').") . PMG was the party intended to operate and maintain the ATM. *Id.* at p. 4 ("The Fund will utilize third-party service providers [PMG] to handle such purchase, operation, and maintenance of new or used ATMs."). Investors of PFB IV (by way of example) were paying for more than an ATM and its operation and maintenance, they were paying for an *annual* rate of return of roughly 25% (ignoring the additional benefits of depreciation) for each of *seven* years based on revenue to be generated by PMG's operation of the purchased ATMs. The foregoing "business model" and structure involves much more than a "simple" sale of an ATM.[6]

Notwithstanding the foregoing, the Debtor seeks to break down the transaction into pieces by arguing that PMG "simply sold" ATMs to the Funds and then contractually agreed to manage the ATMs. In the Debtor's view, the Investors' investments were made separately between the Investors and the Funds. The Debtor, however, ignores that *PMG made the payments* to the Funds (or PIG on its behalf) on account of Investors' returns. The Debtor also ignores that he referred to

---

[3] The PFB IV MSA provides that, in exchange for a $52,000 investment, an Investor would generally receive $1,357.92 per month for a period of 85 months, which results in an implied rate of return of roughly $25%. Second Interim Report ¶ 55.

[4] *See* PFA II POM, p. 8 ("Depending on specifications for each portfolio, ATMs will generally cost either $14,857, or [$]17,333"); *see* Examiner's First Interim Report, Exs. 1-3 [ECF Nos. 329-1 to 329-3] (listing the purchase price of many ATMs sold to the Funds at $20,800 or $26,000).

[5] April 2024 Overview Email (Exhibit P) (PMG "[s]ells ATMs from organic or mostly acquisition growth to the Prestige for $17k-21k with a cost basis ranging from $2k to $8k.").

[6] The Debtor's assertion that the business model analogue is a sale-leaseback transaction (*see* Second Interim Report ¶¶ 102 & 105) does not insulate it from a finding that it operated as a Ponzi scheme if sales revenue from subsequent purchasers was used to make the rental payments to earlier investors. *See Notice of (I) Filing of Second Interim Report of Examiner, Edward A. Phillips and (II) Statement of General Legal Principles Regarding Alleged Ponzi Schemes* [ECF No. 473], at 3-4 n.2.

Honorable Jerrold N. Poslusny, Jr.  
August 21, 2025
Page 3

the relationship between the Funds and PMG as "partnering" and that he had control of all entities—PMG[7] and the Funds' managers—opposite of the Investors in each transaction.

In short, the "business model" of selling (directly or through an affiliate) and then managing ATMs does not insulate the Debtor or PMG from the Court's scrutiny for purposes of determining whether the Debtor (by and through entities under his control) operated a Ponzi scheme. *See Kapila v. Phillips Buick-Pontiac-GMC Truck, Inc. (In re ATM Fin. Servs., LLC),* 2011 Bankr. LEXIS 2394, *1-2 (Bankr. M.D. Fla. June 11, 2011) (concluding that an entity operated a Ponzi scheme where the "[p]urchasers typically *'bought' ATMs from the debtor or from separate companies owned by Netschi*" and then signed "an equipment management agreement with the debtor to service the ATMs" because "the debtor paid the fictitious 'withdrawal fees' using *cash invested by new purchasers*") (emphasis added).

2.  The Examiner excluded PMG's "revenue" or "profit" from the sale of ATMs in PMG's "hardware profit center," which were available to pay Investors' returns during the Review Period.

    ***Examiner's Reply***:  Where an entity uses subsequent investors' funds—whether characterized as "revenue" or "profit"—to pay earlier investors, the entity is *actually using* subsequent investors' funds to pay earlier investors.  Treating the Investors' funds as "revenue" for accounting or tax purposes does not entitle an entity to use those funds to pay returns to earlier investors.  The Examiner did not "exclude" those "revenues" from his analysis.  In fact, the Examiner concluded that those "revenues"—which were Investors' funds—were actually used to pay earlier Investors.  The Debtor also admitted as much.  *See* Second Interim Report ¶ 109 (noting that the Debtor stated that "it was the *strong profit generated from kiosk hardware sales* and revenue from" PMG that were used to pay Investors' returns) (emphasis added).  The characterization of Investors' funds as "revenue" does not preclude a finding that "revenue" from subsequent Investors was used to pay returns to prior Investors. *See Damian v. Courtright*, 2024 U.S. Dist. LEXIS 191018, *11-12 (Bankr. N.D. Ill. Oct. 2, 2024) ("TGC's recording of funds obtained from investors as income or operating revenue gave the false impression that TGC was running a profitable business, when it was not. . . . But the fact that TGC maintained offices and staff and generated some revenue from its websites does not change the fundamental fact the TGC used new investor upfront fees to pay the returns for old investors."); *see also* Sci. Evid. and Expert Test in Cal (CEB) § 8.28 ("In a Ponzi scheme, the only principal 'income' source is new investment funds, while the repayment of investment funds comes out of capital rather than investment gains.").

    The Debtor attempts to decouple PMG's sale of ATMs (or interests therein) to the Funds from the Investors' investments with the Funds to support the Debtor's assertion that PMG was entitled to use the profit from the ATM sales to pay returns owed to Investors. *See* Response to Question #6(b) ("the sale of the Kiosk was highly profitable and facilitated a couple years of Fund/Investor payments"). The Debtor ignores that Investors' returns generally were intended to be repaid from the revenue from the ATM operations. *See* PFB IV PPM (Exhibit E), p. 8 ("The Manager intends

---

[7] HCG owned 83% of PMG, and the Debtor owned 99.5% of HCG. Second Interim Report ¶¶ 15 & 51.

Honorable Jerrold N. Poslusny, Jr.
August 21, 2025
Page 4



to make monthly distributions of capital derived from the operation of the Fund's ATMs."); PFA II POM, p. 13 (Under an MSA, PMG "will, among other things, by itself or through its subcontractors . . . (iii) remit payment to [PFA II] for monthly pooled transaction fees and other revenues generated by the ATMs as required by such [MSAs]"); *see also* "What is flow of funds" chart (attached hereto) from an "ATM Kiosk Investor Update" dated March 11, 2024 that the Debtor emailed to Jerry Hostetter.  The "flow of funds" chart expressly provides that "ATM fee income" (such as surcharge, interchange and DCC fees) is the source of distributions to Investors.  Nowhere in the PPMs/POMs or the "flow of funds" does the Debtor indicate—as he now argues—that PMG intended to use ATM sale proceeds or Investors' *own* funds to pay returns to the Investors.

The illogical nature of the Debtor's argument is demonstrated by a simple illustration.  Assume that a Company bought a car for $1,000.  Assume further that the Company sells the car to Investor One for $10,000, and the Company agrees that it will leaseback the car from Investor One for 7 years in exchange for a minimum rent of $500 per month, plus 50% of the Company's monthly receipts in excess of $1,000 derived from the Company's operation of the car in the ride-share business.

Assume further that the Company, however, makes $0 per month in its ride-share business for the first 18 months.  So, every month the Company took $500 out of its $9,000 profit (which is now exhausted) on the sale of the car and used it to fund the monthly returns to Investor One.

Hearing that the Company paid in full its returns to Investor One for 18 straight months, Investor Two agrees to the same investment deal as Investor One.  The Company continues to earn $0 for the next 9 months.  So, the Company takes $1,000 of its "profit" on the sale of a car to Investor Two and used it to fund the $500 monthly returns owed to each of Investor One and Investor Two.  No other investors are interested in the Company's sale-leaseback investment opportunity.  Accordingly, the Company abruptly collapses.

In that illustration, the sale of the car was profitable (ignoring costs of deployment, insurance, licensing and other expenses), but the Company lacked operating profits from the ride-share business to pay the returns to Investor One.  The only source of funds to pay returns to Investor One starting in the 19th month was to use the "profit" on the sale of the car to Investor Two.  With no other investor available, the Company collapsed after the 27th month when the "profits" from the sale of the cars (*i.e,* the investors' funds) were exhausted.

By the Debtor's logic, the Company did not use Investor Two's funds to pay Investor One.  Instead, the Company paid Investor One with its "profits" from car sales—even though the full sale-leaseback operation was unprofitable.  The Examiner disagrees and believes that such illustration involves the use of Investor Two's funds to pay returns to Investor One on account of profits that did not exist.  Furthermore, imposing an investment fund—controlled by the Company—in between the Company and Investor One/Investor Two does not alter the investment

Honorable Jerrold N. Poslusny, Jr.  
August 21, 2025
Page 5

nature of Investor Two's funds and does not insulate the sale-leaseback business model in that illustration from challenge as a Ponzi scheme.

The Debtor's argument that ATM sale proceeds (*i.e.,* the Investors' funds) are revenue or "gross receipts" on PMG's tax return and therefore should be considered as a source to pay returns to earlier Investors also misses the point. In a Ponzi scheme, so long as new investors' funds (gross receipts) exceed the returns paid to earlier investors (costs of goods sold/shared transaction fees), a company will appear profitable. For example, if a company receives $10 million from new investors (gross receipts) and only pays $6 million in returns to earlier investors (costs of goods sold/shared transaction fees), a company will *appear* to have a profit of $4 million—regardless of whether it earned an operating profit or the amount thereof. Of course, that changes abruptly when new investors' funds dry up and the company's business collapses because its operating profit is insufficient to pay investors' returns. Therefore, the treatment of PMG's "hardware sales" and Investors' returns on its tax returns does *not* establish that PMG did not operate a Ponzi scheme. It only establishes (as is true in the case of a Ponzi scheme) that PMG's increasing annual amount of funds from new Investors was sufficient to pay returns to prior Investors until there were no more new Investors and PMG abruptly collapsed.

3. The Examiner ignored "relevant" bank accounts and there was "no requirement" for all revenue to be centralized in the accounts reviewed by the Examiner.

*Examiner's Reply*: The Examiner did not ignore any relevant bank accounts. The Examiner also never stated that there was a "requirement" that all revenue be centralized in any particular accounts. The entities controlled by the Debtor apparently chose to use certain accounts for particular purposes. The Examiner meticulously followed the flow of funds. Specifically, the Examiner reviewed the Funds' bank account statements, wire transfer transactions and checks to determine (i) in which accounts the Funds received Investors' funds, (ii) from which accounts they sent those funds to PMG, and (iii) in which accounts they received Investors' returns from PMG. The Examiner then reviewed PMG's accounts to determine (i) in which accounts PMG received funds from Investors, (ii) from which accounts PMG paid returns to the Funds (or PIG, on behalf of the Funds). The flow of funds established that PMG (x) received Investors' funds only in Restricted Account #8413 and (y) paid Investors' returns to the Funds or PIG from only two accounts—Restricted Account #8413 and operating account #3440—during the Review Period. Second Interim Report ¶¶ 63 & 65-66; Sci. Evid. and Expert Test in Cal (CEB) § 8.28 ("The forensic accountant may gather bank records, including bank statements and underlying deposit and withdrawal information, to analyze the cash receipts coming into-and the cash disbursements going out of-the account. These documents will be classified as to their nature (e.g., operational versus investment) and analyzed for their appropriateness.").

Having confirmed that all payments on account of Investors' returns were made from those two accounts, the only question remaining was the nature (operational versus investment) of *all* funds deposited into those two accounts. Those are the only funds that were *actually used* to pay Investors' returns. *See CFTC v. Agridime LLC A Tex. Corp.*, 2025 U.S. Dist. LEXIS 151429, *7 (N.D. Tex. Jun. 2, 2025) ("Despite Agridime's representations that customers' funds would be used only for cattle and cattle-related expenses, Agridime *actually used* newer customer funds to



Honorable Jerrold N. Poslusny, Jr.
August 21, 2025
Page 6

pay earlier customers' principal and returns, and used customers' funds to pay undisclosed commissions" in Ponzi scheme.) (emphasis added); *Mills v. Trustmark Nat'l Bank*, 2021 U.S. Dist. LEXIS 37481, *3 (S.D. Miss. Mar. 1, 2021) (noting that perpetrator was "*actually using* new investors' money to pay old investors—a classic Ponzi scheme") (emphasis added); *Stoebner v. Opportunity Fin., LLC (In re Polaroid Corp.)*, 543 B.R. 888, 890 (Bankr. D. Minn. 2016) (noting that post-collapse investigation of Ponzi scheme revealed that "funding was *actually used* to repay earlier lenders") (emphasis added). Therefore, the Debtor's assertion of the existence of other revenue that (he claims) could have been used to pay Investors' returns, but was not *actually used* to pay such returns, misses the point of the investigation.

4. The Examiner excluded revenue and gross profits from entities owned by PMG and its other affiliates.

   *Examiner's Reply*: The Examiner did not exclude any *relevant* revenue. **First**, the Examiner accounted for *all* funds—from whatever sources (new Investors' funds, ATM operations, affiliates, third party loans, etc.) and whether the nature of each source was operational or investment—that were *actually used* to make payments to the Investors. In the Examiner's analysis, the Examiner assumed (favorably to the Debtor)[8] that all non-Investor funds deposited into the two accounts from which Investors' returns were paid (Restricted Account #8413 and operating account #3440) were legitimate sources of payments to Investors.

   **Second**, in analyzing PMG's gross profit, the Examiner gave PMG credit for *all* gross profit that PMG (which the Debtor controls) included in *its* Gross Profit Reports, including gross profits from ShareNet (a separate entity, but a wholly-owned subsidiary of PMG);[9] PowerQwest (an affiliate not owned by PMG, but under common control);[10] and First Regents (an affiliate not owned by PMG, but under common control).[11] Second Interim Report ¶ 80 n.30. The fact that any of those

---

[8] Some of the PPMs provide that Investors' returns were to be paid from the operation of the ATMs, rather than the proceeds of their own investments. *See, e.g.,* PFB IV PPM (Exhibit E), p. 8 ("The Manager intends to make monthly distributions of capital derived from the operation of the Fund's ATMs."); *see also* Second Interim Report, ¶ 103 n.44.

[9] ShareNet's gross profits reported in PMG's Gross Profit Reports for 2021, 2022, and 2023 totaled $2,305,116, as follows: $1,056,268 for 2021; $771,473 for 2022; and $477,375 for 2023. *See, e.g.,* 2023 PMG Gross Profit Report (Exhibit M), 2023 GP Summary tab (Row 88, Cols. BT, BU and BV); Dec. 2023 GP by TID tab (Rows 13634 through 13775).

[10] PowerQwest's gross profits reported in PMG's Gross Profit Reports for 2021, 2022, and 2023, totaled $260,374 as follows: $80,276 for 2021; $75,243 for 2022; and $104,855 for 2023. *See, e.g.,* PMG Dec. '23 Gross Profit Report (Exhibit M), 2023 GP Summary tab (Row 75, Cols. BT, BU and BV); Dec. 2023 GP by TID tab (Rows 13246 through 13523).

[11] First Regents' gross profits reported in PMG's Gross Profit Reports for 2021, 2022, and 2023, totaled $8,288,848 as follows: $3,011,934 for 2021; $2,922,873 for 2022; and $2,354,041 for 2023. *See, e.g.,* PMG Dec. '23 Gross Profit Report (Exhibit M), 2023 GP Summary tab (Row 32, Cols. BT, BU and BV).

Honorable Jerrold N. Poslusny, Jr.
August 21, 2025
Page 7



entities may have had *other* gross profits not attributable to PMG's business is irrelevant. But, if any of those *other* gross profits were *actually used* to pay Investors' returns, such funds are already *included* in the Examiner's bank account analysis. Second Interim Report ¶¶ 63 n.22 & 88 n.38.

**Third**, the Debtor's argument that the Court should consider affiliates' gross profits that (allegedly) could have been, but were not, actually used to pay the earlier investors is both illogical and contrary to applicable case law focusing on the "actual use" of funds. For example, by the Debtor's logic, gross profit for affiliated entities that was not actually used to pay Investors' returns could enable an entity to operate a Ponzi scheme with a separate entity so long as the affiliates had the gross profit sufficient to pay investor returns even if those profits were not actually used for that purpose. In any event, despite repeated requests, the Debtor has failed to demonstrate that any affiliates had gross profit anywhere near the amount necessary to close the gap between the $407.3 million paid to Investors during the Review Period and PMG's $62.013 million gross profit.[12]

**Fourth**, the Debtor's attempt to rely on revenue (*i.e.,* gross receipts) generated by affiliates that was not actually used to pay Investors' returns is even more illogical. That would ignore the affiliates' expenses that must be paid to continue the affiliates' own operations. Considering the gross receipts of PowerCoin (an affiliate not owned by PMG, but under common ownership) as compared to its gross profit illustrates the absurdity of the Debtor's argument. According to its tax returns, in 2021, PowerCoin had gross receipts of $22.48 million, but only $566,000 in gross profit. In 2022, PowerCoin had $59.20 million in gross receipts, but only $1.24 million in gross profit. In 2023, PowerCoin had $118.9 million in gross receipts, but only $9.4 million in gross profit. Even if PowerCoin gave all of its $11.206 million in gross profit to PMG (and it did not), it would have been insufficient when added to PMG's $62.013 million gross profit from ATM operations to fund the $407.3 million in Investor payments made during the Review Period.

5. The Examiner was biased against the Debtor because the Examiner (i) met more times with PIG representatives than with the Debtor, (ii) did not give the Debtor additional time to produce documents, and (iii) did not address issues raised by the Debtor during a Zoom call on August 12, 2025.

*Examiner's Reply*: The Examiner acted neutrally at all times. As the Debtor acknowledged in its Response, the Examiner's counsel "simply provides caselaw on Ponzi Schemes, without providing an opinion or legal argument." *See* Response n.2. That was by design. The Examiner understands that, as a neutral party, the purpose of the investigation was to provide the Court with the relevant facts and case law necessary for the Court to determine whether the Debtor operated a Ponzi scheme.

The Examiner met with Mr. Hostetter because he was the President of PIG, which managed all of the Funds. As an executive officer of PIG, Mr. Hostetter was familiar with the flow of funds between PMG and the Funds (and PIG) and PMG's financial reporting to the Funds or their

---

[12] If PMG's affiliates had the required gross profit necessary to fund Investor returns, one wonders why the Debtor did not utilize those gross profits to ward off the collapse of PMG, many of its affiliates, and the Debtor's personal bankruptcy filing.

Honorable Jerrold N. Poslusny, Jr.
August 21, 2025
Page 8



Managers. The Examiner's financial professionals (*not* the Examiner) met with Mr. Eby because he was the Director of Finance of PIG. Both Messrs. Hostetter and Eby openly answered all questions posed by the Examiner.

PIG was owned 40% by Mr. Hostetter and 60% by the Debtor (through his 99.5% ownership interest in HCG). The Debtor, however, disclaimed knowledge of aspects of PIG's finances even though he controlled it. The Debtor was much less able or willing to share information than Messrs. Hostetter and Eby. For example, although the Debtor also controlled PMG (through HCG's 83% ownership interest of PIG and his 99.5% ownership of HCG), he asserted (through counsel) that "Heller does not, and never did, have access to Paramount or any of the affiliates['] accounting software[.]" Response to Question #21 (Exhibit C). The Debtor also asserted that he had "[n]o access to the accounting software" of the Funds. Response to Question #21(b). Thus, the Debtor was not as helpful in the Examiner's efforts to follow the flow of funds.

With respect to the Debtor's assertion that he was going to provide documentation, I note that, by an email dated August 4, 2025, Debtor's counsel said that "we will be sending [me] the documents referenced in [the Debtor's] responses." *See* Response to Questions (introductory email) (Exhibit C). Those documents were not produced, and the August 12 Zoom meeting was conducted without them. The Debtor also indicated that he could not share other information or documents upon the advice of his criminal counsel. On at least six occasions, the Debtor responded to the Examiner's questions by stating that he was "unsure" of the answer. Accordingly, the meetings with the Debtor were less productive for each of those reasons than meetings with parties that were either more willing or able to talk about the relevant accounting issues and flow of funds from and to the Investors.

The Examiner also did not ignore the Debtor's responses to questions posed to him. In fact, the Examiner addressed many of the Debtor's responses in the Second Interim Report. *See* Second Interim Report ¶ 62 n.22 (exclusion of other bank accounts argument), ¶ 80 n.32 (exclusion of affiliates' revenue argument), ¶¶ 108-09 (exclusion of "hardware profit center" argument). Disagreeing with the Debtor's narrative is not bias. Most importantly, as the Examiner stated in his Second Interim Report he focused primarily on documents, like the account statements from financial institutions, which are less susceptible to misinterpretation or manipulation. Second Interim Report ¶ 13. The Examiner and his professionals also reviewed internal financial statements, emails and text messages. The Examiner's findings are based on the trail of funds and are well-supported by the relevant documents.

Honorable Jerrold N. Poslusny, Jr.
August 21, 2025
Page 9

For the foregoing reasons, the Examiner disagrees with the Debtor's arguments that the Second Interim Report was "fundamentally flawed" or that the Examiner was somehow "biased" against the Debtor.[13]

Respectfully submitted,

*/s/ Kurt F. Gwynne*

Kurt F. Gwynne
REED SMITH LLP

KFG:aa

Counsel to Edward A. Phillips, Examiner

cc: Sari B. Placona, Esquire (via email)
All counsel of record (via ECF)
Edward A. Phillips, Examiner (via email)
Gabrielle Colson, Esquire (via email)

---

[13] Through his counsel, the Debtor advances other reasons why he believes that PMG's business model cannot be considered a Ponzi scheme. For example, the Debtor argues that a Ponzi scheme is "perpetual" whereas PMG could "pull the ripcord" and put an end to its business. Whether PMG could "pull the ripcord" does *not* change the facts that (i) PMG used subsequent Investors' funds while it was operating to pay returns to earlier Investors during the Review Period and (ii) PMG collapsed because money from new Investors dried up. Moreover, a Ponzi scheme is not perpetual as it is destined to fail when the ever-increasing need for new investors' funds cannot be obtained. *See Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1156 (9th Cir. 2024) ("By definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership.").

Prestige Investment Group

# What Is Flow Of Funds …

