**MS&B** McMANIMON · SCOTLAND · BAUMANN

75 Livingston Avenue, Roseland, NJ 07068  (973) 622-1800

**Sari B. Placona**
**Direct Dial: 973-721-5030**
**splacona@msbnj.com**

Client No. 35420-001

August 26, 2025

<u>Via ECF</u>
Honorable Jerrold N. Poslusny, Jr.
United States Bankruptcy Court
Mitchell H. Cohen U.S. Courthouse
400 Cooper Street, 4th Floor
Camden, New Jersey 08101

Re:  Daryl Fred Heller; Chapter 11, Case No. 25-11354 (JNP)

Dear Judge Poslusny:

As Your Honor is aware, this firm is counsel to Daryl Fred Heller, the Chapter 11 debtor (the "Debtor" or "Mr. Heller"). Please accept this letter as a response to Mr. Gwynne's letter dated August 21, 2025 (the "Letter") (ECF 496). Mr. Gwynne's Letter failed to address some of the flaws the Debtor identified in the Examiner's Second Report (ECF 481). Moreover, he failed to address the threshold issue that there are no investors of Paramount/Affiliates, thereby rendering the Examiner's "Second Interim Report" misguided and misleading. The Letter attempts to justify the partial set of data the Examiner chose to review and/or report on. This created an ill-advised narrative and in turn irresponsibly connects random dots that have no connection.

Rather than continue to engage in a multi-page letter campaign, the Debtor will be retaining an independent, third-party professional to review the Examiner's Second Interim Report to provide factual findings and evidence related to tax returns, accounting, revenue, bank accounts, and contracts validating that there are no investors. In lieu of an elongated point-by-point rebuttal to Mr. Gwynne's Letter, below is a summary response to five (5) sections of the Letter.

**Response to First Section of Mr. Gwynne's Letter:**
- The Debtor respectfully disagrees that the Examiner understands Paramount's business model. Again, the Examiner purports his theory of the business model, and intentionally ignores the indisputable legal and contractual evidence provided to him which contradicts his thesis that Paramount/Affiliates have 'investors.'
- The Examiner takes singular points made in response and draws isolated conclusions, all while responding under the misguided thesis that Paramount/Affiliate have investors which in and of itself invalidates the entirety of his conclusions.
- Mr. Gwynne makes many assertions in this section such as, but not limited to, "PMG made the payments to the Funds on the account of investors returns" which again is factually

inaccurate. He references realities that relate to Prestige Funds not Paramount/Affiliates as if they are interchangeable legally and then *unreasonably* suggests the Debtor's use of the word "partnering" implies "investors" when that is not the case. The Debtor interprets the word "partnering" as a reference to customers, vendors, and professional relationships in all his businesses.
- The caselaw referenced in both the Examiner Report and Letter, compare 'apples to oranges.' The caselaw provided, even Kalia as well as Nationwide Automated Systems and ATM Financial Services, are diametrically different. Additionally, except for one case study which was a completely different model, all of the case studies provided had direct "investors" of which Paramount/Affiliates did not.
- In short, the fundamental differences of the case studies are as follows:
    - The case study Companies were at accounting level booking revenue as 'investment,' not as a 'sale.'
    - The case study Companies if booking as a 'sale' did not have 'material profits' associated with the sale to support 30-36 months of payments, at which point program could be terminated with a nominal payment.
    - The case study Companies did not have large 'profits' AFTER making the payments that were part of model. Even Kalia case study did not have material profits on ATM sale (based on initial diligence we are even unsure if fully booked as 'sale') and therefore used the actual 'revenue' from the sale, not the actual 'profit' from the sale to make payments.
    - The programs of the Companies in the case study were perpetual with no end to them other than one (which did not have elements defined in next bullet point) and accordingly no way to exit program.
    - The case study Companies did not have defined buyouts, ripcords, and many other ways to terminate the program long before end of the six (6) or seven (7) year period.
    - The case study Companies were always having to pay off the full investment, not pennies on the dollar, or zero. To note again, the Prestige program was not an investment but since the Examiner asserts it is, this would be a fundamental difference.

**Response to Second Section of Mr. Gwynne's Letter:**
- While there are many erroneous and misguided elements in Mr. Gwynne's responses, in the interest of brevity, we address three (3) of his statements:
    - 1) 'Treating Investors funds as 'revenue' for accounting or tax purposes does not entitle an entity to use those funds to pay returns to earlier investors.' First, there are no investors thereby invaliding this report. Second, Paramount/Affiliate was not 'treating as revenue' rather the revenue was a ***factual sale*** with ***factual profit*** which the Examiner continues to ignore. This is when considering the factually documented accounting internally and at the Internal Revenue Service ("IRS") which is not reasonable by the Examiner and misleading. Second, Mr. Gwynne refused to address the ATM sales profit, rather he talks about the revenue as if it included no gross profit, which is factually inaccurate. The Debtor's response to his report, was focused on the gross profit generated, not revenue generated which he intentionally omits.
    - He then references a case stay of TGC which was 'recording investor revenue as income or operating revenue.' Again, there are no investors and

2

- Paramount/Affiliate was not booking an 'investment' as income or operating revenue rather was reporting as a 'sale' with associated COGs thereby creating a profit which is completely different than the TGC case study.
  - The "What is Flow of Funds" slide was not developed by Mr. Heller, but rather was developed by Jerry Hostetter's team who reported to him. In that email, Mr. Heller was forwarding to Jerry Hostetter a deck inclusive of other updates which included this "What is Flow of Funds" slide and many others. To suggest Prestige and Fund Managers did not know there was material profit on selling the ATM and the core tenant of program is outrageous as there are documented conversations of acknowledgement. Furthermore, 'ATM fee income' was part of the program with Paramount/Affiliates, however bank accounts used, profits/available cash, AP/AR/NP/NR, or how they account for it was manipulated in Mr. Gwynne's response.
- The car analogy used is inapplicable, as it is dissimilar to Paramount/Affiliates and Prestige Funds (i) as it illustrates an investor buying, (ii) illustrates a commitment of 50% of revenue, (iii) profit only covers 18 of 84 months, and (iv) business revenue of $0 per month. Conversely, Paramount/Affiliates had (i) no individual investors, (ii) no commitment to percentage of revenue or profit, (iii) profit from sale to cover 30-36 months until termination options, (iv) tens of millions of monthly revenues, and (v) full contractual ability to terminate the program after 2 or 3 years, not 7 years. Thus, facts of the car analogy are fundamentally different than Paramount/Affiliates.
- In summary, the report manipulates and camouflages the issue presented therein, by erroneously isolating the focus on 'did subsequent investors pay earlier investors' vs. accepting the factual reality that there are no investors, thus no contractual or legal obligations due and owed. If you ignore any businesses' profits, accounting, recognition of revenue, etc. would make it look like 'subsequent customers payments accpaid earlier customers COGs/WIP.'

**<u>Response to Third Section of Mr. Gwynne's Letter:</u>**
- This section of the Letter is based on the erroneous theory that Paramount/Affiliates owed contractual and legal obligations to investors, which is factually incorrect.
- The Examiner stated he did, "not ignore any relevant bank accounts" which is incorrect. The Debtor identified and advised him multiple times, (to which he responded, and we paraphrase, "probably too late to source as we need to get this report out given pressure from Prestige") that there were many Paramount and/or Affiliates' bank accounts that he did not subpoena based on our review of his subpoenas. The fact that the Examiner filed the report which omits bank accounts and revenue is another reflection of the fundamental flaw, misleading nature, and errors in the report. Under this logic it would be irrelevant to the Examiner if there were another bank account with substantial funds. When in fact said bank accounts relate to entities that are actually operating and managing, some of Prestige owned ATMs, which simply undermines the integrity of this report.
- In summary, Mr. Gwynne suggests in his response that Paramount and/or Affiliate revenue generated in bank accounts he did not review, or in some cases reviewed though omitted is irrelevant, is a fundamental flaw of the report. The Examiner is insinuating ATMs owned by Prestige that were generating revenue in the program, but did not flow into either specific Paramount bank accounts or other bank accounts he did not review is irrelevant.

3

When in fact, in many cases, funds could not legally flow through Paramount accounts given regulatory requirements or entities/accounts, further demonstrated the negligence in the formulation of this report.

**Response to Fourth Section of Mr. Gwynne's Letter**:
- In summary, this section describes the thesis that there were 'investors' which is factually inaccurate. There are no investors. Again it was suggested revenue generated in bank accounts not reviewed, or omitted, is irrelevant. It is also again suggested that hundreds of millions of gross profits generated from sale of ATMs is somehow irrelevant, or that all gross profit should be under a single account or entity which would be in violation of regulatory law which requires separation. All of these points show the report is incomplete and misleading. On one hand, the report is focused on revenue generated by the ATMs, and the other, the report suggests it is irrelevant if it does not flow through two (2) specific accounts (or a few others). This is a glaring contradiction within this report and Mr. Gwynne's response.

**Response to Fifth Section of Mr. Gwynne's Letter**:
- In summary, Jerry Hostetter and his team had no visibility, connection, or access to Paramount/Affiliates and the fundamental elements reported on within the report. Mr. Heller had working knowledge and visibility to most of the fundamental elements with Paramount/Affiliates. This report focused on Paramount/Affiliates and the Examiner met with affiliates of Prestige approximately five (5) times, and only meet with Mr. Heller twice. Moreover, the Examiner agreed on a follow up of deliverables, which suggests the call was perhaps a bit biased.

In conclusion, the Debtor fundamentally disagrees with the assertions and misguided assumptions including (i) the false thesis of Paramount/ Affiliates having 'investors,' and (ii) the use of case studies with no relevance, which is like comparing 'apples to oranges.' The report and responses intentionally reviewed sets of partial data. Moreover, the report ignored (i) entities who were operating Prestige ATMs, (ii) the gross profit from sale of ATMs, (iii) tax returns reflecting revenue and profit post payment to Prestige, and (iv) the reality of factual accounting in place (filed with the IRS), all to create a narrative that is flawed and contradicts the documents and data. The integrity of this report is compromised by the aforementioned facts which suggest that the Examiner attempted to construct a narrative aligned with the case study comparisons of Ponzi schemes, instead of looking objectively at the entirety of facts.

Thank you for the Court's courtesies.

Respectfully submitted,

*/s/ Sari B. Placona*

Sari B. Placona

4

4931-6607-4979, v. 1