UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Kristi J. Doughty (No. 038611987)
David W. Carickhoff
CHIPMAN BROWN CICERO & COLE, LLP
1313 N. Market Street, Suite 5400
Wilmington, DE 19801
Phone:  (302) 295-0191
Email: doughty@chipmanbrown.com
       carickhoff@chipmanbrown.com

*Attorneys for Claudia Z. Springer,*
*Chapter 7 Trustee of the bankruptcy estates of*
*the Blackford Debtors*

| | |
|---|---|
| In re:<br><br>DARYL FRED HELLER,<br><br>          Debtor. | Chapter 11<br><br>Case No. 25-11354 (JNP) |
| Claudia Z. Springer, solely in her capacity as Chapter 7 Trustee of the bankruptcy estates of the Blackford Debtors,<br><br>          Plaintiff,<br><br>v.<br><br>DARYL FRED HELLER,<br><br>          Defendant. | Adv. Pro. No.: 25-_____  (JNP) |

**COMPLAINT TO DETERMINE EXCEPTIONS TO DISCHARGE OF DEBTS OWED
BY DARYL FRED HELLER TO THE BLACKFORD DEBTORS, PURSUANT TO
<u>11 U.S.C. §§ 523(a)(2)(A), (a)(2)(b) AND (a)(6)</u>**

     Claudia Z. Springer, solely in her capacity as the chapter 7 trustee (the "<u>Chapter 7 Trustee</u>"

or "<u>Plaintiff</u>") of the bankruptcy estates of Blackford ATM Ventures Fund D, LLC, Blackford

ATM Ventures Fund M II, LLC, Blackford ATM Ventures Fund M IV, LLC, Blackford ATM

Ventures Fund M, LLC, Blackford ATM Ventures Fund M V, LLC, and Blackford ATM Ventures,

LLC (collectively, the "Blackford Debtors"), pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(6) and Rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure, files this complaint (the "Complaint"), through her undersigned counsel, seeking a ruling that certain debts owed to the Blackford Debtors by Daryl Fred Heller, the above-referenced chapter 11 debtor and defendant ("Heller" or "Defendant"), are nondischargeable.   In support thereof, the Chapter 7 Trustee respectfully alleges as follows:

## JURISDICTION

1.      This civil proceeding arises under and otherwise relates to a case under 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). This is a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2) and 11 U.S.C. § 523, since this is a proceeding to determine the dischargeability of particular debts. Pursuant to Rule 7008 of the Federal Rule of Bankruptcy Procedure (collectively, the "Bankruptcy Rules" and each, a "Bankruptcy Rule"), the Plaintiff consents to entry of final orders or judgments by the United States Bankruptcy Court for the District of New Jersey (the "Court") with respect to the relief requested in this Complaint.

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This proceeding is initiated under Bankruptcy Rule 7001.

4.      By timely filing this Complaint[1], pursuant to 11 U.S.C. § 523 and Bankruptcy Rule 4007, the Chapter 7 Trustee preserves her right to have the Court determine that the debts owed to the Blackford Debtors by the Defendant are excepted from discharge on the basis of fraud and related misconduct.

---

[1] By Order of the Court entered on June 10, 2025 at D.I. 331, the Chapter 7 Trustee's deadline to file a complaint to determine the non-dischargeability of indebtedness pursuant to 11 U.S.C. § 523 and Bankruptcy Rule 4007 was extended through and including August 31, 2025.

4937-7427-2580, v. 1

5.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B) and (a)(6).

## THE PARTIES

6.      On January 21, 2025, involuntary petitions for relief under chapter 7 of the Bankruptcy Code were filed in the United States Bankruptcy Court for the District of Delaware (the "DE Bankruptcy Court") naming Blackford ATM Ventures Fund D, LLC, Blackford ATM Ventures Fund M II, LLC, Blackford ATM Ventures Fund M IV, LLC, Blackford ATM Ventures Fund M, LLC, Blackford ATM Ventures Fund M V, LLC, and Blackford ATM Ventures, LLC as alleged debtors.

7.      By Order of the DE Bankruptcy Court dated January 22, 2025, the Blackford Debtors' cases were consolidated for procedural purposes only and are now jointly administered under Case No. 25-10105 (MFW) (Bankr. D. Del.) (the "Blackford Chapter 7 Cases").

8.      On February 28, 2025, the DE Bankruptcy Court entered the *Order for Relief in Involuntary Cases* (the "Order for Relief"), which, among other things, directed the United States Trustee to appoint an interim chapter 7 trustee in the Blackford Chapter 7 Cases pursuant to section 701(a)(1) of the Bankruptcy Code.

9.      On April 30, 2025, Claudia Z. Springer was appointed as the chapter 7 trustee of the Blackford Debtors' bankruptcy estates.

10.     Heller is an individual that is a citizen and resident of the State of Pennsylvania and the chapter 11 debtor in the above-captioned case pending before this Court (the "Bankruptcy Case").

4937-7427-2580, v. 1

## FACTUAL ALLEGATIONS

I.      **General Background**

11.      According to their First Amended and Restated Limited Liability Company Agreements, each Blackford Debtor is owned 99% by Heller Capital Group, LLC (with Heller as managing member) and 1% by Accordo Limited Partnership ("Accordo") (with Heller as general partner), with Heller Capital Group, LLC ("Heller Capital") as the managing member of each Blackford Debtor.  Heller was, at all relevant times, the Founder and Chief Executive Officer of Heller Capital and authorized to bind the Blackford Debtors to agreements.

12.      Upon information and belief, Heller controls and/or controlled Paramount Management Group LLC ("Paramount"), the management, maintenance and servicing company with regard to certain of the Blackford Debtors' assets.  Upon information and belief, Heller owns, either directly or indirectly, Paramount.[2]

13.      Each of the Blackford Debtors had one or more ATM Management Services Agreements (each, an "MSA") with Paramount.  Pursuant to the MSAs:  (i) the Blackford Debtor would purchase Automated Teller Machines ("ATMs") from Paramount for management by Paramount; (ii) title to the purchased ATMs was to remain in the Blackford Debtor's name; (iii) Paramount would secure agreements with third party retailers for installing the ATMs at their locations; (iv) once installed, Paramount would be responsible for the operation of the ATMs (including maintenance and managing and replenishing cash); (v) Paramount would remit to the Blackford Debtor a fixed monthly payment (plus advertising revenue) based upon the amount of funds the Blackford Debtor transferred to Paramount to purchase the ATMs and Paramount would

---

[2] *See* Examiner's Report (defined below), ¶ 15 (D.I. 473-1, p. 11 of 44) ("Therefore, the Debtor controlled [Paramount].");¶ 37 (D.I. 473-1, p. 17 of 44) ("Daryl has absolute control of [Paramount].") (citation omitted).

keep a management fee.[3]  The MSAs were executed by Daryl Heller on behalf of the Blackford Debtor and by Randall Leaman on behalf of Paramount, as its President and COO.

14.    In sum, the Blackford Debtors were supposed to own certain ATMs, which were then supposed to be maintained and serviced by Paramount.  Paramount was supposed to pay a monthly fee to each Blackford Debtor based upon the amount of ATMs such Blackford Debtor purchased through Paramount.

15.    Based upon the financial records of the Blackford Debtors received to date by the Chapter 7 Trustee, it appears that each Blackford Debtor received a monthly payment from Paramount through 2023.  The payments from Paramount, however, stopped in early 2024.[4] Monthly payments were used by the Blackford Debtors to pay debt service under their obligations with various lenders holding liens on the Blackford Debtors' assets.

16.    Based upon the financial records of the Blackford Debtors received to date by the Chapter 7 Trustee, it appears that the Blackford Debtors were paying Heller Capital and Accordo member distributions and other amounts through April 1, 2024.

17.    By the end of 2024, it appears that Paramount was selling ATMs to third parties to raise money, even those ATMs that were owned by the Blackford Debtors, not Paramount.  To the extent that the Blackford Debtors actually owned ATMs, as represented by Heller, such ATMs were subsequently sold or abandoned by Heller and/or his entities without the Blackford Debtors receiving any consideration for such sales.

---

[3] See Examiner's Report, ¶ 17.

[4] The purpose of the Blackford Debtors appears very similar to that of the "Funds" as described in the Examiner's Report: "The structure of the investment opportunity in the Funds varied as to form, but all were designed to provide Investors with an opportunity to in invest in ATMs and the revenue derived from them."  Examiner's Report, ¶ 18.

4937-7427-2580, v. 1

18.    Based upon the filings in the Bankruptcy Case and in litigation commenced by the Prestige Funds in the Prestige Litigation (defined below), it appears that Heller caused the Blackford Debtors to take on debt that he knew the Blackford Debtors could not pay back, as the Blackford Debtors either did not own the ATMs that Heller represented they did or such ATMs were not being properly serviced by Paramount as he represented they were.  Either way, the Blackford Debtors were rendered insolvent at least by the time that they borrowed funds from Silverview Lending (defined below).

19.    Thus, at least from August 23, 2023, any "member distributions" or other transfers from the Blackford Debtors to Heller Capital, Accordo, Heller, Heller controlled entities or investors are fraudulent transfers and/or unlawful dividends to or for the benefit of Heller.  Further, it is believed that Paramount, at Heller's direction, sold ATMs which were not the property of Paramount, but were property of one of the Blackford Debtors.

**II.    Silverview Loans**

20.    Upon information and belief, on or about June 26, 2023, Heller, on behalf of (a) Blackford ATM Ventures Fund D, LLC; (b) Blackford ATM Ventures Fund M, LLC; (c) Blackford ATM Ventures Fund M II, LLC; (d) Blackford ATM Ventures Fund M IV, LLC; (e) Blackford ATM Ventures Fund M V, LLC; (f) Blackford ATM Ventures, LLC; and (g) Blackford Holdings, LLC ("Blackford Holdings," and together with the Blackford Debtors, the "Blackford Entities" and each, a "Blackford Entity"), approached Silverview, Silverview Special Situations

6

Lending LP, Silverview Special Situations Lending II LP[5], and Spearhead Insurance Solutions IDF, LLC – Series SCL4 (collectively, the <u>Silverview Plaintiffs</u>") for a loan.[6]

21.     Upon information and belief, as part of its due diligence process, Silverview requested detailed financial information from the Blackford Entities and Heller, as Guarantor of the Obligations under the Loan Documentation (each as defined herein), to assess their ability to repay the loan. As set forth more fully below, this included, without limitation, financial statements, balance sheets, profit and loss statements, and other relevant documentation reflecting the Blackford Entities' and Heller's assets, liabilities, income, and overall financial condition.

22.     Upon information and belief, Heller, on behalf of the Blackford Entities and himself, provided these materials with the understanding that Silverview would reasonably rely on them in making its lending decision. Silverview's request for this information was a critical and material component of the underwriting process, ensuring that the Blackford Entities and Heller had the financial wherewithal to satisfy their obligations under the Loan Agreement.

23.     Upon information and belief, as part of Silverview's due diligence process, and at its request, Heller, on behalf of the Blackford Entities, provided written documentation and made oral representations (the "<u>Blackford Diligence Documentation</u>") concerning, among other things, the value, location, and quantity of certain collateral pledged to secure the loan, which included a series of ATMs purportedly owned by the Blackford Entities (collectively, the "<u>Blackford ATMs</u>" and each, a "<u>Blackford ATM</u>") located throughout the United States.  These documents included

---

[5] Together, Silverview Special Situations Lending LP and Silverview Special Situations Lending II LP are referred to herein as "<u>Silverview Lending</u>."  Silverview Credit Partners LP ("<u>Silverview</u>") is a judgment creditor of Heller and the Agent for the lenders under the Loan Agreement.

[6] Silverview filed a Complaint contesting the dischargeability of Heller's debt to Silverview.  *See* Docket No. 238. Any reference to documents in this section can be found attached to such Complaint or are available from Silverview's counsel.

appraisals, inventory reports, financial statements and other records purporting to reflect the true nature and worth of the Collateral (as defined herein).

24.   Upon information and belief, Heller, on behalf of the Blackford Entities, represented that these materials were accurate, complete and reliable, knowing that Silverview would rely on them in determining whether to extend credit.

25.   Upon information and belief, as part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that the Blackford Entities owned 3,697 Blackford ATMs.

26.   Upon information and belief, as part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that the Blackford ATMs were unencumbered, except as otherwise disclosed to Silverview.

27.   Upon information and belief, as part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that the average purchase value of a Blackford ATM was $26,827.00.

28.   Upon information and belief, as part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that, collectively, the Blackford ATMs had a fair market value of over $90 million.

29.   Upon information and belief, as part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that in 2022, the Blackford ATMs had a collective total operating revenue of $71,363,970.00.

30.   Upon information and belief, as part of the Heller-provided Blackford Diligence Documentation, Heller, on behalf of the Blackford Entities, represented that each Blackford ATM was managed and operated by Heller-controlled servicer, Paramount, pursuant to certain MSAs

4937-7427-2580, v. 1

between the Blackford Entities and Paramount. The MSAs were included as part of the Collateral package under the Loan Agreement.

31.     Upon information and belief, during the due diligence process, Heller, on behalf of the Blackford Entities, made oral representations regarding Paramount's responsibilities pursuant to the MSAs, including that Paramount worked with a "sponsor bank" to ensure Paramount's regulatory compliance in its management of the Blackford ATMs. Heller represented that if Paramount were to cease managing and operating the Blackford ATMs, the sponsor bank would serve as a "backstop" and was legally required to manage and operate the Blackford ATMs for the benefit of the Blackford Entities and in Paramount's absence.

32.     Upon information and belief, during the due diligence process, Heller, as Guarantor, provided written documentation and made oral representations regarding his personal financial condition (the "Heller Diligence Documentation").

33.     Upon information and belief, as part of the Heller-provided Heller Diligence Documentation, Heller represented that as of June 30, 2023, he had a net worth of $318,140,004.00 and that his assets were held at three entities: (1) Heller Capital; (2) Heller Investment Holdings, LLC; ("Heller Investment"); and (3) Accordo.

34.     Upon information and belief, as part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his interest in Heller Capital had a "highly conservative" valuation of $255,700,000.00.

35.     Upon information and belief, as part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his interest in Heller Investment had a "highly conservative" valuation of $48,150,000.00.

4937-7427-2580, v. 1

36.    Upon information and belief, as part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his interest in Accordo had a "highly conservative" valuation of $13,683,000.00.

37.    Upon information and belief, as part of the Heller-provided Heller Diligence Documentation, Heller represented that, as of June 30, 2023, his personal liabilities did not exceed $1,600,000.00.

38.    On August 23, 2023, the Silverview Plaintiffs entered into a series of agreements with the Heller-controlled Blackford Entities including: (i) that certain loan agreement between the Silverview Plaintiffs and the Blackford Entities (the "Loan Agreement"); (ii) a Collateral Assignment of Management Service Agreements (the "Collateral Assignment"); and (iii) a Pledge and Security Agreement (the "Pledge Agreement" and collectively with the Loan Agreement and the Collateral Assignment, the "Loan Documentation"). Heller, on behalf of Heller-controlled Heller Capital, the Borrower Representative under the Loan Agreement, executed the Loan Documentation.

39.    The Obligations under the Loan Documentation were guaranteed by Heller pursuant to that certain Guaranty Agreement, dated August 23, 2023, executed by Heller in favor of Silverview (the "Guaranty"). The Guaranty provided that the "Guarantor hereby unconditionally and irrevocably guarantees to the [Silverview Plaintiffs], for the benefit of the [Silverview Plaintiffs], the full and punctual payment and performance, when due, of all of the Obligations, whether such Obligations would have arisen at maturity or earlier by reason of acceleration."

40.    Pursuant to the Loan Documentation, all of the Blackford Entities' Obligations are secured by a continuing security interest and Lien upon the Collateral, as defined in the Security

Agreement and the other Security Documents (together with the Collateral Assignment, the "Collateral"). The Collateral includes, but is not limited to, the Blackford ATMs.

41.    After closing, the Silverview Plaintiffs promptly perfected their security interest in the Blackford ATMs, each of which bear identifying serial numbers.

42.    Approximately 400 of the 3,697 Blackford ATMs securing the Silverview Plaintiffs' investment have serial numbers starting with "PH."

43.    As evidenced by the Loan Documentation, Heller, on behalf of the Blackford Entities, made affirmative representations, in writing, regarding title to the Blackford Entities' assets, including the Blackford ATMs, and any encumbrances thereon.  Specifically, under Section 4.7 of the Loan Agreement, Heller represented that each Blackford Entity had "good title to its assets . . . and the same are not subject to any Liens other than Permitted Liens."[7]  Upon information and belief, Heller also made oral representations regarding the same.

44.    Pursuant to the Loan Agreement, Heller, on behalf of the Blackford Entities, also represented that with respect to certain of the Blackford Entities, "[t]he Liens in favor of [Silverview] provided pursuant to the Security Documents are valid and perfected second priority security interests in the Collateral (subject only to Permitted Liens)." Loan Agreement § 4.16. With respect to other of the Blackford Entities, Heller, on behalf of the Blackford Entities, provided evidence that "each Lien granted by any Obligor under any Loan Document is a valid, first priority Lien, and that there are no Liens upon any Collateral other than Permitted Liens." Loan Agreement § 3.1(vi).

---

[7] Pursuant to the Loan Agreement, "Permitted Liens" encompassed a defined and limited set of liens that the Blackford Entities had disclosed or could grant either in the ordinary course of business or with the consent of the Silverview Plaintiffs. *See* Loan Agreement, Definitions Schedule, pp. 15-16.

4937-7427-2580, v. 1

45. Further, pursuant to the Pledge Agreement, Heller, on behalf of the Blackford Entities, represented that each Blackford Entity had "good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens except for Permitted Liens." Pledge Agreement § 3.1.

46. Silverview also received the Perfection Certificate, executed by Heller for and on behalf of the Blackford Entities. The Perfection Certificate, among other things, set forth the serial number and state of location of each Blackford ATM and was represented and warranted to be true and accurate as of the date of the Loan Agreement's execution.  Loan Agreement § 4.14.

47. As a result of the foregoing, Silverview Lending and Spearhead agreed to make two tranches of loans to the Blackford Entities—a Tranche 1 Term Loan of $18,000,000 and a Tranche 2 Term Loan of up to $7,000,000 (the "Term Loans"), for a total loan sum of up to $25,000,000. The Blackford Entities, in turn, agreed to pay interest on the principal of the Term Loans of 15.50% along with certain other fees. In total, the Silverview Plaintiffs lent the Blackford Entities $23,000,000.00 pursuant to the Loan Agreement.

48. Upon information and belief, as represented by Heller, the Blackford Entities' revenue was purportedly derived from fees charged to users of the Blackford ATMs for completing a transaction.

49. As part of post-closing obligations under the Loan Agreement, on or about September 22, 2023, the Blackford Entities were required to provide Silverview with, among other things, a list of each of the Blackford ATM units by serial number and the address where such Blackford ATM was physically located. *See* Loan Agreement § 5.15(c). Upon information and belief, Silverview never received this information, despite repeated requests to Heller.

12

50.     Beginning on or about June 15, 2024, and continuing through the date hereof, the Blackford Entities failed to make any of the principal and interest payments as required under the Loan Agreement, including any payments after receipt of written notices of default and acceleration.

### III.     Silverview Plaintiffs' Litigation Against Heller and Blackford Entities

51.     On September 11, 2024, the Silverview Plaintiffs initiated a lawsuit against the Blackford Entities and Heller in the Supreme Court of the State of New York County of New York (the "State Court"), Index No. 654755/2024 (the "Breach of Contract Action")[8], via a motion for summary judgment in lieu of complaint [NYSECF No. 26] (the "Summary Judgment Motion").

52.     The Silverview Plaintiffs, through the Breach of Contract Action, sought to recover sums due and owing under the Loan Agreement. Specifically, the Silverview Plaintiffs sought to enforce their rights under the Loan Agreement as a result of the Blackford Entities' default on their obligations under the Loan Agreement. The Silverview Plaintiffs sought recovery from Heller personally as a guarantor of the Blackford Entities' financial obligations under the Loan Agreement, pursuant to the Guaranty.

53.     Neither the Blackford Entities nor Heller responded to the Summary Judgment Motion.[9]

54.     On November 25, 2024, the State Court entered an order granting the Silverview Plaintiffs' Summary Judgment Motion against the Blackford Entities and Heller, jointly and severally, in the amount of $28,554,186.80, as well as attorneys' fees, costs, and interest at the

---

[8] References to the docket of the Breach of Contract Action shall appear as "NYSECF No. _." *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc.* (*In re Howard's Express, Inc.*), 151 F. App'x 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket).

[9] *See* Summary Judgment Decision (as defined herein) p. 1.

4937-7427-2580, v. 1

Default Rate arising from the Blackford Entities' foregoing default, and additional interest accruing thereafter at the statutory rate of 9% per annum until the judgment is paid in full [NYSCEF No. 42] (the "Summary Judgment Decision").[10]

55.     Neither the Blackford Entities nor Heller appealed the Summary Judgment Decision, and the time for any appeal has expired.

56.     On December 9, 2024, the Silverview Plaintiffs filed the *Order to Show Cause for Restraining Order and Leave to Examine Under CPLR § 5229* [NYSCEF No. 46] (the "OSC") and *Memorandum of Law in Support of an Order to Show Cause for a Restraining Order and Leave to Examine Under CPLR § 5229* [NYSCEF No. 47]. Through the OSC, the Silverview Plaintiffs sought to prohibit the Blackford Entities and Heller from transferring any assets and require Heller and a Blackford Entities' corporate representative to be examined by the Silverview Plaintiffs.

57.     On December 17, 2024, the State Court entered the OSC and ordered the parties to sit for depositions [NYSECF No. 65]. Pursuant to the OSC, in relevant part, Heller was required to "truthfully answer questions about the location and quantity of [the Blackford Entities'] and Heller's assets, under penalty of perjury."

58.     Heller and a corporate representative of the Blackford Entities failed to appear at their scheduled depositions and did not respond to subsequent requests to reschedule the same.

59.     On January 13, 2025, the State Court entered the *Order Granting Plaintiffs' Attorneys Fees and Costs* [NYSECF No. 73] (the "Fee Order") and granted the Silverview

---

[10] *See* Summary Judgment Decision p. 4 ("ORDERED Plaintiffs are granted judgment against Defendants, jointly and severally, for attorneys' fees and costs."). On April 10, 2025, the State Court entered Judgment against Heller and the Blackford Entities in the total amount of $32,045,229.41 [NYSECF No. 77].

Plaintiffs attorneys' fees in the sum of $283,961.52, plus additional attorneys' fees from any of the Silverview Plaintiffs' efforts to enforce the judgment.

60.    On April 10, 2025, the State Court entered judgment against, among others, the Blackford Debtors, jointly and severally, in an amount no less than $28,554,186.72 [NYSECF No. 77].

61.    Silverview holds a liquidated, fixed and undisputed debt against Heller and the Blackford Entities, jointly and severally, in an amount no less than $28,838,148.32.

## IV.    Facts Evidencing Heller's Fraud As Demonstrated by Related Litigation

62.    On August 23, 2024, a group of investors (the "Prestige Funds") filed a lawsuit in Lancaster, Pennsylvania against Paramount alleging, among other things, that Paramount had defaulted on "Monthly Revenue Remittances" under several "ATM Management Services Agreements." *See Prestige Fund A, LLC, et al. v. Paramount Mgmt. Group, LLC*, Case No. CI-24-06012 (Pa. C.P. Aug. 23, 2024) (the "Prestige Litigation").[11]

63.    The Prestige Litigation ultimately resulted in a November 21, 2024 Consent Judgment against Paramount in the amount of $138,156,118.38, which also required Paramount to provide an inventory and rights and title to the ATMs the Prestige Funds owned.

64.    When Paramount did not comply with the Consent Judgment, contempt proceedings revealed the Debtor's fraud.  The Prestige Funds learned through the Prestige Litigation that the ATMs that the Debtor represented he bought for the Prestige Funds either (i) never existed, (ii) were purchased but stayed in a warehouse, (iii) were sold to more than one

---

[11] References to the docket of the Prestige Litigation shall appear as "Pa. C.P. _." The case is pending in the Court of Common Pleas of Lancaster Country, Pennsylvania.

4937-7427-2580, v. 1

entity, and/or (4) were not bought outright.  *See* Prestige Funds' *Complaint* [D.I. 236] ("Prestige

Funds Complaint") against Heller contesting dischargeability, ¶¶ 5-8.

65.    In hearings held in connection with the request to find Paramount in contempt (the

"Contempt Hearings"), a number of witnesses were called to testify either live or through

stipulated testimony.  Expert testimony elicited from Paramount's former Vice President of

Information Systems revealed that "PH" stood for "placeholder," and Automated Teller Machines'

serial numbers preceded by such designation may be fictitious.[12]   As set forth above,

approximately 400 of the 3,697 Blackford ATMs have serial numbers starting with "PH."

66.    Upon information and belief, Silverview also analyzed the Blackford ATMs in

relation to the list of Automated Teller Machines held by the Prestige Funds (the "Prestige ATMs")

that was used as an exhibit at the Contempt Hearings. Those lists should have been completely

different. However, by comparing the Prestige Funds' list to its Collateral list, the Silverview

Plaintiffs determined that certain serial numbers of the Prestige ATMs matched serial numbers

associated with the Blackford ATMs in the Collateral list the Blackford Entities provided at

closing.  Further, Heller, on behalf of Paramount, represented to the Prestige Funds that Paramount

owned the Prestige ATMs.

67.    Based on the observable events that transpired in the Prestige Litigation, along with

the facts set forth herein, it is evident that Heller orchestrated a scheme in which the Prestige Funds

and the creditors of the Blackford Debtors (including, without limitation, Silverview) are some of

the many victims. The financial harm suffered by the Prestige Funds and the creditors of the

Blackford Debtors are not isolated incidents but rather part of a broader fraudulent enterprise

---

[12] *See* Pa. C. P. Tr. of Civil Contempt Hr'g at 27 (dated Dec. 6, 2024).

designed by Heller to misappropriate funds. As discussed below, this is borne out in the Examiner's Report (defined below) and in the not less than 15 other complaints filed against Heller contesting dischargeability.

## V.      Heller's Bankruptcy Case and the Examiner's Report

68.      On February 10, 2025, Heller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

69.      On March 7, 2025, the Court entered the *Order Directing the Appointment of an Examiner* [D.I. 99] (the "Examiner Order"). Pursuant to the Examiner Order, in relevant part, "[t]he Examiner shall (a) investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, of the affairs of the [Defendant] or any entity or entities owned or controlled by the [Defendant], either directly or indirectly, or through any intermediate entity" and investigate the accuracy and completeness of Heller's financial disclosures.

70.      On March 18, 2025, the Court entered the *Order Approving the Appointment of a Chapter 11 Examiner by the United States Trustee* [D.I. 131], which approved the appointment of Edward A. Phillips as Examiner (the "Examiner") in the Bankruptcy Case.

71.      On April 11, 2025, the interim trustee of the Blackford Debtors filed unliquidated proofs of claim against the Debtor (Claim Nos. 39-44). The claims were unliquidated as the interim trustee had not yet had ample time to investigate the potential claims. The Chapter 7 Trustee is still conducting discovery to determine the full extent of the claims against the Debtor and his related entities. The Chapter 7 Trustee intends to amend such claims after her investigation is concluded.

17

72.    On August 13, 2025, the Examiner filed his Second Interim Report [D.I. 473] (the "Examiner's Report")[13], which focuses on the allegation that the Debtor operated a Ponzi scheme. Examiner's Report, ¶ 9.

73.    Among other things, the Examiner reviewed the bank statements and other financial documents of Paramount for the months of January 2021 through March 2025 (the "Review Period"). *Id.,* ¶ 9. Paramount's primary sources of receipts (other than Investor funds) consisted of fees generated by its ATM operations. *Id.,* ¶ 69.

74.    After accounting for documented operating expenses of $123,501,130, Paramount was left with $38,162,066 in net operating cash for the entire Review Period. *Id.,* ¶ 70. This $38,162,066 in net operating cash was insufficient to pay the aggregate $407,324,116 in distributions Paramount paid to Investors during the Review Period. *Id.,* ¶ 71. Even the $161,663,196 in gross receipts from the ATM operations was insufficient to pay the $407,324,116 in returns to Investors during the Review Period. *Id.,* ¶ 72.

75.    Further, Paramount's gross profit from its deployed ATMs also was insufficient to pay the returns paid to Investors during the Review Period. *Id.,* ¶ 73 and 78.

76.    Even when adding other sources of capital (other than Investors' funds) deposited into all of the FNB Accounts (as defined in the Examiner's Report), Paramount lacked sufficient funds to pay the $407,324,116 in returns to Investors during the Review Period. *Id.,* ¶ 80.

77.    "With no other available funds to pay returns to earlier Investors, [Paramount] necessarily used funds from subsequent Investors to pay returns owed to earlier Investors.

---

[13] Unless otherwise defined herein, all capitalized terms used in this section have the meanings ascribed to them in the Examiner's Report.

[Paramount's] obligations to the Funds on account of Investor returns, exceeds [Paramount's] receipts (excluding Investor Funds)…." *Id.,* ¶ 81.

78.    In addition to being necessary, Paramount's use of Investor funds to pay other Investor obligations appears intentional. *Id.,* ¶ 84-85.

79.    The Examiner determined that the number of ATMs that Paramount needed to generate sufficient operating receipts to pay returns to the Investors during the Review Period ranged from over 27,000 ATMs to 155,848 ATMs during the Review Period, with over 69,000 needed in 2024. *Id.,* ¶ 98-100.  Paramount never had a sufficient number of ATMs to produce the revenue that it was supposed to generate to cover amounts due to Investors. *Id.,* ¶ 88-97.

80.    While the Examiner's Report focuses on the Funds and their Investors, it is instructive to Heller's other entities, including the Blackford Debtors.  The Blackford Debtors were not able to timely pay back their lenders, including Silverview, with the income generated from the Blackford ATMs.

81.    It also appears that Heller intentionally misrepresented the number of Blackford ATMs in order to induce loans from creditors of the Blackford Debtors, including Silverview.

## VI.    <u>Other Complaints Pursuant to 11 U.S.C. § 523 Against Heller</u>

82.    Not less than 15 other complaints have been filed against Heller in his Bankruptcy Case objecting to dischargeability.  In addition to Silverview, the Prestige Funds filed the Prestige Funds Complaint.  The Prestige Funds allege that Heller represented the business plan as follows: "the Funds own ATMs purchased with their investment money, the management company (Paramount) would place those ATMs and service them, the ATMs would generate revenue when used, and the Funds would receive a monthly return on the investment from the portfolio of ATMs."  Prestige Funds Complaint, ¶ 54.

83.    The Prestige Funds allege various intentional misrepresentations by Heller that induced the Prestige Funds to enter into MSAs with Paramount and to invest over $700 million. *Id*., ¶¶ 55-58.

84.    The Prestige Funds allege that with the funds received from the Prestige Funds, Paramount should have purchased in excess of 38,000 ATMs, but this number of ATMs was never purchased.  *Id.*, ¶¶ 66 and 67.

85.    The Prestige Funds further allege that Heller knowingly made various misrepresentations to them in investor presentations, including regarding the number of ATMs belonging to the Prestige Funds and the revenue generated from them.  *Id*., ¶¶ 72-74.

86.    Libertas Funding LLC ("Libertas") also filed a *Complaint Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. § 523* [D.I. 254] (the "Libertas Complaint").

87.    Libertas alleges that, during November 2023, Heller reached out to it in order to obtain working capital for Heller Capital, Premier Technology Group, LLC ("PTG"), Blackford Holdings, LLC and Paramount ("Heller Businesses").  Libertas Complaint, ¶ 8.

88.    Libertas further alleges that, in reliance on Heller's representations of the financial status of the Heller Businesses and various additional incorporated entities, on November 20, 2023, Libertas purchased from Heller Capital, PTG and Paramount twenty percent (20%) of their respective "Future Receipts" valued at $3,423,750 in consideration of a purchase price of $2,750,000. *Id.*, ¶ 9.

89.    Libertas further alleges that, in reliance on Heller's representations of the financial status of the Heller Businesses and various additional incorporated entities, it purchased additional Future Receipts for approximately $7.8m.  *Id.*, ¶¶ 10-13.

90.     Libertas alleges that Heller represented and warranted to Libertas that the revenue of merchants was earned through the sale and operation of ATMs and that all deposits into accounts reflected on bank statements provided to Libertas were proceeds earned by such merchants through the sale and operation of ATMs owned and operated by such merchants. *Id.*, ¶ 14.

91.     Libertas alleges that Heller's representations in this regard were false when made, as large portions of the funds reflected as coming into the bank accounts on statements provided to Libertas were not generated from the sale and operation of ATMs, but rather from other sources, including investors and other funders and/or lenders. *Id.*, ¶ 16.

92.     The Libertas Complaint is replete with other allegations of Heller's misrepresentations in order to induce Libertas to purchase "Future Receipts" of the Heller Businesses. *See, e.g.*, *id.*, ¶¶ 16-17, 23.

93.     WebBank also filed a *Complaint Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. § 523* [D.I. 255] (the "WebBank Complaint"). The WebBank Complaint is very similar to the Libertas Complaint, including regarding allegations of Heller's intentional misrepresentations to induce the purchase of "Future Receipts" of the Heller Businesses. *See*, *e.g.*, WebBank Complaint, ¶¶ 14-16.

94.     Reliance Financial, LLC ("Reliance Financial") also filed a *Complaint to Determine the Dischargeability of Debt* [D.I. 249] (the "Reliance Complaint") against Heller.

95.     Reliance Financial alleges that in or around December 2023, Heller approached it seeking working capital for Paramount by submitting an application with Reliance Financial. Reliance Complaint, ¶ 7.

96.     Reliance Financial alleges that Heller represented and warranted to it that Paramount's revenue was earned through the sale and operation of ATMs and that all deposits,

including those reflected in bank statements submitted to Reliance Financial during due diligence, were revenue of Paramount earned through the sale and operation of those ATMs.  *Id.*, ¶ 9

97.     Reliance Financial further alleges that Heller's representations in this regard were false when made, as large portions of the funds reflected as coming into the bank accounts on statements provided to Reliance Financial were not generated from the sale and operation of ATMs, but rather from other sources, including investor funds.  *Id.*, ¶ 10.  The Reliance Complaint also alleges other misrepresentations made by Heller to induce Reliance Financial to purchase Paramount's receivables.  *See*, *e.g.*, *id.*, ¶¶ 16 and 18.

98.     Reliance Financial ultimately purchased over $5.3m of Paramount's receivables based on Heller's misrepresentations.  *Id.*, ¶¶ 11 and 14.

## FIRST CAUSE OF ACTION
**(Holding Debt Non-Dischargeable Pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B))**

99.     The foregoing paragraphs are incorporated by reference as if set forth in full herein.

100.    The Blackford Debtors are creditors of the Debtor as reflected in each of their proofs of claim filed in the Debtor's Bankruptcy Case.

101.    Section 523(a)(2) of the Bankruptcy Code provides that a discharge does not discharge an individual debtor from debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" or "(B) use of statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(A) and (B).

22

102.     Any transfers from the Blackford Debtors to or for the benefit of Heller, a Heller affiliate or an investor from at least August 23, 2023 forward, were fraudulent transfers and/or unlawful dividends obtained by Heller by falsely representing the financial condition of the Blackford Debtors and/or the financial condition of Paramount with the intent to deceive.

103.     When Heller represented on behalf of the Blackford Debtors to Silverview that the Blackford Debtors owned 3,697 Blackford ATMs, Heller knew: (a) that the Blackford Debtors did not own 3,697 Blackford ATMs; (b) some or all of the Blackford ATMs were pledged to other parties; or (c) some or all of the Blackford ATMs did not and do not exist.

104.     These misrepresentations were intentional to induce Silverview to enter into the Loan Agreement and to provide funds to the Blackford Debtors, some of which Heller used to either pay off other investors or himself and/or related entities.

105.     The Blackford Debtors suffered damages proximately caused by Heller's misrepresentations, as they incurred debts they could not repay and the funds that they received were used to either further Heller's Ponzi scheme or to pad his own pockets through fraudulent transfers and/or unlawful dividends.

## SECOND CAUSE OF ACTION
### (Holding Debt Non-Dischargeable Pursuant to 11 U.S.C. § 523(a)(6))

106.     The foregoing paragraphs are incorporated by reference as if set forth in full herein.

107.     In relevant part, 11 U.S.C. § 523(a)(6) provides that "[a] discharge under section . . . 1141 of . . . title [11] does not discharge an individual debtor from any debt—for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

108.     The acts of Defendant detailed herein establish willful and malicious injury by the Defendant to the Blackford Debtors.

4937-7427-2580, v. 1

109.    The Defendant willfully, maliciously and deliberately injured the Blackford Debtors by causing them to enter into the Term Loans with Silverview, which the Defendant knew the Blackford Debtors, controlled by the Defendant, had no ability to repay, were used to pay others, and/or were used to enrich the Defendant.

110.    The Defendant willfully, maliciously and deliberately injured the Blackford Debtors by causing them to make unlawful dividends and/or fraudulent transfer that were used to enrich the Defendant

111.    The Blackford Debtors' injuries were the direct result of the Defendant's wrongful and intentional acts.

112.    The Defendant's conduct resulting in injury to the Blackford Debtors was without cause or just excuse.

## DEMAND FOR RELIEF

WHEREFORE, the Chapter 7 Trustee respectfully requests judgment in this Court that:

A.  Defendant's indebtedness to the Blackford Debtors in an amount to be liquidated after further review and investigation by the Chapter 7 Trustee on account of Defendant's conduct as set forth above constitutes a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(2);

B.  Defendant's indebtedness to the Blackford Debtors in an amount to be liquidated after further review and investigation by the Chapter 7 Trustee on account of Defendant's conduct as set forth above constitutes a non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(6);

C.  Defendant shall pay to Plaintiff all costs of suit herein; and

D.  Grants Plaintiff such other and further relief which the Court deems appropriate.

4937-7427-2580, v. 1

Dated:  August 27, 2025

CHIPMAN BROWN CICERO & COLE, LLP
*Attorneys for Claudia Z. Springer,*
*Chapter 7 Trustee of Blackford Debtors*


By: */s/ Kristi J. Doughty*

Kristi J. Doughty (No. 038611987)