**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Suite 201
Roseland, NJ 07068
(973) 622-1800
Anthony Sodono III (asodono@msbnj.com)
Sari B. Placona (splacona@msbnj.com)
*Counsel to Daryl Fred Heller*
*Chapter 11 Debtor and Debtor-in-Possession*

In re:

DARYL FRED HELLER,

                    Debtor.

Case No. 25-11354 (JNP)

Chapter 11

### DEBTOR'S BRIEF IN SUPPORT OF WHY THE COURT SHOULD NOT APPOINT A TRUSTEE OR CONVERT THE CASE PURSUANT TO 11 U.S.C. §§ 1104(a)(1), (2), 1112(b)(1)

Daryl Fred Heller, the Chapter 11 Debtor and Debtor-in-Possession ("Mr. Heller" or the "Debtor"), by and through his counsel, McManimon, Scotland & Baumann, LLC ("MSB"), hereby submits his Brief in Support of Why the Court Should Not Appoint a Trustee or Convert the Case Pursuant to 11 U.S.C. §§ 1104(a)(1), (2), 1112(b)(1) (the "Brief"). The Debtor submits this Brief in response to the Court's August 27, 2025, Order to Show Cause (the "OSC") [ECF 520], which ordered the Debtor show cause why the Court should not appoint a trustee or convert the case. See OSC, at pg. 2. The Debtor respectfully submits as follows:

### PRELIMINARY STATEMENT

On August 27, 2025, the Court *sua sponte* entered the OSC, thereby ordering the Debtor to show cause why the Court (i) should not appoint a trustee, or (ii) convert the case. Id. For the Court to appoint a trustee or convert the case, it must first find, either that "cause" exists under 11 U.S.C. § 1104(a)(1), or that such appointment is in the interests of creditors or other interests of the estate

under 11 U.S.C. § 1104(a)(2). As discussed below and throughout this Brief, the Debtor submits that neither standard is satisfied to warrant the appointment of a trustee. Moreover, while 11 U.S.C. § 1104(a) governs the appointment of a trustee, 11 U.S.C. § 1112(b) authorizes the Court to convert or dismiss a Chapter 11 case for "cause," unless the Court determines that appointing a trustee under 11 U.S.C. § 1104(a) is in the best interests of creditors and the estate. Accordingly, the threshold question before the Court is whether 'cause' exists under 11 U.S.C. §§ 1104(a)(1) or 1112(b), or whether the appointment of a trustee under 11 U.S.C. § 1104(a)(2) would better serve the interests of creditors and the estate. The Debtor submits these standards are not met here.

Mr. Heller, as a debtor-in-possession, has demonstrated good faith, full-disclosure, competence, and reliability in the administration of his bankruptcy case. On March 19, 2025, the Debtor attended his 341(a) Meeting of Creditors (the "341(a) Meeting") and responded to creditors' questions and concerns. Although Mr. Heller had the right to assert his Fifth Amendment rights, he chose not to do so. Instead, he testified under oath for several hours. Moreover, the Debtor has proven a willingness to work with creditors as evidenced by the Fed. R. Bankr. 9019 motions filed to approve settlement agreements with two (2) of the Debtor's largest creditors, Deerfield Capital, LLC ("Deerfield") and Orrstown Bank ("Orrstown"), in which both motions currently remain pending before this Court. ECF 213, 258. Even further, the Debtor has met with the Examiner and his counsel several times throughout the pendency of this case to provide information, documents, and access to filings. More poignant, the Examiner's report does not cite any untoward acts of the Debtor since the filing date of the Chapter 11. Any acts complained of by the Examiner occurred more than eighteen (18) months ago. Certainly, there is no "cause" for concern to allow Mr. Heller to continue as a debtor-in-possession. Mr. Heller will continue to cooperate with the Examiner and comply with his budget. There is no need and certainly no

2

"cause" to appoint a trustee. This history demonstrates the Debtor's consistent compliance and cooperative conduct under the Bankruptcy Code, which supports a finding of good faith and does not provide any basis for cause under 11 U.S.C. §§ 1104(a)(1) or 1112(b).

Moreover, as the Court is aware by way of Silverview Credit Partners, L.P.'s September 12, 2025, Status Letter and Request for the Immediate Appointment of a Chapter 11 Trustee [1][ECF 549], the Debtor (i) on August 21, 2025, was recently indicted in the Eastern District of Pennsylvania (*United States v. Daryl Heller*, Case 5:25-cr-00366-CH) (the "Criminal Case"), and (ii) on September 2, 2025, a civil enforcement action was filed by the Securities and Exchange Commission ("SEC") against the Debtor (*SEC v. Daryl F. Heller, et al.*, Case 5:25-cv-0536) (the "Civil Case"). The Debtor respectfully submits to the Court, unless and until the government proves its case – in either the Criminal Case and/or Civil Case – the allegations remain unproven and must not prejudice the Debtor in his bankruptcy case. The Criminal Case and Civil Case consist of unproven allegations which the Debtor maintains will ultimately result in either his acquittal or favorable judgment(s). Unless or until the prosecution secures a conviction, or the SEC secures a civil judgment, the presumption of innocence remains, and the indictment and civil action should be weighed accordingly by this Court. Certainly, the Court can draw any inference it desires in its discretion, however, we ask the Court to consider the "totality of circumstances" as articulated herein. Again, the allegations are predicated on prior "alleged" acts of the Debtor – pre-petition over eighteen (18) months ago.

Moreover, the alleged acts underlying the Criminal Case and Civil Case and the issues pertaining to the Automated Teller Machine ("ATM") investment issues concerning Paramount Management Group, LLC ("Paramount"), date back to approximately 2021, several years before

---

[1] Prestige Funds at one point filed a motion to appoint a trustee, however, it withdrew that motion. As of even date, there has been no further filings by the Funds.

the filing of this bankruptcy case. Prestige Funds ("Funds")[2] has been an active creditor in this bankruptcy case and, the Debtor submits it was the Funds – and the managers of the Funds, William Poole, Buck Joffrey, Jerry Hostetter ("Hostetter"), and Dave Zook ("Zook") (collectively, the "Fund Managers") – who were the catalysts of any allegedly untoward acts which resulted in the failures of the ATM investments.

In fact, on August 22, 2025, a Complaint was filed in the Eastern District of Pennsylvania, by investors, individually and derivatively on behalf of Prestige Fund A, LLC, Prestige Fund A II, LLC, Prestige Fund A IV, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund D III, LLC, Prestige Fund D V, LLC, and Prestige Fund D VI, LLC, against Zook and The Real Asset Investor, LLC, for violations of the Federal Securities Exchange Act, Pennsylvania Securities Act, breach of fiduciary duty, and negligent misrepresentation and omission (the "Zook Action").[3] Therefore, at this juncture, it remains to be seen who will ultimately be found responsible for the alleged bad acts which involve Paramount, the Funds, and the ATM investments. Moreover, since August 27, 2025, pending in the United States District Court for the Eastern District of Pennsylvania is an action entitled, "Batman Investments LLC, individually and on behalf of all others similar situated, v. Jerry Hostetter, David Zook, et al.", bearing Case No. 5:25-cv-04911(the "Batman Action").

Based on these complaints, Zook and Hostetter can in no way claim "unclean hands." They seek to portray themselves to this Court and creditors as innocent investors, when in reality, they were intimately involved in alleged untoward transactions. It is poignant that *neither*

---

[2] Prestige consists of the following entities: Prestige Fund A II, LLC; Prestige Fund A IV, LLC; Prestige Fund A IX, LLC; Prestige Fund A V, LLC; Prestige Fund A VI, LLC; Prestige Fund A VII, LLC; Prestige Fund A, LLC; Prestige Fund B BTMI, LLC; Prestige Fund B II, LLC; Prestige Fund B IV, LLC; Prestige Fund B V, LLC; Prestige Fund B VI, LLC; Prestige Fund B VII, LLC; Prestige Fund B BTM I, LLC; Prestige Fund D BTM I, LLC; Prestige Fund D III, LLC; Prestige Fund D IV, LLC; Prestige Fund D V, LLC; Prestige Fund D VI, LLC; and Prestige Fund D, LLC, WF Velocity I,LLC, WF Velocity IV, LLC, WF Velocity V, LLC, WF Velocity VI, LLC, and WF Velocity VII, LLC.

[3] The case is captioned *Kwansoo Lee, DDS, et al., v. David Zook, et al.*, Case 2:25-cv-04842.

the Zook Action or Batman Action included Mr. Heller, which should be considered in determining culpability, and whether 'cause' exists to appoint a trustee over Mr. Heller's affairs.

Finally, on August 13, 2025, Edward A. Phillips (the "Examiner"), the appointed Examiner in this case [ECF 99], issued his Second Interim Report of Examiner, Edwards a Phillips (Regarding *Ponzi* Allegation) (the "Second Examiner Report") [ECF 473]. The Second Examiner Report alleged Paramount's "earnings from ATM operation [] were insufficient to pay returns to Investors during the Review Period." See Second Examiner Report, at ¶ 112(iii). The Debtor submits the Second Examiner Report failed to (i) address the threshold issue that there are no investors of Paramount or its affiliates, (ii) account for the entities who were operating the Funds' ATMs, (iii) account for gross profit from sale of ATMs, (iv) account for tax returns reflecting revenue and profit post payment to the Funds, and (v) account for the reality of factual accounting in place, filed with the Internal Revenue Service ("IRS").

On September 19, 2025, the Court granted the Debtor's Amended Application of Professional [ECF 563], which authorized the Debtor's retention of Withum Smith + Brown, PC ("Withum") as financial advisors to the Debtor. ECF 564. Withum prepared a response to the Second Examiner Report to analyze the Examiner's findings and issued a report on behalf of counsel for the Debtor. Kenneth J. DeGraw ("Mr. DeGraw") of Withum, will testify at the OSC hearing, if necessary.[4]

With the above framework established, the Debtor respectfully submits that at the conclusion of the OSC hearing, the Court will find that there is not "cause" for a trustee to be appointed, or for the case to be converted. Allowing Mr. Heller to remain as debtor-in-possession maintains stability in the case and provides a runway for the Debtor to propose a feasible plan to replay creditors. Disruption does nothing but satisfy the creditors sensationalized allegations.

---

[4] Withum is retained by MSB as counsel to Mr. Heller under a "Kovel" agreement.

## STATEMENT OF FACTS

1.      On February 10, 2025, the Debtor filed his voluntary Chapter 11 petition under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). ECF 1.

2.      The Debtor continues to manage his affairs as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      On February 11, 2025, Deerfield filed a Motion for Relief From the Automatic Stay to Continue the State Court Proceedings Against the Debtor in Pennsylvania and New Jersey, Prohibit use of Cash Collateral, Transfer Venue and Expedited Discovery (the "Deerfield Stay Motion"). ECF 9.

4.      On February 18, 2025, Deerfield filed a Motion to Appoint a Chapter 11 Trustee ("Deerfield Trustee Motion"). ECF 30. The issue of appointment of a Chapter 11 trustee pursuant to the Deerfield Trustee Motion was mooted by the appointment of the Examiner pursuant to the Examiner Order. ECF 99. On March 18, 2025, the Court entered an Order Approving the Appointment of a Chapter 11 Examiner selected by the Office of the United States Trustee. ECF 131.

5.      On February 24, 2025, the Debtor filed his petition, schedules, and Statement of Financial Affairs. ECF 59. On March 17, 2025, the Debtor filed an Amended Schedule A and F. ECF 122.

6.      On February 26, 2025, the Debtor filed a Motion Authorizing the Debtor to Sell Real Property Located at 7605 Pleasure Avenue, Sea Isle City, New Jersey Free and Clear of All Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. § 363(b), (f), and (m); and Granting Related Relief (the "Sale Motion"). ECF 73. After objections and modifications to the Sale

4935-2392-9967, v. 1

Motion, on April 3, 2025, the Sale Motion was approved.  The Sea Isle property was sold thereby creating estate funds for the benefit of creditors for the Debtor's Plan. ECF 169.

7.      On March 21, 2025, the Debtor filed an Application for Retention of Professionals, seeking to hire the law firm of McCarter & English as criminal counsel to the Debtor (the "Criminal Counsel Retention App."). ECF 139. After objections and a hearing on April 22, 2025 [ECF 193] having occurred regarding the Criminal Counsel Retention App., the hearing was adjourned to June 2, 2025 [ECF 261], and then finally rescheduled to June 10, 2025. ECF 296. On June 10, 2025, the Court entered an oral decision approving the Criminal Counsel Retention App.

8.      On March 21, 2025, the Court entered an Order Authorizing the Retention of McManimon, Scotland & Baumann, LLC, as Attorneys for the Debtor. ECF 138.

9.      On April 30, 2025, the Debtor filed a Motion for an Order Approving the Agreement Between the Debtor, Charlene R Heller, and Orrstown Bank Pursuant to 9019 of the Federal Rules of Bankruptcy Procedure (the "Orrstown 9019 Motion"). ECF 213. On May 20, 2025, the Debtor filed a Motion for an Order Approving the Agreement Amongst the Debtor, Heller Capital Group, LLC, Heller Investment Holdings, LLC, and Deerfield Capital, LLC Pursuant to 9019 of the Fed. R. Bankr. P. (the "Deerfield 9019 Motion"). ECF 258. Unfortunately, due to timing restraints, on or about September 22, 2025 Deerfield advised the Debtor that it was terminating the Deerfield 9019 Motion, however, it remains open to a new settlement proposal.

10.     On May 21, 2025, the Funds filed a Motion for the Appointment of Chapter 11 Trustee and to Modify Examiner's Order (the "Prestige Trustee Motion"). ECF 265. On June

7

4935-2392-9967, v. 1

30, 2025, Prestige withdrew, in part, the Prestige Trustee Motion. ECF 367. The Funds have not filed anything in further support of a trustee.

11.     On May 30, 2025, the Debtor filed a Motion Expunging Claim Nos. 13 through 32 Filed by Prestige Fund A II, LLC et al. pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (the "Motion Object Prestige Claims"). [ECF 288]. On June 10, 2025, the Court entered an oral decision refraining from ruling on the Motion Object Prestige Claims, which issues will be settled in the adversary proceeding captioned as <u>Prestige Fund A, LLC et al. v. Daryl Heller and Heller Capital Group, LLC</u>, Adv. Pro. 25-01128 (the "Prestige Complaint").

12.     On August 1, 2025, the Debtor filed (i) Debtor's Chapter 11 Plan (the "Plan"), and (ii) Debtor's Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code Describing Debtor's Chapter 11 Plan (the "Disclosure Statement"). ECF 433, 434.

13.     On August 13, 2025, the Examiner issued the Second Examiner Report. ECF 473. On August 26, 2025, the Debtor filed a letter which contested the Second Examiner Report. ECF 517.

14.     On September 15, 2025, the Debtor filed Amended Schedule A, B, and F and Statement of Financial Affairs. ECF 552.

15.     On September 17, 2025, the Debtor filed the Amended Application for Retention of Professional, to retain Withum as financial advisors. ECF 563. On September 19, 2025, the Court granted the Debtor's retention of Withum. ECF 564.

## <u>LEGAL ARGUMENT</u>

**I.    Neither Cause Exists to Appoint a Trustee or Convert the Case, nor is Appointment of a Trustee in the Best Interests of Creditors**

16.     Pursuant to 11 U.S.C. § 1104(a):

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the

8

> United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

See 11 U.S.C. § 1104(a)(1), (2).

17.    "The two subsections of 11 U.S.C. § 1104(a) authorize the appointment of a trustee (1) for cause, and (2) in the interest of creditors." In re Concord Coal Corp., 11 B.R. 552, 553 (Bankr. S.D.W. Va. 1981). "In this case, fraud and dishonesty have been alleged but not proven." Id.  "It is settled that appointment of a trustee *should be the exception*, rather than the rule." In re Sharon Steel Corp., 871 F.2d 1217, 1225 (3d Cir. 1989) (emphasis added). "There is a strong presumption that the debtor should be permitted to remain in possession absent a showing of need for the appointment of a trustee." In re Ionosphere Clubs, Inc., 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990).

18.    Court's consider the following factors when determining whether a trustee should be appointed, (i) materiality of misconduct, (ii) evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors or customers, (iii) the existence of pre-petition voidable preferences or fraudulent transfers, (iv) unwillingness or inability of management to pursue estate causes of action, and (v) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor. See generally In re Nartron Corp., 330 B.R. 573,  582-592 (Bankr. W.D. Mich. 2005).

19.    "[O]n a motion for the appointment of a trustee, *the focus is on the debtor's current activities, not past misconduct*." In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (emphasis added). The general, "*focus is on the debtor's current management, not the misdeeds of past management*." In re The 1031 Tax Grp., LLC, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007) (emphasis added). "Whether the debtor in possession has special expertise and *whether the appointment of a trustee would entail substantial costs* are relevant factors to be considered in determining whether this burden has been met in a particular case." In re G-I Holdings, Inc., 385 F.3d 313, 320–21 (3d Cir. 2004) (emphasis added).

20.    Additionally, fraud must be proven, not alleged. In re Concord Coal Corp., 11 B.R. 552, 553 (Bankr. S.D. W. Va. 1981). Even when considering:

> in circumstances where fraud or mismanagement is present, the legislative history of § 1104(a)(1) suggests that the court . . . 'balance the benefit to be gained from such an appointment against the detriment to the reorganization effort and the rights of the debtor that may result from such an appointment.'

In re Hamilton, No. 11–07491, 2012 WL 2204904, at *3 (Bankr. E.D.N.C. June 14, 2012) (quoting 7 Collier on Bankruptcy ¶ 1104.02[3][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)

21.    In the case In re Piedmont Ctr. Investments, LLC, the debtor therein was indicted by a federal grand jury on fifteen (15) felony counts of bank fraud, false statements, and identity theft, in which the Piedmont court emphasized, "[a]lthough the indictments are primae facie evidence of fraud, *the court would not appoint a trustee on this basis alone*." In re Piedmont Ctr. Investments, LLC, 11-06178-8-JRL, 2011 WL 5903398 *4 (Bankr. E.D.N.C. Sept. 8, 2011) (emphasis added). "In this case, fraud and dishonesty have been alleged but not proven." Id. "[M]ere existence of a prior felony conviction will not justify the appointment of a trustee in

10

every Chapter 11 case." <u>Gomez v. U.S. Trustee</u>, No. 7:09–CV–496, 2010 WL 582706, at *2

(W.D. Va. Feb. 18, 2010).

22.     A finding of gross mismanagement under 11 U.S.C. 1104(a)(1), "suggests some

extreme ineptitude on the part of management to the detriment of the organization. . . . ris[ing]

above simple mismanagement to achieve the level envisioned by the Code." <u>In re Sundale, Ltd.</u>,

400 B.R. 890, 907 (Bankr. S.D. Fla. 2009). As to Ponzi schemes relating to 'fraud' under 11

U.S.C. § 1104(a)(1):

> *The U.S. Trustee proved that Debtor was the principal in a Ponzi
> scheme*. Ponzi schemes are fraudulent. Fraud, before or after the
> filing of a bankruptcy case, is a ground to appoint a trustee.
> Appointment would also be in the best interest of creditors.
> Therefore, the Court can grant the U.S. Trustee's Motion to
> Appoint a Trustee

<u>In re Vaughan</u>, 429 B.R. 14, 26 (Bankr. D.N.M. 2010) (emphasis added).

23.     First and foremost, any allegations of fraud or dishonesty directed at the Debtor

remain just that, unproven allegations. The fact that the Debtor was indicted under the Criminal

Case does not establish he has committed any crime nor does it, *a fortiori*, constitute 'cause' to

appoint a trustee. The fact that the SEC filed the Civil Case, does not prove any civil misconduct

occurred. Like the <u>Piedmont</u> court explained, although indictments may be prima facie evidence

of fraud, that court would not appoint a trustee on that basis alone. <u>See</u> <u>Piedmont</u>, 2011 WL

5903398 *4. Accordingly, the indictment in the Criminal Case, and the filing of the Civil Case,

are insufficient to support a finding of cause under 11 U.S.C. 1104(a)(1). Nothing in the pending

Criminal Case or Civil Case poses any immediate harm to creditors in this Chapter 11

proceeding, and therefore does not support a finding of 'cause' to appoint a trustee under 11

U.S.C. § 1104(a)(1), nor does it establish that such appointment would be in the best interests of

4935-2392-9967, v. 1

creditors under 11 U.S.C. § 1104(a)(2). In fact, not only is there nothing "immediate," the allegations occurred more than eighteen (18) months ago.

**A.** **The Focus Should be on the Debtor's Competency and Compliance as a Debtor-in-Possession During the Administration of his Bankruptcy Case**

24.     Second and most critical, appointment of a trustee is the <u>exception, not the rule</u>. <u>Sharon Steel</u>, 871 F.2d at 1225 (emphasis added). In the present matter, the record does not support appointment of a trustee, and the strong presumption is the Debtor should remain the debtor-in-possession. <u>Ionosphere</u>, 113 B.R. at 167. The materiality of misconduct in the present matter are merely allegations, there has been no proven misconduct by the Debtor. <u>See</u> <u>generally</u> <u>Nartron</u>, 330 B.R. at 582-592. When reviewing the Debtor's conduct during the administration of this bankruptcy case, the record reflects only good-faith and compliance.

25.     The focus should be on the Debtor's current activities, not on unproven misconduct, especially when considering the allegations concerning Paramount, the Funds, Zook, Hostetter, and the ATM investments occurred several years ago, and the Fund Managers are now the target of investors of the Funds. <u>See</u> <u>Sletteland</u>, 260 B.R. at 672. The focus should be on the Debtor's current management, not on alleged misdeeds of the past. <u>See</u> <u>1031 Tax Grp.</u>, 374 B.R. at 86. The Debtor attended the 341(a) Meeting and fielded questions from creditors and addressed their concerns for well over two (2) hours. Additionally, (i) the Debtor filed timely monthly operating reports and is current with his quarterly fees, (ii) worked with his creditors and filed the Orrstown 9019 Motion [ECF 213] and Deerfield 9019 Motion [258], (iii) filed amended schedules and financial affairs statement [ECF 122, 552], and (iv) timely filed his Plan [ECF 433] and Disclosure Statement [ECF 434]. Surely, the Debtor's impressive track record in administering his bankruptcy case, as a debtor-in-possession, should be considered by the Court when considering whether a trustee should be appointed or the case converted.

12

**B.    The Funds and Their Managers' Conduct Must be Considered When Assessing Whether the Court may Find Fraud Against the Debtor**

26.    Significantly, the Funds have spun the narrative that criminal and securities wrongdoings are solely attributable to the Debtor, yet they withdrew their motion for a trustee and are not participating at the hearing on October 22, 2025 (See ECF 586). The Funds have done this by, but not limited to, (i) speaking with LancasterOnline, an online news company, which resulted in slanderous and detrimental articles published to discredit the Debtor's character, and (ii) filed Claim Nos. 13 through 32 which egregiously claimed the Debtor was responsible for $503,290,225.46 in the aggregate, attributable to the Pennsylvania state court judgment against Paramount – not the Debtor – for $138,156,118.38.[5] Surely, the Zook Action[6] would not have been filed if the Debtor was the sole target or if a party other than the Debtor was responsible for any alleged acts. Accordingly, it remains to be determined who will ultimately bear responsibility for the ATM investment issues involving Paramount and the Funds. The Debtor is confident, through discovery, that he will ultimately be exonerated.

**C.    The Second Examiner Report and Alleged Ponzi Allegation**

27.    In addition, the Debtor submits the Second Examiner Report is purely an opinion of the Examiner [ECF 473], which is refuted by Withum. The Withum Report (defined herein) suggests that the Examiner Report is fundamentally flawed, therefore it should not be considered or at least discounted when assessing "cause" to appoint a trustee. Foremost, it is self-evident that the appointment of a trustee will result in excessive professional fees which means less payment to creditors. The Examiner and the current professionals have already incurred excessive fees in this matter. Given that the Examiner's fees already impose a significant burden

---

[5] Said judgment was entered in the case stylized *Prestige Funds A, LLC, et al. v. Paramount Management Group, LLC*, pending in the Court of Common Pleas of Lancaster County Pennsylvania's Civil Division, bearing docket number CI-24-06012

[6] See footnote 2.

4935-2392-9967, v. 1

on the Debtor's estate, adding the substantial costs of a trustee, her/his professionals and accountant would only exacerbate this strain and risk collapsing the estate, strongly weighing against the appointment of a trustee. See In re G-I Holdings, 385 F.3d at 320–21.

28.     Regarding the substance of the Second Examiner Report, it must be emphasized that any allegation of Ponzi-activity, is unproven. The Second Examiner Report includes case studies which are materially different than the issues pertaining to Paramount, as Paramount did not have investors documented by factual financial and accounting records, and in essence the Examiner is not only comparing apples to oranges, but apples to giraffes. In Vaughan, the finding of 'fraud' and interest of creditors under 11 U.S.C. 1104(a)(1), (2), *was based on the proven fact*, established by the United States Trustee, that the Debtor was the principal in a Ponzi scheme. See Vaughan, 429 B.R. at 26. There is no proven case, whether in this Court, the Criminal Case, Civil Case, or state court, that the Debtor was the principal of a Ponzi scheme. Moreover, a finding of "cause" under 11 U.S.C. § 1104(a)(1) for gross mismanagement, "suggests some *extreme* ineptitude on the part of management to the detriment of the organization. . . . ris[ing] above simple mismanagement to achieve the level envisioned by the Code." In re Sundale, Ltd., 400 B.R. 890, 907 (emphasis added). At this conjuncture, there has been no finding of gross mismanagement by the Debtor of his estate, or any entity whatsoever. Id. More critically, there has been no allegation of mismanagement since the petition was filed which was more than seven (7) months ago. Moreover, the most "recent" allegation of impropriety is almost two (2) years ago. Therefore, it begs the question as to why a trustee is required.

29.     Furthermore, the Debtor disagrees with the Examiner's interpretation of Paramount's business model in the Second Examiner Report, as it ignores clear legal and

14

4935-2392-9967, v. 1

contractual evidence disproving the existence of 'investors.' The Examiner's conclusions are based on the erroneous premise that Paramount and affiliates had 'investors,' rendering his analysis fundamentally invalid. Examiner's assertions such as payments being made "on account of investors' returns" are factually inaccurate and conflate unrelated entities like the Funds connection to Paramount and affiliates. The case law cited in the Second Examiner Report is wholly inapplicable in its entirety, as the referenced companies operated under materially different models involving actual investors, unlike Paramount and affiliates. The Examiner disregarded documented accounting and IRS filings showing that Paramount and affiliates generated legitimate sales and profits, not investor funds.

30.    The Second Examiner Report omits critical bank accounts and revenue streams despite the Debtor identifying them which undermine the accuracy of the Examiner's findings. Analogies and case studies used in the Second Examiner Report are misleading and fail to reflect the contractual termination rights, profit structure, and operational realities of Paramount and its affiliates. The Examiner's focus on whether "subsequent investors paid earlier investors" is irrelevant because there were no investors and no corresponding legal obligations of Paramount and does not consider the fact that revenue used were profits generated from the sale of ATMs to the Funds.

31.    The Examiner's suggestion that revenue in unreviewed or omitted bank accounts are irrelevant is fundamentally flawed and misrepresents the financial reality of Paramount as it ignores entities that were actually managing ATMs owned by Funds so one cannot omit that revenue. The Second Examiner Report's dismissal of hundreds of millions in profits from ATM sales as irrelevant is misleading, particularly given that regulatory requirements necessitated separation of funds across multiple banking accounts. The Second Examiner Report contradicts

15

itself by focusing on ATM-generated revenue while simultaneously claiming it is irrelevant if not routed through two (2) specific accounts, which is a glaring inconsistency. The Debtor also disputes the implication that Hostetter and his team had meaningful insight into Paramount and affiliates, as they had no visibility or access to the core elements of the business model. Conversely, the Debtor possessed working knowledge of Paramount and affiliates, yet the Examiner met with him only twice while meeting with Funds' affiliates approximately five (5) times, raising concerns about whether the Examiner has a complete record. The Examiner's failure to follow up on agreed deliverables casts doubt upon the completeness of the Second Examiner Report.

32.    Accordingly, the Debtor submits that no finding of 'cause' can be made to support appointing a trustee or converting the case based on the Second Examiner Report.

**<u>Withum's Response to Examiner's Reports</u>**

33.    The Debtor believes that Withum adequately addressed, in the short period of time it had to review, the Examiner's  inaccuracies and misunderstanding on the Examiner's part, pursuant to Withum's independent report ("Withum's Report") and analysis of the Examiner's Reports.[7] The Withum Report is annexed as Exhibit A to the Certification of Mr. DeGraw in Support of Brief ("DeGraw Cert.").[8] As a result, MSB, not the Debtor, has retained Withum as its financial advisor to address the legal issues regarding the  Examiners Second Report.[9]

34.    Withum's conclusion, based on its financial expertise and review of the Second Examiner Report, which review was on done on limited time based on the OSC hearing date and

---

[7] Withum's Report analyzed the First Interim Report of Examiner [ECF 329] and the Second Interim Report of Examiner [ECF 437]. In the event additional information becomes available, Withum reserves the right to amend or supplement its findings if deemed appropriate or necessary.

[8] Mr. DeGraw's Curriculum Vitae is attached as Exhibit A to the Withum Report. Documents reviewed by Mr. DeGraw are attached as Exhibit B to the Withum Report.

[9] Moreover, Withum's communications with MSB are subject to the attorney-client privilege, pursuant to <u>United States v. Kovel</u>, 296 F.2d 918 (2d Cir. 1961), see Supplemental Certification of Sari B. Placona, Esq. in Further Support of Debtor's Amended Application for Retention of Professional. ECF 582.

briefing deadline, is that the Examiner's conclusions are premature, and are based on limited data

sets, or review, which may lead to flawed conclusions.

35.    Withum submits the Examiner's overall structure, relationship, control, and

economic environment (collectively, the "Enterprise Structure") in the Second Examiner Report

is mischaracterized and, in some instances, disregards financial relationships. The Examiner

failed to discuss the Enterprise Environment in the Second Examiner Report, which would

provide the Court, as the trier-of-fact, with the appropriate context as to the overall discussion of

Paramount and its subsidiaries and affiliates, as well as the Funds.

36.    Withum sets forth the simplified Enterprise Structure of Paramount based on

review of relevant documents[10] and discussions with the Debtor is as follows:

   a. Said "Investors"[11] were participants in the various Funds. The
      investors committed capital based on Private Placement
      Memorandums ("PPM)" and offering agreements. The Funds were
      governed by their own operating agreements;
   b. The Funds would acquire ATMs, also known as kiosks ("Kiosks"),
      from Paramount and/or one (1) of its affiliated entities.[12] The sale
      of the Kiosk was revenue to respective Paramount entity, and
      generated net income after costs. The acquisition of the Kiosks by
      the Funds was an asset of the acquiring Funds, which was eligible
      to be depreciated;
   c. The Funds' Kiosks were managed and maintained through
      Management Services Agreements ("MSA") with Paramount and/
      or its affiliated entities (Paramount Entities");
   d. The Paramount Entities were distinct from the Funds' entities. The
      investors in the Funds' entities were not a party to the Paramount
      Entities.
   e. Paramount and or its affiliates would then pay a fee to the Funds
      based on a waterfall in the MSA. The Funds would in turn
      distribute funds to its member/investors to the extent of available
      cash flow as outlined in the Funds respective 'Operating
      Agreements'; and
   f. After a period of years, or other triggering event described in the
      MSA, the arrangement would terminate, and Paramount would

---

[10] See Exhibit B to the Withum Report
[11] Examiner refers to "investors," however, Withum refutes that conclusion and the existence of said "investors."
[12] Id., at Exhibit C to the Withum Report.

reacquire the Kiosk(s) from the Funds under and Asset Purchase
Agreement ("APA").

37.    While Withum's analysis of the Enterprise Structure is simplified, due to timing

constraints,[13] it points to the need for a more fulsome review of the calculation of the cash flows

under the MSAs, APAs, and Operating Agreements to provide a more accurate and through

analysis. Furthermore, a review of the business decisions, financial assumptions and financial

projections, which underpinned the agreements versus the actual results of Paramount's business,

combined with the related actions, reactions, or inactions by management would be instructive in

understanding the context of the operating environment decision making and ultimate demise of

the business.

38.    Paramount has various entities[14] that were utilized for management and

maintenance of the ATM Kiosks owned by the Funds. Some of these entities served specific

purposes, such as for cryptocurrencies known as Bitcoin Teller Machines ("BTM"). These

Paramount subsidiaries and affiliates were established for regulatory reasons and related

industries, like the aforementioned cryptocurrencies or cannabis industry. Paramount could not

operate these Kiosks without the use of separate entities or would have defaulted on various core

operating agreements and banking partnerships. These entities were subject to supervision and

audit by the respective sponsoring institution.

39.    The Second Examiner Report focused on the cash flow of Paramount from Kiosk

servicing[15] to the exclusion of revenues derived by those serviced by affiliated entities, assuming

---

[13] Withum's analysis was done on compressed time, limited access to documents and limited access to third party
financial data, and its comments are limited to the approach and analysis of the Examiner. Withum is taking no
position on the findings of the Examiner at this time.
[14] See Exhibit C to the Withum Report
[15] See Second Examiner Report, at ¶ 79.

the revenues, if any, were already reflected in Paramount.[16] The exclusion of the economic activity from these entities would lead the reader, here the Examiner, to the erroneous conclusions regarding sources and uses of funds. Further the Examiner points to the cash flows from various affiliates[17] that were identified in the accounts of Paramount, however, discounts their relevancy.[18]

40.     The Examiner identifies Kiosk sourced revenue during the review period in the Paramount accounts.[19] The Examiner than dismisses the availability of revenues from the sale of Kiosks within Paramount. The Examiner chose instead to reference the funds received by Paramount as investor funds.[20] The investor funds belong to the relevant Funds' entity. The Funds' entity to the extent it was remitting funds to Paramount for the acquisition of Kiosks was revenue to Paramount and was therefore available funds to meet the servicing payments called for in the MSAs. While the funds clearly originated with investors, once remitted for the acquisition of Kiosks, the character of the revenues changed.

41.     The Examiner's focus solely on ATM revenues to meet cash flow needs to the Funds, results in a misleading result by the Examiner in the Second Examiner Report. The Examiner identifies the magnitude of the ATM revenues at $161,000,000[21] which demonstrates a substantive business. To disregard another substantive profit center in hardware sales, as well as the servicing of same by affiliated entities, in turn results in a misleading conclusion.

42.     Importantly, the Examiner did not review additional accounts from various financial institutions for Paramount and affiliated entities. The Debtor identified twenty-nine (29)

---

[16] Id., at footnote 22.
[17] Id., at footnote 30.
[18] Id., at footnote 22.
[19] Id., at ¶ 69.
[20] See Second Examiner Report, at ¶ 84.
[21] Id., at ¶ 79.

additional financial institutions that the Examiner did not subpoena.[22] The economic activity that flowed through these accounts, in addition to subpoenaed institutions, should have been considered in arriving at conclusions regarding sources and uses of cash.

43.    For example, Paramount had multiple financial accounts, which were maintained at financial institutions, to conduct transactions for the cryptocurrency Kiosks. One (1) entity, PowerCoin, LLC, maintained accounts at multiple financial institutions, including the cryptocurrency exchanges Kraken, Crypto.com, and Bianance, which were used to facilitate the purchase and sale of cryptocurrencies.

44.    Similarly, PowerQuest Financial, LLC, operated cannabis-Kiosks, which were located in marijuana dispensaries and maintained separate financial accounts for operating and regulatory concerns.

45.    The Second Examiner Report discussed non-First National Bank ("FNB") accounts that were not used in the Examiner's analysis, in which some were subpoenaed, and others were not. A full analysis of all Paramount's financial accounts, and its subsidiaries and affiliates' financial accounts, would provide a full financial landscape of all business revenues generated by Kiosks owned by the Funds, as well as revenue streams available to make payments under the MSAs. This critical failure leads to faulty conclusions in the Second Examiner Report.

46.    The Second Examiner Report relies on the analysis of a limited number of bank accounts but does not include a reconciliation of all financial accounts to internal accounting records for Paramount and subsidiaries and affiliates. The conclusions included in the Second Examiner Report rely exclusively on the bank accounts and deposits as classified by the Examiner and retained professionals without a reconciliation to how those transactions are treated in the accounting records, which is essential if the analysis is to be relied upon.

---

[22] See Exhibit D to the Withum Report.

47.     A full analysis of all financial institution accounts and reconciliation to the accounting and business records would assist with clarifying the economics of the funds. To note, the Second Examiner Report contains an analysis of two (2) FNB accounts, (i) restricted account ending in 8143, and (ii) operating account ending in 3440. Specifically, the Examiner classifies the deposits from the Funds as "investments"[23] which disregards the relationship with the Funds and the acquisition of Kiosks. Withum submits a full analysis of all financial accounts and underlying accounting records is necessary to properly classify these financial transactions.

48.     Withum submits the Examiner's Reports [ECF 329, 427] are the result of the review of extensive financial and business information, however, given the size and volume of the total Enterprise Structure, there was still significant data not accessed, reviewed, nor analyzed by the Examiner. Accordingly, Withum submits the Examiner's conclusions are premature and require further inquiry into the financial and business activity of the entire Enterprise Structure before an accurate conclusion can be reached.

**D.     There is no Cause to Support Conversion of the Debtor's Case**

49.     11 U.S.C. § 1112(b)(1) provides in relevant part that,

> …on the request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a cause under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of the creditors and the estate, for cause.

See 11 U.S.C. § 1112(b)(1).

50.     "Whether cause exists under § 1112(b) and, if so, whether dismissal is appropriate are questions left to the sound discretion of the bankruptcy court." In re Corinthian, LLC, 440 B.R. 97, 102 (Bankr. E.D. Pa. 2009) (citing to In re Brown, 2005 WL 2589194 at *2 (Bankr. E.D. Pa 2005)). Indeed, "[c]ourts have wide latitude in determining whether cause exists to

---

[23] See Second Examiner Report, at ¶ 81.

4935-2392-9967, v. 1

convert or dismiss." <u>Matter of NuGelt, Inc.</u>, 142 B.R. 661, 665 (Bankr. D. Del. 1992). Moreover,

"[i]n so concluding, a court need not provide an exhaustive elaboration on its reasoning." <u>Id.</u>

51.    In addition to the non-exhaustive list of grounds for dismissal outlined by section

1112(b)(4) of the Bankruptcy Code, courts may consider the "totality of the circumstances" in

determining whether sufficient cause exists. <u>See</u> <u>In re SGL Corp.</u>, 200 F.3d 154, 160 (3d Cir.

1999) (finding that the factors enumerated in section 1112(b)(4) are "not exhaustive and…a

court may consider whether other facts and circumstances qualify as 'cause'"); <u>see also</u> <u>Matter of</u>

<u>NuGelt, Inc.</u>, 142 B.R. at 665 ("the court is not limited to the statutory examples and cause may

be determined from the facts and circumstances of the case.").

52.    As established in detail above, there is no 'cause' to support conversion of the

Debtor's case.

53.    11 U.S.C. § 1112(b)(4) provides a non-exhaustive, illustrative list of causes for

dismissal, the term "cause" includes:

> (A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B)    gross mismanagement of the estate;
> (C)    failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D)    unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E)    failure to comply with an order of the court;
> (F)    unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> (G)    failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
> (H)    failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
> (I)    failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for

relief;

(J)    failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K)    failure to pay any fees or charges required under chapter 123 of title 28;

(L)    revocation of an order of confirmation under section 1144;

(M)    inability to effectuate substantial consummation of a confirmed plan;

(N)    material default by the debtor with respect to a confirmed plan;

(O)    termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P)    failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

See 11 U.S.C. § 1112(b)(4).

54.    The Debtor submits none of the 11 U.S.C. § 1112(b)(4) factors support conversion. The Debtor proposed his Plan [433], in which conversion will result in much less payment to creditors. Moreover, the Debtor filed his Disclosure Statement [ECF 434] and Plan within the time fixed by the Court. As established above, the Debtor's track record as a debtor-in-possession in administering this case is far from gross mismanagement of the estate. The Debtor has never failed to comply with Orders of this Court. The Debtor has met reporting requirements and attended his 341(a) Meeting.  He has also met with the Examiner and answered numerous inquiries. The Debtor has never failed to pay any fees or charges in the administration of this case. When considering the totality of factors under 11 U.S.C. § 1112(b)(4), they weigh overwhelmingly in favor of not appointing a trustee or non-conversion. Moreover, when considering the "totality of the circumstances" the Court should not find that conversion of the Debtor's case is not appropriate. See In re SGL, 200 F.3d at 160.

55.    Conclusively, in this bankruptcy case, "cause" cannot be established under 11 U.S.C. § 1104(a)(1) to support a finding to appoint a trustee, nor can a finding of "cause" be

found under 11 U.S.C. § 1112(b) to support conversion of the Debtor's case. Likewise, a finding under 11 U.S.C. § 1104(a)(2) cannot be made that appointment of a trustee is in the best interests of the Debtor's creditors. In the absence of such proof, the statutory requirements for either appointing a trustee or converting the case are not satisfied, and the case should remain in Chapter 11, and the Debtor as debtor-in-possession.

## CONCLUSION

56.    For the foregoing reasons, the Debtor respectfully submits the Court should not enter an Order either (i) appointing a trustee, or (ii) converting the case.

> **McMANIMON, SCOTLAND,**
> **& BAUMANN, LLC**
> *Counsel to Daryl Fred Heller*
> *Chapter 11 Debtor and Debtor-in-Possession*

Dated: October 3, 2025                 By:*/s/ Sari B. Placona*
                                          Sari B. Placona

4935-2392-9967, v. 1