**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

Gerard Catalanello, Esq.
James J. Vincequerra, Esq. (admitted *pro hac vice*)
Seth M. Cohen, Esq. (admitted *pro hac vice*)
Kimberly Schiffman, Esq. (admitted *pro hac vice*)
Jonathan P. Wieder, Esq. (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email:  Gerard.Catalanello@alston.com
            James.Vincequerra@alston.com
            Seth.Cohen@alston.com
            Kimberly.Schiffman@alston.com
            Jonathan.Wieder@alston.com

– and –

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Silverview Credit Partners, LP*

In re:

DARYL FRED HELLER,

                              Debtor.

Case No.: 25-11354-JNP

Hon. Jerrold N. Poslusny, Jr.

Chapter 11

**SILVERVIEW CREDIT PARTNERS, LP'S**
**(I) REPLY TO DEBTOR'S BRIEF IN SUPPORT**
**OF WHY THE COURT SHOULD NOT APPOINT A TRUSTEE OR**
**CONVERT THE CASE PURSUANT TO 11 U.S.C. §§ 1104(a)(1), (2), 1112(b)(1)**
**[D.I. 588]; AND (II) MEMORANDUM OF LAW IN SUPPORT OF AN ORDER**
**CONVERTING CHAPTER 11 CASE TO LIQUIDATING PROCEEDING UNDER**
**CHAPTER 7 OR, IN THE ALTERNATIVE, APPOINTING A CHAPTER 11 TRUSTEE**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTUAL BACKGROUND.............................................................................. 7

    I.    The Bankruptcy Case .................................................................................................. 7

        a.    General .................................................................................................................. 7

        b.    The 341(a) Meeting of the Creditors ....................................................................... 8

        c.    The Trustee Motions and Appointment of the Examiner ......................................... 9

    II.    The Debtor's Alleged Pre-Petition Fraud and Related Adversary Proceedings .............. 15

    III.    The Department of Justice's Indictment of the Debtor and the Securities and Exchange Commission's Civil Proceeding Initiated Against the Debtor......................................... 15

REPLY AND ARGUMENT...................................................................................................... 17

    I.    THIS CHAPTER 11 CASE SHOULD BE CONVERTED TO CHAPTER 7. ................. 17

        A.    There is Cause to Convert under Section 1112(b)(4)(A) of the Bankruptcy Code Because the Estate Has Substantial or Continuing Losses or Diminution and No Reasonable Likelihood of Rehabilitation............................................................... 20

        B.    There is Cause to Convert under Section 1112(b)(4)(B) of the Bankruptcy Code Because the Estate Has Been Grossly Mismanaged. ................................................ 22

        C.    If Conversion to Chapter 7 is not in the Best Interest of Creditors, a Chapter 11 Trustee Should Be Appointed. ................................................................................. 23

    II.    IN THE ALTERNATIVE, A CHAPTER 11 TRUSTEE SHOULD BE APPOINTED... 23

        A.    There is Abundant "Cause" Within the Meaning of Section 1104(a)(l) of the Bankruptcy Code to Warrant the Appointment of a Chapter 11 Trustee. ............... 24

        B.    Appointment of a Chapter 11 Trustee is Warranted Under Section 1104(a)(2) of the Bankruptcy Code Because it is in the Best Interest of the Estate, Creditors and All Other Parties........................................................................................................... 26

CONCLUSION......................................................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 ...................................................................................................................27

*Cuthill v. Greenmark (In re World Vision Entm't, Inc.)*,
    275 B.R. 641 (Bankr. M.D. Fla. 2002) .................................................................................24

*In re AdBrite Corp.*,
    290 B.R. 209 (Bankr. S.D.N.Y. 2003) .................................................................................19

*In re BH S & B Holdings, LLC*,
    439 B.R. 342 (Bankr. S.D.N.Y. 2010) .................................................................................17

*In re Citi-Toledo Partners*,
    170 B.R. 602 (Bankr. N.D. Ohio 1994) ...............................................................................18

*In re Cranney*,
    2013 Bankr. LEXIS 2312 (Bankr. D. Mass. May 30, 2013) ................................................19

*In re Harrison*,
    2020 Bankr. LEXIS 3648 (Bankr. E.D.N.C. Aug. 6, 2020) ................................................25

*In re Ionosphere Clubs, Inc.*,
    113 B.R. 164 (Bankr. S.D.N.Y. 1990) .................................................................................27

*In re Kanterman*, 88 Bankr. 26 (S.D.N.Y. 1988) .........................................................................17

*In re Marvel Entm't Grp. Inc.*,
    140 F.3d 463 (3d Cir. 1998).................................................................................23, 24, 26

*In re Pied Piper Casuals, Inc.*,
    40 B.R. 723 (Bankr. S.D.N.Y. 1984) ...................................................................................18

*In re PRS Ins. Grp., Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ....................................................................................27

*In re Reserves Resort, Spa & Country Club LLC*,
    2013 Bankr. LEXIS 2808 (Bankr. D. Del. July 12, 2013).....................................................17

*In re Rivermeadows Assocs., Ltd.*,
    185 B.R. 615 (Bankr. D. Wyo. 1995) ..................................................................................25

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989)..........................................................................................18, 24

*In re Stream TV Networks, Inc.*,
    2024 Bankr. LEXIS 25 (Bankr. E.D. Pa. Jan. 5, 2024) ..........................................17

*In re Tucker*,
    411 B.R. 530 (Bankr. S.D. Ga. 2009) .......................................................................18

*In re V. Savino Oil & Heating Co.*,
    99 B.R. 518 (E.D.N.Y. 1989) ....................................................................................25

*Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*,
    455 B.R. 153 (B.A.P. 8th Cir. 2011)..........................................................................27

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*,
    64 F.4th 84 (3rd Cir. 2023) .......................................................................................18

*Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*,
    374 B.R. 556 (Bankr. M.D. Pa. 2007) .......................................................................18

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*,
    384 F.3d 108 (3d Cir. 2004)......................................................................................18

*Off. Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*,
    285 B.R. 148 (Bankr. D. Del. 2002) ..........................................................................23

*Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*,
    200 F.3d 154 (3rd Cir. 1999) ....................................................................................19

*Tarquinio v. Tarquinio (In re Tarquinio)*,
    2017 U.S. Dist. LEXIS 194421 (D.N.J. Nov. 27, 2017)......................................17, 18

*Toibb v. Radloff*,
    501 U.S. 157 (1991)..................................................................................................19

*United Sur. & Indem. Co. v. López-Muñoz (In re López-Muñoz)*,
    553 B.R. 179 (B.A.P. 1st Cir. 2016)..........................................................................24

*USHA SoHa Terrace, LLC v. RGS Holdings, LLC (In re Futtleman)*,
    584 B.R. 609 (Bankr. S.D.N.Y. 2018) .......................................................................24

## RULES

FED. R. BANKR. P. 2015.3(b) .....................................................................................21

## STATUTES

11 U.S.C. § 1104(a)(1) and (2) ............................................................... *passim*

11 U.S.C. § 1112(b)(1) ........................................................................................................ *passim*

11 U.S.C. § 112(b)(4)(A) and (B)...................................................................................... *passim*

11 U.S.C. § 1112(b)(2) ...............................................................................................................19

Silverview Credit Partners, LP ("Silverview"), by and through its undersigned counsel, respectfully submits this (i) reply to the *Debtor's Brief in Support of Why the Court Should Not Appoint a Trustee or Convert the Case Pursuant to 11 U.S.C. §§ 1104(a)(1), (2), 1112(b)(1)*, dated October 3, 2025 [D.I. 588] (the "Debtor Response"); and (ii) memorandum of law ((i) and (ii), the "Reply") in response to the Court's *Order to Show Cause*, dated August 27, 2025, which directs Daryl Fred Heller (the "Debtor") to show cause why the Court should not convert the Debtor's chapter 11 case to a liquidating proceeding under chapter 7, of Title 11, of the United States Code, 11 U.S.C. § 101 *et seq.* the "Bankruptcy Code") or appoint a chapter 11 trustee [D.I. 520] (the "OSC"). In support of this Reply, Silverview submits the declaration of James J. Vincequerra, attached hereto as **Exhibit "1"** (the "Vincequerra Declaration"), and respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

1.      This Chapter 11 Case has reached a crisis point.

2.      This Chapter 11 Case is not a reorganization; it is a continuation of fraud. The Debtor is not an unfortunate distressed businessperson seeking a fresh start. On the contrary, the Debtor is the architect of what federal prosecutors have called a "massive investment fraud scheme" resulting in "significant investor losses of approximately $402 million."[2] The Securities and Exchange Commission, alleging multiple violations of the Securities Act and seeking disgorgement of ill-gotten gains, has likewise charged the Debtor with "operating a [$700 million] multi-year Ponzi scheme" and misappropriating more than $185 million of investor funds for the

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms elsewhere in the Reply.

[2]    Press Release, U.S. Att'ys Off. (E.D. Pa.), Lancaster County Man Indicted in Connection With Massive Investment Fraud Scheme (Sep. 3, 2025), https://www.justice.gov/usao-edpa/pr/lancaster-county-man-indicted-connection-massive-investment-fraud-scheme (the "USAO Press Release"); *see also infra* ¶¶ 33-34.

Case 25-11354-JNP    Doc 596    Filed 10/08/25    Entered 10/08/25 15:11:20    Desc Main
Document      Page 7 of 34

Debtor's personal use.[3] The Examiner appointed by this Court has too observed that the Debtor appears to have operated his businesses in a manner consistent with a Ponzi scheme of staggering proportions.[4] The Debtor faces at least fifteen nondischargeability actions, each alleging the intentional fraud uncovered by the United States government and Examiner. Since the Petition Date, the Debtor has used this Chapter 11 Case, not for any legitimate purpose of reorganization, but rather as yet another weapon to delay, obstruct and drain the very creditors he victimized. The Bankruptcy Code was not enacted to shield, let alone tolerate, such abusive behavior, and this Court should not either.

3.      There is a complete absence of a reasonable likelihood of rehabilitation for this Debtor. There is no viable path forward for the Debtor, who faces a maximum possible sentence of 100 years' imprisonment; no basis for assuming that the Debtor, against the backdrop of a conduct-based injunction and officer and director bar, can restructure his affairs. The Debtor has, in fact, been stripped of the ability to independently manage his own finances and, by extension, incapable of administering this Estate as an independent fiduciary.[5] While it goes without saying that every indicted person under our criminal laws is entitled to a presumption of innocence in a criminal proceeding, this is not such a proceeding. This, instead, is a chapter 11 bankruptcy proceeding voluntarily commenced by the Debtor, where the expectations of good faith, fair dealing and transparency are incumbent on a debtor. Indeed, they are a requirement, a prerequisite if one will, in order for any debtor to obtain the benefits afforded by Congress under the Bankruptcy Code. The gravity and scope of the criminal and civil fraud alleged here by federal

---

[3]    Press Release, SEC, SEC Charges Pennsylvania Resident and His Companies with $770 Million Ponzi Scheme (Sep. 3, 2025), https://www.sec.gov/newsroom/press-releases/2025-111-sec-charges-pennsylvania-resident-his-companies-770-million-ponzi-scheme (the "SEC Press Release"); *see also infra* ¶ 37.
[4]    *See* Second Interim Report, D.I. 473-1, pp. 39-40; *infra* ¶¶ 27-28.
[5]    *See* Conditions of Release Order p. 3.

prosecutors, the SEC, and a host of third-party creditors who have suffered massive losses, coupled with numerous other indicia demonstrating that the Debtor is unfit to administer the Estate and its significant economic loss at his helm, is too much for this Court to ignore. There is no reorganizable business here. ***One cannot reorganize a Ponzi scheme***. The only possible outcome is liquidation under the guise of an independent third party appointed by this Court, not the Debtor.

4.       What's more—there exists a substantial and continuing loss to, and diminution of, the Estate, a fact that the Debtor Response completely omits to address. In the Debtor's entire twenty-four (24) page response, the Debtor does nothing more than assert, without substantiation, that he timely filed papers.[6] Not only is that assertion false, but ***the Debtor wholly fails to address the substance of those papers***—[7] substance that is profoundly damning to his position, such as money spent by the Debtor in August at the casino.[8] Instead, the Debtor chose to devote the bulk of the Debtor Response casting blame on others and reciting why the Examiner is wrong (*see* Debtor Response ¶¶ 29-48). That choice leaves the Debtor Response silent on the most critical question: why the Estate should be considered sound under the Debtor's watch.

5.       The administrative burn in this Chapter 11 Case is staggering. The Debtor has incurred professional fees far in excess of the Estate's cash since the voluntary petition was filed. Professional fees from February 10, 2025 through August 31, 2025 totaled approximately $442,157.00, while cash on hand as of August 31, 2025 was only $6,838.00. In that regard, there is substantial uncertainty as to the source of these funds. The value of the Estate under the Debtor's watch is collapsing, if not already collapsed. As reflected in the Amended Schedules, the Debtor reduced his total asset value from approximately $228 million to just $8.3 million.[9] This

---

[6]    *See* Debtor Response p. 25.
[7]    *See infra* ¶¶ 47-49.
[8]    August Report PDF p. 29.
[9]    *See* D.I. 552 (the "<u>Amended Schedules</u>").

precipitous decline not only underscores the unreliability of the Debtor's prior disclosures and whether any of the reported figures can be relied upon as accurate, but the futility of continuing to allow the Debtor control over the Estate. Far from rehabilitation, what is occurring here is deterioration—at an enormous cost to creditors.

6.    This Chapter 11 Case presents circumstances that fall squarely within the mandatory conversion provisions of 11 U.S.C. § 1112(b). Section 1112(b)(4)(A) of the Bankruptcy Code requires conversion where there are continuing losses and no likelihood of rehabilitation. No viable enterprise exists to rehabilitate, only a hemorrhaging Estate that belongs in liquidation. Section 1112(b)(4)(B) of the Bankruptcy Code requires conversion for gross mismanagement. Mismanagement is an understatement. The Debtor's conduct is fraud in its purest form, obstruction, and abuse at every turn.

7.    Accordingly, Silverview respectfully requests that this Court enter an order immediately converting this case to one under chapter 7, pursuant to 11 U.S.C. § 1112(b), so that an independent chapter 7 trustee may take control of the Estate, investigate the extent of the Debtor's misconduct, and maximize recoveries through an orderly liquidation. This Chapter 11 Case has been pending for eight months, yet virtually no progress has been made toward a legitimate reorganization. There is no reasonable prospect that the Debtor can confirm what is, on its face, a patently unconfirmable Plan, no transparency regarding the true scope of his assets or the extent of his prepetition transfers,[10] and an Estate that has been rendered administratively insolvent. The absence of these fundamental building blocks of a chapter 11 proceeding underscores the futility of continuing in this chapter.

---

[10]    *See infra* ¶ 60.

8.       In the alternative, should the Court determine that conversion is not yet appropriate, the Debtor must, at a minimum, be removed from control. An independent chapter 11 trustee must be appointed, pursuant to 11 U.S.C. § 1104(a)(1) and (2), to protect the Estate, conduct a full investigation, and restore creditor credibility to these proceedings. The interests of creditors demand it.

9.       The Debtor's positions are, at best, untenable and exaggerated, and at worst, so disconnected from the record as to raise serious concerns about his understanding of the realities of this Chapter 11 Case. One point is clear from the Debtor Response, however: talk is cheap. What matters are actions, and the Debtor's actions, both pre- and post-petition, speak volumes.

10.      The Debtor argues that he has demonstrated a willingness to work with creditors,[11] yet his conduct tells a very different story. After submitting a certification in support of a proposed settlement, the Debtor refused to take the stand to explain why the actions he proposed were in the best interests of the Estate—prompting the Deerfield Settlement to collapse and leading Deerfield to file a motion for relief from stay and highlight the Debtor's refusal to testify. The Deerfield motion has been withdrawn, and Deerfield has made plain its profound lack of confidence in the Debtor's honesty and character.[12] Assertions of cooperation mean little when the Debtor's actions reflect self-preservation over transparency.

11.      Significantly, the Debtor has gone so far as to indicate that he would invoke the Fifth Amendment in response to discovery directly tied to this Court's OSC—an extraordinary posture that speaks louder than any words he has filed.[13] That is not a minor omission—it strikes

---

[11]   *See* Debtor Response p. 2.
[12]   *See infra* ¶¶ 20-23.
[13]   *See* Vincequerra Decl., **Exh. "A"**. The deposition of the Debtor in connection with this OSC is scheduled to occur on October 9, 2025. Silverview expressly reserves the right to supplement this Reply, including to advise the Court of the Debtor's anticipated invocation of the Fifth Amendment privilege on a question-by-question basis.

at the very core of the fiduciary obligations imposed on a chapter 11 debtor. An individual debtor-in-possession who will not testify about the rationale for his own decisions, or why they serve the Estate and its creditors, is the antithesis of what the Bankruptcy Code requires. That refusal alone confirms what the record already makes plain: this Debtor cannot be trusted with the responsibilities of chapter 11, and conversion or the appointment of a trustee is the only path forward.

12.     The Debtor also grossly overstates the virtue in "testif[ing] under oath for several hours" and "cho[osing] not to invoke the Fifth Amendment" in connection with the 341(a) Meeting.[14] The Debtor's testimony was evasive and incomplete.[15]  More often than not, the Debtor refused to provide straightforward answers about his assets and Estate, deflected basic inquiries and repeatedly directed creditors to seek discovery (which he later moved to quash). That is not candor; it is calculated obstruction.

13.     And the Debtor's action of "[meeting] with the Examiner several times throughout the pendency of the case to provide information, documents and access to filings" is equally hollow.[16] Not only has the Examiner himself noted the Debtor's failure to provide information,[17] but Estate resources have been wasted on frivolous maneuvers designed to delay accountability, including attacks on the independent, Court-appointed and Debtor-approved Examiner himself and his findings.[18] Whenever the record does not favor him, the Debtor resorts to baseless tactics aimed solely at manufacturing a different answer. In that regard, the Withum Report, which Withum expressly noted was prepared on a compressed timeline, with limited access to financial data, and

---

[14]    Debtor Response p. 2.
[15]    *See infra* ¶¶ 17-19.
[16]    Debtor Response p. 2.
[17]    *See* Second Interim Report, D.I. 496, p. 8.
[18]    *See infra* ¶¶ 25 and 28.

based upon information provided by the Debtor—[19] whose truthfulness has been called into question by the record as a whole—does not genuinely rebut the Examiner's findings. Instead, its mere four (4) pages offer commentary on the Examiner's approach and analysis, ultimately suggesting that a more fulsome review be undertaken.[20] The Debtor has not cooperated; his actions are obstruction designed as compliance, and it speaks volumes about the Debtor's continued unwillingness to act as a fiduciary of this Estate.

14.     Stewardship of the Estate is not a right—it is a privilege. The Debtor has proven incapable and unworthy of that privilege. An independent fiduciary is urgently needed. The time for half-measures is over. The Estate must be taken out of the hands of the architect—before even more harm is done.

## RELEVANT FACTUAL BACKGROUND

### I.     The Bankruptcy Case

#### a.     *General*

15.     On February 10, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor continues in possession of his property and operating and managing his businesses and financial affairs as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107(a) and 1108 (the "Estate"). The United States Trustee for Region 3 (the "United States Trustee") has not appointed an official committee of unsecured creditors in this Chapter 11 Case.

16.     As of the date hereof, creditors have filed claims against the Debtor's estate totaling approximately $825,806,629.50.

---

[19]    *See* Withum Report, D.I. 588-1, p. 1.
[20]    *See generally* Withum Report, D.I. 588-1.

**b.** __*The 341(a) Meeting of the Creditors*__

17.     On March 31, 2025, the section 341(a) meeting of the creditors was convened, at which the Debtor appeared with counsel, and several creditors participated (the "341(a) Meeting").[21]

18.     At the 341(a) Meeting, at which the Debtor's criminal counsel participated, the Debtor repeatedly failed to provide direct answers to basic questions, often professing ignorance regarding matters that should have been within his knowledge as the principal and sole fiduciary of the Estate.

19.     The Debtor repeatedly failed to provide answers to questions regarding entities in which he holds an interest, and potential assets and liabilities, each of which plainly relate to this Estate and bear directly on its value.[22] In fact, in connection with the Debtor's refusal to answer questions regarding Heller Capital Group, LLC ("HCG"), the United States Trustee stated that HCG relates this Chapter 11 Case and provided that there are "some answers that [he'd like to have as well]."[23] Instead of providing information, the Debtor frequently deflected inquiries by instructing creditors to pursue discovery.[24] On multiple occasions, the Debtor's counsel or counsel

---

[21]   *See generally* Vincequerra Decl., **Exh. "B"**.

[22]   *See, e.g.*, Hrg. Tr. 82:16-83:13, March 31, 2025 (When Orrstown Bank inquired about a potential asset of the Debtor's estate, counsel for the Debtor responded that, "[the Debtor] is not going to answer that" and subsequently instructed Orrstown Bank to seek discovery.); Hrg. Tr. 77:12-81:3 (When Prestige (as defined herein) asked the Debtor what had become of funds invested in entities owned and/or controlled by him, the Debtor dismissed the inquiry on the ground that it concerned "non-debtor entities," notwithstanding the fact that these entities are controlled by the Debtor, and his interests in each may directly affect the assets and liabilities of the Estate.); Hrg. Tr. 97:8-98:5 (When questioned regarding Heller Investment Holdings ("HIH")—an entity which the Debtor holds a significant interest and which has been placed into receivership along with its assets—counsel for the Debtor stated that no response would be provided, notwithstanding the Debtor's prior testimony that HIH serves as a source of the Debtor's salary.); Hrg. Tr. 111:21-112:5 (The Debtor was instructed not to answer questions relating to his capacity as signatory of certain entities, notwithstanding that such information could bear directly on potential claims against the Debtor.).

[23]   Hrg. Tr. 95:18-25.

[24]   *See, e.g.*, Hrg. Tr. 93:23-94:22 (When questioned about his ownership in entities, counsel for the Debtor stated that, "we're not going to get into all this," as parties to the 341(a) Meeting would "be here from now 'till doomsday." The Debtor's counsel instructed Deerfield to seek discovery and/or that the Debtor would "obviously answer at the appropriate time.").

for one of his affiliated entities, responded on the Debtor's behalf and interposed misguided objections.[25]

     **c.**     ***The Trustee Motions and Appointment of the Examiner***

     20.     On February 18, 2025, Deerfield Capital, LLC ("Deerfield") filed the *Motion for Appointment of Chapter 11 Trustee* [Docket No. 30] (the "Deerfield Trustee Motion").[26] Through the Deerfield Trustee Motion, Deerfield argued that, *inter alia*:

> Deerfield does not trust the Debtor . . . and, based upon the pre-petition pleadings of the other creditors, nobody trusts him. In this case, already present are (a) substantial unexplained transfers of real and personal property to family members and others, (b) gross mismanagement, (c) violation of pre-petition court orders demonstrating a lack of respect for the court system, (d) false financial statements to creditors and the IRS, (e) a complete lack of trust with the creditor constituency, (f) a complete lack of transparency, and (g) the provision of fraudulent information and documents to creditors designed to mislead.[27]

     21.     Deerfield also argued that "[it] has zero confidence in the Debtor's ability to honestly and effectively manage his affairs;"[28] and "under no circumstances can this Debtor be in charge of the liquidation and recovery of assets. For the creditors to acquiesce in such a course of action would be foolish and reckless given the Debtor's demonstrated past conduct."[29]

---

[25]  *See, e.g.*, Hrg. Tr. 97: 5-6; Hrg. Tr. 103: 12-16.

[26]  On May 21, 2025, Prestige also filed a motion for the appointment of a chapter 11 trustee and to modify the Examiner Order [D.I. 265] (the "Prestige Trustee Motion"). Through the Prestige Trustee Motion, Prestige argued that, *inter alia*, there was overwhelming evidence in support of the appointment of a trustee, pursuant 11 U.S.C. § 1112(b), including "the pervasive fraudulent conduct of the Debtor, interests of the creditors and interest of properly administering the estate." Prestige Trustee Motion p. 3. Prestige also incorporated, by reference, as if set forth in the Prestige Trustee Motion in full, the contents of Deerfield Trustee Motion and Deerfield Joinders (as defined herein). Silverview [D.I. 296] and Chicago Atlantic Admin, LLC ("Chicago Atlantic") [D.I. 301] each filed statements in support of the Prestige Trustee Motion. Prestige subsequently withdrew, in part, the Prestige Trustee Motion [D.I. 367] (the "Prestige Withdrawal") for "reasons . . . rooted in judicial efficiency and economy." Prestige Withdrawal p. 1.

[27]  Deerfield Trustee Motion p. 10. Deerfield also argued that "[it] has absolutely no confidence in the Debtor's ability to act as a fiduciary or confirm a plan." Deerfield Trustee Motion p. 12.

[28]  Deerfield Trustee Motion, *Certification of Albert A. Ciardi III in Support of Motion for the Appointment of Chapter 11 Trustee* (the "Ciardi Certification") ¶ 25.

[29]  Ciardi Certification ¶ 28.

22.     Silverview, Orrstown Bank, the Receiver,[30] and Prestige[31] (collectively, the "Deerfield Joinder Parties") agreed with the arguments advanced by Deerfield in the Deerfield Trustee Motion, and each filed a statement in support thereof (collectively, the "Deerfield Joinders").[32] Indeed, **"Silverview believes that here there is substantial danger that the Debtor will, if not monitored by an independent fiduciary, continue to take steps to hide, transfer and otherwise dissipate estate assets to the detriment of his creditors. . . . [T]he record is replete with serious and well-ground facts of misconduct, fraud and deceit by the Debtor in regard to his assets and liabilities."[33]

23.     Ther Deerfield Trustee Motion was ultimately carried and remains held in abeyance, pursuant to a carefully negotiated, multilateral, and consensual agreement among Deerfield, the Deerfield Joinder Parties, and the Debtor, which was memorialized in the *Order Directing the Appointment of an Examiner*, pursuant to section 1104(c) of the Bankruptcy Code, entered by the Court on March 7, 2025 [D.I. 99] (the "Examiner Order").[34]

24.     Through the Examiner Order, the Court directed and ordered the Examiner to, *inter alia*:

---

[30]    "Receiver" refers to Steven Mitnick, the receiver appointed over certain the assets of Golden Gate Investment Company, LLC and Paramount Management Group, LLC ("Paramount" or "PMG").

[31]    "Prestige" refers collectively to Prestige Fund A, LLC, Prestige Fund A IV, LLC, Prestige Fund A IX, LLC, Prestige Fund B, LLC, Prestige Fund B II, LLC, Prestige Fund B IV, LLC, Prestige Fund B V, LLC, Prestige Fund B VI, LLC, Prestige Fund B VII, LLC, Prestige Fund B BTM I, LLC, Prestige Fund A II, LLC, Prestige Fund A V, LLC, Prestige Fund A VI, LLC, Prestige Fund A VII, LLC, Prestige Fund D, LLC, Prestige Fund D III, LLC, Prestige Fund D IV, LLC, Prestige Fund D V, LLC, Prestige Fund D VI, LLC, Prestige Fund D BTM I, LLC, WF Velocity I, LLC, WF Velocity Fund IV, LLC, WF Velocity Fund V, LLC, WF Velocity Fund VI, LLC and WF Velocity Fund VII, LLC.

[32]    *See* D.I. 63, 66, 80, and 85, respectively.

[33]    *Silverview Credit Partners LP's Statement in Support of Deerfield Capital, LLC's Motion for the Appointment of Chapter 11 Trustee* [D.I. 63].

[34]    On March 6, 2025, the Court entered the *Consent Order Preserving Status Quo* [D.I. 96] (the "Consent Order"). Pursuant to the Consent Order, the Debtor, Heller Entities (as defined therein), and Heller Individuals (as defined therein) agreed to cooperate with the Examiner (as defined herein); *see also Amended Consent Order Preserving Status Quo* [D.I. 119]; Examiner Order ¶ 4 ("The Debtor shall fully and promptly cooperate with the Examiner in the performance of any of the Examiner's duties in the Investigation.").

(a) investigate any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity, if any, in the management of the affairs of the Debtor or in any entity or entities owned or controlled by the Debtor, either directly or indirectly, or through any intermediate entity including but not limited to . . . Paramount Management Group, LLC . . . (b) investigate any and all transfers by the Debtor and any Debtor Entities including, but not limited to, all transfers or allegations referenced in the Removed Litigation . . . (c) investigate the accuracy and completeness of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, including, but not limited to, the stated value of assets included therein, [and] (d) otherwise perform the duties of an examiner set forth in section 1106(a)(3)and 1106(a)(4) of the Bankruptcy Code (collectively the "Investigation").[35]

25.    On March 13, 2025, the United States Trustee appointed Edward A. Phillips, CPA, subject to Court approval,[36] to serve as the Examiner [D.I. 118]. And on March 18, 2025, the Court entered the *Order Approving the Appointment of a Chapter 11 Examiner by United States Trustee* [D.I. 131].

26.    On June 9, 2025, the Examiner filed the *First Interim Report of Examiner, Edward A. Phillips (Regarding Multiple Sales of the Same Automated Teller Machines to the Same or Multiple Purchasers)* [D.I. 329] (the "First Interim Report"), attached to the Vincequerra Declaration as **Exhibit "C"**. "The Examiner's analysis of the Invoices identified duplicate and triplicate sales of individual ATMs to separate Prestige Funds."[37] "The purchase price for the ATMs 're-sold' in the duplicate (second) and triplicate (third) sales totaled $20,848,531.00."[38] In his response, the Debtor sought to dismiss the Examiner's findings and discount the Examiner's

---

[35]  Examiner Order ¶ 3.
[36]  *See Application for Order Approving Appointment of Examiner* (the "Examiner Application") [D.I. 120]. Pursuant to the Examiner Application, (a) the United States Trustee consulted with the Debtor and others regarding the Examiner's appointment, and (b) the Examiner disclaimed connections to, *inter alia*, the Debtor, creditors, and any other parties in interest except as otherwise set forth on the *Verified Statement of Edward A. Phillips*, attached to the Examiner Application. *See also Supplemental Verified Statement of Edward A. Phillips* [D.I. 133].
[37]  First Interim Report ¶ 16. Further, "the Examiner's analysis of the Invoices identified duplicate sales of individual ATMs to the *same* Prestige Fund on the *same* Invoice." First Interim Report ¶ 19.
[38]  First Interim Report ¶ 18.

analysis, credentials, and industry expertise—[39] notwithstanding the Debtor's consent to this Examiner's appointment.

27.      Thereafter, on August 13, 2025, the Examiner issued the *Second Interim of Examiner, Edward A. Phillips (Regarding Ponzi Allegation)* [D.I. 473] (the "Second Interim Report" and together with the First Interim Report, the "Examiner Reports"),[40] attached to the Vincequerra Declaration as **Exhibit "D"**. The Second Interim Report is extraordinarily thorough, and its revelations are deeply troubling. Among other things, the Second Interim Report strongly suggests that the Debtor operated his businesses in a manner consistent with a Ponzi scheme—an assertion that Silverview, the Deerfield Joinder Parties, and other creditors have long and vocally maintained, and which underlie the Nondischargeability Complaints, Indictment, and SEC Enforcement Action (each as defined herein). Indeed, the Examiner concluded that, *inter alia*:

   i.   The Debtor had control of PMG, PIG, PFM, PFM II, PFM III, and WFV Management. Second Interim Report, D.I. 473, ¶ 112(i).

   ii.   PMG's earnings from ATM operations (including Investors' funds) were insufficient to pay returns to Investors during the Review Period. Second Interim Report, D.I. 473, ¶ 112(iii).[41]

   iii.   PMG's gross receipts (excluding Investors' funds) were insufficient to pay the returns to Investors that were paid during the Review Period. Second Interim Report, D.I. 473, ¶ 112(iv).[42]

   iv.   Even considering all of PMG's additional receipts (other than Investors' funds) during the Review Period, PMG still lacked sufficient funds to pay the $407.3

---

[39]   *See* D.I. 334.

[40]   On August 15, 2025, the Examiner filed the *Notice of Errata* with respect to the Second Interim Report [D.I. 477], and on August 21, 2025, the Examiner filed his response [D.I. 496] (the "Examiner's Response") to the *Debtor's Response to Notice of (I) Filing of Second Interim Report of Examiner, Edward A. Phillips and (II) Statement of General Legal Principles Regarding Alleged Ponzi Schemes* [D.I. 481] (the "Debtor's First Response"). The *Notice of Errata* and Examiner's Response are included in the definition of the Second Interim Report.

[41]   "PMG's earnings from its ATM operations (excluding Investors' funds) during the Review Period totaled approximately $38 million during the Review Period. Those earnings were insufficient to pay the $407.3 million in returns paid to Investors during the Review Period." Second Interim Report, D.I. 473, ¶ 112(iii)(a).

[42]   "PMG's gross receipts for ATM operations (other than Investors' funds) totaled approximately $161.6 million during the Review Period. Those gross receipts were insufficient to pay the $407.3 million in returns paid to Investors during the Review Period." Second Interim Report, D.I. 473, ¶ 112(iv)(a).

million in returns paid to Investors during the Review Period. Second Interim Report, D.I. 473, ¶ 112(v).[43]

v.   Putting aside any alleged discrepancies in the ATM count during the Review Period and whether ATMs were required to be installed and operational under the relevant disclosures and agreements, PMG lacked the number of revenue-generating ATMs necessary to generate the $407.3 million paid to the Investors during the Review Period. Second Interim Report, D.I. 473, ¶ 112(vi).[44]

28.   Predictably, on August 15 [D.I. 481] and 26 [D.I. 517], 2025, the Debtor filed responses to the Second Interim Report (together, the "Debtor's Second Response"),[45] where he sought to disclaim the Second Interim Report. Summarily, the Debtor argued that the Examiner misunderstands the business model and relied upon an "incomplete and arbitrarily narrow data set."[46] The Debtor went so far as to suggest bias on the part of the very Examiner he consented to appoint—an allegation that is plainly untenable and readily rebutted.[47] In fact, the Examiner explained that, *inter alia*: (a) he (or the Examiner's financial professionals) met with PIG representatives, who "openly answered all questioned posed by the Examiner," because they were familiar with certain entities' flow of funds, and the "Debtor was not as helpful in the Examiner's

---

[43]   Even adding all other sources of capital (other than Investors' funds) deposited into all of the FNB Accounts, which total $171.9 million and include gross receipts from (i) other funds ($31.9 million), (ii) other Debtor-related entities ($69.9 million), (iii) third-party lenders ($23.9 million), and (iv) all other receipts ($46.2 million), PMG still lacked sufficient funds to pay the $407.3 million in returns paid to Investors during the Review Period ($161.6 million + $171.9 million = $333.5 million). Even ignoring all operating and other expenses, PMG's total gross receipts were still $73.8 million short of the amount paid to Investors during the Review Period ($407.3 million - $333.5 million = $73.8 million).
Second Interim Report, D.I. 473, ¶ 112(v)(a).

[44]   From January 2021 through September 2024, the highest single monthly ATM count reflected in the Gross Profit Reports was 17,179 in July 2023. Based on the annual gross profit information contained in PMG's Gross Profit Reports and the $407.3 million paid to Investors during the Review Period, on a monthly basis, PMG would have needed more than 17,179 revenue-generating ATMs to generate the receipts (and earnings necessary) to pay the $407.3 million paid to Investors during the Review Period. This further evidences that PMG used subsequent Investors' funds to pay returns to earlier Investors.
Second Interim Report, D.I., 473, ¶ 112(vi)(a).

[45]   The Debtor (and Deerfield) also improperly sought to unilaterally terminate the Court-appointed Examiner in direct contravention of 11 U.S.C. § 324(a). *See* D.I. 258 (the "Deerfield Settlement") and D.I. 271.

[46]   *See* Debtor's Second Response, D.I. 481, pp. 1-2.

[47]   *See* Debtor's Second Response, D.I. 481, pp. 2-4.

efforts" to follow such flow;[48] (b) "[t]he Debtor . . . indicated that he could not share other information or documents upon the advice of his criminal counsel;[49]" and (c) "[o]n at least six occasions, the Debtor responded to the Examiner's questions by stating that he was 'unsure' of the answer."[50]

29.     In light of the Second Interim Report's filing, on August 15, 2025, Silverview; Prestige; Chicago Atlantic; GCC Investment Holdings LLC, Grizzly RE, LLC and NEO Mfg. MA, LLC; Steward Capital Holdings LP and Avenaero Holdings, LLC; and the Receiver filed the *Joint Letter Requesting Immediate Status Conference* [D.I. 482] (the "Joint Letter") to discuss the trajectory of the Chapter 11 Case and its direction. The parties expressed that they are "deeply troubled by the [Debtor's] conduct detailed in the Second Interim Report, which raises significant concerns regarding the Debtor's stewardship of this [Debtor's] estate."[51]

30.     On August 26, 2025, the Court held the requested status conference, at which many signatories to the Joint Letter, including Silverview, and the Debtor appeared and were heard. At the status conference, Silverview requested that the Court, *sua sponte*, appoint a chapter 11 trustee,[52] a request that was opposed by the Debtor. Following the hearing, the Court entered the OSC.[53]

31.     On October 3, 2025, the Debtor filed the Debtor Response. Attached thereto is the *report addressing the (i) First Interim Report of Edward A. Philips (Regarding Multiple Sales of the Same Automated Teller Machines to the Same or Multiple Purchasers [ECF 329], and (ii) the*

---

[48]    Second Interim Report, D.I. 496, p. 8.
[49]    Second Interim Report, D.I. 496, p. 8.
[50]    Second Interim Report, D.I. 496, p. 8.
[51]    Joint Letter p. 1.
[52]    On September 12, 2025, Silverview, via letter, again requested that the Court immediately appoint a chapter 11 trustee. *See* D.I. 549.
[53]    Pursuant to the OSC, the Debtor was ordered and directed to show cause on or before October 3, 2025. And "[r]eplies may be filed by 10/8/2025." OSC p. 2.

*Second Interim Report of Examiner, Edward A. Phillips (Regarding Ponzi Allegation) [ECF 473]*

(the "Withum Report").

## II.    The Debtor's Alleged Pre-Petition Fraud and Related Adversary Proceedings

32.     A staggering *fifteen* creditors have commenced nondischargeability actions (collectively, the "Nondischargeability Actions" and each, a "Nondischargeability Action") against the Debtor, alleging that the Debtor engaged in fraud prior to the Petition Date. These complaints plead detailed facts supporting causes of action under 11 U.S.C. § 523(a)(2) (for money obtained by fraud or false representations), 11 U.S.C. § 523(a)(4) (embezzlement and larceny), and § 523(a)(6) (for willful and malicious injury), among other sections of 11 U.S.C. § 523 and the Bankruptcy Code, and collectively depict a business model predicated on misrepresentation and deception to secure investments or loans.[54] The allegations in these Nondischargeability Actions not only underscore the seriousness of the Debtor's prepetition conduct but also align with the troubling findings in the Examiner Reports, Indictment and SEC Enforcement Action.

## III.    The Department of Justice's Indictment of the Debtor and the Securities and Exchange Commission's Civil Proceeding Initiated Against the Debtor

33.     On August 21, 2025, the Debtor was indicted in the Eastern District of Pennsylvania (*United States v. Daryl F. Heller*, Case 5:25-cr-00366-CH (the "Indictment")) on multiple counts of securities and wire fraud. Through the Indictment, attached to the Vincequerra Declaration as **Exhibit "E"**, the Eastern District alleged a pattern of fraudulent conduct directly implicating the Debtor's management of assets and business affairs.

34.     Specifically, the Eastern District alleged that from January 2017 to December 2024, the Debtor orchestrated a scheme in which he solicited approximately $770 million from investors

---

[54]   *See* Prestige Trustee Motion pp. 4-15 (setting forth a summary of each Nondischargeability Action).

by falsely promising that their money would be used to purchase and operate Automated Teller Machines ("ATMs"), guaranteeing fixed monthly returns from ATM revenues. In reality, much of the money was used to pay earlier investors, cover the Debtor's personal and business expenses, and satisfy business debts incurred by other companies that the Debtor owned and controlled. The Debtor concealed the fraud by, *inter alia*, creating false records that misrepresented both the number of ATMs and the revenues generated. In fact, many of the purported ATMs did not exist or were not operational.[55]

35.      On September 3, 2025, the Debtor was arrested and detained. The Debtor was released from federal custody on Friday, September 5, 2025, on $500,000.00 bail.

36.       Importantly, as a condition of the Debtor's release, the Eastern District imposed significant restrictions on both his personal and business financial resources. Most notably, the Debtor is now restricted from having sole access to his finances. According to the terms of the Debtor's Conditions of Release Order, attached to the Vincequerra Declaration as **Exhibit "F"**, a third-party financial services firm, Luma Financial Group has been granted "coaccess to all personal and corporate accounts" with any and all expenditures or withdrawals requiring the signature of both parties.[56]

37.      In a parallel matter, on September 3, 2025, the Securities and Exchange Commission (the "SEC") commenced a civil enforcement action against the Debtor (*SEC v. Daryl F. Heller, et al.*, Case 5:25-cv-05036 (the "SEC Enforcement Action")), attached to the Vincequerra Declaration as **Exhibit "G"**, alleging multiple violations of the Securities Act arising from fraudulent conduct associated with the Debtor's prolonged  multi-year Ponzi scheme that

---

[55]   *See* USAO Press Release.
[56]   Vincequerra Decl., **Exh. "F"**, p. 3.

resulted in investor losses of approximately $400,000,000.00. [57] Through the SEC Enforcement

Action, the SEC is seeking serious remedies against the Debtor, including injunctions, substantial

disgorgement penalties, and bars on future conduct.

## REPLY AND ARGUMENT

## I.    THIS CHAPTER 11 CASE SHOULD BE CONVERTED TO CHAPTER 7.

38.    Pursuant to section 1112(b)(1) of the Bankruptcy Code:

> [O]n request of a party in interest, and after notice and hearing, the court shall
> convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under
> [chapter 11], whichever is in the best interests of creditors and the estate, for cause
> unless the court determines that the appointment under section 1104(a) of a trustee
> or an examiner is in the best interests of creditors and the estate.[58]

39.    The purpose of section 1112(b) is to preserve estate assets by "preventing the debtor

in possession from gambling on the enterprise at the creditors' expense when there is no hope of

rehabilitation." *In re Reserves Resort, Spa & Country Club LLC*, 2013 Bankr. LEXIS 2808, at *5

(Bankr. D. Del. July 12, 2013).

40.    Section 1112(b)(4) of the Bankruptcy Code provides a non-exhaustive list of

sixteen circumstances that constitute cause under section 1112(b)(1), including a "substantial or

continuing loss to or diminution of the estate and the absence of a reasonable likelihood of

rehabilitation." 11 U.S.C. § 1112(b)(4)(A); *see Tarquinio v. Tarquinio (In re Tarquinio)*, 2017

U.S. Dist. LEXIS 194421, at *14 (D.N.J. Nov. 27, 2017).

41.    In determining whether there has been a substantial or continued diminution of the

estate, "a court must make a full evaluation of the present condition of the estate." *In re Stream TV

Networks, Inc.*, 2024 Bankr. LEXIS 25, at *84 (Bankr. E.D. Pa. Jan. 5, 2024). Substantial or

---

[57]    *See* SEC Press Release.
[58]    11 U.S.C. § 1112(b)(1).

continuing loss exists "where a debtor continues to incur or maintain a negative cash-flow." *In re Tarquinio,* 2017 U.S. Dist. LEXIS 194421, at \*15. Courts have determined that a debtor's "administrative insolvency constitutes cause to convert [its case to chapter 7]." *In re BH S & B Holdings, LLC*, 439 B.R. 342, 349 (Bankr. S.D.N.Y. 2010). Importantly, "all that need be found is that the estate is suffering some diminution in value." *In re Kanterman*, 88 Bankr. 26, 29 (S.D.N.Y. 1988).

42.    "Rehabilitation" under section 1112(b) of the Bankruptcy Code "contemplates more than probable reorganization. Implicit in the term 'rehabilitation' is a return to financial good health." *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 726 (Bankr. S.D.N.Y. 1984); *see also Tarquinio*, 2017 U.S. Dist. LEXIS 194421 at \*15 ("Rehabilitation signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met."). "If a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed." *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 64 F.4th 84, 101-02 (3rd Cir. 2023). "[I]f Chapter 11 plan does not have a rehabilitative purpose, the statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 373 (5th Cir. 1987) (en banc)).

43.    "'[C]ause' is present to convert or dismiss a case where there has been 'gross mismanagement' of the estate." *In re Tucker*, 411 B.R. 530, 533 n.6 (Bankr. S.D. Ga. 2009); *see generally In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989). Gross mismanagement will be

found where a debtor fails to comply with this fiduciary duty, including a debtor's failure to preserve estate value and engaging in conduct which undermines creditor confidence. *See Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 565-66 (Bankr. M.D. Pa. 2007). Inaccurate reporting has also supported conversion. *See In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994).

44.    Because the list of factors is not exhaustive, "[a] finding of cause is not limited to the grounds stated in § 1112(b)." *In re AdBrite Corp.,* 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003). Courts are given broad discretion in determining what may constitute sufficient cause for the conversion of a case. *See Toibb v. Radloff*, 501 U.S. 157, 165 (1991); *Off. Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 160 (3rd Cir. 1999) ("[A] court may consider whether other facts and circumstances qualify as 'cause.'").

45.    A debtor's perpetration of a Ponzi scheme "might also constitute cause for conversion to chapter 7 because, if true, it would put in substantial doubt [the debtor's] credibility and good faith and therefore his ability to confirm a plan of his own proposal." *See In re Cranney*, 2013 Bankr. LEXIS 2312, at *6, *17 (Bankr. D. Mass. May 30, 2013) (recognizing that where there are "credible allegations of fraud, [the debtor's] ability to negotiate, 'sell,' and confirm an otherwise meritorious plan is, as a matter of fact if not law, compromised").

46.    Section 1112(b)(1) of the Bankruptcy Code is not permissive. If this Court concludes "cause" exists, it must convert the case, dismiss it, or appoint a chapter 11 trustee under section 1104(a) unless (a) the Court "specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate" and (b) the Debtor establishes that certain enumerated conditions, none of which apply here, are met. 11 U.S.C. § 1112(b)(2).

A.      **There is Cause to Convert under Section 1112(b)(4)(A) of the Bankruptcy Code Because the Estate Has Substantial or Continuing Losses or Diminution and No Reasonable Likelihood of Rehabilitation.**

47.     The Debtor's limited financial disclosures demonstrate that the Estate has suffered and is continuing to suffer substantial and continuing losses and a diminution of value, and rehabilitation is not possible. According to the July 2025 Monthly Operating Report [D.I. 519]:

i.   **Cash is Evaporating**: The cash balance beginning July 2025 was $14,528.00, but after $27,144.00 in receipts and $38,834.00 in disbursements, the month ended with only $6,938.00 cash on hand. That's a 53% cash drop in a single month.

ii.  **Professional Fees are Consuming the Estate**: Nearly half a million dollars of Estate value has been consumed by professionals. Approved and paid Debtor's professional fees total $442,157.00, with $350,301.00 paid in a single month—an astounding burn rate for an Estate whose asset values have collapsed. Indeed, as noted herein, the Amended Schedules cut total asset value from approximately $228 million down to just $8.3 million—a loss of over 96%.

iii. **Spending on Personal Luxuries During Chapter 11 Case**: Disbursements include Apple streaming subscriptions; restaurants (*e.g.*, $252.90 single expenditure); alcohol purchases (*e.g.*, a $355.03 single expenditure on "wine and spirits"); clothing and retail (*e.g.*, $251.22 spent at a "specialty retail store"); and even charitable donations. These are not Estate-preserving expenditures; they show personal consumption draining cash while creditors go unpaid.

48.     The Debtor's most recently filed Monthly Operating Report for August 2025 [D.I. 576] (the "August Report") further paints a troubling picture of the Estate's financial condition. The Estate's cash balance at the beginning of August 2025 was $6,838.00. While there appears to be an increase in cash during the latest operating period ($93,909.00), such an increase is attributable to a $89,697.79 tax refund that the Debtor received on August 26, 2025, not a sustainable revenue stream. Without such refund, the Debtor would have had a cash balance of $4,211.21, a further reduction in the cash balance from the prior month. Meanwhile, the Estate is incurring significant disbursements on entertainment, dining, subscriptions, and even gambling. The August Report also lists $0.00 in salary and wages, and expenses, underscoring the absence

of any reliable financial grounding. At the same time, professional fees approved to date exceed $442,000.00, draining the Estate with no evidence or progress toward reorganization.

49.     The Debtor's *Periodic Entity Report* [D.I. 317] is further demonstrative of the stark picture of erosion and loss of value.[59] HCG reported assets of approximately $109 million at year-end 2024, but by March 31, 2025, those assets had collapsed to just $83 million, which impaired the balance sheet by roughly $28 million. Its quarterly results swung from $7.6 million in net income in Q4 2024 to a net loss in Q1 2025, with cash balances dropping to zero. Similarly, HIH reported ongoing operating losses and a depleting of cash from $35,000.00 at year-end 2024 to barely $326.00 by March 2025, despite carrying nearly $42 million in liabilities. Cash Ventures IV, LLC, which previously showed $1.4 million in income in 2024, generated no revenue in the first quarter of 2025 and reported a net loss, while liabilities exceed total assets. DHTC, LLC likewise showed continuing operating losses with only $246.00 in cash by March 2025. Collectively, the Periodic Entity Report confirms that the entities in which the Estate holds value are hemorrhaging, including mounting losses, and in several cases have been reduced to near worthlessness—highlighting the ongoing diminution of the Estate and the futility of any attempt at rehabilitation. And troubling, even this bleak snapshot may not tell the full story, as it is unclear whether the Period Entity Report truly accounts for all of the Debtor's entities and accurately reflects the financial landscape. The Court and creditors cannot and should not credit the Debtor's self-serving valuations.

50.     With particular respect to rehabilitation, any rehabilitation proposed by the Debtor is a fiction built on gross speculation and wishful thinking. What the Debtor does face is the reality

---

[59]     Pursuant to Federal Rule of Bankruptcy Procedure 2015.3(b), "[t]he first report must be filed at least 7 days before the first date set for the meeting of creditors under §341." FED. R. BANKR. P. 2015.3(b). The Debtor's Periodic Entity Report was filed over two months late.

of criminal prosecution carrying the functional equivalent of a life sentence and a parallel enforcement action seeking to bar him permanently from managing businesses. The Debtor's ability to serve as a fiduciary is not just impaired, it is being stripped from him by the criminal and regulatory systems that have correctly recognized the scale of his fraud. Against this backdrop, the Debtor's proposal, as set forth in his Plan (as defined herein) to—outside of the oversight of this Court—"strategically liquidate" his undisclosed interests in undisclosed portfolio companies is unmoored from reality.[60] This Debtor, given his history and present circumstances, cannot credibly be entrusted with such authority.

51.    Accordingly, "cause" exists under section 1112(b)(4)(A) of the Bankruptcy Code to convert this Chapter 11 Case to one under chapter 7 because substantial and continuing loss to, and diminution of, the Estate is present, and a reasonable likelihood of rehabilitation does not exist.

**B.    There is Cause to Convert under Section 1112(b)(4)(B) of the Bankruptcy Code Because the Estate Has Been Grossly Mismanaged.**

52.    Cause also exists to convert this Chapter 11 Case because of "gross mismanagement" of the Debtors' estate. *See* 11 U.S.C. § 1112(b)(4)(B). Setting aside the prepetition misconduct of biblical proportions, the same pattern of mismanagement has continued postpetition, each as forth above. The Debtor has, *inter alia*: (a) filed the Amended Schedules, which unexplainably slash asset value by epic proportions; (b) provided incomplete and unreliable financial reports; (c) permitted entities in which the Estate holds substantial value to bleed assets and incur mounting losses; (d) obstructed discovery; (e) sought to discredit an independent, agreed upon, Debtor-approved, Court-appointed Examiner; (f) attempted to quash creditor oversight; (g) evaded taking the stand; and (h) dissipated Estate funds on personal consumption and administrative litigation that benefits no one but himself.

---

[60]    *See Debtor's Chapter 11 Plan,* D.I. 433 (the "Plan"), p. 4.

53.     Accordingly, the Debtor's conduct both before and after the Petition Dates makes plain that this Estate has been, and continues to be, grossly mismanaged, leaving conversion under section 1112(b)(4)(B) of the Bankruptcy Code not merely appropriate but necessary.

**C.     If Conversion to Chapter 7 is not in the Best Interest of Creditors, a Chapter 11 Trustee Should Be Appointed.**

54.     Should the Court determine that it is not in the best interest of creditors and Estate to convert the Chapter 11 Case at the time (a determination that Silverview submits is not warranted under these facts), Silverview submits that, in accordance with section 1112(b)(1) of the Bankruptcy Code, a trustee or an examiner should be appointed under section 1104(a) of the Bankruptcy Code.

**II.     IN THE ALTERNATIVE, A CHAPTER 11 TRUSTEE SHOULD BE APPOINTED.**

55.     Section 1104(a) of the Bankruptcy Code provides that the Bankruptcy Court shall order the appointment of a trustee, at any time after the commencement of the case but prior to confirmation of a plan, on request of a party in interest "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management," or (ii) if the appointment of a trustee "is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(1), (2). "[C]ourts must be given the discretion necessary to determine if the debtor-in-possession's conduct shown rises to a level sufficient to warrant the appointment of a trustee." *In re Marvel Entm't Grp. Inc.*, 140 F.3d 463,472 (3d Cir. 1998). "Where the Court makes either of these findings, an order for the appointment of a trustee is mandatory." *Off. Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

A.    **There is Abundant "Cause" Within the Meaning of Section 1104(a)(l) of the Bankruptcy Code to Warrant the Appointment of a Chapter 11 Trustee.**

56.    Section 1104(a)(1) of the Bankruptcy Code provides that cause exists to appoint a chapter 11 trustee where the debtor's current management engaged in wrongful conduct, including fraud. *See, e.g.*, *Cuthill v. Greenmark (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002) ("A Ponzi scheme is by definition fraudulent."). However, "[t]he categories enumerated in 11 U.S.C. § 1104(a)(1) cover a wide range of conduct and, thus, are best described as illustrative, rather than exclusive." *In re Marvel*, 140 F.3d at 472;[61] *see also USHA SoHa Terrace, LLC v. RGS Holdings, LLC (In re Futtleman)*, 584 B.R. 609, 616 (Bankr. S.D.N.Y. 2018) (listing, as further non-exhaustive factors, "inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds, inadequate record-keeping and reporting, and various instances of conduct found to establish fraud or dishonesty, lack of credibility, and lack of creditor confidence"); *United Sur. & Indem. Co. v. López-Muñoz (In re López-Muñoz)*, 553 B.R. 179, 191 (B.A.P. 1st Cir. 2016) (reviewing the definition of fraud under 11 U.S.C. § 523(a)(2)(A), when analyzing fraud under 11 U.S.C. § 1104(a)(1)).

57.    A court "may find cause to appoint a trustee for 'acrimony' . . . when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor." *In re Marvel*, 140 F.3d at 472-73. In *Marvel*, the Third Circuit affirmed a district court's finding that there was cause to appoint a trustee pursuant to section 1104(a)(1) based on the "deep-seeded conflict and animosity between" the parties and "the lack of confidence all creditors had in [the debtor's current management's] ability to act as fiduciaries." *In re Marvel*, 140 F.3d at 473.

---

[61]    Cause also may be established by the (1) materiality of the misconduct of the debtor's management, (2) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors, (3) existence of prepetition voidable preferences or fraudulent transfers, (4) unwillingness or inability of management to pursue estate causes of action, (5) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor, and (6) self-dealing by management or waste or squandering of corporate assets. *See In re Marvel*, 140 F.3d at 472-73; *In re Sharon Steel Corp.*, 871 F.2d at 1228.

58.     Pre-petition conduct of the type alleged to have occurred prior to the commencement of this Chapter 11 Case is sufficient to warrant the appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1) (the relevant "cause" for appointment of a trustee may exist "either before or after the commencement of the case"); *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) ("[T]he Code is clear that the pre-petition conduct of the debtor's management may be the sole deciding factor" in the appointment of a chapter 11 trustee."); *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (E.D.N.Y. 1989) ("[t]his pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee."); *In re Harrison*, 2020 Bankr. LEXIS 3648, at *8 (Bankr. E.D.N.C. Aug. 6, 2020) ("The plain language of section 1104(a)(1) allows the court to consider the pre-petition conduct of the debtor in determining whether the appointment of a trustee is appropriate.").

59.     The federal government has criminally charged the Debtor with wire fraud and securities fraud, while the SEC has separately charged him with multiple violations of the Securities Act—each detailing the same conduct that forms the basis of each Nondischargeability Action filed by creditors in this Court. The Second Interim Report likewise details how the Debtor used funds solicited for investment purposes to pay maturing obligations, a classic hallmark of a Ponzi scheme. The Debtor's credibility is irreparably compromised, and creditors have made plain their total lack of confidence in his ability to serve as a fiduciary. Where, as here, there is overwhelming evidence of fraud, dishonesty, and breach of trust, section 1104(a)(1) of the Bankruptcy Code requires the appointment of a trustee.

60.     Moreover, despite the Debtor's assurances that he would (and will) comply with his statutory obligations and provide complete and accurate information, the Debtor has failed to do so. To this day—nearly eight months after the commencement of this Chapter 11 Case—the

Debtor casually notes that the "[l]ist [is] to be provided" with respect to transfers made within ninety days prior to the Petition Date,[62] as though compliance with his disclosure obligations under the Bankruptcy Code is optional. The papers he does file are riddled with inaccuracies, internally inconsistent, and so unreliable as to be unworthy of belief.

61.    The Debtor's strategy, in short, has been to flood this Court and his creditors with torrent filings, objections, and procedural skirmishes—"drinking from a firehose" as a litigation tactic—while insisting that the creditors he defrauded underwrite the cost of this obstruction, further lending to the deep seeded conflict and animosity between the Debtor and majority of the creditor body. Silverview agrees with the Debtor that there are costs associated with the appointment of a chapter 11 trustee.[63] However, where the alternative is leaving the Estate in the hands of a demonstrably unfit fiduciary, the appointment of an independent party is plainly the right course.

62.    Accordingly, "cause" exists under section 1104(a)(1) of the Bankruptcy Code to appoint a chapter 11 trustee.

**B.    Appointment of a Chapter 11 Trustee is Warranted Under Section 1104(a)(2) of the Bankruptcy Code Because it is in the Best Interest of the Estate, Creditors and All Other Parties.**

63.    "Unlike § 1104(a)(1), which provides for mandatory appointment upon a specific finding of cause, § 1104(a)(2) 'envisions a flexible standard.' It gives the district court discretion to appoint a trustee 'when to do so would serve the parties' and estate's interests." *In re Marvel*, 140 F.3d at 474.

64.    If a slew of nondischargeability filings suggest that the debtor's management is untrustworthy or incapable of effectively managing the estate, this could justify the appointment

---

[62]  *See* Amended Schedules p. 2.
[63]  *See* Debtor Response ¶ 27.

of a trustee under § 1104(a)(2). *See, e.g.*, *Keeley & Grabanski Land P'ship v. Keeley (In re Keeley & Grabanski Land P'ship)*, 455 B.R. 153, 165 (B.A.P. 8th Cir. 2011) (concluding that the appointment of a chapter 11 trustee was warranted due to, *inter alia*, the untrustworthiness of debtor's principals and debtor's past performance casts serious doubt on its prospects of reorganization). The presumption that a debtor should remain in possession of its estate and in control of its affairs holds only if management "can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355; *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("[A] debtor-in-possession must act as a 'fiduciary of his creditors' to 'protect and to conserve property in his possession for the benefit of creditors,' and to refrain [ ] from acting in a manner which could damage the estate . . ." (citing *In re Sharon Steel Corp.* 86 B.R. 455, 457 (Bankr. W.D. Pa. 1988), *aff'd*, 871 F.2d 1217 (3d Cir. 1989)). *See also In re PRS Ins. Grp., Inc.,* 274 B.R. 381, 387 (Bankr. D. Del. 2001) (the use of corporate assets for the personal benefit of insiders, resulting in the deterioration of the debtors' assets , further evidences "gross mismanagement" and mandates appointment of a chapter 11 trustee.).

65.     For all of the reasons set forth herein, the appointment of a trustee is in the best interests of creditors, the Estate, and all parties in interests. This Estate is on life support. The Debtor has no credibility. There is no prospect of rehabilitation. The Debtor has demonstrated, through pre- and post-petition conduct, that he cannot be entrusted with fiduciary responsibilities, a critical one of which has been stripped away from him.  By operation of the Conditions of Release Order, the Debtor cannot function as an independent steward of his own finances. Against this backdrop, it is inconceivable that the Debtor could serve as the fiduciary of an Estate involving hundreds of millions of dollars in claims and targeted allegations of fraud.

66.    Accordingly, appointment of a trustee under section 1104(a)(2) of the Bankruptcy

Code is essential.

## <u>CONCLUSION</u>

67.    For the reasons set forth herein, Silverview respectfully request that the Court enter

an order converting the Debtor's Chapter 11 Case to a liquidating proceeding under chapter 7,

pursuant to section 1112(b) of the Bankruptcy Code, and grant such other relief as the Court deems

just, fair, and equitable. In the alternative, Silverview respectfully requests that the Court enter an

order appointing a chapter 11 trustee, pursuant to 1104(a) of the Bankruptcy Code, and grant such

other relief as the Court deems just, fair, and equitabl

Dated: October 8, 2025

By: */s/ Gerard Catalanello*

Gerard Catalanello, Esq.
James J. Vincequerra, Esq. (admitted *pro hac vice*)
Seth M. Cohen, Esq. (admitted *pro hac vice*)
Kimberly Schiffman, Esq. (admitted *pro hac vice*)
Jonathan P. Wieder, Esq. (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: Gerard.Catalanello@alston.com
          James.Vincequerra@alston.com
          Seth.Cohen@alston.com
          Kimberly.Schiffman@alston.com
          Jonathan.Wieder@alston.com

*– and –*

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Silverview Credit Partners, LP*