**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**
Gerard Catalanello, Esq.
James J. Vincequerra, Esq. (admitted *pro hac vice*)
Seth M. Cohen, Esq. (admitted *pro hac vice*)
Kimberly Schiffman, Esq. (admitted *pro hac vice*)
Jonathan P. Wieder, Esq. (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email:  Gerard.Catalanello@alston.com
   James.Vincequerra@alston.com
   Seth.Cohen@alston.com
   Kimberly.Schiffman@alston.com
   Jonathan.Wieder@alston.com

– and –

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Silverview Credit Partners, LP*

| | |
|---|---|
| In re:<br><br>DARYL FRED HELLER,<br><br>                                     Debtor. | Case No.: 25-11354-JNP<br>Hon. Jerrold N. Poslusny, Jr.<br>Chapter 11 |

**SILVERVIEW CREDIT PARTNERS, LP'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS (I) REPLY TO DEBTOR'S BRIEF IN SUPPORT OF WHY THE COURT SHOULD NOT APPOINT A TRUSTEE OR CONVERT THE CASE PURSUANT TO 11 U.S.C. §§ 1104(a)(1), (2), 1112(b)(1) [D.I. 588]; AND (II) MEMORANDUM OF LAW IN SUPPORT OF AN ORDER CONVERTING CHAPTER 11 CASE TO LIQUIDATING PROCEEDING UNDER CHAPTER 7 OR, IN THE ALTERNATIVE, APPOINTING A CHAPTER 11 TRUSTEE**

Silverview Credit Partners, LP ("Silverview"), by and through its undersigned counsel, respectfully requests the Court's leave to file this supplemental brief in further support of its timely filed papers, dated October 8, 2025 [D.I. 596]. In support of this supplemental brief, Silverview submits the declaration of James J. Vincequerra, attached hereto as **Exhibit "A"** (the "Vincequerra Declaration"), and the attached exhibits and respectfully represents as follows:

## RELEVANT FACTUAL BACKGROUND

1. On October 8, 2025, Silverview timely filed its (i) reply to the *Debtor's Brief in Support of Why the Court Should Not Appoint a Trustee or Convert the Case Pursuant to 11 U.S.C. §§ 1104(a)(1), (2), 1112(b)(1)*, dated October 3, 2025 [D.I. 588] (the "Debtor Response"); and (ii) memorandum of law ((i) and (ii), the "Reply") in response to the Court's *Order to Show Cause*, dated August 27, 2025, which directs Daryl Fred Heller (the "Debtor") to show cause why the Court should not convert the Debtor's chapter 11 case to a liquidating proceeding under chapter 7, of Title 11, of the United States Code, 11 U.S.C. § 101 *et seq.* the "Bankruptcy Code") or appoint a chapter 11 trustee [D.I. 520] (the "OSC").

2. In footnote 13 of Silverview's Reply, Silverview noted that a deposition of the Debtor in connection with the OSC was scheduled to occur on October 9, 2025 and expressly reserved the right to supplement its Reply, including to advise the Court of the Debtor's anticipated invocation of the Fifth Amendment privilege on a question-by-question basis based on the Debtor's counsel's email indicating his intent to do so. *See* D.I. 596-1.

3. Silverview took the Debtor's deposition on the morning of October 9, 2025. Upon advice of his counsel, the Debtor invoked his Fifth Amendment rights over two hundred times over the course of an approximately two hour deposition. *See generally* Ex. 1. Significantly, the Debtor refused to respond *inter alia* to the following questions:

2

- Questions regarding the Debtor's Schedule of Assets and Liabilities and amendments thereto (the "Schedules" [DI. 59, 72, 552], including the basis, if any, for the Debtor's valuations of his equity interests, and whether the Debtor understood that the schedules were required to be truthful and accurate (Ex. 1 at 28:4-51:16);

- Questions regarding discrepancies between the Debtor's schedules and the information he reported on his personal financial statement,[1] including valuations of his equity interests and a substantial reduction in reported income from 2021/2022 to 2023/2024 and whether the Debtor's reported income included bonuses or not (Ex. 1 at 51:17-59:15);

- A question about whether the Debtor has a gambling addiction (Ex. 1 at 59:10-11) *see infra* ¶ 10;

- Questions about the Examiner's First Interim Report [D.I. 329] and the truthfulness of Debtor's Response thereto [D.I. 334], including the inability to reconcile text messages about the number of ATMs owned or operated by Paramount Management Group ("Paramount") with the Debtor's representations to Silverview about the number of "active" Blackford[2] owned ATMs and the invoices to the Prestige Funds reviewed by the Examiner, whether the list of ATMs purportedly owned by Blackford included so called "placeholder" ATMs, whether any of the ATMs sold to the Prestige Funds overlapped with those sold to Silverview, and why the Debtor has not submitted an updated response to the Examiner's First Interim Report that explains the identified repetition of ATM serial numbers on the Prestige Fund invoices in the 118 days since he indicated his intent to do so (Ex. 1 at 59:16 -69:16);

- Questions about the Examiner's Second Interim Report [D.I. 473], including the inability to reconcile the Paramount ATM service provider receipts in 2022 as documented by the Examiner with the revenue Debtor's broker represented that Blackford earned from just a subset of those ATMs. *Compare* Vincequerra Decl. Ex. 2 (listing total operating revenues in 2022 of $71,363,970 for 3,697 ATMs) *with* D.I. 473 ¶ 70 (listing just $34,371,286 for all of Paramount) (Ex. 1 at 69:17 – 80:22).

- A question regarding whether the Debtor forged or falsified documents (81:1-16);

---

[1] Upon information and belief, the Debtor's personal financial statement is in the Debtor's possession. Silverview will make such documentation available to the Court and Debtor upon request.
[2] "Blackford" refers collectively to Blackford ATM Ventures Fund D, LLC; Blackford ATM Ventures Fund M, LLC; Blackford ATM Ventures Fund M II, LLC; Blackford ATM Ventures Fund M IV, LLC; Blackford ATM Ventures Fund M V, LLC; Blackford ATM Ventures, LLC, and Blackford Holdings, LLC.

3

4. Because the deposition was not held until October 9, 2025, and the Court ordered that replies to the Debtor's response to the OSC be filed by October 8, 2025, there was no way for Silverview to include the Debtor's responses to questions at his deposition in its Reply.

5. Following the deposition, on October 9, 2025, counsel for the Debtor filed a Letter Objecting to Silverview's Reply and sought leave to file a response to the Silverview Reply by October 13, 2025, which the Court granted by text Order the same day.

## ARGUMENT

### A. The Court Should Draw Adverse Inferences Based on the Debtor's Invocation of the Fifth Amendment in Response to Silverview's Questions.

6. While the Fifth Amendment to the Constitution applies in both criminal and civil contexts, the "aims supporting the privilege simply apply less forcefully in civil than in criminal cases." *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986). The distinction between criminal and civil application of Fifth Amendment "derives from the desire for fact which impels the adversary process, and from the concomitant doctrine that privileges must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Id*. (internal quotations and citations omitted).As a result, it is well settled that reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). As courts have acknowledged, "invocation of the Fifth Amendment poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth." *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994). The adverse inference fills that gap. Accordingly, adverse inferences may be drawn against parties to civil actions "when they refuse to testify in response to probative

4

evidence offered against them." *Id*. In other words, while the Court should not draw an adverse inference based on a party's silence alone, the Court may draw adverse inferences wherever the adverse inference is supported by other corroborating evidence. Here, there is more than sufficient corroborating evidence for the Court to draw appropriate adverse inferences as to each topic on which Mr. Heller refused to testify based on his Fifth Amendment rights.

9. As to the Debtor's Schedule of Assets and Liabilities (the "Schedules"), there is sufficient corroborating evidence to permit an adverse inference that the Debtor has not truthfully and accurately listed all of his assets and liabilities. Indeed, in an email in August 2023, the Debtor claimed to have income "close to 20M."[3] However, the Debtor's most recent amendment to his Schedules lists his income in 2023 as just over $2 million and his income in 2024 as even less. *See* D.I. 552 , Form 107, Part 2, line items 4-5. Moreover, the drastic reduction in asset value between D.I. 59 (listing assets totaling $227,971,500) and D.I. 552 (listing assets of just $8,261,500) itself illustrates that the Debtor's valuations of his equity interests in his Schedules were exaggerated if not downright fanciful. Conversely, in listing the Debtor's equity interest in "i Employee Services, LLC," of which the Debtor purports to own 100%, the Debtor listed the value of that interest as $0.00. *See* D.I. 552 at Schedule A/B Part 4, Line Item 19. Yet, the Debtor also stated that the same entity would be paying a portion of the retainer for Debtor's financial advisor. *See* D.I. 583 ¶ 15.

10. The Court should likewise draw an adverse inference from Mr. Heller's refusal to answer whether he has a gambling addiction that Mr. Heller is gambling away a portion of the bankruptcy estate's assets. Corroborating evidence exists in the form of debit purchases as recently

---

[3]  *See supra* n.1.

5

as August 2025 paid to "Crown Coins Casino." *See* D.I. 576-1, Truist Wealth Checking Account Statement dated August 28, 2025.

11. The Court can and should draw several adverse inferences from the Debtor's invocation of the Fifth Amendment in response to questions about the Examiner's First Interim Report. The Court should draw the adverse inference that the number of active Blackford owned ATMs was less than the 3,697 represented by Debtor to induce Silverview to loan Blackford $23 million. The Court should also draw the adverse inference that the list of Blackford ATMs included placeholders that did not operate or bring in revenue. Corroborating evidence for these conclusions exists in the form of text messages from Paramount's Chief Executive Officer Randall Leaman to Debtor stating that he was concerned that "all hell [was] going to break loose" if Paramount turned over control of Paramount's ATMs because "[Paramount does not] have 28,000 units" but was instead at less than 17,000 in August 2024. *See* D.I 473, Ex. R at p. 3. And the Court should likewise draw the adverse inference that Debtor has no rebuttal to the Examiner's First Interim Report because despite averring that he intended to do so more than 100 days earlier, he has not submitted any explanation of the apparent sale of the same ATMs multiple times.

12. Similarly, the Court can and should draw the adverse inference from the Debtor's invocation of the Fifth Amendment in response to all questions about the Examiner's Second Report that, as set forth in the Examiner's Second Interim Report, the gross earning from ATM operations were insufficient to pay returns to all investors during the Review Period of January 2021 – March 2025. The Court should also draw an adverse inference that the Debtor or his agents knowingly falsified the total operating revenues reported for Blackford's ATMs for at least 2022. Corroborating evidence exists in the form of (i) emails from the Debtor purporting to explain to other executives at Paramount why the business model was *not* a ponzi scheme, indicating that the

Document    Page 7 of 9

company's own executives had cause to think it was a ponzi scheme, *see* D.I. 473, Ex. P, and (ii) emails sent by the Debtor's broker to induce Silverview to loan Blackford $23 million which listed operating revenues of $71,363,970 for 2022 which is over $30 million more than Paramount's entire operating revenue from its ATMs in 2022 even though the Blackford ATMs were supposed to be a small fraction of Paramount's total number of ATMs.

13. Finally, the Court should draw an adverse interest from the Debtor's refusal to answer – including in the negative – if he forged or falsified any documents that he did so on one or more occasions. Corroborating evidence exists in the form of text messages or testimony from two separate employees of Mr. Heller's companies that their signatures were applied to documents that they do not believe they ever signed. *See* D.I. 203-1, Ex. F (text message from Randall Leaman stating "I found out that I'm personally guaranteed some purchases of ATMs for Genmega on a credit application that I never signed but somebody stamped my signature for that's about 20 or 25,000"); D.I. 297-3, Deposition of Barry Rynearson dated May 9, 2025 at 81:24 – 82:1 (remarking when confronted with his signature on a management report for Heller Capital Group that "It is really odd. I don't recall putting my signature on financial statements. It is really odd."). When considered in the context of the allegation in the Indictment that "defendant Daryl F. Heller created and maintained reports that grossly overstated the true financial performance of the ATMs that Paramount had sold to investors." *See* Silverview Reply Ex. E ¶ 31, these statements provide additional corroborating evidence to support an adverse inference that the Debtor has forged or falsified documents.

14. In light of the foregoing corroborating evidence, the Court can and should allow adverse inferences from Debtor's invocation of the Fifth Amendment. Moreover, allowing an adverse interest does not make invoking Mr. Heller's Fifth Amendment rights too "costly" because

he is "not prevented from presenting evidence to the factfinder to support his [] position even in the absence of his testimony." *See Adkins v. Sogliuzzo,* 625 F. App'x 565, 572 (3d Cir. 2015) (affirming district court's grant of adverse interest against a former executor based on his invocation of the Fifth Amendment).

15. The sum total of these adverse inferences further bolsters the inescapable conclusion set forth in Silverview's Reply that good cause exists to convert the case to a chapter 7 under section 1112(b) of the Bankruptcy Code, or at minimum, that good cause exists to appoint a chapter 11 trustee under Section 1104(a) of the Bankruptcy Code. These adverse inferences support the other evidence that Debtor is untrustworthy and not dependable as a fiduciary of the bankruptcy estate, and that his continued management of the bankruptcy estate risks substantial harm to the creditors' prospects of recovery.

**B. There is No Prejudice to Debtor in Considering this Supplemental Brief.**

16. Debtor was aware since September 17, 2025 that Silverview sought Debtor's deposition in connection with the OSC. Debtor was therefore on notice since mid-September that Silverview would seek to rely on Mr. Heller's deposition in support of its argument. Silverview also expressly reserved rights to submit such a supplemental brief in its Reply *prior* to the deposition.

17. While any potential claim of prejudice should fail on this basis alone, because this supplemental brief is filed just one day after the Court granted leave to the Debtor to file a sur-reply by October 13 and the Debtor may address this supplemental brief in its October 13 sur-reply, there is no possible prejudice to the Debtor in the Court's consideration of this supplemental brief.

8

**CONCLUSION**

18. For the reasons set forth herein as well as those set forth in Silverview's Reply, Silverview respectfully request that the Court enter an order converting the Debtor's Chapter 11 Case to a liquidating proceeding under chapter 7, pursuant to section 1112(b) of the Bankruptcy Code, and grant such other relief as the Court deems just, fair, and equitable. In the alternative, Silverview respectfully requests that the Court enter an order appointing a chapter 11 trustee, pursuant to 1104(a) of the Bankruptcy Code, and grant such other relief as the Court deems just, fair, and equitable.

Dated: October 10, 2025

By: */s/ Gerard Catalanello*
Gerard Catalanello, Esq.
James J. Vincequerra, Esq. (admitted *pro hac vice*)
Seth M. Cohen, Esq. (admitted *pro hac vice*)
Kimberly Schiffman, Esq. (admitted *pro hac vice*)
Jonathan P. Wieder, Esq. (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, New York 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: Gerard.Catalanello@alston.com
       James.Vincequerra@alston.com
       Seth.Cohen@alston.com
       Kimberly.Schiffman@alston.com
       Jonathan.Wieder@alston.com

– and –

Enrique Chaljub Garcia, Esq. (admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email: Enrique.Chaljub@alston.com

*Counsel to Silverview Credit Partners, LP*