OFFICE OF THE UNITED STATES TRUSTEE
FOR THE DISTRICT OF NEW JERSEY (CAMDEN)


IN RE:                    .    Case No. 25-11354-JNP
                          .
                          .    Office of the U.S. Trustee
DARYL FRED HELLER,        .    One Newark Center
                          .    Suite 2100
                          .    Newark, NJ 07102
          Debtor.         .
                          .    March 31, 2025
. . . . . . . . . . . . . .    10:00 a.m.


TRANSCRIPT OF 341 MEETING OF CREDITORS
BEFORE JEFFREY M. SPONDER, ESQ.
OFFICE OF THE U.S. TRUSTEE


TELEPHONIC APPEARANCES:

For the Debtor:           McManimon Scotland & Baumann, LLC
                          By:  SARI BLAIR PLACONA, ESQ.
                               ANTHONY SODONO, III, ESQ.
                          75 Livingston Avenue, Suite 201
                          Roseland, NJ 07068

                          McCarter & English
                          By:  CHRISTOPHER D. ADAMS, ESQ.
                          Four Gateway Center
                          100 Mulberry Street
                          Newark, NJ 07102

For Heller Capital        White and Williams
Group and Heller          By:  HEIDI J. SORVINO, ESQ.
Investment Holdings:      810 Seventh Avenue, Suite 500
                          New York, NY 10019


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

Case 25-11354-JNP   Doc 596-3   Filed 10/08/25   Entered 10/08/25 16:31:29   Desc
Exhibit Int of Dan - Trans Winter of 841a   Page 2 of 29

2

TELEPHONIC APPEARANCES (Cont'd):

For Prestige Fund:          Stark & Stark
                            By:  JOSEPH H. LEMKIN, ESQ.
                            P.O. Box 5315
                            Princeton, NJ 08543

For Creditor:               Dilworth Paxon, LLP
                            By:  MARTIN WEIS, ESQ.
                            1500 Market Street, Suite 3500E
                            Philadelphia, PA 19102

For Deerfield Capital,      Ciardi Ciardi & Astin
LLC:                        By:  ALBERT ANTHONY CIARDI, III, ESQ.
                            1905 Spruce Street
                            Philadelphia, PA 19103

For the Internal            Internal Revenue Service
Revenue Service:            By:  Ruth Ayling
                            P.O. Box 7346
                            Philadelphia, PA 19101-7346

For Steward Capital         Archer & Greiner, P.C.
Holdings & Avenaero         By:  JERROLD S. KULBACK, ESQ.
Holdings:                   1025 Laurel Oak Road
                            Voorhees, NJ 08043

For Silverview Credit       Alston & Bird, LLP
Partners:                   By:  KIMBERLY SCHIFFMAN, ESQ.
                            90 Park Avenue, 15th Floor
                            New York, NY 10016

For Steven Mitnick:         Mitnick Law, PC
                            By:  MARC D. MICELI, ESQ.
                            P.O. Box 530
                            49 Old Turnpike Road
                            Oldwick, NJ 08858

OTHER APPEARANCES:

Kurt Gwynne, Esq. for Examiner, Edward Philips
Kirsten K. Ardelean, Office of the U.S. Trustee
Harry M. Gutfleish, Esq. for Funders App and Reliance Financial
E. Richard Dressel, Esq. for Brett & Gail Levin
Donna Donaher, Esq. for First National Bank
Donald W. Clarke, Esq. for GCC Investment Holdings, et al.
Nancy Isaacson, Esq. for Randall Leaman
Mr. Etchenson (phonetic)
Thomas T. Reith, Esq. for Needham Bank

3

# **I N D E X**

                                                                    **PAGE**

**WITNESS**

DARYL FRED HELLER

    Examination by Mr. Sponder                            10

    Examination by Mr. Lemkin                             77

    Examination by Mr. Weis                               82

    Examination by Mr. Ciardi                             85

    Examination by Ms. Ayling                            105

    Examination by Mr. Kulback                           107

    Examination by Ms. Schiffman                         113

    Examination by Mr. Miceli                            124

Case 25-11354-JNP    Doc 696-3    Filed 10/08/25    Entered 10/08/25 16:31:20    Desc
Exhibit in of Declaration of 341 a    Page 4 of 29

4

 1          MR. SPONDER:  Good morning.  My name is Jeff Sponder

 2  and I'm an attorney with the Office of the United States

 3  Trustee which is a component of the Department of Justice.  The

 4  United States Trustee supervises the administration of

 5  bankruptcy cases.

 6          Today is Monday, March 31st, 2025.  It's ten o'clock

 7  in the morning approximately.  This is the 341(a) meeting of

 8  creditors in the Daryl Fred Heller case which is Case Number

 9  25-11354 which is a Judge Poslusny case.  This meeting is being

10  conducted pursuant to Section 341(a) of the Bankruptcy Code.

11  Debtors are required to appear for an examination under oath

12  regarding their bankruptcy cases and this meeting is for the

13  purpose of conducting such examination.

14          This examination is being recorded, so all

15  appearances and responses must be verbal.  Please note that I

16  will be conducting this meeting and I will ask all of my

17  questions first.  When I finish, I will ask if anyone has any

18  questions of the witness concerning the context of today's

19  341(a) meeting.  At that time, you may ask your questions, if

20  any.

21          I ask that you keep your phone lines muted unless you

22  are going to be speaking.  Please note that this meeting is an

23  opportunity for creditors to examine the debtor under oath

24  about the debtor's general financial affairs.  This is not the

25  time to ask questions about your particular claim or contract.

1        This case was commenced on February 12th, 2025.
2   Notice of this 341(a) meeting, just give me a second --

3        MS. PLACONA:  Jeff, just for clarification, we filed
4   I believe February 10th.  If I heard you, I think you said the
5   10th -- the 12th.

6        MR. SPONDER:  Okay.  I will check.  Sorry about that.
7   So February 10th, 2025, the case filed.  Notice of the 341(a)
8   meeting was provided on February 20th, 2025 at Docket Number
9   39.  Notice of the telephonic 341(a) meeting, which included
10  the dial-in number to access the meeting, was filed on February
11  14, 2025 at Docket Number 26.

12       On February 20th, 2025, also a notice of adjournment
13  of the meeting of creditors was filed at Docket Number 39 which
14  scheduled a 341 meeting for March 19th of 2025.  Shortly
15  thereafter, on March 17, 2025, a notice advising creditors of
16  the adjourned date of the 341(a) meeting would be March 31st,
17  2025 at 10 a.m. and included the call-in number.

18       The schedules and Statement of Financial Affairs were
19  filed on February 24th, 2025 at Docket 59.  It appears that
20  amended schedules were filed on February 26th at Docket 72.  It
21  further appears that a summary of schedules was filed on
22  February 27th, 2025 at Docket Number 79.  And then it looks
23  like there was another -- more amended schedules filed on March
24  17, 2025 at Docket Number 122 and a summary of assets and
25  liabilities filed a day later at Docket Number 129.

1          All right.  Before we get started, let me get an

2   appearance from debtor's counsels, please.

3          MS. PLACONA:  Good morning.  Sari Placona, McManimon,

4   Scotland & Baumann, and Anthony Sodono on behalf of the debtor

5   who is in the room with us.

6          MR. SPONDER:  Great.  And is there anyone else

7   appearing on behalf of the debtor today?

8          MR. ADAMS:  Good morning, Jeff, it's Christopher

9   Adams with McCarter & English for Mr. Heller.

10          MR. SPONDER:  Thank you, Mr. Adams.  I appreciate it.

11   All right.  And as I said before we got on the line, for those

12   of you that are on the phone, I will specifically call each of

13   you after I complete my questioning.  And if you haven't done

14   so already, please send me an e-mail with your information and

15   who you represent, okay?  Thank you.  All right.

16          Mr. Heller, good morning.

17          MR. HELLER:  Good morning, Mr. Sponder.

18          MR. SPONDER:  And can you state your full name and

19   spell your full name for the record?

20          MR. HELLER:  Certainly.  Daryl Fred Heller,

21   D-a-r-y-l, F-r-e-d, H-e-l-l-e-r.

22          MR. SPONDER:  And can you raise your right hand and

23   let me know when it's up?

24          MR. HELLER:  It's raised.

25          MR. SPONDER:  Thank you.

Case 25-11354-JNP   Doc 696-3   Filed 10/08/25   Entered 10/08/25 16:31:20   Desc
Exhibit Condot Joan-Trans-Winted-841a   Page 7 of 292

7

1               DARYL FRED HELLER, DEBTOR, SWORN

2          MR. SPONDER:  And your counsel provided me with a

3    copy of your Pennsylvania Driver's License which does not

4    expire until 2/27 of '26, as well as your United States

5    Passport which doesn't expire until 2034.  So I thank you for

6    providing those documents for proof of yourself.  I appreciate

7    that.  I know counsel advised where you're located off the

8    record, but can you advise where you are today right now?

9          MR. HELLER:  We are in McCarter & English office in

10   Newark, New Jersey.

11         MR. SPONDER:  And I understand that there are

12   individuals present with you.  I understand Mr. Adams, Mr.

13   Sodono and Ms. Placona.  Are there any other individuals there

14   with you?

15         MS. SORVINO:  Yes.  It's Heidi Sorvino, counsel to

16   Heller Capital Group and Heller Investment Holdings.

17         MR. SPONDER:  Thank you.  And is there anyone else

18   there with you?

19         MR. HELLER:  No, that is everyone.

20         MR. SPONDER:  Okay.  So a nice full house.  I got

21   you.  All right.  Are you under the influence of any alcohol or

22   narcotics that would affect your testimony today?

23         MR. HELLER:  I am not.

24         MR. SPONDER:  What is your home address?

25         MR. HELLER:  909 Greenside Drive, Lititz, PA 17543.

8

1      MR. SPONDER:  And what's the best way to contact you

2 by telephone?

3      MS. PLACONA:  Jeff, sorry, I'm not comfortable

4 putting his cell phone on the record with all these creditors.

5 You and I can just talk offline if that's okay.

6      MR. SPONDER:  Okay.  You can provide it to me via

7 e-mail.  Someone is not on mute.  So the person's that speaking

8 now, you're not on mute.  Please, everyone, make sure you're on

9 mute.  Thank you.

10      I want to go over some ground rules for this 341(a)

11 meeting.  Mr. Heller, if you don't understand a question,

12 please let me know as I can rephrase the question.  If you

13 estimate information, please tell me that you are estimating.

14      As I mentioned earlier, this meeting is being

15 recorded to create a record.  As such, please answer questions

16 with yeses or nos instead of uh-huhs or the like.  In addition,

17 only one of us may speak at a time.

18      Also, your counsels are on the line or with you and

19 may interject an objection to a question.  If that happens,

20 please wait for us to discuss the objection before providing

21 your answer.  Do you understand those ground rules?

22      MR. HELLER:  I do.

23      MR. SPONDER:  Great.  I have a few questions first

24 for either Ms. Placona or Mr. Sodono.  Other than representment

25 of the debtor in this case, do you have any previous or ongoing

Case 25-11354-JNP    Doc 696-3    Filed 10/08/25    Entered 10/08/25 16:31:20    Desc
Exhibit Int of Joan Transcript of 341a    Page 9 of 29

9

1    relationship, business or otherwise, with the debtor?

2         MS. PLACONA:  No.

3         MR. SPONDER:  And as a result, your firm is not a

4    pre-petition creditor of the debtor, is that correct?

5         MS. PLACONA:  No, we drew down for pre-petition

6    services which was disclosed in our retention application.

7    That was only in connection with the bankruptcy filing.

8         MR. SODONO:  Right.  Her services are rendered

9    contemporaneous with the filing.  We were only retained maybe a

10   week before, maybe couple days.

11        MR. SPONDER:  No, understood.  So, at the time of the

12   filing, your firm was not a creditor of the debtor because you

13   drew down, correct?

14        MS. PLACONA:  Correct.

15        MR. SPONDER:  Thank you.  And I saw you filed a

16   2016(b) statement and it shows that there was a retainer of

17   40,738, is that correct?

18        MS. PLACONA:  That's correct.

19        MR. SPONDER:  And the source of the retainer was from

20   Mr. Heller's wife, is that correct?

21        MS. PLACONA:  That's correct.

22        MR. SPONDER:  All right.  Do you anticipate receiving

23   any post-petition retainers?

24        MR. SODONO:  Retainers, no.

25        MR. SPONDER:  And do you have any agreements

1  regarding the referral of the case?

2              MR. SODONO:  No.

3              MR. SPONDER:  All right.  So back to you, Mr. Heller.

4                        EXAMINATION

5  BY MR. SPONDER:

6  Q    Do you have a copy of the petition that was filed on

7  February 10, 2025 at Docket Number 1?

8  A    Yes, I do.

9  Q    And do you have a copy of the schedules and Statement of

10 Financial Affairs filed on February 24, 2025 at Docket Number

11 59?

12 A    I have Docket 62.  I do -- will find a source of --

13             MR. SPONDER:  No problem.

14             MS. PLACONA:  What's the docket, Jeff?

15             MR. SPONDER:  59, I believe that's the amended

16 schedules and Statement of Financial Affairs.

17 A    Yes, I do now.

18 Q    Okay.  And do you have the amended schedules that were

19 filed at Docket Number 72?

20             UNIDENTIFIED SPEAKER:  52.

21             MR. SPONDER:  72.

22             MS. PLACONA:  I'll get (indiscernible) for now.  I

23 think he hasn't --

24             MR. SPONDER:  Okay.

25             MS. PLACONA:  They're not printed out in front of

1  him, but we have them on the screen.

2        MR. SPONDER:  Okay.  I mean, as long as he can see

3  them when I get to them.

4  Q    Next is do you have the summary of schedules that was

5  filed at Docket Number 79?

6        MS. PLACONA:  What's the number?

7        MR. SPONDER:  Seven-nine.

8        MS. PLACONA:  We'll also pull it up on the screen for

9  him, Jeff.

10       MR. SPONDER:  Okay.

11 Q    And then we have -- do you have in front of you or

12 available the amended schedules that were filed at Docket

13 Number 122?

14 A    Yes.

15 Q    And, lastly, the summary of assets and liabilities that

16 were filed at Docket Number 129?

17 A    Yes.

18 Q    Okay.  Have you filed any previous bankruptcy cases in the

19 last eight years?

20 A    I have not.

21 Q    Have you filed any previous bankruptcy cases for any

22 affiliates or companies that you own?

23 A    No.

24 Q    Did you review the petition that was filed on February

25 10th, 2025 at Docket Number 1?

1  A    Along with my lawyers, yes, I did.

2  Q    And is the information contained in the petition true and

3  accurate to the best of your knowledge?

4  A    To the best of my knowledge.

5  Q    To the best of your knowledge, yes?

6  A    Yes.

7  Q    Thank you.  If you turn to Docket Number 1, it has page

8  numbers in the top of the page.  Do you see that?

9  A    I do.  And it is in front of me.

10  Q    Great.  If you turn to Page 6 of 15 of Docket Number 1 and

11  let me know when you're there.

12  A    I am there.

13  Q    Great.  And Part 7 on the bottom includes an s/ with your

14  name, do you see that?

15  A    Yes, I do.

16  Q    And do you understand that the s/ of your name is a

17  representation from your counsel that you, in fact, signed the

18  petition?

19  A    Yes, I do.

20  Q    And did you actually sign the petition on February 10th of

21  2025?

22  A    Yes.

23  Q    Do you understand that you signed the petition under

24  penalty of perjury?

25  A    Yes.

1          MR. SPONDER:  Ms. Placona or Mr. Sodono, please

2   confirm that your office is holding the original petition with

3   Mr. Heller's wet signature?

4          MS. PLACONA:  Yes.

5          MR. SPONDER:  Thank you.

6   Q    Next, if I didn't say it earlier, but if you have Docket

7   Number 2 which is the certificate of credit counseling, if you

8   don't, that's fine.  I can just ask you questions if you

9   remember about it.

10  A    I don't have that document.

11  Q    Okay.  Do you remember taking the credit counseling course

12  via the Internet on February 10th, 2025 at 11:20 a.m.?

13  A    Yes.

14  Q    And is there anything that you would like to revise in the

15  petition at this time?

16  A    I don't recall all those questions.

17  Q    Your answer broke up a little bit, I'm sorry.

18  A    Yeah, I do not recall the answers or all those questions,

19  so I to the best -- yeah.

20  Q    All right.  So there's nothing --

21         MS. PLACONA:  Yes.  Jeff, if through the course of

22  the bankruptcy it's determined that an amendment needs to be

23  filed, we will do so.

24         MR. SPONDER:  Okay.  Thank you.  Just to let you

25  know, we're going to go through each of these documents that I

Heller - Sponder                                    14

1  stated earlier with similar questions, Mr. Heller, so that we

2  have your signature and all that information on the record.

3  So, I apologize, but I have to go through each one separately.

4  Q    So the next one is Docket Number 59.  And can you turn to

5  that document if you have it in front of you?

6  A    Yes, I have it.

7  Q    All right.  And did you review Docket Number 59 which

8  includes schedules and the Statement of Financial Affairs that

9  were filed on February 24th, 2025?

10  A    Along with my lawyers, yes, I did.

11  Q    All right.  Can you turn to Page 34 of 53 and let me know

12  when you're there?

13  A    I am there.

14  Q    Great.  And as you can see, that page contains a

15  declaration about an individual debtor's schedules, is that

16  correct?

17  A    Correct.

18  Q    Similar to the petition that we just looked over, there

19  appears to be an s/ with your name.  Do you see that on the

20  bottom?

21  A    I do.

22  Q    Again, do you understand that the s/ of your name is a

23  representation by your counsel that you signed this

24  declaration?

25  A    Yes, I do.

1  Q    And did you sign this declaration on February 24th, 2025?

2  A    Yes, I did.

3  Q    And do you understand that you signed the declaration

4  under penalty of perjury?

5  A    Yes.

6        MR. SPONDER:  Ms. Placona or Mr. Sodono, can you

7  confirm that your office is holding the original declaration

8  with Mr. Heller's wet signature?

9        MS. PLACONA:  That's correct.

10       MR. SPONDER:  Ms. Placona, so I don't have to ask

11 this question each time, are you holding all of the

12 declarations or -- and wet signatures of the debtor at your

13 office?

14       MS. PLACONA:  That's correct.

15       MR. SPONDER:  Okay.

16 Q    Mr. Heller, is there anything that you would like to

17 revise in the schedules or in the declaration other than what

18 has already been revised in the amended schedules filed with

19 the court at Docket Number 72 and 122?

20 A    To my knowledge, no.

21 Q    Okay.  At this time, do you anticipate filing any further

22 amended schedules?

23 A    To my knowledge, no.

24 Q    All right.  Next, can you turn to Page 35 of 53 at Docket

25 Number 59 and let me know when you're there?

1          MR. SODONO:  Mr. Sponder, as to that last

2   (indiscernible) the last question, obviously if information is

3   -- we come across certain information or if Mr. Heller does,

4   then, of course, on a rolling basis we're going to amend the

5   petitions.

6          MR. SPONDER:  Oh, appreciate that, Mr. Sodono, and

7   thank you.

8   Q     So my question, Mr. Heller, was if you could turn to Page

9   35 of 53 of Docket Number 59.  Let me know when you're there.

10  A     I am there.

11  Q     All right.  And this appears to be the Statement of

12  Financial Affairs, is that correct?

13  A     That is correct.

14  Q     And can you next turn to Page 44 of 53 of Docket Number

15  59?

16  A     I am there.

17  Q     And this page appears to be a declaration concerning the

18  Statement of Financial Affairs, is that correct?

19  A     That is correct.

20  Q     All right.  Similar to the petition and the other

21  declarations, there appears to be an s/ with your name, is that

22  correct?

23  A     I'm on my -- you're saying Page 43?

24  Q     44 of 53.

25  A     Yes, that's correct.

1  Q    Okay.  And do you understand that the s/ of your name is a

2  representation by your counsel that you signed the declaration?

3  A    Yes.

4  Q    And did you sign the Statement of Financial Affairs

5  declaration on February 24th of 2025?

6  A    I did.

7  Q    Do you understand that you signed the Statement of

8  Financial Affairs declaration under penalty of perjury?

9  A    I do.

10 Q    Okay.  Next, did you review the amended schedules and

11 amended Statement of Financial Affairs filed on February 26,

12 2025 at Docket Number 72?

13 A    Yeah, I do not have that docket in front of me.

14      MR. SPONDER:  Okay.  All right.  Is there any way to

15 get that document in front of Mr. Heller or do I need to come

16 back to it after I go through the other ones?

17      MS. PLACONA:  Jeff, what document are you looking

18 for?

19      MR. SPONDER:  72.  It's the amended schedules.

20      MS. PLACONA:  Sure.  Hold on.  I'll pull it up on my

21 computer and go sit next to him.

22      MR. SPONDER:  Okay.  Thank you.

23      MS. PLACONA:  Okay.  We're here.

24 Q    All right.  So if you can turn to Page 12 of 26 and let me

25 know when you're there?

1          MS. PLACONA:  Okay.

2    Q    Thank you.  And, Mr. Heller, Page 12 of 26 appears to be a

3    declaration concerning the amended schedules, is that correct?

4    A    Yes.

5    Q    And similar to the petition and other declarations that we

6    just went over, there appears to be an s/ with your name, is

7    that correct?

8    A    That is correct.

9          MR. SPONDER:  Someone is typing again.  I'm sorry.

10   Q    Mr. Heller, do you understand that --

11         MR. SPONDER:  Someone's still typing.

12         MS. PLACONA:  Yeah, that person needs to please stop.

13   It's actually very disturbing while we're trying to listen to

14   the questions.

15         MR. SPONDER:  Right.  Stop typing or put yourself on

16   mute.  Preferably put yourself on mute.  We appreciate that.

17   Q    All right.  Mr. Heller, do you understand that the s/ of

18   your name is a representation by your counsel that you signed

19   this declaration?

20   A    I do.

21   Q    And did you sign this declaration on February 26, 2025?

22   A    I did.

23   Q    Do you understand that you signed the declaration

24   concerning the amended schedules under penalty of perjury?

25   A    Yes.

Heller - Sponder                    19

1  Q    Next, if you can turn to Page 22 of 26 of this document

2  which is Document Number 72?

3          MS. PLACONA:  I don't know.  But, Jeff, I'm going to

4  just ask again for everyone please put themselves on mute.

5  Whoever's typing right now, please check that your phone is on

6  mute.

7          MR. SPONDER:  Right.  I'm not going to continue the

8  341 if we're not going to have peace and only two lines open.

9  So we'll have to do this all over, again, if that's the case.

10 All right.

11         MS. PLACONA:  We are on Page 22 when you're ready.

12         MR. SPONDER:  Thank you, Ms. Placona.

13 Q    All right.  Similar to the petition and the other

14 declarations there, this appears to be a -- well, I'll back up

15 a little bit, sorry.  This appears to be a declaration

16 concerning the Statement of Financial Affairs, the amended one,

17 is that correct?

18 A    Correct.

19 Q    And there's an s/ with your name, is that correct?

20 A    Correct.

21 Q    And do you understand that the s/ of your name is a

22 representation by your counsel that you signed this

23 declaration?

24 A    I do.

25 Q    And did you sign the amended Statement of Financial

1 Affairs declaration on February 26, 2025?

2 A    I did.

3 Q    All right.  Do you recall what changes, if any, were made

4 in the amended schedules and the amended Statement of Financial

5 Affairs in Docket Number 72 as compared to Docket Number 59?

6 A    I do not.

7        MR. SPONDER:  All right.  That's me typing.  Sorry,

8 sorry.

9        MS. PLACONA:  I don't even hear it.

10       MR. SPONDER:  Okay.  Good.

11 Q    All right.  Mr. Heller, is the information contained in

12 the Statement of Financial Affairs in Docket Number 72, as well

13 as the Docket 59, true and accurate to the best of your

14 knowledge?

15 A    To the best of my knowledge, yes.

16 Q    Thank you.  And, at this time, is there anything you would

17 like to revise in the Statement of Financial Affairs filed at

18 either Docket Number 59 or Docket Number 72?

19 A    At this time, no.

20       MR. SPONDER:  And that, of course, is subject, Mr.

21 Sodono, to any revisions that need to be made subsequent to

22 this after the 341, correct?

23       MS. PLACONA:  That's correct.  It's the same

24 representation made by Mr. Sodono earlier.

25       MR. SPONDER:  Thank you, Ms. Placona.

1  Q     Next, can we turn to Docket Number 79?

2          MS. PLACONA:  It's on my screen again.  I'm next to

3  Mr. Heller.

4  Q     Excellent.  And, Mr. Heller, Docket Number 79 appears to

5  be a summary of assets and liabilities, is that correct?

6  A     Correct.

7  Q     And this same document was filed with Document Number 59.

8  Do you know if there are any changes to this document?

9  A     Not at this time.

10          MS. PLACONA:  Jeff, I'm really trying not to be

11  difficult.

12          MR. SPONDER:  Okay.

13          MS. PLACONA:  It's just a little hard.  I guess I'm

14  just asking everyone one more time which is why I'm speaking

15  loudly.  Maybe people who aren't listening so clearly to me, if

16  they can please just hit mute while they're typing.  It's very

17  distracting.  So now I hear nobody typing, which I appreciate

18  and I thank everyone.  So, again, thank you.

19          MR. SPONDER:  Thank you, Ms. Placona.  I appreciate

20  it.  Hopefully the fifth time we'll be listened to.  But I'm

21  not so sure.

22  Q     All right.  So next we'll go, let's go to Docket Number

23  122.

24  A     I have it in front of me.

25  Q     Great.  And did you review these amended schedules before

1  they were filed?

2  A    Along with my lawyers, yes, I did.

3  Q    And do you know what changes, if any, were made in the

4  amended schedules?

5  A    The amended -- repeat the question, please.

6  Q    Do you know what changes were made in these amended

7  schedules?

8           MS. PLACONA:  Only if you can remember, you know,

9  sitting here.

10 A    Yeah, I do not.

11 Q    Okay.  And can you turn to Page 22 of 24 of Docket Number

12 122 and let me know when you're there?

13 A    I am there.

14 Q    As you can see, Page 22 of 24 of Docket 122 is another

15 declaration concerning amended schedules, is that correct?

16 A    That is correct.

17 Q    And there appears to be an s/ with your name, like the

18 other declarations, is that correct?

19 A    That is correct.

20 Q    Do you understand that the s/ of your name is a

21 representation by your counsel that you signed this

22 declaration?

23 A    I do.

24 Q    And did you sign this declaration on or about March 17,

25 2025?

1  A    Yes, I did.

2  Q    Do you understand that you signed the declaration

3  concerning the amended schedules under penalty of perjury?

4  A    I do.

5  Q    Mr. Heller, is there anything that you would like to

6  revise in the schedules at Docket 59 or amended schedules at

7  Docket 72 and 122 or in the declarations at this time?

8  A    Not at this time.

9  Q    All right.  And does the information contained in the

10 schedules and amended schedules which were filed at Dockets 59,

11 72 and 122 accurately represent your financial position as of

12 the petition date?

13 A    Yes, subject to the disclosure that there has been

14 impairment and they will be reviewed again.

15 Q    All right.  What does impairment mean?

16         MS. PLACONA:  Yeah, I think for clarification the

17 answer is if something needs to be amended to be reflected

18 either an increase or a decrease in value or number, those

19 amendments will be filed.

20         MR. SPONDER:  Okay.  Thank you, Ms. Placona.

21 Q    Mr. Heller, is that what you meant by impairment?

22 A    That is correct.

23 Q    Thank you.  All right.  So last one we're going to go over

24 hopefully appears to be a summary of assets and liabilities at

25 Docket 129.  If you have that, can you turn to that document?

1  A    Docket 129, I have it.

2  Q    All right.  This is a summary of assets and liabilities.

3  Do you know why the second one was filed?

4  A    I do not.

5  Q    Okay.  Thank you for that.  Mr. Heller, have you retained

6  any other professionals other than your attorneys at McManimon,

7  Scotland & Baumann?

8  A    Yes, accountants.

9  Q    And accountants, that's DMC Group, is that correct?

10 A    Could you repeat that, please?

11 Q    Are the accountants DMC Group?

12 A    Yes.

13 Q    And are there any other professionals that you retained?

14 A    Other than this room?

15        MS. PLACONA:  Well, again --

16 Q    Yes.

17        MS. PLACONA:  -- I think on file, there's a retention

18 application for Mr. Adams from McCarter & English.

19        MR. SPONDER:  Okay.  And I think --

20        MS. PLACONA:  And there's also --

21        MR. SPONDER:  -- go ahead, Ms. --

22        MS. PLACONA:  -- I'm sorry, Jeff.  There's also a

23 broker in connection with the pending sale hearing on

24 Wednesday.

25 Q    And that's Goldcoast Sotheby's International, is that

1  correct, Mr. Heller?

2           MS. PLACONA:  That's correct.  Thank you for that.

3  A    That is correct.

4  Q    Thank you.  All right.  Mr. Heller, in your own words, why

5  did you file for Chapter 11 bankruptcy protection?

6  A    There was a TRO in place and there was multiple, you know,

7  compelling reasons to do it and upon discussion with my

8  lawyers, I came to a decision that it was best to bring that

9  level of transparency and order to the process.

10 Q    All right.  So you said there was a TRO in place.  What

11 type of TRO, what court?

12 A    I think it was pending.

13 Q    And was that pending in a case in Pennsylvania or another

14 state?  Or if you don't know, you don't know.

15 A    Yeah, I don't know.

16 Q    Okay.  And you said multiple compelling reasons, but you

17 didn't say the multiple compelling reasons.  What are the

18 multiple compelling reasons?

19 A    Well, the compelling reasons were the transparency, as

20 well as bringing order to the process.  And that decision was

21 made with counsel.

22 Q    All right.  You may not be able to answer this, Mr.

23 Heller, and it might be Mr. Sodono or Ms. Placona.  What is

24 your exit strategy here out of Chapter 11?

25           MR. SODONO:  We are still assessing the debtor's

1  options.  There are just a lot of moving parts as you can tell

2  by this folder, many parties.  And so we need to see how it

3  progresses over the next few weeks to determine what the claims

4  are and how we can resolve them, what a plan would look like.

5  So it's very, very difficult at this, at the kind of embryotic

6  stage.  We're trying to get through, you know, a sale, there's

7  a venue motion.  Until we do that, it's difficult to give you

8  specifics.

9         MR. SPONDER:  All right.  Understood.  Thank you, Mr.

10 Sodono.

11 Q    Back to you, Mr. Heller.  Did you receive any assistance

12 in preparing the petition or schedules, as well as amended

13 schedules other than from your counsel?

14 A    I did not.

15 Q    If you can turn to Docket Number 72, Page 8 of 26 and let

16 me know when you're there?

17 A    I am there.

18 Q    Great.  So this is Schedule I and it provides that you

19 were employed as an executive with Heller Capital Group, is

20 that correct?

21 A    That is correct.

22 Q    And you've been with Heller Capital Group for

23 approximately 11 years, is that correct?

24 A    Yes.

25 Q    And that you listed your gross monthly salary at being

1  $42,000.01, is that correct?

2  A    To the best of my knowledge, yes.

3  Q    And then your net salary, if you look on Page 9 of 26 at

4  Question Number 7, is 37,618 with 86 cents, is that correct?

5  A    To the best of my knowledge, yes.

6  Q    All right.  And then if you further go down, there's

7  Question 8(h) which asks for other monthly income.  It lists

8  income from K-1s from Heller Capital Group, LLC and Heller

9  Investment Holdings, LLC of 125,000 a month, is that correct?

10  A    To the best of my knowledge, yes.

11  Q    All right.  If you go further down, Paragraph or Question

12  13, you set forth that you expect a decrease in K-1 earnings

13  and much less income in future years.  Can you explain that a

14  little bit more?

15  A    That reference would pertain to all the pending lawsuits,

16  judgments and otherwise out there.

17  Q    Are you currently receiving $125,000 a month for K-1

18  income from Heller Capital Group, LLC and Heller Investment

19  Holdings, LLC?

20  A    Yeah.  K-1 earnings only show up at year-end, so it was a

21  projection.  It's not something that occurs monthly.

22  Q    Okay.  So you receive 125,000 times 12 months and you

23  receive that at the end of the year, is that correct?

24         MS. PLACONA:  Jeff, for what year were you referring

25  to?

1          MR. SPONDER:  I'm not referring to any year.  I'm

2     just referring to what's on Page 9 of 26 of Document Number 72.

3          UNIDENTIFIED SPEAKER:  Okay.  Let's look at Page 9.

4     This (indiscernible).

5          MS. PLACONA:  Okay.  One second, Jeff.  We're

6     reviewing Number 13.  Just give us a second.

7          MR. SPONDER:  Ms. Placona, I don't mind doing this,

8     however, it is a --

9          MS. PLACONA:  Yes, Jeff, go ahead.  You can repeat

10    your question, please.

11         MR. SPONDER:  Okay.  And he can just answer that he

12    doesn't know.  I can get the answer other ways, but for the

13    record I can't have him looking around everyone in the room for

14    the answer.  All right.  So --

15         MS. PLACONA:  He was just reading what was on the

16    schedules.  But, no problem, we understand.

17         MR. SPONDER:  No, likewise.  Okay.  Thank you.

18  Q    So what I was asking was whether or not you receive the --

19    well, you said, you already testified that you don't receive

20    125,000 a month, but you receive 12 months each of 125,000 at

21    the end of the year from K-1 income, is that correct?

22  A    No, my reference on that page speaks to historical.

23  Q    So what other monthly income are you expecting going

24    forward?

25  A    I don't know.  It's variable.  It's K-1 based.

1  Q    And who has control over the Heller Capital Group, LLC and

2  Heller Investment Holdings, LLC for purposes of including

3  amounts to be paid to you pursuant to a K-1?

4  A    A hundred and twenty entities.

5  Q    And how many of those 120 entities are owned and/or

6  controlled by you?

7  A    I don't know.

8  Q    Is it more than one?

9  A    Yes.

10  Q    Is it more than 20?

11  A    I don't know.  I'm not going to guess.

12  Q    Okay.  So you don't know if it's more or less than 20 out

13  of 120 companies, whether or not you own those companies?

14  A    Yup.

15  Q    Okay.

16         MS. PLACONA:  Jeff, I think he would need time to go

17  back and get you an answer.

18         MR. SPONDER:  Okay.

19         MS. PLACONA:  Right now he doesn't know the answer.

20         MR. SPONDER:  That's fair.  Thank you, Ms. Placona.

21  Q    All right.  So your income right now monthly, is that the

22  37,618.86 in Question 7 on Page 9 of 26?

23  A    I believe so.

24  Q    Do you get pay stubs, pay advices?

25  A    I do not.  It's a guaranteed payment given I own the

Heller - Sponder                        30

1   company.

2   Q    So I'm just trying to figure out why you wouldn't know

3   what the amount is that you receive.  That's all I'm asking.

4   If you -- you either know or you don't know.  You put down

5   37,618.86.  Is that the amount that you get paid monthly net?

6          MR. SODONO:  For a weekly, biweekly, monthly pay stub

7   or are you referring to a K-1 or a W-2?  I'm just trying to

8   understand the question a little bit.

9          MR. SPONDER:  Okay.  I can clarify, Mr. Sodono.

10  Q    Mr. Heller, you set forth on Number 7 on Page 9 of 26 that

11  you have take home pay net 37,618.86.  I asked you whether or

12  not that's what you take home and you said you weren't 100

13  percent sure.  I just want to know what your month -- is this

14  correct?

15  A    Approximately, that is correct.

16  Q    So when you say approximately, does that mean that some

17  months you get more, some months you get less?  Is that what

18  that approximately means?

19  A    Well, there is, it's based on 26 pays and there is twice a

20  year where there's a three-month pay.  So, yes.

21  Q    So this amount actually would be higher because of the two

22  extra pay periods, correct?

23  A    This is an average of.

24  Q    Okay.  Fair enough.  Thank you.  All right.  So when you

25  turn to Schedule J, if you would, and that's on Page 10 of 26,

1  let me know when you're there.

2  A     I am there.

3  Q     Question 2 asks for dependent's relationship and

4  dependent's age and you listed your daughter but did not put

5  her age.  Is there any reason why that wasn't disclosed?

6  A     No.

7  Q     All right.  What is your daughter's age?

8            MS. PLACONA:  Hold on a second.  I just want to --

9  you're looking for her age?

10           MR. SPONDER:  Right.  That's what's required on

11 Schedule J.

12 A     Nineteen.

13 Q     Thank you.  All right.  And if you continue on Schedule J,

14 at the bottom it lists 23 or actually we'll do 22© that your

15 monthly expenses are about, approximately 32,000, is that

16 correct?

17 A     That is correct.

18 Q     If you go up the page to Number 8, child care and

19 children's educations costs of 7,000, explain that for me,

20 please.

21 A     Please repeat the question.

22 Q     Certainly.  If you go up the page on Document 72, Page 11

23 of 26 to Number 8 for child care and children's education costs

24 of $7,000, can you explain what that expense is for?

25 A     That is tuition for my daughter.

1  Q    And that's tuition for college?

2  A    That is correct.

3  Q    Okay.  And then if you go down to Number 21 on the same

4  page, it lists allowances 1,500, can you explain what that

5  means?

6  A    Yeah, those are expenses that my daughter would absorb in

7  college, could be food, could be otherwise.

8  Q    So that's separate and apart of the $7,000 for tuition?

9  A    That is correct.

10 Q    All right.  Then if you further go down to 21, it has

11 miscellaneous 500 and what is that for?

12 A    That is just a catchall bucket.

13 Q    Okay.  And do you have any domestic support obligations?

14 A    I do not.

15 Q    All right.  I'm not sure if I went through it.  I know

16 that I did ask a few questions about the K-1 income.  What do

17 you expect the K-1 income to be for 2025, if you know?

18 A    I do not know.

19 Q    And when will you know?

20 A    2025 we would not know until likely September 15th of

21 2026.

22 Q    What was your K-1 income for 2024?

23 A    I do not know.

24 Q    And is there any way to find out?

25 A    No, K-1s are not completed, company returns are not

1  completed.

2  Q    Is there an expected amount that you are -- you believe

3  you will be receiving?

4  A    I do not know.

5  Q    How about 2023?

6  A    They were not completed either.

7  Q    When was the last year they were completed?

8  A    2022.

9  Q    All right.  So for 2022, what was your K-1 income, if you

10 remember?

11 A    I don't recall.

12         MR. SPONDER:  Okay.

13         MS. PLACONA:  Jeff, I do think I shared the last

14 filed tax return with Ms. Arendas as part of her inquiry.

15         MR. SPONDER:  Okay.  Great.  Thank you.

16 Q    All right.  Mr. Heller, what is your current marital

17 status?

18 A    Married.

19 Q    And will your spouse be contributing to your plan if we

20 get to that stage?

21 A    I don't know.

22 Q    Are any of your obligations also the obligations of any

23 other person or entity?

24 A    Could you repeat that question?

25 Q    Certainly.  Are any of your obligations also the

Heller - Sponder                                          34

1  obligation of any other person or entity?

2          MR. SODONO:  I think that really calls for a legal

3  conclusion, Jeff.  I don't know what is, all his personal

4  guarantees are, his obligations, indemnifications, so I don't

5  know that I can fairly answer that.  As long as he knows, but

6  if he doesn't --

7  A    I do not know.

8          MR. SPONDER:  Thank you, Mr. Sodono.

9  Q    So let's turn to Document Number 59, Page 29 of 53 and let

10 me know when you're there.

11 A    Which document was that again, Mr. Sponder, 59?

12 Q    59.

13         MS. PLACONA:  And, for the record, I don't hear any

14 typing, so thank you, everyone.

15 A    I've got Document 59.  Would you be so kind to give me the

16 page number, again?

17 Q    Of course, 29 of 53.

18 A    I am there.

19 Q    All right.  So this is co-debtors, so basically

20 obligations of any other person or entity similar to you and

21 you have your wife listed with Orrstown Bank and Randall Leaman

22 with Fulton Bank, is that correct?

23 A    That is correct.

24 Q    All right.  And your wife, with Orrstown, that is with

25 your property in Pennsylvania, is that correct?

Heller - Sponder                    35

1  A    Correct, as well as -- yeah.  Correct, as well as some

2  other business debt.

3  Q    Okay.  Mr. Leaman is -- that involves Fulton Bank and

4  that's on the Sea Isle City, New Jersey property, is that

5  correct?

6  A    Yes.

7  Q    And then it looks like on the bottom there, there are

8  personal guarantees, Heller Capital Group, LLC and Heller

9  Investment Holdings, LLC for liabilities listed on your

10 Schedules E/F as contingent debt, is that correct?

11 A    That is correct.

12 Q    Have you received the United States Trustee operating

13 guidelines?

14 A    Yes.

15 Q    Have you closed all your pre-petition bank accounts or has

16 an order been entered in the case allowing such accounts to

17 remain open?

18         MS. PLACONA:  Jeff, I'll jump in.  We did receive a

19 bank account order which allows the Truist account and the

20 account at Citi to remain open.  And he's been working with the

21 banks to get those labeled as DIP accounts.

22         MR. SPONDER:  Okay.  Thank you, Ms. Placona.

23 Q    And, Mr. Heller, have you opened any new debtor in

24 possession accounts?

25 A    I have not.

1 Q    Have you provided my office with proof of insurance?

2 Let's start with the Pennsylvania property.

3          MS. PLACONA:  Jeff, I do believe I shared that with

4 Ms. Arendas.

5          MR. SPONDER:  All right.  Just for the record, I did

6 speak with Ms. Arendas prior to this 341 meeting.  She does not

7 have any proof of insurance for the Pennsylvania property.

8 Q    How about, Mr. Heller, the Sea Isle City property?

9          MS. PLACONA:  Again, I do believe I shared that.  So

10 that's on me.  I will look back and I will get insurance to her

11 forthwith.

12          MR. SPONDER:  Okay.  Well, with respect to the Sea

13 Isle City property, Ms. Placona, just so you know, the document

14 that was provided to us, the insurance expired on August of

15 2023.

16          MS. PLACONA:  Okay.  We'll get you an updated

17 insurance.

18          MR. SPONDER:  Okay.  Thank you.

19 Q    And, Mr. Heller, I take it from Ms. Placona that you've

20 submitted the documents requested by my colleague Ms. Ardelean

21 concerning initial reporting requirements?

22 A    To the best of my knowledge, yes.

23 Q    So for purposes of --

24          MR. SPONDER:  I'm sorry, do you want to say

25 something, Ms. Placona?

1          MS. PLACONA:  No.  I wasn't really clear on the

2   question.  Are you talking about the monthly operating reports?

3          MR. SPONDER:  No, I'm talking about the e-mail that

4   you received from Ms. Ardelean asking for many different

5   documents, including the insurance documents.

6          MS. PLACONA:  Okay.  Thank you.

7          MR. SPONDER:  Okay.  And that's the same answer from

8   Mr. Heller, that you've provided most, if not all, the

9   documents that were requested by Ms. Ardelean?

10          MS. PLACONA:  That's correct.

11  Q    Okay.  So, Mr. Heller, all debtors must file monthly

12  operating reports and must pay statutory fees to the United

13  States Trustee Program quarterly.  Are you aware of these

14  requirements?

15  A    I am.

16  Q    Monthly operating reports are to be filed on or before the

17  21st of the month after the month to be reported.  So as for

18  this case, which was filed on February 10, 2025, the February

19  2025 report was due on or before March 21st, 2025.  Has the

20  February 2025 report been filed yet, to the best of your

21  knowledge?

22          MS. PLACONA:  Jeff, I'm going to answer this.  It has

23  not.  We're working with the accountant and we were going to

24  see if it was okay with U.S. Trustee's Office to do the  sub

25  pari for February with March.

1          MR. SPONDER:  It is not.  You're going to have to do

2   February by itself and March by itself.  I can answer that one

3   for you.

4          MS. PLACONA:  Okay.  No problem.

5          MR. SPONDER:  Do you anticipate when that will be

6   filed?

7          MS. PLACONA:  I would say by the end of next week.

8          MR. SPONDER:  Okay.

9   Q    So that you know, Mr. Heller, then the March report will

10  be due on or before April 21st, 2025 and so on.  Do you

11  understand this requirement?

12  A    Yes.

13  Q    And I take it that the accountants, as well as yourself,

14  will be drafting the reports?

15  A    Yes.

16  Q    Next, the debtor is responsible to pay statutory,

17  quarterly fees which are due 30 days after a calendar quarter

18  ends.  So, in this case, the first quarter of 2025 quarterly

19  payment is due on or before April 30th, 2025 and the quarterly

20  payments are based upon your disbursements during a calendar

21  quarter.  Do you understand this requirement?

22  A    Yes.

23  Q    Have you made any post-petition payments to any

24  pre-petition creditors without Court approval?

25  A    To my knowledge, no.

1  Q    And have you sold any assets post-petition or do you

2  intend to sell any of your assets?

3  A    No.

4       MS. PLACONA:  Again, for clarification, Jeff, the Sea

5  Isle property which has been noticed and a hearing is on

6  Wednesday.

7  Q    Does that refresh your recollection, Mr. Heller, that

8  you're moving to sell your Sea Isle City property?

9  A    Yes.

10 Q    Okay.  And, Mr. Heller, did you receive any PPP loans or

11 other assistance or funds related to the pandemic?

12 A    Yes, we did.

13      MR. SODONO:  Wait, wait, wait, hold on, hold on.

14      MR. SPONDER:  No, I --

15      MR. SODONO:  When you say you, you mean Mr. Heller

16 individually, correct?

17      MR. SPONDER:  Understood, Mr. Sodono.  I was going to

18 jump in and ask whether or not that was Mr. Heller, if that's

19 you individually.

20      MR. SODONO:  Okay.  Thank you.

21 Q    If it was you individually or if it were your companies?

22 A    My companies.

23 Q    Okay.  Thank you.  And are you current with your tax

24 returns?

25 A    I am not.  I cannot file my personal return until company

 1 has filed.

 2 Q    When was the last tax return that you filed?

 3 A    2022.

 4 Q    Do you anticipate filing those returns anytime soon?

 5 A    I'm working with an accountant.  That is the expectation.

 6          MR. SODONO:  Jeff, let me just clarify because he's

 7 got a new accountant.  We filed a retention app with the Court.

 8 That accountant has never done any work for Mr. Heller.  So

 9 that accountant is going through all the information.  And,

10 yes, he will file as soon as he acquires all the information

11 and, obviously, can put together a tax return.

12          MR. SPONDER:  Thank you, Mr. Sodono.

13 Q    Mr. Heller, is the new accountant also the accountant for

14 your other businesses or is this accountant just for you

15 personally?

16 A    It is for me personally.

17 Q    So, in other words, what you said you have to wait until

18 the companies' tax returns are filed, do you know when those

19 will be filed?

20 A    I do not.

21 Q    All right.  So, Mr. Heller, I understand you own some real

22 property, one piece of property in Pennsylvania and one in New

23 Jersey, is that correct?

24 A    That is correct.

25 Q    And what's the address of the Pennsylvania property?

1  A     909 Greenside Drive, Lititz, PA.

2  Q     And what do you believe the value of the property to be?

3  A     Somewhere in the 2.5 to 2.6 million range.

4  Q     Okay.  And if you want to follow, I am going through your

5  schedules.  You can look either on Docket 59 or Docket 122.

6  And I'm looking at Docket 122 right now on Page 1 of 24.  All

7  right.  Mr. Heller --

8         MS. PLACONA:  Okay.  Jeff, we're here.

9         MR. SPONDER:  All right.  I'm not going to -- I'm

10 going to kind of jump around, but I just wanted to tell you

11 that I'm going through the schedules now.

12        MS. PLACONA:  Thank you.

13 Q     So, Mr. Heller --

14 A     Thank you.  I appreciate it.

15 Q     No problem.  Mr. Heller, is there a mortgage or any liens

16 against the Pennsylvania property?

17 A     Yes, there is a mortgage with Orrstown Bank.

18 Q     And do you recall how much Orrstown Bank is owed?

19 A     To the best of knowledge, around 1.5, 1.6.

20 Q     All right.  And what is the monthly mortgage payment that

21 you pay to Orrstown Bank?

22 A     Around 13,000.

23 Q     And when was the last time you made the mortgage payment?

24 A     My (indiscernible) I'm not sure.  I think a couple weeks

25 ago and there's another one being made I believe early this

1  week.  But I'd have to confirm.

2  Q    So you're basically current with the Pennsylvania

3  mortgage?

4  A    There's the March payment was not made, but it's being

5  made.

6  Q    Okay.  And then you have, what's the address for the New

7  Jersey property?

8  A    I think it's 7605 Pleasure Avenue.

9  Q    Okay.  And that's in Sea Isle City?

10 A    Sea Isle City.  Yeah, I'm sorry, Mr. Sponder.  Yeah, Sea

11 Isle City, New Jersey.

12 Q    No problem.  And do you recall what the value of the Sea

13 Isle City property is?

14 A    Around 6.5 million.

15 Q    And I understand you own this with Mr. Leaman, is that

16 correct?

17 A    That is correct.

18 Q    And what percentage do you own and what percentage does

19 Mr. Leaman own to the best of your knowledge?

20 A    I don't know.

21       MS. PLACONA:  Well, so let me just clarify.  Pursuant

22 to the sale papers that were filed, Mr. Heller, and a recorded

23 deed, owns 76 percent of the home and Mr Leaman at 24 percent.

24 There is a dispute that there was a corrective deed that was

25 never recorded that provides Mr. Leaman with 30 percent which

1  would, in turn, give Mr. Heller 70 percent.  But right now,

2  again, the papers that we filed to sell the property allocate

3  76 percent to Mr. Heller.

4  Q    All right.  Mr. Heller, was the 76 percent/24 percent

5  based on the amount provided for the purchase of the property?

6           MR. SODONO:  You mean the amount of the down payment

7  or the property in total?  I'm trying to understand a little

8  bit, Mr. Sponder.

9           MR. SPONDER:  No, that's a good question, Mr. Sodono,

10 thank you.  So I'm just trying to understand what the 76

11 percent and 24 percent mean.  I guess it could be the down

12 payment.

13 Q    But, Mr. Heller, if you can clarify why there's a 76/24

14 percent difference?

15 A    I don't recall.

16 Q    Okay.  Is there a mortgage or any liens against the New

17 Jersey property?

18 A    Yes, there is.

19 Q    And is that with Fulton Bank?

20 A    That is correct.

21 Q    And do you recall what the amount is with Fulton Bank for

22 the mortgage?

23 A    Approximately 3.8 million, I believe, 3.7, 3.8.

24 Q    All right.  And do you recall what the monthly mortgage

25 payment is on that property?

1  A    I believe 20 or 21,000.

2  Q    And when was the last mortgage payment made on that

3  property?

4  A    I don't recall.

5  Q    Was it made within 2025?

6  A    No, I believe late 2024.

7  Q    So you're probably a couple of months past due with

8  respect to the mortgage?

9  A    I don't know, though likely.

10 Q    Okay.  And do you rent any of these properties, the

11 Pennsylvania property or the New Jersey property?

12 A    No.  The New Jersey property was rented maybe a couple

13 weeks a year and the Pennsylvania property, I reside in.

14 Q    And when was the last time the New Jersey property was

15 rented a couple of weeks per year, was that last year?

16 A    Yes.  Not this year, last year and when specifically, I

17 don't know.  It's like a week or two max.

18 Q    Okay.  So it's sometime summer 2024, I take it?

19 A    Likely.

20 Q    Okay.  And do you personally own any vehicles?

21 A    I do not.

22 Q    And do you own any household furnishings or goods?

23 A    Yes, I do.

24 Q    All right.  And right now, I'm going through, let's see.

25 So 122 if you want to follow, I'm going through that.  And

1  household furnishing and goods, you listed $50,000.  What

2  consists, what are the household goods and furnishings that

3  equal up to $50,000?  You don't have to be overly specific.

4  A    Yeah, I don't know.  That was a decision we came to with

5  counsel.  It's an approximate.

6  Q    All right.  So the furnishings and goods, the household

7  goods and furnishings, are those from both houses?

8  A    Yeah, I'm not even -- they're probably just Pennsylvania.

9  Q    Okay.  And is there a furniture and household -- and

10 goods, and household goods in the New Jersey property?

11 A    There is, though most, maybe not all, are being sold with

12 the property.

13 Q    Okay.  All right.  And it looks like you own some

14 electronics worth about 5,000.  I take it that includes

15 televisions and the like, is that correct?

16 A    That is correct.

17 Q    And do you have any collectibles of value such as

18 antiques, paintings, baseball cards?

19 A    No.  Yeah, I mean, I'm looking at probably the same page

20 you are.  There is some rifles there that are listed.

21 Q    Right.  That's for -- so you have some equipment for

22 sports and hobbies such as golf clubs, bikes, skis and then

23 some firearms, is that correct?

24 A    That's correct.

25 Q    But you have no antiques, paintings, baseball card

1 collection, stamps, coins, anything like that of value?

2 A     Not to my knowledge.

3 Q     All right.  So you believe that the golf clubs and the

4 sporting equipment is about 2,500, is that correct?

5 A     Correct.

6 Q     And that the firearms are about 15,000?

7 A     To the best of my knowledge, yes.

8 Q     All right.  Then you believe your used clothes are worth

9 about 5,000?

10 A     To the best of my knowledge, yes.

11 Q     All right.  And you, it looks like you listed that you own

12 some jewelry, some miscellaneous watches and rings, about

13 $2,000?

14 A     To the best of my knowledge, again, yes.

15 Q     And when you filed bankruptcy, do you recall how much cash

16 you had on hand or in your safe deposit box at home?  I think

17 it was about 3,000, does that sound about right?

18 A     To the best of my knowledge, yes.

19 Q     And what do you normally keep in your wallet or at home on

20 a daily basis?

21 A     You're referring to cash?

22 Q     Yes.

23 A     Yeah, those are generally approximate levels, perhaps a

24 bit more.

25 Q     All right.  And then you had two bank accounts which Ms.

1 Placona I think already advised the Trust account and Citibank

2 account and those are remaining open.  And at the time you

3 filed, Truist had 10,000 and Citibank had 20,000, is that

4 correct?

5 A    To the best of my knowledge, yes.

6 Q    And the coin base account, is that an account -- I'm not

7 getting the word, but what --

8 A    Crypto, crypotocurrency?

9 Q    Yes, is that a crypto account?

10 A    Yes.

11 Q    All right.  Do you still have that account?

12 A    I do but I've been blocked out of it.

13 Q    And who blocked you out of the account?  If you know.

14 A    I do not.

15 Q    And is there only $1,000 in it?

16 A    Again, to the best of my knowledge.  That's an

17 approximate.

18 Q    Right.  Is it a wallet?

19 A    Yeah, it's a coin-based account.  It was a coin-based

20 account with a wallet.  I've not been in it for many months.

21 Q    All right.  Do you own any stocks, bonds or publicly

22 traded stocks?

23 A    Right now, no.

24 Q    All right.  Right now means that you had some in the past?

25 A    I mean, yeah, over the years I would have, yes.

1 Q    Okay.  And then you list Heller Capital Group, LLC    in

2 your schedules as non-publicly traded stock and interest in

3 business and you have a fair market value of a hundred and

4 sixty million.  Is that correct?

5 A    Could you repeat the question?

6 Q    Oh, yeah, it was a long one but, okay.  So, I'm looking at

7 on Page 4 of 24 of Document 122, Question 19, list -- you're

8 required to list non-publicly traded stock and interest in

9 businesses and you included Heller Capital Group LLC with a

10 fair market value of one hundred sixty million, book value of

11 thirty-five million.

12        MS. PLACONA:  Are you asking him to confirm if that's

13 accurate?

14        MR. SPONDER:  Yes.

15 A    I mean, I put a disclosure in that we read earlier, so to

16 the best of my knowledge, yes.

17 Q    All right.  And then --

18 A    That's not as of today.  That's previous per my disclosure

19 on the documents.

20 Q    All right.  So this was filed on March 17, 2025.  Today is

21 March 31, 2025.  So, we're 14 days past.  Has that changed?

22 A    Yeah, the disclosure states, though, it relates back to

23 June 30th of 2024.

24 Q    All right.  The disclosure says this has been downgraded

25 from December 31, 2023, given impairment that occurred in the

Heller - Sponder                                        49

1  first six months of 2024.  Is that what you mean?

2  A    That is correct.

3  Q    Okay.  And then do you have an interest in Heller

4  Investments Holdings, LLC, is that correct?

5  A    That is correct.

6  Q    And you list it as a fair market value of 60 million, book

7  value of 28 million, is that correct?

8  A    To the best of my knowledge, yes.

9  Q    Then you list DHTC 50 percent and that it owns real

10  estate.  What property does DHTC own?

11  A    I just owns a vacant lot.

12  Q    Where?

13  A    In Lititz, Pennsylvania.

14  Q    And you own 50 percent.  Who owns the other 50 percent, if

15  you know?

16  A    Yeah, the partner on it is simply a neighbor -- Terrence

17  Curtin and it was just a lot between us.

18  Q    Okay.  Then you list iEmployee Services, LLC, you have a

19  hundred percent, worth zero.  Is that business operating?

20  A    It was a management company, so it's more of pass-through?

21  Q    Is it still operating?

22  A    Yes, to my knowledge, yes.

23  Q    And what does it operate -- or what does it manage, I

24  should say?

25  A    It had a management team inside of it for a group of

1 companies.

2 Q    Are the group of companies owned by you?

3 A    No, the group of companies are owned by an entity -- of an

4 entity that Heller Capital -- or Heller Investment Holdings

5 owned.

6 Q    Then you have Raw Adventures, LLC listed as a hundred

7 percent.  What type of business is that?

8 A    It's a funding company.

9 Q    And does it still operate?

10 A    Yes, it's still active.

11 Q    And has it funded anything recently?

12        MS. PLACONA:  Jeff, we need to take a break.  We need

13 to use the restroom and we need to handle a personal call.  Can

14 we please take a five minute break?

15        MR. SPONDER:  Certainly.

16        MS. PLACONA:  Okay.  Thank you.

17        MR. SPONDER:  We're going to take a five minute

18 break.

19                   (Off the record)

20        MR. SPONDER:  All right.  It is now 11:21.  We were

21 off the record for approximately six minutes.  We are back on

22 the record.

23        Mr. Heller, I was in the middle of asking some

24 questions.  I will continue if you don't mind.

25 Q    We just finished discussing The Raw Adventures as a

1 funding company and still operating.  Do you recall that?

2 A    I do.

3 Q    All right.  And then my next question is, do you have a

4 retirement or pension account?  It looks like you do -- a 401k

5 from Principal Group, is that correct?

6 A    That is correct.

7 Q    And have you taken any funds out of that account recently?

8 A    There were some hardship funds taken.

9 Q    And how much?

10 A    Approximately four hundred --

11 Q    Four hundred thousand?

12 A    -- thousand.

13 Q    And when was that taken out?

14 A    A couple of weeks ago.

15 Q    And since it was hardship, will you have to pay taxes on

16 the amount you took out?

17 A    Yes.  I think the taxes were taken out.

18 Q    So they were taken out already?

19 A    Yeah, I think.  To the best of my knowledge, yes, I think

20 there was a couple of different taxes, so I'm not clear on all

21 that.

22 Q    All right.  And what was the $400,000 used for?

23 A    It has not been allocated yet.

24 Q    All right.  And is there anything that it's supposed to be

25 allocated to?

Heller - Sponder                              52

1            MS. PLACONA:  Jeff, we're waiting on you, right?  Not

2   rushing you.

3            MR. SPONDER:  No, not waiting on me.  We're waiting

4   on Mr. Heller.  I asked what --

5            MS. PLACONA:  Jeff?

6            MR. SPONDER:  Can you hear me?

7            MS. PLACONA:  Jeff, did we lose you?

8            MR. SPONDER:  No, you shouldn't have lost me.

9            UNIDENTIFIED SPEAKER:  I can hear Jeff and Sari.

10           UNIDENTIFIED SPEAKER:  I can hear everybody as well.

11           MR. SPONDER:  Sari, can you hear us?

12           MS. PLACONA:  Can anyone hear me?

13           UNIDENTIFIED SPEAKER:  We all hear you.

14           UNIDENTIFIED SPEAKER:  We hear you, Sari.

15           MS. PLACONA:  Hello?

16           MR. SPONDER:  I'm going to stop the recording again

17  and send Ms. Placona an e-mail, everybody, so that we can get

18  this back on track, okay?

19                    (Off the record)

20           MR. SPONDER:  All right.  We're back on the record.

21  We had some technical difficulties.  So, I had a question

22  pending which you did not hear, Mr. Heller, which is why

23  everything went silent.

24  Q    And that is, you said you didn't have an allocation yet

25  for the $400,000 of hardship funds from your 401k.  Do you know

Heller - Sponder                                        53

1  what that's allocated for?

2  A    It is intended to be for legal.

3  Q    So, to pay legal expenses?

4  A    Generally, yes.

5  Q    How about as a retainer for your other counsel, Mr. Adams

6  at McCarter and English?

7  A    Yes, that could be part of it.

8  Q    Okay.  Are you owed a tax refund?

9  A    Could you please repeat the question?

10  Q    Certainly.  Are you owed a tax refund?

11         MS. PLACONA:  From what year?

12  A    Yeah, what year?

13  Q    For any and every year.

14  A    Yeah, taxes have not been filed so I don't know.

15  Q    Do you anticipate receiving a tax refund when your taxes

16  are filed?

17  A    I don't know.

18  Q    Okay.  Do you own any annuities, interest in IRAs, trusts

19  or any future interests in any properties?

20  A    Yeah, the 401k is a combination 401k and Roth IRA I

21  believe.

22  Q    Okay.  And do you receive any support from your family?

23         MS. PLACONA:  Financial support?

24         MR. SPONDER:  Correct.  Thank you.

25  A    I do not.

1  Q    And do you have any interest in any insurance policies?

2  A    Like life insurance?

3  Q    Yes, any insurance.  So, it could be health --

4        MS. PLACONA:  I think you're asking, in Mr. Heller's

5  name if he owned the policy, correct?

6  Q    Correct.  If, Mr. Heller, if you have any or own any

7  interest in health, disability or life insurance policies?

8  A    Yes, I would.

9  Q    All right.  And are those set forth in your schedules as

10 an ING VUL Whole Life Policy with a hundred eighty-three

11 thousand dollars surrender or refund value?

12 A    To the best of my knowledge, yes.

13 Q    And then you list various policies that are term with no

14 surrender value, is that correct?

15 A    To the best of my knowledge, yes.

16        MR. SPONDER:  Ms. Placona or Mr. Sodono, I'm going to

17 need a list of those various policies.

18        MS. PLACONA:  Sure.

19 Q    Mr. Heller, do you have any claims against any third

20 parties?

21 A    I do not.

22 Q    Are you owed any --

23        I'm sorry?

24        MS. PLACONA:  Hold on a second.

25        MR. SPONDER:  Yes, go ahead.

1        MS. PLACONA:   Can you just clarify your answer?   I

2   think you're asking if he individually has any claims, correct?

3        MR. SPONDER:   Correct.   Yes.

4        Everything I'm asking, Mr. Heller, if I don't

5   specify, is about you, you're the debtor, you personally.

6   Q    So, my question was, do you have any claims against any

7   third parties?

8   A    I don't know.   We're still reviewing.

9        MS. PLACONA:   I think at this point with

10  (indiscernible) there are discussions with the client and

11  counsel.   We're still navigating to see whether there are any

12  claims.

13       MR. SPONDER:   Okay.

14       MS. PLACONA:   Potentially.

15  Q    And then, you list in your schedules that you have not

16  taken payroll at Heller Capital for the six weeks prior to the

17  bankruptcy filing in the amount of $60,000.   Is that correct?

18  A    That is correct.

19  Q    Are you currently taking payroll post-petition?

20  A    I am.

21  Q    And are you going to seek repayment of the $60,000 as a

22  creditor of Heller Capital?

23  A    I don't know.   That decision is still being made with

24  counsel.

25  Q    Okay.   You list a membership with Bent Creek Country Club,

1  is that correct?

2  A    Correct.

3  Q    It has a value of zero.  Do you continue to pay for the

4  membership?

5  A    Correct.

6  Q    And how much is the membership?

7  A    I --

8           MS. PLACONA:  If you know.

9  A    I don't know.

10 Q    Is it a golf membership?  Do you have to pay for food, you

11 know -- I'll just leave it at that.

12 A    Could you repeat the question?

13 Q    Right.  Is it a country club where you pay to play golf

14 where you have to pay a certain amount of money for food over

15 the year?

16 A    There's no minimum food spent.

17 Q    Okay.  And --

18 A    I don't know, I'm not active there.

19 Q    Okay.  You're not active but you still hold the

20 membership.  Is that for purposes of business?

21 A    I live inside the community.

22 Q    Okay.  Understood.  All right.  We went through the

23 amended schedules on one twenty-two which includes the

24 schedules in Docket 59.  Do you own any other assets that have

25 not been listed on Schedule A/B or in the amended A/B to the

Heller - Sponder                                            57

1  best of your knowledge or recollection?

2  A    To the best of my knowledge, no.

3  Q    All right.  I'm going to back up a little bit.  And when

4  we were going through the businesses that you had, I neglected

5  to ask a question when we were -- when we went off record.  And

6  that question is, do you have any other ownership interest or

7  any ownership interest through Heller Capital Group or Heller

8  Investment Holdings?

9         MS. PLACONA:  Wait -- I'm -- please repeat it.

10 Q    Right.  So, I'll break it up.  Do you have any other

11 ownership interests other than what you set forth on your

12 schedules of businesses?

13 A    To the best of my knowledge, no.

14 Q    All right.  I've heard of Prestige Investment Group and

15 Paramount Management Group, LLC.  Do you personally own or own

16 any stock or shares through one of your companies -- of those

17 companies.

18         MS. PLACONA:  Of which entity?

19         MR. SPONDER:  Both Prestige Investment Group and

20 Paramount Management Group, LLC.

21         MS. PLACONA:  Well, I think we should take one by

22 one.

23         MR. SPONDER:  Okay.  That's fine.

24         MS. PLACONA:  I want to clarify the record.

25         MR. SPONDER:  That's fine, Ms. Placona.

1  Q    So, let's start with Prestige Investment Group.  Do you

2  have any ownership interest or an ownership interest through

3  one of your other companies?

4  A    Personally I do not.  Company-wise yes.

5  Q    And which company?

6  A    Heller Capital.

7  Q    And how much does Heller Capital own of Prestige

8  Investment?

9  A    I don't know.

10  Q    All right.  Would 60 percent as a class A member, would

11  that sound familiar or you still don't know?

12  A    I don't know.

13  Q    Okay.  And then Paramount Management Group, LLC, do you

14  have any ownership interest or ownership interest through one

15  of your other companies?

16  A    Personally no, Heller Capital yes.

17  Q    And do you know what percentage of that company Heller

18  Capital owns?

19  A    I do not know.

20  Q    Are there any other companies that Heller Capital Group or

21  Heller Investment Holdings own other than Prestige and

22  Paramount?

23  A    Yes.

24  Q    And are you able --

25        MS. PLACONA:  Wait -- I'm sorry, Jeff.

1           MR. SPONDER:  No, that's fine.

2           MS. PLACONA:  Please repeat it.

3    Q    Are there any other companies that either you own or have

4    ownership interest through Heller Capital Group or Heller

5    Investment Holdings other than Prestige Investment Group or

6    Paramount Management Group, LLC?

7           MS. PLACONA:  Hold on, I'm just objecting to the form

8    to some degree.  There is a lot in there.

9           MR. SPONDER:  Okay.

10          MS. PLACONA:  Maybe we can break it down.

11          MR. SPONDER:  Ms. Placona, I'll break it down.

12   Q    So, I think you've already answered a few times, Mr.

13   Heller that you don't have any other ownership interest.  So,

14   let's start with do you have an ownership interest through

15   Heller Capital or Heller Investment Holdings of any other

16   companies other than Prestige Investment Group or Paramount

17   Management?

18   A    I don't know.

19   Q    Okay.  And who would know?

20          UNIDENTIFIED ATTORNEY:  Could you repeat the

21   question?  I think there's still confusion on the question.

22   Would you be so kind to repeat it?

23          MR. SPONDER:  No problem.

24   Q    The question was, do you have any ownership interest

25   through Heller Capital Group or Heller Investment Holdings in

1  any other entities, besides what you've testified to, with

2  respect to Prestige and Paramount?

3         So, in other words, do you have an ownership interest

4  through Heller Capital Group or Heller Investment Holdings in

5  any other companies?

6  A    Thank you for the clarity, yes, I do, but I don't have the

7  documents in front of me.

8         MR. SPONDER:  I just ask, Ms. Placona, that you

9  provide the companies that he has an ownership interest through

10 Heller Capital Group or Heller Investment Holdings, okay?

11         MR. PLACONA:  Yes, sir.

12         MR. SPONDER:  Thank you.

13         All right.  Let's move on.

14 Q    All right.  Mr. Heller, are there any taxing authorities

15 that you owe for pre-petition taxes and, if so, that's probably

16 on your Schedule E/F on Document 59.

17 A    Docket 59?

18         MS. PLACONA:  Hold on, Jeff, he's just trying to

19 reference the document.

20         MR. SPONDER:  No problem.  That's why I said it.  I

21 think it's Page 15 of 53.

22 A    I am looking at Page 53.

23 Q    Fifteen of 53.

24 A    Oh, 15, I'm sorry.

25 Q    no problem.  And it's also going to be at Document 122 at

1  Page 8 of 24 if that's easier.

2  A    I am there.  Thank you.

3  Q    All right.  So, it looks like you owe the IRS

4  approximately 5.1 million, 5 million being priority, a hundred

5  thousand being nonpriority?

6  A    To the best of my knowledge, yes.

7  Q    So, I'm going to now be on Document 122, Schedules E/F

8  starting on Page 9 of 24 and we're going to go through some of

9  these unsecured creditors, okay?

10 A    Okay.

11 Q    All right.  So, like I said, Schedule E/F, Page 9 of 24

12 and Docket 122 you list Austin Business Finance in the amount

13 of 800,000.  Do you recall what that's for?

14         MS. PLACONA:  Only if you know.

15 A    I mean, it was a business loan.  I don't recall the

16 specificity of it.

17 Q    All right.  And do you know why it's listed as contingent?

18 Is that because it's a business loan?

19 A    Yeah, it's not to me personally, it's a business loan.

20 Q    All right.  So it's a personal guarantee?

21 A    I believe so.

22 Q    Okay.  Then if you turn to Page 10 of 24 in Docket 122,

23 you list Chicago Atlantic Advisors in the amount of 22 million.

24 Do you recall what that was for?

25 A    What page was that again?

1  Q     Page 10 of 24.  Chicago Atlantic Advisors, 22 million.

2  A     Do I recall what it is for?

3  Q     Yes.  Correct.

4  A     Yeah, it was a business operating loan.

5  Q     All right.  And you --

6  A     And a guaranty.

7  Q     Okay.  And you list this as contingent.  You list a lot of

8  these claims as contingent.  Is your answer going to be the

9  same for each of them, that they were guarantees?

10  A     That's correct.

11         MS. PLACONA:  And unless we need to specify

12  differently, I think that's a fair statement for now.

13         MR. SPONDER:  Okay.  So, I'll assume that.  If when I

14  get to other ones, if you need to jump in as to a different

15  reason for contingent, you can let me know, okay?

16         MS. PLACONA:  Thanks.

17  Q     All right.  So, we're staying on Page 10 of 24.  There's

18  Credibly Funding for $300,000.  Do you recall what that was

19  for?

20  A     Same answer as before.

21  Q     So it's a business loan?

22  A     That's correct.

23  Q     Then if we go to Page 11 of 24 on Docket 122, Deerfield

24  Capital is listed for 6.68 million.  Do you recall what that's

25  for?

1  A    Same purpose, business loan.

2  Q    All right.  The same page on the bottom, First

3  Commonwealth for 485,000, do you recall what that was for?

4  A    Same purpose, business loan.

5  Q    All right.  Page 12 of 24 lists three with First National

6  Bank, all contingent, for 1.5 million, 400,000 and 450,000.

7  And what were those for?  Were those business loans as well?

8  A    That is correct.

9  Q    Then if we turn to Page 13 of 24, you list Funders App,

10 LLC for 800,000, and what was that for?

11 A    Again, to the best of my knowledge it was a business loan.

12 Q    All right.  And then you have Libertas Funding on the same

13 page for 12 million, and what was that for?

14 A    Again, to the best of my knowledge, it would have been a

15 business loan.

16 Q    All right.  And then on the bottom, you have Mid Penn Bank

17 for 2.3 million.  What was that for?

18 A    To the best of my knowledge, business loan.

19 Q    Turn to Page 14 of 24.  You have three for Needham Bank at

20 9.5 million, 5 million and 38 million, and do you recall what

21 those were for?

22 A    Same purpose, again, to the best of my knowledge, business

23 loans.

24 Q    All right.  Then if you turn to Page 15 of 24, there are

25 two Orrstown Banks for 1.3 and 1.5.  And then on Page 16, three

Heller - Sponder                                64

1 more Orrstown Banks for 2.2 million, 275,000 and 300,000.  Were

2 those all business loans as well?

3 A    To the best of my knowledge yes, although one of those is

4 the loan on a residential.  So, one would be personal and the

5 other would be business.

6 Q    Okay.  Understood.  So, if you look at Page 16 to 24 on

7 the top, 2.2 million, is that the one involving, you believe,

8 the mortgage?

9 A    To the best of my knowledge, I believe it would be on Page

10 15, the 1.5 million.

11 Q    Okay.  And then the other ones are business loans,

12 correct?

13 A    Correct.

14 Q    So, if we turn to Page 17 of 24, there's Reliance Platinum

15 for 4 million.  Was that also a business loan?

16 A    To the best of my knowledge, yes.

17 Q    And then Silverview Credit Partners, 23 million.  Was that

18 a business loan?

19 A    To the best of my knowledge, yes.

20 Q    All right.  Turning to Page 18 of 24, Traditions Bank

21 600,000 -- what was that for?

22 A    To the best of my knowledge, again, a business loan.

23 Q    All right.  The next two are at Truist Bank for 375,000

24 and 120,000.  What are those for?

25 A    Same purpose.  Best of my knowledge, it would be a

1  business loan.

2  Q    And then on Page 19 of 24, UniBank is listed as 3.5

3  million.  What was that for?

4  A    Best of my knowledge, a business loan.

5  Q    And then Uivest, same page for 500,00, what was that for?

6  A    To the best of my knowledge, business loans.

7  Q    And then, finally, Westwood Funding 80,000, was that also

8  a business loan?

9  A    To the best of my knowledge, a business loan again.

10 Q    All right.  I notice from with respect to the difference

11 between Document 122 and Document 59, you had added a few other

12 creditors in unknown amounts.  And those -- let me see when I

13 get there -- those appear to be on Page 11 of 24, CT

14 Corporation System unknown amount.  Do you recall why this was

15 included?

16      MS. PLACONA:  Only if you know.

17 A    I don't know.

18 Q    Okay.  And then Page 10 of 24, in the middle, Corporation

19 Service Company, this one was added in the unknown amount.  Do

20 you know why that was included?

21 A    I don't know either.

22      MS. PLACONA:  So, Jeff, I'm sure you're aware of this

23 but I think a lot of times when you do, like, a judgment or a

24 lien search, sometimes the creditor name doesn't come up and

25 CSC is the party to contact.  So that's maybe where that had

Heller - Sponder                    66

1  come from.  Just for some clarity.

2           MR. SPONDER:  Okay.  That might be the agent for the

3  debt for the business?

4           MS. PLACONA:  Correct.

5  Q    And then, if you look, Mr. Heller, Page 17 of 24, you have

6  Superior Group ATMS on the bottom and that's for notice

7  purposes only.  Do you recall why this one was added or is it

8  the same reason possibly?

9  A    Yes, it is for the same reason.

10 Q    Okay.

11 A    I don't know why it was added.

12 Q    All right.  So I'm going to go now to Document 72 and I'm

13 going to go through the amended Statement of Financial Affairs.

14 And that starts on Page 13 of 26 on Document 72.

15          MS. PLACONA:  Page 13?

16          MR. SPONDER:  Yes.

17 A    I am there.

18 Q    All right.  So, Question 4 on the bottom on the amended

19 Statement of Financial Affairs at Page 13 of 26 in Document 72

20 provides your gross income from employment in 2024 and 2023 of

21 504,000, is that correct?

22 A    To the best of my knowledge, yes.

23 Q    is that what you believe the amount is going to be for

24 2025?

25 A    To the best of my knowledge, yes.

1  Q    All right.  Then you have Question 5 on Page 14 of 26 of

2  the same document, Document Number 72 provides your gross other

3  income from 2024 and 2023 of 1.5 million each year.  Is that

4  correct?

5  A    To the best of my knowledge, yes, it's the K-1 issue we

6  spoke about earlier.

7  Q    Correct.  And so for 2025, you don't know what that amount

8  is going to be is what I think you testified, is that correct?

9  A    That's correct.

10 Q    All right.  And then if we go down further, it looks like

11 you made payments exceeding 7,575 to creditors within 90 days

12 of the petition filing and you had provided list to be

13 provided.  Has that list been provided?

14         MS. PLACONA:  No, Jeff, it has not.  We're still

15 reviewing that with the accountant.

16         MR. SPONDER:  All right.  When do you anticipate that

17 because we're now approximately five weeks after this was

18 filed.

19         MR. SODONO:  You know, the accountant as you know,

20 has just been retained, we anticipate hopefully by the end of

21 next week.

22         MR. SPONDER:  All right.  I appreciate that, Mr.

23 Sodono.

24 Q    And then going down further, Page 15 of 26, it appears

25 that you were involved in several lawsuits before the

1  bankruptcy was filed.  Is that correct?

2  A    Yes.

3  Q    I don't need you to go into the details of each of these

4  litigations but I would like a brief overview if you have

5  knowledge of the litigations, and I'll go through them shortly

6  if you can.  But all I'm asking for is a brief overview of what

7  the case is about, okay?

8         MS. PLACONA:  Jeff, I think I'm going to answer.  I

9  mean, there are allegations in a complaint that need to be

10  responded to and merely has Mr. Heller as a defendant they are

11  allegations at best right now.  I think it's hard to give an

12  overall response to that.

13         MR. SPONDER:  Well, I disagree, Ms. Sodono (sic), I

14  mean, Deerfield Capital versus Accordo -- all I'm asking is

15  what is that case about -- why are you involved.  And I don't

16  think that raises any issues.  I'm not asking for any answer to

17  a complaint.  I'm just asking what, in his words, what he

18  believes that action entails and why he's involved.

19  A    I don't know all the details.

20  Q    Okay.  For any of these actions?  Or for just that first

21  one -- or the first two, Deerfield Capital?

22  A    Yes, I mean, the details of -- sorry, just scrolling

23  through it I do not know the details of all of these

24  Q    Okay.  So if you look at the third one, Orrstown Bank,

25  Orrstown Bank is the mortgage company for one of the

1 | properties, is that correct?

2 | A    That's correct.

3 | Q    And then there's the fifth one, Orrstown Bank.  Could

4 | those be possibly mortgage foreclosures or something different?

5 | And I'm just asking -- I don't know.

6 | A    I don't know.  I don't think there's any foreclosures in

7 | place but I don't know detail.

8 | Q    All right.  So, you don't have any details, again, on any

9 | of these, all of these lawsuits that are listed here?  If I

10 | were to go through them individually, your answer would be the

11 | same -- that you don't recall what the actions are about?

12 | A    That's correct.  I do not know the details of all of them.

13 | Q    Okay.  All right.  Next we're going to move over to Page

14 | 18 of 26 and you're required to list gifts above $600 within

15 | the two years prior to the bankruptcy filing.  And this one was

16 | actually amended from 59, Document 59, that is, and Document 59

17 | --

18 |         MR. SODONO:  What document again?

19 |         MR. SPONDER:   So, I'm looking at Document 72, Page

20 | 18 to 26.

21 |         MS. PLACONA:  Got it.  Yes, we're here.

22 |         MR. SPONDER:  All right.

23 |         And on Document 59, the same question was asked and

24 | that was Document 59, Page 40 of 53.

25 |         MS. PLACONA:  What's the question, Jeff?  I'm sorry.

1  Q    Right.  So, you're going to need both to make it easier

2  because on Document 59, Apex is listed as receiving a $240,000

3  gift which is no longer listed in Document 72.

4  A    Yeah, upon further review that was a decision we came to

5  with counsel.  There was, essentially, an administrative error

6  in the initial filing.  That's all it was.

7  Q    So there was no gift provided to Apex in March of 2024 of

8  240,000?

9  A    Yes, there was not.

10          MS. PLACONA:  That's correct.  There was not.  And

11 just for clarity.

12          MR. SPONDER:  No, I'm just --

13          MS. PLACONA:  I don't want to testify, I just want to

14 clean the record up.

15          MR. SPONDER:  No, thank you, Ms. Placona.

16 Q    Then you have listed -- so for purposes of Document 72 you

17 have your son, which I believe is Ethan Heller, is that

18 correct?

19 A    That is correct.

20 Q    And in January 2024, you gifted a hundred eighty thousand

21 dollars, is that correct?

22 A    That is correct.

23 Q    Are you aware of what those funds were used for?

24 A    Yeah, it was used towards a down payment of a house that

25 he is living in.

1  Q    All right.  And then you have you daughter who I believe

2  is Taite Heller, is that correct?

3  A    Yes, Taite, that's my daughter, yes.

4  Q    And she received a $35,000 gift in May of 2024, is that

5  correct?

6  A    Yeah, approximate timeline, yes.  And it was --

7  Q    Go ahead, it was for what?

8  A    I was saying it was potentially multiple gifts that

9  totaled 35,000 or approximately 35,000.

10 Q    All right.  Do you know what those gifts were used for?

11 A    They were -- yeah, they were just stipends.  They were

12 used for spending purposes on her side.

13 Q    Right.  And then you have listed, again, your son, Ethan

14 Heller, in and about April 2024, a transfer of a hundred

15 seventy-five thousand in Bitcoin, is that correct?

16 A    That's correct.

17 Q    And does your son still hold that Bitcoin, to the best of

18 your knowledge?

19 A    I don't know.

20 Q    And it was just a gift, correct?

21 A    That is correct.

22 Q    All right.  Were there any other gifts above $600 during

23 the two years prior to the bankruptcy filing?

24 A    Could you repeat that again, Mr. Sponder?

25 Q    Of course.  Other than what you've listed here, the three

1 gifts above $600, are there any other gifts that you gave

2 within two years of the bankruptcy filing above $600?

3 A    To the best of my knowledge, no.

4 Q    All right.  So, turning to Page 19 of 26, which is

5 question 16, it looks like you paid your counsel approximately

6 $40,738 on February 10th of 2025.  Is that correct?

7          MS. PLACONA:  Jeff, one second.  Mr. Heller would

8 just like to --

9          THE WITNESS:  Yeah, there was -- there's continued

10 diligence on this, but there was communication with legal over

11 the last couple of days that there may be another, albeit small

12 gift that is disclosed as well.

13          MS. PLACONA:  We may need to further amend the

14 schedule on the gifts.  That is what he is trying to clarify to

15 you.  I think he sent us an e-mail over the weekend.  We need

16 to review it and if it's necessary, we'll file an amendment.

17          MR. SPONDER:  Okay.  Is the gift to a family member

18 or someone else?  If you know or remember.

19          THE WITNESS:  Family member.

20          MR. SPONDER:  Since you haven't seen it or looked at

21 it, Ms. Placona, I'll not go into it next further other than

22 that it's a family member and you'll look at it and amend the

23 schedules if necessary, correct?

24          MS. PLACONA:  Correct.

25 Q    And, Mr. Heller, my question was, the next one, Page 19 of

Heller - Sponder                                73

1   26, was 40,738 paid to your attorneys on February 10, 2025, is

2   that correct?

3   A    Correct.

4   Q    And is this the payment that was made by your wife?

5   A    Yes.

6   Q    And then going further down on that page, it looks like

7   there was within two years before the bankruptcy, there was a,

8   it looks like your son purchased a house in January 2024 and

9   you were the co-signer on the mortgage and the deed, is that

10  correct?

11  A    That is correct.

12  Q    And did you put any money towards the purchase of the

13  property or is that what the gift was used for as we discussed

14  earlier, for a hundred eighty thousand dollars?

15  A    That is correct.

16  Q    So it was the gift of a hundred eighty thousand, correct?

17  A    That is correct.

18  Q    And you were originally on the mortgage and deed and you

19  removed yourself from both the mortgage and the deed?

20  A    Yes -- well, not the mortgage, I'm sorry.  I removed from

21  the deed.  So I believe I'm still a co-signer on the mortgage.

22  It was the intent to remove myself from the deed.

23  Q    All right.  And just to clarify, your son is Ethan Heller,

24  correct?

25  A    Correct.

Heller - Sponder                                    74

1  Q    All right.  And do you intend to institute any litigation

2  post-petition?  In other words, do you intend to sue anybody at

3  this time?

4  A    I don't know yet.

5  Q    Was any of your property attached, garnished or seized

6  during the year prior to the bankruptcy filing?

7  A    Attached, garnished or --

8  Q    Or seized.

9  A    I mean, there was some bank accounts frozen.  I'm not sure

10 what category that falls in.

11         MR. SODONO:  Personally?

12 Q    As Mr. Sodono said, were those personal bank accounts or

13 corporate bank accounts?

14 A    Both.

15 Q    Okay.  So, did you have any other bank accounts besides

16 the Truist and Citibank Account or were those the accounts that

17 were frozen?

18 A    Yeah, no other accounts and, yes, they are the accounts

19 that were frozen.  The Truist account, specifically, was

20 frozen.

21 Q    And they're no longer frozen, correct?

22 A    Correct.

23 Q    Were any of your assets repossessed or closed upon or

24 otherwise transferred during the year prior to the bankruptcy

25 filing?

1   A    To my knowledge, no.

2   Q    Was any of your property in the hands of as receiver or

3   other court appointed official as of the petition date or

4   during the year prior to the bankruptcy filing?

5   A    My personal holdings, no.  There may have been some

6   business holdings down the line that were.

7   Q    Okay, but nothing personal, correct?

8        MS. PLACONA:  No.

9   Q    I'm sorry.  So, my question which I think you said no or

10  said that you had business possibly, was any of your property,

11  personal property, in the hands of a receiver or other court

12  appointed official as of the petition date or during --

13  A    Personal property, no.

14  Q    And was any of the property that was in the hands of the

15  receiver owned by a company that you have an ownership interest

16  in through another company that you own?

17  A    Could you repeat the question, please?

18  Q    I'm going to try to.

19       UNIDENTIFIED ATTORNEY:  Hey, Jeff, someone's typing

20  again.  We're having a hard time hearing the question.  I'm

21  sorry.

22       MR. SPONDER:  Thank you.  So, that person that wasn't

23  typing before, you're back on typing, can you please put on

24  mute?

25  Q    So, my question is, was there a receiver appointed -- was

1  there a receiver appointed to any companies that you have an

2  ownership interest through other companies that you own?

3  A    Yes, there was.

4  Q    And do you recall which companies those were that had the

5  receiver?

6  A    At the time of filing, I -- I mean, I think it was

7  Paramount and Golden Gate, though, again, that's to the best of

8  my knowledge as of February 10th.

9  Q    All right.  Appreciate that.  And other than listing that

10 your home was broken into and that there was $50,000 of damage,

11 did you suffer any other losses from fie or theft or any other

12 casualties during the year prior to the bankruptcy filing?

13 A    I did not.

14        MR. SPONDER:  So, I've come to the conclusion of my

15 questions as of right now.  I may have more questions after

16 other people ask questions.

17        I am going to first ask Ms. Ardelean from my office

18 since she's on the line, hopefully, still, whether or not she

19 has any questions.  So, Ms. Ardelean, do you have anything to

20 add?

21        MS. ARDELEAN:  Not right now, thank you, Jeff.

22        MR. SPONDER:  All right.  Thank you, Ms. Ardelean.

23        All right.  So we're going to start with Mr. Lemkin.

24 If you can set forth your name and where you're from and who

25 you represent and you can ask your questions.

Heller - Lemkin                         77

 1          Again, I just ask everybody else to put yourself on

 2   mute.  I will put myself on mute to help us out as well.  Thank

 3   you.

 4          So, Mr. Lemkin, if you have any questions, please?

 5          MR. LEMKIN:  Yes, I do have a few, thank you.  It's

 6   Joseph Lemkin with Stark and Stark on behalf of a number of the

 7   Prestige Funds which we've listed, filed a notice of appearance

 8   on the docket.  There's over 25, so I won't go through them all

 9   here now but they're readily available on the docket.

10                          EXAMINATION

11   BY MR. LEMKIN:

12   Q    I just wanted to ask a few questions, specifically about

13   our investors that (indiscernible) Prestige invested a total of

14   515 million dollars from 2021 to 2023.  That money, according

15   to signed documents, was to purchase ATMs and place them into

16   operation, should have amounted to about 25,000 to 27,000 ATMs

17   in operation.  Mr. Heller, did that happen?

18          MR. SODONO:  We're not going to -- I mean, this is

19   now getting into specifics.  If Mr. Lemkin wants to serve Rule

20   2004, we'll consider it, but right now there's a motion

21   pending.

22          MR. LEMKIN:  I disagree.  These are closely held

23   companies with massive amounts of investments that

24   (indiscernible) relate or clearly lead to (indiscernible) to

25   this estate, and I think $515 million is significant and should

Heller - Lemkin                      78

1  be answered.

2          MR. SODONO:  Mr. Sponder, these have to do with non-

3  debtor entities and, you know, at the appropriate time, my

4  client will sit if there's a proper subpoena we'll address

5  these issues.  But these really don't have to do with the

6  debtor's petition schedules and Statement of Financial Affairs.

7          MR. SPONDER:  Mr. Lemkin and Mr. Sodono, I appreciate

8  Mr. Sodono, you throwing this back to me.  Fortunately or

9  unfortunately, I don't wear a black robe.  I'm not the judge.

10 If you are advising your client not to answer the question, you

11 know --

12         MR. SODONO:  I am.  I'm advising him not to answer

13 those questions.

14         MR. SPONDER:  Okay.  All right.  So --

15         MR. SODONO:  We will, obviously, answer at an

16 appropriate time.  So I'm not saying he'll never do it.  It's

17 just that at 341 it is just -- it's not appropriate.

18         MR. SPONDER:  All right.  And again, Mr. Lemkin, you

19 can make a record.  I will allow you to do that, you know, with

20 all of your questions.

21         But, you know, Mr. Sodono, if you are going to advise

22 your client not to answer, that's fine.  Just said it for the

23 record so that we have a clean record, okay?  That's all I ask.

24 Thank you.

25         MR. LEMKIN:  Thank you.  And just for the record, you

1  know, we believe it is appropriate but understand the position

2  of Mr. Sodono.  These are closely held companies that he has an

3  -- Mr. Heller has an interest in and that would have a

4  significant impact on the assets and liabilities in this case.

5  That's (indiscernible) the only record, then I'll put that --

6  for any other failure to respond, I'll just say the same thing.

7  I won't just keep repeating myself.

8  Q    Regarding -- the next question I'll skip over is regarding

9  the proposed budget or salary.  I just want to confirm, where

10  are you getting the -- Mr. Heller, the 40,000, or approximately

11  $40,000 a month of income?  Which entity?

12  A    Heller Capital, Heller Investment Holdings.

13  Q    One or both?  Can you break that down for us?

14  A    I don't have the breakdown, but a combination of both.

15  Q    Okay.  Also, I understand you've taken out money from

16  various (indiscernible) banks against receivables.  Where did

17  those funds go?

18        MR. SODONO:  Again, we'll address those at the

19  appropriate time.

20        MR. LEMKIN:  All right.

21  Q    Also, a promissory note at Golden Gate for 11.9 million,

22  what did you do with that money?

23        MR. SODONO:  Again, another non-debtor entity.  We'll

24  answer at an appropriate time.

25        MR. LEMKIN:  All right.  I just have a couple more

1  questions.

2  Q    You spoke much about the vehicle -- that you don't have

3  any vehicles in your name.  What vehicles do you use and whose

4  name are they in?

5       MR. SODONO:  As to that, he didn't say he used one.

6  Q    Do you use a vehicle, Mr. Heller?

7  A    Yes, I do.

8  Q    And what type of vehicle is that?

9  A    I have one vehicle.  It's a Mercedes Benz.

10 Q    And what year?

11 A    To the best of my knowledge, 2022 or 2023.

12 Q    Do you know the value of it?

13 A    I do not.

14 Q    Okay.  Next question.  Do you have ownership or any

15 interest in BitStop?

16       MS. PLACONA:  Is that the coin?  That was asked

17 already previously.

18       MR. LEMKIN:  I have it as BitStop.

19 A    Personally, no, I do not.

20 Q    Okay.  You mentioned another entity, funding entity,

21 called Raw, what particularly does Raw fund?

22       MS. PLACONA:  Are you asking what Raw Adventures

23 does?

24       MR. LEMKIN:  Yes.  Well, he said it's a funding

25 company, so I'm asking what they fund.

1          MR. SODONO:  Again, it's a non-debtor company.

2 We'll, again, we'll address it at the appropriate time, Mr.

3 Lemkin.

4          MR. LEMKIN:  All right.  I have no further questions

5 at this time.

6          MR. SPONDER:  All right.  Thank you, Mr. Lemkin.

7          This is Jeff Sponder again for the record.  Next, Mr.

8 Phillips, the examiner, or through your counsel, Mr. Gwynne, if

9 you have any questions, please set forth your appearances for

10 the record.  Thank you.

11         MR. GWYNNE:  Good afternoon.  Kurt Gwynne from Reed

12 Smith for the record.  I don't have any questions at this time

13 but I would like to, if I could, Mr. Sponder, reserve the right

14 depending on questions that other people may ask.

15         MR. SODONO:  Well, let me -- it's Anthony Sodono --

16 the examiner is not a creditor.  Obviously, Mr. Heller has been

17 cooperating with the examiner, providing information, answering

18 questions.  The examiner order provides that it will be done on

19 an informal basis.  So, I'm not sure -- it's a creditors'

20 meeting.  I'm not sure if an examiner has that right.  Mr.

21 Gwynne can send me some authority and I will consider it but I

22 don't -- this is a creditors' meeting.

23         MR. SPONDER:  Thanks, Mr. Sodono.  Jeff Sponder.  I'm

24 not sure either, Mr. Sodono, but as Mr. Gwynne said, he didn't

25 have any questions as of now.  Hopefully, you know, we won't

1  have to deal with that if he doesn't have any questions.  So, I

2  think we can hold off and go from there, okay?

3          So, next up on my list is Mr. Gutfleish.  Can you set

4  forth your name and appearance for the record if you have any

5  questions.

6          MR. GUTFLEISH:  Harry Gutfleish on behalf of Funders

7  App and Reliance Financial.  I have no questions at this time.

8  Thanks, Jeff.

9          MR. SPONDER:  Thank you, Mr. Gutfleish.

10          Next is Martin Weis, please.  Please put your

11  appearance on the record and if you have any questions.

12          MR. WEIS:  Good afternoon, Mr. Sponder.  Martin Weis

13  on behalf of Orrstown Bank.  Just a few questions if I could.

14                          EXAMINATION

15  BY MR. WEIS:

16  Q    Mr. Heller, regarding your residence in Lititz, PA.,

17  approximately how many acres is that?

18  A    I think approximately two -- so, two.

19  Q    All right.  And is there a vineyard on that property?

20          Sorry, was there an answer?

21  A    Yeah, I'm sorry, I said -- Mr. Weis, I said that is

22  correct.

23  Q    Okay.  I didn't catch that.  All right.  And do you make

24  wine or does anybody make wine out of the products of the

25  vineyard?

1          MR. SODONO:  I don't know what's there.  He's not

2  going to answer that.  We can get in there separately.  When I

3  file a 2004, we're happy to address all of these issues.

4      There's a pending motion, by the way, an objection by

5  Orrstown.  Orrstown certainly could have used 9014 to do some

6  discovery and ask all these questions.  So, my client at this

7  point, is not going to address that.

8          MR. WEIS:  I mean, that's a potential asset of the

9  estate, Mr. Sodono, and if you're instructing him not to

10  answer, the record will so reflect.

11          MR. SODONO:  Again, if you filed a motion 9014, you

12  could have filed some discovery.  It wasn't sent so this is not

13  really the appropriate time to address that.

14          MR. WEIS:   I respectfully disagree with that.

15          MR. SODONO:  I respectfully disagree to respectfully

16  disagree.

17          MR. WEIS:  Very good.

18  Q    With regard to the property in Lititz, are the real estate

19  taxes current?

20  A    To the best of my knowledge, yes.

21  Q    And is the property insured?

22  A    To the best of my knowledge, yes.

23          MR. WEIS:  And, Ms. Placona, I believe that you were

24  going to provide evidence of proof of insurance to the U.S.

25  Trustee's Office.  To the extent you haven't to already, would

Heller - Weis                              84

 1  you agree to provide it to Orrstown Bank as well?

 2          MS. PLACONA:  Of course.

 3  Q    Mr. Heller, are you familiar with a property located at

 4  1433 North Road, Westfield, Pennsylvania?

 5  A    Yes, I am.  I do not own it though.

 6  Q    And are you familiar with a vacation home located at RR 4

 7  Westfield, Pennsylvania?

 8  A    I am not.

 9  Q    Are you familiar with the Westfield area generally?

10          MS. PLACONA:  Westfield in what state?

11          MR. WEIS:  Westfield, Pennsylvania.

12          MR. PLACONA:  Thank you.

13  A    Yes, somewhat.

14  Q    To your knowledge, is North Road and RR 4 the same road?

15  A    To the best of my knowledge, I have no idea.

16  Q    Okay.  And is the vehicle that you drive leased?

17  A    No.  It's a loan.  Company.

18  Q    Did you say a specific company or did you just say

19  company?

20  A    Yeah, I said company.  To the best of my knowledge, I

21  believe it's Heller Capital.  I'm not a hundred percent sure.

22  Q    Is Heller Capital an operating entity right now?

23  A    Yes.  I mean, it's -- I mean --

24  Q    Sir, did you want to add anything to that?

25  A    No.

1  Q     Okay.  And is Heller Investments an operating entity?

2  A     Yes.

3  Q     And was the accounting firm that last prepared your tax

4  return Acuity?

5  A     That is correct.

6  Q     They're located in Lancaster?

7  A     That is correct.

8           MS. PLACONA:  Pennsylvania, correct?

9           MR. WEIS:  Correct.

10          I have nothing further.  Thank you.

11          MR. SPONDER:  All right.  Thank you, Mr. Weis.

12          Next up we have Mr. Ciardi.  If you don't mind

13  putting your appearance on the record and ask any questions

14  that you may have.  Thank you.

15          MR. CIARDI:  Thank you.  Albert Ciardi on behalf of

16  Deerfield Capital.

17                          EXAMINATION

18  BY MR. CIARDI:

19  Q    Mr. Heller, could you please get Docket Item 72 in front

20  of you?  Then turn to Page 426.

21  A    Yes.  Sari is pulling it up for me.  Hold on, Mr. Ciardi.

22          MS. PLACONA:  We're here.

23  Q    Okay.  Question 17, you list three accounts -- Truist

24  Citibank and Coinbank  Are those the only accounts that you

25  have had in the last year, Mr. Heller?

```
 1  A    To the best of my knowledge, yes.

 2  Q    Okay.  So, on the financial statement you provided to us

 3  within the last year, you had an account at Merrill Lynch with

 4  $500,000 in it.  Why is that not listed?

 5  A    Because it was owned by the company.

 6  Q    The Merrill Lynch account is owned by the company and not

 7  by you?

 8  A    That is correct.

 9  Q     And which company, sir?

10  A     Heller Capital.

11  Q     Would it surprise you, sir, that you listed it as a

12  securities account owned you individually on your financial

13  statement?

14  A     To the best -- yes, I -- I don't know.

15  Q    Okay.  Charles Schwab isn't listed on this -- your

16  statement of financial affairs.  Can you tell me why that

17  account's not listed, for a million, nine hundred and ten

18  thousand?

19         MS. PLACONA:  Mr. Ciardi, I missed the question.

20  Which account?

21         MR. CIARDI:  Charles Schwab, $1,910,000.  I don't

22  have it as an open account or a closed account, and I want to

23  know why.

24  A    Yeah, it's a -- I don't have my PFS in front of me.  But,

25  Charles Schwab, I believe is a -- was a 401(k) account that
```

Heller - Ciardi                                    87

1  changed providers.

2  Q     And what is it now?

3  A     It would be the Prudential account we spoke of.

4  Q     Okay.  You have Coinbase listed at $1,000 as of the

5  petition date.  But, in a prior financial statement, $295,000

6  was in that account.  Where did that other $294,000 go?

7         MS. PLACONA:  Mr. Ciardi, which personal financial

8  statement are you referencing?  Which year and -- obviously, we

9  don't have it in front of us, so I just want to make sure we're

10 all on the same page.

11        MR. CIARDI:  The one ending 12/31/23 that was

12 provided to my client, not the one that might have been

13 provided to other clients with the same -- other people with

14 the same date, but one that was provided to mine.

15        MS. PLACONA:  Okay.  And so, can -- thank you for

16 that.  Can you now repeat the question for us?

17 Q     Coinbase is listed as you having $295,000.  There's only

18 $1,000 listed on this financial statement.  And the transfer to

19 your son as a gift doesn't account for all of the discrepancy.

20 Where did the rest of the money go?

21 A     The -- as testified earlier, there was a transfer to my

22 son.  And in terms of the additional, I mean, it's -- I don't

23 know other than it is the market, the volatility of the market

24 based on holdings that it had.  So, crypto goes up and down

25 significantly quick and fast as you know.


**WWW.JJCOURT.COM**

1  Q    Okay.  Is Coinbase, the account listed here, the only

2  crypto account that you have had in the last two years?

3  A    To the best of my knowledge, yes.

4         MR. ADAMS:  And now when you say, you keep referring

5  to him personally, not any of the companies or anything, right?

6  Q    We're only referring to Mr. Heller.  This is the only

7  account in which you would have a digital bitcoin or other

8  crypto wallet, is that correct?

9  A    Yeah, the exception to that -- again, I don't think it

10  would be defined as a wallet, but there may have been a couple

11  thousand dollars on a cash account, a Cash App account, that

12  was closed.  But, it would be -- or that I don't have access to

13  anymore and it was closed, I believe.  But, it was a couple

14  thousand dollars.  So, if you would refer to that as a wallet

15  or an account, yes.  That would be the only other holdings.  In

16  terms of a traditional wallet, no.

17  Q    Further on down in this -- your statement of financial --

18  or I'm sorry, your schedules here, you do not list anybody as

19  having owing you money, anybody -- anybody owing you money

20  individually.  So, my question, sir, is in your prior financial

21  statement you listed HWG promissory note, a Written (phonetic)

22  note, a Fry (phonetic) note, and a TD Martin (phonetic) note,

23  combined at $110,000.  Have those notes been paid off or do

24  they still exist?

25  A    That was a decision we came to with counsel.  They are

Case 25-11354-JNP   Doc 694-3   Filed 10/08/25   Entered 10/08/25 16:31:20   Desc
Exhibit in to Deer Trans Script of 34ra   Page 99 of 129

Heller - Ciardi                                    89

1  years old, eight, ten years old, and we felt they were not

2  collectible.

3  Q    Sir, you listed them as their full value of $110,000 in a

4  financial statement less than a year ago.  Whether they're

5  worthless or not, is there a reason you did not include them as

6  somebody owing you money?

7           MR. SODONO:  Mr. Ciardi, he said that he would

8  discuss -- he discussed that with client -- with counsel, and

9  that was a --

10          MR. ADAMS:  You know, you guys are really asking for

11  a legal conclusion, right?

12          MR. SODONO:  Depending on IRS standard or otherwise,

13  case law, what's collectible, what's not collectible.  There's

14  probably 20, 30 different answers depending on the

15  circumstance.

16  Q    Let's make it easier, Mr. Heller.  Has the HWG promissory

17  note been paid off?

18  A    No.

19  Q    The Written note, has that been paid off?

20  A    No.

21  Q    The Fry note?

22  A    No.

23  Q    The TD Martin?  No?

24  A    No.

25  Q    Okay.  So, back up on the same schedule here, you list

1  Heller Capital Group at a fair market value of $160 million as

2  of the date of the petition.  Is that a correct fair market

3  value in your mind?

4  A     That is not what the petition states.  There was a

5  disclosure on the petition stating that as of June 30th, that

6  was a recast and there was also further disclosure that there's

7  a significant downgrade coming to that.  So -- but that's what

8  the petition states.

9  Q     So, you understand, sir, that the petition asks for a

10 valuation as of the date of the petition.  These schedules were

11 to provide that, correct?  Do you understand what you were

12 asked to give when you prepared these schedules?

13 (indiscernible) --

14 A     Again, that was -- that was a -- that was a decision that

15 we came to with counsel.  So, we were in the evaluation phase.

16         MR. ADAMS:  I apologize, Mr. Ciardi.  I just sneezed.

17 I didn't want you to hear it.

18 Q     That's okay.  So, let's be clear.  Do you, sitting here

19 today, believe that Heller Capital has a fair market value of

20 $160 million?

21         MR. SODONO:  As of today or when, what point?

22 Q     As of the petition date, the date the schedules are

23 prepared, as of?

24 A     I do not believe that it is.

25 Q     Do you believe --

1  A    Sitting here today.

2  Q    -- it is less or more than $160 million?

3  A    Less.  And we have started the process of that with an

4  outside third party financial advisor.

5  Q    So, sir, Heller Capital, are you the -- you're the 99

6  percent owner of Heller Capital, correct?

7  A    That is correct.

8  Q    You are the decision maker of Heller Capital, correct?

9  A    Yeah.  I mean, there's multiple -- was multiple decision

10 makers, yes.

11 Q    Okay.  So, as of today, are there any other employees of

12 Heller Capital?

13 A    Yes.  There is a few as of today.

14 Q    Who are they?

15        MS. PLACONA:  Do you know their names?

16        THE WITNESS:  I mean, yeah, I could -- yeah.  I could

17 define them.

18 Q    What are their names?

19 A    The --

20        MS. PLACONA:  If you know it, you can put -- if you

21 know it, you can tell him who the employees are.

22 A    Yeah.  Rose -- Daryl Heller would be one under a guarantee

23 payment structure.  Rose Cole.  Neal Leininger.  Nate Carvell.

24 I think sitting here today, that's it, I believe.

25 Q    I think you testified that --

Heller - Ciardi                                                    92

1  A    To the best my --

2  Q    -- you get a bi-weekly check from Heller Capital for about

3  $41,000 gross?

4  A    Yeah, no, I did not testify to that.  I testified that the

5  payroll is every two weeks, which would be 26 times a year.

6  And the approximate amount that it comes to on a annual basis,

7  divided by 12, would be the number that was noted.  There is

8  two months out of the year where there's three pays, so it's

9  substantially higher.  On a monthly basis, it's a bit lower,

10 and it averages the numbers we put in there.

11 Q    So, are you going to get a paycheck this Friday or did you

12 get one last Friday?

13 A    I believe pay -- I believe payroll executed last week.

14 Q    So, did you get a check on Friday?

15 A    I did not check my account.  It may have come Thursday.

16 Q    Okay.  And how much was it?

17 A    It was in that seventeen thousand range that's been noted.

18 Q    Okay.  And I note that you don't take taxes out for your

19 payroll.  Why?

20 A    Because I'm a -- it's a guaranteed payment in an LLC, you

21 cannot do it.

22 Q    So, you don't withhold your taxes?

23        MR. SODONO:  I think you're looking for a legal and

24 an accounting decision.

25        MR. CIARDI:  I'm just asking what he does.  He

1  doesn't -- he does or he doesn't.  I'm trying to see if

2  administrative taxes have been accruing since the petition

3  date.

4  A    Yeah.  Again, we'd have to talk to the accounts.  But, at

5  a guaranteed payment level, when you're the owner of an LLC,

6  you can't -- and again, I don't want to go into legal terms,

7  but you can't be -- you can't be an employee.  If you own an

8  LLC, you get a guaranteed payment, and there's certain

9  reparatory things around that.  So, I function as, I believe,

10  every other individual who owns an LLC that works within it

11  would function.  So, I don't think they can do withholdings.

12  There is certain things like benefits, et cetera, that are

13  withheld.

14  Q    Other than those checks from Heller Capital, have you

15  personally received any money since the petition date from any

16  source?

17  A    To the best of my knowledge, no.

18  Q    Sir, does Heller Capital still own AVAIL Technology?

19       MR. SODONO:  Again, we're talking about non-debtor

20  entities, Al.

21       MR. CIARDI:  I'm trying to figure out how much that

22  -- what that $160 million was left in there, Mr. Sodono.

23  Q    Let's start it this way.  What entities, Mr. Heller, does

24  Heller Capital still own that you manage on a day-to-day basis?

25  I can make it clearer.  What do you do when you go to work

1  every day?

2  A     Yeah.  I do not work specifically in any one of those

3  entities, but, you know, have high level responsibility.  Right

4  now in recent months, the vast majority of my responsibility

5  ties to the things we're here about today, legal and otherwise

6  issues.

7  Q     So, what sources of income does Heller Capital have that

8  gives it the ability to pay you $17,000 every two weeks and

9  four other employees every two weeks?

10 A     It's source of income is management fees and interest fees

11 and/or K-1s, K-1 distributions.

12 Q     K-1 isn't a source of cash.  That's a reporting item.  So,

13 let's go over the list.  Mr. Heller, let's go through the list

14 of your companies and you can tell me which one has paid Heller

15 Capital, that is the source of income for your payroll.  Is

16 AVAIL one of those sources?

17        MR. SODONO:  Hey, Al, we'll sit in for an

18 appropriate 2004, if necessary.  We're not going to get into

19 all this.  We'll be here from now 'til doomsday.  He owns about

20 interest in about a hundred companies.  So, we'll sit.  We'll

21 obviously answer to the best of his ability at the appropriate

22 time.

23        MR. CIARDI:  He's going to answer these questions

24 either today or on Wednesday when I put him on the stand.  I

25 think we're (indiscernible) --

1          MS. PLACONA:  Hold on.  Hold on.  Just for

2     clarification.  Coming Wednesday, I think -- again, we

3     discussed he's appearing in court.

4          MR. CIARDI:  Correct.

5          MS. PLACONA:  I'm not suggesting he's getting on the

6     stand.   Well, we can talk offline.

7          MR. SODONO:  Well, he's not going to answer them

8     today.

9   Q    Mr. Heller, there's a company owned by Heller Capital

10    Group called PAAS.  Is that still owned by Heller Capital

11    Group?

12          MR. SODONO:  Again, these are non-debtor companies.

13    So, we'll obviously answer them at the appropriate time, Al.

14          MR. CIARDI:  Okay.

15          MR. SPONDER:  So, Mr. Ciardi, Mr. Ciardi, let me --

16    let me jump in.

17  Q    Mr. Heller --

18          MR. SPONDER:  Mr. Ciardi, let me jump in.  So, for

19    the record, I mean, my understanding is that Heller Capital

20    Group is owned by Mr. Heller.  So, I think these relate to the

21    petition and to this bankruptcy case.  If you're going to not

22    answer these, so be it.  But, I just wanted to set forth for

23    the record that as Mr. Ciardi's going into it, it might be some

24    answers that I'd like to have as well.  So, I just wanted to

25    set that for the record.  Proceed, Mr. Ciardi.

1       MR. CIARDI:  Thank you.

2  Q    I'm going to move to a different topic.  Mr. Heller, do

3  you own or contribute to a seat license for an Eagles football

4  game?

5  A    Yes.

6  Q    Okay.

7  A    I did.  I did.

8  Q    You did?

9  A    Yes.

10 Q    Okay.  And did you contribute to that seat license for

11 when it was purchased?

12 A    Could you repeat the question?  You're saying did I --

13 well, repeat the question.  I want to understand it.

14 Q    Did you contribute money to the purchase of an Eagles seat

15 license for season tickets to Eagles games?

16 A    Personally, I don't think I did.  One of my companies

17 likely did.

18 Q    Okay.  And which one of those companies?  Would that be

19 Heller Capital?

20 A    I don't know.

21 Q    Well, sir, did you go to any Eagles games this year?

22       MR. SODONO:  Again, I'm not going to answer -- not to

23 answer.  Whether he went to a game has nothing to do with any

24 of his assets.

25 Q    Did you pay for tickets to go to any games this year, sir?

1    MR. SODONO:  Pre- or post-petition would -- I mean --

2 (indiscernible) Super Bowl?  I mean it's -- we're in '25.  The

3 Super Bowl may be the only game or maybe a playoff game.  I

4 don't know.

5    MR. CIARDI:  I mean, does he have the ability to

6 answer or do you need to answer, Mr. Sodono?

7    MR. SODONO:  I think I'm qualified to answer it.

8 Q    Sir, are you aware that the operating assets of Heller

9 Investment Holdings has been seized by a receiver?

10 A    I am not.

11 Q    You're not aware of that?

12 A    That Heller Investment Holdings was seized by a receiver?

13 I do not or I'm not --

14 Q    I said the assets.  I said the assets of Heller Investment

15 Holdings, sir.

16    MS. PLACONA:  Al, Al, can you clarify what assets

17 means?  I'm getting some feedback, but can you hear me okay?

18    MR. CIARDI:  Yes.

19 Q    Sir, are you aware that the Glorious Cannabis entity has

20 been seized by a receiver on behalf of Needham Bank?

21    MS. SORVINO:  Al, it's Heidi Sorvino.  This is beyond

22 the scope of the 341.

23    MR. CIARDI:  It is actually not.  He actually

24 testified in response to somebody's question that Heller

25 Investment Holdings was the source of his salary.  So, I'm

Heller - Ciardi                                        98

1  entitled to ask how Heller Investment Holdings is the source of

2  his salary in this -- under -- the assets under receivership.

3          MR. SODONO:  Well, what's that have to do with his

4  salary if it's under receivership?  He's not going to answer

5  that, Al.  We'll answer it at the appropriate time.

6          Somebody -- somebody's got to go on mute.  It sounds

7  like we're in a spaceship.

8          MR. SPONDER:  Agreed.  This is --

9  Q   Mr. Heller, are you aware of an individual known as

10 Quentin Miller?

11 A   Yes.

12 Q   Are you aware of three entities which start with the word

13 DHQM, which either you or an entity in which you may have had

14 an interest, own real estate?

15 A   Yeah.  I mean -- two -- two of them, yes.

16         MS. PLACONA:  Well, clarify which two first.

17         THE WITNESS:  In terms of own real estate?

18         MS. PLACONA:  If you only --

19         MR. SODONO:  Hold on.  Hold on.  The question is,

20 it's two-part.  One, do you own?  The second part is, does some

21 entity own that you're a part of?

22 A   Yeah, no.  I do not personally own --

23         MR. SODONO:  Okay, that's it.

24 A   -- one of my entities --

25         MR. SODONO:  All right.

1  A      -- owns one of them.

2          MR. SODONO:  That's it.

3  Q    Which entity owns one of them, sir?

4          MR. SODONO:  If you know.

5  A    Heller Investment Holdings, I believe.

6  Q    Heller Investment Holdings owns something with DHQM?

7  A    One entity, yes.

8  Q    Now, sir, back to payroll.  Are Rose Cole, Nate -- Mr.

9  Leininger and Nate -- I can't read my handwriting here -- are

10 they still receiving a salary from Heller Capital Group?

11         MR. SODONO:  Again, he (indiscernible).  It's well

12 beyond 341.  This is -- deals with non-debtor entities.  He'll

13 answer at an appropriate time.

14 Q    Mr. Heller, are the books and records of Heller Capital

15 and Heller Investment in your possession?  I don't mean

16 physically, I mean under your control.

17 A    I don't even have access to the accounting software.

18 Q    You don't have access to the accounting software for

19 Heller Capital Holding?

20         MR. SODONO:  He answered.  You just asked and

21 answered that, Al.

22 Q    Okay.  Who does?

23 A    Yeah, I don't know.  There'd be multiple people that would

24 have been involved with it over the years.

25 Q    Well, there's only three people that could be involved

1  with it now, if not you.  Of the three people you identified

2  earlier, who has access to the Heller Capital books and

3  records?

4  A    The accounting and books are being done by an outside

5  entity, which we're working with the examiner on.

6  Q    Who is the outside entity that's doing the books and

7  records of Heller Capital?

8  A    An entity called Luma.

9  Q    And where are they based?

10 A    Central Pennsylvania.  I don't know the exact address.

11 Q    And do they have access to the books and records?

12          MR. SODONO:  Hold on, Al.  He wasn't finished.

13 A    Yeah, I was stating that CohnReznick also had involvement

14 significantly over recent weeks.

15 Q    Sir, do you have -- I know you testified to Mr. Sponder's

16 question that you would be ultimately providing a list, your

17 90-day and one-year transfers to other people.  And I mean you,

18 you as Daryl Heller.  Do you have copies of your bank

19 statements, financial records, for the one year preceding the

20 filing of the bankruptcy?

21 A    I mean, yes, I'm sure they could be accessible.

22 Q    Well, do you have them such that you can provide them to

23 your attorney, that they could then prepare this list of

24 transfers?

25 A    Yes.

1  Q    Have you (indiscernible) --

2          MR. SODONO:  Are you talking about written -- hold

3  on.  Written copy, written state -- I mean, printed statements,

4  online.  I'm not sure.  I just want to make sure we're clear.

5  Q    I want to know what he has provided to enable him to

6  answer the question, what were his transfers in the 90 days and

7  in the one year prior to bankruptcy.  What documents has he

8  provided in the month and a half since he's been in bankruptcy

9  that would allow that question to the statement of financial

10 affairs to be answered?

11 A    Yeah, the accountant that has been retained is working

12 through it, along with legal counsel.

13 Q    So, you provided the accountant -- the accountant all

14 those statements, sir?

15 A    Yes.  I believe they have 12 months worth.

16 Q    So, what is the entity called Apex that was listed in your

17 statement of financial affairs initially as a gift and then

18 removed?  What is it?

19 A    It, as noted earlier, was an administrative error.  We

20 filed this expeditiously within what, 24, 48 hours.

21 Q    Sir, I'm talking about your schedules that were filed on

22 March 24 -- or February 24th.

23 A    Referring to the February 10th filing.

24 Q    Okay.  I'm not -- I'm not referring to the February 10th

25 filing, sir.  I'm asking about a list of gifts that you gave

1 that included an entity called Apex that was filed, I believe,

2 two weeks after your bankruptcy filing.  So, not on an

3 emergency basis.

4          MS. PLACONA:  So, Al, I just want to clarify.  Al, I

5 believe he testified already, correct me if I'm wrong, that it

6 was removed because it was an administrative error.

7 Q    Okay.  Who is Apex?  And why was it an administrative

8 error?

9          MS. PLACONA:  I don't think that's relevant here

10 based on his testimony.  It's no longer part of the filed

11 schedules.

12 Q    Oh, well, let me make it easier.  Does your son, Ethan

13 Heller, own part of Apex, sir?

14 A    (No audible response).

15 Q    And I don't know why we went on mute again.

16          MS. PLACONA:  Well, Al, I'm going to tell you why.

17 First we went on mute because I'm not sure that that's privy to

18 a 341 of a debtor asking about a non-debtor's ownership.  So, I

19 put it on mute.  Thank you.  I'm sorry.  I want clarification

20 --

21 Q    Let me ask it this way and then we'll get there.  Mr.

22 Heller, did you provide $240,000 to a company or entity known

23 as Apex in March of 2024?

24          UNIDENTIFIED SPEAKER:  Personally, Al?

25          MR. CIARDI:  Yes.

1          UNIDENTIFIED SPEAKER:  Personally?

2          MS. PLACONA:  What's the answer?

3    A    No.

4    Q    You did not?

5    A    (No audible response).

6    Q    I just want to be clear --

7    A    No.

8    Q    -- on what the answer is.

9    A    Yeah, no, personally, I did not.

10   Q    Did Heller Capital or Heller Investment provide $240,000

11   to a company known as Apex?

12         MS. SORVINO:  Beyond the scope of the 341.

13         MR. CIARDI:  Ms. Sorvino, do you represent Mr.

14   Heller?

15         MS. SORVINO:  No, I represent Heller Capital Group

16   and Heller Investment Holdings.

17         MR. CIARDI:  Okay.  So, are we saying that your

18   client then made these transfers?

19         MS. SORVINO:  I don't know.  But, you're asking him

20   about what Heller Capital and Heller Investment Holdings did

21   over a year ago, and you don't have any documents in front of

22   him for even to verify that.  And you're asking him to go by

23   memory.  So, yes, (indiscernible) --

24         MR. CIARDI:  No, I'm asking him to look at the first

25   set of statement of financial affairs that he filed, which said

Heller - Ciardi                                                104

1  two hundred and forty thousand to a company called Apex, which

2  is owned by his son.  So, that was either a true statement or a

3  false statement.  And I'm just trying to get to the bottom of

4  it before Wednesday.

5          MS. PLACONA:  Well, hold on.  Get to -- again, get to

6  the bottom of what?  I'm very confused.

7          MR. CIARDI:  Was that a true or false statement in

8  his original statement of financial affairs?

9          MS. PLACONA:  So, again, I'm going to speak to what I

10 said previously.  The amendment stands.  And I'm going to refer

11 you to what's filed on the docket.

12         MR. CIARDI:  I'll ask it Wednesday.  Mr. Sponder,

13 given that debtor's reluctant to answer some questions, I see

14 the floor back to you or whoever's next.

15         MR. SPONDER:  All right.  Thank you.

16         MR. SODONO:  There's no reluctance.  We'll answer

17 them at the appropriate time.  I want to make sure the record's

18 clear.

19         MR. SPONDER:  All right.

20         MR. CIARDI:  Well, this is the creditor's meeting.

21 This is the time for him to be --

22         MR. ADAMS:  That's non-debtors.  It's non-debtors.

23         MR. CIARDI:  -- as he said, transparent.

24         MR. SODONO:  Yep, non-debtors.

25         MR. CIARDI:  Mr. Heller started this off saying he

Heller - Ayling                              105

1   wanted to be transparent, and frankly, this is very opaque and

2   the opposite of transparent.

3            MR. ADAMS:  Well, I got to disagree.  He hasn't taken

4   the Fifth once, I don't think.  So, he's been here, he's

5   answering questions now for a few hours.  So, I think he's as

6   opaque as you can get.

7            MR. SPONDER:  All right.

8            MR. ADAMS:  Now, we could disagree on opaque --

9            MR. CIARDI:  I would agree with that.

10           MR. ADAMS:  -- (indiscernible) with me, but we can

11  disagree on that.  But, he's been here for almost three hours.

12  I don't know how you could say he hasn't cooperated.  That's

13  probably the longest 341 I've been in in, oh, God, I don't know

14  how many years.

15           MR. SPONDER:  Well, gentlemen, I appreciate that.

16           MR. CIARDI:  That's why I turn I turn the floor back

17  to you.

18           MR. SPONDER:  Thank you, Mr. Ciardi.  Thank you, Mr.

19  Sodono.  I appreciate that for the record.  Let's move on.  We

20  have Ruth Ayling.  If you have any questions, and please put

21  your appearance on the record.  Thank you.

22           MS. AYLING:  Hi.  Good afternoon.  This is Ruth

23  Ayling on behalf of the Internal Revenue Service.

24                            EXAMINATION

25  BY MS. AYLING:

1  Q    I'm just wondering.  Are you aware that there has been a

2  secured claim filed by the Internal Revenue Service for the

3  filed return of 2022?

4        MS. PLACONA:  Before Mr. Heller answers, I'll respond

5  that any -- any filed documents that get filed with PACER are

6  part of the claims that we will review when necessary.  Is that

7  what you mean by a filed claim?

8        MS. AYLING:  Yes.  Yeah, we filed our proof of claim.

9  So, that means that Schedule D would have to be amended to

10 include the Internal Revenue Service.

11       MS. PLACONA:  We'll review the claim and make the

12 necessary amendments.

13 Q    Okay.  And I did hear testimony earlier that you're not

14 sure when 2023 and 2024 are to be filed.  I need them as soon

15 as possible to perfect the claim.  So, you can send copies once

16 they are prepared and ready to go.  Send copies to me.  I would

17 prefer them within three weeks if possible.

18 A    Yeah, absolutely.  It's my strong preference to get them

19 filed as well.  And been working on it for months.

20 Q    Okay.  And you're aware that the case can be dismissed if

21 they remain unfiled, right?

22       MS. PLACONA:  We will -- we will have them.  We

23 understand in order to confirm a plan of reorganization, tax

24 returns of a debtor need to be filed.  So, we will work

25 diligently to get those done.

1    MS. AYLING:  Okay.  I think that's it for me right

2  now.  If there's anything else, I'll be in touch, Sari.

3          MS. PLACONA:  Thank you.

4          MR. SPONDER:  All right.  Thank you.

5          MS. AYLING:  Okay.  Thanks.  Have a great day.

6          MR. SPONDER:  Thank you, Ms. Ayling.

7          MS. PLACONA:  You too.

8          MR. SPONDER:  Thank you, Ms. Ayling.  Next, Mr.

9  Dressel, your appearance and if you have any questions, please.

10          MR. DRESSEL:  Yes.  Richard Dressel on behalf of

11  Brett and Gail Levin.  I have no questions at this time.

12          MR. SPONDER:  Thank you, Mr. Dressel.  Next we have

13  Mike -- Mr. Magnoni (phonetic).  If you have any questions, and

14  place your appearance on the record.  Thank you.

15                (No audible response)

16          MR. SPONDER:  All right.  Mr. Magnoni, I'm not sure

17  if you're on mute or if you've already left the call.  I'll

18  wait a couple more seconds and then we'll go on to the next

19  person.

20                (No audible response)

21          MR. SPONDER:  All right.  Not hearing anything, Donna

22  Donaher, if you have any questions and if you want to put your

23  appearance on the record.

24          MS. DONAHER:  Donna Donaher for First National Bank.

25  I have no questions at this time.

 1              MR. SPONDER:  Thank you.  Next we have Mr. Kulback,

 2   if you want to put your name on the -- your appearance on the

 3   record, and if you have any questions.  Thanks.

 4              MR. KULBACK:  Thank you, Mr. Sponder.  Jerry Kulback

 5   of Archer & Greiner for Steward Capital Holdings LP and

 6   Avenaero Holdings LLC.

 7                              EXAMINATION

 8   BY MR. KULBACK:

 9   Q    Mr. Heller, are you familiar with an entity called Golden

10   Gate Investment Company, LLC?

11   A    Yes, I'm aware of it.

12   Q    Is the sole member of Golden Gate Investment Company, LLC

13   Paramount Management Group, LLC?

14   A    I'm not sure.

15   Q    Do you know if the member of Paramount Management Group,

16   LLC is Heller Capital Group, LLC?

17   A    Yes, that's correct.

18   Q    And you are the CEO of Heller Capital Group, LLC, correct?

19   A    That's correct.

20   Q    And you own 99 percent of the membership interest of

21   Heller Capital Group, LLC, correct?

22   A    That's correct.

23   Q    Are you familiar with an entity called Project Catapult,

24   LLC?

25   A    Yes.

1  Q    And (indiscernible) Project Catapult, LLC is Heller

2  Capital Group, LLC, correct?

3  A    To the best of my knowledge, yes.

4  Q    And who at Heller Capital Group, LLC currently manages

5  Project Catapult, LLC?

6  A    Yeah, I -- there's -- I don't know.  There's various

7  people outsourced (indiscernible).

8  Q    Can you explain that further?  Who is it?  Who

9  (indiscernible)?

10         MR. SODONO:  Again, Jerry, respectfully, this is --

11 these are non-debtors.  We'll obviously sit at the appropriate

12 time and go through all of this.

13         MR. KULBACK:  I ask the questions.  If you'd rather

14 not answer those, fine.  But, I am going to ask the questions.

15         MR. SODONO:  Okay.  Thank you.

16 Q    Are you (indiscernible) who is the (indiscernible)?  If

17 your counsel is directing you to not answer, that's fine, but

18 who are the people that outsource the management decision for

19 Project Catapult, LLC?

20         MR. SODONO:  Yeah, I'm going to ask him not to answer

21 that.  But, he'll answer it at the appropriate time.

22         MR. SPONDER:  Yeah, just -- I just want to jump in,

23 Mr. Kulback.  I'm sorry.  Someone is not on mute again.  I'm

24 getting distorted.  I'm not going to have a record.  Please,

25 you know, put yourself on mute so that I can hear everything

1  and then everything can be recorded properly.  Thank you.  Go

2  ahead, Mr. Kulback.

3          MR. KULBACK:  Thank you, Mr. Sponder.

4  Q    Mr. Heller, are you familiar with an entity called

5  TellerCoin (phonetic), LLC?

6  A    Yes.

7  Q    The member of TellerCoin, LLC is Heller Capital Group,

8  LLC, correct?

9  A    One of the members, yes.

10 Q    Okay.  A member, that's correct.  My question was whether

11 there are any member.  How would I go about finding out what

12 assets are owned by Golden Gate Investment Company, LLC?

13         MR. SODONO:  Again, he's not going to answer that.

14 We'll get it at an appropriate time.

15 Q    How would I go about finding out what assets are owned by

16 Project Catapult, LLC?

17         MR. SODONO:  Same answer.

18 Q    Mr. Heller, are you familiar with the term digital coin

19 machine?

20 A    Yes.

21 Q    And can you tell me what your understanding of a digital

22 coin machine is?

23 A    It's a form of a cryptocurrency kiosk.

24 Q    Does Golden Gate Investment Company, LLC own digital coin

25 machines?

Heller - Kulback                                    111

1          MR. SODONO:  Again, it's well beyond, well beyond

2   341.  He'll answer it at the appropriate time.

3   Q    Does Project Catapult, LLC own digital coin machines?

4          MS. PLACONA:  Oh, my God.

5          MR. SODONO:  Yeah, same answer.

6   Q    Does PowerCoin, LLC manage the digital coin machines owned

7   by Golden Gate or by Project Catapult?

8          MR. SODONO:  Same answer.

9   Q    Is there a master list that you are aware of as the CEO of

10  Heller Capital Group, LLC that shows what DCMs, digital coin

11  machines, are owned by which entity, where those digital coin

12  machines are located, and who operates those digital coin

13  machines?

14         MR. SODONO:  Yeah, same answer.

15  Q    Mr. Heller, is there a reason why digital coin machines

16  were pledged to multiple secured creditors -- any digital coin

17  machines?

18         MR. SODONO:  Yeah, same answer.  I don't even know

19  who -- what was pledged to whom and -- so, we'll get -- at the

20  appropriate time, we're more than happy to sit.

21  Q    Sure.  Mr. Heller, before you signed documents on behalf

22  of Heller Capital Group, LLC in its various capacities, did you

23  review those documents generally?

24         MR. SODONO:  Again, non-debtor entities.  Same

25  answer.

1          MR. KULBACK:  I think this goes to direct claims

2   against Mr. Heller and his capacity as signer of documents.

3          MR. SODONO:  Yeah, I don't have anything.  I don't

4   know about them.  I'm not going to have my client answer them

5   unless I've reviewed everything.

6   Q    Mr. Heller, is there a reason that nobody from Heller

7   Capital Group, LLC testified before the U.S. District Court for

8   the Eastern District of Pennsylvania (indiscernible) as

9   collateral agent for Golden Gate Investment Company, LLC?

10         MR. SODONO:  Again, they're all -- this is all non-

11  debtors, so again, same answer.

12         MR. ADAMS:  And, again, Mr. Kulback, we're -- again,

13  we're happy in the right forum to (indiscernible) --

14         MR. KULBACK:  No, understandable.  I'm asking the

15  questions and I understand your position (indiscernible).

16         MR. SODONO:  I know.  I know.  Thank you.

17         MR. KULBACK:  That's all I have now.  I'll reserve my

18  right to (indiscernible).

19         MR. SODONO:  Thanks.  I appreciate it.

20         MR. KULBACK:  At a -- let's say, a more appropriate

21  time.  I'm going to say this is an appropriate time, but I'm

22  not going to debate you on the phone right now as to that.

23  We'll just deal with it, you know, after the court can

24  (indiscernible) --

25         MR. SODONO:  Thank you.  Thank you very much.  I

Heller - Schiffman                    113

1  appreciate that.

2          MR. KULBACK:  Sure.  Thank you.

3          MR. SPONDER:  Thank you, Mr. Kulback.

4          MR. KULBACK:  Mr. Sponder, I see it back to you.

5          MR. SPONDER:  All right.  Thank you, Mr. Kulback.  I

6  appreciate it.  And next, Ms. Schiffman, please, if you can put

7  your appearance for the record and if you have any questions.

8          MS. SCHIFFMAN:  Yes.  Thank you, Mr. Sponder.  This

9  is Kimberly Schiffman of Alston & Bird, LLP on behalf of

10 Silverview Credit Partners.

11                      EXAMINATION

12 BY MS. SCHIFFMAN:

13 Q    Mr. Heller, can you hear me okay?

14 A    I can, yes.

15 Q    Okay, great.  It you can't, just speak up and I'll repeat

16 my question.  Do you have a financial or other interest in

17 Accordo, LP?

18 A    I do not.

19 Q    You do not own a financial interest in Accordo, LP?  Okay.

20 Do you --

21          UNIDENTIFIED SPEAKER:  (indiscernible)

22          MS. SCHIFFMAN:  I'm sorry?

23          MS. PLACONA:  Go ahead, Mr. Heller.  Sorry, there was

24 just feedback here.

25          MR. SODONO:  What's the question?

1        MS. PLACONA:  Does he have an interest in Accordo?

2  Q    Financial or other.

3  A    (No audible response).

4  Q    Hello?

5        MS. PLACONA:  From what period are you referring to,

6  Ms. Schiffman?

7  Q    Sure.  Any period, did you ever --

8        MR. REED:  I'm sorry.  Counsel, Counsel, I'm sorry to

9  interrupt.  This is Tom Reith from Blank Rome.  Why are we

10 going on mute so much?  Is there side conversations between

11 counsel and the witness?

12       MS. SCHIFFMAN:  I think (indiscernible) that question

13 to me.  I'm not (indiscernible) --

14       MS. PLACONA:  No, sir, there's not.  I was typing

15 some notes and I didn't want to be distractive to everyone

16 else, as per the conversation from Mr. Sponder.  So, I'm trying

17 to lessen the feedback.

18       MR. REITH:  Thank you for answering the question.

19       MS. PLACONA:  You're welcome.

20 Q    Okay.  Getting back to Accordo Limited Partnership.  Ms.

21 Plonca (sic), did you ever -- or Mr. Heller, excuse me, did you

22 ever have a financial, own a financial or other interest, in

23 Accordo Limited Partnership?

24 A    I had a one percent interest at one point.

25 Q    Okay.  And at what point was that?

1  A    Yeah, I don't know the exact time periods but in -- yeah,

2  it -- numerous years.

3  Q    Okay.  Did you ever represent the valuation of Accordo in

4  one of the partnerships?

5         MS. PLACONA:  I'm sorry.  Where?  When?  How?  What

6  do you mean represent?  I'm sorry.

7  Q    Sure.  Will you ever disclose -- did you ever disclose the

8  valuation of Accordo Limited Partnership, say from 2021 to

9  current?  Did you ever represent the valuation of that company?

10 A    Yeah, I don't know.

11 Q    Okay.  Understood.  I believe your counsel had stated that

12 you own an interest in a hundred companies or so.  Will you be

13 disclosing that list of companies?

14 A    Yes, it's already disclosed multiple places.  But, I don't

15 -- that's not personal ownership there.  What I own has been

16 disclosed.  The subentities of subentities of subentities,

17 yeah, there is -- there's listings of them and there's been

18 certain disclosures already.

19 Q    Sure.  Can you point me to the (indiscernible) this is?

20 A    Yeah, that would be with legal.

21 Q    And, Ms. Plonca, would you be able to share that list of

22 the entities that Mr. Heller has an interest in?

23 A    It's with legal.  It's with the examiner which started

24 this process.  And it's with CohnReznick.

25         MR. SODONO:  Wait, hold on.  Hold on a second.  I

Heller - Schiffman                                116

1  think the question is -- are you talking about the ownership of

2  the ownership of the ownership of the ownership?  Is that what

3  we're asking?

4          MS. SCHIFFMAN:  If Mr. Heller has a direct or

5  indirect ownership in the hundred or so entities that it was

6  testified that he has an ownership interest in.

7          MR. ADAMS:  I mean, yeah, eventually, we'll certainly

8  do that.

9          MS. SCHIFFMAN:  Okay.  I'm just asking

10  (indiscernible).

11          MR. ADAMS:  Yeah, no, no.  I think Mr. Heller --

12  yeah, I think the, you know, it's one of the things, I believe,

13  the examiners has or will have.  So, yeah, I don't think it'll

14  be that -- all that difficult to get.

15  Q    Okay.  Thank you.  Mr. Heller, do you own an indirect

16  interest or a direct interest in the Blackford entities?  And

17  there are a lot of them, and I'm happy to spell them out one by

18  one if that's (indiscernible) --

19          MR. ADAMS:  Is the question personally or through a

20  business?

21          MS. SCHIFFMAN:  Either directly or -- directly for

22  himself or indirectly through Heller Capital Group or any other

23  entity that he might have an interest in.

24  A    Indirectly, yes.

25  Q    Okay.  When did you acquire an interest in the Blackford

**WWW.JJCOURT.COM**

Heller - Schiffman                          117

1  entities?

2          MR. SODONO:  Oh, he didn't acquire it.  No.  You're

3  talking about indirectly some company?

4          MS. SCHIFFMAN:  Correct.

5          MR. SODONO:  If you know.

6  A    I don't.

7  Q    Okay.  Can you --

8  A    I don't know.

9  Q    -- I'm sorry, Mr. Heller, I interrupted. (indiscernible).

10         MS. PLACONA:  Ms. Schiffman, you're breaking up a

11 little bit for us.

12         MS. SCHIFFMAN:  Is this better?

13         MS. PLACONA:  Yes.  Thank you.

14         MS. SCHIFFMAN:  Yeah, no problem.

15 Q    Mr. Heller, can you explain the ownership structure of the

16 Blackford entities as they relate to you or any company that

17 you own an interest in that indirectly holds an interest in the

18 Blackford entities?

19         MS. PLACONA:  We're going to defer an answer on that

20 the same way we've answered the other questions.  We're happy

21 to deal with a Rule 2004 subpoena.

22         MS. SCHIFFMAN:  Okay.  Bear with me, I'm just looking

23 at my list of questions here.

24         MS. PLACONA:  No problem.

25 Q    Mr. Heller, you did testify to this, but I just -- I want

Case 25-11354-JNP   Doc 696-3   Filed 10/08/25   Entered 10/08/25 16:31:20   Desc
Exhibit to Declaration of Sandra   Page 128 of 129

Heller - Schiffman                                    118

 1  to make sure I understood correctly.  You signed your

 2  bankruptcy schedules and statements under the penalty of

 3  perjury, correct?

 4          MR. SODONO:  That's been asked and answered.  Go

 5  ahead.

 6  Q    On your schedules, E&F specifically, you provided

 7  Silverview holds a non-priority unsecured claim in the amount

 8  of $23 million, is that right?

 9          MR. SODONO:  All right.  Hold on.  Let us get to the

10  schedule.

11          MS. PLACONA:  What document?

12          MS. SCHIFFMAN:  No problem.

13          MR. SODONO:  E&F.

14          MS. PLACONA:  I'm asking her what docket she's

15  looking at.

16          MR. SODONO:  Oh, what docket?  Yeah.

17          MS. SCHIFFMAN:  (indiscernible).  Bear with me.

18          MS. PLACONA:  No problem.

19          MS. SCHIFFMAN:  I believe it is Document Number 59 or

20  (indiscernible).  Docket Number 59.  And if you pull

21  (indiscernible)  it's Page 23 of 53 of the PDF.

22          MS. PLACONA:  Do you have Document 59 in front of

23  you?  Please give us a second.  We put that away.

24          MS. SCHIFFMAN:  No worries.  Take your time.

25          MS. PLACONA:  And what page on 59?

1        MS. SCHIFFMAN:  Sure.  It's PDF, Page 23.

2        MS. PLACONA:  Twenty-three of 53 you're looking for.

3        MR. SODONO:  Here.

4        MS. PLACONA:  Okay, we're back.

5        MR. SODONO:  Yeah, go ahead.

6   Q    Okay.  Sure.  So, I'll just repeat the question.  You

7   provide that Silverview will be a non-priority unsecured claim

8   in the amount of $23 million, is that correct?

9   A    To the best of my knowledge, yes.

10  Q    Okay.  You also provide that the debt is contingent, is

11  that right?

12  A    That's correct.  To the best of my knowledge, it's a -- it

13  was a personal guarantee.

14  Q    Okay.  Thank you.  Thank you.  And then just one -- two

15  more questions in the same vein, or three, rather.  Are you

16  aware that on November 24th of 2024, the Supreme Court of New

17  York granted a judgment against you and the Blackford entities

18  jointly and separately in the amount of upwards of $28 million?

19  A    I don't know.

20  Q    You don't know?  Okay.  Are you aware that on January 14th

21  of this year, 2025, in connection with that decision, that same

22  court awarded attorney fees against you in the sum of $28 --

23  upwards, excuse me, of $28 -- $283,000?

24  A    I don't know.

25  Q    Okay.  So, I'm assuming the answer to the next question is

1  going to be, I don't know, but I will ask it anyway.  Why did

2  you list that amount as contingent?

3  A    That was a decision we came to with counsel on reviewing.

4  Q    Thank you.  And let's see.  Okay.  Mr. Heller, when the

5  Blackford entities entered into that certain loan agreement, I

6  believe it is dated August of 2023 with Silverview, you or

7  Heller Capital Group, on behalf of the Blackford entities,

8  represented and provided material that the Blackford entity

9  owned upwards of 3,000 ATMs.  They believe it's 3,697, is that

10 correct?

11        MR. SODONO:  Again, that's well beyond the scope of a

12 341.  We'll answer at an appropriate time.

13 Q    Okay.  I'm going to ask the questions anyway, but I

14 respect your position.  Does Blackford entity own those ATMs?

15        MR. SODONO:  Again, same answer.

16 Q    Okay.  As of today, how many ATMs do the Blackford

17 entities own?

18        MR. SODONO:  Same answer.

19 Q    Okay.  Has -- have those ATMs been pledged to other

20 parties?

21        MR. SODONO:  Same answer.

22 Q    Do all those ATMs exist?

23        MR. SODONO:  Same answer.

24 Q    Okay.  Are you -- and last question in this line.  Are you

25 aware that 400 of those ATMs begin with the serial number PH?

1  Are you aware of what PH stands for?

2              MR. SODONO:  Same answer.

3              MS. SCHIFFMAN:  Okay.  Thank you, Mr. Sodono.

4  Q    I want to briefly talk about Paramount.  I believe that

5  you disclosed or you testified, excuse me, the ownership

6  structure of Paramount and the (indiscernible), correct?

7              MR. SODONO:  Well, I'd have to -- sorry, a lot of

8  feedback.  Can you just repeat that, please?

9  A    No problem.  Let me ask it a simpler way.  What is the

10 ownership structure of Paramount?  I just want to make sure I

11 understood it correctly.

12             MR. SODONO:  Yeah, same answer.  I don't -- Mr.

13 Sponder, we're dealing with non-debtor entities.  I'm not sure,

14 you know, where we're going with all this.

15             MS. SCHIFFMAN:  Mr. Sodono, I believe he already

16 testified to this.  I'm just asking for clarification.

17             MR. SODONO:  Again, I'm hearing feed -- are you guys

18 -- I don't know.  It could be my old ears, but I'm hearing

19 feedback.  Can you say that again?

20             MS. SCHIFFMAN:  No problem.  I'm hearing a lot of

21 feedback too.  So, this is Kim Schiffman.  I'll ask if somebody

22 is not speaking, to please put their phone on mute.  Okay.  I

23 think that that's better.

24 Q    What is Paramount's ownership structure?

25 A    One of the -- I believe I testified that one of the

Heller - Schiffman                        122

1 members is Heller Capital.

2 Q    Okay.  And how did you come to be involved in Paramount

3 Management?

4         MR. SODONO:  Again, that -- I'm not going to -- not

5 going to answer that.

6         MS. PLACONA:  I don't think he testified that he's

7 involved.  He said Heller Capital, for just clarity.

8         MS. SCHIFFMAN:  Okay.  Thank you, Ms. Palonca (sic).

9 Q    What is the nature, if you know, of Paramount's business?

10        MR. SODONO:  Again, this is all non-debtor questions.

11 We'll answer at the appropriate time.

12 Q    Okay.  Let me just look through my notes.  Okay.  Mr.

13 Heller, are you familiar with an entity by the name of CardNet?

14 A    Yeah, to my -- to my know -- I may have heard of the name,

15 but I don't know what it is or who it is.

16 Q    Okay.  So, do you have an ownership (indiscernible)?

17        MR. SODONO:  Again, hold on.  I'm sorry.  I just --

18 something's going on with the speakers.  Can you say that

19 again?  It's breaking up.

20        MS. SCHIFFMAN:  No worries.  No, no, no, no worries.

21 I hear the feedback too.  Again, if you're not speaking, please

22 put the phone on mute.  Thank you.

23 Q    Mr. Heller, do you have an ownership interest either

24 directly or indirectly in CardNet?

25 A    Yeah, to my knowledge -- to my knowledge, no.  But,

1 there's entities of entities of entities of entities, so, to my

2 knowledge, no.

3          MS. PLACONA:  And again, for clarity, I think first

4 he said yes.  But the answer is no.  I think he's testifying

5 that to his knowledge he does not have an ownership.

6          THE WITNESS:  No, I think -- I believe I said, I've

7 heard of the company.

8          MS. PLACONA:  Okay.

9          THE WITNESS:  But not that I was an owner of or we

10 were owner of.

11          MS. PLACONA:  Okay.

12 Q    Is Heller Capital Group an owner of CardNet?

13 A    I don't know.

14 Q    Okay.  Are you familiar with an entity by the name of

15 PowerQuest?

16 A    Yes.

17 Q    Do you have -- do you or Heller Capital Group have a

18 direct or indirect ownership interest in PowerQuest?

19 A    I do not.

20 Q    And Heller Capital Group?

21          MR. SODONO:  Yeah, it's beyond the scope.

22          MS. SCHIFFMAN:  Okay.  I believe that's it for my

23 questions, and I (indiscernible) reserve the right to ask more

24 pointed questions at the Rule 2004 examination of Mr. Heller.

25 Mr. Heller, thank you for your time.

1          MR. SODONO:  Thank you as well.

2          MS. PLACONA:  Thank you.

3          MR. SPONDER:  All right.  We have a few more.  So,

4   next up is Mr. Clarke, if you have any questions and set your

5   appearance on the record, please.

6          MR. CLARKE:  Sure.  Good afternoon.  Don Clarke,

7   Genova Burns, for GCC Investment Holdings, Grizzly RE, LLC, and

8   NEO Manufacturing, MA, LLC.  We don't have any questions.

9   Thank you.

10         MR. SPONDER:  Thank you, Mr. Clarke.  Next up is Mr.

11  Miceli, if you have any questions and if you want to put your

12  appearance on the record.  Thank you.

13         MR. MICELI:  Sure.  Good afternoon.  This is Marc

14  Miceli.  I represent Steven Mitnick.  I was a court appointed

15  receiver over Golden Gate Investment and Paramount Management

16  in the Eastern District of Pennsylvania, Case -- that's Case

17  Number 24-CV-06257.  I just have a few questions.

18                            EXAMINATION

19  BY MR. MICELI:

20  Q    Mr. Heller, you testified earlier that you were familiar

21  with these digital currency kiosk machines, also known as DCMs,

22  is that correct?

23  A    There was a question asked just a few minutes ago if I

24  know what DCM stands for, and the acronym was given and I said,

25  yes, it was a cryptocurrency kiosk.

Heller - Miceli                                          125

1  Q    Okay.  And is it your understanding -- to your

2  understanding that the lawsuit where Steven Mitnick was

3  appointed receiver, dealt with among others, 584 digital

4  currency kiosk machines?

5           MR. SODONO:  Again, this is beyond the scope.

6           MR. MICELI:  I respect that.  That's okay.  Let me

7  just ask the questions if you don't mind.

8  Q    Mr. Heller, do you know where the 584 DCMs are currently

9  located?

10          MR. SODONO:  That's beyond the scope.

11 Q    Mr. Heller, are the books and records of Golden Gate

12 Investment in your possession?

13          MR. SODONO:  Again, beyond the scope.

14 Q    Same question.  Are the books and records of Paramount,

15 Paramount Management Group, are they in your possession and

16 control?

17          MR. SODONO:  Beyond the scope.

18 Q    Mr. Heller, do you know who has the books and records of

19 either Golden Gate or Paramount?

20          MR. SODONO:  Beyond the scope.

21 Q    Mr. Heller, are you in possession of any documents

22 relating to the DCMs that were discussed just a few minutes

23 ago?

24          MR. SODONO:  Again, beyond the scope.

25 Q    Mr. Heller, I know this was previously asked by Mr. Lemkin

1  at the top of the 341 hearing today.  I just want to have

2  clarification.  Was it your testimony that you don't have a

3  personal interest in an entity called BitStop?

4  A    Personal interest?  Yeah, no.  To my knowledge, no, I do

5  not own anything personally.

6  Q    Okay.  Do you have an ownership interest in BitStop

7  through a company that you may own or control?

8  A    Yeah, I believe I stated Heller Capital, I think, is an

9  entity that would have an ownership of this.

10 Q    Do you know what the interest percentage is?

11 A    I don't know.

12 Q    And do you know any other entity or individual that owns

13 BitStop?

14         MR. ADAMS:  Any -- I think they need a little

15 clarity.  Any entity, I don't know.

16 Q    Well, do you know any -- do you know any other owners that

17 have an interest in BitStop?

18         MR. SODONO:  Again, it's beyond the scope.  He

19 testified he didn't have it, so --

20         MR. MICELI:  Okay.  I think with that, I'll -- I have

21 no more further questions.  I reserve a right to take a 2004

22 subpoena and a 2004 examination at the appropriate time.  And

23 with that, I'll yield -- yield back to Mr. Sponder.  Thank you.

24         MR. SPONDER:  Thank you, Mr. Miceli.  A few more to

25 go.  Ms. Isaacson, if you put your record -- name and

Case 25-11354-JNP   Doc 696-3   Filed 10/08/25   Entered 10/08/25 16:31:20   Desc
Exhibit D to Declaration of Sandra   Page 237 of 992

127

1  appearance on the record and if you have any questions.

2  Thanks.

3       MS. ISAACSON:  Thank you.  Nancy Isaacson, Greenbaum,

4  Rowe, Smith & Davis, for Randall Leaman.  And I don't have any

5  questions at this time.  I reserve my right to take a 2004 exam

6  if necessary.  Thank you.

7       MR. SPONDER:  Thank you, Ms. Isaacson.  Next up is

8  Mr. Umble (phonetic).  If you could put your appearance on the

9  record and if you have any questions.  Thank you.

10                  (No audible response)

11      MR. SPONDER:  All right.  Not hearing Mr. Umble,

12 we'll move on to Mr. Etchenson (phonetic), if you want to put

13 your appearance on the record and any questions you may have.

14      MR. ETCHENSON:  I'm Mr. Etchenson.  I don't have any

15 questions.  No thank you.

16      MR. SPONDER:  Thank you.  And then we have Mr. Reith.

17 If you have any questions and if you want to put your

18 appearance on the record.

19      MR. REITH:  Hello.  Thomas Reith, Blank Rome, on

20 behalf of Needham Bank.  No questions at this time.  Reserving

21 rights.  Thank you.

22      MR. SPONDER:  All right.  Is there anyone that I did

23 not call that may have a question?

24                  (No audible response)

25      MR. SPONDER:  Okay.  All right.  Well, apologies for

128

1  the length of the time, but at least we went through it.

2  Again, this is Jeff Sponder, for the record.  I'm going to --

3  I'm going to end the meeting now.  I wanted to thank everyone

4  for appearing.  I appreciate it.

5          And I think there are some amendments that still need

6  to be filed, especially the amendments with respect to the

7  statement of financial affairs and payments above -- above a

8  certain amount within 90 days and within a year.  So, I'm going

9  to keep the meeting open until such time as those things are

10 filed.  If there are any -- if I have any further questions, we

11 could reconvene.  I'm hoping that we won't have to, that the

12 information is provided.  So, with that, I am going to end the

13 meeting right now, and I want to thank everyone again for

14 appearing.  Thank you.

15         MR. SODONO:  Mr. Sponder, it's Anthony Sodono.

16 Again, I want to thank you and all the parties.  If parties

17 want to serve anything, they can serve our office.  We'll

18 accept service.  And we appreciate everyone's time.  We are

19 here now, three hours and 15 minutes, so it's been kind of a

20 long morning.  But, we appreciate everyone and we'll answer the

21 questions that everyone asked at an appropriate time, so thank

22 you.

23         MR. SPONDER:  All right.  And I'm going to --

24         MS. ARDELEAN:  Ms. Placona?  Ms. Placona?

25         MS. PLACONA:  Hello?

Case 25-11354-JNP    Doc 696-3    Filed 10/08/25    Entered 10/08/25 16:31:20    Desc
Exhibit into Dec Trans v/p/q/34/a    Page 239 of 192

129

1          MR. SPONDER:  Yeah, Ms. Ardelean, just -- Ms.

2  Ardelean, just wait.  Ms. Ardelean, just wait one second.  Let

3  me go off the record and then you can -- you can ask the

4  question, okay?

5          MS. ARDELEAN:  Okay.

6          MR. SPONDER:  All right.  We're going to go off the

7  record.

8          MS. ARGELIAN:  Okay.  Sorry.

9                    *  *  *  *  *

10                **C E R T I F I C A T I O N**

11          We, KELLI PHILBURN, ALYCE H. STINE and KIM WEBER,

12  court approved transcribers, certify that the foregoing is a

13  correct transcript from the official electronic sound recording

14  of the proceedings in the above-entitled matter, and to the

15  best of our ability.

16

17  /s/ Kelli Philburn                /s/ Alyce H. Stine

18  KELLI PHILBURN                    ALYCE H. STINE

19

20  /s/ Kim Weber

21  KIM WEBER

22  J&J COURT TRANSCRIBERS, INC.      DATE:  May 2, 2025

23

24

25